Exhibit 3

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY, | |
| Plaintiff, on behalf of itself and all others similarly situated, | No. 1:16-cv-00259-MMS (Judge Sweeney) |
| vs. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

## <u>DECLARATION OF PROFESSOR CHARLES SILVER</u>

I, Charles Silver, state as follows:

## I.      SUMMARY OF OPINIONS

1.      In view of Class Counsel's extraordinary accomplishment, prevailing market rates for legal services, and the ready availability of other law firms that competed for clients with risk corridor claims, the request for a fee in the amount of 5 percent of the Class's gross recovery is plainly reasonable and should be approved.

## II.     CREDENTIALS

2.      I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media.  I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.  I received tenure in 1991.  Since then, I have been a Visiting Professor at University of Michigan School of Law (twice), the Vanderbilt University Law School, and the Harvard Law School.

3.      I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for

30 years.  I have published over 100 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Declaration.  My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996), the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004), the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, and the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT.

4.     My first publication after joining the Texas Law faculty, an analysis of the restitutionary basis for fee awards in class actions, appeared in 1991.  Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1991).  My most recent publication in the field, an empirical study of fee awards in securities fraud class actions, appeared in the Columbia Law Review nearly twenty-five years later.  Lynn A. Baker, Michael A. Perino, and Charles Silver*, Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUM. L. REV. 1371 (2015) (*Is the Price Right?*).  The CORPORATE PRACTICE COMMENTATOR chose this article as one of the ten best in the field of corporate and securities law in 2016.  The study of attorneys' fees has been a principal focus of my academic career.

5.     I have testified as an expert on attorneys' fees many times.  Judges have cited or relied upon my opinions when awarding fees many class actions, including *In re Enron Corp. Securities, Derivative & "ERISA" Litig*., 586 F. Supp. 2d 732 (S.D. Tex. 2008), *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014), and *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) , all of which settled for amounts exceeding $1 billion.

6.      From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010).  Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

7.      Finally, because I teach and write about both insurance law and health law and policy, I knew about the risk corridor litigation before I was engaged to prepare this Declaration. (In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.)  I also feel comfortable discussing the importance of this litigation and the associated risks.

8.      I have attached a copy of my resume as Exhibit 1 to this declaration.

## III.    DOCUMENTS REVIEWED

9.      In preparing this report, I reviewed the items listed below which, unless noted otherwise, were generated in connection with this case.  I also reviewed other items including, without limitation, cases, studies, and published scholarly works.

- *Health Republic* Complaint (Dkt. 1)

- *Health Republic* Order Granting Motion for Risk Corridors Class Certification and Appointing Class Counsel (Dkt. 30)

- *Health Republic* Order Granting in Part and Denying in Part Motion to Dismiss (Dkt. 31)

- *Health Republic* Approved Class Notice (Dkt. 41-1)

- *Health Republic* Approved Supplemental Class Notice (Dkt. 50-1)

- Exhibit B to May 12, 2020 *Health Republic* Joint Status Report (Dkt. 72-2)

- June 24, 2020 *Health Republic* Order Granting Motion to Include Additional Class Member (Dkt. 75)

- July 23, 2020 *Health Republic* Order Granting Joint Motion to Divide Class into Subclasses and Stipulation for Entry of Partial Judgment as to the Non-Dispute Sublcass (Dkt. 82)

- *Health Republic* Declaration of Stephen A. Swedlow (draft)

- *Common Ground* Order Granting Motion for Risk Corridors Class Certification and Appointing Class Counsel (Dkt. 17)

- *Common Ground* Approved Class Notice (Dkt. 24-1)

- *Common Ground* Second Amended Complaint (Dkt. 59)

- Exhibit B to May 12, 2020 *Common Ground* Joint Status Report (Dkt. 84-2)

- May 27, 2020 *Common Ground* Order Granting Motion to Include Additional Class Members (Dkt. 88)

- June 24, 2020 *Common Ground* Order Granting Motion to Include Additional Class Members (Dkt. 92)

- July 23, 2020 *Common Ground* Order Granting Joint Motion to Divide Class into Subclasses and Stipulation for Entry of Partial Judgment as to the Non-Dispute Sublcass (Dkt. 105)

- Corrected Amicus Brief of Alliance of Community Health Plans in Land of Lincoln Mutual Health Insurance Co. v. United States, Case No. 17-1224, Federal Circuit (Dkt. 85)

- Brief of Amicus Curiae Health Republic Insurance Co. in Land of Lincoln Mutual Health Insurance Co. v. United States, Case No. 17-1224, Federal Circuit (Dkt. 46)

- Brief of Amici Curiae Bundorf et al, in Land of Lincoln Mutual Health Insurance Co. v. United States, Case No. 17-1224, Federal Circuit (Dkt. 182)

- Corrected Brief of Amici Curiae Health Republic Insurance Co. and Common Ground Health Cooperative in in Land of Lincoln Mutual Health Insurance Co. v. United States, Case No. 17-1224, Federal Circuit (Dkt. 184)

- Federal Circuit Opinion, Moda Health Plan v. United States, Case No. 17-1994 (Dkt. 87-1)

- Federal Circuit Order Denying En Banc Rehearing and Dissents from Denial of En Banc Rehearing, Maine Community Health Options v. United States, Moda Health Plan v. United States, Land of Lincoln Mutual Health Insurance Co. v. United States, and Blue Cross and Blue Shield of North Carolina v. United States (Case No. 17-1994, Dkt. 148)

- Brief of Amici Curiae Economists in Support of Petitioners (Certiorari Stage), *Maine Community Health Options v. United States* (S. Ct.)

- Brief of Amici Curiae Economists in Support of Petitioners (Merits Stage), Maine Community Health Options v. United States, Moda Health Plan v. United States, Land of Lincoln Mutual Health Insurance Co. v. United States (S. Ct.)

- Maine Community Health Options v. United States, 590 U.S. ____ (2020)

## IV.   FACTS

10.    The opinions expressed in this Declaration are based upon facts provided by Class Counsel and the foregoing documents.

11.    In brief, in February of 2016, Quinn Emanuel (QE) filed the first lawsuit in the nation—the *Health Republic* class action—seeking relief under the Tucker Act for the federal government's failure to make billions of dollars in risk corridor payments. The complaint, filed in the Court of Federal Claims, sought compensation for risk corridor payments that were due in 2014 and 2015 but not made. QE filed a second complaint—the *Common Ground Healthcare*

*Cooperative* class action—when claims relating to risk corridor payments due in 2016 became ripe.

12.     Other law firms competed with QE for clients and subsequently filed individual complaints on their behalf.  Issuers, all of which are sophisticated clients, therefore had a choice: They could opt into one of QE's class actions or secure representation by another law firm and sue on their own.  The competition was brisk and dozens of issuers hired different firms.  Others, collectively holding about one-third of the value of all risk corridor claims, hired QE by opting in to one or both of the *Health Republic* and *Common Ground* classes.

13.     QE competed with other law firms on price as well.  In return for offering clients individual representation, other law firms reportedly charged contingent fees equal to multiples of the 5 percent requested by QE.  QE, by contrast, informed potential class members that it would charge 5 percent of the class' recovery as fees.  The class-wide notice indicated this amount or less, with the fee being finally fixed by the Court.  Class members thus sorted themselves according to both the type of representation they desired and the price they wanted to pay.

14.     As the lawsuits developed, QE had greater success than its competitors.  In *Health Republic*, the firm defeated the government's motion to dismiss.  By contrast, in the majority of individual cases where the Court of Federal Claims decided a motion to dismiss on the pleadings or a motion for summary judgment, the federal government prevailed.

15.     A consequence of the procedural requirements of a class action such as this (*e.g.*, class certification, notice to the class, an opt-in period), other law firms' cases, rather than QE's plaintiff classes, went up on appeal first.  Even so, the fortunes of the issuers in the *Health Republic* and *Common Ground* classes were at stake because the appeals would make law for everyone.  To protect their interests, QE consulted with counsel for the individual issuers and submitted amicus

briefs in the appeals on behalf of the *Health Republic* and *Common Ground* classes, an issuer industry group, and a consortium of healthcare economists. These efforts bore fruit. Although the Federal Circuit ruled against the individual issuers, Judges Wallach and Newman dissented from the denial of the issuers motion for rehearing *en banc*, thereby improving the odds of Supreme Court review. Their dissent cited the amicus briefs that QE filed for the economists and the *Health Republic* and *Common Ground* classes extensively.

16.     In the Supreme Court, QE again submitted amicus briefs on behalf of the economists at the certiorari and merits stages and, in April of 2020, eight Justices agreed with QE's position. They ruled that the government breached its statutory obligation to make risk corridor payments and that issuers are entitled to recover in the Court of Federal Claims under the Tucker Act.

17.     As if providing the legal theory that this Court and ultimately the Supreme Court endorsed was not enough, QE then secured a stipulated judgments pursuant to which the federal government will pay members of the *Health Republic* and *Common Ground* classes 100 percent of the money they were supposed to receive as risk corridor payments. The total recovery across the two cases will be $3.7 billion--$1.9 billion for the Health Republic Class and $1.8 billion for the Common Ground class. (An additional amount, approximately, $200 million, is still tied up in litigation.) The larger industrywide recovery attributable to QE's legal theory and aggressive litigation efforts will approach $12 billion.

18.     In compensation for its services and in keeping with its communications with the issuers that opted into the classes, QE is asking the Court to award 5 percent of the common fund recoveries in the *Health Republic* and *Common Ground* cases as fees.

## V.    HOW CAN A 5 PERCENT FEE NOT BE REASONABLE?

19.    As a professor, I am accustomed to debating.  Both when teaching students and doing research, my job is to develop sophisticated views, to defend them from objections, and to explain why they are better than differing positions that might be entertained.

20.    When preparing this Declaration, I could not see what there is to debate.  How can Class Counsel's request for a 5 percent contingent fee be anything but reasonable?

- The percentage is far below the rate that prevails in any market sector;

- The percentage is far lower than the fees that sophisticated clients willingly pay in enormous cases;

- The percentage is far below the fees that other law firms demanded to prosecute identical cases individually and that many issuers willingly agreed to pay;

- The class-member issuers, all of which are highly sophisticated, knew that the fee could be up to 5 percent when they opted into the class;

- The prospect of receiving 5 percent of the recovery as fees motivated Class Counsel to do an outstanding job;

- Issuers that opted into the class will recoup 95 percent of their losses after Class Counsel is paid; and

- Even in class actions with billion-dollar recoveries, fee awards below 5 percent are rare.

With so many important considerations weighing in favor of Class Counsel's fee request, what can possibly be said against it?

21.    In my view, the most conclusive point in favor of the reasonableness of the fee is that Class Counsel had to compete for clients with lawyers at other prominent law firms who offered to represent claimants individually.  In the Court of Federal Claims, class actions work on

an opt-in basis: only claimants that express the desire to be included become class members. Consequently, Class Counsel had to convince issuers that class-based representation would serve them better than individual representation. QE did this by competing on quality and price. QE offered class-based representation at the bargain rate of 5 percent while other lawyers are thought to have demanded fees equal to multiples of that rate for individual representation. Because issuers are sophisticated business entities with easy access to legal services, competition enabled them to choose the option that would serve them best. They having done so, there is no reason to reduce QE's fees below the level that class members deemed to be reasonable when they opted in. As the Restatement (Third) of the Law Governing Lawyers observes, "Fees agreed to by clients sophisticated in entering such arrangements (such as a fee contract made by inside legal counsel in behalf of a corporation) should almost invariably be found reasonable." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 34, Cmt *c*.

22.     It may be helpful to consider the reasonableness of QE's fee request from another angle. The *Health Republic* and *Common Ground* classes contain 153 issuers and 130 issuers, respectively. Had QE contracted with each issuer directly, as mass tort lawyers do with personal injury claimants, the reasonableness of a fee equal to 5 percent of each issuer's recovery would be obvious. Here, QE eliminated the need to contract with issuers individually by prosecuting a class suit. But because class actions filed in the Court of Federal Claims work on an opt-in basis, the class action overlay leaves the logic just described unchanged. When sophisticated claimants opt into a class knowing that they will have to pay 5 percent of their recoveries in fees, they should be treated as having agreed to pay that amount.

23.     The fact that the aggregate recovery for both groups combined is approximately $4 billion does not alter this conclusion. The gross recovery per claimant—100 percent of the risk

corridor payments that were due but not made—is exactly what the issuers hoped to secure when they opted into QE's classes. The fact that a lawyer obtained the result that a client wanted provides a reason for enforcing a contract, not for invalidating one. It shows that a contracted-for arrangement worked well. In the private market, clients reward lawyers for winning their cases. They do not punish them by slashing their fees.

24.    The aggregate recovery is the wrong focus, too. Because issuers opted into the classes individually, the relevant question, I believe, is whether they will individually pay reasonable fees if the Court grants QE's request. The answer is plainly that they will. The members of the *Health Republic* class will receive an average gross recovery of about $13.7 million apiece. The members of the *Common Ground* class will receive about $13.8 million apiece. These are numbers that issuers are accustomed to dealing with. They are also numbers on which clients normally pay fees ranging from 33⅓ percent to 40 percent. By comparison, a 5 percent fee is a steal.

25.    A critic might argue that the comparison just made is inappropriate because this was a "straight law" case. If the courts accepted QE's legal theory, the issuers would win; otherwise, they would lose. In cases where fees range from one-third of the recovery upward, by contrast, lawyers have to develop facts and, consequently, face greater costs and risks.

26.    Accepting this point as true for the sake of argument, the first response is that the fee QE requests—5 percent of the recovery—is one-seventh to one-eighth the size of the typical contingent fee. QE thus dealt with the "straight law" nature of the case by cutting its fees drastically.

27.    The second response is that the law firms that competed with QE for clients set their fees at least three times as high. The faced the same "straight law" case that QE did, but

demanded far more.  Presumably, other firms had less confidence in QE's Tucker Act theory, which they adopted, than QE did.  The market thus produced a range of fees that varied with lawyers' perceptions of risk.

## VI.    BACKGROUND ANALYSIS

28.    Having confessed to seeing nothing to argue against, I will now explain why, throughout my academic career, I have urged judges to base fee awards from common funds on the percentages that prevail in the private market for legal services.  Although the view was not widely accepted when I first expressed it, it is now.  Even judges who are not legally bound to base fee awards on market rates want to know what the rates are and give them weight when deciding how much lawyers whose efforts create common funds should be paid.

29.    To appreciate the importance of taking guidance from market rates, I will briefly show that the rates that claimants and lawyers agree to encourage the latter to serve the former well by maximizing their expected net recoveries.

### A.    Fee-Setting Is a Positive-Sum Interaction

30.    Many people think that fee-setting is a zero-sum game in which more for the lawyers means less for the class members.  Because the object of class litigation is to help the victims, they infer that lower fees are always better than higher ones.

31.    In reality, fee-setting is a positive-sum interaction in which higher fees can generate higher recoveries for claimants.  To see why, imagine what would happen if judges set common fund fee awards at 0 percent, the lowest possible level.  Expected recoveries would then be $0 because lawyers cannot afford to litigate class actions on these terms.  From class members' perspective, any fee between 1 percent and 99 percent is better than a 0 percent fee because any positive recovery is better than no recovery.

32.     When regulating fees, then, judges should not seek to set them as close to zero as possible.  They should regulate fees with an eye toward maximizing class members' net expected recoveries—the amounts they take home after paying their attorneys.  Judges should keep in mind, for example, that a claimant who nets $1 million after paying $400,000 in fees is better off than one who nets $500,000 after paying only $100,000.

33.     The Third Circuit stated the point this way: "The goal of appointment [of class counsel] should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, *not to obtain the lowest attorney fee*.  The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee."  *Third Circuit Task Force Report,* 208 F.R.D. 340, 373 (January 15, 2002) (emphasis added).  The Seventh Circuit made a similar point in *In re Synthroid Marketing Litig.*, 264 F.3d 712 (7th Cir. 2001).  It rejected the so-called "mega-fund rule," according to which fees must be capped at low percentages when recoveries are very large, noting that "[p]rivate parties would never contract for such an arrangement" because it would encourage cheap settlements.  *Id*. at 718.

## B.     Market-Based Fees Compensate Lawyers For Incurring Risks

34.     In the market for legal services, claimants negotiate fees when litigation starts, not when it ends.  Upfront, they see the risks that lie ahead and the virtue of paying fees that encourage lawyers to bear them.  As the Seventh Circuit observed,

> The best time to determine [a contingent fee lawyer's] rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees.  They strike their bargains before work begins.

*In re Synthroid Marketing Litigation*, 264 F.3d 712, 724 (7th Cir. 2001).

35.     When awarding fees in class actions, judges should put themselves into class members' shoes and seek to determine how large a fee they would have offered in direct negotiations with their attorneys when litigation began.

36.     The best evidence on which to base an answer is the market rate.  A general insight from the economics of contracts is that parties tend to agree on terms that maximize the amount of wealth available for them to share.  See Alan Schwartz and Robert E. Scott, *Contract Theory and the Limits of Contract Law*, 113 YALE L. J. 541 (2003) ("[P]arties at the negotiation stage prefer to write contracts that maximize total benefits.").  When markets are competitive, as the market for legal services plainly is, clients and lawyers should settle on the lowest percentages that maximize their joint expected return.  This is the percentage that maximizes clients' net expected recoveries.

### C.     Quality of Plaintiffs' Counsel

37.     When considering how much lawyers should be paid, it is also important to remember that the quality of counsel matters greatly.  Lawyers' rates vary with experience, rank, and accomplishment.  For example, it is well known that a select group of attorneys with outstanding reputations command exceedingly high rates, often more than $1,500 per hour.

38.     QE is one of the nation's premier litigation firms, for both plaintiff and defense work.  It served as class counsel in four of the fifty largest antitrust cases that resolved from 2013 through 2018, including the second-largest—the Credit Default Swaps Antitrust Litigation, which settled for $1.86 billion.  University of San Francisco Law School and The Huntington National Bank, *2018 Antitrust Annual Report* (2019).  QE also ranked ninth among all law firms in terms of number of antitrust settlements and third in aggregate settlement amount.  *Id*.  The firm has a thriving patent litigation practice that includes its recent successful representation of Qualcomm in a series of lawsuits against Apple and related companies where more than $8 billion was at

stake, and a separate representation of the California Institute of Technology against Apple and Broadcom that produced a $1.1 billion infringement award. *See Apple, Qualcomm Drop Multibillion-Dollar Licensing War*, Law360.com, Apr. 16, 2019, https://www.law360.com/articles/1150362, and Scott Graham, *Caltech and Quinn Emanuel Score $1.1B Verdict Against Apple, Broadcom*, Law.com/The Recorder, Jan. 29, 2020, https://www.law.com/therecorder/2020/01/29/caltech-and-quinn-emanuel-score-1-1b-verdict-against-apple-broadcom/?slreturn=20200615120403.   Reflecting the firm's overall excellence, Law360 reported that QE ranked among the four law firms most feared by corporate counsel. Aebra Coe, *The 4 Firms That Scare General Counsel The Most*, Law360.com, Sept. 18, 2019, https://www.law360.com/articles/1150362.   I understand that, of those four, QE is actually the "most feared" firm; *i.e.*, it was the firm that scored highest in the survey.

39.     Plainly, the lawyers who practice at QE command hourly rates comparable to those charged by other elite practitioners.  And because they often work on contingency, their nominal rates must be even higher.  Otherwise, their effective rates would fall below the level needed to offset the nonpayment and non-reimbursement risks they incur.

## VII.   FEES PREVAILING IN THE PRIVATE MARKET FOR LEGAL SERVICES

40.     Although only the Seventh Circuit formally requires judges to base fee awards in class actions on  market rates, judges across the country increasingly recognize the superiority of the 'mimic the market' approach.  For example, in *Goldberger v. Integrated Resources, Inc*., 209 F.3d 43 (2d Cir. 2000), the Second Circuit wrote that "market rates, where available, are the ideal proxy for [class action lawyers'] compensation."  *Id*., p. 52 It is hard to do better than "ideal."

41.     Other examples of cases in which market rates were applied include *Guevoura Fund Ltd. v. Sillerman*, No. 1:15-CV-07192-CM, 2019 WL 6889901, at *21 (S.D.N.Y. Dec. 18, 2019); *In re TRS Recovery Servs., Inc. & Telecheck Servs., Inc., Fair Debt Collection Practices*

*Act (FDCPA) Litig.*, No. 2:13-MD-2426-DBH, 2016 WL 543137, at *9 (D. Me. Feb. 10, 2016);

*In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 788 (N.D. Ill. 2015); *In re*

*Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig.*, No. 3:10-CV-30163-MAP, 2014 WL

6968424, at *6 (D. Mass. Dec. 9, 2014); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,

842 F. Supp. 2d 346 (D. Me. 2012); *In re Trans Union Corp. Privacy Litig.*, No. 00 C 4729, 2009

WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009), *order modified and remanded*, 629 F.3d 741 (7th Cir.

2011); and *In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 40 (D.N.H. 2006).

42.     The 'mimic the market' approach is attractive for two reasons.  It reflects the

importance of incentivizing lawyers properly and provides an objective basis on which to decide

how much lawyers will be paid.  The two considerations–incentives and objectivity–are linked.

By taking guidance from the market, judges constrain their discretion and thereby make lawyers'

incentives clearer and more reliable.

### A.     In Contingent Fee Litigation, Percentage-Based Compensation Predominates

43.     When clients hire lawyers to handle lawsuits on straight contingency, the market

sets lawyers' compensation as percentages of claimants' recoveries.  Even sophisticated business

clients with complex, high-dollar legal matters use the percentage approach.

> [T]he contingency fee model covers all sorts of plaintiffs' litigation, including cases
> where sophisticated individual clients have high-stakes, complex claims worth
> hundreds of millions of dollars. . . .  [I]t is essentially unheard of for sophisticated
> lawyers to take on a case of this magnitude and type on any basis other than a
> contingency fee, expressed as a percentage of the relief obtained.

*In re Payment Car Interchange Fee & Merchant Discount Litig.*, 991 F. Supp. 2d 437, 440

(E.D.N.Y. 2014).  *See also Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) (Easterbrook, J.)

(noting the predominance of the percentage method in plaintiff representations and observing that

"[w]hen the 'prevailing' method of compensating lawyers for 'similar services' is the contingent

fee, then the contingent fee *is* the 'market rate'" (emphasis in the original)).

44.    Abundant evidence supports this contention.  When two coauthors and I studied hundreds of settled securities fraud class actions specifically looking for terms included in fee agreements between lawyers and investors seeking to serve as lead plaintiffs, all the agreements we found provided for contingent percentage fees.  *Is the Price Right*, *supra*.  No lead plaintiff agreed to pay its lawyers by the hour; nor did any retain counsel on a lodestar basis.

45.    The finding just described was expected.  Over the course of my academic career, I have studied or participated in hundreds of class actions, many of which were led by sophisticated business clients.  To the best of my recollection, I have encountered only one in which a lead plaintiff paid class counsel out of pocket, and that case is more than 100 years old.  Even wealthy clients that, in theory, might have paid lawyers by the hour used contingent, percentage-based compensation arrangements instead.  Because percentage-based compensation arrangements dominate the market (thereby indicating that the market has determined they are the most efficient way to align attorneys' incentives with their clients' interests), judges should also use them when awarding fees from common funds.

46.    The market also appears to favor fee percentages that are flat or that rise as recoveries increase.  Scales with percentages that decline at the margin are rarely employed.  Professor John C. Coffee, Jr., the country's leading authority on class actions, made this point in a report filed in the antitrust litigation relating to high fructose corn syrup.

> I am aware that "declining" percentage of the recovery fee formulas are used by some public pension funds, serving as lead plaintiffs in the securities class action context.  However, I have never seen such a fee contract used in the antitrust context; nor, in any context, have I seen a large corporation negotiate such a contract (they have instead typically used straight percentage of the recovery formulas).

*Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation*, M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), ¶ 22.  My experience is similar to Professor

Coffee's.  I know of no instance in which a large corporation used a scale of declining percentages when hiring a lawyer or firm to represent only itself.

47.     In view of the rarity with which declining scales are used, the 'mimic the market' approach suggests that flat percentages and scales with percentages that rise at the margin create better incentives.  This is so because flat percentages and rising scales better incentivize plaintiffs' attorneys to extract higher dollars that are harder to obtain.  Flat percentages or percentages that increase with the recovery encourage plaintiffs' attorneys to turn down inadequate settlements.

**B.     Clients Normally Pay Contingent Fees in the Range of 25 Percent to 40 Percent**

48.     Millions of plaintiffs have hired lawyers on contingency to handle cases of diverse types.  Consequently, the market for legal services is a rich source of information about lawyers' fees.  In this section, I survey this evidence.

49.     Before doing so, I wish to note that there is broad agreement that fees ranging from 25 percent to 40 percent prevail in most types of plaintiff representations.  For example, judges have often noted that fees in personal injury cases normally equal or exceed one-third of plaintiffs' recoveries.  *See, e.g.*, *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1382 (N.D. Ga. 2019) ("Plaintiffs request for approval of Class Counsel's 33% fee falls within the range of the private marketplace, where contingency-fee arrangements are often between 30 and 40 percent of any recovery"); *Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 201 (N.D. Ill. 2018) ("a typical contingency agreement in this circuit might range from 33% to 40% of recovery"); *Wolff v. Cash 4 Titles*, No. 03-22778-CIV, 2012 U.S. Dist. LEXIS 153786, 2012 WL 5290155, at *4 (S.D. Fla. Sept. 26, 2012) ("One-third of the recovery is considered standard in a contingency fee agreement."); *Burkholder v. City of Ft. Wayne*, 750 F. Supp. 2d 990, 997 (N.D. Ind. 2010) (observing that "a counsel fee of 33.3% of the common fund 'is comfortably within the range typically charged as a contingency fee by plaintiffs' lawyers' in an FLSA action").

50.     Many judges have also observed that attorneys regularly contract for contingent fees between 30 percent and 40 percent in non-class, commercial cases. See, e.g., *Kapolka v. Anchor Drilling Fluids USA, LLC*, No. 2:18-CV-01007-NR, 2019 WL 5394751, at *10 (W.D. Pa. Oct. 22, 2019); *Lincoln Adventures LLC v. Those Certain Underwriters at Lloyd's, London Members*, No. CV 08-00235 (CCC), 2019 WL 4877563, at *8 (D.N.J. Oct. 3, 2019); *Cook v. Rockwell Int'l Corp.*, No. 90-CV-00181-JLK, 2017 WL 5076498, at *2 (D. Colo. Apr. 28, 2017); and *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. CIV.A. 08-2177 DMC, 2013 WL 5505744, at *32 (D.N.J. Oct. 1, 2013).

51.     The point of surveying the evidence, then, is not to establish something new.  It is to show that, had QE taken these cases on an individual basis, it and its potential clients would have all known that reasonable contingent fees for this case include rates much higher than QE ultimately offered.  Specifically, in cases of diverse types, the market rate for contingent fee lawyers ranges from 25 percent to 40 percent of clients' recoveries.

        1.     Personal Injury Cases

52.     If judges chose to base fee awards in class actions on fees charged in personal injury cases, this Report could be quite short.  The evidence clearly shows that contingent fees normally

range from 25 percent to 40 percent in these cases,[1] are often higher in mass tort contexts,[2] and are higher still in medical malpractice cases, which are exceptionally risky and costly.[3] Lower rates prevail in commercial airplane crash cases, where liability is usually conceded.[4] Fees vary across contexts because cases of different types require lawyers to bear different risks.

---

[1] On fees in personal injury cases, *see* Deborah R. Hensler *et al*., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 135-36 & Table 5.11 (RAND 1991), available at http://www.rand.org/pubs/reports/2006/R3999.pdf (reporting that randomly selected accident victims who hired attorneys on contingency paid median fees of 33 percent and mean fees of 29 percent); Herbert M. Kritzer, *Investing in Contingency Fee Cases*, WISCONSIN LAWYER 11, 12 (August 1997) (reporting that in a sample of 989 plaintiff representations in Wisconsin, slightly more than half of the claimants agreed to pay a one-third contingent fee); Nora Freeman Engstrom, *Sunlight and Settlement Mills*, 86 N.Y.U. L. REV. 805, 846 (2011) (reporting that "every one of the twelve [high volume plaintiffs' firms she] studied charge[d] a tiered contingency fee," with most charging "at least 33%--and perhaps as high as 40%").

[2] On fees in mass tort cases, *see* James S. Kakalik, *et al*., COSTS OF ASBESTOS LITIGATION Table S.2 (RAND 1983) (finding that asbestos claimants whose cases closed before August, 1982, paid legal fees and other litigation **expenses** equal to about 42 percent of their recoveries); James S. Kakalik *et al*., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES xviii Figure S.1 (RAND 1984) (finding that asbestos claimants paid legal fees and expenses equal to 39 percent of their recoveries). For anecdotal reports of fees in mass tort cases, *see In re A.H. Robins Co., Inc.*, 182 B.R. 128, 131 (E.D. Va. 1995) (reporting that thousands of women injured by the Dalkon Shield signed contingent fee arrangements providing for fees between one-quarter and one-half of the recovery, with most charging one-third); Mireya Navarro, *Sept. 11 Workers Agree to Settle Health Lawsuits*, NEW YORK TIMES, November 19, 2010, available at http://www.nytimes.com/2010/11/20/nyregion/20zero.html (reporting that thousands of rescue and clean-up workers who were harmed as a result of the terrorist attacks on September 11, 2001, hired lawyers on terms requiring them to pay one-third of their recoveries); Martha Neil, *Frustration Over Uncontained Gulf Oil Spill – and Tort Claim Contingency Fees of Up to 50 Percent*, ABA JOURNAL (May 24, 2010), available at http://www.abajournal.com/news/article/frustration_over_uncontained_gulf_oil_spill--and_tort_legal_fees_of_up_to_5/ (reporting that thousands of clients with claims against BP arising out of the Deepwater Horizon catastrophe promised to pay contingent fees in the range of 40 percent to 50 percent).

[3] On factors affecting the size of contingent fees charged in medical malpractice cases, *see* ABA/TIPS Task Force on Contingent Fees, Report on Contingent Fees In Medical Malpractice Litigation (September 20, 2004), available at http://apps.americanbar.org/tips/contingent/MedMalReport092004DCW2.pdf.

[4] *See id*., at 27.

2.   Large Commercial Lawsuits

53.   We do not know as much about fees paid in large commercial lawsuits as we might.[5] No publicly available database collects information about this sector of the market, and businesses that sue as plaintiffs rarely reveal their fee agreements.  Consequently, most of what is known is drawn from anecdotal reports.[6]  That said, the evidence available on the use of contingent fees by sophisticated clients shows that marginal percentages tend to be high.

a)   *Patent Cases*

54.   Consider patent infringement representations.  There are many anecdotal reports of high percentages in this area.  The most famous one related to the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry.  NTP, the plaintiff, promised its law firm, Wiley Rein & Fielding ("WRF"), a one-third contingent fee.  When the case settled for $612.5 million, WRF received more than $200 million in fees.  Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03.

---

[5]I have studied the costs insurance companies incur when *defending* liability suits.  *See* Bernard Black, David A. Hyman, Charles Silver and William M. Sage, *Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004*, 10 AM. L, & ECON, REV. 185 (2008).  Unfortunately, this information sheds no light on the amounts that businesses pay when acting as plaintiffs.

[6] Businesses sometimes use hybrid arrangements that combine guaranteed payments with contingent bonuses.  In a recent case against Bank of America, for example, a group of bankruptcy creditors with about $58 million at stake agreed to pay a law firm $1 million upfront and 5 percent of the net recovery.  Petra Pasternak, *It's BIG, You're in Charge! Firm Picked for Pending Case Against BofA, Citi*, CORP. COUNS. (Online) April 9, 2010.  Hybrid arrangements hold few lessons for class actions, however, because lawyers representing plaintiff classes must work on straight contingency.

55.    Another famous case involved the law firm of Dickstein Shapiro, which was reported to be entitled to a fee of $90 million under a *partial* contingent fee agreement[7] after securing a $501 million jury award against Boston Scientific.  Martha Neil, *Dickstein Contingent-Fee Payout Could Be $600K Per Partner*, ABA J. (May 20, 2008).[8]  In yet another instance, the Texas law firm of McKool Smith won a $200 million jury verdict against Microsoft for Toronto-based i4i Inc.  Penalties and interest added $90 million to the total.  The firm's share, under another *partial* contingent fee agreement, was reported to be $60 million, assuming the verdict held up.  Cheryl Hall, *Patents and Patience Pay Off for Dallas Law Firm McKool Smith*, THE DALLAS MORNING NEWS, March 27, 2010.

56.    These reports are typical, not aberrations, as Professor David L. Schwartz found when he interviewed 44 experienced patent lawyers and reviewed 42 contingent fee agreements.

> There are two main ways of setting the fees for the contingent fee lawyer [in patent cases]: a graduated rate and a flat rate.  Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery.  The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates. As the case continued, the lawyer's percentage increased.  Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

---

[7] In a partial contingent fee agreement, the contingent bonus, usually but not necessarily a percentage of the recovery, applies on top of other guaranteed compensation, such as a fixed payment upfront or a discounted hourly rate.  Because guaranteed compensation is unavailable in class actions, partial contingent fee agreements provide no guidance for fee percentages in class actions.

[8] The parties later settled the case for $50 million.  American Lawyer, Interest Award Brings Doctor's Judgment Against Johnson & Johnson to $593 Million In Patent Fight Over Stents, April 01, 2011, http://www.dicksteinshapiro.com/files/News/264f90ee-6c20-49c9-a487-98a0b54 87d82/Presentation/NewsAttachment/af4ec2e6-3255-4a0b-b3d8-996140459f30/American%20 Lawyer_Saffran.pdf.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALA. L. REV. 335, 360 (2012).  In a case like this one that required the lawyers to bear significant litigation expenses with no guarantee of reimbursement a high fixed percentage would apply.[9]

57.    Clearly, in the segment of the market where sophisticated business clients with high-damage claims hire lawyers to litigate patent cases on contingency, successful lawyers earn enormous premiums over their normal hourly rates.  The reason is obvious.  When waging patent cases on contingency, lawyers must incur large risks and high costs, so clients must promise them hefty returns.  Clients still prefer this arrangement to bearing the risks and costs of litigation themselves, so they willingly do.

### b)    Other Large Commercial Cases

58.    Turning from patent lawsuits to business representations more generally, many examples show that compensation tends to be a significant percentage of the recovery.  A famous case from the 1980's involved the Texas law firm of Vinson & Elkins ("V&E").  ETSI Pipeline Project ("EPP") hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline.  Harry Reasoner, then V&E's managing partner, described the financial relationship between EPP and V&E.

---

[9] Professor Schwartz's findings are consistent with reports found in patent blogs, one of which stated as follows.

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not pay any legal fees for the representation.  Instead, the law firm only gets paid from damages obtained in a verdict or settlement.  Typically, the law firm will receive between 33-50% of the recovered damages, depending on several factors – a strictly results-based system.

Matt Cutler, *Contingent Fee Patent Litigation, and Other Options*, PATENT LITIGATION, http://intellectualproperty-rights.com/?page_id=30 (reviewed March 13, 2012).

> The terms of our retention were that our client would pay all out-of-pocket expenses as they were incurred, but all legal fees were contingent upon a successful outcome. We were paid 1/3 of all amounts received by way of settlement or judgment. We litigated the matter for 5 years. At the conclusion, we had settled with all defendants for a total of $634,900,000.00. As a result, a total of $211,633,333.00 was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities Litigation,* MDL No. 551 (D. Ariz., Nov. 30, 1990).

59.     Several things about this example are noteworthy. First, the contingency fraction was one-third of the recovery in a massive case. Second, V&E (unlike QE here) bore no liability for out-of-pocket expenses. Third, the ETSI Pipeline case was enormous, ultimately generating a recovery greater than $600 million and a fee north of $200 million. Fourth, the client was a sophisticated business with access to the best lawyers in the country. No claim of pressure or undue influence by V&E could possibly be made.

60.     The National Credit Union Administration's ("NCUA") experience in litigation against securities underwriters provides a more recent example of contingent-fee terms that were used successfully in large, related litigations. After placing 5 corporate credit unions into liquidation in 2010, the NCUA filed 26 complaints in federal courts in New York, Kansas, and California against 32 Wall Street securities firms and banks. To prosecute the complaints, which centered on sales of investments in faulty residential mortgage-back securities, the NCUA retained two outside law firms, Korein Tillery LLP and Kellogg, Hansen, Todd, Figel, & Frederick PLLC, on a straight contingency basis. The original contract entitled the firms to 25 percent of the recovery, net of expenses. As of June 30, 2017, the lawsuits had generated more than $5.1 billion in recoveries on which the NCUA had paid $1,214,634,208 in fees.[10]

---

[10]The following documents provide information about NCUA's fee arrangement and the recoveries obtained in the litigations: Legal Services Agreement dated Sept. 1, 2009, https://www.ncua.gov/services/Pages/freedom-of-information-act/legal-services-agreement.pdf;

61.     When it retained outside counsel on contingency, NCUA knew that billions of dollars were at stake.  The failed corporate credit unions had sustained $16 billion in losses, and the NCUA's object was to recover as much of that amount as possible.  It also knew that dozens of defendants would be sued and that multiple settlements were possible.  Even so, the NCUA agreed to pay a straight contingent percentage fee in the standard market range on all the recoveries.  It neither reduced the fees that were payable in later settlements in light of fees earned in earlier ones, nor bargained for a percentage that declined as additional dollars flowed in, nor tied the lawyers' compensation to the number of hours they expended.

62.     In *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (D. Md. 2000), the bankruptcy trustee wanted to assert claims against Ernst & Young.  He looked for counsel willing to accept a declining scale of fee percentages, found no takers, and ultimately agreed to pay a law firm a straight 40 percent of the recovery.  Ernst & Young subsequently settled for $185 million, at which point the law firm applied for $71.2 million in fees, 21 times its lodestar.  The bankruptcy judge granted the request, writing: "[v]iewed at the outset of this representation, with special counsel advancing expenses on a contingency basis and facing the uncertainties and risks posed by this representation, the 40% contingent fee was reasonable, necessary, and within a market range." *Id*. at 335.

63.     Again, remarks by commentators indicate that these examples are typical.  In 2011, THE ADVOCATE, a journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial Law Developments and Doctrine."  It included an article on

---

National Credit Union Administration, Legal Recoveries from the Corporate Crisis, https://www.ncua.gov/regulation-supervision/Pages/corporate-system-resolution/legal-recoveries.aspx; Letter from the Office of the Inspector General, National Credit Union Administration to the Hon. Darrell E. Issa, Feb. 6, 2013, https://www.ncua.gov/About/leadership/CO/OIG/Documents/OIG20130206IssaResponse.pdf.

alternative fee arrangements, which reported typical contingent fee rates of 33 percent to 40 percent.

> A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOCATE (TEXAS) 20 (2011).

### c)   Sophisticated Named Plaintiffs in Class Actions

64.     Sophisticated business clients also agree to pay fees in the indicated range when serving as lead plaintiffs in class actions. Here are a few examples.

- In *Payment Card,* 991 F. Supp. 2d a multi-billion-dollar litigation, twelve business clients signed retainer agreements which generally provided that class counsel would receive one-third of the class-wide recovery.[11]

---

[11] Typical language read as follows:

   (a) Fees As Class Counsel

   (1) Fees for the Firm's professional services in the Action as Class Counsel will be on a contingent basis and dependent upon the results obtained. In the event of a settlement or a favorable outcome at or after a trial, the Firm shall seek to recover legal fees equal to one-third of the Value of the Recovery attributable to our representation of the Class from one or more of the defendants. Any amount which is not recovered from the defendant(s) shall be payable on a contingent fee basis as described in paragraph (2) below. The Company agrees to support any request for attorney's fees, costs and disbursements to the court that is in an amount of one-third of the Value of the Recovery or less.

- In *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), which settled in 2013 for relief valued at about $81 million, five sophisticated investors serving as named plaintiffs agreed to pay 35 percent of the gross class-wide recovery as fees, with expenses to be separately reimbursed.  (The 35 percent fee was bargained down after initially being set at over 40 percent.)

- In *San Allen, Inc. v. Buehrer*, Case No. CV-07-644950 (Ohio – Court of Common Pleas), which settled for $420 million, seven businesses serving as named plaintiffs signed retainer contracts in which they agreed to pay 33.3 percent of the gross recovery obtained by settlement as fees, with a bump to 35 percent in the event of an appeal.  Expenses were to be reimbursed separately.

- In *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct.), a RICO class action that produced a $297 million settlement, both of the businesses that served as named plaintiffs were represented by counsel in their fee negotiations and both agreed that the fee award might be as high as 40 percent.

65.    A series of related pharmaceutical antitrust cases provides a particularly compelling example.  The plaintiffs in these cases were 20 or so drug wholesalers who appeared as a class.

---

(2) In the event that the court does not approve the fee requested by the Firm, the Company and the other named plaintiffs agree to pay the difference between the fee awarded by the court and an amount equal to one-third of the Value of the Recovery made on behalf of the named plaintiffs.

(b) Fees Owed If Recovery Is Made Outside Of Class Action.

In the event that The Company makes a recovery outside of the class action (as, for example, if a class is not certified or the Company withdraws as a class representative) the Company agrees to pay a contingent fee equal to one-third of the Value of the Recovery to the Company.

Many were large companies – several were of Fortune 500 size or bigger – and most or all had in-house or personal counsel monitoring the litigations.  The potential damages were enormous.  In one of the cases, *King Drug Company of Florence, Inc. v. Cephalon, Inc*., No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015), the plaintiffs recovered over $500 million.  In the series as a whole, they won more than $2 billion.  In all the cases that produced recoveries, the wholesalers actively supported fee awards in the normal range.  Many submitted declarations or letters urging judges to approve such amounts.  Seeing that these sophisticated clients believed that class counsel should receive market rates despite the number and size of the recoveries, the presiding judges gave their opinions great weight.

66.     The table below identifies the pharmaceutical antitrust cases just discussed that produced "mega-fund" recoveries of $100 million or larger.  As is apparent, the plaintiffs supported fees equal to one-third of the recovery in most of the cases.  Even in the largest settlement, they supported a 27.5 percent fee.

| TABLE 1.  RECOVERIES AND FEE AWARDS IN PAY-FOR-DELAY PHARMACEUTICAL ANTITRUST CASES, SORTED BY SETTLEMENT DATE | | |
|---|---|---|
| **Case** | **Recovery (millions)** | **Fee Award** |
| *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015) | $512 | 27.5% plus expenses |
| *In re Neurontin Antitrust Litig.*, No. 02-1830 (D.N.J. Aug. 6, 2014) | $191 | 33⅓% plus expenses |
| *In re Flonase Antitrust Litig.*, No. 08-cv-3149 (E.D. Pa. June 14, 2013) | $150 | 33⅓% plus expenses |
| *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-340 (D. Del. April 23, 2009) | $250 | 33⅓% plus expenses |
| *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) | $175 | 33⅓% plus expenses |
| *In re Buspirone Antitrust Litig.*, No. 01-CV-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) | $220 | 33⅓% plus expenses |
| *In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D. Mich. Nov. 26, 2002) | $110 | 30% plus expenses |

67.     In sum, when seeking to recover money in risky commercial lawsuits involving large stakes, sophisticated business clients typically pay contingent fees ranging from 25 percent to 40 percent, with fees of 33 percent or more being promised in most cases.

**C.     In The Market For Legal Services, Contingent Fees Always Exceed 5 Percent**

68.     I mentioned above the difficulty I have imagining the grounds on which a 5 percent fee award might be opposed.  That is so partly because higher fee percentages prevail throughout the market for legal services.  The lowest market-based fees I know of are those charged by lawyers who represent plaintiffs in lawsuits brought in the wake of commercial aircraft disasters.  These lawyers often charge fees in the 15-20 percent range because airline companies frequently concede liability, leaving damages as the only issue to be contested.  When airlines combine concessions with early settlement offers, they also limit their fees to the amounts by which they increase clients' recoveries.  See ABA Formal Opinion 94-389, n. 13 (1994) (reporting that "[i]n cases where airline insurers voluntarily . . . [made] an early settlement offer and concede[d] all legal liability, average

contingent fee rates dropped to 17% and were often only charged on a portion of the recovery")

(citing L. Kriendler, *The Letter: It Shouldn't Be Sent*, 12 THE BRIEF 4, 38 (November 1982)).

## VIII.   FEE AWARDS IN COMPARABLE CASES

69.    In my experience, judges want to know how other judges have handled fees in

similar cases.  Being familiar with empirical studies of fee awards in general and with awards

made in cases with recoveries exceeding $100 million—the traditional "mega-fund" threshold—I

can confidently report that Class Counsel's request for a 5 percent fee falls far below the range

that judges typically award.

70.    I start by reviewing several recent studies of fee award practices in general.  In

2010, Professors Theodore Eisenberg and Geoffrey Miller published a study of class actions and

shareholder derivative actions that settled in state and federal courts during the 1993-2002 period.

Theodore Eisenberg and Geoffrey P. Miller, *Attorneys Fees and Expenses in Class Action

Settlements: 1993–2008,* 7 J. OF EMPIRICAL LEGAL STUD. 248 (2010).  Across all of the cases in

their dataset, they found mean and median fee-to-recovery ratios of 0.23 and 0.24, respectively,

meaning that in typically cases judges awarded 23 percent or 24 percent of recoveries as fees.

71.    Joined by a new coauthor, Professors Eisenberg and Miller published a follow up

study that focused on more recent settlements.  Theodore Eisenberg, Geoffrey P. Miller & Roy

Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937 (2017).  The later

study reports mean and median fee percentages of 27 percent and 29 percent, respectively, for all

cases in the authors' dataset.  The updated study also reports average fees of 22.3 percent in the

highest recovery decile, which includes cases with settlements exceeding $67.5 million.

72.    Professor Brian Fitzpatrick's study of federal class actions that resolved in 2006

and 2007 provides additional information on fees.  Brian T. Fitzpatrick, *An Empirical Study of

Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 820 (2010).  He

found that awards ranged from 3 percent to 47 percent, but clustered within the market range.  The figure below displays his results.  *Id.*, at 834, Fig. 4.

*Figure 4:*  The distribution of 2006–2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar cross-check.



73.     Fitzpatrick also found that awards tend to decline as settlement amounts increase. In the highest recovery category, which ran from $72.5 million to $6.6 billion, the mean and median fee awards were 18.4 percent and 19.0 percent, respectively.

74.     Professors Lynn Baker, Michael Perino, and I recently published an empirical study of fee awards in securities fraud class actions in the Columbia Law Review.  Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371 (2015).  Our dataset included "every securities class action filed in every federal district court in which the parties announced a settlement from January 1, 2007 through December 31, 2012," more than 400 in all.  *Id.*, at 1387.

For the dataset as a whole, we found a mean fee award of almost 24 percent and a median award of 25 percent.  *Id*., at 1389, Table 1.

75.    The studies of fee award practices in general all show that an award of 5 percent would be extremely low.  When one focuses more narrowly on mega-fund cases with recoveries of $100 million, this impression remains the same.  There are many mega-fund cases with awards that greatly exceed 5 percent.  For example, in *Cook v. Rockwell Int'l Corp.*, No. 90-CV-00181-JLK, 2017 WL 5076498, at *1 (D. Colo. Apr. 28, 2017), the court awarded 40 percent of a $250 million recovery as fees.  In *Allapattah Servs., Inc. v. Exxon Corp*., 454 F. Supp. 2d 1185, 1241 (S.D. Fla. 2006), the court awarded a 31.3 percent fee on a recovery of $1.075 billion.  Similarly, in *Jaffe v.  Household Int'l*, the court awarded a 24.68% fee on a $1.575 billion settlement.

76.    Having compiled lists of settlements and fee awards over decades, I can confidently attest that there have been more than 100 mega-fund settlements with fee awards exceeding 5 percent.  A table containing a list of them appears in Exhibit 2.  The table is exemplary, not exhaustive.  Because no source collects all class action settlements, there are surely many that I have missed.  The table is not adjusted for inflation, either.  By making older cases with settlements below $100 million larger, an inflation adjustment would increase the size of the table dramatically.

77.    The table lists several cases with billion-dollar recoveries.  It shows, for example, that in *In re Enron Corp. Sec., Derivative & ERISA Litig*., 586 F. Supp. 2d 732 (S.D. Tex. 2008), the court awarded 9.5 percent of a $7.2 billion settlement.  In *In re WorldCom, Inc. Sec. Litig*., No. 02 CIV 3288(DLC), 2004 WL 2591402, at *20-*21 (S.D.N.Y. Nov. 12, 2004) and 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005), the award was 5.5 percent of $6.1 billion.  In *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*., 991 F. Supp. 2d 437 (E.D.N.Y. 2014), class

counsel received 9.6 percent of $5.7 billion.  Altogether, 18 cases with billion-dollar recoveries have awards above 5 percent; in only 3 cases are the awards lower.

## IX.   LODESTAR CROSS-CHECK

78.   When awarding fees as a percentage of the settlement, courts often gauge their reasonableness by performing lodestar cross-checks. These cross-checks employ two components: the lodestar calculation, which multiplies hourly rates by time expended; and an imputed multiplier, which is a factor that brings the lodestar calculation into line with the fee request.  I discuss both quantities here.

### A.   Lodestar Cross-Checks Are Undesirable And Should Not Be Made

79.   Before getting into the particulars of the comparison, I wish to note that I oppose the use of lodestar cross-checks and have argued against them repeatedly and on many grounds. First, class members want their lawyers to maximize the value of their claims.  Other things being equal, lawyers do this by securing recoveries as quickly as possible.  Because lodestar cross-checks assign significant weight to hours worked, they encourage lawyers to refrain from settling until they have run up their billable hours sufficiently to support the fee award they want.  This harms class members by delaying their recoveries and needlessly exposing them to risks.

80.   Second, lodestar cross-checks weaken the connection between fees and recoveries—the connection that lashes class counsel's interests fast to class members' wellbeing—by linking lawyers' fees to hours expended instead of recoveries.  When a lawyer's lodestar justifies a fee of no more than $10 million, an economically rational lawyer will be indifferent between a $50 million recovery and a $100 million settlement.  Either way, the fee is the same.  Class members, by contrast, will prefer the larger settlement and will want their lawyer to secure it.  Employing a lodestar cross-check as a limit on class counsel fees thus creates an obvious misalignment of interests.

81.     Third, the signal sent by the private market is unambiguous: plaintiffs that hire contingent fee lawyers directly never use the lodestar method.  Because market forces pressure lawyers to offer fee arrangements that serve clients well, the natural inference to draw is that lodestar cross-checks cause lawyers to serve clients poorly.  I see no reason for courts to employ a fee formula the market has rejected when assessing the reasonableness of class counsel's fees.

82.     Fourth, the market-based approach that I endorse *is* a cross-check on the reasonableness of class counsel fee requests.  It provides an objective and independent standard on the basis of which an assessment can be made.  This is especially clear in a case like this one where issuers sorted themselves into groups that included companies that opted into one or both of the class actions knowing that the fee would be at most 5 percent and others that agreed to pay multiples of that amount for individual representation .  Unless a cross-check can only be made in lodestar terms, a question of law on which I take no position, I see no obvious reason for a second cross-check to be made, after the Court looks to market rates for similar claims.

### B.     The Requested Hourly Rates Are Reasonable

83.     Turning to the lodestar cross-check itself, Class Counsel requests compensation for its work at a blended rate of approximately $1033 per hour for all attorneys and $325 per hour for paralegals and other supporting employees.  To this point in the litigation, QE's lodestar basis is over $10 million.

84.     Before discussing sources of information that shed light on the reasonableness of the requested blended rate, I note that courts have approved QE's rates in other lawsuits.  U.S. District Court Judge André Birotte Jr. did so in *UM Corp. v. Tsuburaya Productions Co., Ltd.*, where the submitted rates were similar to those requested here.  Order Granting In Part Defendant Tsuburaya Productions Co. Ltd.'s Motion for Attorney's Fees and Full Costs, *UM Corp. v. Tsuburaya Productions Co., Ltd.*, CV 15-03764-AB (AJWx), (C.D. Calif., Aug. 1, 2018).

Likewise, in *Liqwd, Inc. v. L'Oréal USA, Inc*., 2019 WL 6840353 (D. Del.), the court approved hourly rates for QE attorneys ranging from $705 per hour to $1,040 per hour. In these cases and others, experts familiar with the rates charged by lawyers with practices in major metropolitan areas testified that QE's rates were within the prevailing market range.

85.     Additional information about court-approved rates can be found in the fee applications that lawyers submit in bankruptcy proceedings.  Studying them, one learns that many lawyers are compensated at rates higher than those requested here.  For example, in the Sears bankruptcy proceeding, the fee application submitted in 2019 by Weil, Gotshal & Manges LLP, the debtors' attorneys, includes dozens of lawyers whose hourly charges exceed $1,000, with nine lawyers charging $1,500 per hour or more.  Unlike Class Counsel, these lawyers did not work on contingency and did not advance costs.  Even so, the bankruptcy judge approved the fee request in full.

86.     Even higher hourly rates were sought in the Toys R' Us bankruptcy, where Kirkland & Ellis LLP served as debtors' counsel.  There, the highest hourly rate was $1,795, the blended rate for all partners, of which there were dozens, was $1,227, and the blended rate for all timekeepers, including paralegals and support staff, was $901.

87.     The rates sought by the law firm of Davis Polk & Wardwell LLP in the ongoing Purdue Pharma bankruptcy proceeding provide a third anecdotal example.  In late November of 2019, the firm sought rates that included $1,645 per hour for seven partners, $1,445-$1,585 for four more partners, and $1,225 for six lawyers described as being "of counsel."  Davis Polk also sought rates exceeding $1,000 per hour for fifteen associates and rates exceeding $900 per hour for many more.

88.     Looking at bankruptcy cases more broadly, a survey published in 2016 of almost 3,000 fee requests found that, "[i]n major markets, bankruptcy partners make $1,000 an hour or more."  Katelyn Polantz, *In Bankruptcy, Flat is Fine; Median Rates at Large Firms Ran $595 Per Hour*, The National Law Journal, May 16, 2016.

89.     One can also consult surveys of law firms' billing rates, such as those taken by the National Law Journal (NLJ).  The number of firms participating in the NLJ surveys varies from year to year, but always exceeds 100.  The NLJ surveys are often cited to courts as evidence supporting hourly rates in fee applications.  See, e.g., *Parkinson v. Hyundai Motor Am*., 796 F. Supp. 2d 1160, 1172-73 (C.D. Cal. 2010) (admitting into evidence and relying upon expert report by Professor William Rubenstein which was based in part on NLJ surveys).

90.     The NLJ survey for 2014 – now six years old – reported that senior partners at large law firms often charged $1000 per hour or more.  See Karen Sloan, *NLJ Billing Survey: $1,000 Per Hour Isn't Rare Anymore*, The National Law Journal (January 13, 2014).  Reading the text of the article, one learns that "[n]early 20 percent of the firms included in *The National Law Journal*'s annual survey of large law firm billing rates [in 2014] had at least one partner charging more than $1,000 an hour."  A more recent survey showed that lawyers who practice in the Supreme Court routinely charge more than $1,000 per hour too.  *Billing Rates*, The National Law Journal Supreme Court Brief (Online), Sept. 6, 2019.

91.     As explained, Class Counsel are excellent lawyers who should be paid at rates comparable to those charged by other lawyers in the top tier who practice in major metropolitan areas.  For partner-level lawyers who expended 100 hours or more on the litigation, the requested rates range from a high of $1,250 to a low of $870.  For associates who meet the same time threshold, the rates run from $905 to $600.  The two paralegals who spent serious time on the

matter are billed at a blended rate of $328 and $310.  Having considered a variety of sources, it is

my opinion that these requested rates and the requested blended rate of $1033 per hour for all

attorneys and $325 for other staff are in line with the market rate and are therefore reasonable.

      **C.**      **The Court Has Discretion To Approve The Requested Multiplier**

      92.      I turn now to the multiplier portion of the lodestar, which will be in the 18-19 range

if the Court awards 5 percent of the recovery for the Non-Dispute Subclasses in *Health Republic*

and *Common Ground* as fees.

      93.      The best-known feature of multipliers is that they increase sharply as recoveries

become larger.  See Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in*

*Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 966 (2017).[12]

      94.      The practice of increasing multipliers rapidly as recoveries grow larger has solid

grounding in the economics of litigation.  The multiplier is the component of the lodestar-

multiplier method that ties the fee award to the recovery.  Neither lawyers' hourly rates nor the

time they expend does this more than weakly.  Unless the multiplier increases as recoveries grow

larger, lawyers will find it advantageous to settle cheaply because, by doing so, they will not put

their fees at risk—which they do whenever settlement offers are declined.  In other words, the

upside potential of refusing to settle must exceed the downside risk of losing fees, which it will

only do if lodestar multipliers reward lawyers adequately for taking large risks.

      95.      Recognizing the importance of scaling up multipliers, in mega-fund cases judges

regularly approve multipliers that are far above average.  For example, In re *Doral Financial*

*Corp. Secs. Litig.*, No. MDL 1706, ECF No. 107 (S.D.N.Y. July 17, 2007), which settled for $129

---

[12] The dataset assembled by Eisenberg et al. contains few settlements that are enormous.  For
example, the largest decile of cases they report includes all settlements greater than $67.5 million.
*Id.*, Table 13.  Because multipliers increase greatly as recoveries grow, a category that would lump
a $67.6 million settlement together with a $4 billion judgment is likely to hide more than it reveals.

million, the court approved a multiplier of 10.26.  That said, even for a mega-fund case a lodestar

multiplier of 20 is unquestionably high.  The question is whether, in the unique circumstances of

this case, a high-end multiplier is justified.

96.     When considering this question, one must remember that multipliers offset the risk

of losing and going unpaid that lawyers incur when working on contingency.  The size of the

multiplier must therefore relate to the magnitude of the risk.

97.     Although the risk associated with this litigation cannot be quantified precisely, it

was plainly significant.  One indication of this is that three of the four insurers whose cases were

consolidated in the Supreme Court lost in the Court of Federal Claims.  Another is that all four

insurers lost in the Court of Appeals for the Federal Circuit, which also rejected a request for *en

banc* review.  Given the belief, which several prominent commentators have expressed, that the

Federal Circuit tends to favor the government in disputes with contractors,[13] Class Counsel knew

from the outset that odds of losing in the lower courts were substantial.

98.     From the day litigation started, then, Class Counsel must have expected  that relief,

if it came at all, would come from the Supreme Court.  The risk of losing was therefore extremely

high.  The Supreme Court receives 7,000-8,000 applications for review each year and accepts

---

[13]     See, e.g., Steven L. Schooner, A Random Walk: The Federal Circuit's 2010 Government
Contracts Decisions, 60 Am. U. L. Rev. 1067, 1079 (2011) ("as a general rule, the government, as
defendant and litigant, enjoys both deference [in the Federal Circuit] and access to a broad arsenal
of defenses"); W. Stanfield Johnson, The Federal Circuit's Great Dissenter and Her "National
Policy of Fairness to Contractors", 40 Pub. Cont. L.J. 275, 346 (2011) ("[T]he Federal Circuit has
made protection of the public fisc its priority. Plainly, . . . it is no longer considered a priority or
'special responsibility' of the court "'to make government officials accountable to the citizens
whose servants they are' or for the Government 'to render prompt justice against itself.'") (quoting
2 Wilson Cowen et al., The United States Court of Claims: A History (1978) at 170-71; and Ralph
C. Nash, Jr., The Government Contracts Decisions of the Federal Circuit, 78 Geo. Wash. L. Rev.
586, 587 (2010) (observing that the Federal Circuit has "slowly drifted away" from the view that
"[n]othing could be more important than ensuring that the citizens of this country believe that their
federal government treats them fairly.").

about 80 cases.  The base rate odds of having an application granted are therefore abysmally small:

about 1 percent.  A REPORTER'S GUIDE TO APPLICATIONS PENDING BEFORE THE SUPREME COURT

OF THE UNITED STATES (undated), https://www.supremecourt.gov/publicinfo/reportersguide.pdf

(visited July 21, 2020).  When this figure is adjusted for the historical rate at which the Supreme

Court has reversed the federal circuit, the likelihood of winning falls below even this minuscule

level. See Roy E. Hofer, Supreme Court Reversal Rates: Evaluating the Federal Courts of Appeals,

2 Landslide 8, 9 (2010) (finding that, in cases where certiorari was granted, the Supreme Court

reversed the Federal Circuit 83 percent of the time).

      99.     The possibility that a Congress hostile to the Affordable Care Act would take steps

to reduce or eliminate the government's liability must also be considered.  Congress has enacted

laws for the purpose of scuttling meritorious lawsuits before, and in 2016-2017 the Trump

Administration and Congress were aligned in wanting to repeal the ACA and prevent risk corridor

payments from being made.  In fact, Congressman Morgan Griffith (R-VA) introduced a bill that

would have prevented the Justice Department from using the Judgment Fund to satisfy the issuers'

claims.  Press Release, Griffith Introduces Bill to Limit the Use of the Judgement Fund, Nov. 17,

2016, https://morgangriffith.house.gov/news/documentsingle.aspx?DocumentID=398646.

      100.    In sum, this litigation was exceptionally risky *because* it was a straight law case.

The issuers faced an inherently skeptical audience at the highest court they were likely to reach,

the Federal Circuit, and were extremely unlikely to proceed past that point, to the Supreme Court.

And the possibility that a hostile Congress and President would intervene could not be ignored;

indeed, I understand that at least one bill was proposed in Congress during the pendency of these

lawsuits to prevent any risk corridors plaintiff from drawing on the Judgment Fund, if they won.

An informed observer would have said this case was near hopeless.  Litigating was economically

rational only because the enormity of the stakes created the opportunity to collect an exceptional fee. Fortunately, the gamble paid off. Plaintiffs' counsel turned class members' multi-million-dollar write-offs into long-overdue receivables, and all for a requested fee that is far smaller than the rates other lawyers offered for individual cases.

101.    In my experience, judges presiding over class actions seek to award the fees that, in light of the circumstances, adequately compensate lawyers for the risks and costs they incurred, and which properly incentivize future class counsel to seek the best results for class members as possible. A lodestar cross-check can help inform this analysis, but blindly applying it to limit fees when it should instead be used to reward exceptional results is against this shared goal. Although the requested lodestar multiplier is unquestionably high, it is justified in long-shot litigation of this sort, particularly because it reflects a complete win for the class rather than a settlement achieved on the cheap. I therefore believe that a lodestar cross-check confirms that Plaintiffs' Counsel's fee request is reasonable.

## X.    COMPENSATION

102.    I received a flat fee of $17,500 for preparing this report.

## XI.    CONCLUSION

103.    For the reasons set out above, I believe that Class Counsel's request for a fee award equal to 5 percent of the gross recovery is reasonable and should be approved.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.  Executed this 27th day of July, 2020, at Empire, Michigan.

_____
CHARLES SILVER

**EXHIBIT 1: RESUME OF PROFESSOR CHARLES SILVER**

## CHARLES SILVER

School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705
(512) 232-1337 (voice)
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

## ACADEMIC EMPLOYMENTS

School of Law, University of Texas at Austin, 1987-2015
    Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
    W. James Kronzer Chair in Trial & Appellate Advocacy
    Cecil D. Redford Professor
    Robert W. Calvert Faculty Fellow
    Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow
    Assistant Professor

University of Michigan Law School, Fall 2018
    Visiting Professor

Harvard Law School, Fall 2011
    Visiting Professor

Vanderbilt University Law School, Fall 2003
    Visiting Professor

University of Michigan Law School, Fall 2018 & Fall 1994
    Visiting Professor

University of Chicago, 1983-1984
    Managing Editor, *Ethics: A Journal of Social, Political and Legal Philosophy*

## EDUCATION

Yale Law School, JD (1987)
University of Chicago, MA (Political Science) (1981)
University of Florida BA (Political Science) 1979

## PUBLICATIONS
### Special Projects
### Books

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (with Samuel Issacharoff, Reporter, and Robert Klonoff and Richard Nagareda, Associate Reporters) (American Law Institute 2010).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Class Action Litigation," 25 Rev. Litig. 459 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Mass Tort Litigation," 42 Tort Trial & Insurance Practice Law Journal 105 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Medical Malpractice Litigation," 25 Rev. Litig. 459 (2006).

PRACTICAL GUIDE FOR INSURANCE DEFENSE LAWYERS (2002) (with Ellen S. Pryor and Kent D. Syverud, Co-Reporters); published on the IADC website (2003); revised and distributed to all IADC members as a supplement to the Defense Counsel J. (2004).

### BOOKS

MEDICAL MALPRACTICE LITIGATION: HOW IT WORKS, WHAT IT DOES, AND WHY TORT REFORM HASN'T HELPED (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage) (Cato Institute, forthcoming 2019).

OVERCHARGED: WHY AMERICANS PAY TOO MUCH FOR HEALTH CARE (with David A. Hyman) (Cato Institute, 2018).

HEALTH LAW AND ECONOMICS, Vols. I and II (coedited with Ronen Avraham and David A. Hyman) (Edward Elgar 2016).

LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION, (coedited with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley) (Foundation Press, 2nd Ed. 2012) (updated annually through 2018).

PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (with William T. Barker) (LexisNexis 2012) (updated annually through 2017).

### Articles and Book Chapters by Subject Area (* indicates Peer Reviewed)
### Health Care Law & Policy

1.      "There is a Better Way: Give Medicaid Beneficiaries the Money," (with David A. Hyman) (under submission).

2.       "Regulating Pharmaceutical Companies' Financial Largesse," 7:25 Israeli J. Health Policy Res. (2018), https://doi.org/10.1186/s13584-018-0220-5 (with Ronen Avraham).*

3.      "Medical Malpractice Litigation," (with David A. Hyman) OXFORD RESEARCH ENCYCLOPEDIA OF ECONOMICS AND FINANCE (2019), DOI: 10.1093/acrefore/9780190625979.013.365.*

4.      "It Was on Fire When I Lay Down on It: Defensive Medicine, Tort Reform, and Healthcare Spending," (with David A. Hyman) OXFORD HANDBOOK OF AMERICAN HEALTH LAW, I. Glenn Cohen, Allison Hoffman, and William M. Sage, eds. (2017).*

5.      "Compensating Persons Injured by Medical Malpractice and Other Tortious Behavior for Future Medical Expenses Under the Affordable Care Act," (with Maxwell J. Mehlman, Jay Angoff, Patrick A. Malone, and Peter H. Weinberger)25 Annals of Health Law 35 (2016).

6.      "Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," (with David A. Hyman) 63 DePaul L. Rev. 574 (2014) (invited symposium).

7.      "Five Myths of Medical Malpractice," (with David A. Hyman) 143:1 Chest 222-227 (2013).*

8.      "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (with David A. Hyman), 46 New England L. Rev. 101 (2012) (invited symposium).

9.      "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?" (coauthored with David A. Hyman) MEDICAL MALPRACTICE AND COMPENSATION IN GLOBAL PERSPECTIVE (Ken Oliphant & Richard W. Wright, eds. 2013)*; originally published in 87 Chicago-Kent L. Rev. 163 (2012).

10.     "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman).*

11.     "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

12.     "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

13.     "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

14.     "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?" 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

15.     "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

16.     "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

17.     "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).**

## Studies of Medical Malpractice Litigation

18.     "Fictions and Facts: Medical Malpractice Litigation, Physician Supply, and Health Care Spending in Texas Before and After HB 4," 51 Tex. Tech L. Rev. 627 (2019). (with David A. Hyman and Bernard Black) (invited symposium on the 15th anniversary of the enactment of HB4).

19.     "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010," 13 J. Empirical Legal Stud. 183 (2016) (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati).

20.     "Policy Limits, Payouts, and Blood Money: Medical Malpractice Settlements in the Shadow of Insurance," 5 U.C. Irvine L. Rev. 559 (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

21.     "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.**

22.     "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017.**

23.     "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012).**

24.     "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard S. Black and David A. Hyman).**

25.     "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black).**

26.     "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue).**

27.     "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 The Advocate (Texas) 25 (2008) (with Bernard S. Black and David A. Hyman) (invited symposium).

28.     "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 3 Geneva Papers on Risk and Insurance: Issues and Practice 177-192 (2008) (with Bernard S. Black, David A. Hyman, William M. Sage and Kathryn Zeiler).**

29.     "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 J. Legal Stud. S9 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

30.     "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," J. Empirical Legal Stud. 3-68 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

31.     "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard S. Black, David A. Hyman, and William S. Sage).*

## Empirical Studies of the Law Firms and Legal Services

32.     "Screening Plaintiffs and Selecting Defendants in Medical Malpractice Litigation: Evidence from Illinois and Indiana," 15 J. Empirical Legal Stud. 41-79 (2018) (with Mohammad Rahmati, David A. Hyman, Bernard S. Black, and Jing Liu)*

33.     "Medical Malpractice Litigation and the Market for Plaintiff-Side Representation: Evidence from Illinois," 13 J. Empirical Legal Stud. 603-636 (2016) (with David A. Hyman, Mohammad Rahmati, Bernard S. Black).*

34.     "The Economics of Plaintiff-Side Personal Injury Practice," U. Ill. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

35.     "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited symposium).

36.     "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 Amer. Law & Econ. Rev. 185 (2008) (with Bernard S. Black, David A. Hyman, and William M. Sage).*

## Attorneys' Fees – Empirical Studies and Policy Analyses

37.     "The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions," RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION, Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds. (forthcoming 2018).

38.     "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

39.     "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

40.     "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

41.     "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

42.    "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 DePaul L. Rev. 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, Ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

43.    "Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider," 20 The NAPPA Report 7 (Aug. 2006).

44.    "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006).

45.    "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

46.    "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 Tex. Rev. of Litig. 301 (1993).

47.    "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 Tex. L. Rev. 865 (1992).

48.    "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 Cornell L. Rev. 656 (1991).

### Liability Insurance and Insurance Defense Ethics

49.    "Liability Insurance and Patient Safety," 68 DePaul L. Rev. 209 (2019) (with Tom Baker) (symposium issue).

50.    "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," 68 Rutgers U.L. Rev. 83 (2015) (with William T. Barker) (symposium issue).

51.    "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., RESEARCH HANDBOOK IN THE LAW & ECONOMICS OF INSURANCE 438-460 (2015).*

52.    "Insurer Rights to Limit Costs of Independent Counsel," ABA/TIPS Insurance Coverage Litigation Section Newsletter 1 (Aug. 2014) (with William T. Barker).

53.    "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 DePaul L. Rev. 617 (2014) (invited symposium).

54.    "Ethical Obligations of Independent Defense Counsel," 22:4 Insurance Coverage (July-August 2012) (with William T. Barker), available at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

55.    "Settlement at Policy Limits and The Duty to Settle: Evidence from Texas," 8 J. Empirical Leg. Stud. 48-84 (2011) (with Bernard S. Black and David A. Hyman).*

56.   "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 <u>Ariz. L. Rev.</u> 787 (2002) (invited symposium).

57.   "Defense Lawyers' Professional Responsibilities: Part II – Contested Coverage Cases," 15 <u>G'town J. Legal Ethics</u> 29 (2001) (with Ellen S. Pryor).

58.   "Defense Lawyers' Professional Responsibilities: Part I – Excess Exposure Cases," 78 <u>Tex. L. Rev.</u> 599 (2000) (with Ellen S. Pryor).

59.   "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 <u>Conn. Ins. L. J.</u> 205 (1998) (invited symposium).

60.   "The Lost World: Of Politics and Getting the Law Right," 26 <u>Hofstra L. Rev.</u> 773 (1998) (invited symposium).

61.   "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 <u>Fordham L. Rev.</u> 233 (1996) (invited symposium).

62.   "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6 <u>Coverage</u> 47 (1996) (with Michael Sean Quinn).

63.   "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6 <u>Coverage</u> 21 (1996) (with Michael Sean Quinn).

64.   "The Professional Responsibilities of Insurance Defense Lawyers," 45 <u>Duke L. J.</u> 255 (1995) (with Kent D. Syverud); reprinted in IX INS. L. ANTHOL. (1996) and 64 <u>Def. L. J.</u> 1 (Spring 1997).

65.   "Wrong Turns on the Three Way Street: Dispelling Nonsense about Insurance Defense Lawyers," 5-6 <u>Coverage</u> 1 (Nov./Dec.1995) (with Michael Sean Quinn).

66.   "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 <u>Tex. L. Rev.</u> 1203 (1994) (with Ellen Smith Pryor).

67.   "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 <u>Tex. L. Rev.</u> 1583 (1994); reprinted in Practicing Law Institute, INSURANCE LAW: WHAT EVERY LAWYER AND BUSINESSPERSON NEEDS TO KNOW (1998).

68.   "A Missed Misalignment of Interests: A Comment on *Syverud, The Duty to Settle*," 77 <u>Va. L. Rev.</u> 1585 (1991); reprinted in VI INS. L. ANTHOL. 857 (1992).

**Class Actions, Mass Actions, and Multi-District Litigations**

69.    "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation?   A Comment on *Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation*," 5 J. of Tort L. 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

70.    "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. 1985 (2011) (invited symposium).

71.    "The Allocation Problem in Multiple-Claimant Representations," 14 S. Ct. Econ. Rev. 95 (2006) (with Paul Edelman and Richard Nagareda).*

72.    "A Rejoinder to *Lester Brickman, On the Theory Class's Theories of Asbestos Litigation,*" 32 Pepperdine L. Rev. 765 (2005).

73.    "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

74.    "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

75.    "The Aggregate Settlement Rule and Ideals of Client Service," 41 S. Tex. L. Rev. 227 (1999) (with Lynn A. Baker) (invited symposium).

76.    "Representative Lawsuits & Class Actions," in B. Bouckaert & G. De Geest, eds., INT'L ENCY. OF L. & ECON. (1999).*

77.    "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 Va. L. Rev. 1465 (1998) (with Lynn A. Baker) (invited symposium).

78.    "Mass Lawsuits and the Aggregate Settlement Rule," 32 Wake Forest L. Rev. 733 (1997) (with Lynn A. Baker) (invited symposium).

79.    "Comparing Class Actions and Consolidations," 10 Tex. Rev. of Litig. 496 (1991).

80.    "Justice in Settlements," 4 Soc. Phil. & Pol. 102 (1986) (with Jules L. Coleman).*

### General Legal Ethics and Civil Litigation

81.    "A Private Law Defense of Zealous Representation" (in progress), available at http://ssrn.com/abstract=2728326.

82.    "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

83.    "Fiduciaries and Fees," 79 Fordham L. Rev. 1833 (2011) (with Lynn A. Baker) (invited symposium).

84.    "Ethics and Innovation," 79 George Washington L. Rev. 754 (2011) (invited symposium).

85.    "In Texas, Life is Cheap," 59 Vanderbilt L. Rev. 1875 (2006) (with Frank Cross) (invited symposium).

86.   "Introduction: Civil Justice Fact and Fiction," 80 <u>Tex. L. Rev.</u> 1537 (2002) (with Lynn A. Baker).

87.   "Does Civil Justice Cost Too Much?" 80 <u>Tex. L. Rev.</u> 2073 (2002).

88.   "A Critique of *Burrow v. Arce*," 26 <u>Wm. & Mary Envir. L. & Policy Rev.</u> 323 (2001) (invited symposium).

89.   "What's Not To Like About Being A Lawyer?" 109 <u>Yale L. J.</u> 1443 (2000) (with Frank B. Cross) (review essay).

90.   "Preliminary Thoughts on the Economics of Witness Preparation," 30 <u>Tex. Tech L. Rev.</u> 1383 (1999) (invited symposium).

91.   "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 <u>G'town J. Legal Ethics</u> 959 (1998) (with David A. Hyman) (invited symposium).

92.   "Bargaining Impediments and Settlement Behavior," in D.A. Anderson, ed., DISPUTE RESOLUTION: BRIDGING THE SETTLEMENT GAP (1996) (with Samuel Issacharoff and Kent D. Syverud).

93.   "The Legal Establishment Meets the Republican Revolution," 37 <u>S. Tex. L. Rev.</u> 1247 (1996) (invited symposium).

94.   "Do We Know Enough about Legal Norms?" in D. Braybrooke, ed., SOCIAL RULES: ORIGIN; CHARACTER; LOGIC: CHANGE (1996) (invited contribution).

95.   "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 <u>Law and Contemporary Problems</u> 213 (1995) (with Amon Burton, John S. Dzienkowski, and Sanford Levinson,).

96.   "Thoughts on Procedural Issues in Insurance Litigation," VII INS. L. ANTHOL. (1994).

**Legal and Moral Philosophy**

97.   "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 <u>L. & Phil.</u> 381 (1987).*

98.   "Negative Positivism and the Hard Facts of Life," 68 <u>The Monist</u> 347 (1985).*

99.   "Utilitarian Participation," 23 <u>Soc. Sci. Info.</u> 701 (1984).*

**Practice-Oriented Publications**

100.  "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996).

101. "Getting and Keeping Clients," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

102. "Advertising and Marketing Legal Services," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

103. "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

104. "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 Clearinghouse Rev. 114 (June 1994) (with Stephen Yelenosky).

### Miscellaneous

105. "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 Pop. Res. & Pol. Rev. 255 (1984) (with Robert Y. Shapiro).*

### PERSONAL

Married to Cynthia Eppolito, PA; Daughter, Katherine; Step-son, Mabon.

Consults with attorneys and serves as an expert witness on subjects in his areas of expertise.

First generation of family to attend college.

Exhibit 2

|  | Case Reference | Settlement Amount (in Millions) | Fee % | Case Type |
|---|---|---|---|---|
| 1 | In re Enron Corp. Sec., Derivative & ERISA Litig., 586 F. Supp. 2d 732 (S.D. Tex. 2008) | $7,227.00 | 9.52% | Securities, Derivative and ERISA |
| 2 | In re WorldCom, Inc. Sec. Litig., No. 02 CIV 3288(DLC), 2004 WL 2591402, at *20-*21 (S.D.N.Y. Nov. 12, 2004) and 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) | $6,133.00 | 5.50% | Securities |
| 3 | In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 991 F. Supp. 2d 437 (E.D.N.Y. 2014) | $5,700.00 | 9.56% | Antitrust |
| 4 | In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503 (E.D.N.Y. 2003), aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96 (2d Cir. 2005) | $3,383.40 | 6.50% | Antitrust |
| 5 | In re Tyco Int'l, Ltd. Multidistrict Litig., 535 F. Supp. 2d 249, 274 (D.N.H. 2007) | $3,200.00 | 14.50% | Securities |
| 6 | In re Cendant Corp. Litig., 243 F. Supp. 2d 166 (D.N.J. 2003), aff'd sub nom. In re Cendant Corp. Sec. Litig., 404 F.3d 173 (3d Cir. 2005) | $3,200.00 | 1.70% | Securities |
| 7 | In re Petrobras Securities Litig., No.14-cv-09662, ECF No. 838 (S.D.N.Y. 2018) | $3,000.00 | 6.21% | Securities |
| 8 | In re AOL Time Warner, Inc. Sec., No. 02 CIV. 5575 (SWK), 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) | $2,500.00 | 5.90% | Securities and ERISA |
| 9 | In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig., No. 09-MDL-2058, ECF No. 862 (S.D.N.Y. Apr. 8, 2013) | $2,425.00 | 6.29% | Securities, Derivative and ERISA |
| 10 | In re Credit Default Swaps Antitrust Litig., No. 13MD2476 DLC, ECF No. 554 (S.D.N.Y. April 18, 2016) | $1,864.65 | 13.61% | Antitrust |
| 11 | Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., et al., No. 02 C-5893, Dkt. No. 2265 (N.D. Ill. Nov. 10, 2016) | $1,575.00 | 24.68% | Securities |
| 12 | In re Nortel Networks Corp. Sec. Litig., 539 F.3d 129 (2d Cir. 2008) | $1,138.67 | 3.00% | Securities |

|  | Case Reference | Settlement Amount (in Millions) | Fee % | Case Type |
|---|---|---|---|---|
| 13 | In re Royal Ahold N.V. Sec. & ERISA Litig., 461 F. Supp. 2d 383 (D. Md. 2006) | $1,100.00 | 12.00% | Securities and ERISA |
| 14 | In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827 SI, 2013 WL 1365900, at *20 (N.D. Cal. Apr. 3, 2013) | $1,080.00 | 28.60% | Antitrust |
| 15 | Allapattah Servs., Inc. v. Exxon Corp., 454 F. Supp. 2d 1185, 1241 (S.D. Fla. 2006) | $1,075.00 | 31.33% | Breach of Contract |
| 16 | In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.,MDL No. 1658 (SRC) (D.N.J. Jun. 28, 2016) | $1,062.00 | 20.00% | Securities, Derivative and ERISA |
| 17 | *In re McKesson HBOC, Inc. Sec. Litig.*, No. 99-CV-20743, slip op. at 1 (N.D. Cal. Feb. 24, 2006), ECF No. 1560 (N.D. Cal. Apr. 13, 2007), ; ECF No. 1727 (N.D. Cal. Jan. 18, 2008), ; & ECF No. 1800 (N.D. Cal. Feb. 8, 2013) | $1,052.00 | 7.6%* | Securities |
| 18 | *In re Nortel Networks Corp. Sec. Liti g.*, No. 05-MD-1659 (LAP), ECF No. 77 (S.D.N.Y. Dec. 26, 2006) | $1,043.00 | 8.00% | Securities |
| 19 | In re NASDAQ Mkt.-Makers Antitrust Litig., 187 F.R.D. 465 (S.D.N.Y. 1998) | $1,027.00 | 14.00% | Antitrust |
| 20 | In re Am. Int'l Grp., Inc. Sec. Litig., No. 04 CIV 8141 DAB, 2010 WL 5060697, at *3 (S.D.N.Y. Dec. 2, 2010), aff'd, 452 F. App'x 75 (2d Cir. 2012) | $1,009.50 | 6.00% | Securities |
| 21 | In re UnitedHealth Grp. Inc. PSLRA Litig., 643 F. Supp. 2d 1094 (D. Minn. 2009) | $925.50 | 7.00% | Securities |
| 22 | In re Urethane Antitrust Litig., 2016 WL 4060156, at *8 (D. Kan. July 29, 2016) | $835.00 | 33.33% | Antitrust |
| 23 | Carlson v. Xerox Corp., 355 F. App'x 523 (2d Cir. 2009) | $750.00 | 16.00% | Securities |
| 24 | In re Wachovia Preferred Sec. & Bond/Notes Litig., No. 09 CIV. 6351 RJS, 2012 WL 2589230 (S.D.N.Y. Jan. 3, 2012) | $627.00 | 12.00% | Securities |
| 25 | In re Cardinal Health Inc. Sec. Litigations, 528 F. Supp. 2d 752 (S.D. Ohio 2007) | $600.00 | 18.00% | Securities |
| 26 | Dahl v. Bain Capital Partners, LLC, No. 07-CV-12388, ECF No. 1095 (D.Mass. Feb 2, 2015). | $590.50 | 33.00% | Antitrust |

| | Case Reference | Settlement Amount (in Millions) | Fee % | Case Type |
|---|---|---|---|---|
| 27 | In re Initial Pub. Offering Sec. Litig., 671 F. Supp. 2d 467 (S.D.N.Y. 2009) | $586.00 | 33.33% | Securities |
| 28 | In re: Cathode Ray Tube (CRT) Antitrust Litig., 2016 WL 4126533, at *1 (N.D. Cal. Aug. 3, 2016) | $576.75 | 27.50% | Antitrust |
| 29 | In re Lucent Techs., Inc., Sec. Litig., 327 F. Supp. 2d 426 (D.N.J. 2004) | $517.00 | 17.00% | Securities |
| 30 | In re: Lehman Brothers Securities and ERISA Litigation, No. 09-md-02017, ECF No. 970 (S.D.N.Y. Jun. 29, 2012) | $516.22 | 10.99% | Securities and ERISA |
| 31 | King Drug Co. of Florence v. Cephalon, Inc., Civil Action No. 06-cv-01797-MSP, Dkt. 870 at 8 (E.D. Pa. Oct. 15, 2015) | $512.00 | 27.50% | Antitrust |
| 32 | Maine State Ret. Sys. v. Countrywide Fin. Corp., No. 2:10-CV-00302 MRP, 2013 WL 6577020, at *18 (C.D. Cal. Dec. 5, 2013) | $500.00 | 17.00% | Securities |
| 33 | In re BankAmerica Corp. Sec. Litig., 228 F. Supp. 2d 1061 (E.D. Mo. 2002), aff'd, 350 F.3d 747 (8th Cir. 2003) | $490.00 | 18.00% | Securities |
| 34 | Spartanburg Regional Health Servs. District, Inc. v. Hillenbrand Indus., Inc., No. 03-DV-2141, ECF No. 377  (D.S.C. Aug. 15, 2006) | $489.80 | 25.00% | Antitrust |
| 35 | In re Pfizer, Inc. Securities Litig., No. 04-cv-09866, ECF No. 727 (S.D.N.Y. 2016) | $486.00 | 28.00% | Securities |
| 36 | Hefler v. Wells Fargo & Company et al., No.16-cv-05479, ECF No 254 (N.D.Cal. 2018) | $480.00 | 20.00% | Securities |
| 37 | In re: Schering-Plough Corp/Enhance Securities Litigation, No. 08-CV-00397, ECF No. 439 (D.N.J. Oct. 1, 2013) | $473.00 | 16.92% | Securities |
| 38 | In Re Dynegy Inc. Sec. Litig. No. 02-CV-01571, ECF No. 686 (S.D.Tex. Jul. 7, 2005) | $473.00 | 8.73% | Securities |
| 39 | In Re Raytheon Co. Sec. Litig. No. 99-CV-12142, ECF No. 645 (D.Mass. Dec. 6, 2004) | $460.00 | 9.00% | Securities |

| | **Case Reference** | **Settlement Amount (in Millions)** | **Fee %** | **Case Type** |
|---|---|---|---|---|
| 40 | In Re Waste Mgm't Inc. Sec. Litig. No. 99-CV-02183, ECF No. 248 (S.D.Tex. May 1, 2002) | $457.00 | 12.00% | Securities |
| 41 | In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., No. 03 CIV.5755, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006), aff'd, 272 F. App'x 9 (2d Cir. 2008) | $455.00 | 21.40% | Securities and Derivative |
| 42 | In Re Qwest Commc'ns Int'l Sec. Litig. No. 01-cv-01451, ECF No. 1203 (D.Colo. May 27, 2009) | $445.00 | 15.00% | Securities |
| 43 | In re High-Tech Employee Antitrust Litig., No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) | $415.00 | 9.80% | Antitrust |
| 44 | In re Checking Account Overdraft Litig., 830 F. Supp. 2d 1330, 1358 (S.D. Fla. 2011) | $410.00 | 30.00% | Antitrust |
| 45 | Ohio Public Emps. Ret. Sys. v. Freddie Mac, No. 03 Civ. 4261, 2006 U.S. Dist. LEXIS 98380 (S.D.N.Y. Oct. 26, 2006) | $410.00 | 20.00% | Securities |
| 46 | In Re Marsh & McLennan Co. Inc. Sec. Litig., No. 04-CV-08144, ECF No. 333 (S.D.N.Y. Dec. 23, 2009) | $400.00 | 13.50% | Securities |
| 47 | In re Vitamins Antitrust Litig., No. MDL 1285, 2001 WL 34312839 (D.D.C. July 16, 2001) | $359.00 | 34.00% | Antitrust |
| 48 | In re Cendant Corp. Prides Litig., 51 F.Supp.2d 537 (D.N.J. 1999), vacated and remanded, 243 F.3d 722 (3d Cir. 2001), on remand, No. 98-2819 (D.N.J. June 11, 2002) | $341.50 | 5.70% | Securities |
| 49 | New Jersey Carpenters Health Fund v. Residential Capital LLC, No. 08-cv-8781-HB, ECF No. 353 (S.D.N.Y. July 31, 2015) | $335.00 | 20.75% | Securities |
| 50 | Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp., 318 F.R.D. 19, 28 (S.D.N.Y. 2016) | $335.00 | 12.34% | Securities |
| 51 | In re Rite Aid Corp. Sec. Litig., 269 F. Supp. 2d 603 (E.D.Pa. 2003) and 146 F. Supp. 2d 706 (E.D.Pa. 2001). | $320.00 | 25.00% | Securities |

| | Case Reference | Settlement Amount (in Millions) | Fee % | Case Type |
|---|---|---|---|---|
| 52 | Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc., No. 08-CV-10841-JSR-JLC, 2012 WL 13029280 (S.D.N.Y. May 8, 2012) | $315.00 | 17.00% | Securities |
| 53 | In re Williams Sec. Litig., No. 02-cv-72-SPF, ECF No. 1638 (N.D. Okla. Feb. 12, 2007) | $311.00 | 25.00% | Securities |
| 54 | Sullivan et al. v. Barclays plc et al., No.13-cv-02811, ECF No. 500 (S.D.N.Y. 2019) | $309.00 | 19.00% | Antitrust |
| 55 | In re General Motors Corp. Sec. & Derivative Litig., No. 06-md-1749, ECF No. 139 (E.D. Mich. Jan. 6, 2009) | $303.00 | 15.00% | Securities and Derivative |
| 56 | In re Oxford Health Plans, Inc. Sec. Litig., MDL No. 1222 (CLB), 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) | $300.00 | 28.00% | Securities |
| 57 | In re DaimlerChrysler AG Sec. Litig., No. 00-0993 (KAJ), ECF No. 971 (D. Del. Feb. 5, 2004) | $300.00 | 22.50% | Securities |
| 58 | Sullivan v. DB Investments, Inc., 667 F.3d 273 (3d Cir. 2011) | $295.00 | 25.00% | Antitrust |
| 59 | Wyatt v. El Paso Corp., No. 02-2717, ECF No. 376 (S.D. Tex. Mar. 9, 2007), | $285.00 | 15.30% | Securities |
| 60 | In re Delphi Corp. Sec., Derivative & "ERISA" Litig., 248 F.R.D. 483, 507 (E.D. Mich. 2008) | $284.10 | 18.00% | Securities, Derivative and ERISA |
| 61 | In re Massey Energy Company Securities Litig.., No. 10-cv-00689, ECF No. 203 (S.D.W.Va. 2014) | $265.00 | 12.00% | Securities |
| 62 | In re Tricor Direct Purchaser Antitrust Litig., No. 05-340-SLR, ECF No. 543 (D. Del. 2009) | $250.00 | 33.33% | Antitrust |
| 63 | Christine Asia Co., Ltd. V. Jack Yun Ma, No. 1:15-md-02631  (S.D. N.Y. 2019) | $250.00 | 25.00% | Securities |
| 64 | In re Allergan, Inc. Proxy Violation Securities Litig, No.14-cv-02004, ECF No. 500 (C.D.Cal. 2019) | $250.00 | 21.00% | Securities |

| | Case Reference | Settlement Amount (in Millions) | Fee % | Case Type |
|---|---|---|---|---|
| 65 | In re: Libor-Based Financial Instruments Antitrust Litigation, (Barclays and Citi Settlements) No. 11-md-2262, ECF No. 465 (S.D.N.Y. Aug 14, 2018 ) | $250.00 | 18.50% | Antitrust |
| 66 | In Re Global Crossing Ltd. Sec. Litigation., 225 F.R.D. 436 (D. Md. Nov. 24, 2004) | $245.00 | 15.67% | Securities |
| 67 | In re Comverse Tech., Inc., Sec. Litig., No. 06-1825, 2010 WL 2653354 (E.D.N.Y. June 24, 2010) | $225.00 | 25.00% | Securities |
| 68 | In re Buspirone Antitrust Litig., MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y. Apr. 11, 2003) | $220.00 | 33.33% | Antitrust |
| 69 | In re Genworth Fin. Inc. Sec. Litig., No. 3:14-cv-00682-JRS, 2016 WL 7187290, at *1-*2 (E.D. Va. Sept. 26, 2016) | $219.00 | 28.00% | Securities |
| 70 | Schuh v. HCA Holdings Inc., No. 3:11-cv-01033, ECF No. 563 at 1 (M.D. Tenn. Apr. 14, 2016) | $215.00 | 30.00% | Securities |
| 71 | In re: Merck & Co Inc Vytorin/Zetia Securities Litigation, No. 08-CV-02177, ECF No. 352 (D.N.J. Oct. 1, 2013) | $215.00 | 28.00% | Securities |
| 72 | In re Sears Roebuck and Co. Securities Litigation, No. 02-cv-7527, ECF. No. 289 (N.D. Ill. Jan. 8, 2007) | $215.00 | 14.80% | Securities |
| 73 | In re Wilmington Trust Corporation Securities Litig, No.10-cv-00990, ECF No. 842 (D.Del. 2018) | $210.00 | 28.00% | Securities |
| 74 | In re Salix Pharmaceuticals, Ltd., No. 14-cv-08925, ECF No. 236 (S.D.N.Y. 2017) | $210.00 | 21.24% | Securities |
| 75 | In re Linerboard Antitrust Litig., No. CIV.A. 98-5055, 2004 WL 1221350, at *19 (E.D. Pa. June 2, 2004), amended, No. CIV.A.98-5055, 2004 WL 1240775 (E.D. Pa. June 4, 2004) | $203.00 | 30.00% | Antitrust |
| 76 | Silverman v. Motorola, Inc., No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012), aff'd sub nom. Silverman v. Motorola Sols., Inc., 739 F.3d 956 (7th Cir. 2013) | $200.00 | 27.50% | Securities |

| | Case Reference | Settlement Amount (in Millions) | Fee % | Case Type |
|---|---|---|---|---|
| 77 | In re CMS Energy Sec. Litig., No. 02-cv-72004, ECF No. 476 (E.D. Mich. Sept. 6, 2007) | $200.00 | 22.50% | Securities |
| 78 | In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109 (D.N.J. 2002) | $194.00 | 28.00% | Securities |
| 79 | In re Microstrategy, Inc. Sec. Litig. 172 F Supp. 2d 778 (E.D. Va. 2001) | $192.50 | 18.00% | Securities |
| 80 | In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. 403 (S.D. Tex. 1999) | $190.00 | 25.00% | Antitrust |
| 81 | In re Bristol-Myers Squibb Sec. Litig., No. 06-2964, 2007 WL 2153284 (3d Cir. July 27, 2007) | $185.00 | 19.77% | Securities |
| 82 | In re Bank of New York Mellon Corp. Forex Trans. Litig., 12 MD 2335 (LAK), ECF No. 663 (S.D.N.Y. Dec. 4, 2015) | $180.00 | 25.00% | Securities* |
| 83 | In re Relafen Antitrust Litig., No. 01-12239, ECF No. 297 (D. Mass. Apr. 9, 2004) | $175.00 | 33.00% | Antitrust |
| 84 | In re BP p.l.c. Securities Litig., No. 10-md-02185, ECF No. 1512  (S.D.Tex. 2017) | $175.00 | 11.57% | Securities |
| 85 | In re Cobalt International Energy, Inc. Securities Litig, No. 14-cv-03428, ECF No. 366 (S.D.Tex. 2019) | $173.80 | 25.00% | Securities |
| 86 | In re Schering-Plough Corp. Sec. Litig., No. 01-CV-0829 (KSH/MF), 2009 WL 5218066 (D.N.J. Dec. 31, 2009) | $165.00 | 23.00% | Securities |
| 87 | Alaska Elec. Pension Fund v. Pharmacia Corp., No. 03-1519 (AET), ECF No. 405 (D.N.J. Jan. 30, 2013) | $164.00 | 27.50% | Securities |
| 88 | Standard Iron Works v. Arcelormittal, et al., No. 08-cv-5214, ECF. No. 539 (N.D. Ill. 2014) | $163.90 | 33.00% | Antitrust |
| 89 | In re Titanium Dioxide Antitrust Litig., No. 10-CV-00318 RDB, 2013 WL 6577029 (D. Md. Dec. 13, 2013) | $163.50 | 33.33% | Antitrust |
| 90 | In re Dollar General Corp. Sec. Litig., No. 3:01-0388, ECF No. 209 (M.D. Tenn. May 24, 2002) | $162.00 | 20.90% | Securities |

| | **Case Reference** | **Settlement Amount (in Millions)** | **Fee %** | **Case Type** |
|---|---|---|---|---|
| 91 | City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc. et al., No. 12-cv-05162, ECF No. 458 (W.D.Ark. 2019) | $160.00 | 30.00% | Securities |
| 92 | In re Se. Milk Antitrust Litig., No. 2:07-CV 208, 2013 WL 2155387, at *8 (E.D. Tenn. May 17, 2013) | $158.60 | 33.33% | Antitrust |
| 93 | Velez v. Novartis Pharm. Corp., No. 04 Civ. 09194 (CM), 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) | $152.50 | 25.00% | Gender Discrimination |
| 94 | Cook v. Rockwell Int'l Corp. , No. 90-CV-00181-JLK, 2017 WL 5076498  (D. Colo. Apr. 28, 2017) | $150.00 | 40.00% | Pollution |
| 95 | In re Flonase Antitrust Litig., 951 F. Supp. 2d 739 (E.D. Pa. 2013) | $150.00 | 33.33% | Antitrust |
| 96 | In re Broadcom Corp. Sec. Litig., No. 01-CV-00275, ECF No.686 (C.D. Cal. Sept. 12, 2005) | $150.00 | 25.00% | Securities |
| 97 | Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A., 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (Scheindlin, J.) | $150.00 | 25.00% | Securities |
| 98 | In re JPMorgan Chase & Co. Securities Litigation, No. 12-cv-03852-GBD, ECF No. 211 (S.D.N.Y. May 10, 2016) | $150.00 | 21.00% | Securities |
| 99 | In re Polyurethane Foam Antitrust Litig., No. 1:10 MD 2196, 2015 WL 1639269, at *7 (N.D. Ohio Feb. 26, 2015), appeal dismissed (Dec. 4, 2015) | $147.80 | 30.00% | Antitrust |
| 100 | In re Apollo Grp. Inc. Sec. Litig., No. CV 04-2147-PHX-JAT, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012) | $145.00 | 33.33% | Securities |
| 101 | In re: Informix Corp. Sec. Litig. No 97-CV-1289-CRB, ECF No. 471 (N.D.Cal., Nov 23, 1999) | $142.00 | 30.00% | Securities |
| 102 | In re Barrick Gold Securities Litig., No. 13-cv-03851, ECF No. 194 (S.D.N.Y. 2016) | $140.00 | 18.00% | Securities |
| 103 | Kaplan v. S.A.C. Capital Advisors, L.P. et al., No. 12-cv-09350, ECF No. 388 (S.D.N.Y. 2017) | $135.00 | 20.00% | Securities |

|  | **Case Reference** | **Settlement Amount (in Millions)** | **Fee %** | **Case Type** |
|---|---|---|---|---|
| 104 | In re Computer Assocs. Class Action Sec. Litig., No. 02-CV-1226 (TCP), 2003 WL 25770761 (E.D.N.Y. Dec. 8, 2003) | $133.50 | 25.30% | Securities |
| 105 | In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 246 F.R.D. 156 (S.D.N.Y. 2007) | $133.00 | 24.00% | Securities |
| 106 | In re Doral Financial Corp. Secs. Litig., No. MDL 1706, ECF No. 107 (S.D.N.Y. July 17, 2007) | $129.00 | 15.25% | Securities |
| 107 | In re Plasma-Derivative Protein Therapies Antitrust Litig., No. 09-cv-07666, ECF Nos. 693, 697, 697-1 and 701 (N.D. Ill. 2014) | $128.00 | 33.33% | Antitrust |
| 108 | In re Rite Aid Corp. Sec. Litig., MDL No. 1360, 2005 WL 697461 at *2-3 (E.D. Pa. Mar. 24, 2005) | $126.64 | 25.00% | Securities |
| 109 | Anwar et al v. Fairfield Greenwich Limited et al, No. 09-cv-0118, ECF No. 1457 (S.D.N.Y. Nov. 20, 2015) | $125.00 | 30.00% | Securities |
| 110 | In re Wells Fargo Mortg.-Backed Certificates Litig., No. 09–cv–01376, ECF No. 475 (N.D.Cal. Nov. 14, 2011). | $125.00 | 19.75% | Securities |
| 111 | In Re: Bristol-Meyers Squibb Co. Securities Litigation, No. 07-cv-05867, ECF No. 78 (S.D.N.Y. Dec. 9, 2009) | $125.00 | 17.00% | Securities |
| 112 | In re LendingClub Securities Litig., No. 16-cv-02627, ECF No. 400 (N.D. Cal. 2018) | $125.00 | 13.10% | Securities |
| 113 | In re New Century, No. 07-cv-00931, ECF No. 504 (C.D.Cal. Nov 15, 2010) | $124.83 | 11.50% | Securities |
| 114 | In re Optical Disk Drive Prod. Antitrust Litig., No. 3:10-MD-2143 RS, 2016 WL 7364803, at *6 (N.D. Cal. Dec. 19, 2016) | $124.50 | 25.00% | Antitrust |
| 115 | Kurzweil v. Philip Morris Cos., 1999 U.S. Dist. LEXIS 18378, (S.D.N.Y. Nov 24, 1999) | $123.80 | 30.00% | Securities |
| 116 | Norma J Thurber, et al v. Mattel Inc, et al, , No. 99-cv-10368, ECF No. 193 (C.D.Cal., Sep. 29, 2003) | $122.00 | 27.00% | Securities |
| 117 | In re Deutsche Telekom AG Sec. Litig., 2005 U.S. Dist. LEXIS 45798, *12, 14 | $120.00 | 28.00% | Securities |

| | Case Reference | Settlement Amount (in Millions) | Fee % | Case Type |
|---|---|---|---|---|
| 118 | Freedman v. Weatherford International Ltd. et al, No. 12-cv-02121, ECF No. 219, (N.D.Ill. Nov. 23, 2015) | $120.00 | 20.94% | Securities |
| 119 | Kohen v. Pacific Investment Management Co., et al., No. 05-cv-04681, ECF No. 572 (N.D.Ill. May 2, 2012) | $118.75 | 20.00% | Securities |
| 120 | In re Mercury Interactive Corp. Securities Litigation, No. 05-cv-03395, ECF. No. 416 (N.D.Cal. Mar. 3, 2011) | $117.50 | 22.00% | Securities |
| 121 | In re Healthsouth Corporation Securities Litigation (UBS Defendants), No. 05-cv-01500.  ECF No. 1721 (N.D.Ala. Jul 26, 2010) | $117.00 | 19.50% | Securities |
| 122 | In re Lernout & Hauspie Securities Litigation, (KPMG Settlement) No. 00-cv-11589, ECF No. 930 (D.Mass. Dec 22, 2004) | $115.00 | 20.00% | Securities |
| 123 | In re American International Group, Inc. Securities Litigation (Starr Defendants), No. 04-cv-08141.  ECF No. 682 (S.D.N.Y Apr 10, 2013) | $115.00 | 13.25% | Securities |
| 124 | In re Ikon Office Sols., Inc., Sec. Litig., 194 F.R.D. 166 (E.D. Pa. 2000) | $111.00 | 30.00% | Securities and Derivative |
| 125 | In re Morgan Keegan Open-End Mutual Fund Litigation, No. 07-cv-02784, ECF No. 435 (W.D.Tenn. Aug 2, 2016) | $110.00 | 30.00% | Securities |
| 126 | New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., et al., No. 08-cv-05653, ECF No. 277 (S.D.N.Y. May 10, 2016) | $110.00 | 28.00% | Securities |
| 127 | In re Prudential Sec. Inc. Ltd. Partnerships Litig., 912 F. Supp. 97, 104 (S.D.N.Y. 1996) | $110.00 | 27.00% | Securities |
| 128 | In re CVS Corporation Securities Litigation, No. 01-cv-11464, ECF No. 191 (D.Mass, Sep 7, 2005) | $110.00 | 25.00% | Securities |
| 129 | In re DPL Inc., Sec. Litig., 307 F. Supp. 2d 947 (S.D. Ohio 2004) | $110.00 | 20.00% | Securities |

| | Case Reference | Settlement Amount (in Millions) | Fee % | Case Type |
|---|---|---|---|---|
| 130 | In re Healthsouth Corporation Securities Litigation (EY Settlement), No. 05-cv-01500.  ECF No. 1617 (N.D.Ala. Jun 12, 2009) | $109.00 | 18.49% | Securities |
| 131 | Knurr v. Orbital ATK, Inc. et al., No. 16-cv-01031, ECF No. 462 (E.D.Va 2019) | $108.00 | 28.00% | Securities |
| 132 | In re Auto. Refinishing Paint Antitrust Litig., No. MDL NO 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) | $105.75 | 32.60% | Antitrust |
| 133 | In re Prison Realty Sec. Litig., No. 3:99–0458, 2001 U.S. Dist. LEXIS 21942 (M.D. Tenn. Feb. 9, 2001). | $104.00 | 30.00% | Securities |
| 134 | Erica P. John Fund, Inc. v. Halliburton Co., No. 02-xc-01152, ECF No. 844  (N.D.Tex. Apr. 25, 2018) | $100.00 | 33.33% | Securities |
| 135 | 8. In re Am. Express Fin. Advisors Sec. Litig.,  No. 04 Civ. 1773 (DAB), ECF No. 170 at 8 (S.D.N.Y. July 18, 2007) (Batts, J.) | $100.00 | 27.00% | Securities |
| 136 | In re AT & T Corp., 455 F.3d 160 (3d Cir. 2006) | $100.00 | 21.25% | Securities |
| 137 | In re Honeywell International Inc. Securities Litigation, No. 00-cv-03605, ECF No. 256 (D.N.J. Aug 16, 2004) | $100.00 | 20.00% | Securities |
| 138 | In re HP Securities Litigation, No. 12-cv-05980, ECF No. 279 (N.D.Cal. Nov. 16, 2015) | $100.00 | 11.00% | Securities |