# Exhibit 4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY, | |
| Plaintiff, on behalf of itself and all others similarly situated, | No.  1:16-cv-00259-MMS |
| vs. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

<u>**DECLARATION OF  DAWN BONDER**</u>

I, Dawn Bonder, declare:

1.　　I am Chief Executive Officer of Health Republic Insurance Company ("HRIC" or "Health Republic").

2.　　I have served as CEO of HRIC since February 2013, when I was recruited to help launch the company as a Consumer Operated and Oriented Plan ("CO-OP") offering plans on Oregon's Affordable Care Act ("ACA") health insurance exchanges.

3.　　HRIC is a nonprofit corporation organized under the laws of the State of Oregon.

4.　　HRIC began providing health insurance to insureds who purchased their plans through the state-based health exchange, as well as off-exchange, in Oregon in January of 2014. HRIC also offered plans both on and off the state-based health exchange for the 2015 plan year.

5.　　Before entering the ACA health exchanges and before helping HRIC set its premiums for 2014 and 2015, I understood the risk corridors program was intended to allow carriers to price their plans in line with how we hoped the market would perform rather than how we feared the market would perform.

1

6.     I understood that risk corridors payments would be paid on at least an annual basis.  My understanding was based on the language of Section 1342 of the ACA, as well as the Part D risk corridors program, which I further understood (a) was the model of the ACA risk corridors program, and (b) paid all risk corridors amounts annually.  My understanding was also based on HHS's stated policy positions and representations that risk corridors payments would be paid on at least an annual basis.  Due to these facts, I understood that if HRIC lost money on health plans in any year from 2014-2016 due to its inability to accurately set annual premium rates and qualified for a risk corridor payment under the Affordable Care Act, the government would pay HRIC the full amount determined by CMS to be owed to HRIC pursuant to the risk corridor program, the following year.  I also understood that if HRIC had a profit exceeding the program guidelines, it would owe a payment of the full amount determined by CMS to be owed by HRIC to HHS pursuant to the risk corridor program, in the following year.  HRIC relied on these statements promising full risk corridors payments on an annual basis when designing qualified health plans to offer on the ACA exchanges and when setting premiums for those plans.

7.     Receiving risk corridor payments on an annual basis (to the extent they were owed pursuant to the program's terms) was important to maintain HRIC's risk-based capital position and to provide sufficient operating cash in the event we lost an unexpected amount of money due to the inherent risks in this new insurance market.

8.     Due to the government's failure to pay HRIC its 2014 risk corridor payment, and the indication that they would not fully pay the 2015 risk corridor amounts, HRIC was at risk of falling below statutory reserve requirements.  HRIC withdrew from the 2016 market and has wound down its 2015 insurance plans.  Put simply, thousands of people in Oregon lost HRIC as an insurer from 2016 on because of HHS's failure to pay risk corridor amounts in full.  If HRIC

had received even 30% of the amounts owed it for 2014, and/or had there been the ability to record the risk corridor amount owed to HRIC for 2014 and 2015 as a recognized asset, HRIC could have continued in the 2016 market.

9.     In late 2015/early 2016, Quinn Emanuel met with me and other executives at Health Republic to discuss the possibility of filing suit against the government to recover the Risk Corridors amounts owed by the government.  Quinn Emanuel had developed a legal theory, strategy, proposed venue and plan of action to pursue these claims against the government. Health Republic did not have the available funds to hire Quinn Emanuel by the hour, so the parties discussed a contingent fee arrangement.

10.    Stephen Swedlow of Quinn Emanuel made a proposal to our board and the board approved hiring Quinn Emanuel on a contingent fee arrangement for 25% of any recovery.  In February 2016, Health Republic became the first QHP issuer to file suit to recover improperly withheld risk corridor payments owed to it under Section 1342 of the Affordable Care Act.  At the time Health Republic filed suit, QHP issuers were not optimistic about the chance of a lawsuit's success.  For example, prior to filing this suit, I spoke with Robert Gootee, CEO of Oregon-based QHP issuer Moda Health.  Mr. Gootee told me that filing a lawsuit was a bold choice, and not one that he would consider making on Moda's behalf, as he believed a suit would not succeed.  Notwithstanding the market's pessimism, Health Republic filed suit because it believed that it was fundamentally unfair for the government to pull the rug out from under CO-OPs and other QHP issuers who were induced to enter the marketplace by the government's promises of risk mitigation.  Health Republic firmly believed that the government should fulfill its obligations.  Moreover, Health Republic wanted to file its case as a class action, to enable other QHP issuers to recover without having to directly sue the government.  This was

particularly important because for many, if not all QHP issuers, the Department of Health and Human Services is their biggest customer and largest source of revenue, making a lawsuit against the government inherently risky. Ultimately, Health Republic's lawsuit became a vehicle for a $1.9 billion stipulated judgment for recovery of unlawfully withheld risk corridor payments.

11.     Prior to filing suit, Health Republic agreed to pay an attorney's fee of 25% of the recovery or award in the context of a class action settlement or judgment. Class counsel has confirmed, however, that Health Republic will pay the attorney's fee approved by the Court, and that class counsel is requesting a 5% fee, not a 25% fee.

12.     Health Republic's lawsuit, filed in February 2016, set off a series of follow-on lawsuits brought by QHP issuers seeking to recover risk corridor payments. Moda Health, whose CEO had previously dismissed the possibility of a lawsuit, in June 2016 became the second issuer to file a risk corridors lawsuit. It was approximated by the United States Supreme Court in a related appeal of one of the later filed individual cases that the legal theory and strategy first filed by Health Republic in this class action complaint will lead to an industrywide recovery approaching $12 billion. The Health Republic case was not only the first risk corridor case, but also the case that defined the successful legal theory and strategy for recovery for all the follow-on cases.

13.     Health Republic was an active participant in this litigation. Prior to filing suit, it was not clear what the nature of the government's defenses would be and how much day-to-day involvement would be required of Health Republic. Health Republic chose to file suit notwithstanding that uncertainty. During the course of the litigation, Health Republic regularly communicated with class counsel, providing information and assisting with the litigation as needed. All told, Health Republic's leadership and employees have spent hundreds of hours

advising, strategizing and participating in the prosecutions of this litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29th day of July, 2020, at Portland, Oregon.

_____

Dawn Bonder