**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

HEALTH REPUBLIC INSURANCE
COMPANY,

          Plaintiff,
          on behalf of itself and all others
          similarly situated,

    vs.

THE UNITED STATES OF AMERICA,

          Defendant.

No.  1:16-cv-00259-MMS

(Judge Sweeney)

**DISPUTE SUBCLASS' BRIEF IN OPPOSITION TO THE GOVERNMENT'S MOTION
<u>FOR LEAVE TO AMEND ITS ANSWER</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     BACKGROUND ..................................................................................................2

II.    ARGUMENT ......................................................................................................5

       a.    The Government Waived Its Right to Pursue an Offset ..........................5

       b.    The Government's Delay was Excessive and Highly Prejudicial ..........................9

       c.    Liquidation Courts are the Appropriate Fora to Adjudicate the Government's Claims ..........................................................................12

       d.    Any Counterclaim for Interest Is Futile Because the Law Prohibits Post-Liquidation Interest and Prohibits Interest When the Government Is the Net Debtor..........................................................................18

III.   CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. United States*,
42 Fed. Cl. 326 (1998) ................................................................................................ 7

*Alfa Laval Separation, Inc. v. United States*,
47 Fed. Cl. 305 (2000) .............................................................................................. 10

*Bank of America v. United States*,
217 Ct. Cl. 731 (1978) ................................................................................................ 7

*California by & through Yee v. United States*,
145 Fed. Cl. 802 (2019) ......................................................................................... 9, 10

*Christofferson v. United States*,
77 Fed. Cl. 361 (2007) ...................................................................................... 9, 10, 11

*Cobra Int'l, Inc. v. BCNY Int'l, Inc.*,
702 F. App'x 994 (Fed. Cir. 2017) ............................................................................. 9

*Conway v. United States*,
145 Fed. Cl. 514 (2019) ............................................................................................ 14

*Cupey Bajo Nursing Home, Inc. v. United States*,
36 Fed. Cl. 122 (1996) .............................................................................................. 10

*Davister Corp. v. United Republic Life Ins. Co.*,
152 F.3d 1277 (10th Cir. 1998) ........................................................................... 15, 16

*Dysart v. United States*,
169 Ct. Cl. 276, 340 F.2d 624 (1965) ......................................................................... 6

*Frantz Equip Co. v. United States*,
122 Ct. Cl. 622 (1952) .............................................................................................. 17

*In Re Liquidation of Pine Top Ins. Co.*,
322 Ill. App. 3d 693 (2001) ...................................................................................... 18

*Local Oklahoma Bank v. United States*,
59 Fed. Cl. 713 (2004) ......................................................................................... 19, 20

*Maine Community Health Options*,
140 S. Ct. 1308 (2020) ............................................................................................... 4

ii

*Munich Am. Reinsurance Co. v. Crawford*,
   141 F.3d 585 (5th Cir. 1998) ........................................................................... 15, 16

*Panhandle E. Pipe Line Co. v. United States*,
   408 F.2d 690 (Ct. Cl. 1969) .................................................................................. 8

*Preuss v. United States*,
   412 F.2d 1293 (Ct. Cl. 1969) .............................................................................. 17

*Principal Life Ins. Co. & Subsidiaries v. United States*,
   76 Fed. Cl. 326 (2007) .................................................................................. 6, 7, 9

*Principal Life Ins. Co. & Subsidiaries v. United States*,
   75 Fed. Cl. 32 (2007) .................................................................................... 11, 12

*Ralston Purina Co. v. Parsons Feed & Farm Supply, Inc.*,
   416 F.2d 207 (8th Cir. 1969) .......................................................................... 19, 20

*Rockwell Automation, Inc. v. United States*,
   70 Fed. Cl. 114 (2006) ....................................................................................... 10

*Ruthardt v. United States*,
   303 F.3d 375 (1st Cir. 2002) .............................................................................. 14

*Sexton, as Trustee in Bankruptcy of Kessler & Co. v. Dreyfus*,
   219 U.S. 339 (1911) ............................................................................................ 18

*Shell Oil Co. v. United States*,
   123 Fed. Cl. 707 (2015) ........................................................................................ 8

*Stephens v. American Int'l Ins. Co.*,
   66 F.3d 41 (2d Cir. 1995) ................................................................................... 16

*Te-Moak Bands of W. Shoshone Indians of Nevada v. United States*,
   948 F.2d 1258 (Fed. Cir. 1991) ............................................................................ 9

*Tenneco Resins, Inc. v. Reeves Bros.*,
   752 F.2d 630 (Fed. Cir. 1985) .............................................................................. 8

*United States Department of Treasury v. Fabe*,
   508 U.S. 491 ................................................................................... 13, 15, 16, 17, 19

*UnitedHealthcare of New York, Inc. v. Lacewell*,
   --- F.3d ---, 2020 WL 4045365 (2d Cir. 2020) ................................................... 17

*Vanston Bondholders Protective Committee v. Green*,
   329 U.S. 156 (1946) ............................................................................................ 18

## Statutory Authorities

31 U.S.C. § 3717 .................................................................................................................... 19

15 U.S.C. § 1012 ............................................................................................................... 13, 19

15 U.S.C. § 1012(b) ............................................................................................................... 13

28 U.S.C. § 1503 .............................................................................................. 6, 13, 14, 15, 17

28 U.S.C. § 2508 .............................................................................................. 6, 13, 14, 15, 17

37 U.S.C. § 3713 ................................................................................................................... 13

Affordable Care Act § 1342 ............................................................................................. 2, 7-8

Ariz. Rev. Stat.  § 20-629 ...................................................................................................... 14

Ariz. Rev. Stat.  § 20-635 ................................................................................................. 14, 18

Ariz. Rev. Stat. § 20-612(a) .................................................................................................. 15

Ariz. Rev. Stat. § 20-612(c) .................................................................................................. 15

Colo. Rev. Stat. § 10-3-504(2) .............................................................................................. 15

Colo. Rev. Stat. § 10-3-517(2) .............................................................................................. 18

Colo. Rev. Stat. § 10-3-529 .................................................................................................. 14

Colo. Rev. Stat. Ann. § 10-3-541 .......................................................................................... 14

## Rules and Regulations

45 C.F.R. § 156.1215(b) ....................................................................................................... 17

45 CFR § 30.18 ..................................................................................................................... 19

RCFC 15(a) ............................................................................................................................. 9

**Additional Authorities**

*Department of Health and Human Services, Summary Report on Transitional Reinsurance Payments and Permanent  Risk Adjustment Transfers for the 2014 Benefit Year* , available at https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Progr.................................................................................................................................. 7

*Department of Health and Human Services, Summary Report on Transitional Reinsurance Payments and Permanent  Risk Adjustment Transfers for the 2015 Benefit Year* , available at https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Progr.................................................................................................................................. 7

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY,<br><br>       Plaintiff,<br>       on behalf of itself and all others<br>       similarly situated,<br><br>   vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>       Defendant. | No. 1:16-cv-00259-MMS<br>(Judge Sweeney) |

**DISPUTE SUBCLASS' BRIEF IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR LEAVE TO AMEND ITS ANSWER**

Enough is enough. For over half a decade, the federal government unlawfully failed to make risk corridor payments it promised to qualified health plan issuers to induce them to join Affordable Care Act marketplaces. For some QHP issuers, the government's dereliction of duty was merely harmful. For others, including the members of the Dispute Subclass, it was fatal. The government's failure to meet its obligations—to the tune of tens or hundreds of millions of dollars—rendered Dispute Subclass members insolvent and forced them into liquidation proceedings. Now, four and a half years into this litigation, the government for the first time seeks to assert counterclaims against the very entities its misconduct bankrupted. To add insult to injury, the government seeks interest on the Dispute Subclass's debts at an effective annual rate exceeding 15%. The government thus seeks to capitalize on the fact that its unlawful conduct rendered Dispute Subclass members unable to meet their financial obligations. And importantly for purposes of the government's motion, instead of seeking to have its debts adjudicated in 2017, the government allowed interest to continue to accrue at extremely high

rates, knowing that Dispute Subclass members could not possibly make payments to the government.  In other words, the government is seeking millions of additional dollars *because* it delayed bringing its claims.  The Court should not reward the government's undue and prejudicial delay, and should deny its motion for leave to amend.

## I.    BACKGROUND

Section 1342 of the Affordable Care Act created the "risk corridor" program designed to mitigate the risks of QHP issuers that chose to participate in the ACA marketplaces.  Under Section 1342, for the years 2014, 2015, and 2016, the government was required to make statutorily defined payments to QHP issuers whose costs exceeded certain thresholds.  The program was designed to induce issuers to participate in the then-nascent marketplaces, notwithstanding the substantial uncertainties surrounding the new markets.  Based on the government's promises, the three members of the Dispute Subclass—Meritus Health Partners, Meritus Mutual Health Partners, and Colorado Health Insurance Cooperative, Inc. ("Colorado HealthOp")[1]—sold policies on the Arizona (Meritus) and Colorado (Colorado HealthOp) ACA state exchanges in the 2014 and 2015 benefit years.

In late 2014, after the government induced Meritus and Colorado HealthOp to participate in ACA exchanges, the government reversed course with respect to risk corridor payments, passing an appropriations bill that purportedly prevented the Department of Health and Human Services from making payments beyond the amount the risk corridors program took in from QHP issuers.  As a result, the government failed to meet its risk corridor obligations to Meritus and Colorado HealthOp. For Meritus Health Partners, this amounted to a deficit of over $58

---

[1]    While Freelancers Co-Op of New Jersey is currently a member of the Dispute Subclass, Freelancers and the government have agreed in principle to a resolution of their dispute, and the parties intend to file a motion to place Freelancers in a separate subclass.

million.  For Meritus Mutual, it was over $14 million.  For Colorado HealthOp, it was over $111 million.

The government's failure to make nearly $200 million in payments it promised to Meritus and Colorado HealthOp had a predictable effect:  all three entities became insolvent. Colorado HealthOp entered into liquidation in January 2016, while Meritus entered into liquidation in August 2016.  The government filed proofs of claims in both the Meritus and Colorado HealthOp liquidation proceedings.

Meanwhile, the government filed its answer to the complaint in this case on February 27, 2017, Dkt. 43, and submitted multiple briefs on the parties' cross-motions for summary judgment from March through June 2017.  Dkt. 52, 56.  The government did not identify an offset or similar defense in any of these submissions.  Then, on June 12, 2017, Health Republic identified the members of the 2014/2015 risk corridor class on the docket.  Dkt. 57.  The class included Meritus and Colorado HealthOp.  Dkt. 57-1.  But the government became aware of Meritus and Colorado HealthOp's participation in the Health Republic suit prior to June 12, 2017, as class counsel submitted the list of entities that opted in to the government for its approval.  *See* Dkt. 57-2.  The government subsequently objected to the inclusion of certain class members, but did not object to Meritus or Colorado HealthOp.  Dkt.  57-2.  Because both Meritus and Colorado HealthOp entered into liquidation in 2016, the government knew they were insolvent when it approved of their participation in the class.  The government did not at that time raise offset or other debts, either formally via an amendment to its answer or informally with class counsel; nor did the government raise the issue at the class certification stage.  Declaration of Stephen Swedlow ¶ 2 (Ex. 1).

On July 11, 2017, the Court entered a limited stay of this case.  Dkt. 62.  Specifically, the Court noted that it was staying only "proceedings on the parties' cross-motions for summary judgment."  *Id*.  In the same order, the Court ordered the parties to continue litigating a disputed matter unrelated to the summary judgment motions, setting a deadline for parties to report to the Court on outstanding issues regarding composition of the class.  *Id*.  Each time the Court referenced the stay in future orders, it reaffirmed that the stay applied to "proceedings on the parties' cross-motions for summary judgment."  Dkt. 69, 73.  In the three years that summary judgment proceedings were stayed, the government never amended its answer nor ever indicated to class counsel that it intended to pursue an offset defense or counterclaim against any class member.

On April 27, 2020, the Supreme Court confirmed in an 8-1 decision that the government's failure to make risk corridor payments to QHP issuers was unlawful.  *Maine Community Health Options*, 140 S. Ct. 1308 (2020).  In a May 12, 2020 status report, the government for the first time in this four-plus-year litigation indicated that it may seek to assert an offset defense or counterclaim against unidentified class members. Dkt. 72.  It was not until July 6, 2020 that the government first identified the offsets it intended to pursue, producing a breakdown of its asserted offsets (again, for the first time) a day later.  The breakdown revealed that the government was seeking to recover from Dispute Subclass members not only debts purportedly owed to the government under the Affordable Care Act, but also interest at an effective rate of over 15% per year.  *See* Swedlow Dec. ¶¶ 4-6; July 7, 2020 E-Mail from T. Mebane to B. Berkman (Ex. 2).  For Colorado HealthOp, this represented interest totaling over $7 million. Swedlow Dec. ¶ 4.  For Meritus Health Partners, it totaled over $17 million, swallowing (when combined with the principal) the entirety of Meritus Health's risk corridors

recovery.  *Id.* ¶ 5.  The government maintained that interest continued to accrue each day.  See July 7, 2020 E-Mail from T. Mebane to B. Berkman (Ex. 2).

On July 9, 2020, class counsel emailed the government on behalf of Meritus, explaining that the government's assertion that it is entitled to recover interest through offset represented all or nearly all of Meritus's dispute with the government, as the court overseeing Meritus's liquidation had approved the government's proposed offset of the principal.  *See* July 9, 2020 E-Mail from B. Berkman to T. Mebane (Ex. 3).  In effect, the government's three-year delay in amending its answer *manufactured a dispute between itself and Meritus*, as the gulf between the parties consists entirely or largely of the interest that purportedly accrued between 2017 and 2020.[2]  The government nonetheless refused to even engage with class counsel.  *See* July 10, 2020 E-mail from T. Mebane to B. Berkman (Ex. 3).  Though the government maintains that it "attempted to resolve the issue of outstanding countervailing debts with members of the class," and that "the Dispute Subclass Plaintiffs were unwilling to resolve their outstanding debts without litigation," Mot. at 4, in reality, the government demanded total capitulation of the Dispute Subclass, and refused to even substantively respond to class counsel when counsel raised the possibility of an adjustment to the government's demands.

## II.   ARGUMENT

### a.   The Government Waived Its Right to Pursue an Offset

To begin, the government's motion is based on two false premises.  The first false premise—which permeates the government's entire motion—is that the Court "stayed the case" on July 11, 2017.  *See, e.g.*, Mot. at 5.  The Court's Order was not so broad.  On July 11, 2017,

---

[2] To the extent the government posits that it was Meritus's failure to meet its obligations and not the government's delay in seeking to adjudicate those obligations that caused interest to accrue, the government also caused Meritus's inability to pay when it unlawfully failed to make risk corridor payments.

the Court stayed "proceedings on the parties' cross-motions for summary judgment"; that is all.
Dkt. 62.  On June 29, 2018, the Court reaffirmed that "proceedings on the parties' cross-motions
for summary judgment will remain stayed."  Dkt. 69.  On May 14, 2020, the Court again noted
that "proceedings on the parties' cross-motions for summary judgment shall remain stayed."
Dkt. 73.  The government thus mischaracterizes the nature of the stay—the Court did not "stay
the case" and thereby prevent any activity; it stayed only proceedings on the summary judgment
motions on the class's risk corridor claims.  Indeed, in the very order where the Court entered its
stay, it instructed the parties to continue litigating a disputed issue unrelated to the summary
judgment motions, and set a deadline to report back to the Court on that issue.  Dkt. 62.  The
government relies on its mischaracterization of the stay to absolve its delay, which it maintains
lasted for a mere 31 days. Not so.  The government's counterclaims have nothing to do with
"proceedings on the parties' cross-motions for summary judgment," and so nothing stopped the
government from seeking leave to file its counterclaims between 2017 and 2020.   The
government simply chose not to.

The second false premise of the government's motion is that the Court is required to
adjudicate the government's purported offsets.  *See* Mot. at 6 (citing 28 U.S.C. §§ 1503, 2508).
But the government's ability to have its offsets adjudicated is not unlimited—it is limited by
"considerations of judicial administration concerned with the delayed amendments of pleadings
and the belated raising of new issues."  *Principal Life Ins. Co. & Subsidiaries v. United States*,
76 Fed. Cl. 326, 327 (2007) (citing *Dysart v. United States*, 169 Ct. Cl. 276, 340 F.2d 624, 627
(1965)).[3]  Indeed, a long line of cases "amply demonstrates that the United States may not, when
the need strikes it, transform a victory into a pyrrhic one by raising a setoff at the last possible

---

[3] As explained below, the government's ability to have offsets adjudicated in this Court is also
limited by the McCarran-Ferguson Act.

moment." *Principal Life Ins. Co.*, 76 Fed. Cl. at 328 (collecting cases); *see also Bank of America v. United States*, 217 Ct. Cl. 731 (1978) (affirming denial of leave to pursue offset for the first time years into litigation). As a result, the Court of Federal Claims has repeatedly noted that the government must raise offset "at the earliest possible stage in the proceedings," or else it waives its right to pursue an offset. *Principal Life Ins. Co.*, 76 Fed. Cl. at 328; *Abramson v. United States*, 42 Fed. Cl. 326, 331 (1998) (holding that the government waived its right to pursue an offset after failing to raise it during the first two years of litigation).

The government failed to raised offset "at the earliest possible stage" of this litigation. On June 10, 2017, the day Meritus and Colorado HealthOp first appeared on the docket, the government knew that they owed the government the risk adjustment payments that make up the bulk of the government's asserted offsets. Indeed, the Department of Health and Human Services published QHP issuers' risk adjustment obligations for 2014 and 2015 on June 30, 2015 and June 30, 2015, respectively.[4] The government was also aware that Meritus and Colorado HealthOp were insolvent, as they both entered into liquidation in 2016 and the government filed notices of claim in their respective liquidation proceedings. Nothing stopped the government from seeking leave to amend its answer in June 2017. And, as noted above, because the stay expressly applied only to "proceedings on the parties' cross-motions for summary judgment," nothing stopped the government from seeking leave to amend its answer in the rest of 2017,

---

[4] *See* Department of Health and Human Services, Summary Report on Transitional Reinsurance Payments and Permanent Risk Adjustment Transfers for the 2014 Benefit Year (June 30, 2015), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/Summary-Reinsurance-Payments-2014.pdf; Department of Health and Human Services, Summary Report on Transitional Reinsurance Payments and Permanent Risk Adjustment Transfers for the 2015 Benefit Year (June 30, 2016), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/June-30-2016-RA-and-RI-Summary-Report-5CR-063016.pdf.

2018, 2019, or the beginning of 2020. The government's proposed counterclaims have nothing

to do with the summary judgment motion—indeed, they have nothing at all to do with Section

1342 of the Affordable Care Act. Not bound by a stay, the government simply chose to sit on its

claims year after year, allowing questionable interest and penalties to accrue at borderline

usurious rates in the meantime.[5]

Next, the government maintains that there has not been discovery, a pretrial conference,

or a scheduling order in this case to make it appear as though this case is at its outset. But the

government is well aware that the dispositive issues in this case have been hard fought by the

parties for years—in this Court, the Federal Circuit, and the Supreme Court. In reality, the

government's motion is akin to seeking leave to amend its complaint after trial, once all of the

disputed issues in the case have been resolved. *See Panhandle E. Pipe Line Co. v. United States*,

408 F.2d 690, 719 (Ct. Cl. 1969) (holding than an offset claim was untimely where it was not

"pleaded either as an affirmative defense or as a counterclaim" or otherwise raised prior to end of

trial).

The government's last argument—that it should be permitted to amend its answer three

years late because additional QHP issuers joined the class from 2018 to 2020—is mere

shadowboxing. The government is not seeking to assert counterclaims on new members of the

class. It wants to assert counterclaims against Dispute Subclass members who joined the class in

June 2017, and who the government knew were insolvent in June 2017. *Shell Oil Co. v. United

States*, 123 Fed. Cl. 707, 727 (2015) (denying the government leave to amend where the

---

[5] Even if the government had an innocent misunderstanding of the limited nature of the stay in
this case, the Federal Circuit has ruled that the existence of a stay does not excuse a years-long
delay where the trial court "called for annual reports on the status of the case," and the delaying
party could "have asked for a partial lifting of the stay." *Tenneco Resins, Inc. v. Reeves Bros.*,
752 F.2d 630, 635 (Fed. Cir. 1985). If the government somehow believed that a stay of summary
judgment proceedings precluded it from filing a counterclaim, it could have asked the Court for
clarification of the stay or asked the Court to lift the stay. The government chose not to do so.

government had been aware of the facts underlying their claim for many years).  The government cites no authority for the proposition that it can pursue untimely offsets against Dispute Subclass members simply because claims against other entities might have been timely.

In short, the government is attempting to do exactly what the law says it cannot: "transform[ing] a victory into a pyrrhic one by raising a setoff at the last possible moment." *Principal Life Ins. Co.*, 76 Fed. Cl. at 328.  The Court should deny the government's motion.

### b.    The Government's Delay was Excessive and Highly Prejudicial

Even had the government not waived its right to pursue an offset, the government does not meet the standard to amend its answer under RCFC 15(a).  The Court may deny the government's motion for leave to amend for numerous reasons, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *Christofferson v. United States*, 77 Fed. Cl. 361, 363 (2007).  "The existence of any one of these criteria is sufficient to deny a motion to amend, the theory being that the amendment would not be necessary to serve the interests of justice under such circumstances."  *Id.*

For the reasons described at length above, the government has engaged in undue delay. "Delay alone, even without a demonstration of prejudice, [is] sufficient grounds to deny amendment of pleadings."  *Te-Moak Bands of W. Shoshone Indians of Nevada v. United States*, 948 F.2d 1258, 1262 (Fed. Cir. 1991) (citing a case where a delay of 27 months justified denial of motion for leave to amend).  The Federal Circuit has affirmed denials of leave to amend where the delay was as short as two months, *see Cobra Int'l, Inc. v. BCNY Int'l, Inc.*, 702 F. App'x 994, 995 (Fed. Cir. 2017), and the Court of Federal Claims regularly denies leave to amend, even without a showing of prejudice, when the delay "is measured in years."  *California by & through*

*Yee v. United States*, 145 Fed. Cl. 802, 811–12 (2019) (denying leave to amend after unexplained three-year delay); *see also Rockwell Automation, Inc. v. United States,* 70 Fed. Cl. 114, 124 (2006) (denying government's motion for leave to add affirmative defenses after an unexplained eight-year delay); *Alfa Laval Separation, Inc. v. United States*, 47 Fed. Cl. 305, 314 (2000) (denying leave to amend after two-year delay).   To the extent the government wishes to amend its answer after a prolonged period of time, it bears the burden to explain and justify its delay. *Cupey Bajo Nursing Home, Inc. v. United States*, 36 Fed. Cl. 122, 132 (1996) ("Thus, the Federal Circuit has adopted the rule that a party seeking to amend its complaint after significant delay bears the burden of justifying the delay.").   As noted, the government offers no explanation for its three-plus year delay.   Nor can it.   It was clear that the parties were free to continue litigating disputed issues unrelated to the summary judgment motions—the Court instructed as much in its stay order, setting a deadline for the parties to report to the Court concerning their dispute over composition of the class.   Dkt. 62.   The government's delay thus has no justification, and the Court should deny its motion based on delay alone.   See *Alfa Laval Separation,* 47 Fed. Cl. at 314 (denying motion to amend after unexplained two-year delay); *Christofferson*, 77 Fed. Cl. 361, 363 (denying leave to amend after years-long delay where party did not carry burden of explaining delay).

Although the government's delay alone is sufficient to deny the government's motion, the Dispute Subclass was also highly prejudiced by the government's delay.   First, the government's counterclaims will require the parties—four and a half years into this suit—to begin litigating, for the first time, several difficult legal and factual issues that have never been part of this case and that could have been litigated years ago, including, but by no means limited to:  the validity of the subclass's alleged debts; the legality of the government's claimed interest;

if interest is allowed, the date on which interest began to run; whether the government has the right to pursue offsets in this court; the applicability of the McCarran-Ferguson Act; and the division of power between this court and state liquidation courts. Where, after a years-long delay, the government's counterclaim raises "potentially thorny questions" and "would undoubtedly set off a new wave of motions," involving "a new set of operative facts," the non-moving party is severely prejudiced. *Principal Life Ins. Co. & Subsidiaries v. United States*, 75 Fed. Cl. 32, 33 (2007); *see also Christofferson*, 77 Fed. Cl. at 366-67 (denying leave to amend as prejudicial where amendments would introduce new issues and "would require another round of potentially lengthy negotiations").

Moreover, when the government identified its purported offsets, the offsets included interest totaling nearly 40% of the principal of the identified ACA debts. When class counsel inquired about the basis for the interest, the government indicated that it believed it was entitled to collect interest and penalties at an effective rate exceeding 15% per year. *See* Ex. 2. The government also maintained that interest would continue to accrue at that rate every day until judgment is entered. *Id*. Thus—accepting (incorrectly) the government's premise that it is entitled to its claimed interest—the government allowed interest to continue to accrue for three years without ever seeking a judgment, despite being aware of the potential debts and the parties' insolvency on the day the Dispute Subclass members joined the case. The government's position is thus that its claim against Colorado HealthOp has ballooned by millions of dollars because of the government's unjustified delay. And with respect to Meritus and Meritus Mutual, the interest that purportedly accrued during the three-year delay represents all or nearly all of the dispute between the parties, as Meritus already offset the principal of the debts at issue several years ago in accordance with the government's proof of claim and the order of the court overseeing its

11

liquidation.  *See* Liquidation Court Order on Government's Proof of Claim for Meritus (Ex. 4).[6]

The government's unexplained delay is therefore not merely prejudicial—***it is the actual source***

***of the underlying dispute between the government and two of the three members of the non-***

***dispute subclass***.  It is difficult to conceive of a more prejudicial delay than one that increases

the potential damages award against the non-delaying party by tens of millions of dollars and, in

fact, manufactures the substantive dispute between the parties.  *See Principal Life Ins. Co.*, 75

Fed. Cl. at 33 (holding that plaintiffs were prejudiced by government's late assertion of offset

that would "eliminate" or "substantially reduce the recovery," and that "plaintiff was entitled to

be notified about the existence of these claims" earlier).

The government's delay is especially prejudicial because Meritus and Colorado HealthOp

are insolvent and were forced into liquidation by the government's illegal refusal to pay the risk

corridor amounts at issue in this lawsuit.  The government is thus seeking to weaponize its

litigation strategy in this case (stemming from its original bad acts), all to eke out the maximum

possible share of the Dispute Subclass's estates, to the detriment of all other potential

beneficiaries, namely policyholders.  The Court should not permit the government to use its

delay as a sword, and should therefore deny the government's motion for leave to amend.

### c.    Liquidation Courts are the Appropriate Fora to Adjudicate the Government's Claims

If the Court denies the government's motion for leave to amend, it will not leave the

government without a forum to adjudicate the Dispute Subclass's alleged debts; instead, like

other creditors, the government may proceed—and in fact has already proceeded[7]—in the state

---

[6]   Consistent with the offset, Meritus continues to seek payment for only the net amount due from the government as debtor, after application of the offset in accordance with Arizona law.

[7]   The government has filed proofs of claims in both the Meritus and Colorado HealthOp insolvency proceedings.

courts overseeing Meritus's and Colorado HealthOp's liquidations.  Indeed, federal and state law *require* that the government proceed in the liquidation courts, and not in this forum.

The government cites two federal statutes in support of its position that this Court is required to give effect to the government's offsets.  *See* Mot. at 5-7 (citing 28 U.S.C. §§ 1503, 2508).  The government is correct that it is typically the case that the Court of Federal Claims must adjudicate the government's asserted offsets (subject, of course, to the equitable limitations identified in Sections II.a and II.b, which the government has transgressed here).  But the government almost entirely fails to grapple with the McCarran-Ferguson Act, 15 U.S.C. § 1012, which limits government's ability to effectuate its offsets in this Court.  Specifically, the Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b).

In *United States Department of Treasury v. Fabe*, the Supreme Court explained the McCarran-Ferguson Act's import with respect to the government's efforts to recover debts from insolvent insurers.  508 U.S. 491.   In *Fabe*, the government asserted that, pursuant to 37 U.S.C. § 3713, it was entitled to a "superpriority" for the debts it was owed in an insurer insolvency proceeding, notwithstanding state law prioritizing the government's claims behind, among other claims, administrative expenses and policyholder claims.  *Id*. at 495.  The Court ruled that to the extent the state priority law serves to protect policyholders, it is a law enacted "for the purpose of regulating the business of insurance," and it pre-empts federal laws that do not "specifically relate[] to the business of insurance."  *Fabe*, 508 U.S. at 505-06.  The Court subsequently ruled that 37 U.S.C. § 3713, the general federal superpriority statute, was pre-empted by the state

priority law to extent the state law prioritized the claims of policyholders (and administrative costs of the insolvency proceeding) above the government's claims. *Id*. at 508-09.

This case presents a straightforward application of *Fabe*. The government claims that the Dispute Subclass members owe it various debts, and the government asserts a superpriority over those debts (in the form of an offset) based on federal statutes—28 U.S.C. § 1503 and § 2508—that are not specific to the business of insurance. Both Arizona and Colorado law prioritize the claims of policyholders and guaranty associations, as well as administrative costs, above the government's claims. *See* A.R.S. § 20-629 (Arizona priority of distribution law); C.R.S.A. § 10-3-541 (Colorado priority of distribution law); *see also Ruthardt v. United States*, 303 F.3d 375, 383-83 (1st Cir. 2002) (holding that under McCarran-Ferguson Act, a state law prioritizing the claims of guaranty associations over the government's claims pre-empts the federal superpriority statute). And neither Colorado nor Arizona law permit the government to make the offsets it seeks in this case, because Arizona law does not permit the government to offset post-liquidation interest, and Colorado law does not permit the government to offset non-contractual debts. *See* A.R.S. § 20-635 (noting that the rights and liabilities of creditors are "fixed as of the date" of the liquidation order, thereby preventing the government from claiming the ongoing interest it seeks against Meritus); C.R.S. § 10-3-529 (limiting the right to offset to debts "arising out of one or more contracts between the insurer and another person"); *Conway v. United States*, 145 Fed. Cl. 514 (2019) (holding that the government's offset of reinsurance payments due to Colorado HealthOp was unlawful). Indeed, in *Conway*, the Court of Federal Claims already adjudicated *the same debts* that the government asserts against Colorado HealthOp here, and concluded that that the government's prior offset violated Colorado law because the debts arose by operation of law and not out of "one or more contracts." *Conway*, 145 Fed. Cl. at 524-26.

14

But the Court need not evaluate these questions of state law, because they are reserved for the liquidation court under the McCarran-Ferguson Act and Arizona and Colorado's insurer insolvency regimes. Both Arizona and Colorado law reserve the power to adjudicate an insolvent insurer's debts for the court overseeing the insurer's liquidation, and provide the liquidation court with exclusive jurisdiction over matters related to the insurer's liquidation. A.R.S. 20-612(a) ("The superior court is vested with exclusive original jurisdiction of delinquency proceedings under this article, and is authorized to make all necessary and proper orders to carry out the purposes of this article."); A.R.S. 20-612(c) ("Delinquency proceedings pursuant to this article shall constitute the sole and exclusive method of liquidating . . . an insurer."); Colo. Rev. Stat. § 10-3-504(2) ("The district court in and for the city and county of Denver shall have jurisdiction to entertain, hear, or determine any complaint praying for the . . . liquidation . . . of any insurer, or praying for an injunction or restraining order or other relief preliminary to, incidental to, or relating to such proceedings other than in accordance with this part 5.").

The McCarran-Ferguson Act and *Fabe* require that 28 U.S.C. § 1503 and § 2508—the federal statutes allowing the government to pursue offsets in the Court of Federal Claims—yield to state laws vesting exclusive jurisdiction over offsets (and other matters related to liquidation) in state liquidation courts. A "policy of placing ultimate control over all issues relating to the insolvency proceedings in a single court is aimed at protecting the relationship between the insurance company and its policyholder," and as such is "shielded from federal interference by the McCarran-Ferguson Act" under *Fabe*. *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 593 (5th Cir. 1998); *see also Davister Corp. v. United Republic Life Ins. Co.,* 152 F.3d 1277, 1281 (10th Cir. 1998) ("The Utah statute consolidating all claims against a liquidating insurer, by

its nature and express terms, was enacted to protect policyholders.").  Indeed, consolidation of all claims against a liquidated insurer in a single forum "prevents the unnecessary and wasteful dissipation of the insolvent company's funds that would occur if the receiver had to defend unconnected suits in different forums across the country."  *Munich,* 141 F.3d at 593. "Consolidation also eliminates the risk of conflicting rulings, piecemeal litigation of claims, and unequal treatment of claimants, all of which are of particular interest to insurance companies and policyholders[.]"  *Id.*  Perhaps most importantly, "[a]llowing a putative creditor to pluck from the entire liquidation proceeding one discrete issue," would "directly impact the policyholders because it deals with a purported asset of the insurance company that could be apportioned to them."  *Davister*, 152 F.3d at 1281.  Consequently, federal appellate courts have repeatedly ruled that even where federal law otherwise entitles a party to pursue a claim in a particular forum, that entitlement is trumped by the McCarran-Ferguson Act and state laws vesting exclusive jurisdiction over insurer liquidations in specific state courts.  *Davister*, 152 F.3d at 1282 (holding that under McCarran-Ferguson Act and state insurer liquidation regimes, creditor was not entitled to pursue claim in arbitration against insolvent insurer even though the Federal Arbitration Act otherwise authorized arbitration); *Munich*, 141 F.3d at  595-96 ("We therefore hold that the FAA is reverse pre-empted under the McCarran–Ferguson Act, thereby leaving the district court without the power to compel arbitration in this case."); *Stephens v. American Int'l Ins. Co.*, 66 F.3d  41, 45 (holding that Kentucky Liquidation Act superseded creditor's right to arbitrate under the FAA).  So too here.  Under the McCarran-Ferguson Act, the government's claims must be adjudicated in the state courts overseeing the Dispute Subclass's liquidations.

The government does not meaningfully engage with the McCarran-Ferguson Act or *Fabe*, aside from a single footnote suggesting that the Act does not apply because the debts the

government seeks to offset arise from the Affordable Care Act. The government cites *UnitedHealthcare of New York, Inc. v. Lacewell*, --- F.3d ---, 2020 WL 4045365, at *6 (2d Cir. 2020), for the proposition that because the ACA "specifically relates to the business of insurance," the McCarran-Ferguson Act's reverse pre-emption rule does not apply. Mot. at 7. This argument is inapposite. Here, the ACA is responsible for the existence of the Dispute Subclass's purported debts. But the existence of a debt pursuant to the ACA is not inconsistent with Arizona or Colorado law; indeed, state insurer insolvency laws presuppose that the insurers have debts that have become too much to bear. The inconsistency between state and federal law in this case arises from the government's attempt to effectuate an offset in this court pursuant to 28 U.S.C. § 1503 and § 2508, which conflicts with both state claim priority laws and state reservations of exclusive jurisdiction over liquidation matters for the state liquidation courts.[8] It is 28 U.S.C. § 1503 and § 2508—which the government concedes are not specifically directed to the business of insurance—and not the Affordable Care Act that are pre-empted by the McCarran-Ferguson Act under *Fabe*.[9]

In short, the government is not left without a forum to pursue its claims if the Court denies its motion for leave to amend. The government can pursue (and in fact has already

---

[8] The government indicates that "[h]ad the risk corridors payments been made during the life of the risk corridors programs, the United States Department of Health and Human Services ('HHS') would have collected the money owed by the Dispute Subclass Plaintiffs through offset, consistent with 45 C.F.R. § 156.1215(b)," which is the ACA netting regulation. But the government does not purport to rely on the ACA netting regulation to pursue its offset in this dispute; it relies on 28 U.S.C. § 1503 and § 2508. Nor could the government rely on the ACA netting regulation, which refers only to the practices of the Department of Health and Human Services and does not apply to this Court. *See* 45 C.F.R. § 156.1215(b) ("HHS may net payments owed to issuers…"). The government forfeited its right to rely on the ACA netting regulation when the Department of Health and Human Services unlawfully failed to make risk corridor payments and forced entities to pursue payment through this Court.

[9] The government argues that the Subclass's insolvencies do not affect the right of the government to pursue its offsets in this court, but the cases it cites do not address *insurer* insolvencies, which come within the ambit of the McCarran-Ferguson Act. *See* Mot. at 9 (citing *Preuss v. United States*, 412 F.2d 1293 (Ct. Cl. 1969) and *Frantz Equip Co. v. United States*, 122 Ct. Cl. 622 (1952)).

pursued) its claims in the state courts overseeing the Dispute Subclass's liquidations, as it is required to do by state and federal law.  The Court should deny the government's motion for leave to amend because it is futile for the government to raise claims that must be brought in a different forum, and because there is no inequity in forcing the government to pursue its debts in that forum.

### d.    Any Counterclaim for Interest Is Futile Because the Law Prohibits Post-Liquidation Interest and Prohibits Interest When the Government Is the Net Debtor

For hundreds of years, the rule has been that interest on a debt ceases to accrue once an entity enters insolvency proceedings.  *See In Re Liquidation of Pine Top Ins. Co.,* 322 Ill. App. 3d 693, 701-02 (2001) (holding that claims against insolvent insurers cannot include any post-allowance interest); *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 164 (1946) ("[t]he general rule in bankruptcy and in equity receivership has been that interest on the debtors' obligations ceases to accrue at the beginning of the proceedings"); *Sexton, as Trustee in Bankruptcy of Kessler & Co. v. Dreyfus*, 219 U.S. 339, 344 (1911) ("For more than a century and a half the theory of the English bankrupt system has been that everything stops at a certain date.").  This prohibition is reflected in both the Arizona and Colorado insurer insolvency laws, which fix the rights and liabilities of an insolvent insurer upon issuance of an order of liquidation. *See* Ariz. Rev. Stat. § 20-635 ("The rights and liabilities of the insurer and of its creditors, policyholders, stockholders, members, subscribers and all other persons interested in its estate shall, unless otherwise directed by the court, be fixed as of the date on which the order directing the liquidation of the insurer is filed[.]"); Colo. Rev. Stat. § 10-3-517(2) ("Upon issuance of the order, the rights and liabilities of any such insurer and of its creditors, policyholders, shareholders, members, and all other persons interested in its estate shall become fixed as of the date of entry of the order of liquidation[.]").

The government has posited that it is entitled to claim interest that continues to accrue to this day at an effective rate exceeding 15% annually, pursuant to 31 U.S.C.§ 3717 and 45 CFR § 30.18.  *See* July 7, 2020 E-mail from T. Mebane to B. Berkman (Ex. 2).  Needless to say, the government's position is inconsistent with the Arizona and Colorado laws fixing debts on the date a liquidation order is entered.  And, under the McCarran-Ferguson Act and *Fabe*, Arizona and Colorado law pre-empt the statutory bases for any assertion of post-liquidation order interest by the government.  Taken to its logical conclusion, the government's position is that it (and no other creditor, including policyholders) can continue to accrue post-liquidation order interest at above-market rates until the government's claims consume the insurer's entire estate—or, at the very least, until it consumes the entirety of the government's obligation to the insurer, which is precisely what the government has done to Meritus Health Partners.  It is difficult to conceive of a federal law that would more powerfully interfere with the rights of policyholders than one which allows the government to usurp via delay the entirety of a multi-million-dollar asset that could be used to pay policyholder claims.  *See Fabe*, 508 U.S. at 505-06 ("The primary purpose of a statute that distributes the insolvent insurer's assets to policyholders in preference to other creditors is identical to the primary purpose of the insurance company itself: the payment of claims made against policies.").

Moreover, even setting aside the McCarran-Ferguson Act, the government is not entitled to pre-judgment interest under the well-established "interest on the balance" rule.  Where two parties have claims that "arise out of related transactions,"[10] prejudgment interest "is available only on the net difference between the two claims at any point in time." *Local Oklahoma Bank v. United States*, 59 Fed. Cl. 713, 722-23 (2004) (*citing Ralston Purina Co. v. Parsons Feed &*

---

[10]   The government's position across the risk corridor cases has been that the ACA "created several interrelated programs under which the Parties' respective claims arise." *See* Dkt. 80 at 1.

*Farm Supply, Inc.*, 416 F.2d 207, 212 (8ᵗʰ Cir. 1969)).   "The objective of the rule is to compensate for the loss of the use of money only to the extent of the difference between the two claims."   *Id*. (internal quotation marks omitted).   With respect to both Meritus and Colorado HealthOp, the government is the *net debtor*—excluding the government's claimed prejudgment interest, it owes *more* to Meritus and Colorado HealthOp in risk corridor payments than the government asserts Meritus and Colorado HealthOp owe to it for other ACA obligations. Consequently, even if the government's bases for collecting interest in this case were not pre-empted by state law, the government would have no entitlement to the interest it seeks.

**III.    CONCLUSION**

For the foregoing reasons, the Court should deny the government's motion for leave to amend its answer.   To the extent the Court permits the government to proceed, it should prohibit the government from pursuing interest accrued after the date of the Dispute Subclass's insolvency orders.

DATED:  August 13, 2020                    Respectfully submitted,

                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP

                                            */s/ Stephen Swedlow*
                                            Stephen Swedlow
                                            stephenswedlow@quinnemanuel.com
                                            191 N. Wacker Drive, Suite 2700
                                            Chicago, Illinois 60606
                                            Telephone:  (312) 705-7400
                                            Facsimile:  (312) 705-7401

                                            J.D. Horton
                                            jdhorton@quinnemanuel.com
                                            Adam B. Wolfson
                                            adamwolfson@quinnemanuel.com
                                            865 S. Figueroa Street
                                            Los Angeles, California 90017
                                            Telephone:  (213) 443-3000
                                            Facsimile:  (213) 443-3100

*Attorneys for Plaintiff Health Republic
Insurance Company and the Classes*