**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY | |
| Plaintiff, on behalf of itself and all others similarly situated, | No. 1:16-cv-00259-MMS (Judge Sweeney) |
| v. | ORAL ARGUMENT REQUESTED |
| THE UNITED STATES OF AMERICA Defendant. | |

**OPPOSITION AND OBJECTION TO CLASS COUNSEL'S MOTION FOR APPROVAL OF ATTORNEY'S FEE REQUEST**

# TABLE OF CONTENTS

**Page**

I.   Introduction ..................................................................................................... 1

II.  Background ...................................................................................................... 3

    A.   The risk corridors program .................................................................... 3

    B.   History of the *Health Republic* and *Common Ground* cases .................... 3

    C.   Quinn Emanuel's role after the stay of *Health Republic* and *Common Ground* ................................................................................................. 5

III. The percentage-of-the-fund fee award Quinn Emanuel seeks is grossly excessive and not supported by a lodestar cross-check .................................................... 7

    A.   The lodestar shows that a fee award of $8.828 million would be generous ........... 7

        1.   *Hours worked*:  Because Quinn Emanuel has provided no bills or records of the time the firm purportedly billed, the Court should reduce its hours by *at least* 35% ................................................. 8

        2.   *Appropriate billable rate*:  The Court should reduce Quinn Emanuel's hourly rates based on the *Laffey* matrix .................................. 11

        3.   *Appropriate multiplier*:  The 18-19x multiplier Quinn Emanuel seeks is grossly excessive and unjustified .................................. 13

        4.   *Lodestar calculation*:  Based on the application of a reasonable multiplier to reasonable hours and rates, the lodestar cross-check results in a fee award of $8.828 million ..................................... 17

    B.   The lodestar method is more appropriate than the percentage-of-the-fund method for determining the fee award .................................................... 18

        1.   The lodestar is the appropriate method to calculate Quinn Emanuel's fee .......................................................................... 18

        2.   The cases Quinn Emanuel cites to support a 5% fee do not help it .......... 19

        3.   There was no advance agreement between Quinn Emanuel and the class about a 5% fee and set fee cases Quinn Emanuel relies on do not help it ............................................................................ 20

    C.   $8.828 million represents an appropriate fee award under any method ............... 21

IV.  Conclusion .................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Acevedo v. Brightview Landscapes, LLC*
2017 WL 4354809 (M.D. Pa. Oct. 2, 2017) ............................................................19

*Alexander v. FedEx Ground Package Sys., Inc.*
2016 WL 3351017 (N.D. Cal. June 15, 2016) ....................................................18, 19

*American Rena International Corporation v. Sis-Joyce International Co.*
2015 WL 12732433 (C.D. Cal. Dec. 14, 2015) ................................................8, 9, 10, 11, 18

*Americas Mining Corp. v. Theriault*
51 A.3d 1213 (Del. 2012) .....................................................................................17

*Beckman v. KeyBank, N.A.*
293 F.R.D. 467 (S.D.N.Y. 2013) .........................................................................16

*Bentley v. United of Omaha Life Ins. Co.*
2020 WL 3978090 (C.D. Cal. Mar. 13, 2020) .......................................................9

*In re BioScrip, Inc. Sec. Litig.*
273 F. Supp. 3d 474 (S.D.N.Y. 2017).................................................................22

*In re Bluetooth Headset Prods. Liab. Litig.*
654 F.3d 935 (9th Cir. 2011) .................................................................................7

*Blum v. Stenson*
465 U.S. 886 (1984)...............................................................................................11

*Boeing Co. v. Van Gemert*
444 U.S. 472 (1980)...............................................................................................7

*Brundle on behalf of Constellis Employee Stock Ownership Plan v. Wilmington Tr., N.A.*
258 F. Supp. 3d 647 (E.D. Va. 2017), *aff'd*, 919 F.3d 763 (4th Cir. 2019)...........13

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*
2008 WL 2371975 (N.D.N.Y. June 9, 2008)........................................................17

*In re Chiron Corp. Sec. Litig.*
2007 WL 4249902 (N.D. Cal. Nov. 30, 2007) ...................................................11

*In re Citigroup Inc. Bond Litig.*
988 F. Supp. 2d 371 (S.D.N.Y. 2013)............................................................14, 15

*In re Cook Med., Inc., Pelvic Repair Sys. Prods. Liab. Litig.*
  365 F. Supp. 3d 685 (S.D.W. Va. 2019) ...............................................15

*DL v. D.C.*
  924 F.3d 585 (D.C. Cir. 2019) ..........................................................11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*
  2013 WL 12387371 (N.D. Cal. Nov. 5, 2013) ...............................13, 18

*In re Enron Corp. Sec., Derivative & ERISA Litig.*
  586 F. Supp. 2d 732 (2008) ........................................................15, 16

*Estrada v. Bruno's Best Pizza, Inc.*
  2016 WL 3683186 (S.D.N.Y. June 20, 2016) .................................8, 17

*Foodtown, Inc. of Jacksonville v. Argonaut Ins. Co.*
  102 F.3d 483 (11th Cir. 1996) ..........................................................21

*Gattinella v. Kors*
  2016 WL 690877 (S.D.N.Y. Feb. 9, 2016) ....................................13, 14

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*
  55 F.3d 768 (3d Cir. 1995)..................................................................7

*Geneva Rock Prods., Inc. v. United States*
  119 Fed. Cl. 581 (2015) ..............................................................10, 21

*Georgia State Conference of the NAACP v. Kemp for Georgia*
  2018 WL 2271244 (N.D. Ga. Apr. 11, 2018) .....................................12

*Good v. W. Virginia-Am. Water Co.*
  2017 WL 2884535 (S.D.W. Va. July 6, 2017) ....................................17

*Haggart v. Woodley*
  809 F.3d 1336 (Fed. Cir. 2016)............................................................7

*Hensley v. Eckerhart*
  461 U.S. 424 (1983).............................................................8, 9, 11

*Hernandez v. Chipotle Mexican Grill, Inc.*
  257 F. Supp. 3d 100 (D.D.C. 2017) ..................................................12

*Ibarra v. Wells Fargo Bank, N.A.*
  2018 WL 5276295 (C.D. Cal. Sept. 28, 2018) ...............................13, 14

*Il Fornaio (Am.) Corp. v. Lazzari Fuel Co., LLC*
  2015 WL 2406966 (N.D. Cal. May 20, 2015) .................................9, 17

*IMS Health Corp. v. Schneider*
901 F. Supp. 2d 172 (D. Me. 2012) ....................................................................12

*In re Ins. Brokerage Antitrust Litig.*
282 F.R.D. 92 (D.N.J. 2012)...............................................................................19

*Kane Cty., Utah v. United States*
145 Fed. Cl. 15 (2019) ...........................................................................7, 10, 11

*Lahiri v. Universal Music & Video Distrib. Corp.*
606 F.3d 1216 (9th Cir. 2010) ..............................................................................9

*Maine Community Health Options v. United States*
140 S. Ct. 1308 (2020)...........................................................1, 2, 5, 6, 19, 21

*In re Merry-Go-Round Enterprises, Inc.*
244 B.R. 327 (Bankr. D. Md. 2000) ....................................................................16

*Moda Health Plan, Inc. v. United States*
130 Fed. Cl. 436 (2017) .........................................................................................4

*Moore v. United States*
63 Fed. Cl. 781 (2005) ...........................................................................................7

*Moore v. Verizon Commc'ns Inc.*
2014 WL 588035 (N.D. Cal. Feb. 14, 2014) ......................................................14

*In re NASDAQ Mkt.-Makers Antitrust Litig.*
187 F.R.D. 465 (S.D.N.Y. 1998) .........................................................................20

*Park v. Thomson Corp.*
633 F. Supp. 2d 8 (S.D.N.Y. 2009)...................................................................9, 10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*
991 F. Supp. 2d 437 (E.D.N.Y. 2014) .................................................................20

*Perkins v. Linkedin Corp.*
2016 WL 613255 (N.D. Cal. Feb. 16, 2016) ......................................................10

*In re Petrobras Sec. Litig.*
317 F. Supp. 3d 858 (S.D.N.Y. 2018)...................................................................7

*Quern v. Jordan*
440 U.S. 332 (1979)..............................................................................................21

*Quimby v. United States*
107 Fed. Cl. 126 (2012) .......................................................................................21

*Raulerson v. United States*
  108 Fed. Cl. 675 (2013) ................................................................20

*Retiree Support Grp. of Contra Costa Cnty. v. Contra Costa Cnty.*
  2016 WL 4080294 (N.D. Cal. July 29, 2016) ..................................21

*Retta v. Millennium Prods., Inc.*
  2017 WL 5479637 (C.D. Cal. Aug. 22, 2017) ..................................14

*In re Rite Aid Corp. Sec. Litig.*
  396 F.3d 294 (3d Cir. 2005) ..........................................................10

*Rodriguez v. Farmers Ins. Co. of Arizona*
  2014 WL 12544829 (C.D. Cal. Mar. 13, 2014) ...............................14

*Rodriguez v. Sec'y of Health & Human Servs.*
  91 Fed. Cl. 453 (2010) *aff'd*, 632 F.3d 1381 (Fed. Cir. 2011) ...............12

*Sabo v. United States*
  127 Fed. Cl. 606 (2016) ...............................................................8, 9

*Sakiko Fujiwara v. Sushi Yasuda Ltd.*
  58 F. Supp. 3d 424 (S.D.N.Y. 2014) ..............................................16

*In re Skelaxin*
  12-md-2343, Dkt. 747 (E.D. Tenn. June 30, 2014) .........................20

*Stetson v. Grissom*
  821 F.3d 1157 (9th Cir. 2016) ........................................................7

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*
  2005 WL 1213926 (E.D. Pa. May 19, 2005) ....................................16

*Thomas v. United States*
  121 Fed. Cl. 524 (2015) .................................................................21

*In re Tyco Int'l, Ltd. Multidistrict Litig.*
  535 F. Supp. 2d 249 (D.N.H. 2007) ...............................................20

*U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*
  2013 WL 10914086 (D.N.M. Aug. 9, 2013) .....................................12

*In re Visa Check/Mastermoney Antitrust Litig.*
  297 F. Supp. 2d 503 (E.D.N.Y. 2003) ............................................20

*Vizcaino v. Microsoft Corp.*
  290 F.3d 1043 (9th Cir. 2002) .......................................................13

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*
2017 WL 1352859 (N.D. Cal. Apr. 12, 2017) ...............................................13, 14, 15, 19, 22

*In re Washington Pub. Power Supply Sys. Sec. Litig.*
19 F.3d 1291 (9th Cir. 1994) ..........................................................................................18, 19

**Statutes**

28 U.S.C. § 1491(a)(1).............................................................................................................4

42 U.S.C. § 18062(b) ..............................................................................................................3

Pub. L. No. 113–235, § 227, 128 Stat. 2130, 2491 (2014) ............................................3

**Other Authorities**

77 Fed. Reg. 17,220, 17,220 (Mar. 23, 2012)......................................................................3

78 Fed. Reg. 15,410, 15,473 (2013) ..............................................................................3, 22

79 Fed. Reg. 30,240, 30,260 (2014) ..............................................................................3, 22

*Laffey* Matrix, available at http://www.laffeymatrix.com/see.html ...............................11, 12, 18

USAO Attorney's Fees Matrix - 2015-2020, available at
https://www.justice.gov/usao-dc/page/file/1189846/download...............................................12

The undersigned members of the *Health Republic* and *Common Ground* classes ("Objecting Class Members")[1] submit this opposition and objection to Quinn Emanuel's motion for approval of attorney's fees.

## I.      Introduction

Objecting Class Members oppose Quinn Emanuel's request for over $184 million in fees. Objecting Class Members agree that Quinn Emanuel should be compensated handsomely for the two class actions, both of which raised the issues ultimately won by other firms in the *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020) case.  But the amount Quinn Emanuel seeks—which would result in *hourly rates of over $18,000 per attorney* and a multiplier of *more than 18*—is simply too high, not grounded in precedent, unsupported by adequate evidence, and contrary to the representations Quinn Emanuel made to class members to encourage them to join the class.

*First*, Quinn Emanuel made important representations in the Court-approved class notice it sent to putative class members when it sought to increase class participation.  Specifically, it stated that:  (i) any fee would be constrained by a "lodestar cross-check (*i.e.*, a limitation on class counsel fees based on the number of hours actually worked on the case)"; (ii) the worst-case scenario would be 5% of the total recovery; and (iii) "the fee may be substantially less than 5% depending upon the level of class participation."  The fee motion now eschews each of these assurances.  It downplays the promised lodestar cross-check, claiming a cross-check is not really necessary or useful and the Court should not feel constrained by one.  Indeed, Quinn Emanuel does not even provide billing records needed to calculate an appropriate lodestar.  The motion also incorrectly suggests that 5% was not just a cap but an agreed-upon rate, citing alleged side conversations with a small and unidentified portion of the classes' 283 members.  And while it touts the class participation as "by orders of magnitude the largest" of all risk corridors cases, it

---

[1] The 34 specific class members submitting this opposition/objection are identified on the signature block.

does not acknowledge that this is precisely the level of participation that, according to the class notice, should result in a fee of "substantially less than 5%."

*Second*, the cases Quinn Emanuel relies on do not support its fee request. While the firm emphasizes that some cases have approved fee awards amounting to more than 5%, it fails to mention that the courts only made the percentage awards after performing lodestar cross-checks and finding low lodestar multipliers—in several cases below 1. The authorities Quinn Emanuel cites to support an unprecedented multiplier of more than 18 are similarly inapplicable. In fact, one case did not involve a lodestar at all, but an inquiry into whether a fixed fee agreement was unethical. Unlike the astronomical one Quinn Emanuel seeks here, lodestar multipliers are generally below 2, even in hard-fought cases, dealing with complex subject matter, and pursued by excellent counsel.

*Third*, the fee request aggrandizes Quinn Emanuel's role without appropriately crediting the huge roles played by others while *Health Republic* and *Common Ground* were stayed. This includes the six well-regarded law firms that represented the petitioners in *Maine Community Health Options*, and the several dozen others that submitted amicus briefs that were potentially helpful to the Federal Circuit and Supreme Court's consideration and resolution of the case. Quinn Emanuel similarly fails to acknowledge that this case turned on purely legal issues, did not require significant fact discovery, and did not require a fight over class certification.

Under decades of class action fee award authority, a fair, legally justifiable, and generous fee award would be $8.828 million. This sum results from an appropriate adjustment to the number of hours Quinn Emanuel claims to have billed to this matter (because it chose not to provide any billing entries), reasonable hourly rates based on the *Laffey* matrix (which is regularly applied to hourly rates of large law firms, including Quinn Emanuel), and a multiplier of 2, which Quinn Emanuel's own expert has acknowledged to be above-average. This sum would also appropriately account for the representations Quinn Emanuel made to class members to induce them to join the class and would richly compensate the firm for its role in the case.

II.     **Background**

A.     **The risk corridors program**

To induce health plans' participation in "Health Benefit Exchanges" meant to make health coverage more broadly available, the Affordable Care Act established the risk corridors program, which provided for reimbursements to health plans that suffered losses in the exchanges.  77 Fed. Reg. 17,220, 17,220 (Mar. 23, 2012); 42 U.S.C. § 18062(b).  But after the program began, Congress included an appropriations rider forbidding the Department of Health and Human Services (HHS) from adequately funding it.  *See* Pub. L. No. 113–235, § 227, 128 Stat. 2130, 2491 (2014).  Right away, entities involved with the exchanges highlighted the negative consequences that would come if the government did not follow through on its statutory promise to make risk corridors payments.  *See, e.g.*, Ex. 1, Comment by America's Health Insurance Plans (AHIP), 5 (April 21, 2014) (explaining that changing the rules of the risk corridors program would be unfair and could lead to market disruption).[2]  Thus, this concern was central to the dispute since at least 2014—well before this case began.  Prompted by comments like these, HHS repeatedly acknowledged its statutory obligation to make full risk corridors payments, even if it caused a program deficit.  *See, e.g.*, 78 Fed. Reg. 15,410, 15,473 (2013); 79 Fed. Reg. 30,240, 30,260 (2014).  HHS never followed through on its obligation to make these payments.

B.     **History of the *Health Republic* and *Common Ground* cases**

In February 2016, Quinn Emanuel filed the complaint in *Health Republic Insurance Company v. United States*, 1:16-cv-259, challenging the government's failure to make risk corridors payments.  Other prominent law firms and health plans were also involved with the

---

[2]  *See also* Ex. 2, Comment by BlueCross BlueShield Association, 21 (April 21, 2014) ("Potential QHP issuers need to be able to evaluate the parameters of the program and have confidence that the program will make payments and assess charges according to the published parameters before making their decision to participate in the marketplaces.  Implementing the risk corridors program in a budget-neutral manner is a reversal from the position that CMS took last year in the 2014 Benefit and Payment Parameter final rule.").

issue during the same period, and these firms brought several other separate lawsuits in early to mid-2016 challenging the government's nonpayment.  *See, e.g.*, *First Priority Life Ins. Co. v. United States*, 1:16-cv-587; *Moda Health Plan, Inc. v. United States*, 1:16-cv-649; *Blue Cross & Blue Shield of N.C. v. United States*, 16-cv-651; *Land of Lincoln Mut. Health Ins. Co. v. United States*, 16-cv-744; *Me. Cmty. Health Options v. United States*, 16-cv-967.  A year later, in June 2017, Quinn Emanuel filed a parallel complaint in *Common Ground Healthcare Coop. v. United States*, 1:17-cv-877.  The lawsuits were brought under the Tucker Act, the statute that waives sovereign immunity for claims against the United States based on a federal statute, like the Affordable Care Act provisions here.  28 U.S.C. § 1491(a)(1).

After the Court denied the government's motion to dismiss, in response to *unopposed* class certification motions by Quinn Emanuel, in early 2017, the Court appointed the firm as class counsel, appointed Health Republic as class representative, and certified the class as an opt-in class.  1:16-cv-259, Dkt. No. 30 (Jan. 3, 2017).  After certification, Quinn Emanuel sent a notice to prospective class members.  In the notice, to induce health plans to join the class, Quinn Emanuel made several important affirmative representations.  *First*, it represented that 5% of the class recovery was the absolute highest it might ultimately seek.  Dkt. No. 50-1.  *Second*, it represented that "[t]he fee may be substantially less than 5% depending upon the level of class participation represented by the final membership of the [class]."  *Id.  Third*, Quinn Emanuel also reassured prospective class members that its fees "will be determined by the Court subject to . . . what is called a 'lodestar cross-check' (i.e., a limitation on class counsel fees based on the number of hours actually worked on the case)."  *Id.*

Just a few months after class certification, the nature of Quinn Emanuel's role transformed because this case was stayed pending the outcome of other cases, which other counsel pursued.  The first risk corridors case to reach summary judgment was *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436 (2017).  Covington & Burling represented the plaintiff in that case.  In February 2017, the *Moda* Court (Judge Wheeler) granted plaintiff's motion for summary judgment, concluding that "[t]here is no genuine dispute that the

Government is liable to Moda." *Id.* at 466.  Judge Wheeler also agreed with positions taken

early on by AHIP and others in the Affordable Care Act exchange market that the government

needed to honor its promises:  "the Government made a promise in the risk corridors program

that it has yet to fulfill.  Today, the Court directs the Government to fulfill that promise." *Id.*

The government appealed Judge Wheeler's summary judgment order.  Pending the resolution of

that appeal, and appeals of similar rulings in other risk corridors cases, this Court stayed the

*Health Republic* and *Common Ground* cases in mid-2017—*three years ago*.  1:16-cv-259, Dkt.

No. 62 (July 11, 2017); 1:17-cv-877, Dkt. No. 9 (Aug. 9, 2017).  Those appeals by Moda, Blue

Cross & Blue Shield of North Carolina, Land of Lincoln, and Maine Community Health Options

ultimately made their way to the Supreme Court and led to the *Maine Community Health*

*Options* decision—again, all while *Health Republic* and *Common Ground* were stayed.

**C.**     **Quinn Emanuel's role after the stay of *Health Republic* and *Common Ground***

After the stay, activity in this case came to a halt.  At the Federal Circuit and Supreme

Court, the petitioners in *Maine Community Health Options* were represented by the law firms

Kirkland & Ellis, Brown & Peisch, Barnes & Thornburg, Massey & Gail, Covington & Burling,

and Crowell & Moring.  Multiple firms submitted amicus briefs, including Reed Smith, Husch

Blackwell, Akin Gump Strauss Hauer & Feld, Deutsch Hunt, Kiernan PLLC, O'Melveny &

Myers, Sidley Austin, Faegre Baker Daniels, Pepper Hamilton, McKenna Long & Aldridge, and

McDermott, Will & Emery.  Twenty-four states and the District of Columbia, National

Association of Insurance Commissioners, Wisconsin Physicians Service Insurance Corporation,

and WPS Health Plan filed other amicus briefs.

After the stay of *Health Republic* and *Common Ground*, Quinn Emanuel, too, authored

amicus briefs in support of the petitioners in *Maine Community Health Options* at both the

Federal Circuit and the Supreme Court.  At the Federal Circuit, Quinn Emanuel represented the

following amici:  Alliance of Community Health Plans; several individual economists; and

Health Republic Insurance Company.  At the Supreme Court, the only amici Quinn Emanuel

represented were the economists—not the plaintiffs or the class in *Health Republic* and *Common Ground*.

In its fee motion, Quinn Emanuel highlights the arguments it made in the economists' amicus briefs:  that the government needed to honor the promises it made to induce participation in the exchanges.  This argument was not unique or novel to Quinn Emanuel or the economists.  As noted above, these arguments were raised much earlier, including in 2014 comments to HHS and in Judge Wheeler's summary judgment order.  The *Maine Community Health Options* petitioners and other amici advanced identical arguments.  For example, consistent with its earlier objection, at both the Federal Circuit and the Supreme Court, AHIP—represented by Akin Gump, Deutsch Hunt, and Kiernan PLLC—made the same point and emphasized the unfairness of the government's position.  *See* Ex. 3, Brief of AHIP in Support of Rehearing En Banc, Case 17-1994, 2-11 (Fed. Cir. Aug. 10, 2018); *see also* Ex. 4, Supreme Court Amicus Brief of AHIP, 2 (Sept. 6, 2019) ("This Court has long recognized that no entity would partner with the government if it did not expect the government to adhere to its commitments.").[3]  AHIP's Federal Circuit brief was filed before the first amicus brief Quinn Emanuel filed on behalf of the economists, which it now touts.  Ex. 5, Brief of Economists in Support of Rehearing En Banc, Case 17-1224 (Fed. Cir. Aug. 14, 2018).

Quinn Emanuel's Supreme Court amicus brief made the same points, as did petitioners and other amici.  Ex. 6, Supreme Court Amicus Brief of Economists, 2 (Sept. 6, 2019).  And, in its decision, the Supreme Court emphasized the unfairness of the government's failure to honor its obligations.  *Maine Community Health Options*, 140 S. Ct. at 1331.  Thus, while Quinn Emanuel no doubt put effort into its amicus submissions, it is clear that several others (including Judge Wheeler) raised the theme for which Quinn Emanuel takes credit even before the firm submitted its first amicus brief.

---

[3]  Quinn Emanuel states in its brief (at 7) that it submitted the AHIP brief.  That is not correct.  As Mr. Swedlow's declaration confirms, Quinn Emanuel submitted an amicus brief on behalf of Alliance of Community Health Plans, which is *not* AHIP.  Swedlow Dec., ¶ 22.

**III.     The percentage-of-the-fund fee award Quinn Emanuel seeks is grossly excessive and not supported by a lodestar cross-check**

When, as here, a class has been certified, Rule 23(h) of the United States Court of Federal Claims authorizes the Court to award "reasonable attorneys' fees."  Courts recognize two methods for calculating fees:  the lodestar method and the percentage-of-the-fund method.  *Haggart v. Woodley*, 809 F.3d 1336, 1355 (Fed. Cir. 2016); *Stetson v. Grissom*, 821 F.3d 1157, 1165 (9th Cir. 2016).  A lodestar multiplies the number of hours reasonably spent by a reasonable hourly billing rate.  *See, e.g.*, *Kane Cty., Utah v. United States*, 145 Fed. Cl. 15, 18 (2019).  Courts also commonly apply an appropriate multiplier, *id.*, though "[t]here is a strong presumption that the lodestar is sufficient . . . without an enhancement multiplier."  *In re Petrobras Sec. Litig.*, 317 F. Supp. 3d 858, 876 (S.D.N.Y. 2018) (quoting *Perdue v. Kenny A.*, 559 U.S. 542, 546 (2010)).  The percentage-of-recovery method applies a certain percentage to the settlement fund.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

"Ultimately controlling is the requirement that the award of attorneys' fees be reasonable."  *Moore v. United States*, 63 Fed. Cl. 781, 786 (2005).  In pursuit of the goal of reasonableness, courts of appeal have recommended use of the lodestar method "to confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate."  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 n.40 (3d Cir. 1995); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 945 (9th Cir. 2011).  Thus, under this authority, whether the Court uses the lodestar as the starting point or as a cross-check, it is a critical aspect to calculating a fee award.  As discussed below, the lodestar cross-check shows that an award of $8.828 million would be generous.

**A.     The lodestar shows that a fee award of $8.828 million would be generous**

The $184 million Quinn Emanuel seeks would award the firm over $18,000 per hour for each attorney who worked on the matter.  This can be described only as an exorbitant hourly rate.  Quinn Emanuel can only reach this inflated sum by relying on select portions of inapposite cases.  $8.828 million, on the other hand, would represent a generous and legally defensible fee.

1.   *Hours worked*:  **Because Quinn Emanuel has provided no bills or records of the time the firm purportedly billed, the Court should reduce its hours by** *at least* **35%**

The party seeking fees bears the burden of establishing that the fees and costs were reasonably necessary to achieve the results obtained.  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  Quinn Emanuel claims that its "attorneys have worked almost 10,000 hours," and its paralegals, support staff, and summer associates "worked over 400 hours" on the *Health Republic* and *Common Ground* cases.  *See* Swedlow Dec., ¶ 23.  Based on these hours, Quinn Emanuel contends that its lodestar is $10 million.  *Id*.  But Quinn Emanuel has provided no records of the time its attorneys and staff purportedly billed.  All the Court has as evidence of these alleged hours is one paragraph in a declaration in support of the fee motion.  *Id*.  This lone paragraph is not enough to meet Quinn Emanuel's burden, especially since 10,000 hours would be an extraordinary amount of work for a case that has been stayed for the last 3 years.  The lack of detailed billing records is particularly puzzling since the class notice promised that a lodestar cross-check would apply.

A fee applicant must provide time records documenting the tasks completed and the time spent.  *Hensley*, 461 U.S. at 437.  "Sufficient documentation requires contemporaneous records of exact time spent on the case, by whom, their status and usual billing rates, as well as a breakdown of expenses such as the amounts spent copying documents, telephone bills, mail costs and other expenditures related to the case."  *Sabo v. United States*, 127 Fed. Cl. 606, 634 (2016) (Sweeney, J.).  "If proper records are not submitted, the court may deny fees altogether or it may reduce the award."  *Estrada v. Bruno's Best Pizza, Inc*., 2016 WL 3683186, at *2 (S.D.N.Y. June 20, 2016) (internal quotation marks omitted).

*American Rena International Corporation v. Sis-Joyce International Co*., 2015 WL 12732433 (C.D. Cal. Dec. 14, 2015), which involved a request for fees by Quinn Emanuel, highlights this principle.  There, Quinn Emanuel submitted contemporaneous time records in connection with its request for attorney's fees.  *Id.* at *42.  The court found that many of the

firm's time entries included block billing (*i.e.*, lumping together multiple tasks in a single billing entry) and that other entries were "completely redacted." *Id.* at *42-44. The court reduced the hours in block-billed entries by 10%, explaining that "[b]lock billing frustrates the ability of a court to evaluate the reasonableness of the time spent on each task." *Id.* at *43-44. The court's cuts to the redacted entries were even more severe. *Id.* at *44. Noting that the party seeking fees is responsible for accurate and specific accounting, the court excluded all hours where the firm had redacted the billing descriptions. *Id.* ("It is unclear how the court can evaluate the reasonableness of such entries when the entire subject matter is concealed.").

Consistent with *Sabo* and *American Rena*, countless common fund cases have reduced hours in a lodestar cross-check based on insufficient billing records. *See, e.g.*, *Park v. Thomson Corp.*, 633 F. Supp. 2d 8, 13 (S.D.N.Y. 2009) (describing a 35% reduction in a common fund case as "modest" because counsel listed tasks performed, but did not supply billing records); *Bentley v. United of Omaha Life Ins. Co.*, 2020 WL 3978090 (C.D. Cal. Mar. 13, 2020) (applying a 30% reduction in a common fund case because task descriptions were vague); *Il Fornaio (Am.) Corp. v. Lazzari Fuel Co., LLC*, 2015 WL 2406966, at *4 (N.D. Cal. May 20, 2015) (criticizing counsel in a common fund case for spending "2,681.05 hours of work on a case which never reached summary judgment or trial," finding the amount "overstated" and "not justified," and reducing it by more than 40% on the cross-check); *see also Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1222-23 (9th Cir. 2010) (affirming 30% reduction of block-billed hours).

Quinn Emanuel's evidentiary support for its fee application here is even more deficient than in the foregoing cases. Indeed, Quinn Emanuel does not submit any time records at all. Not even redacted ones. Because Quinn Emanuel did not support the request with the documents required by *Hensley*, neither class members, nor the Court, can evaluate whether it was appropriate to spend almost 10,000 hours on two cases that did not involve disputed issues of fact and that were stayed well before significant discovery or trial preparation. No one can tell what work Quinn Emanuel did or why the work was necessary.

Quinn Emanuel argues that it need not supply time records, but the cases it cites do not support this point.  In *Kane*, 145 Fed. Cl. 15, unlike here, counsel *did* provide timesheets, and the court reviewed them and found the entries "reasonable and commensurate with the work required."  *Id.* at 20.  *In re Rite Aid Corp. Sec. Litig*., 396 F.3d 294 (3d Cir. 2005) also does not suggest that plaintiffs' counsel could simply assert ballpark hours figures like Quinn Emanuel has done here.  In reversing the district court for incorrect calculation of the lodestar, the Third Circuit implied that any acceptable summary would need to be detailed, emphasizing "that lawyers have an incentive to increase their hours for cross-check purposes."  *Id.* at 307 n.16.  *Geneva Rock Prods., Inc. v. United States*, 119 Fed. Cl. 581 (2015), is similarly unhelpful to Quinn Emanuel.  There, the court was able to determine that 2,600 hours was "reasonably expended" over the course of 5 years in that case, which required counsel to "work[] steadily on voluminous discovery."  *Id.* at 590-91.  The same cannot be said here, where Quinn Emanuel asserts it spent *4 times* as many hours on cases that were stayed for years and that involved no discovery.  Moreover, even in cases that have calculated the lodestar without timesheets and billing statements, plaintiffs' counsel nonetheless provided the court with a lawyer-by-lawyer breakdown of the lodestar by task.  *See, e.g., Perkins v. Linkedin Corp*., 2016 WL 613255, at *17 (N.D. Cal. Feb. 16, 2016) (relying on sworn declarations that, unlike here, included "detailed summaries of their time, demonstrating both the number of hours spent by specific individuals on the necessary work, and the nature of the work performed").

Without the billing records, the Court is simply unable to perform a cross-check.  The above authorities make clear that this Court should reduce the hours Quinn Emanuel claims to have billed.  As for how much, if no reimbursement was warranted for redacted entries in *American Rena*,[4] and if a 35% reduction was "*modest*" in *Park*, where the claimant at least provided a break out of the tasks it performed, there can be no question that a reduction of only

---

[4]  Despite the result in *American Rena*, Objecting Class Members do *not* seek a denial of Quinn Emanuel's fee application in its entirety.

35% would be *generous* here, where Quinn Emanuel has supplied no documentation for its claimed hours. Without such a reduction, firms will have no incentive to follow the dictate of *Hensley*. Thus, the Court can and should reduce the "almost 10,000 hours" of alleged attorney time to 6,500 or fewer hours, and the "over 400 hours" of support time to 260 or fewer hours.[5]

> **2.      *Appropriate billable rate*:  The Court should reduce Quinn Emanuel's hourly rates based on the *Laffey* matrix**

"[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).  Quinn Emanuel does not satisfy this burden.  Nor can it:  the hourly rates it seeks are staggeringly high.

To determine an appropriate hourly rate for use in the lodestar cross-check, courts routinely refer to one of two *Laffey* matrices.  *See Kane*, 145 Fed. Cl. at 19; *see also In re Chiron Corp. Sec. Litig.*, 2007 WL 4249902, at *6 (N.D. Cal. Nov. 30, 2007) ("A widely recognized compilation of attorney and paralegal rate data is the so-called *Laffey* matrix, so named because of the case that generated the index.").  One *Laffey* matrix is for "sophisticated federal-court practitioners in the District of Columbia," and the second—maintained by the U.S. Attorney's Office for the District of Columbia—is for "all types of lawyers" in the metropolitan area.  *DL v. D.C.*, 924 F.3d 585, 587 (D.C. Cir. 2019).  *Laffey* rates are regularly used to calculate fee awards for work by big-name firms—including Quinn Emanuel—on complex cases.  *See, e.g.*, *Am. Rena*, 2015 WL 12732433, at *41 (applying the U.S. Attorney's Office's *Laffey* matrix rates to Quinn Emanuel and adjusting the *Laffey* rates downwards after finding that Washington D.C. legal professionals have a higher hourly rate when compared to Los Angeles legal professionals); *U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*, 2013 WL 10914086, at *22 (D.N.M. Aug. 9, 2013) (applying *Laffey* matrix in award for the firm Skadden Arps Slate Meagher & Flom LLP in a

---

[5] Indeed, based on the complete absence of billing records, it is impossible for the Court to determine whether the claimed "support" time is even compensable.

complex healthcare False Claims Act suit); *Hernandez v. Chipotle Mexican Grill, Inc.*, 257 F. Supp. 3d 100, 116 (D.D.C. 2017) (Arnold & Porter LLP); *IMS Health Corp. v. Schneider*, 901 F. Supp. 2d 172, 195-96 (D. Me. 2012) (applying *Laffey* matrix rates to Thomas C. Goldstein, then of Akin Gump).

Moreover, even the lower U.S. Attorney's Office *Laffey* rates have been found to be *too high* for cases, like this one, with no significant discovery disputes and no jury trial. *Rodriguez v. Sec'y of Health & Human Servs.*, 91 Fed. Cl. 453, 465 (2010) (Sweeney, J.) *aff'd*, 632 F.3d 1381 (Fed. Cir. 2011); *cf. Georgia State Conference of the NAACP v. Kemp for Georgia*, 2018 WL 2271244, at *3 (N.D. Ga. Apr. 11, 2018) (refusing to pay Hogan Lovells based on *Laffey* matrix and instead paying rates below the *Laffey* ones).

The *Laffey* matrices make clear that the rates Quinn Emanuel seeks are too high. *See* Swedlow Dec., ¶ 23 (seeking hourly rates of $325 per hour for support staff, $600 to $905 for associates, and $870 to $1,250 for partners). For the years relevant here, the *Laffey* matrix rates for sophisticated work are between $331 an hour for a junior attorney and $899 an hour for a senior attorney with over 20 years of experience and $180 to $203 an hour for support staff. *Laffey* Matrix, available at http://www.laffeymatrix.com/see.html. The U.S. Attorney's Office *Laffey* rates for the same period are between $291 and $637 an hour for attorneys and $157 to $173 an hour for support staff. USAO Attorney's Fees Matrix - 2015-2020, available at https://www.justice.gov/usao-dc/page/file/1189846/download.

Thus, applying even the most favorable *Laffey* matrix—and ignoring that Quinn Emanuel avoided rigorous discovery, any fight on class certification, and trial—the rates it seeks are 30 to 45% too high. It would therefore be reasonable for the Court to reduce the rates by at least 35% from an unspecified blended rate of $1,033 to a blended rate of $671. It would likewise be reasonable to reduce support staff time—if included at all—to a rate that falls within the *Laffey* range, with a maximum of $203 an hour.

3.      *Appropriate multiplier*:  The 18-19x multiplier Quinn Emanuel seeks is
grossly excessive and unjustified

Quinn Emanuel seeks a multiplier over 18.  This is simply not appropriate, and any fee award close to what Quinn Emanuel seeks would be unprecedented.

"Although the range of multipliers used by district courts in common-fund cases varies widely, an overwhelming majority of district courts have used between 1.0-4.0 as the multiplier." *Ibarra v. Wells Fargo Bank, N.A.*, 2018 WL 5276295, at *5 (C.D. Cal. Sept. 28, 2018) (internal quotation marks omitted); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002) (charting multipliers in common fund cases).  As even Quinn Emanuel's fee expert Brian T. Fitzpatrick has conceded, most multipliers are well below 2, and the average multiplier is 1.62. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2013 WL 12387371, at *13 (N.D. Cal. Nov. 5, 2013) (noting that Fitzpatrick "reported that of the 192 fee awards studied where 'a lodestar cross-check and the lodestar multiplier was ascertainable, the mean and median multipliers were 1.62 and 1.30.'")[6]; *Gattinella v. Kors*, 2016 WL 690877, at *2 (S.D.N.Y. Feb. 9, 2016) (reducing award by using a 1.94 multiplier, and explaining that the lodestar multiplier of 2.4 sought there was "higher than what other courts, including this one, have typically awarded.").  Significantly, multipliers tend to be low when the common fund is large, since large

---

[6] There is no need for either of Quinn Emanuel's two "fee experts" here because the Court can assess the legal and factual questions at issue and their declarations do little more than repeat Quinn Emanuel's arguments.  This Court should therefore join the other courts that have rejected the opinions of both Fitzpatrick and Charles Silver.  *See, e.g.*, *Brundle on behalf of Constellis Employee Stock Ownership Plan v. Wilmington Tr., N.A.*, 258 F. Supp. 3d 647, 665 (E.D. Va. 2017), aff'd, 919 F.3d 763 (4th Cir. 2019) (rejecting similar declaration by Silver in support of a class action fee award and noting that "there is no evidence that Silver has ever tried a case in this district, or anywhere else for that matter"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 2017 WL 1352859, at *3 (N.D. Cal. Apr. 12, 2017) (declining to follow Fitzpatrick's recommendation for the court to award $28.56 million in fees under the percentage method where it would have led to a 19x lodestar multiplier on cross-check). Fitzpatrick and Silver are particularly objectionable because they routinely provide testimony across the nation favorable to class counsel in support of attorney's fees.  *See, e.g.*, *id.*  To our knowledge, they have never testified that any class counsel should be paid a dollar less than they requested.

funds lead to large fee awards even without a multiplier, and because it is the reasonableness of the absolute size of the fee award (rather than the amount of the multiplier) that is the true focus of the court's inquiry. *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 376 (S.D.N.Y. 2013) ("[C]ourts in this Circuit have trended toward awarding . . . lower multipliers for awards from extremely large common funds.").

When, unlike here, a case requires several depositions, extensive written discovery, and disputes over class certification, those factors can serve as bases for a reasonable increase to the multiplier. *Retta v. Millennium Prods., Inc.*, 2017 WL 5479637, at *12 (C.D. Cal. Aug. 22, 2017) (citing extensive discovery and motion practice as basis to increase multiplier); *Moore v. Verizon Commc'ns Inc.*, 2014 WL 588035, at *7 (N.D. Cal. Feb. 14, 2014) (justifying multiplier on "substantial risk that Plaintiffs would not succeed at the class certification or merits stage of the litigation"). On the other hand, the lack of this kind of extensive discovery or motion practice weighs against a substantial multiplier. *Rodriguez v. Farmers Ins. Co. of Arizona*, 2014 WL 12544829, at *5 (C.D. Cal. Mar. 13, 2014) (explaining that lack of discovery or contested class certification weighed against a substantial multiplier).

Courts regularly apply multipliers between 1 and 2 in complex cases brought by exceptional counsel, who assumed significant risks, and expended substantial resources in pursuing the case. *Clean Diesel*, 2017 WL 1352859, is directly on point. There, as here, the plaintiffs' counsel sought a multiplier in the "mid to high teens." *Id.* at *3. Citing other sophisticated common fund cases, the court rejected this request as "simply not appropriate." *Id.* Instead, the court applied a multiplier of 2 to compute the fee award for the well-known class action lawyers who pursued that case. *Id.* at *6. As the Court explained, this multiplier was "comparable to multiples applied in other complex class actions." *Id.* at *3; *Ibarra*, 2018 WL 5276295, at *6 (explaining that a multiplier of 2 "is within the range most commonly applied in class actions resulting in common fund judgments."); *see also Gattinella*, 2016 WL 690877, at *1-2 (S.D.N.Y. Feb. 9, 2016) (emphasizing "complex issues of liability and damages," "significant risks," "substantial resources" expended, and "exceptional work" and awarding 1.94

multiplier); *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d at 376, 379 (awarding 1.34 multiplier where "litigation was both broad in scope and complex," the case involved "risk of an unfavorable outcome brought on by changes in applicable case law," "the applicable law [wa]s far from simple," and the quality of counsel was "deserving of a substantial award"); *In re Cook Med., Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 365 F. Supp. 3d 685, 701 (S.D.W. Va. 2019) (1.8 multiplier). Notably, even these decisions reflect a multiplier that is skewed upwards when compared to what would be appropriate here, because the courts applied these multipliers to hourly rates far below even the *Laffey* rates. *See, e.g., Clean Diesel*, 2017 WL 1352859, at *4 ($502 average rate).

Courts reserve multipliers above this range for the most trend-setting cases, pursued by plaintiff's counsel "efficiently," *and with virtually no help from other firms. In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 787-803 (2008). *Enron* shows how extraordinary a case must be to warrant a high multiplier of 5.2, and why this case does not come close. That case posed "extraordinary complexity and risk" as well as a "substantial financial burden." *Id.* at 790. Since every obvious culpable party had been shuttered, class counsel needed to pioneer a "a novel theory of scheme liability" to recover and as a result there was a substantial risk of "little or no recovery." *Id.* at 791-93, 797. Nonetheless, class counsel made what was likely "the largest investment ever made in a single securities class action." *Id.* at 791. The case, already "extremely complex," was made more complex because "in the course of th[e] litigation, various binding, higher-court decisions" made recovery "increasingly difficult." *Id.* at 788. The 6-year case involved "several hundred" fact depositions, "numerous" dispositive motions, "enormous energy and effort" on class certification issues, and pursuit through the district court, Fifth Circuit, and Supreme Court. *Id.* at 786-87. The case was also pursued leanly; indeed, an independent federal judge assigned to review the firm's billing records commented that he "would have expected the lodestar amount to be significantly higher," which showed that class counsel "was extremely efficient." *Id.* at 788. Finally, the court found it highly notable that counsel acted virtually alone, distinguishing another case in which "three

firms" had been involved. *Id.* at 803. In fact, counsel's efforts were thwarted by separate criminal and bankruptcy matters that eroded time and assets, and complicated discovery. *Id.* at 772, 791-92. None of the extraordinary circumstances that drove the *Enron* multiplier are present here. Quinn Emanuel did not make "the largest investment ever made," an independent judge did not declare that it was "extremely efficient," it did not pursue a dwindling pool of funds, it was not thwarted by separate bankruptcies and criminal actions, and it had considerable support from other firms.

Given this authority, the multiplier sought by Quinn Emanuel is astronomical and unjustified. The cases Quinn Emanuel cites are outliers, and do not support the fee request. *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000), was not a class action but an adversary proceeding brought under a set contingency fee agreement that—unlike here— the client had approved in advance. *Id.* at 330. As a result, the court declined to use a lodestar analysis at all. *Id.* at 335. The question in *Merry-Go-Round* was whether the contingency fee was so high that it was unethical under the Rules of Professional Conduct. *Id.* at 338. After much consternation, the court found that the award did not violate that different test. *Id.* at 341.

Likewise, the suggestion in *Beckman v. KeyBank, N.A*., 293 F.R.D. 467 (S.D.N.Y. 2013), that a lodestar multiplier of 8 is common has been rejected as outright false. *Sakiko Fujiwara v. Sushi Yasuda Ltd*., 58 F. Supp. 3d 424, 437 (S.D.N.Y. 2014). Citing *Beckman*, the court in *Sakiko* explained that "[t]his exact sentence, with the same case citations in support of it, has made its way into many court 'decisions' in this circuit via proposed orders drafted by plaintiffs' attorneys." *Id.* The court dismissed it as inaccurate posturing by opportunistic plaintiff's counsel and instead applied a 1.75 multiplier. *Id.* The other cases that Quinn Emanuel cites also do not support its sky-high multiplier. *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp*., 2005 WL 1213926, at *16-18 (E.D. Pa. May 19, 2005) (agreeing to a 15.6 multiplier after making clear that the vast majority of megafund multipliers are between 1 and 2.95, and emphasizing the "extraordinary support Plaintiffs have shown for counsel's request for fees," including that the general counsel of one class member submitted a declaration advocating for an

even higher fee); *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1257 (Del. 2012) (a case in which, unlike here, a lodestar cross-check was neither promised, nor applied).

Based on this authority, a multiplier between 1 and 2 would be appropriate here and would more than adequately compensate Quinn Emanuel for its role in the case.  This is in line with what courts have rewarded excellent counsel in complex cases, especially in view of the size of the fund here, and the amount the multiplier would be applied to.

4.     ***Lodestar calculation*: Based on the application of a reasonable multiplier to reasonable hours and rates, the lodestar cross-check results in a fee award of $8.828 million**

Applying a multiplier of 2 (which Quinn Emanuel's own expert has testified is well above average) to a reasonable hourly rate (a blended rate of $671 for attorney time and, potentially, $203 for support time), and a reasonable number of hours (6,500 hours for attorneys; 260 for others), a reasonable fee award would be $8.828 million or lower.

Unlike Quinn Emanuel's requested fee, $8.828 million represents a reasonable fee under settled common fund precedent.  Indeed, if a class member wished to be a hard-nosed adversary on these issues, it could ask the Court to award far below $8 million.  It could emphasize the countless courts that have applied multipliers between 0.07 and 1.  *See, e.g.*, *Good v. W. Virginia-Am. Water Co.*, 2017 WL 2884535, at *27 (S.D.W. Va. July 6, 2017) (explaining that Fitzpatrick's research revealed cross-check multipliers as low as 0.07).  It could contend that Quinn Emanuel's purported hours billed should be reduced by far more than 35% since the firm chose not provide billing records.  *Estrada*, 2016 WL 3683186, at *2 ("If proper records are not submitted, the court may deny fees altogether."); *Il Fornaio (Am.) Corp.*, 2015 WL 2406966, at *4 (40% reduction in common fund case).  It could also contend that Quinn Emanuel should receive no credit for hours spent on amicus briefs at all.  *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 2008 WL 2371975, at *5 (N.D.N.Y. June 9, 2008) (rejecting the argument that filing an amicus brief in a separate case was "absolutely necessary to ensure [plaintiffs'] victory," and therefore concluding that fees for amicus brief were not recoverable).

And it could seek rates based on the lower U.S. Attorney's Office's *Laffey* matrix rates and reduced to account for lower hourly rates in Quinn Emanuel's Los Angeles hub. *Am. Rena*, 2015 WL 12732433, at *41. But Objecting Class Members do not wish to pick these fights and do not wish to rely on cherry-picked data points and cases. Instead, as partners in the risk corridors effort, they seek a fair reward for Quinn Emanuel. A fair, reasonable, and legally defensible fee award would be $8.828 million.

But even if the Court were to give Quinn Emanuel every benefit of doubt, the award should not exceed $20 million. To get there, the Court would need to ignore the firm's failure to provide time records, accept the purported hours billed without question or documentation, accept the blended hourly rates with no reduction, and apply a multiplier of around 2, which according to Quinn Emanuel's own expert, is well above average. Swedlow Dec., ¶ 23 (asserting Quinn Emanuel's lodestar is about $10 million); *DRAM*, 2013 WL 12387371, at *13. Thus, $20 million is the highest award that could be even arguably tethered to an appropriate lodestar here, and represents an absolute cap on fees—and it is still unreasonable under the circumstances.

**B.     The lodestar method is more appropriate than the percentage-of-the-fund method for determining the fee award**

As is common in high dollar value cases, the lodestar method supplies the appropriate fee award. Thus, the Court should simply apply the lodestar. None of the arguments Quinn Emanuel makes to justify application of a 5% fee have merit.

**1.     The lodestar is the appropriate method to calculate Quinn Emanuel's fee**

When a case involves a large fund, "picking a percentage without reference to all the circumstances of the case, including the size of the fund, would be like picking a number out of the air." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1297 (9th Cir. 1994). As a result, "in megafund cases, the lodestar cross-check assumes particular importance." *Alexander v. FedEx Ground Package Sys., Inc.*, 2016 WL 3351017, at *2-3 (N.D. Cal. June 15,

2016).  When a lodestar shows that a percentage method would create an outsized reward, courts appropriately adopt the lodestar.  *Clean Diesel*, 2017 WL 1352859, at *2-3.

*Clean Diesel* is again directly on point.  Analogous to the progress attributable to lead counsel in *Maine Community Health Options*, "much of the groundwork" for the settlement in *Clean Diesel* had been laid through a separate settlement.  2017 WL 1352859, at *2.  And analogous to the large sums that the government failed to pay class members here, the high settlement value in *Clean Diesel* "resulted substantially from the nature and value of the assets at issue."  *Id.*  Thus, the court explained, "because the Settlement was substantial . . . even a modest percentage of the Settlement would generate an outsized award of attorneys' fees."  *Id.*  The court therefore held that the percentage method would overcompensate the class attorneys and violate the ultimate goal of reasonableness.  *Id.* at *2-3.

The result of *Clean Diesel*, *Alexander*, and *Washington Public Power* is warranted here.  The judgment was high here because the amount in controversy was high.  The case was stayed while other capable counsel pursued *Maine Community Health Options*, reducing Quinn Emanuel's burden, its risk, and its contribution to the ultimate result.  Using a percentage-of-the-fund approach here would not produce a reasonable fee but would be like "picking a number out of the air."  *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d at 1297.  Thus, just like many other cases, and consistent with Quinn Emanuel's representations to class members when it sought their participation in the class, the lodestar method produces the appropriate fee award.

### 2.     The cases Quinn Emanuel cites to support a 5% fee do not help it

Quinn Emanuel cites several cases for the proposition that the Court should apply a 5% fee.  In full context, none of the cases support Quinn Emanuel's request.  For example, the request cites *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 124 (D.N.J. 2012) and *Acevedo v. Brightview Landscapes, LLC*, 2017 WL 4354809, at *19 (M.D. Pa. Oct. 2, 2017) for the proposition that 30% to 40% is a reasonable contingent fee, but it fails to mention that the courts only awarded fees there after performing a lodestar cross-check and finding a multiplier of 0.34

and 1.3 respectively.  It cites *Raulerson v. United States*, 108 Fed. Cl. 675, 679 (2013) for the proposition that a 33% award is reasonable, but it does not acknowledge that the court only reached its fee award after determining that the lodestar cross-check was below 1.  Quinn Emanuel also emphasizes the 33.33% fee in *Neurontin Antitrust Litig.*, 2:02-cv-01830, Dkt. 114 (D.N.J. Aug. 6, 2014) and *In re Skelaxin*, 12-md-2343, Dkt. 747 (E.D. Tenn. June 30, 2014), but it again leaves out the fact that the courts so concluded only after determining that it would "equate to a lodestar multiplier of approximately 1.99" in *Neurontin* and "a lodestar multiplier between 2.1 and 2.5" in *Skelaxin*.  This pattern continues throughout Quinn Emanuel's brief. Mot. at 26 (touting the percentage fee but failing to mention that the courts made the awards only after performing a cross-check and finding lodestars well below 4 in *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 271 (D.N.H. 2007), *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998), *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 448 (E.D.N.Y. 2014), and *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003)).

If anything, the cases confirm that the lodestar method is appropriate here.  Indeed, the low lodestars found in the cases show that a multiplier of 2 would be generous.

3.      **There was no advance agreement between Quinn Emanuel and the class about a 5% fee and set fee cases Quinn Emanuel relies on do not help it**

Seeking to analogize this case to ones where clients agreed to a set fee in advance, Quinn Emanuel implies that class members have already agreed to a set 5% fee.  Specifically, Quinn Emanuel claims that, even though the notice it sent to class members informed them that 5% was the absolute cap, could be substantially reduced based on class participation, and would be subject to a lodestar cross-check, nevertheless, in side conversations with "dozens" of unidentified class members Quinn Emanuel asked them to assume the firm would seek 5%. Swedlow Dec., ¶¶ 15, 21.

These statements are pure inadmissible hearsay and the Court should disregard them. The Court should also reject Quinn Emanuel's reliance on these purported statements because

-20-

they contradict the court-approved notice all class members received and relied upon.  *Retiree Support Grp. of Contra Costa Cnty. v. Contra Costa Cnty*., 2016 WL 4080294, at *6 (N.D. Cal. July 29, 2016) (class counsel are prohibited from making representations that undermine or contradict the class notice); *Quern v. Jordan*, 440 U.S. 332, 335 n.3 (1979) (class notices are meant "for the protection of the members of the class").

Moreover, these conversations, even if they took place, would not be enforceable because, as the court held in one of the two cases cited by Quinn Emanuel in the class notice, any such fee arrangement must be in writing.  *Geneva Rock*, 119 Fed. Cl. at 593 ("[T]he fee arrangement negotiated by class counsel fails to adhere to the law governing contingent fee agreements requiring them to be in writing."); *Foodtown, Inc. of Jacksonville v. Argonaut Ins. Co*., 102 F.3d 483, 485 (11th Cir. 1996) (same).  And it certainly goes without saying that conversations with a few unidentified class members would not bind all 283 class members.

In sum, there was no agreement setting a 5% fee.  Thus, it does not help Quinn Emanuel that class members agreed to a set fee provision in *Quimby v. United States*, 107 Fed. Cl. 126 (2012) and *Thomas v. United States*, 121 Fed. Cl. 524 (2015), because that's simply not what happened here.

**C.    $8.828 million represents an appropriate fee award under any method**

Quinn Emanuel's main role here was to wait while other good firms won *Maine Community Health Options*.  This was the appropriate legal strategy; there was no need for Quinn Emanuel to invest substantial hours once *Health Republic* and *Common Ground* were stayed.  But this fact impacts every one of the factors considered in making a common fund fee award, and makes clear that an award of $8.828 million or below is generous and appropriate, and anything approaching or over $20 million would be patently unreasonable.

- The Court regularly considers cases brought under the Tucker Act, and involving the Affordable Care Act, and is able to evaluate the complexity of those statutes.  But even accepting those statutes as incomprehensively complex, counsel other than Quinn Emanuel largely argued and resolved any complexities.

- The substantive participation of many qualified firms tempered the risk of non-recovery, and a fee of $8.828 fully compensates for the risk.  Moreover, since the defendant in this case is the government, it is unlike other cases in which litigation risk is high based on "risks that the defendant may be unable to pay any ultimate award."  *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d 474, 498 (S.D.N.Y. 2017).

- As Quinn Emanuel concedes, the *Health Republic* and *Common Ground* class members comprise "*one-third of the total value of all risk corridors claims,*" representing "*by orders of magnitude the largest contingent . . . represented by any law firm in risk corridors litigation.*"  Swedlow Dec., ¶ 17 (emphasis added).  According to the class notice, and consistent with the lodestar, this type of class participation is precisely the circumstance that should send the fee plunging to "*substantially* less than 5%."  Dkt. No. 50-1 (emphasis added).

- Other class actions have made awards well below 5%.  *See, e.g.*, *Clean Diesel*, 2017 WL 1352859, at *6 (0.24%).  Moreover, we can find no case that has applied such a high fee percentage where the case was stayed and ultimately won as the result of a decision rendered in a separate case pursued by separate counsel.

## IV.   Conclusion

The Supreme Court correctly held that the government should stand by its word.  The same premise applies to Quinn Emanuel.  Quinn Emanuel touted the 5% as a ceiling, which could be "substantially reduced" depending on class participation, and that would be subject to a lodestar cross-check.  Considering those factors, the Court should award $8.828 million or less because that huge sum is the amount Quinn Emanuel is due.

Dated:  August 20, 2020          Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

_____

MOE KESHAVARZI
MKeshavarzi@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone: 213.620.1780
Facsimile: 213.620.1398

JACK BURNS
JBurns@sheppardmullin.com
501 West Broadway, 19th Floor
San Diego, CA 92101-3598
Telephone: 619.338.6588

Attorneys for:
Kaiser Foundation Health Plan, Inc., Kaiser Foundation Health
Plan of Georgia, Kaiser Foundation Health Plan of the Mid-
Atlantic States, Inc., Kaiser Foundation Health Plan Inc. of
Colo., Harken Health Insurance Company, Health Plan of
Nevada, Inc., Oxford Health Plans (NJ), Inc., Rocky Mountain
Health Maintenance Organization, Incorporated,
UnitedHealthcare Benefits Plan of California, UnitedHealthcare
Community Plan, Inc., UnitedHealthcare Insurance Company,
UnitedHealthcare Life Insurance Company UnitedHealthcare of
Alabama, Inc., UnitedHealthcare of Colorado, Inc.,
UnitedHealthcare of Florida, Inc., UnitedHealthcare of Georgia,
Inc., UnitedHealthcare of Kentucky, Ltd., UnitedHealthcare of
Louisiana, Inc., UnitedHealthcare of Mississippi, Inc.,
UnitedHealthcare of New England, Inc., UnitedHealthcare of
New York, Inc., UnitedHealthcare of North Carolina, Inc.,
UnitedHealthcare of Oklahoma, Inc., UnitedHealthcare of
Pennsylvania, Inc., UnitedHealthcare of the Mid-Atlantic, Inc.,
UnitedHealthcare of the Midlands, Inc., UnitedHealthcare of the
Midwest, Inc., UnitedHealthcare of Utah, Inc., UnitedHealthcare
of Washington, Inc., UnitedHealthcare of Ohio, Inc., Rocky
Mountain HealthCare Options, Inc., All Savers Insurance
Company, UnitedHealthcare Insurance Company Inc., and
CareConnect Insurance Company, Inc. fka North Shore-LIJ
Insurance Company Inc.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY | |
|         Plaintiff, on behalf of itself and all others similarly situated, | No. 1:16-cv-00259-MMS (Judge Sweeney) |
|     v. | |
| THE UNITED STATES OF AMERICA | |
|         Defendant. | |

**DECLARATION OF MOE KESHAVARZI IN SUPPORT OF OPPOSITION AND OBJECTION TO CLASS COUNSEL'S MOTION FOR APPROVAL OF ATTORNEY'S FEE REQUEST**

I, Moe Keshavarzi, declare as follows:

1.      I am an attorney with Sheppard, Mullin, Richter & Hampton LLP.  I have personal firsthand knowledge of the facts set forth herein, except where the context indicates otherwise.

2.      Exhibit 1 is a true and correct copy of a comment by America's Health Insurance Plans (AHIP) dated April 21, 2014, which was retrieved from the government website regulations.gov.

3.      Exhibit 2 is a true and correct copy of a comment by BlueCross BlueShield Association dated April 21, 2014, which was retrieved from the government website regulations.gov.

4.      Exhibit 3 is a true and correct copy of the brief submitted in the Federal Circuit by AHIP in support of rehearing en banc dated August 10, 2018, which was retrieved from the court docket in case number 17-1994.

5.      Exhibit 4 is a true and correct copy of the Supreme Court Amicus Brief of AHIP dated Sept. 6, 2019, which was retrieved from the Supreme Court docket in *Maine Community Health Options*.

6.      Exhibit 5 is a true and correct copy of the brief submitted in the Federal Circuit by Quinn Emanuel on behalf of its economist clients in support of rehearing en banc dated August 14, 2018, which was retrieved from the court docket in case 17-1224.

7.      Exhibit 6 is a true and correct copy of the Supreme Court amicus brief Quinn Emanuel on behalf of its economist clients dated September 6, 2019, which was retrieved from the Supreme Court docket in *Maine Community Health Options*.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration was executed on August 20, 2020, in Los Angeles, California.

Respectfully submitted,

_____

MOE KESHAVARZI
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone: 213.620.1780
Facsimile: 213.620.1398
Attorneys for Kaiser Foundation Health Plan and
UnitedHealthcare Insurance Company Inc.

# EXHIBIT 1

America's Health
Insurance Plans

601 Pennsylvania Avenue, NW
South Building
Suite Five Hundred
Washington, DC 20004

202.778.3200
www.ahip.org



April 21, 2014

Mandy Cohen, M.D., MPH
Deputy Administrator and Director
Center for Consumer Information and Insurance Oversight
Centers for Medicare and Medicaid Services
200 Independence Avenue SW
Washington, DC 20201

*Submitted electronically:* [http://www.regulations.gov](http://www.regulations.gov)

**Re: Patient Protection and Affordable Care Act; Exchange and Insurance Market Standards for 2015 and Beyond (HHS-9949-P)—AHIP Comments**

Dear Dr. Cohen:

We are writing on behalf of America's Health Insurance Plans (AHIP) to offer comments in response to the Department of Health and Human Services, Centers for Medicare and Medicaid Services (HHS) Proposed Rule on Exchange and Insurance Market Standards for 2015 and Beyond (HHS-9949-P).

Leading up to the launch of the 2014 open enrollment period for the 2015 plan year – and continuing forward – AHIP and its member plans remain committed to helping ensure successful exchange implementation. The comments here are meant to provide in depth suggestions based upon the extensive consultation with health plan operations staff around the country. These suggestions are focused on providing affordable coverage options for consumers – a goal as paramount today as it was in plans' preparations for the 2014 open enrollment period.

To that end, we continue to have serious concerns about the impact of recent transitional policies and continue to believe that additional mitigation relief is a critical step to address the potential for adverse selection and ensure more affordable premiums moving forward. Our detailed suggestions that follow outline the specifics steps we believe are necessary and build on the important policies that HHS has previously proposed.

Please see the attachment for a detailed set of comments on the provisions of the proposed rule.
Thank you in advance for your consideration of these comments, and we look forward to
continued dialogue around these and other issues.


Sincerely,


Dan Durham
Executive Vice President
Policy and Regulatory Affairs

**Attachment**
**AHIP's Detailed Comments on the Proposed Rule for the 2015 Exchange and Insurance Market Standards**

**Standards Related to Reinsurance, Risk Corridors, and Risk Adjustment (Part 153)**

The proposed rule considers making changes to the Affordable Care Act (ACA)'s premium stabilization programs—specifically reinsurance and risk corridors—in order to address "uncertainties around operations and the risk pool and to stabilize the market as it continues to transition to full compliance with the ACA provisions." Specifically, the proposed rule would allow for the prioritization of reinsurance funds toward requests for reinsurance payments in the event that reinsurance collections fall short of estimates. The proposed rule would also make adjustments to an issuer's risk corridors calculation by raising the ceiling on administrative costs and the floor on margins by two percentage points (to 22% and 5%, respectively). This adjustment would apply to issuers of qualified health plans (QHPs) in all States and would not be included in the issuer's Medical Loss Ratio (MLR) calculation.

*Recommendations:*

We appreciate efforts by the Department of Health and Human Services (HHS) to provide additional mitigation relief through the risk corridors program in order to address "additional administrative costs, risk pool effects, and uncertainty…related to State extensions of renewals" and related challenges. Specifically, we strongly support the proposal to provide a uniform, nation-wide adjustment to the risk corridors calculation in 2015. However, as we discuss below, we are concerned that the Department may not have the resources to support these mitigation relief policies if budget neutrality is imposed on the risk corridors program. We also strongly support the proposal to prioritize reinsurance payments to the extent contributions are lower than estimated. This change will provide health plans the assurance that reinsurance funds will first be available to support the reinsurance program and not for other purposes.

At the same time, we continue to have serious concerns about the unintended consequences of the transitional policy, which allows for the existence of non-ACA compliant plans until as late as October 2017. This will likely result in lower exchange enrollment than would otherwise result without this policy and could create problems with adverse selection—as those most likely to remain in their current plans are widely expected to be younger and healthier than the population enrolling in the exchange. We believe that additional mitigation relief should be paired with the Administration's transitional policy in order to promote a balanced and affordable insurance marketplace in future years.

This heightened risk of adverse selection may cause higher premiums in the Exchanges – as recognized by experts such as the American Academy of Actuaries and the National Association of Insurance Commissioners (NAIC). As the NAIC has cautioned, allowing non-ACA compliant plans to be renewed past 2016 "allows different rules for different policies which threaten to undermine the new marketplace. Creating two tiers of plans—the compliant and non-

3

compliant—could result in higher premiums overall and market disruptions in 2015 and beyond."[1]

Moreover, a recent analysis by Milliman found that—as a result of recent policy changes and related factors:

> "…the ACA individual medical marketplace faces more serious risk pool composition challenges than would have been reasonably expected at the beginning of open enrollment…The potential for adverse selection—caused by having two parallel markets operating under different rules—poses a significant risk to the viability of the ACA individual medical marketplace."[2]

We have developed a set of recommendations intended to help provide the relief necessary to mitigate premium increases and promote affordable coverage. This relief will, in turn, expand participation and coverage in the reformed marketplace.

- **Risk corridors should be operated without the constraint of budget neutrality – in a manner consistent with the statutory requirements of the ACA and Medicare Part D.** In both this proposed rule and the 2015 Notice, HHS has indicated its intent to operate the risk corridors program in a budget neutral way, and reserves the right to make additional changes to the program in future years to achieve this goal. This intent was mirrored in the Administration's FY 2015 budget, which assumes that risk corridors payments to QHPs will equal payments to HHS from QHPs in 2015. Subsequent regulatory guidance—released on April 11, 2014, provides additional details about how HHS intends to administer the risk corridors program in a budget neutral manner.

  Specifically, the guidance states that HHS anticipates that risk corridor collections will be sufficient to pay for all risk corridor payments. In the event risk corridor collections are insufficient to make risk corridor payments for a year, all risk corridor payments for that year would be reduced on a pro rata basis to the extent of any shortfall. However, risk corridor collections received the next year will be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current payments. In addition, the regulatory guidance also provides that if any risk corridor funds remain after prior and current year obligations have been met, they will be held to offset potential insufficiencies in risk corridor collections in the next year.

  We appreciate the regulatory guidance's flexibility in administering budget neutrality – including providing a mechanism to reduce or offset any payment reductions health plans experienced in a previous year due to insufficient risk corridor collections. At the same time,

---

[1] NAIC Statement on Non-Compliant Plan Extensions. March 5, 2014. Available at:
http://www.naic.org/newsroom_statement_140305_hamm_non-compliant_plan_extensions.htm
[2] Milliman memorandum on "The Risk Corridor Program and Budget Neutrality. April 11, 2014. Available at:
http://www.ahip.org/MillimanReport/Risk-Corridors41114/

we continue to have significant concerns with the impact that such a policy would have on the risk corridors program's statutory goal of stabilizing premiums in the reformed marketplace.

We believe requiring budget neutrality is contrary to the statutory requirements for risk corridors under the ACA, which directs the Secretary to make payments to health plans with risk corridors ratios above certain thresholds.[3] This direction is not qualified by any additional language that would restrict use of these funds. Imposing budget neutrality also represents a reversal from the guidance provided to health plans in the final Notice of Benefit and Payment Parameters for 2014, which stated that the "risk corridors program is not statutorily required to be budget neutral" and that "regardless of the balance of payments and receipts, HHS will remit payments as required under Section 1342..."[4] Changing the rules of the risk corridors program after premiums for 2014 have been set will increase the potential for market disruption and may result in higher premiums for 2015 – as plans will have no guarantee that sufficient funding is available to lower their pricing risk and ensure more affordable options for consumers.

Implementing budget neutrality would create a situation where an issuer's payments received or charges remitted under the risk corridors program could be influenced not only by that issuer's experience, but potentially by the experience of all other QHP issuers in the market. Since an issuer cannot reasonably estimate the distribution of risk corridors transfers for the entire market of QHPs, issuers will face considerable uncertainty about whether or not risk corridors will provide appropriate protection to issuers under budget neutrality. This constraint has the potential to adversely affect issuers in the 2014 benefit year, and may lead to higher premiums in future benefit years since issuers would not be able to factor in the impact of the program when setting rates.

Budget neutrality also works at cross-purposes with the risk mitigation policies that have already been finalized (in the 2015 Notice) as well as the additional risk mitigation contemplated under the proposed rule. By limiting the pool of funds to make risk corridors payments, budget neutrality could dampen the impact of the transitional relief the Department seeks to provide.

For these reasons, we strongly recommend HHS adhere to its original guidance.

- **Adjust the risk corridors calculations for reinsurance payments to enhance the program's protections and promote stability in the marketplace.** Under the current methodology, payments a QHP receives from the transitional reinsurance program are deducted from "allowable costs" in the numerator of the risk corridors calculation. We recommend that a plan's allowable costs not be reduced by any payments received under the reinsurance program. Implementing this recommendation would substantially enhance the protection provided for under the risk corridors program and help mitigate premium increases in 2015 – consistent with the Administration's goal to stabilize the market and address risk pool challenges.

---

[3] 42 USC §18062 (b)(1)
[4] 78 Fed. Reg.15473.

- **We support the framework for adjusting the risk corridors calculation across all States to ameliorate adverse selection in 2015.** While we support the transitional relief through adjustments to risk corridors, we also encourage HHS to raise these thresholds above the proposed 22% and 5% levels. An upward adjustment in the thresholds would provide transitional relief that is commensurate with the significant operations and risk pool challenges ahead for the 2015 benefit year.

- **Lower the reinsurance attachment point for 2015 to $45,000.** Similar to the change made to the 2014 reinsurance parameters, lowering the attachment point for 2015 will help moderate premium increases and promote market stability. Lowering the attachment point will help offset more high-cost claims and thus help reduce premiums and promote affordability in 2015. We anticipate that lowering the attachment point could be accomplished without changing the contribution rate, but also recognize the need to assure funding for the program (in the event that requests for reinsurance are higher than expected). Support for lowering the attachment point for 2015 can be found in the statutory provision regarding reinsurance which clearly allows for flexibility in the use of contribution amounts collected for any calendar year in regard to their use and allocation in any of the three years in which reinsurance amounts are collected.[5]

- **Support the prioritization of reinsurance payments in the event that contributions are lower than estimated.** We strongly support the proposal to prioritize reinsurance payments – as included in the proposed rule – as a way to help assure that the reinsurance payment pool is sufficient and provides the premium mitigation relief necessary to promote a stable market.

- **Remove risk corridors and reinsurance transfers from the MLR calculation.** In this regard, we encourage HHS to refrain from adjusting incurred claims in the MLR calculation based on risk corridors and reinsurance transfers. Specifically, we recommend that payments an issuer receives from the transitional reinsurance program as well as net receipts under the risk corridors program not be deducted from "incurred claims" in the numerator of the MLR calculation. As HHS recognized in the preamble to the proposed rule, issuers have faced a range of "special circumstances" as part of ACA implementation. Removing net receipts under the risk corridors and reinsurance payments from the MLR calculation as described would more accurately reflect the "special circumstances" that issuers have faced during the initial open enrollment period – including higher-than-anticipated spending on administrative costs.

In addition to these recommendations, we encourage the Department to finalize details of any additional transitional relief as soon as possible. Issuers will soon be submitting rates for the 2015 benefit year and will need adequate time to incorporate any changes to the premium stabilization programs into 2015 rates.

---

[5] 42 USC §18061 (b)(4)

**Sequestration**

The proposed rule notes that, per the Administration's sequestration report, risk adjustment and reinsurance will be subject to 7.3 percent sequestration in FY 2014. This amounts to sequestered funds totaling $247 million for the risk adjustment program and $731 million for the reinsurance program.

In consultation with the Office of Management and Budget (OMB), HHS has determined that while these programs are subject to the sequester, any sequestered funds can be made available to plans at the beginning of FY 2016 (i.e., beginning in October 2015). HHS has indicated that additional details on how this process will work are forthcoming.

While we appreciate HHS's commitment to ensuring that full payments are made as soon as possible, delaying the full payment of risk adjustment and reinsurance funds raises significant timing and operational concerns. We urge the Department to outline the details of this process as soon as possible so that issuers can make necessary adjustments to appropriately account for this delay. In addition, while we appreciate the commitment regarding the making of full payments, as part of outlining the details of implementation for sequestration, we think it is important that HHS provide further mitigations related to sequestration as part of implementation. For example, HHS should clarify that its proposal to prioritize reinsurance payments should contributions be lower than estimated would apply in the case where sequestration is the cause of such a shortfall, even given HHS's commitment that such a shortfall is only temporary in nature.

## Extension of Good Faith Safe Harbor to 2015

AHIP, and its members, appreciated the recognition in the Exchange, SHOP, and Eligibility Appeals Final Rule ("Exchange Rule") that 2014 was a transition year warranting a decision not to impose civil monetary penalties (CMPs) or decertification for non-compliance with certain Exchange requirements if a QHP issuer has made good faith compliance efforts. A parallel safe harbor was later provided for enforcement actions related to risk adjustment and reinsurance. HHS acknowledged that, at the appropriate time, it would consider an extension of this approach.

2015 remains a transition year because of the number of operational processes and policies that remain outstanding. HHS is still working on processes for back-end FFM functionality, processes for SHOP, automated change of circumstances processes, the distributed data model for risk adjustment, processes for reinsurance, automated payment systems for health plans, and a host of other projects and processes. While QHP Issuers are actively monitoring their own compliance with current applicable FFM standards and guidance, the sheer volume and magnitude of new technology, processes, and procedures to come will result in 2015 remaining a transitional year. An extension of the good faith safe harbors through 2015 would reinforce HHS' commitment to an effective partnership between the Marketplace and FFM issuers that recognizes the joint efforts to promote an effective consumer-oriented Marketplace of affordable quality choices. This approach also sends a positive signal to issuers considering entering the FFM in 2015 or expanding their QHP offerings.

*Recommendations:*

In order to promote stability of the program and a focus on a successful 2015 enrollment season, we urge HHS to extend this good faith compliance approach by regulation through the end of 2015 for both Exchange standards and for risk adjustment and reinsurance. Additionally, we urge HHS to reinforce its commitment to this policy of good faith compliance throughout the 2015 application process, including attestations, and within the 2015 QHP issuer agreements.

We also ask for an addition to the regulatory language to clarify that the good faith safe harbors apply for conduct related to the 2014 and 2015 benefit years. This clarification would make clear, for example, that: (1) conduct that occurs before or after these years, but relates to these years is covered by the safe harbor (*e.g.*, a QHP Issuer's good faith conduct during open enrollment beginning October 1, 2013) and (2) the safe harbor applies to enforcement actions initiated after these benefit years (*e.g.*, in 2016 for conduct occurring in good faith in 2015).

## Market Wide Standards (Parts 146, 147 and 148)

### Guaranteed Availability (§147.104) and Guaranteed Renewability (§147.106) Amended for Certain Coverage

These rules clarify that nothing in the guaranteed availability or renewability requirements requires an issuer to renew or continue coverage if providing that coverage is prohibited under applicable Federal law.

*Recommendations:*

We do appreciate the clarification that guaranteed availability and renewability provisions are *subordinate* in situations where there is specific conflicting statutory language in Federal law. This clarification is helpful, and we believe it should be finalized with some additional clarifications. We suggest that the final rule include a full list of current Federal prohibitions on the sale of coverage that would over-ride the guaranteed availability and renewability rules. The added clarity is needed for issuers to ensure compliance with this rule and so that issuers, Exchanges, State regulators, and HHS can effectively manage any complaints or appeals from consumers who were denied coverage due to one of the cited Federal prohibitions. If this clarification only applies to Medicare enrollees, that should be clearly stated. We also seek clarification on situations where the Exchange sold coverage to individuals who are also enrolled in Medicare and recommend HHS consider adding additional questions within the eligibility application to prevent individuals from receiving subsidies who are also enrolled in Medicare.

We also appreciate the example provided regarding section 1302(e) catastrophic plans, which confirms that once an individual fails to meet the eligibility criteria at the time of renewal he or she is no longer eligible to purchase that particular product. It would appear that the same logic would apply to non-SHOP (outside the SHOP) group business in situations where the employer no longer meets the eligibility requirements because of a change in group size from the original effective date and renewal. Inclusion of this clarification would address one area of misalignment related to group size in the SHOP versus non-SHOP marketplace where carriers are required to renew existing policy forms irrespective of the employer group's size at the time of renewal but

simultaneously apply accurate group size for purposes of other Public Health Service (PHS) Act and the ACA provisions. In such situations, employers in the non-SHOP marketplace would continue to have coverage options on a guaranteed available basis but it would be aligned with their group size definition.

**Product Withdrawal and Uniform Modification of Coverage (§§146.152, 147.106 and 148.122)**

The rule includes new standards regarding certain modifications and what would constitute uniform modifications or the withdrawal of the existing product and creation of a new product. Modification made solely pursuant to Federal or State law requirements — such as increases in annual limits on cost-sharing — would be considered modifications rather than product withdrawals. Modifications not required by law would be considered modifications of coverage if they met all of the following criteria:

- the product is offered by the same insurer;
- the product is the same product type (e.g., Preferred Provider Organization or Health Maintenance Organizations);
- the product covers the majority of the same counties in its service area;
- the product has the same cost-sharing structure, except for variations in cost-sharing related solely to the utilization or cost of medical care or necessary to maintain the same metal level of coverage; and
- the product provides the same level of covered benefits, except for changes in benefits, not attributable to legal requirements that cumulatively affect the rate for the product by no more than 2%.

*Recommendations:*

*Product vs. Plan* – While the proposed criteria provide health plans with the needed flexibility to make necessary changes to plans based on the early experience of 2014 enrollees, we recommend HHS provide several clarifications. While generally throughout the market rules HHS refers to products when talking about packages of benefits offered to consumers, in this case we recommend that the references to "product" under this section are changed to "plan." A product is a package of benefits that is reported to State regulators in an insurance filing and constitutes many unique plans with different cost sharing structures. A plan is the discrete pairing of a package of benefits and cost sharing. Referring to plans is more appropriate given the focus on unique plans including QHPs. An unintended consequence of leaving the reference to products is that issuers would not have the flexibility to modify single health insurance plans within a product family and thus would be required to withdraw entire sets of plans that constitute a product. This may have the unintended consequence of a significant number of product discontinuations, contrary to the proposal's stated intent.

*Changes Pursuant to Federal and State Law* – In the proposed rule, modifications made solely pursuant to Federal or State law requirements — such as increases in annual limits on cost-sharing — would be considered modifications rather than product withdrawals. As HHS defines the impact of State and Federal law on 2014 plans, health insurance issuers may have to make broad changes to the design of the plan, depending on the Federal or State law. We recommend

9

that these changes are considered appropriate so long as the modification is being made in response to Federal or State regulatory requirements. For example, increases due to Essential Health Benefits (EHB) modifications (such as adding in the pediatric dental EHB on-exchange), State-mandated benefits, or to ensure benefits continue to fall within the same metal tier due to changes in the Actuarial Value (AV) Calculator should be excluded from the 2% rate increase threshold.

With regard to Stand-Alone Pediatric Dental (SADP) benefits, we recommend that HHS clarify the requirements for recertification. In the preamble, HHS indicates that the guaranteed renewability requirements do apply to SADP plans. While HHS states that issuer modifications made solely pursuant to Federal or State law requirements would be considered modifications rather than product withdrawals, the changes prescribed in the 2015 Payment Notice and the resulting AV calculation will move plans from what HHS considers to be a low percentage in 2014 to a high percentage in 2015. After taking into account the 2015 out-of-pocket maximums for SAPD and tweaking deductibles, this will impact the AV calculation even though consumers will likely want to remain enrolled in the same plan. We recommend that these changes are viewed as a plan renewal and not a discontinuation.

*Service Area* - HHS has proposed that, in order for a product to have uniform modification of coverage, the product would have to cover a majority of the same counties in the service area. We recommend that HHS only focus on reductions in service area, not expansions. For changes in service area that qualify as a uniform modification, some consumers who live in the impacted service area will be unable to renew their plan. As discussed below, we recommend these consumers be afforded the option to automatically migrate to a similar plan to ensure continuity. These transitions are common in the commercial market and Medicare Advantage today and will ensure an optimal consumer experience.

Because network rating is not permitted in 2015, QHP issuers may be required to discontinue a QHP in order to develop plans that reflect the network relativity for a particular service area, even though the same service areas are covered. In other words, one QHP in 2014 may be multiple QHPs in 2015 due to the elimination of pricing for network by service area. As a result, QHP issuers will be required to send discontinuation letters and consumers will have to re-enroll in 'new' QHPs even though the benefit plan and network of their 2014 QHP may not have changed, and in total, the same service areas are covered. We recommend that HHS recognize the impact of these changes – at least in 2015 – both in policy and operational ability by implementing a cross-walk approach by which one 2014 QHP may be linked to multiple 2015 QHPs. The service area evaluation should then be made in total and not by evaluating single QHPs created for this purpose. Even if a uniform modification approach is used, the QHP templates will have to include a cross-walk in order to 'renew' members into the same plan without requiring a new enrollment. Additionally, in the case of current plans that use one or more networks which are now required to be re-filed as separate plan identifiers (IDs) for each plan network, we ask that those be treated as uniform modification and not as plan withdrawals, which would have unintended adverse affect on consumers.

*State Preemption* - In §146.152(f)(3) HHS proposes that States may establish criteria that only broaden – but not restrict – the definition of uniform modification of coverage. We support this

provision so that the Federal requirements will serve as the most restrictive and States could allow for additional flexibility so that plans could make additional modifications to the plans.

In addition, we recommend that HHS clarify that preemption of State law means that issuers are allowed to make additional changes to plans that are not pursuant to Federal or State law or are necessary to maintain AV values. Issuers routinely evaluate their benefits offered and make modifications based on consumer requests or new medical evidence. For example, in some States issuers are allowed to modify individual policies to the extent required by State or Federal law or to stay in step with EHB requirements. However, those issuers are not allowed to add additional benefits or remove benefits (for example, if a treatment is no longer recognized as medically appropriate). Thus, such policies cannot be updated. Instead, issuers must create another plan just like the first one, build the change into that second plan, and then maintain both plans going forward. Such an approach is not practical and would not seem to be in keeping with the guidance. We recommend that benefit updates not contrary to EHB requirements should be specifically identified as permissible under the uniform modification requirements. As a result, in States where the withdrawal of a plan is presently prohibited in all circumstances, the issuer would not have to keep offering the obsolete plan in the future.

*Required Notices* - We have provided separate comments on the content of the draft "Notices When Discontinuing or Renewing a Product in the Group or Individual Market," and we strongly recommend that HHS revisit its approach. The requirements have the potential to significantly confuse consumers, as they would potentially receive multiple, uncoordinated notices generated as a result of Federal or State requirements, in addition to the notices that will be sent by the Exchange. We therefore recommend that any new Federal notice requirements for plan discontinuation or renewal should take effect for plan years that end on or after December 31, 2014.

We are also concerned that requiring a standard notice form for plan renewals and withdrawals interferes with effective communication methods already developed by many issuers and regulated by States' Departments of Insurance or Managed Health Care. Currently, plans have the flexibility to design notices that are appropriate based on the specific scenario facing each individual enrollee and thus provide actionable steps in plain language. In contrast, the standardized notices proposed by HHS are overly prescriptive and do not provide plans the flexibility to include additional language and tailor to specific circumstances. For example, the notices don't currently include member specific actionable dates, allow for enrollee migration to a similar plan, or consumer-specific information on how to get help – including, but not limited to, issuer phone number, website or email address and State-based exchange contact information. Allowing issuers to modify dates and to tailor notices will allow issuers to reflect applicable deadlines for the market (on or off exchange) and State and to the timing of discontinuation. It is important to note that open enrollment deadlines and interpretations of special enrollment period effective dates fluctuated a great deal in 2014. Issuers are best positioned to understand how various deadlines relate to a specific member, and State regulators are best positioned to provide oversight to make sure appropriate dates are communicated to consumers. Thus, an approach that allows for flexibility in the consumer notices – versus fixed dates – will best serve consumers.

Standardized notices cannot be updated quickly enough to reflect changes in the Exchanges or include specific, actionable information for enrollees. With regard to Exchange enrollees, as discussed in our comments on §155.410 regarding Initial and Annual Open Enrollment Periods, we have concerns about notices being sent to QHP enrollees advising of plan changes independent of the required notices that the Exchange will be sending all enrollees. Such multiple notices have the effect of confusing—rather than assisting – consumers.

Thus, we strongly recommend that HHS continue to allow issuers – working with States – to develop and issue these notices as is done today. However, if HHS requires standardized notices, we ask that HHS make the following changes to the requirements:

- **HHS should clarify to whom the notices must be distributed.** We recommend they are provided only to primary policyholders in the individual market and plan sponsors (i.e., employers) in the group market. State regulators generally allow one notice to be addressed to a family, and we recommend that HHS align its requirements with current practice. In the group market, employers (not issuers) should be responsible for notifying their employees as they are in the best position to explain the changes and the impact on them (i.e., the employer may be selecting a new plan with the same or different issuer that offers the same benefits).

- **HHS should provide model language rather than standardized language for the entire notice.** We recommend that HHS provide model language on the general types of information that must be included, similar to how the process works in Medicare Advantage. This will minimize unnecessary health plan call volume when consumers receive notices that are unclear and uncoordinated with other notices and ensure they include actionable information.

- **HHS should defer adoption of Federal notice requirements for plan discontinuation or renewal until plan years that end on or after December 31, 2014.** Any new notice requirements require considerable lead-time so that health plans can complete their IT requirements. As such, any new notice requirements must be finalized as soon as possible.

*Continuity for Consumers -* In the case where an issuer is withdrawing a plan or making reductions to a plan's service area, we recommend that the consumers have the option of being automatically migrated to a similar plan. The health plan would include information about this option in their notice to the policyholder or plan sponsor and would "auto-map" the terminating plan to the similar plan. While this option would require additional work by both issuers (and in the case of QHPs the Exchange), this would be an ideal process for the consumer who would have to take no affirmative action to remain covered. Auto-migration would also aid the transition of individuals between plans (that are the same) even if the plan has a different HIOS ID due to technical reasons. In these scenarios, we recommend that issuers have the option to link existing HIOS IDs to new HIOS IDs. Operational considerations warrant further discussions as part of a larger discussion regarding the global redetermination/renewal process. One potential model is the Medicare Advantage redetermination program to the extent it is applicable to the commercial market. We would welcome clarification on the methodology behind "auto-map" for the enrollee, (e.g., the plan closest based on price or based on set of benefits most akin to the plan that is no longer available).

Finally, it is critical that HHS finalize the guaranteed renewability requirements as soon as possible given many State 2015 filing deadlines may pass prior to the publishing of the Final Rule. Additional flexibility should be afforded in these situations so plans do not have to re-file plans or make major changes at a later date.

**Fixed Indemnity Insurance in the Individual Health Insurance Market (§148.220)**
The Proposed Rule revises the current regulatory criteria regarding when an individual fixed indemnity insurance product may be considered a HIPAA excepted benefit by (1) eliminating the current requirement that payment be made on a per-period basis and not on a per-service basis, (2) imposing a new requirement that fixed indemnity insurance be sold only as secondary to other health coverage that meets the definition of "minimum essential coverage" (MEC), and (3) requiring a disclosure that the coverage is not a substitute for MEC and that lack of MEC may result in an additional tax payment. The requirements would become effective for policy years beginning on or after January 1, 2015. In other parts of this comment letter, we have raised the broad concern about HHS and other agencies issuing guidance and then subsequently changing articulated policies. We note that this proposed rule is such an example as it would supersede HHS policy released in the form of a "frequently asked question" in January of 2013 and modified in January of 2014.

AHIP appreciates the opportunity to respond to several of the important questions posed in the preamble. Additionally, while AHIP is not expressing a position for or against the requirement that fixed indemnity be sold only as supplemental to MEC, there are several policy and operational issues that the industry agrees are important for HHS to take into account as the Department considers this proposed rule.

*Recommendations:*

- **We support the concept of clear disclosure to potential purchasers of individual fixed indemnity coverage that such coverage is not MEC. We suggest flexibility with respect to conveying this information**. The proposed rule prescribes the following disclosure language in plan materials: "This is a supplement to health insurance and is not a substitute for major medical coverage. Lack of major medical coverage (or other minimum essential coverage) may result in an additional payment with your taxes." We believe this language may be confusing to consumers since it could imply that the purchase of the fixed indemnity product could affect their tax status. Given the fact that there have been several policy changes in the past year related to extension of non-ACA compliant policies and hardship exceptions, we believe that disclosures that specify when a person might or might not be subject to a tax penalty may be inaccurate. Ideally we would prefer that the rule allow for flexibility on the part of the insurer as to how the disclosure may be worded.

  Alternatively, we suggest that the required language be modified to more clearly convey that the purchase of the fixed indemnity coverage is not MEC as required under the

Affordable Care Act as follows: "This is a supplement to health insurance and is not a substitute for major medical coverage. It does not count as Minimum Essential Coverage under the Affordable Care Act."

- **Essential Health Benefit (EHB) coverage should not be the standard for fixed indemnity product sales.** In the preamble, HHS seeks comments on whether the requirement for individuals to have MEC in order to be sold fixed indemnity insurance should be further limited only to those that have essential health benefit (EHB) coverage. We strongly believe that the MEC standard should <u>not</u> be narrowed further because the individual mandate to secure minimum essential coverage is the standard that is being applied across all health insurance markets. The requirement for EHB does not currently extend to large or midsize groups, self-funded plans, grandfathered plans or non-ACA compliant transitional coverage that is allowed in many States to continue through 2016 and beyond. To limit the sale of individual fixed indemnity policies only to those that have secured insurance that contains the ACA-required EHBs severely limits the number of people to whom these products may be sold, and deprives a large majority of Americans of access to the important financial protection offered by fixed indemnity products.

- **We support adoption of an applicant attestation as the method by which an insurer is reasonably assured that potential purchasers have MEC.** In the preamble, HHS seeks comments on the extent of verification issuers should require from applicants to be "reasonably assured" that they have minimum essential coverage, including whether an attestation in the application is sufficient. We note that HHS has found attestation to be appropriate and sufficient in a number of instances in which consumers must prove their eligibility for programs or exemptions from ACA requirements. Examples include individual income level reporting for purposes of seeking subsidies, qualification for a hardship exemption from the individual mandate requirement, and State flexibility to allow individuals to attest that they have purchased pediatric dental coverage.

  The method by which issuers may be "reasonably assured" of existing coverage must be flexible enough to recognize the difficulty that an issuer will face in gaining knowledge of the insured status of each individual, as well as the variation in how products are sold and delivered, in order to not unduly hinder or delay product availability or policy issuance. AHIP requests that HHS require a self-attestation above the signature line of the fixed indemnity product application. We also request that it be clearly conveyed in the final rule that the insurer is <u>not</u> to be held responsible for ongoing monitoring or verification of the insured status of each customer.

- **We recommend that the language of the regulation reflect the decision to allow for attestation as the method of reasonable assurance of MEC coverage status.** Section "(4)(i)" of the proposed rule provides that supplemental benefits are "provided only to

individuals who have other health insurance coverage that is minimum essential coverage within the meaning of section 5000A(f) of the Internal Revenue Code." If this rule is finalized, we request that this language be changed to reflect that attestation is the method by which the customer assures that they have MEC. We suggest that the rule language be amended as follows: "... provided only to individuals that attest that they ~~who~~ have other health insurance coverage that is minimum essential coverage within the meaning of section 5000A(f) of the Internal Revenue Code."

- **We request that HHS allow for adequate time for insurers and State regulators to implement this regulatory change.** HHS asks for comments on whether the effective date of "policy years beginning on or after January 1, 2015" gives enough time for transition. We appreciate HHS's recognition of the time and effort that will be required of issuers and State regulators for the filing and review of all individual fixed indemnity products. We are concerned that a January 1, 2015 effective date is unrealistic in light of the time needed for filing new products and applications, as well as the regulatory load for State insurance departments in the coming months as they are also reviewing filings and rates for qualified health plans, non-Exchange major medical products and all other insurance products to be sold in 2015. We therefore request that the effective date be changed to "one year from the date this rule is finalized," to allow both issuers and regulators sufficient time to complete these processes.

  In order to allow consumers to keep current coverage without requiring insurers to cancel policies, the proposed regulation correctly applies only to sales after a certain date. Such an approach also recognizes that current customers have purchased their coverage on a guaranteed renewable basis. We are concerned that describing the effective date using the words "policy years on or after" could be interpreted to mandate that carriers ask current policy holders whether they have a plan that meets MEC. We suggest that the effective date of this provision of the rule be "for policies issued after the one year anniversary of the date this rule is finalized."

### Exchange Establishment Standards (Part 155)

**Payment of Premiums (§155.240)**
With respect to enrollments lasting less than a full month, in order to provide flexibility for Exchanges to establish a standard methodology for partial month premiums or for issuers to prorate premiums in accordance with State law, the proposed rule would allow Exchanges to establish one or more standard processes for premium calculation. Although we support this flexibility, each different methodology will require differing system updates.

*Recommendations:*

We recommend the final rule clarify whether the proration of premium would apply to the first month's premium (in the case of a newborn). If plans are permitted or required to accept prorated

premium payments for partial first months, we recommend that this prorated payment satisfy the "one month's premium" requirement under the three month grace period.

For the FFE, HHS proposes that the premium for coverage lasting less than a full month must equal the product of the premium for one month of coverage divided by the number of days in the month and the number of days for which coverage is being provided, the same method that was adopted for the FF-SHOP in the Payment Notice as well as the Internal Revenue Service Proposed Rule on the Minimum Value of Employer-Sponsored Plans.[6] HHS has indicated that it intends to work closely with QHP issuers to implement this provision as soon as is reasonably possible. Partial coverage months have been occurring since early February when the voluntary termination and "Report a Life Event" functionality was implemented at the FFM. Issuers have already invoiced members for subsequent months based on current guidance and it would be not practicable to implement this policy on a retroactive basis. Implementing new proration methodologies will result in changes to billing systems that will take considerable lead-time to implement. We recommend that this new methodology take effect for the 2015 benefit year and that for months prior to 2015 issuers continue to have the flexibility to use their own proration methodology or not prorate payments.

**Initial and Annual Open Enrollment Periods (§155.410)**
Due to the delay in the start of open enrollment period (OEP) from October to November, in the preamble at *79 FR 15838*, HHS solicits comments on a revised schedule for sending consumers written notice of the annual OEP and annual redetermination of coverage. The two options currently being considered include: (1) shifting the period during which the notice would be sent by a month, so it would be sent no earlier than October 1 and no later than October 31; and (2) extending the period during which the notice would be sent out so that the notice would be sent no earlier than October 1 and no later than November 15, provided electronic notices are available for any consumer who contacts the Exchange on November 15.

***Recommendations:***

The design of a consumer friendly process for the 2015 open enrollment process is critical. The OEP will introduce new complexity including redeterminations of eligibility, auto-renewals, as well as continued support for special enrollment periods throughout the OEP. We look forward to working with HHS as it begins its design and implementation of these processes.

*Need to Reconsider Overall Timeframes for Notices*
It is very important that enrollees have access to their redetermination amounts well before the start of 2015 open enrollment. We recommend that HHS not alter the time frames for the notice of annual OEP redetermination timeframes and keep the September 1 – September 30 dates as specified in §§155.335 and 155.410. Following the Exchange notice in late September informing them of the upcoming OEP, enrollees have 30 days to report additional information that may affect their eligibility status. Then HHS has to calculate and notify consumers of the redeterminations in a timely fashion which we recommend should happen prior to the start of the open enrollment period on November 15, 2014.

---

[6] 78 Fed. Reg. 25915

As HHS considers regulatory changes for the timing of the Exchange provided notices, it is important to coordinate their release with the notices health insurance issuers will be required to send around the same time. Existing Federal and State laws require health insurance issuers to send a notice of discontinuation 90 calendar days prior to the discontinuation. Health plan notices will be going out around October 1, 2014 for changes that take effect on January 1, 2015. In §§146.152, 147.106 and 148.122, HHS proposes that issuers send notices of renewal of coverage. Given that these provisions apply to QHPs, if the Exchange notices are pushed back to late October or early November and the Exchange's redetermination process will not yet be complete (which will include changes to Advance Payment Tax Credit (APTC) amount and Cost Sharing Reduction (CSR) level), enrollees will not understand the combined impact of the plan's proposed changes along with their new subsidy amount. Health plan notices will not provide the full information to the consumer about their options because the information will not be available. As a result, there will be major consumer confusion and calls to both the Exchange and health plan prior to and during the open enrollment period.

We are also concerned about the delay in the release of final rate information. This delay in the release of the cost of the individual market second lowest cost silver plan will require many APTC recipients to have a change in tax credit amount even if their income did not change. For the FFM, while the Final 2015 Issuer letter indicates in Table 1.1 that, "all dates are subject to change," we would recommend that the final QHP agreement timeframes are pushed forward closer to the data lockdown date (September 22) in order to provide HHS with more time to determine the second lowest cost silver plan and run the eligibility redeterminations required by existing regulation.

*Additional Consumer Challenges*
Finally, additional challenges may be posed by having the open enrollment period extend the beginning of the coverage year until February 15 which emphasizes the importance of starting the notice process as soon as possible. To minimize gaps in coverage for existing enrollees it will be important for them to make any new plan selections by December 15 to ensure their new coverage is effective on January 1. Thus for existing enrollees the OEP is essentially one month. The Exchange should avoid situations where an enrollee's existing coverage renews in January (with any impacted changes to APTC and CSR reflected in January 2015), and then the enrollee makes a plan selection on February 15 that is effective on March 1. We note that all individual market plans currently end on December 31st and restart on January 1st and we recommend existing enrollees not have the option of changing their plan after the effective date of January 1st.

As HHS begins planning for 2015, it will be important to both balance its operational and system functionality surrounding the redetermination calculations and any associated notice requirements with the overlapping Federal and State notice requirements. We are also concerned about reports from some State-based Exchanges that the FFM will not have the capability to conduct a bulk redetermination of eligibility for existing enrollees in order to create notices. We understand that HHS is considering an approach where each individual must log-on to their account separately to learn their new APTC amount.

We look forward to working with HHS on alternative designs of the redetermination process that makes it as easy as possible for consumers to get their new subsidy amounts and remain in their

current plan if they choose to do so and have the updates communicated to the issuer in a streamlined manner. We also ask that the FFM consider the ability to support plan migration that was discussed earlier in our comment letter. In the case where an issuer is withdrawing a plan or making reductions to a plan's service area, we recommend that the consumers have the option of being automatically migrated to a similar plan to ensure continuity.

**Special Enrollment Periods (§155.420)**

*Birth /Adoption SEP (155.420(b)(2)(i))*
With regard to special enrollment periods (SEPs), HHS proposes flexibility with respect to coverage effective dates in the case of birth, adoption, or placement for foster care. While the proposed rule would maintain the requirement that the Exchange ensure coverage is effective for a qualified individual or enrollee on the date of birth, adoption, or placement for foster care, Exchanges would be permitted to allow the qualified individual or enrollee to elect a later coverage effective date.

***Recommendations:***

As part of any regulatory changes to the SEPs included in the Exchange regulation it is extremely important that the FFM implement the full functionality to support SEPs. The current interim approach is a manual process and, as a result, error-prone, labor intensive and has negatively impacted consumers. For example, the interim process does not support accurate premium calculations in the case of a recent birthday, cost sharing plan variation changes, proration of premium and APTC for newborns and deaths, removal of an individual from a dental but not the medical policy and vice versa, as well as support for dependents who are aging off their parent's policy. It is critical that HHS make this functionality available prior to the next open enrollment period.

With regard to the birth/adoption SEP, we support additional options for the effective date of coverage, so long as the effective date for this later election is no later than the first of the month following the occurrence of the qualifying event. We also seek clarification regarding the intersection of the birth/adoption SEP and State laws where issuers are required to cover the first 30 days of enrollment.

We also recommend that HHS revise the APTC effective dates when a newborn is being added to the policy. Currently, the APTC is effective on the first of the next month which is consistent with current IRS regulations. The IRS has proposed changing this practice by "providing that a child enrolled in a qualified health plan in the month of the child's birth, adoption or placement with the tax payer for adoption or in foster care is treated as enrolled as of the first day of the month" and thus would be able to receive APTC this first month.[7] While IRS has not yet finalized this rule, the preamble to the proposed rule did note that "(t)hese regulations are proposed to apply for taxable years ending after Dec 31, 2013. Taxpayers may apply the proposed regulations for taxable years ending before January 1, 2015."[8] We urge HHS to provide clarification on this issue in the Final Rule.

---

[7] 78 Fed. Reg. 78913
[8] *Ibid.*

*Individual Market Policy (§155.420(d)(1))*
The rule proposes to expand the SEP for loss of minimum essential coverage to permit qualified individuals and dependents enrolled in a non-calendar year individual insurance policy in 2014 to enroll in an Exchange plan, even if their existing policy is renewing. As a result, individuals enrolled in such policies would be allowed to switch directly to Exchange coverage rather than renewing the current policies.

### Recommendations:

HHS has the authority under the final Market Rules to implement this SEP for Exchange enrollees without any additional regulatory changes. By creating a separate Exchange specific SEP, there will be a disparity between the on-Exchange and off-Exchange markets for 2014. The final Market Rule at §147.104(b)(2) provides a limited open enrollment period for individuals enrolled in non-calendar year individual health beginning on the date that begins 30 calendar days prior to the date the policy year ends in 2014 for a total of 60 days. Under the new Exchange-specific SEP, individuals would have 60 days to enroll in an Exchange plan prior to renewal, but only 30 days prior to enroll in an off-exchange plan. More simply stated, we understand that both on and off exchange plans are supposed to have the same SEP windows and effective dates, and the proposed rule creates conflict because the SEP window and effective dating rules in proposed §155.420 conflict with those specified in §147.104(b)(2) that pertain to this SEP. This would be extremely challenging for health insurance issuers to provide clear guidance to their enrollees who may be interested in comparing Exchange and non-Exchange options. We recommend that HHS instead implement this existing market-wide SEP and modify the existing eligibility application by revising the question related to the loss of minimum essential coverage. The new question(s) should capture those individuals who have an individual market policy that is being renewed, in addition to those that are losing coverage to ensure both categories of individuals can qualify for a SEP.

*Loss of Eligibility for Pregnancy Related Services*
The proposed rule would allow women who lose eligibility for coverage of pregnancy-related Medicaid services and their eligible dependents to enroll in a new QHP. While most scenarios would be addressed by the existing newborn SEP, we recognize there are situations where this scenario would occur and impacted individual should be granted an SEP.

*Loss of Minimum Essential Coverage (§155.420(d)(1))*
The rule provides eligibility for an SEP up to 60 days prior to the end of a qualified individuals or his or her dependent's existing coverage. Under this proposed change the total length of the SEP would be 120 days (60 days prior, 60 days post). We recommend that HHS emphasize the importance of electing the SEP prior to the loss of coverage to minimize any gaps in coverage so the Exchange coverage is effective the day following the lost of MEC. However, we recognize that there are situations where individuals will not have sufficient advance notice to make the change in advance.

*SEP Effective Dates*
The existing regulations provide that certain SEPs (marketplace error, QHP issuer contract violation, exceptional circumstances) can have effective dates based on an "appropriate date

19

based on the circumstances of the SEP in accordance with Guidance issued by HHS."[9] In the proposed rule, HHS proposes to add the existing SEP related to "errors, contract violations and exceptional circumstances and misconduct by a non-Exchange entity providing enrollment assistance."

*Recommendations:*

Within the FFM, the variations in effective dates (both prospective and retroactive) have caused significant operational challenges and manual work for health plans and confusion for consumers. Often consumers are granted any effective date they request with a corresponding SEP that permits such a change. In addition, consumers who are granted retroactive SEPs related to errors often don't want retroactive coverage given the premium implications. We ask that HHS define and consistently apply effective dates and lengths of SEPs, rather than leaving it up to the discretion of individual case managers, which is likely to result in inconsistent and even arbitrary application across enrollees. Further, we recommend that the list of specific SEPs defined in the March 26, 2014 "Guidance for Issuers on Special Enrollment Periods for Complex Cases in the Federally-facilitated Marketplace after the Initial Open Enrollment Period" under paragraphs (d)(4), (d)(9), and (d)(10) of §155.420 is limited to the first year of Exchange operation and not continued in future years.[10] The need for several of these SEPs will be negated by improvements in the Exchange functionality.

*Voluntary Termination*
The rule clarifies that voluntary termination does not qualify an individual for a loss of coverage. The preamble notes this clarification is to prevent people from using voluntary termination as a way to switch from one plan to another without an SEP. We support this change.

**Termination of Coverage (§155.430)**
The proposed rule clarifies the difference between terminations, cancellations, and reinstatements. For retroactive terminations of coverage, HHS would adjust any applicable payments to the original QHP issuer to recoup any APTC and CSR payments made to the issuer and ensure the former issuer refunds or credits any premium paid by the enrollee, reversing claim payments, and ensuring refunds for out-of-pocket payments. For retroactive effective dates, HHS will provide the new issuer any applicable APTC or CSR payments based on the retroactive effective date.

*Recommendations:*

We support the new definitions for terminations and cancellations to codify the existing practices included in the enrollment standards. We also support the inclusion of a definition for reinstatement. There were numerous technical issues during open enrollment (e.g., incorrectly applied premium payments) that could have been quickly addressed if health plans had the option to do reinstatements. Given the limited nature of retroactive effective dates that result in a

---

[9] 45 CFR §155.420(b)(2)(iii)
[10] CMS Affordable Exchange Guidance for Issuers on Special Enrollment Periods for Complex Cases in the Federally-facilitated Marketplace after the Initial Open Enrollment Period. March 26, 2014. Available at: http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/complex-cases-SEP-3-26-2014.pdf

termination, we recommend HHS not include specific guidance for issuers in Part 156. In addition, the current language referring to "premiums and claims" is too vague and could be misinterpreted.

**Navigator Program Standards (§155.210) and Certified Application Counselors (§155.225)**
HHS specifically requests comments on alternative compensation approaches for Navigators and Certified Application Counselors that build in rewards for performance without risk of unintended consequences and improper conduct.

*Recommendations:*

AHIP supports the proposed prohibition of compensating Navigators and Certified Application Counselors on a per-application, per-individual assisted, or per-enrollment basis. Such a compensation approach, while used in the first year in some States, could have unintended consequences or opportunity for improper conduct, and should not be permitted moving forward. Other alternative compensation approaches that reward performance could be team – based initiatives to meet goals that focus on increasing the number of client visits scheduled and completed in a given week, especially those that are focused on meeting with or increasing enrollment of uninsured populations or other unique demographics.

AHIP also supports the prohibition on Navigators and Certified Application Counselors charging for services performed in connection with their navigator or application duties. We also support the restriction on providing gifts unless they are of nominal value, and strongly recommend that gift cards or cash should be prohibited, regardless of the amount.

In addition, with regard to soliciting consumers for application or enrollment through direct contact (e.g., going door-to-door), we suggest that is generally an ineffective approach that should be discontinued. Finally, having Navigators maintain a physical presence in the Exchange service area to provide face-to-face assistance to consumers is also preferred.

**Privacy and Security of Personally Identifiable Information (§ 155.260) and Bases and Process for Imposing Civil Money Penalties for Provision of False or Fraudulent Information to an Exchange or Improper Use or Disclosure of Information (§155.285)**
The preamble of the final 2015 Notice of Benefit and Payment Parameters explained that HHS would not exclude QHP Issuers from the definition of non-Exchange entities for purposes of §155.260, but would instead provide that any entity that gains access to personally identifiable information (PII) submitted to an Exchange or accesses PII directly from individuals should be considered a non-Exchange entity. An Exchange, however, has the flexibility to tailor privacy and security standards to non-Exchange entities so long as those standards remain in compliance with §155.260, including deeming these entities to be in compliance by virtue of adherence to the HIPAA Privacy Security and Breach Notification rules (the "HIPAA rules") if the Exchange determines that these rules meet a threshold level, outlined in the preamble. HHS notes that it "intends to issue guidance that will address in greater detail the applicability of the HIPAA Privacy, Security, and Breach Notification Rules and the additional limitations on use and disclosure of PII in section 1411(g) of the Social Security Act."

The Proposed Rule sets out the process for applying penalties under section 1411 of ACA. This penalty process is different than the existing enforcement process under the HIPAA rules. Unless the HIPAA enforcement and penalty process is primary and deemed to satisfy the requirements of §1411(g), QHP Issuers are potentially subject to dual enforcement and penalty structures arising from the same violations. The HHS Office for Civil Rights enforces the HIPAA rules while the proposed regulation at §156.285 designates the HHS and Office of Inspector General with enforcement authority for "knowing and willful" violations involving Exchange PII. This structure has the potential for concurrent investigations and enforcement actions that will cause confusion, duplication, and inefficient use of the valued resources within HHS. We also note our concern that without this coordination for substantive enforcement standards, issuers that offer QHPIs as well as other health plans that are not QHPIs could be subject to different technical standards and enforcement processes which could create confusion for consumers as well as issuers.

*Recommendations:*

AHIP and its members support building on the strong and established framework for the HIPAA rules and appreciate that the Notice of Benefit and Payment Parameters sets forth a process for providing this flexibility. We recommend that: (1) HHS' future guidance make clear that the FFM will deem QHP issuers, and their business associates, to be in compliance with section 1411(g) requirements based on compliance with the HIPAA Rules; (2) HHS issue guidance that recommends a similar approach to State Exchanges; and (3) in the case of QHP Issuers, provide that the enforcement processes and penalties of the Office for Civil Rights are the exclusive set of processes and penalties for both Federal and State exchanges in order to prevent confusion, disruption, and potentially duplicative penalties.

If HHS rejects the above recommendations and moves forward with establishing additional requirements under section 1411 applicable to QHP issuers in addition to the strong consumer protections and enforcement processes available under the HIPAA Rules applicable to Exchange and non-Exchange health plans, it would not be appropriate to assess any penalties under §155.285 in the absence of clear guidance. As a result, we would recommend that no penalties be assessed under §155.285 for QHP issuers until such time as HHS issues such clarifying guidance clearly outlining such requirements.

## Subpart F - Appeals of Eligibility Determinations for Exchange Participation and Insurance Affordability Programs

### Dismissals (§ 155.530(a)(1) and 155.740 (i)(1))
We support the proposal to accept telephonic withdrawals of an appeal request if an entity (Exchange or SHOP) is capable of accepting telephonic withdrawals, providing the entity records the statement and appellants telephonic signature, and provides written confirmation to the appellant.

**Subpart H—Exchange Functions: Small Business Health Options Program, Functions of a SHOP (§ 155.705) etc.**

We urge that HHS continue to focus on improving the experience and operations of the individual FFM. Despite significant improvements on the consumer-facing side of Healthcare.gov, the FFM still faces significant challenges with back-end data errors, significant manual workarounds, delayed functionalities, and improvements for the 2015 plan year. We urge that these issues be resolved as the FF-SHOP capability is developed and tested. Implementation of the proposed SHOP program will be complex and is untested. Therefore, we recommend that issuer testing should begin as early as May of this year to ensure that the FF-SHOP can deliver the types of premium aggregation services it is proposing to offer. In addition testing must be comprehensive and address a broad array of test cases, including both positive scenarios and scenarios where there are negative outcomes. Testing should include a maximum number of test cases that not only address eligibility, but also enrollment and maintenance scenarios (e.g., reporting a life event) so that issuers and the FF-SHOP can fully support employers and enrollees once coverage begins.

**Subpart K – Exchange Functions: Certification of Qualified Health Plans**

**Network Adequacy (§155.1050, 156.230)**
HHS did not propose any new regulatory requirements related to network adequacy or essential community providers (ECPs) in the Proposed Rule. However, we would like to reiterate our concerns regarding HHS intent to require FFM issuers to submit networks to review whether they meet a "reasonable access" standard and to increase the ECP threshold policies as outlined in the final Letter to Issuers. First, this proposed change is a significant and unnecessary departure from how network adequacy is reviewed today. Second, we are very concerned about the FFM's review of networks and the impact on plan certification when there will be little time for issuers to respond to any concerns raised about their plan networks. Network development – from creation of the network model to the discussion and negotiation with providers and signing of contracts – is a complex and critical function in the design of any health plan that can take upward of a year or more to complete. Finally, we are concerned that the approach appears grounded in out-dated models of assessing network adequacy without a necessary focus on quality.

*Recommendations:*

For all of these reasons, we recommend that HHS not collect lists of in-network providers from issuers for purposes of reviewing for network adequacy. State insurance departments are well positioned to continue their historical oversight role in this regard, as they also have substantial expertise of local health care markets to inform their evaluation and are in a better position than HHS to understand a State's unique challenges that may impact network access standards.

We urge that implementation of any new policies regarding network adequacy are developed through rulemaking and are effective no earlier than for coverage offered in the 2016 benefit year. This will allow additional experience on both consumer needs and utilization across health plan networks that will allow a thoughtful, data driven examination to what (if any) regulatory

changes are necessary. We also believe that HHS should retain the 2014 ECP thresholds and polices for 2015.

### Health Insurance Issuer Standards (Part 156)

**Prescription Drug Benefits (§156.122)**
The preamble indicates that HHS is considering amending the formulary exceptions standards to require processes for accessing drugs, including combination drugs, in an expedited manner when necessary. HHS believes that some enrollees are currently having trouble accessing appropriate prescription drugs in a timely manner and seeks comment on what specific standards would be appropriate for defining an expedited exceptions process.

*Recommendation:*

We note that health plans routinely make non-formulary drugs available to their enrollees—if the patient's physician believes it's medically necessary. Before HHS moves forward with more specific guidance in this area, we would like to better understand the access issues HHS believes are occurring, which will in turn help enable development of an appropriate policy strategy. We would also note that as HHS considers additional policy in the future, it should look to build on existing guidance where appropriate to ensure a consistent, streamlined regulatory approach (e.g., the 72-hour Department of Labor standard for coverage determinations in the individual and small group market). We look forward to continued dialogue with HHS on this important issue.

**Cost-Sharing Limits (§156.140(d))**
In light of the repeal of small group deductible limits, we recommend that §156.130(d) not be finalized.

**Enrollment Processes for Qualified Individuals (§156.265)**
HHS proposes that the Exchange would provide instructions to issuers regarding the payment of the first month's premium for enrollments and that the FFM will establish the day by which a qualified individual that selected a QHP within the open enrollment period (OEP) described at §155.410(b) must make a premium payment. The payment date is no later than the day before the coverage effective date and the payment date policy is applied consistently to all applicants in a non-discriminatory manner.

*Recommendations:*

While generally establishing a payment due date the day before coverage is effective is a workable solution for the FFM, there are several scenarios that commonly occur today that makes this approach challenging to implement. First, in the case of families that have a newborn and are enrolling during the OEP, coverage for the entire family is often effective on the date of birth of the newborn, resulting in a retroactive effective date. Second, the FFM does not always apply the normal effective dates (i.e., enrollments before the 15th of the month are effective on the 1st of the next month and enrollments after the 15th are effective on the 1st of the second following month) when an SEP is triggered even if the enrollment occurs during the OEP. For

24

example, during the recent OEP, individuals who answered the SEP-related questions (e.g., are you loosing MEC?) often received an accelerated effective date. Thus it was very common for issuers to receive enrollments on March 31st with an April 1st effective date. In these two scenarios it is not possible to collect premium payment before the effective date. As a result, we recommend that HHS not codify the requirement that premium payment must be received before the coverage effective date and instead require issuers to set a premium policy due date (e.g., premium payment must be received X days after receipt of the enrollment) and apply it consistently to their enrollees in a non-discriminatory manner.

**Notice of Non-compliance (§156.806)**
We appreciate HHS has proposed that a written notice providing basic information about a potential violation be provided to an issuer after HHS learns of or is informed by a State regarding a potential violation. Such a notice requirement will provide issuers an opportunity to review the matter internally and respond to HHS with new factual information. As proposed, issuers will have 30 days to respond to such a notice. While 30 days may be sufficient in many instances, the nature of the alleged violation and the facts involved may require a longer time to appropriately respond.

*Recommendation:*

We recommend that HHS retain the standard 30 day response time, but allow for the issuer to receive an additional 15 day extension of time to respond if the issuer requests additional time to allow additional investigation and review

**Decertification (§156.810)**
HHS proposes to add two bases on which HHS may decertify a QHP: (1) the QHP issuer substantially fails to meet the requirements outlined in Subpart K related to the cases forwarded to the QHP issuer and (2) the QHP issuer substantially fails to meet the QHP issuer requirements in Subpart M (e.g., related to confirmation of enrollment and payment reports, direct enrollment, the enrollment process for qualified individuals, and acceptance of third party payments).

*Recommendations:*

As discussed earlier in this letter, we recommend that HHS extend the 2014 good faith enforcement safe harbor to the 2015 Plan Year and, specifically, that compliance with Subparts K and M not be grounds for decertification or imposing civil monetary penalties for 2015.

The Health Insurance Casework System (HICS), established under Subpart K of this regulation was established as a way for HHS to forward consumer complaints to issuers. However, because of the many technical issues related to enrollment in the FFM during open enrollment for the 2014 plan year, HICS has been used extensively as a way for the FFM to send enrollment requests to issuers for the issuer to manually enroll a consumer or make changes to an existing enrollment. The parameters for using HICS to support enrollment were not clearly defined, and issuers often received cases that they could not resolve either because they were not permitted under HHS policy to make the requested change or because the case did not include sufficient supporting information. More fundamentally, these HICS "cases" did not represent health plan

customer service issues; instead, they were simply a means for the Exchange to communicate enrollment exceptions necessitated by the Exchange's functional limitations. In addition, issuers received extremely high volumes of cases – many of which were duplicates or changed from Level 1 to Level 2 (impacting the required resolution time) without notice to the issuer. Because of the myriad issues related to HICS cases to date, we strongly recommend that issuers not be subject to decertification for non-compliance with HICS standards for the 2014 and 2015 Plan Years until the system stabilizes and is used for its stated purpose. As a result, the HICS system is currently not a valid measure of health plan customer service performance, and should not be used for that purpose until the Exchange is no longer using it to communicate anything other than the customer services cases for which it was originally intended.

Similarly, issuers should not be subject to decertification for the 2014 and 2015 Plan Years for non-compliance with the requirements under Subpart M. Subpart M includes requirements related to the payment and collections report, which have yet to be finalized or implemented. It also includes requirements related to direct enrollment and payment methods for enrollees, which were both impacted by last minute policy changes, guidance and bulletins and technical issues during open enrollment and will likely undergo substantive changes in 2015.

## Quality Rating System (QRS)

We offer the following set of comments in response to HHS's proposals regarding the Quality Rating System specifically addressing: (1) the calculation and display of quality ratings and (2) implementation and reporting.

### Calculation and Display of Quality Ratings (§155.1400)

HHS has proposed standards for QHP data collection and public reporting of quality related information by Exchanges. Specifically, both the FFM and State Exchanges must prominently display quality rating information assigned for each QHP as calculated by HHS and in a form and manner specified by HHS beginning in 2016. Thus, HHS will be calculating quality ratings for each QHP regardless of the Exchange type. We are supportive of this approach as it promotes harmonization and standardization across the FFM and State Exchanges and also reduces the burden and costs for plans offering QHPs in multiple States.

HHS is considering allowing State Exchanges the flexibility to display additional QHP-quality related information. We support HHS adopting a core set of quality measures, as well as a standardized scoring methodology that will be used uniformly across both the FFM and State Exchanges.  We recognize that States may wish to report additional QHP quality-related information that addresses the specific needs of their enrolled population. Any mechanism that allows for State flexibility should be reserved for future iterations of reporting and later plan years than is proposed here. In addition, Federal measures and rating should be clearly separated from State measures and all Federal measures should be displayed in a consistent format. However, State Exchanges, such as California, that have implemented their own quality ratings for QHP issuers can be used to inform quality reporting on the FFM.

If HHS chooses to allow States to display additional QHP-quality related information, these States should clearly articulate a justification for these additions.  HHS should develop and use criteria to assess introduction of additional measures by States. Such criteria could include:

- Ensuring measure harmonization and minimizing burden to plans and enabling comparisons and benchmarking across States;
- Additional quality measures should address disease states or populations that are not captured in the QRS reporting system (e.g., HIV/AIDS);
- States must demonstrate a specific need for displaying additional quality measures that are not met by the standard set of QRS measures;
- The additional quality information and measures displayed should not conflict with current accreditation measures; and
- The additional quality information must be displayed consistently and in the same format across all State Exchanges.

We also recommend that HHS create a consumer friendly method through which individuals can easily locate quality information and is not overburdened by searching for QHP quality information in multiple locations or websites.

HHS has released the proposed methodology for calculating quality rating information as well as technical guidance related to the display of QHP rating information, which HHS proposes to do in a manner consistent with existing HHS programs (e.g., five star scale similar to Medicare Advantage and Prescription Drug Ratings). We are supportive of HHS's proposal to build upon the Medicare Advantage and Part D rating methodology to capture and display quality information. Building upon an existing rating methodology promotes consistency and offers consumers the ability to view data in an understandable and meaningful manner.

We appreciate HHS's intention to publish for review and comment technical guidance on calculating rating information.  As HHS is developing detailed specifications for this rating methodology we offer several recommendations for reliable and meaningful QRS ratings.

- HHS should establish a minimum sample size requirement for QRS reporting. To align with the current requirements for commercial Consumer Assessment of Healthcare Providers and Systems (CAHPS) methodology, we recommend that QHPs have a minimum sample size of 1,000 members to ensure a sufficient number of completed surveys per QHP and thus, statistically valid measurement rates.
- If a QHP cannot meet the minimum sample size threshold, a QHP should be regarded as not having reportable rates.
- At least in the initial years, measures selected for the QRS should be used by at least one qualified health plan accrediting body in order to provide consistency and reduce the burden associated with data collection.
- Enrollee responses to the QRS CAHPS measures should be case-mix adjusted to provide more valid comparisons across QHPs than unadjusted surveys by controlling for factors related to response bias such as satisfaction differences among previously uninsured enrollees, metal levels, and recipients of the APTC.

27

- The elements of the five star rating methodology should not conflict with what is used by QHP accrediting organizations, such as NCQA. The requirements for QHP accreditation and the QRS should coincide.
- HHS should publish in the Federal Register for review and comment all technical guidance and specifications relating to the QRS rather than use a call notice approach.

We also encourage HHS to offer at least a three month plan review period (similar to what will be offered to FFM QHPs) to allow all issuers to review their quality rating information before the data become public. A plan review period will provide QHPs the opportunity to identify any potential calculation errors or data discrepancies at the macro level. In addition, the QRS review period should be conducted at a different time than the Medicare Advantage Stars review. Given that HHS is calculating the quality ratings for each QHP regardless of the type of Exchange, HHS must coordinate with the States to ensure QHPs offered in State-based Exchanges also have the same opportunity to review the QRS rating data before public display given Exchanges may be on different timelines.

**Quality Rating System Implementation & Reporting (§156.1120)**
In addition to standards for Exchanges to oversee the display of quality rating information, HHS also proposes standards for QHP issuers to collect and report the necessary information to calculate QHP-specific ratings.  HHS has suggested a QRS measure set for family and adult self-only coverage and a measure set for child-only coverage.  HHS intends to publish measure specifications in future technical guidance in 2014 for the 2015 beta test. Additionally, HHS proposes that QHP issuers submit data necessary to calculate the QHP ratings to HHS. We support HHS's initial focus of the QRS for family and adult self-only coverage. Quality rating and measurement for child-only and stand alone dental plans will need to be significantly different than that family and adult self-only coverage QRS, thus requiring additional time for implementation.

To ensure that health plans and providers have sufficient time to establish an infrastructure for data collection, it is critical that QHP issuers have the final list of measures and measure specifications no later than May 2014 for the 2015 Beta testing. If QHP issuers have not received final measure specifications by May 2014, we recommend delaying both beta testing and reporting for one year with the beta testing to occur in 2016 and public reporting in 2017. QHP issuers need time to implement data collection systems and processes, which is particularly important for non-claims based hybrid measures, as well as measures that are not a part of the Healthcare Effectiveness Data Information Set (HEDIS). In addition, given that many of the QRS measures are HEDIS, and health plans report HEDIS data for the Quality Compass in June, measure specifications are needed by the end of May to allow health plans to avoid duplicative processes. We also recommend that HHS commit to a standard measure set that is consistent over time so that QHPs and their providers can focus their quality improvement efforts and costly data collection infrastructure is not continually modified.

HHS is also proposing that QHP Issuers submit data that has been validated in a form and manner to be specified by HHS, however, no additional details about systems or processes for submitting data are known at this time. Issuers must have sufficient lead time to know what systems will be in place for reporting data to HHS. HHS should consider aligning its data

submission process with the approach used in Medicare Advantage. For example, HHS can obtain quality data directly from accrediting organizations such as NCQA or URAC, or from survey vendors for CAHPS. Given that there are likely to be numerous operational issues associated with the reporting mechanism, we recommend leveraging existing systems already in use and allowing sufficient time to test the system before it becomes fully operational.

In order to ensure that only valid and appropriate data are used to calculate quality rating information, HHS is proposing that an independent third party review and validate the quality measure data.  We are concerned that the requirement for QHP issuers to contract with an independent third party will result in a duplicative process, given that HEDIS measures are validated through the NCQA compliance audit. An add-on validation process that would need to be applied to the non-HEDIS measures will create significant administrative expenses for plans. To reduce the administrative burden and expenses of data validation, we recommend measures subject to URAC validation or the NCQA compliance audit be deemed validated for QRS purposes. We also recommend that vendors currently providing such auditing and validating services be deemed to meet the third party validator requirements adopted by HHS.

HHS is also proposing that issuers must collect and submit data at the product level (e.g., HMO, PPO, POS) in every State in which the QHP operates.  HHS intends to allow issuers to collect data based on enrollees of QHPs offered on- and off-Exchange as long as they are considered the same plan.  HHS also proposes to allow for the option of reporting data on enrollees of QHPs offered on- and off-Exchange to address possible small sample size issues in the initial years of reporting until more is known about the Exchange population. However, challenges exist with respect to this approach.  Some QHPs may only offer on-Exchange products and therefore will not have the ability to report combined on-and off-Exchange data.  Additionally, the characteristics of the on-Exchange and off-Exchange populations may be different. For example, many individuals on the Exchange may be accessing health care for the first time and their needs may not be well understood. Given the potential differences in the populations that may be reflected in quality, we recommend that HHS further study this issue to determine if the combined on-Exchange and off-Exchange populations are the same as the QHP issuers reporting data for the on-Exchange population only. If these populations are different, HHS can consider alternative approaches such as comparison within a peer group, e.g. an on-Exchange plan is compared to other plans who also only report quality data for the exchange population.  As more experience is gained with the Exchange population, we will have a better foundation from which to report and compare data from QHPs only offering on-Exchange products with QHPs offering combined on-and off-Exchange products. We also recommend that HHS clarify the parameters for determining if an off-Exchange plan is the same as an on-Exchange plan as well as the process and entity responsible for making this determination.  We also encourage HHS to allow more flexibility in defining what constitutes a "same plan" instead of relying on the set of rigid criteria outlined in the rule.

**Provisions Related to Enrollee Satisfaction Survey (ESS)**

**Display of the Enrollee Satisfaction Survey (§155.1405)**
Similar to the display requirement for the QRS, HHS is proposing display requirements for the Enrollee Satisfaction Survey (ESS) to implement section 1311(c)(4) of the Affordable Care Act.

HHS is proposing that Exchanges must prominently display results from the ESS on its Web site, as calculated by HHS and in a form and manner specified by HHS, starting in 2016. As mentioned above, if QHP issuers have not received the final QRS measure specifications by May 2014, we recommend delaying both beta testing and reporting of the ESS for one year with the beta testing to occur in 2016 and public reporting in 2017.

HHS is also proposing that State Exchanges have the flexibility to display all ESS results, including those scores not used as a part of the QRS. We are concerned with this approach and would like to reiterate several related comments from our letters dated August 27, 2013 and December 2, 2013 regarding ESS instruments and data collection, as these comments continue to represent areas of significant concern.

- It is critical that the survey instruments be designed such that responsibility is allocated to the entity (e.g., Marketplace, QHP Issuer, etc.) that has control over what is being assessed.
- To be truly reflective of a QHP's performance, we support inclusion of questions that capture information about the quality of the plan's provider network that are applicable to areas that health plans can directly influence.
- A health plan's ability to influence clinicians can vary by provider type.  For example, the ACA requires that health plans include specific providers in their network (i.e., essential community providers) who may not have previously contracted with private health insurers and been part of performance reporting and consumer reviews. Additionally, such providers may not initially have the capacity to undertake quality improvement efforts needed to promote quality and patient satisfaction. We recommend that HHS: (1) segregate ESS questions that are only applicable to Exchange and/or provider responsibility as described above and (2) develop criteria for the display of all ESS results in order to provide for standardization and across States.

HHS is also considering allowing State Exchanges to display ESS 2015 beta test results prior to the display of the Federal ESS in 2016.  We do not support this proposal because use of test data for public reporting purposes can result in unreliable and questionable information being conveyed to consumers.  Although the format and language of the ESS drew from existing CAHPS items to the extent possible, beta tests are needed to further refine the questionnaire and sampling design, and provide Exchanges with the first annual scores.  HHS should use beta test information as it is intended -- to test the survey and vendor operations systems.

**Enrollee Satisfaction Survey Administration (§156.1125)**
HHS is proposing that the ESS be used to evaluate the level of enrollee satisfaction of members in each QHP with more than 500 enrollees.  HHS has proposed standards for a QHP issuer to collect and submit validated enrollee experience data from QHPs. Specifically, HHS directs QHP issuers to contract with an HHS-approved ESS vendor to administer the ESS to QHP enrollees. ESS vendors will report survey results to the Exchange on the QHP's behalf so that HHS can calculate the ESS scores and benchmarks. To align with the current requirements for commercial CAHPS, we recommend that the minimum sample size for the ESS be 1,000 members to ensure an adequate number of responses and thus, statistically valid measurement rates.

Similar to the plan review period allowing issuers to review their quality rating information before the data become public, we also recommend that QHP issuers be able to review ESS data before public reporting to identify any potential calculation errors or data discrepancies.  Given that HHS is calculating the ESS results for each QHP regardless of the type of Exchange, we encourage HHS to coordinate with the States to ensure issuers of QHPs in State exchanges also have the same opportunity to review the ESS results before public display.

HHS is also proposing to collect ESS data at the metal level and aggregate the ESS data from the QHP metal level to the QHP product level (e.g., the QHP issuer's HMO silver and HMO bronze would aggregate into one HMO level score) for public reporting purposes to provide consistency with the product-level data that would be submitted for the QRS. This approach could result in sample size issues and therefore we recommend that ESS data collection follow the same approach as the QRS data collection and occur at the product level.  HHS should consider collecting and reporting data at the metal level for future years only if sample size issues are avoided and it provides meaningful, additional information for consumers. Additionally, HHS should clarify how it intends on using metal-level data as it relates to member experience with plans charging different premiums.  For example, HHS could use data collected at the metal level to examine if there are material differences across tiers and evaluate such differences.

Similar to HHS's proposed approach for the QRS, HHS also intends to allow issuers to collect ESS data based on enrollees of QHPs offered on- and off-Exchange as long as they are considered the same plan.  However, challenges exist with respect to this approach.  Some QHPs may only offer on-Exchange products and therefore will not have the ability to report combined on-and off-Exchange data.  Additionally, the characteristics of the on-Exchange and off-Exchange populations may be different. For example, many individuals on the Exchange may be accessing health care for the first time and their needs may not be well understood. Given the potential differences in the populations that may be reflected in quality, we recommend that HHS further study this issue to determine if the combined on-Exchange and off-Exchange populations are the same as the QHP issuers reporting data for the on-Exchange population only. If these populations are different, HHS can consider alternative approaches such as comparison within a peer group, e.g. an on-Exchange plan is compared to other plans who also only report quality data for the exchange population.  As more experience is gained with the Exchange population, we will have a better foundation from which to report and compare data from QHPs only offering on-Exchange products with QHPs offering combined on-and off-Exchange products. We also recommend that HHS clarify the parameters for determining if an off-Exchange plan is the same as an on-Exchange plan as well as the process and entity responsible for making this determination.  We also encourage HHS to allow more flexibility in defining what constitutes a "same plan" instead of relying on the set of rigid criteria outlined in the rule.

HHS is also proposing that data for a sample of eligible enrollees that a QHP issuer provides to their contracted ESS vendor must be validated in a manner consistent with data validated for other clinical measures that are part of the QRS.  Our understanding of HHS" proposal is that if a QHP issuer submits data collected for a HEDIS quality measure that is validated through the NCQA audit process, that data must be shared with the ESS vendor. Currently HEDIS and CAHPS are validated and implemented as separate processes and combining the two processes can cause problems with coordination across vendors, unnecessary delays and added burden.

**MLR Considerations - Issuer Use of Premium Revenue; Reporting and Rebate Requirements (Part 158)**

**Formula for calculating an Issuers Medical Loss Ratio (§158.221)**

We appreciate the recognition of accounting for some of the exceptional circumstances insurers have faced in building interfaces and new, unplanned, and unbudgeted workarounds for Exchange implementation, as well as additional requirements when offering the transitional policies. However, there are a number of items that were not addressed in the preamble, and which we strongly urge be included in the regulation or other guidance.

During the 2013 open enrollment period, a lack of full functionality of many exchanges placed the onus on health plans to support systems and processes that were the original responsibility of the Exchange. Given the current situation in advance of the 2014 open enrollment period, while some process has been made, it is reasonable to expect that many interim processes will remain in place. Our members have been particularly hit with higher administrative costs. In 2013 ACA related systems and IT costs increased by 46 percent and these same costs are expected to increase by an additional 11 percent in 2014.  In addition, plans have had to delay or forgo significant projects such as capital improvements, systems upgrades/replacements, and cost of care and other projects.  Based on member experience, here are some of the primary cost drivers of the ACA:

- Technology infrastructure and maintenance costs related to having to support manual processes for enrollment, amplified by last minute regulatory changes and a general lack of clarity between overlapping State and Federal rules. These included changing enrollment dates, support for new special enrollment periods, lack of automated processes to send updated enrollments for life events and demographic information changes and a need to manually review many enrollments to ensure they were accurate;
- Inadequate lead time for implementing changes, unclear requirements, or provisions that have not been finalized, and last minute policy changes including the transitional and catastrophic policy changes and changes in effective dates and enrollment cut-off dates;
- Higher than anticipated call center volumes due to unclear roles and responsibilities between the Exchange and the issuers, including consumers being instructed by the FFM call center to contact their plan to request changes that plans are not allowed to make under existing HHS regulations and guidance;
- Manual workarounds due to unanticipated problems with FFM and SBM exchange functionality such as adding newborns to the policy and manual processing of life event changes; and
- Hiring additional support staff to handle the increased workload.

Thus, the factors offered (1.0001 for transitional policies, and 1.0004 for Exchange implementation costs), and the impact of the MLR rounding, could fail to provide desired relief for insurers most affected by participation in those programs. Insurers working with State-based exchanges and the FFM have undertaken significant additional and unanticipated administrative costs and functions as they partnered with States and HHS in implementing and assisting when systems integration was not yet operational for enrollment. Currently, it is expected that many

manual processes will remain for the bulk of 2014 including the interim payment process (through September 2014), enrollment reconciliation and interim approaches to support special enrollment periods. Further, the implementation of the financial management and risk mitigation transactions will continue through 2015. The proposed factor of 1.00004 does not provide for recognition of these significant additional costs, incurred exclusively as a result of exchange implementation costs, and does not assist insurers that would already meet the MLR requirements without the use of the factors.

Finally, the proposed language suggests an adjustment to the numerator for 2014 only, however the increase in administrative costs for companies has been seen in both 2013 and 2014, as indicated above for both the transitional and Exchange implementation, and will likely continue into 2015 and beyond.

***Recommendation:***

We recommend that the timeframe for administrative costs - related to the special circumstances of insurers offering the transitional policies in §158.221(b)(6) be extended, and the reference to "*2014*" be changed to "*2013 and until the year in which a State no longer permits transitional policies or 2017, whichever occurs first.*"

We recommend that insurers incurring administrative costs related to exchange implementation, in §158.221(b)(7) - should be permitted to deduct those total costs from the *denominator* of the MLR calculation not the *numerator*. We recommend removal of the 1.0004 factor in that section, and those costs be treated as adjustments to the numerator. We further recommend "in 2014" be changed to "in years 2013 – 2015".

**Activities That Improve Health Care Quality (§158.150)**
ICD–10 conversion expenses are discussed in 158.150 (b)(2)(i)(A)(6). We appreciate that an extension on the timeframe for those expenses has been added, through such time as the Secretary requires. The recent delays, from 2013 - 2014, and now again from 2014 to an uncertain future time mean that many conversion activities and training will need to be repeated, updated, and maintained with any changes made in the interim until finally required. Health Plans have been leaders in readiness, but now maintaining that conversion readiness with every system change or update made in the interim has a significant and ongoing cost. The limit of 0.3 percent of earned premium was already low in comparison to costs, and now is less than adequate to account for the ongoing costs of conversion readiness.

***Recommendation***:

AHIP recommends that the limit of 0.3 percent be moved to 0.4 percent, in recognition of these unusual and unanticipated costs.

**Distribution of de minimis Rebates (§158.243)**
Currently issuers do not distribute *de minimis* rebates to enrollees in the policies that generated those rebates, but instead aggregate such rebates and distribute them to other enrollees whose rebates are not *de minimis*. HHS proposes amending the current handling of de minimis rebates

in two instances: (1) where all the rebates are de-minimis, or (2) where distribution of de minimis rebates to enrollee(s) whose rebates are not de minimis would result in an enrollee receiving a rebate that exceeds the enrollee's annual premium. In these two situations, the issuer must distribute de minimis rebates to enrollees in the policies that generated the de minimis rebates. AHIP opposes the changes to the *de minimis* rebate distribution provisions, as the proposal is counter to the fair and reasonable reasons behind inclusion of the standard. Further, the costs of the distribution, whether as a premium credit or check payment, would frequently exceed the rebate amount, adding to the administrative costs of the current MLR year.

*Recommendations:*

*When all rebates are de minimis*: We recommend permitting insurers to include that total rebate amount in the rate calculations for the next year, thereby allowing the rebate amount to reduce premiums by that amount. This approach would benefit all enrollees in individual and small group market (recognizing that the MLR calculation is based on the total of all products by segment in that State) and has the advantage of assisting consumers in getting premium value.

Such a consideration is unnecessary for the large group segment, as large groups are not in a single risk pool, and employer groups can determine how to utilize any rebates for the benefit for their employees. And though it is highly unlikely there would be *de minimis* rebates in the large group segment, should those occur, we recommend that they be returned to the group.

If the approach of crediting the rebate amount in the rate calculations in the next year is not adopted, we suggest other alternatives be considered that would still reduce the administrative cost and complexity of returning such funds.

*When distribution of rebate would exceed the premium*: Unfortunately, this scenario is the result of MLRs being calculated on the total market segment, rather than on a per policy basis- which is why the rebate might exceed the premium in a given policy. We recommend that in these cases, any amount in excess of premiums be placed in a reserve fund and reported to HHS. If the cost of such administration of those adjustments exceeds the rebates in the fund, the insurer would not have to take further action. If the rebates after those adjustments are more than a nominal amount, the issuer would be required to either credit the rebate amount in the next year rate calculation amount as one alternative.

# EXHIBIT 2



**BlueCross BlueShield
Association**

An Association of Independent
Blue Cross and Blue Shield Plans

April 21, 2014

Marilyn Tavenner
Administrator
Centers for Medicare and Medicaid Services
7500 Security Blvd.
Baltimore, MD 21244

Submitted via http://www.regulations.gov

**RE:   Comments on NPRM on Exchange and Insurance Market Standards for 2015 and Beyond (CMS-9949-P)**

Dear Administrator Tavenner:

The Blue Cross and Blue Shield Association ("BCBSA") appreciates the opportunity to provide comments in response to the NPRM on Exchange and Insurance Market Standards for 2015 and Beyond ("NPRM").

BCBSA is a national federation of 37 independent, community-based, and locally operated Blue Cross and Blue Shield Plans ("Plans") that collectively provide health care coverage for 100 million – one in three – Americans.  Blue Cross and Blue Shield Plans offer coverage in every market and every zip code in America.  Plans also partner with the government in Medicare, Medicaid, the Children's Health Insurance Program, and the Federal Employees Health Benefits Program.

Blue Cross and Blue Shield Plan participation on the exchanges is broad and deep, offering health plan choices to consumers in almost every state and zip code across the nation.  In developing our comments, BCBSA looked at the lessons learned from the initial implementation of exchanges and market reforms to offer recommendations that will help ensure an effective health insurance market that provides affordability and choice for consumers.  With this in mind, BCBSA's priority recommendations on the NPRM are as follows:

- **Extend the good faith safe harbors into 2015.**  Last year CMS provided a good faith compliance safe harbor for 2014 for issuers providing qualified health plans ("QHPs") through a Federally Facilitated Marketplace ("FFM").  At that time, CMS indicated it would consider extending this good faith compliance policy through 2015, which we urge CMS to do.  Given that FFM standards continue to evolve (including through changes made in this NPRM) and enrollment and payment processes continue to rely on manual work-arounds that are prone to errors, a timely extension of the good faith safe harbor prior to the 2015 QHP application process is critically important.

- **Ensure that issuers have flexibility to revise specific cost-sharing amounts to avoid significant product discontinuations being mailed prior to October 1, 2014.** For example, issuers should be able to revise cost-sharing in response to historical or anticipated utilization of a particular benefit and to increase or decrease some cost-sharing elements and not others.  Such flexibility would allow issuers to stay within a metal level without having "odd" cost-sharing amounts (e.g., a co-pay of $26.43 instead of $25).

- **Eliminate the requirement to mail "renewal" notices to all individuals and employees.**  Currently, individual market policyholders and employers receive communications from their health plans concerning renewal.  Similarly, those who purchase coverage through the exchange will receive renewal notices from the exchange.  Implementing the proposed new requirements would be duplicative, could cause consumer confusion (especially for employees in group health plans), and would increase the cost of health insurance.

- **Do not apply the uniform modification and notice requirements to large group or grandfathered plans.**  These requirements will be of little value to large employers.  Large group employers are sophisticated purchasers and most will have finalized their purchasing decisions for the next year by the time the notices are required to be issued.  Additionally, grandfathered plans already have requirements around benefit changes that make these provisions unnecessary.

- **Give issuers flexibility to modify notices and to provide additional information to help consumers make informed decisions.**  Issuers should be permitted to modify renewal language to reflect the policy renewal/termination dates, details on how to contact the plan to explore plan options, and to provide more information on coverage options to consumers.  Issuers should also be permitted to provide information on such coverage options along with renewal notices.  BCBSA has provided detailed comments specific to the notices in a separate comment letter submitted on April 18, 2014.

- **Allow new plans that have been created to reflect network pricing to be considered a new plan within the same product not a new or modified product.** The current process of creating both a new product and plan results in the old plan being discontinued which results in unnecessary disruption for enrollees whose plans may be virtually identical to the one they enrolled in last year.

- **Extend into 2015 the current 2014 transitional policy for SHOPs and simplify the employee choice "opt out" process.**  A state SHOP should be able to continue determining the process that works best for its state.  BCBSA recommends that CMS simplify the proposed process for states to opt out of employee choice for 2015.  As currently proposed, this process could make it difficult for states to opt out.  Given the significant operational challenges that still exist for implementing employee choice, we recommend that CMS remove the requirement to offer employee choice at a metal level beginning January 1, 2015.

- **Implement the proposed changes to the risk corridors parameters.**  BCBSA supports the provisions in the NPRM that would increase the administrative cost ceiling to 22% and increase the profit margin floor to 5% for 2015.  However, we would

recommend increasing the administrative cost ceiling to 25%. These changes are needed to help mitigate additional administrative costs and uncertainties.

- **Continue the risk corridor program as originally intended.** BCBSA opposes the stated intention of CMS to implement the risk corridors program in a budget-neutral manner. Health plans relied on the 2014 Benefit and Payment Parameter final rule, which indicated that the risk corridors program is not statutorily required to be budget neutral, in filing their rates.

- **Prioritize the distribution of reinsurance contributions and enhance the reinsurance program.** BCBSA supports the proposal to prioritize funding for the reinsurance payment pool over payments to the U.S. Treasury. Prioritizing reinsurance payments will ensure that the program operates as intended. We also recommend that CMS lower the attachment point and prorate up the coinsurance rate to ensure that all available dollars are spent in 2015.

- **Remove the proposed requirement that fixed indemnity coverage cannot be sold by the same issuer of major medical coverage.** The proposed requirement would be punitive to companies who currently sell both types of coverage. If an existing member has fixed indemnity coverage with an issuer that also sells major medical coverage, that issuer would not be allowed to offer the member an ACA-compliant health plan unless the issuer first cancelled the member's fixed indemnity coverage.

- **Allow flexibility to establish business rules regarding payment of first month's premium for enrollment.** Decisions regarding payment of the first month's premium for enrollment have traditionally been a business decision made by issuers. BCBSA recommends that issuers continue to have the flexibility to establish payment guidelines for enrollment, provided the rules are implemented in a non-discriminatory manner. For example, many issuers provided great flexibility to consumers during the 2014 open enrollment period with respect to payment of the first month's premium; as a result, more consumers' coverage was effectuated than otherwise would have been without such flexibility.

- **Maintain existing flexibility for issuers to implement premium proration rules, in accordance with state laws.** BCBSA strongly recommends that the FF-SHOP premium proration rule be limited to SHOP. All exchanges, including FFMs, should continue to rely on issuers to prorate premiums in accordance with state law and issuer policies as they currently do for the 2014 benefit year.

- **Clarify the application of civil monetary penalties ("CMP").** Clarify that the CMP for providing false or fraudulent application information apply only to persons that provided the application information to CMS, and that nothing in the CMP provision is intended to suggest that QHP issuers have an obligation to verify application information. In addition, BCBSA recommends that CMS provide a safe harbor for all QHP issuers under the proposed requirement to impose penalties for false or fraudulent information.

- **Ensure the appropriate use of special enrollment periods ("SEPs").** The NPRM would give exchanges broad authority to establish SEPs and retroactive effective dates without specifying in detail the circumstances that would trigger such SEPs. Absent clear and generally applicable guidelines and processes, the availability of SEPs may

vary by case managers, exchange and potentially by issuer.  Having clear guidelines, effective dates and lengths of SEPs is essential to prevent gaming and to ensure affordable health plan choices.

- **Make it easier for issuers and consumers to reconcile a retroactive termination and effective date on deductibles and accumulators, and the treatment of prescription drugs reimbursed at the point of sale.**  The proposed process should ensure that consumers receive the benefit of the advance payments of the tax credits ("APTCs") and cost-sharing reductions ("CSRs") to which they are entitled, while also ensuring that the retroactive SEPs do not require issuer-to-issuer data transfers.  If a consumer enrolls in a different QHP with the same issuer, the issuer should not be required to follow the proposed retroactive SEP issuer change process, as it would not be necessary.  In that case, the QHP issuer will reconcile premiums paid by the enrollee (as necessary), but should not be required to reverse claim payments.  Similarly, the QHP should not be required to refund out-of-pocket ("OOP") payments, but could apply any cost-sharing paid to the new QHP's OOP maximums.

- **Clarify the bases and process for decertification of a QHP offered by an issuer through a FFM.**  The Final Rule should clarify that expedited decertification is reserved for violations that put QHP enrollees' ability to access necessary medical items or services at risk or substantially compromise the operation of the exchange.

- **Ensure greater transparency and stability in the Quality Rating System ("QRS") program.**  We generally support modeling the QHP quality rating program on the Medicare Advantage program's Stars rating system.  However, we urge CMS to use the formal notice and comment rulemaking process to announce and implement changes to the QRS, and to stress timeliness and stability.

- **Establish consistency in quality measurement and reporting as an overarching goal to lower administrative burden and avoid consumer confusion.**  To achieve this goal, BCBSA recommends that for a range of proposed requirements CMS should level the playing field between federally-facilitated and state marketplaces, and between competing QHP issuers, as much as possible.  Furthermore, CMS should use only evidence-based, administratively feasible quality measures for the QRS and require that accrediting entities use the same quality measures to align with the QRS.

******

Our detailed comments on the NPRM follow.


We appreciate your consideration of our comments.  Please let us know if you have any questions or would like additional information.

Sincerely,

/s/

Kris Haltmeyer
Vice President, Health Policy and Analysis
Blue Cross and Blue Shield Association

**BCBSA Detailed Comments and Recommendations on the NPRM on Exchange and Insurance Market Standards for 2015 and Beyond**

1. **Continuing the Good Faith Compliance Safe Harbors**

   <u>Issue</u>:

   CMS provided a good faith safe harbor for 2014 in the Code of Federal Regulations, 45 CFR 156.800(c).  See 78 Fed. Reg. 54070, 54121 (Aug. 30, 2013).  CMS subsequently adopted a parallel safe harbor for enforcement actions related to risk adjustment and reinsurance. 45 CFR 153.740; 78 Fed. Reg. 65046, 65061 (October 30, 2013).

   BCBSA believes that the good faith compliance safe harbors issued by CMS provided important assurances to health plans that they would not face civil monetary penalties or decertification if they made good faith efforts to comply with relevant requirements.  These assurances were an important factor for some of our members in determining whether to participate on marketplaces for 2014 at a time when technology and requirements were still evolving.

   Although CMS provided the good faith compliance safe harbors only for 2014, it stated "At the appropriate time we will consider extending this good-faith compliance through 2015." 78 Fed. Reg. at 54121.  BCBSA believes CMS should extend the safe harbors, as issuers (including current Federally Facilitated Marketplace (FFM) issuers and issuers that did not participate in the FFM in 2015) are in the process of making determinations about 2015.  We believe that extension of the good faith compliance standard for QHP certification for 2015 is critical given the following factors:

   - Many 2014 processes have yet to be automated or assumed by the FFM.  No roadmap has been provided to issuers for this transition to backend FFM functionality.
   - The transition to a new vendor (Accenture) creates additional uncertainties for 2015.
   - New processes will come on line for 2015 that have yet to be tested or detailed (e.g., SHOP, distributed data model for 3Rs, and new 2015 enrollment features).
   - Standards continue to evolve (e.g., numerous last-minute changes on Special Enrollment Periods) which create continued uncertainty, and changes proposed in this NPRM, including changes to criteria for uniform modification, when notices are to be sent to consumers, how risk corridors are calculated, and requirements for providing retroactive coverage in certain circumstances.
   - CMS has recently expanded the scope of standards or requirements that are grounds for civil monetary penalties, see the Interim Final Rule at 45 CFR 156.805(a)(1), and proposes additional CMPs in this Rule, such as 45 CFR 155.285.

   <u>Recommendation #1</u>:  **Extend the good faith safe harbors for 2015 and to new CMPs.**

   In light of the uncertainties above, BCBSA requests that CMS extend the good faith safe harbors in the Code of Federal Regulations, 45 CFR 156.800(c), and 45 CFR 153.740(a). See 78 Fed. Reg. 54070, 54121 (Aug. 30, 2013) and 78 Fed. Reg. 65046, 65061 (October 30, 2013) and extend a safe harbor for the new proposed CMPs contained in 45 CFR 155.285.

**Rationale:**

This extension would promote an effective partnership between issuers and marketplaces as this new program continues to evolve in 2015.  A timely extension prior to the 2015 application process would recognize the efforts issuers have made to promote an effective consumer-oriented marketplace that provides affordable quality choices.

The Annual Letter for QHP issuers on the FFM notes that, while CMS agreed not to impose civil penalties or decertification for non-compliance with certain marketplace requirements in 2014, CMS expects that by 2015 issuers will have gained more experience operating in the FFM. While issuers are actively monitoring their compliance with applicable FFM standards and guidance, the sheer volume and magnitude of changes to regulations, technology, processes, and procedures, has resulted in 2015 remaining a transitional year.

In order to promote stability and a successful 2015 enrollment season, we urge CMS to extend this good faith compliance approach through the end of 2015.  In light of these factors, BCBSA requests an extension of the good faith safe harbors in the Code of Federal Regulations, 45 CFR 156.800(c), and 45 CFR 153.740(a).  See 78 Fed. Reg. 54070, 54121 (Aug. 30, 2013) and 78 Fed. Reg. 65046, 65061 (October 30, 2013).

BCBSA believes that CMS may amend the current regulations in response to comments we will be submitting on the CMP provisions in the recently issued Interim Final Rule (CMS-9943-IFC) or this Proposed Rule, both of which include changes to CMP provisions to which the good faith standard applies.

**Recommendation #2:  Clarify that the Good Faith Safe Harbor is for Conduct Relating to the Benefit Year.**

BCBSA requests that CMS clarify that the safe harbors are for conduct relating to the specified benefit year, and not just for: (a) enforcement actions brought during those years or (b) conduct that occurs during those years.

BCBSA recommends the following amendments to the existing good faith compliance language (suggested additions are underlined; deletions are shown in ~~strikethrough~~ text:

> 157.800(c) Compliance standard.  For <u>conduct relating to</u> benefit years 2014 <u>and 2015</u>, sanctions under this subpart will not be imposed if the QHP issuer has made good faith efforts to comply with applicable requirements.

> 153.740(a) *Enforcement actions.*  If an issuer of a risk adjustment covered plan or reinsurance-eligible plan fails to establish a dedicated distributed data environment in a manner and timeframe specified by CMS; fails to provide CMS with access to the required data in such environment in accordance with § 153.700(a) or otherwise fails to comply with the requirements of §§ 153.700 through 153.730; fails to adhere to the reinsurance data submission requirements set forth in § 153.420; or fails to adhere to the risk adjustment data submission and data storage requirements set forth in §§ 153.610 through 153.630, CMS may impose civil money penalties in accordance with the procedures set forth in § 156.805 of this subchapter.  Civil monetary penalties will not be imposed for non-compliance with these requirements

~~during~~ for conduct relating to benefit years 2014 and 2015 pursuant to this paragraph (a) if the issuer has made good faith efforts to comply with these requirements.

A similar safe harbor should be provided for the new CMP in § 155. 285.

**Rationale:**

Issuers are working diligently and in good faith in a challenging environment that continues to evolve.  The good faith safe harbor should apply to conduct regarding the 2014 benefit year, and not be limited based on whether the conduct occurred during the specified year or when an enforcement action is initiated.

(a) **When the enforcement action is initiated**.  Clarification is particularly important in light of a sentence in the second Program Integrity final rule adopting the safe harbor for enforcement actions related to risk adjustment and reinsurance.  That sentence states that the 2014 good faith compliance safe harbor applies only to actions that CMS actually brings in 2014 - that "nothing in this provision prohibits CMS from imposing CMPs in 2015 for non-compliance that occurred in 2014."  78 Fed. Reg. at 65061.  We do not believe this sentence reflects CMS' intent or the regulatory text.

Limiting the good faith compliance safe harbors to those instances in which an enforcement action is initiated in the time period specified in the Rule (currently 2014) essentially eviscerates its protections.  The purpose of the regulatory good faith compliance standard is to provide issuers with assurances that if they proceed in good faith, they will not be subject to sanctions for noncompliance that may occur in the early years of the program.  Issuers will have no such assurance if the safe harbor provides only that an enforcement action cannot be initiated in 2014 (or 2015, if extended) – but the conduct still could be subject to CMPs if the enforcement action were simply initiated later.  The safe harbor should apply based on whether the conduct is covered, rather than when the enforcement action is initiated.

(b) **Conduct protected should be for the benefit year.**  The safe harbor's protection should at a minimum extend not to any conduct that occurs during calendar years 2014 or 2015 (regardless of when the enforcement action is initiated, as described above), but also should extend to conduct *related to* those two benefit years.  For example, for benefit year 2014, issuers expended substantial resources in a very uncertain environment during 2013, and in 2015 will be implementing reconciliation procedures for benefit year 2014 for the first time.  That conduct in 2013 and 2015 is what we understood to be protected by the safe harbor's phrase "For 2014," contained in 156.800(c), and is the protection we sought and that we understood that CMS would provide.  The benefit year concept should similarly be applied to conduct related to benefit year 2015.

**PART 146 & 147:  HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL MARKETS**

2.  **Product Withdrawal and Uniform Modification of Coverage Exceptions to Guaranteed Renewability Requirements (§§ 146.152, 147.106)**

**Issue:**

The Rule proposes minimum federal standards for determining whether coverage modifications constitute "uniform modifications."  Under these standards, a modification made solely pursuant to federal or state law is considered a uniform modification of coverage – for example, changes based on updated ACA standards, like an increased annual limit on cost-sharing.  Other changes would be considered uniform modifications if all of the following criteria are met:

- The product is offered by the same issuer.
- The same product type (e.g., PPO) is offered.
- The product covers a majority of the same counties in its service area.
- The product has the same cost-sharing structure, except for variation in cost-sharing solely related to changes in cost and utilization of medical care, or to maintain the same metal level.
- The product provides the same covered benefits, except for changes in benefits that cumulatively impact the rate for the product by no more than 2% (not including changes required by state or federal law).

States could apply additional criteria to broaden the scope of what would be considered a uniform modification, but could not narrow its scope.  However, the Preamble clarifies that the proposed definitions would preempt any conflicting state definitions – thus, state laws that prevent issuers from uniformly modifying coverage to comply with federal law requirements would be preempted.

The provision also proposes to require issuers in the individual and group markets to provide standard notices to consumers in a format designated by CMS 90 days prior to discontinuing a product or renewing or modifying coverage, without regard to QHP filing and issuer agreement timelines.  Such notices must be provided to each plan sponsor or individual provided that product (and to all participants and beneficiaries covered under such coverage).

**Recommendation #1:  Clarify that the language related to cost-sharing allows changes to specific cost-sharing amounts that are in response to historical or anticipated utilization of a particular benefit.  Additionally, permit issuers to increase some cost-sharing elements and not others as long as the overall changes in aggregate are based on changes in cost and historic or anticipated utilization. In addition, issuers should be allowed to enhance cost-sharing elements as long as this does not result in a change in metal level.   Finally, the language related to pre-emption of conflicting state law related to changes in cost-sharing, benefits, etc. should appear in the actual rule in addition to the preamble.**

**Rationale:**

BCBSA supports the intent of the NPRM to provide issuers in states with strict uniform modification requirements with the ability to make product modifications in order to keep their plans compliant, including changes in cost-sharing to keep them within the metal levels and benefits as long as they are within the parameters outlined in the NPRM.  To ensure that this requirement is applied in all circumstances, this language should be included in the actual rule and not just the Preamble, so that it will be part of the U.S. Code and therefore a clear requirement.

We are concerned, however, that, as written, the language related to cost-sharing, if read narrowly, would allow issuers to only adjust cost-sharing at the benefit level for "changes in cost and utilization of medical care" for the specific benefit.  While we do not believe this is the intent, if read literally this could mean that issuers would have to modify cost-sharing uniformly, which would result in odd cost-sharing levels.  For example, a plan with a $25 physician office co-pay and a $4,000 MOOP would have to increase both by trend.  In the case of 6.5% trend, the issuer would have a $26.63 physician visit co-pay and a $4,260 MOOP.  Issuers often raise specific elements of cost-sharing in order to keep their cost-sharing levels logical for the consumer and this should be allowed.

Issuers often change cost-sharing of a particular benefit in response to historic or anticipated utilization.  Given this is a new market, issuers need the ability to modify cost-sharing at the benefit level such as the co-pay for a service that is experiencing higher utilization than others, or where they anticipate higher utilization because it is an outlier in the market, without this being considered a product discontinuation. If these types of changes are not allowed, in many instances issuers will likely have to discontinue products rather than have a plan that is subject to adverse selection.

In addition, issuers need to be able to adjust the cost-sharing on some benefits and not others in order to stay within a metal level without having "odd" cost sharing amounts.  For example, an issuer might not change the deductible in a particular plan, but would increase certain co-pays by more than the amount of trend that particular benefit is experiencing in order to have consumer friendly "rounded" cost-sharing amounts. Additionally, issuers often enhance particular cost-sharing elements in response to consumer needs and to meet market demands – particularly in the first few years of a new market.  These changes to cost-sharing should be permitted if an actuary who is a member of the American Academy of Actuaries certifies that they are in response to changes in trend and/or historic or future anticipated utilization, or are an enhancement to cost-sharing that does not result in the product moving to a new metal level.  While we believe the intent of this provision is to allow these types of changes, the current language is not clear. If these types of changes are not allowed, in many instances issuers will likely have to discontinue products rather than have a plan that is subject to adverse selection or that is not competitive in the marketplace.

Additionally, in a guaranteed availability environment, there is not a need for overly restrictive limitations on what changes can be made by uniform modification, as the consumer has the ability to move to any other available plan in the marketplace. Historically, some states have placed limitations on uniform modifications because some consumers would be unable to move to a new product if they were not able to pass medical underwriting.

If the intent of the language in the NPRM is indeed to not allow these types of changes, BCBSA recommends that a third category of notices be created for "Minor Modifications." These notices would be sent when a modification does not meet the criteria to be a uniform modification and the product remains in the same metal level.  The notice would provide a comparison between the old and new benefits so the consumer could understand what is changing and make an informed decision of whether to stay in his or her current plan or select a new plan.

**Recommendation #2: Release the final rule as soon as possible due to the impact this rule will have on the QHP filing timeline.**

**Rationale:**

We are concerned with the timing of the issuance of the final rule and notice requirements. If CMS operates on a traditional timeline, issuers will be in the position of having to discontinue products for 2015, since 2015 products will have already been filed before uniform modification standards are finalized.  Further, the notice requirements place a significant burden on issuers, who will need to build programming and operational support for these new requirements.  We ask that CMS also consider the time a state may need to write and receive approval of state-developed discontinuation and renewal notices.

**Recommendation #3: Do not apply the uniform modification and notice requirements to large group, grandfathered plans and transitional plans and stand-alone dental plans.**

These provisions should not apply to plans in the large group market, grandfathered plans, transitional plans or stand-alone dental plans.

**Rationale:**

Large group employers are sophisticated purchasers and therefore these provisions and notices are unnecessary.  In addition, the majority of large employers will have finalized their purchase decisions for their next plan year by the time the notices are required to be issued. Therefore, the notices will be of little value to large employers and will be an unnecessary burden for issuers.

Under the ACA, grandfathered plans have a separate set of rules that regulate how they may be modified without losing their grandfathered status.  Grandfathered plans are not available on the marketplace, and are subject to existing modification and renewal processes.  If CMS decides to include grandfathered plans in this provision, it should be limited to situations in which a grandfathered plan is being modified in a manner that it is losing its grandfathered status and a specific notice should be developed.

The transitional guidance could require issuers to maintain three times the numbers of products they did prior to the ACA: grandfathered plans; transitional plans; and ACA compliant plans.  To reduce the administrative burden associated with maintaining transitional plans, issuers need the ability to uniformly modify the benefits of similar plans to create a single transitional plan.  This will increase the likelihood that issuers maintain transitional plans as long as allowed.

Finally, stand-alone dental plans are an "excepted benefit" under the Public Health Service Act, not health insurance coverage, and, therefore, they are not subject to guaranteed renewability provisions.  Additionally, new notices would need to be developed applicable to stand-alone dental plans, as the current notices are not worded in a manner that is appropriate.

**Recommendation #4:  Eliminate the requirement to mail notices for "renewals."**

**Rationale:**

Issuers already clearly communicate to their customers at renewal and those who purchase through the marketplace will also receive a notice from the marketplace.  This additional renewal notice would serve no value and only drive up the cost of health insurance.

**Recommendation #5:  Modify the notices to inform consumers that the coverage options available to them will not be displayed on the marketplace until the beginning of open enrollment.**

**Rationale:**

The NPRM states that issuers must send uniform modification or renewal notices to enrollees 90 days before the date the coverage will be discontinued.  Issuers will not finalize QHP agreements with marketplaces until November 3, 2014, and plans will not be displayed on marketplaces until November 15, 2014.  This means that notices directing enrollees to the marketplace will be sent at least 45 days before the enrollee is able to access their plan options on the marketplace.  This also means that for small groups operating on a calendar renewal or a January or February renewal, notices will direct groups to the SHOP prior to plan options being made available for small groups.  Modifying the notice requirements to coincide with the open enrollment period would also provide continuity in future years when open enrollment period dates may change.  Additionally, under current regulations, a summary of benefits and coverage must be sent to enrollees 60 days in advance of making a material modification to a plan.  We ask that HHS also consider aligning the renewal notices with the summary of benefits and coverage timelines.

**Recommendation #6:  Clarify that changes in benefits that impact rates for the product by no more than 2% also include changes as a result of federal or state guidance or regulations (not just state or federal law).**

**Rationale:**

The provision as it is written only references changes in federal or state laws as being excepted from the 2% limit on benefit changes, and does not include changes as a result of regulations or guidance.  Given the variety of mechanisms used to provide new requirements to issuers, we ask CMS to include federal and state regulations and guidance in addition to federal and state laws.

For example, California's marketplace will require through its standard plan designs that all marketplace plans embed the pediatric dental benefit (whereas last year the pediatric benefit was required to be offered as a stand-alone benefit).  If only changes by state or federal "law" (as opposed to regulation) are permitted, everyone receiving a marketplace plan in California could be required to receive a discontinuation notice in 2015 to accommodate the standard plan design changes, which clearly would not be the intent of these rules.

**Recommendation #7:  Defer to state regulators to develop expectations for the notification and closure of non-modified products moving forward.**

**Rationale:**

Most state DOIs have established requirements for product discontinuation, including reviewing issuer communications.  BCBSA encourages CMS to defer to existing state

requirements, and permit states to be able to develop either one standard notice as the NPRM proposes without federal review or to develop custom notices as they deem necessary to clearly communicate the changes to their citizens.  If CMS maintains the requirement to review all notices, this review should be expedited.

**Recommendation #8:  Give issuers flexibility to modify notices and provide additional information to help consumers make informed decisions.**

**Rationale:**

Issuers should have the option to make modifications to the model language to: reflect the actual policy year of the group or enrollee; to direct them to the appropriate enrollment timeframes; to include the company name instead of terms like "we" and "us;" and to speak to consumers in a customer-friendly voice, such as being able to thank them for being their customer in order to make the notice more readable and consumer-friendly.

**Recommendation #9:  Clarify that notices should only be sent to the primary policyholder in the individual market and only to plan sponsors (i.e., employers) in the group market.**

**Rationale:**

It would be administratively burdensome for issuers to distribute these notices to all members, including dependents, in the individual market when the policyholder is the primary decision maker.  For example, what is a child going to do with a notice?

In group situations, employees could be confused, alarmed and/or misled by the notice since they are not involved in the initial purchase decision.

- o  Employees receiving discontinuation notices may think they need to do something, even though their employer handles the purchase of employer-provided insurance.

- o  Employees receiving the renewal notice may be misled into thinking their current coverage is not changing, even though the employer may be planning to change their plan and/or issuer or even discontinue offering employer-provided insurance.

**Recommendation #10:  Increases in service area should not constitute a change that would result in plan cancelation.**

**Rationale:**

As written, a significant area expansion would be viewed as a discontinuation, which we believe is not the intent.

**Recommendation #11:  Allow new plans that have been created to reflect network pricing to be considered a new plan within the same product, not a new or modified product.**

**Rationale:**

Under previous guidance from CMS, issuers were notified that in 2015 that they would be restricted from differentiating pricing based on network as they did in 2014.  For 2015, issuers that want to vary pricing relativities by network within a service area have been instructed to create both a new "product" and "plan" that are service area-specific.  However, this modification is now being viewed as a discontinuation.  If HHS does not allow for issuers to consider new "plans" that have been created to reflect network pricing to be considered a "plan" within the same "product," enrollees in those "plans" will receive a discontinuation notice, will not be able to be auto-renewed, and will be forced to revisit the marketplace purchasing process.

To illustrate the disruption that will occur, one of our Plans has 52% of individual market enrollment in Network A and 48% enrolled in Network B.  If this continues to be considered a discontinuation, over 35,000 members will be in discontinued exchange products and will have to re-enroll for 2015.  It is important to note that this is just one issuer in a single state.

Both the current language in § 147.106, guaranteed renewability of coverage, and the proposed changes in the NPRM reference "product" as opposed to "plan" in relation to guaranteed renewability, uniform modification and discontinuation.  "Product" is also used in § 2703 of the Public Health Service Act where the requirements for guaranteed renewability are contained.  We recommend that in order to differentiate pricing between two networks, issuers be permitted to create a new "plan" within the same "product" in order to use network as a plan-level modifier to reflect the difference in price. Therefore, changing the "plan" number so that an issuer can administratively continue to vary the cost between two different networks in a service area should not require a discontinuation as long as it remains in the same "product" and there are other plans in the service area for the person to enroll in.  This policy will avoid such changes being viewed as a discontinuation and enable persons enrolled in these plans to be eligible for auto-reenrollment, eliminating potentially significant market disruption.

Additionally, CMS needs to ensure that it is prepared operationally to handle the exponential volume of "new plans" as a result of this change.  For example, the Plan referenced above will have three plans for every one plan it offered in the four rating areas with multiple networks, and many of our other Plans have multiple statewide networks.  CMS should implement an operational crosswalk to maintain enrollment from the 2014 plan into the 2015 plans to avoid disruption.

**Recommendation #12:  Allow issuers to "map" members whose coverage is being discontinued to a new product that most closely resembles their old product on the marketplace.**

**Rationale:**

Allowing "mapping" to the closest product would reduce the number of people who would be forced to go through the shopping and enrollment process on the marketplace, and thereby would reduce the number of people who go uninsured because they do not want to shop for insurance again.  "Mapping" occurs when an insurer automatically enrolls a policyholder in a plan with benefits closely aligned with the discontinued plan.  During the discontinuation and replacement process, the insurer will notify impacted policyholders of their right to choose any other product offered by the insurer.  The notice letter will state that if the policyholder does not elect a new product, the policyholder will be enrolled in a plan with benefits most

closely aligned with the discontinued plan ("mapped" to a new plan).  Mapping has been used for years in Medicare Advantage and Part D.

**Recommendation #13:  Provide clarification as to how the uniform modification policy will interact with the HIOS ID requirements.**

**Rationale:**

Issuers must have different HIOS IDs for each plan.  For plans with rolling renewal, it appears that issuers need to have two separate HIOS IDs for one plan – one HIOS ID for the plan with uniform modifications and one HIOS ID for the plan without the uniform modifications.  Issuers need clarification on this issue as soon as possible in order to request enough IDs for the filing process.

**Recommendation #14:  Clarify that changes to care management, network tiering structures, the addition of a network tier and formulary are outside the scope of product discontinuation rules.**

**Rationale:**

Issuers must have the flexibility to make changes to care management, network tiering structures and formulary to reflect the evolving nature of these key plan features.

**Recommendation #15:  Add the following language on page 15817 of the Preamble: "States would have the flexibility to apply additional criteria that broaden the scope of what would be considered a uniform modification, but not narrow its scope," and provide additional clarity about what this language means.**

**Rationale:**

To ensure states are comfortable that they have the authority to broaden the scope of the definition of uniform modification, this language should be included in the Final Rule itself and not just the Preamble and additional clarity should be added so the intent of the language is better understood.  Additionally, states that historically have allowed for a broader uniform modification standard under their existing laws and regulations should be allowed to continue that without any modification to their laws and regulations.

**Recommendation #16:  Limit the restrictions on product type to plans transitioning to or from an HMO.**

**Rationale:**

While the NPRM only mentions HMO and PPO as product types, there are other types such as EPO, POS, etc.  We believe it would be clearer if the requirement only applied when a plan either becomes an HMO or is no longer an HMO.  For example, a plan might be considered a PPO/EPO plan where the only EPO benefit is a single benefit to accommodate a vendor arrangement and the issuer later wants to discontinue the vendor arrangement and contract directly with providers.  By limiting the restrictions on product type to plans transitioning to or from an HMO, the Final Rule would clarify that such changes would not be considered as product discontinuations.

**3.  Relation of Rate Review and Product Discontinuance (Preamble)**

The Preamble notes that some issuers could try to avoid rate review by withdrawing
products and refiling them as "new" products.  CMS intends to apply the criteria for product
discontinuation and renewal to determine whether the rate filing is subject to review.
Specifically, if an issuer withdraws a product in a market and, within a 12-month period,
reintroduces a product in that market with modifications of the discontinued product that do
not differ from the above criteria, CMS would consider the issuer to be continuing to offer the
same "product" within the meaning of that term under §154.102. As such, the rate filing for
the product would be subject to rate review if it meets or exceeds the specified thresholds.

<u>Recommendation:</u>

BCBSA supports the proposed provision but recommends that CMS clarify that CMS or the
state (whichever is the effective reviewer of rates) take into consideration the allowances
under the modification guidance and the impact on rates in order to provide flexibility to
issuers while discouraging the practice of withdrawing and refiling products.

<u>Rationale:</u>

The proposed provision appears intended to prevent gaming of the rate review
requirements, and thus likely will result in a more level playing field.


## PART 148: REQUIREMENTS FOR THE INDIVIDUAL MARKET

**4.  Fixed indemnity health insurance in the individual market (§ 148.220)**

<u>Issue:</u>

The Rule proposes to amend the criteria for fixed indemnity insurance to be treated as an
excepted benefit in the individual market by eliminating the requirement that fixed indemnity
insurance must pay on a per-period basis (as opposed to a per-service basis), and instead
requires, among other things, that it be sold only as secondary to other health coverage that
is minimal essential coverage ("MEC").  Additionally, the fixed indemnity coverage cannot be
sold by the same issuer that sells the major medical coverage.

**<u>Recommendation #1</u>: Include a separate attestation in the application to be signed or
initialed by the enrollee verifying that the applicant has MEC.**

<u>Rationale:</u>

BCBSA is supportive of CMS' efforts to ensure that consumers have MEC when purchasing
a fixed indemnity plan.  An enrollment application with a signed and initialed attestation
statement is a reasonable way of obtaining assurance that the enrollee has MEC.

**<u>Recommendation #2</u>: Add a reference to coverage that pays benefits on a per period
basis.**

<u>Rationale:</u>

The language in the Preamble states that coverage that makes payment on a per-period basis is permitted; however, the language in the NPRM only references "benefits that are paid is a fixed dollar amount per day…"

**Recommendation #3: Remove the requirement that fixed indemnity coverage cannot be sold by the same issuer of major medical coverage**.

**Rationale:**

The requirement that the fixed indemnity coverage cannot be sold by the same issuer is punitive to companies who desire to sell both types of coverage.  If an existing member has fixed indemnity coverage with an issuer that also sells major medical coverage, that issuer would not be allowed to offer the member an ACA-compliant health plan unless the issuer first cancelled the member's fixed indemnity coverage.


**PART 153: STANDARDS RELATED TO REINSURANCE, RISK CORRIDORS AND RISK ADJUSTMENT**

5. **Provisions and Parameters for the Reinsurance Program (§ 153.405)**

   **Issue:**

   The Rule proposes to revise the allocation of reinsurance contributions so that allocations would go first to the reinsurance pool and administrative expenses and then to the U.S. Treasury (once the targets for reinsurance payments and administrative expenses are met). The Preamble also notes that CMS will make payments of sequestered FY 2015 funding for the reinsurance and risk adjustment programs, as soon as practicably possible in fiscal year 2016, which begins on October 1, 2015.

   **Recommendation:**

   BCBSA supports prioritizing distribution of reinsurance contributions to the reinsurance payment pool over payments to the U.S. Treasury, and distributing reinsurance contribution funds to the U.S. Treasury once the targets for reinsurance payments are met.

   We also recommend that CMS lower the attachment point and prorate up the coinsurance rate to ensure that all available dollars are spent in 2015.

   **Rationale:**

   The transitional reinsurance program is designed to stabilize premiums during the initial years of the program, as state and federal high-risk pool enrollees move into the individual market and issuers in that market offer coverage regardless of preexisting conditions or health status.  Prioritizing allocation of reinsurance contributions to the reinsurance payment pool will help moderate future premium increases.

   - *ACA § 1341 provides CMS with discretion to allocate reinsurance contributions as the Agency determines appropriate to carry out the goals of the statute.*

ACA § 1341 calls for the establishment and administration of a transitional reinsurance program, pursuant to which specified "contributing entities," for each of the three years of the program, contribute monies that are to be used "to make reinsurance payments to health insurance issuers … that cover high risk individuals" in the individual market.[1] The statute provides that the contribution amount "can" include an amount to fund administrative expenses, that "the aggregate contribution amounts … shall … equal" specified amounts to be distributed as reinsurance payments during each of the three years of the program, and that "in addition to the aggregate contribution amounts [for reinsurance payments], each [contribution amount] reflects" a proportionate amount to generate funds to be paid to the U.S. Treasury.[2]

The statute imposes few requirements on the expenditure of reinsurance contributions. The funds "may be allocated and used in any of the three calendar years for which amounts are collected based on the reinsurance needs of a particular period or to reflect experience in a prior period," and funds otherwise unexpended at the end of the program period "may be used to make payments under any reinsurance program" in a subsequent period.  The statute also states that contribution amounts collected for the U.S. Treasury "shall be deposited into the general fund … and may not be used for the program established under this section."[3]  Other than these limited directions, the statute is silent regarding the priority, method and timing of allocation of reinsurance contribution funds.  The statute does not, for example, specify that payments must be made to issuers and to the U.S. Treasury simultaneously, or that the U.S. Treasury must receive its full funding before reinsurance pool payments are made.  The statute also is silent on fund distribution if there are insufficient reinsurance contributions collected to satisfy the statutory obligations.  The legislative history for ACA § 1341 similarly does not address these questions.  Congress' silence thus provides the flexibility for CMS, in interpreting and implementing the statute to decide the priority, method and timing of allocation of monies collected through reinsurance contributions.

The U.S. Supreme Court has held that where a statute is silent on a particular question, Congress is considered to have given the executive agency the authority to resolve the question, and courts must uphold the agency's reasonable resolution of it.[4]  The Court emphasized that "the principle of deference to administrative interpretations has been consistently followed by this Court whenever a decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations."[5]  That is assuredly the case in this instance involving the traditional reinsurance program.  Moreover, it is a venerable principle that such judicial deference "has peculiar weight when [the issue] involves a contemporaneous construction of a statute by [those] charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and

---

[1] ACA § 1341(b)(1).
[2] ACA § 1341(b)(3)(B).
[3] ACA § 1341(b)(4) (emphasis added).
[4] *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).
[5] *Id.* at 844 (interior quotation marks and citations omitted).

smoothly while they are yet untried and new."[6]  Given the newness and enormous complexity of the Affordable Care Act, that principle would seem to fully apply here.

Prioritizing distribution of funds for reinsurance payments to issuers does not conflict with, and is not otherwise inconsistent with, the statute, which prohibits use of funds collected for the U.S. Treasury for reinsurance payments but does not specify the priority or order of payments.  In other words, the statutory prohibition set out in ACA §1341(b)(4) seems to suggest that funds collected for the U.S. Treasury could not be used to make reinsurance pool payments instead of making payments to the U.S. Treasury.  In the event CMS collects insufficient reinsurance contributions to meet all of the statutory obligations, however, a predetermined order of funding allocation that prioritizes full commitment to reinsurance pool payments is not improperly using funds intended for the U.S. Treasury to make reinsurance payments instead.  Rather, CMS' proposed approach merely applies all reinsurance contributions toward reinsurance pool payments until the statutory reinsurance pool payment obligation is fulfilled before directing funds to the U.S. Treasury in fulfillment of this additional obligation.

CMS' proposed approach also prioritizes the use of dollars for the statutory purpose of the reinsurance program – stabilizing premiums by addressing the potential risk of enrollees with high medical costs – over use of dollars for the U.S. Treasury.  Although the latter is a mandatory expenditure under § 1341, it is a separate and distinct obligation from the purpose of the reinsurance program.  Accordingly, CMS would be acting within the scope of the *Chevron* doctrine when the agency, faced with the statute's silence regarding use of funds in the event of insufficient reinsurance contributions, construes the statute so as to meet the goals of the reinsurance program and to fulfill the other purposes of the statute as well.

- *CMS may adjust its interpretation of a statute so long it explains its position.*

CMS' proposal to prioritize distribution of monies towards reinsurance pool payments before allocating dollars to the U.S. Treasury reflects a change in approach relative to the 2014 Notice of Benefit and Payment Parameters.  In March 2013, the agency indicated that in the event it did not collect sufficient reinsurance contributions to satisfy the statutory payment obligations, the agency would allocate each reinsurance dollar according to the following approach: 83.2 percent to reinsurance payments, 16.6 percent to the U.S. Treasury, and .2 percent to administrative expenses.[7]  Although the proposal in the NPRM reflects a change in the agency's approach, such a change in position does not preclude judicial deference to the agency's interpretation.  Deference would still be afforded if the agency explains its change of position,[8] which CMS does in the NPRM: "Due to the uncertainty in our estimates of reinsurance contributions to be collected and

---

[6] *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933), *cited in*, *e.g., Zenith Radio Corp. v. U.S.,* 437 U.S. 443, 450 (1978*); Washington Water Power Co. v. FERC,* 775 F.2d 305, 322 (1985).

[7] U.S. Department of Health and Human Services, "Patient Protection and Affordable Care Act; CMS Notice of Benefit and Payment Parameters for 2014 and Amendments to the CMS Notice of Benefit and Payment Parameters for 2014; Final Rules; Patient Protection and Affordable Care Act; Establishment of Marketplaces and Qualified Health Plans; Small Business Health Options Program; NPRM" 78 *Fed.* Reg. 15410, 15460 (Mar. 11, 2013).

[8] *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.*, 545 U.S. 967, 981-2 (2005).

to help assure that the reinsurance payment pool is sufficient to provide the premium stabilization benefits intended by the statute…"[9]

- *Reducing the 2015 attachment point or prorating up the coinsurance rate to ensure that all available dollars are spent in 2015.*

  Given the continued uncertainty in the insurance marketplace caused by such factors as the extension of the Administration's transitional policy, lowering the 2015 attachment or prorating up the coinsurance rate to ensure that all available dollars are spent in 2015 would ensure that the reinsurance program works to mitigate risk as intended. Additional funding may be required to mitigate premium increases for 2015, including eliminating the exchange user fee for 2015.

## 6.   Provisions for the Risk Corridors Program (§ 153.500)

**Issue:**

CMS is considering adjustments to the risk corridors formula to help mitigate additional administrative costs and uncertainties resulting from transitions to the 2014 market rules and the Administration's transition policies.  Unlike the 2015 Notice of Benefits and Payment Parameters, which would apply these adjustments only in states that allowed individuals to extend coverage in non-ACA compliant policies, this rule applies to QHP issuers in all states.  The modifications are as follows:

- An increase in the administrative cost ceiling from 20% to 22% for 2015.
- An increase in the profit margin floor from 3 percent to 5 percent.

CMS intends to implement this program in a budget-neutral manner, and may make future adjustments to program parameters, upwards or downwards, as necessary to achieve this goal.

**Recommendation #1: BCBSA supports the proposed changes to the risk corridors program.  However, we recommend increasing the administrative cost ceiling to 25% for 2015.**

**Rationale:**

BCBSA agrees that these changes are needed to help mitigate additional administrative costs and uncertainties.  We believe that an administrative cost ceiling of 25% would be more appropriate given the significant amount of back-end functionality that health plans have assumed and the potential for higher than anticipated administrative costs into 2015.

**Recommendation #2: BCBSA opposes application of budget neutrality to the risk corridor program.**

BCBSA opposes the stated intention of CMS to implement the risk corridors program in a budget-neutral manner.  While we appreciate the issuance of the April 11 FAQ indicating that budget neutrality would apply over the 3 years of the ACA's risk corridors program, we

---

[9] NPRM at 15820.

do not believe that this will provide adequate assurances to health plans that they can rely on the risk corridors program.  We recommend that risk corridors parameters only be changed prospectively and that final risk corridors parameters for a benefit year should be published well in advance of the QHP filing deadline.

**Rationale**:

The risk corridors program is intended to increase competition by encouraging participation in the marketplaces.  Potential QHP issuers need to be able to evaluate the parameters of the program and have confidence that the program will make payments and assess charges according to the published parameters before making their decision to participate in the marketplaces.

Implementing the risk corridors program in a budget-neutral manner is a reversal from the position that CMS took last year in the 2014 Benefit and Payment Parameter final rule, where it stated, "The risk corridors program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, CMS will remit payments as required under § 1342 of the Affordable Care Act."  78 Fed. Reg. 15,473 (March 11, 2013).  QHPs relied on the agency's 2013 non-neutrality in setting their rates for 2014 and participating in marketplaces.

The statute imposes an obligation on the Secretary to make risk corridors payments to QHPs that meet the statutory criteria, even if those payments exceed the Secretary's risk corridors collections from QHPs.  The statute expresses congressional intent to designate the Treasury as the source of funds for any shortfall in the ACA risk corridors program. Congress did so through its direction in § 1342(a) that the ACA risk corridors program "shall be based on" the similar program under Medicare Part D.  ACA § 1342(a).  The Medicare Part D program likewise authorized risk corridors collections, and, in addition, specified the Treasury as the source of funds for any shortfall between risk corridors collections and payments.

While the 3-year interpretation of budget neutrality in the April 11 CMS FAQ permits the carryover of an obligation from one year to the next, it does not provide adequate assurances that adequate dollars will be available due to the time-limited nature of the ACA's risk corridors program.  If issuers cannot rely on the availability of funding under the risk corridors program, then they will need to be more conservative in their pricing of QHPs.

We urge the administration to revert to the previous interpretation that the risk corridors program is not statutorily required to be budget neutral given the uncertainty in implementing this new law.


## PART 155 – EXCHANGE ESTABLISHMENT AND RELATED STANDARDS

### *Subpart C – General Functions of an Exchange*

**7.  Navigator, Non-navigator Assistance Personnel and Certified Application Counselor Program Standards (§§§ 155.210, 155.215 and 155.225)**

**Issue #1**:

The Rule proposes to preempt certain types of state laws applicable to Navigators, non-Navigator assistance personnel, and certified application counselors ("CACs") that CMS considers to conflict with or prevent the marketplaces from implementing these consumer assistance programs or make it impossible for assisters to perform their duties.  Some, but not all, of the proposed provisions would apply in state marketplaces.

The Rule also proposes to makes several changes to update the standards applicable to these consumer assistance entities and individuals, such as prohibiting them from specified marketing or solicitation activities.

**Recommendation:  BCBSA supports this provision, and supports its application to state-based marketplaces.**

**Rationale:**

Application of this provision to state-based marketplaces would provide consistency throughout the consumer assistance programs and minimize confusion if a state transitions from the FFM to a state-based marketplace.

**Issue #2:**

The Rule proposes to prohibit Navigators and other assisters from providing gifts including gift cards or cash, unless they are of nominal value, which it defines as $15 or less.

**Recommendation:  BCBSA supports CMS' approach on defining nominal value for gifts but we urge CMS to prohibit offering gift cards or cash entirely.**

**Rationale:**

We are concerned that the use of gift cards or cash alternatives could lead to improper conduct or be viewed as a direct inducement for application assistance or enrollment to potential enrollees.  Gift cards or cash, regardless of how nominal the amount, would be an improper use of Navigator and CAC funds and may inappropriately influence consumers' choices

## 8. Certified Application Counselors (§ 155.225)

**Issue:**

The Rule proposes to require that CACs be recertified on at least an annual basis, and successfully complete marketplace-approved recertification training.  Each marketplace would establish its own recertification standards.

**Recommendation:**

BCBSA supports including a recertification requirement and training standards for CACs.

**Rationale:**

This requirement will help ensure that individuals are qualified to assist consumers applying for marketplace and other types of coverage.

## 9.  Payment of Premiums (§ 155.240)

**Issues:**

To provide flexibility for marketplaces to establish a standardized methodology for partial
month premiums or rely on issuers to prorate premiums in accordance with state law and
issuer policies, the Rule proposes to permit marketplaces to establish one or more standard
processes for premium calculation.  The NPRM proposes to apply the FF-SHOP premium
proration rule to the FFM.

**Recommendation:**

BCBSA strongly recommends that the FF-SHOP premium proration rule be limited to SHOP.
All marketplaces, including FFMs, should continue to rely on issuers to prorate premiums in
accordance with state law and issuer policies as they currently do for the 2014 benefit year.

**Rationale:**

Following the operational guidance for the 2014 benefit year, and the procedures in
existence prior to 2014, any requirement on premium proration should continue to be a
business decision made by issuers in accordance with state laws.  The allowance is
especially important as CMS continues to formalize the appropriate effective dates for SEPs;
otherwise implementing formulaic premium proration rules would be difficult to
operationalize given that the SEP effective dates have not yet been specified.

## 10.  Privacy and Security of Personally Identifiable Information (§ 155.260)

**Issue:**

The Rule proposes to add a provision specifying that any person who knowingly and willfully
uses or discloses information in violation of ACA § 1411(g) will be subject to civil money
penalties described § 155.285.  The Preamble states that the agency is proposing this
reference "to clearly link these two regulatory provisions [§ 155.260 and § 155.285] and to
ensure that readers fully understand how civil money penalties will be assessed for *any
improper use or disclosure of information*." (Emphasis added)

**Recommendation:**

BCBSA does not support amending § 155.260(g) to add a reference to §155.285, which
establishes the civil money penalties (CMPs).

**Rationale:**

The proposed amendment is duplicative of the proposed provisions in § 155.285 defining
the scope of CMPs.  The CMPs should be defined just in § 155.285.  Further, the application
of § 155.260 regarding what information is confidential and how it must be kept confidential
may, in some cases, be broader than the specific prohibitions on disclosure in ACA
§1411(g) and should not be linked here.

**11. Bases and Process for Imposing Civil Money Penalties for Provision of False or Fraudulent Information to an Exchange or Improper Use or Disclosure of Information (§ 155.285)**

**Issues:**

- **Inclusion of QHP issuers in definition of a "person."**  The NPRM specifies the grounds for imposing CMPs on a person if CMS determines that the person has provided false or fraudulent information during the process of applying for enrollment in a QHP offered through a marketplace.  It defines "person" to include QHP issuers (among others).  Including QHP Issuers in the definition of person potentially creates confusion regarding the source of required application information provided to establish eligibility to purchase the QHP.

- **Overly Broad Scope.**  In attempting to define the scope of prohibitions under § 1411(g), the Rule proposes a link back to the privacy and security language in 45 CFR § 155.260.  In doing so, the CMP may potentially have the effect of expanding the prohibitions under § 1411(g) on use and disclosure of applicant information and exacerbating existing uncertainties and ambiguities in § 155.260.  Specifically:

  - *Use limitations not properly defined.*  The Preamble's discussion acknowledges that § 1411(g) "limits the ways in which information provided by an *applicant* or from a Federal agency can be used," but this is not reflected in the proposed regulation.  (79 Fed. Reg. at 15835 (emphasis added)).

  - **"*Marketplace PII" not defined*.**  The Preamble provides a definition of "Marketplace PII" as "information required to be provided by an applicant" or "information from a Federal agency that has been verified as being consistent or inconsistent with the records of that Federal agency."  (79 Fed. Reg. at 15835) The Preamble states that § 1411(g) applies to disclosures of "Marketplace PII" but that is not reflected in the proposed regulation, which instead refers to "any information."

  - *Scope of affected information is ambiguous.*  The NPRM defines any violation of privacy and security standards under § 155.260 as a violation of § 1411(g).  However, § 155.260(b) may potentially be read to extend more broadly than §1411(g), to other personally identifiable information, beyond the application information subject to § 1411(g).  § 155.260 is arguably ambiguous as to what information it covers, how such information may be used and disclosed, and whether information gathered from or on behalf of an applicant *who ultimately enrolls* can then be used/disclosed in the same way as similar information can be used or disclosed about an enrollee who did not come through an marketplace.

- **Application information appears to maintain its "Marketplace PII" status indefinitely.**  CMS does not clarify whether the limitations under § 1411(g) on use and disclosure, even if limited to application information, would continue to apply to such information after the individual enrolls in a QHP.  This ambiguity is particularly concerning given the discussion in the Final Exchange and QHP Establishment Rule that CMS received comments recommending that the term applicant be limited to those individuals who do not ultimately become enrollees, but CMS did not adopt this recommendation.

- **Use of an incorrect evidentiary standard for CMP violations.** The NPRM references imposing CMPs based on "credible evidence" and a "reasonable determination" by the agency.  However, CMPs for violations of §1411(g) are potentially significant and should be based on a "preponderance of the evidence" standard.

**Recommendation #1**:  **Clarify application of CMPs.**

Clarify that the CMP for providing false or fraudulent application information applies only to persons that provided the application information to CMS, and that nothing in the CMP provision is intended to suggest that QHP issuers have an obligation to verify application information provided by applicants.  Further, QHP issuers should operate within a safe harbor for the collection and transmission of such information.

**Rationale:**

The process for determining whether a CMP should be applied to individuals providing false or fraudulent information during the application process should not in any way imply that QHP issuers have an obligation or responsibility to provide application information to a marketplace.  In the enrollment process, QHP issuers provide many types of data to a marketplace.  There is a significant amount of data transferred between the issuer, a marketplace, CMS and other entities, with each transaction increasing the risk for compromised data integrity and reliability.

**Recommendation #2**: **Eliminate ambiguities about the scope of ACA § 1411(g).**

CMS should revise § 155.285(a)(1)(iii) to simply state that CMS may impose CMPs for a "knowing and willful use or disclosure of information in violation of § 1411(g) of the Affordable Care Act" and delete the remainder of § 155.285(a)(i)(iii), including (A)-(C), which attempt to summarize what constitutes a violation of  § 1411(g).

**Rationale:**

As proposed, § 155.285(a)(iii) establishing CMP for violations of § 1411(g), attempts to define the scope of the prohibitions under § 1411(g) and links back to the privacy and security language in 45 CFR § 155.260.  In doing so, the CMP may potentially have the effect of expanding § 1411(g)'s prohibitions on use and disclosure of applicant information and exacerbating existing uncertainties and ambiguities in § 155.260.

**Recommendation #3**: **Correct the ambiguity that application information maintains its "Marketplace PII" status indefinitely.**

BCBSA recommends that CMS define "Marketplace PII" to make clear that once an individual enrolls in a QHP, any information a QHP issuer has received from or on behalf of that individual in connection with applying for an marketplace product (i.e., "Marketplace PII") is no longer considered to have come from an "applicant."

In addition, the provision should state that a QHP issuer may use or disclose "Marketplace PII" pertaining to an enrollee in any way permitted by HIPAA.  The agency should include a sentence in the definition of "Marketplace PII" explaining that "Marketplace PII" does not include any information received by a QHP issuer from individuals who are enrolled in a QHP offered by the QHP issuer, whether such information was received prior to or after the

25

individual's enrollment.  The definition should also define what constitutes "marketing" activities consistent with HIPAA privacy regulations.

**Rationale:**

The NPRM does not clarify whether the limitations under § 1411(g) on use and disclosure, even if limited to application information, would continue to apply to such information after the individual enrolls in a QHP or to those individuals who do not ultimately become enrollees.  Also, neither the Preamble statement regarding the use of PII for marketing purposes nor the proposed regulatory language define what is considered "marketing," so it is not clear what activities would require applicant consent.  Without this clarification, it's possible that issuers could be out of compliance for something as unlikely as providing a summary report stating that 15 percent of its members have incomes between 150 and 200 percent of the federal poverty level.

**Recommendation #4**:  **Establish "preponderance of the evidence" as the correct evidentiary standard for CMP violations.**

**Rationale:**

CMPs for violations of § 1411(g) should be consistent with evidentiary standards under the Administrative Procedures Act, which results in most administrative cases being decided on the "preponderance of the evidence" standard.  References to imposition of penalties based on "credible evidence" and a "reasonable determination" by the agency should be eliminated.

**Recommendation #5**: **Extend the good faith compliance standard for actions that could result in CMPs for 2014 and 2015.**

**Rationale**:

While BCBSA recommended earlier in this comment letter that CMS extend a good faith compliance standard for conduct relating to 2014 and 2015 benefit years, the new proposed 155.285 illustrates the need for an extension of the good faith safe harbor in the Rule.

The NPRM specifies additional grounds for imposing CMPs, including with respect to § 1411(g) as discussed above. The new proposed CMP for violations of § 1411(g) ties back to the recently revised § 155.260, which in turn sets standards that must be encapsulated in issuer agreements for 2015 that have not yet been issued by the FFM or state-based marketplaces.  As the standards are continuing to evolve, issuers as well as CMS are still solidifying procedures and standards, making an extension of the good faith compliance safe harbors to 2015 entirely appropriate.

We note that the existing good faith compliance safe harbor in §156.800(c) only applies to HHS enforcement in the FFM under §§ 156.805 and 810.  The good faith compliance standard would not extend to HHS enforcement under § 155.285, which applies whether the Issuer is operating in a FFM or state-based Marketplace.  For that reason, HHS should adopt a separate good faith compliance standard with respect to HHS enforcement of the privacy and security standards under § 155.285, analogous to the approach taken in adopting a separate good faith compliance standard in § 153.740(a) for the premium

stabilization programs.  As with those data submission standards, the good faith compliance standard in § 158.800(c) does not reach the enforcement provisions applicable to §155.285.

In the enrollment process, QHP issuers provide many types of data to a marketplace.  There is a significant amount of data transmitted between the issuer, the marketplace, CMS and potentially other entities.  Each transaction increases the risk of compromised data integrity and reliability, leading to a situation where the data could be false simply due to an error.

***Subpart E - Exchange Functions in the Individual Market: Enrollment in QHPs***

## 12. Enrollment of Qualified Individuals in QHPs (§ 155.400)

<u>**Issue**</u>:

The Rule proposes to require marketplaces to provide instructions to issuers regarding payment of the first month's premium for enrollments.  It proposes that marketplaces may, and the FFM will, require payment of the first month's premium in order to effectuate an enrollment.

<u>**Recommendation**</u>:

BCBSA strongly recommends that marketplaces not provide instructions to issuers regarding payment of the first month's premium for enrollments.  Instead, marketplaces should allow issuers to establish their own business rules on first month's premium for enrollments.

<u>**Rationale**</u>:

Decisions regarding payment of the first month's premium for enrollment have traditionally been a business decision made by issuers.  Although for the 2014 open enrollment period issuers were originally required to have received and processed initial payment no later than the day before coverage was effectuated, CMS later reversed this requirement and instead allowed issuers the flexibility to establish later initial premium payment cut-off dates in order to encourage enrollment and support consumers who had difficulty enrolling in marketplace coverage.  BCBSA strongly recommends that issuers continue to have such flexibility to establish their own payment guidelines for enrollment, provided the rules are implemented in a non-discriminatory manner.

## 13. Initial and Annual Open Enrollment Periods (§ 155.410 – in Preamble only)

<u>**Issue**</u>:

CMS plans to modify the timing of the notice of annual open enrollment period (OEP) and annual redetermination.  CMS indicates that it believes it will be necessary to change the date that the marketplace will send a written notification for the 2015 open enrollment to enrollees.  Because the annual enrollment period was moved to November from October for 2015, CMS is considering shifting the required timeframe for such notice to October 1 through October 31, or October 1 through November 15.

<u>**Recommendation**</u>:

BCBSA supports modifying the timing of the notice of annual open enrollment period and annual redetermination through November 15. Consumers should receive detailed information from a marketplace on their eligibility changes, new subsidy amounts, and what action they need to take, if any, and by what date, to maintain their existing coverage.

**Rationale**:

BCBSA looks forward to continuing to work with CMS on processes for redetermination and enrollment in 2015. Notification timeframes should be coordinated among states, issuers and CMS to ensure consumers are not receiving multiple notices at different times throughout the year. Processes should also be streamlined to ensure a consumer that prefers to maintain their existing coverage will be able to keep it the next year.

If the FFM were to send an eligibility redetermination notice in October, the notice would not include changes in their Advanced Premium Tax Credit (APTC) amount for 2015. In order to calculate someone's 2015 APTC amount, CMS will need to continue to determine the second lowest-cost silver QHP on the marketplace. However, final QHPs will not be determined until as late as November 3 on the FFM. Without including this information in the notice, the FFM would either need to send a separate notice after all the QHPs have been finalized, or require all consumers to come back to healthcare.gov to receive their APTC information. The latter two approaches would create a lot of additional work for marketplaces and individuals, which could create confusion and high demands on marketplace websites and call centers.

Further, extending the allowable time into November would provide additional time to develop a master enrollment database with necessary information to ensure individuals receive an annual eligibility redetermination notice based on correct information from 2014.

## 14. Special Enrollment Periods (§ 155.420)

**Issue**:

The NPRM amends provisions related to special enrollment periods ("SEPs"), effective dates for certain SEPs and the length of SEPs. The proposed changes would provide marketplaces with broad authority to establish enrollment periods and retroactive effective dates without specifying in detail the circumstances that would trigger the SEPs.

Currently, for SEPs for errors, contract violations, and exceptional circumstances, coverage must be effective on an appropriate date based on the circumstances of the SEP. CMS guidance provides that coverage must be effective on either the date of the SEP-triggering event or the regular effective date for SEPs. The Rule proposes to expand the ability of marketplaces to establish the lengths of the SEPs and to establish retroactive effective coverage dates based on whatever the marketplace deems appropriate to the circumstances.

In addition, CMS proposes that the marketplace may permit a qualified individual or enrollee to have a later date of coverage in the event of birth, adoption or placement for adoption or placement in foster care. Current regulations require that the effective date of coverage is the date of the life event in the previous sentence.

**Recommendation #1**: **To ensure that SEPs do not undermine the risk pool, CMS should clarify the circumstances that trigger SEPs, effective dates and lengths of SEPs.**

The FFM and state-based marketplaces (SBM), as applicable, must clarify the criteria for "data" and "systems errors," "misconduct" and "exceptional circumstances" SEPs listed in various bulletins and guidance, before an FFM (or SBM) may apply such a SEP.  These criteria must be clarified and made public, so policies can be applied consistently across marketplaces and issuers.  Further, the criteria should not permit individuals with health conditions to wait until they are sick or need medical attention to enroll in coverage.

**Rationale**:

Issuers need clarification to ensure that SEP policies can be applied consistently across marketplaces and issuers.  Absent clear and generally applicable guidelines, the availability of SEPs may vary by marketplace case manager, marketplace and potentially by issuer— which would be unfair to participants and risk destabilizing the risk pool if SEPs are not applied uniformly.  Consistent application will avoid inconsistent or even arbitrary application of SEPs.

Just as important, however, is that the SEPs should not be so flexible as to be effectively an open enrollment period.  Issuers have not set current premiums with the expectation that the SEPs would effectively allow unlimited open enrollment and CMS recognized that without limited enrollment periods, individuals would have no incentive to enroll in coverage until the individual was sick or needed medical attention.  CMS should not permit the SEPs to undermine the clear enrollment boundaries that are necessary to ensure that the marketplace markets—and the individual markets generally—are robust and healthy.

As CMS considers what constitutes a data display error, we encourage CMS to make reasonable determinations that consider the information an issuer makes available to consumers through their plan materials.  The healthcare.gov website provides a simplified way of shopping and comparing QHPs, and consumers should be encouraged through disclaimers to refer to issuer documents for official information when making their selections.

We look forward to continuing to work together to ensure information displayed to consumers on marketplace portals is clear and accurate for 2015.  As BCBSA has suggested in previous comments, this goal will be accomplished if issuers, states, and CMS clearly understand all certification and recertification criteria before the QHP application process begins, there is sufficient time for issuers to validate their data that will eventually be displayed to consumers in the marketplace portal, and sufficient time for issuers to preview the data in the marketplace portal as it will appear to consumers.

Ensuring issuers can preview, verify, and easily address issues with Plan information before it is provided to consumers will be critical.  This process will minimize the burden on issuers by mitigating the need for subsequent data changes, and alleviate validation problems that issuers encountered during the application window last April.  Also, as BCBSA has previously recommended, CMS should allow issuers to create their own testing scenarios for how data will display in "plan preview."  During the last plan certification window, the use of standardized scenarios in "plan preview" verification limited the ability of CMS and issuers to adequately test the information displayed to consumers.

**Recommendation #2:** **The Final Rule should codify specific criteria and processes for consumers to provide proof of an SEP qualifying event, including validating that they were impacted by a "data error," "misconduct" or "exceptional circumstance."**

**Rationale:**

Given the number of SEPs, and the varying circumstances under which an individual may qualify for an SEP, the FFM and SBM, as applicable, should establish clear and understandable validation processes to ensure issuers, consumers and marketplaces all have a common understanding of the circumstances and related proof that qualify an individual for an SEP.

Requiring proof and validation processes will help ensure that SEP policies can be applied consistently across marketplaces and issuers, and expedite the process of SEP enrollment so that coverage is not delayed and so that issuers and participants are not subject to retroactive coverage unnecessarily. Retroactive coverage is costly for issuers, difficult to administer correctly, and leaves individuals facing unnecessary out-of-pocket (OOP) costs until coverage is effective. Efficient processes should help ensure that retroactive coverage is required only when it is unavoidable.

Relying solely on consumer attestations to determine whether a qualifying event has occurred without requiring any proof could undermine the purposes of the defined enrollment periods, and undermine the integrity of the exchange enrollment processes.

If SEPs are solely based on attestations, we are concerned that consumers incentives to enroll during defined enrollment periods would be weakened, leading to adverse selection and unpredictable costs for issuers. HHS recognized the importance of exchanges putting into place verification standards and processes in the March 27, 2012 Final Rule on the Establishment of Exchanges. Distinguishing between eligibility for an SEP and eligibility for regular enrollment, CMS recognized that SEPs require additional verification standards and processes, "Given that the eligibility criteria for some of the special enrollment periods in § 155.420 do not directly align with the criteria to establish eligibility for coverage through the Exchange or insurance affordability programs in § 155.315, we expect Exchanges will use other verification standards and processes to determine eligibility for those particular special enrollment periods." Therefore, where an SEP is based on information not available through the general application, additional verification is required, and the processes and proof should be specified by CMS in the Final Rule.

Exchanges or issuers are permitted to terminate coverage for purposes of fraud or misrepresentation. However, clear and consistent requirements should be established so states, exchanges, issuers and CMS can avoid the administrative costs and consumer dissatisfaction associated with rescissions due to fraud or misrepresentation. Generally, if consumers are provided subsidized coverage when they are not eligible, they will be liable for any tax credits through IRS processes. It is also not in the consumer's interest to incur an IRS debt because an exchange fails to properly conduct an eligibility determination.

Clear validation processes also will ensure that consumers eligible for SEPs are quickly and properly enrolled and that consumers not eligible for SEPs are quickly and accurately informed of their ineligibility and when they may enroll in coverage.

**Recommendation #3:  The Final Rule should clarify the processes for notifying consumers affected by an error, including who should be sending the notification. Specifically, we recommend the following:**

- The notification requirements should ensure that only individuals immediately affected by a data or process error receive a notification.

- When such individuals are notified, the notice should clearly inform the individuals of their options, how long they have to select a QHP (if they choose to change QHPs) and the earliest date any change would be effective.

- The source of the notice (FFM or issuer) should vary depending on whether the error triggers an SEP:

    o If the error triggers an SEP (regardless of the source of the error), the FFM should notify the affected members of their options and the process and timelines.

    o If the error does **not** trigger an SEP (regardless of the source of the error), the issuer should notify the affected members of the correction.  Issuers should have the flexibility to determine the form and content of such notification.

**Rationale:**

Because of the numerous SEPs that are currently available to consumers, and because the media coverage of such SEPs does not necessarily fully explain the circumstances under which consumers may be eligible for coverage, it is critically important not only that criteria and processes are established to ensure the accuracy of SEP enrollment going forward, but that these criteria and processes are communicated quickly and accurately to affected individuals.

These recommendations will ensure that SEP policies can be applied consistently across marketplaces and issuers.  Further, clear and concise consumer communications are needed to reduce consumer confusion and to make marketplace enrollment and processes more transparent and user-friendly.

**Recommendation #4:  CMS should avoid allowing an open-ended enrollment period following birth, adoption or placement for adoption or placement in foster care. Instead, CMS should establish that the effective date can be no later than the first of the month following the qualifying birth/adoption/placement in foster care event.**

**Rationale:**

Unless CMS establishes timeframes for an SEP triggered by the relevant qualifying event, parents could be encouraged to wait to purchase coverage for the child until significant claims are incurred.  This would lead to adverse selection, which would increase costs for other marketplace enrollees.

**Recommendation #5:  Clarify that SEPs conclude at the end of the regulatory period or when an individual selects a QHP, whichever is sooner, and that the new coverage will start after the existing coverage terminates.**

31

**Rationale:**

The Rule proposes that a marketplace permit qualified individuals and their dependents to enroll in or change from one QHP to another if they are enrolled in a non-calendar year individual health insurance policy, even if such non-calendar year policies are renewing. Similarly, individuals who lose pregnancy-related coverage are permitted to enroll in a QHP when the pregnancy-related coverage ends, as are individuals who lose minimum essential coverage.  The Final Rule should be clear that for the new SEPs, as well as current SEPs, the period for enrollment concludes at the end of the SEP regulatory period (usually 60 days) or when an individual selects coverage, whichever is sooner.

Adding this clarification to the regulatory language will ensure that once an individual selects a QHP, his or her SEP is no longer open.  The clarification will ensure that issuers, marketplaces and consumers have a clear understanding that over the potential 120-day enrollment period available to certain individuals, they cannot change their QHP selection. As marketplaces and issuers work to operationalize the SEP criteria in the most consumer-friendly manner, allowing multiple changes to a QHP selection could be problematic and create additional errors.

Without providing this clarification, we are concerned that individuals could change from one metal level to another within the enrollment period based on when a medical need arises.

**Recommendation #6: Direct issuers and marketplaces to work together to identify root cause of "data errors" and develop processes to ensure issuers are not financially liable for FFM mistakes.**
**Rationale:**

BCBSA supports the FFM's efforts to ensure that all eligible individuals are enrolled in their preferred, and appropriate, coverage.  However, to the extent that individuals were enrolled in coverage they did not select or that was not appropriate because of data errors caused by FFM systems, issuers may be required to bear the operational and administrative cost for outreach and correction of these errors.  CMS should work closely with issuers to ensure that to the extent that errors are the result of FFM systems or processes, issuers are made whole.

**Recommendation #7: Change the end date in § 147.104(b)(2) from " the policy year ends in 2014" to "coverage under the policy ends at the end of the transitional program".**

**Rationale:**

Section 155.420(d)(1) as written references § 147.104(b)(2), which includes a limited open enrollment period for non-calendar year plans during 2014.  Given that the new transitional program extends coverage at least into 2017, the end date in § 147.104(b)(2) needs to be modified to ensure persons enrolled in pre-ACA non-calendar year individual market coverage can maintain continuous coverage when the transitional program ends.

## 15. Termination of Coverage (§ 155.430)

**Issue:**

The Rule outlines a proposed process for when consumers discontinue enrollment in one QHP and move to another.  Generally, the former QHP issuer would be required to refund or credit any premiums paid by the enrollee, reverse claim payments based on the date enrollment ends, and refund OOP payments made based on the date enrollment ends.  CMS would provide the new issuer any advance payments of the APTC and/or CSR based on the retroactive effective date, which would be subject to CSR reconciliation based on the retroactive coverage date.  The new issuer would be required to collect enrollee premium for all months of coverage, adjudicate enrollee claims incurred during the retroactive period, and provide any applicable CSRs.

However, the Rule does not clarify the impact of a retroactive termination and effective date on deductibles and accumulators.  In addition, while the Rule proposes that a consumer would be refunded premiums and OOP expenses with respect to terminations for retroactive enrollments, it is unclear how the process will work for point-of-sale prescription drug expenses.

**Recommendation #1:  BCBSA supports the process for changing QHP issuers under retroactive SEPs.**

**Rationale:**

The proposed process should ensure that consumers receive the benefit of the APTCs and CSRs to which they are entitled, while also ensuring that the retroactive SEPs do not require issuer-to-issuer data transfers.

**Recommendation #2:  Clarify that the process for changing QHP issuers does not apply to consumers enrolling in a different QHP with the same issuer.**

If a consumer enrolls in a different QHP with the same issuer, the issuer should not be required to follow the retroactive SEP issuer change process described above, as it would not be necessary.  If the consumer enrolls with the same issuer, the QHP issuer will reconcile premiums paid by the enrollee (as necessary), but should not be required to reverse claim payments.  Similarly, the QHP should not be required to refund OOP payments, but could apply any cost-sharing paid to the new QHP's OOP maximums.  CMS could adjust the advance payments of the APTC and CSR as necessary.

**Rationale:**

If a consumer remains with the same issuer, there will be no need for the issuer to follow the processes laid out above.  Following the proposed process would be unnecessarily disruptive for consumers and issuers.  Consumers would receive the benefits of the APTCs and CSRs to which they were entitled, and receive credit for any OOP costs incurred, without the delay and cost associated with repayments and re-adjudication of claims.

**Recommendation #3:  Clarify the treatment of prescription drugs reimbursed at the point of sale in termination situations.**

**Rationale:**

The Rule suggests that the new issuer must adjudicate enrollee claims incurred during the retroactive period; however, such requirement will not work for point-of-sale prescription

drug expenses.  The Rule is silent on how prescription drugs—most of which are adjudicated at the point of sale—will be handled in the case of a change in QHP issuers with a retroactive effective date.  CMS should issue guidance providing that prescription drugs reimbursed at the point of sale should be reconciled with CMS during the annual financial payment reconciliation process.

Because of the unique nature of prescription drug point-of-sale claims, the simplest and most straightforward way to address point-of-sale adjudication is for the first QHP issuer to continue to process these claims until the issuer is notified that coverage has been terminated.  At that point, the new QHP issuer may begin adjudicating prescription claims.  Following the end of the benefit year, both QHP issuers will receive appropriate adjustments for such claims during the annual CSR reconciliation process.

### *Subpart H - Exchange Functions:  Small Business Health Options Program*

### 16. Functions of a SHOP (Employee Choice) (§ 155.705)

<u>Issues</u>:

BCBSA appreciates that the Rule gives state regulators the option to provide transitional relief for employee choice in the SHOP for 2015.  The Rule proposes to maintain state requirements for SHOP to provide "employee choice," allowing employers to allow their employees to choose any health plan within a metal tier.  However, the Rule would provide a one-year transition policy under which a SHOP could choose to opt out of implementing employee choice in 2015 only if one of the two circumstances is found to exist by the SHOP:

1) If employee choice would result in significant adverse selection in the state's small group market resulting in market disruptions that could not be fully remediated by the premium stabilization programs or the single risk pool; or

2) If there is insufficient number of issuers offering QHPs or SADPs to allow for meaningful plan choice among QHPs or SADPs for all AV levels in the SHOP.

BCBSA is concerned that the process for opting out of employee choice is too narrowly crafted and would create additional complexity and timing issues because it requires data on adverse selection and choice among QHPs and SADPs even though necessary evidence would not be available.  In addition, the proposed process creates the following key timing issues:

- The proposal indicates that CMS anticipates SHOPs would reach a decision about employee choice no later than "early Fall 2014."  Fall starts September 22, the same day that data is scheduled to be "locked down" for the FFM.

- Issuers would be required to submit rates for approval months before a state receives opt-out approval from the SHOP (or CMS for the FF-SHOPs).  Even though CMS considers providing the opportunity for issuers to modify QHP applications, it is unclear how issuers would file rates without knowing whether employee choice is required.

- In addition, CMS discusses providing QHP issuers the option to withdraw products prior to the close of the initial QHP application window.  However, Blue Plans are required in almost all FFM states to participate on the FF-SHOP under the "tying" provision in 45 CFR 156.200(g).

Further, almost all SHOPs continue to confront barriers to implementing employee choice.  While the Rule proposes a high burden of proof standard for state regulatory agencies (requiring them to provide "concrete evidence" that the above criteria are met), we are very concerned that the proposed waiver process does not discuss requirements for a SHOP to demonstrate operational readiness.  For example, for the FF-SHOP, there are no concrete assurances that employee choice can be ready for November's open enrollment period, even if a state with an FF-SHOP seeks to implement an employee-choice approach.  While we appreciate the information that the CMS policy team is providing to issuers on the design of the FF-SHOP through weekly webinars and other venues, CMS has yet to provide issuers with operational progress reports, system specifications, or testing timeframes for the FF-SHOP.

Also, whether a SHOP can successfully attract employers, issuers and key consumer assistance stakeholders will depend heavily on outreach and education about the SHOP and whether it can provide a better experience than traditional approaches.  Assurances of transitional relief are needed as soon as possible to ensure states and issuers know the small group market criteria for purposes of rate approval and QHP certification, and prevent any confusion among all stakeholders.

Since CMS is in a unique position to both establish federal criteria for SHOPs and then determine whether either a state SHOP or FF-SHOP are capable of sufficiently meeting such regulatory requirements, we recommend that the Final Rule provide maximum flexibility for state marketplaces and the FF-SHOPs as follows:

**Recommendation #1:  In State-based Marketplaces or a SHOP-only state, CMS should extend through 2015 the current 2014 transitional policy, as follows:**

- CMS should avoid requiring the Rule's proposed state recommendation and SHOP opt-out process.

- Instead, CMS should continue to allow states to determine the process that works best for their state, allowing them as an option.

**Rationale:**

Last June, CMS issued the Exchange Establishment rule, which finalized a transitional policy that was proposed last March.  In providing support for the transitional policy, CMS explained in the Preamble that the approach was supported by "serious concerns that issuers would not be operationally ready to offer QHPs through the SHOP if [it] implemented employee choice for 2014."  78 Fed. Reg. 33233, 33235.  CMS has clear authority to extend the 2014 transitional policy relating to employee choice an additional year.  CMS has fully recognized its authority to phase in ACA requirements through extension of the one-year Transitional Policy issued on November 14, 2013 to a three-year Transitional Policy in the March 5, 2014 guidance.

CMS codified the 2014 transitional relief in order to give issuers: 1) "experience under the new small group rating methodology"; 2) "significantly more time to design and implement the modifications to their systems necessary for employee choice and premium aggregation"; and 3) "additional time for education and outreach about employee choice." 78 Fed. Reg. 33233, 33235.

The issues summarized in last year's Final Rule have not been resolved over the past year and therefore warrant an extended employee-choice transitional policy.  Almost all the same exigencies that existed in advance of 2014 continue for 2015.  Across federal and state SHOPs, BCBS Plan participation is greater than that of any other issuer.  However, in advance of the 2015 benefit year, our Plans do not have a complete understanding of the full impact of the new small group rating methodology, this year's enrollment, or the 2014 premium stabilization programs.  For example, while Plans are currently preparing products and rates for the 2015 benefit year, the impact of this year's premium stabilization programs will not be known until June, 2015.

In addition, enrollment and payment systems for employee choice and premium aggregation have yet to be built and implemented in a scalable form across many states.  The vast majority of state-based marketplace SHOPs are not fully functional despite a multi-year effort and hundreds of millions of dollars spent.  For example:

- California announced in February a suspension of their online SHOP enrollment capability which is necessary for employee choice.

- Massachusetts abandoned employee choice due to extraordinary complexities of systems development for no perceived value to employers.
  - Half of the very small number of small businesses that enrolled in their employee-choice pilot were solo-businesses.

- Utah has less than 3,000 employees enrolled in their choice program after six years of operation.

- While some have pointed to D.C. as an example of early SHOP success, almost all of the 12,000+ enrollees are Members of Congress and their staff who are required to purchase through a marketplace.  Even for these members, enrollment has been largely manual.

Looking ahead to 2015, issuers, states and CMS need clarity on the roles each will be performing.  We are concerned that if CMS does not extend the transitional policy as recommended as soon as possible, the proposed process in the Rule would create additional complexity for states, issuers and CMS, add new timing issues for product approvals, and potentially confuse assistors and employers interested in SHOP.

Adding another layer of timing complexity to allow for SHOP review of a state regulatory agency's recommendation would likely create unintended ambiguities for issuers, states and CMS.  Declaration letters from states for a state-based marketplace, or SHOP-only marketplace must be sent by May 1, 2014, if a state intends to submit an application.  A complete Marketplace Blueprint is due no later than June 1, 2014, with CMS conditional approval scheduled by June 15, 2014.  These timeframes are already out of alignment with the QHP certification timelines, which could require an issuer to apply to a different entity for

QHP approval.  The federal blueprint review may or may not coordinate with a state's underlying product approval timelines.  Finalizing the transitional policy as we have recommended will allow both states and issuers to know what the criteria will be in a small group market for purposes of rate approval and QHP certification.

In addition, continuing the transitional policy will allow states to continue building and phasing-in SHOP capabilities.  States could ensure that their SHOPs can provide an automated shopping and enrollment experience for employers and have additional time to prepare for the automated premium aggregator billing system, which is required for an employee choice model to work as designed.  Even if CMS requires states to provide choice among QHPs offered by an issuer, the transitional approach will ensure that SHOPs and issuers can work together to establish automated enrollment before integrating the complexities of automated billing and payment through a premium aggregator.

States that demonstrate operational capabilities to offer employee choice would continue to have the flexibility to choose the method by which employers could offer plans for their employees.

**Recommendation #2:  In FF-SHOPs, CMS should extend the current 2014 transitional policy into 2015 for the reasons recommended above.  However, in 2015, CMS should provide states with the flexibility to phase-in employee choice as follows:**

- A state regulatory agency should be required to notify CMS of its determination among the two options below, or default to the approach CMS determines.  The FF-SHOP would be considered sufficient if it allows employers to choose to offer:
  1) All QHPs at a metal level or a single QHP or
  2) A single QHP (transitional policy)

- Similar to the proposal in the Rule, a state would need to affirmatively opt out of implementing employee choice (#2).  However, we recommend avoiding complex review processes and timing issues for issuers, states and FF-SHOPs, as follows:

  o A state regulatory agency would be required to certify to CMS that continuing the existing transitional policy best meets the needs of its small group market.

  o However, rather than CMS requiring "concrete evidence," a state's certification would have to enumerate the reasons for its decision, which could include one of the following factors:
    - Adverse selection
    - Meaningful choice;
    - Operational readiness
    - Other critical factors a state deems to be material to their determination.

  o For 2015, CMS should use a deferential standard to accept the state's certification as sufficient for the FF-SHOP.

  o Issuers should be notified of whether employee choice is required prior to the end of the initial QHP application submission window so they have sufficient time to adjust rates, if needed, get state approval and minimize the need for state re-review.  If extended to subsequent years, decisions should be made in January of the year prior to the plan year.

**Rationale:**

BCBSA appreciates that CMS continues to seek to provide states with flexibility in the design and operation of their marketplaces to ensure states are implementing sustainable marketplaces that best meet the needs of their population.

In states where CMS acts as the FF-SHOP, it will be critical to ensure states have the flexibility to determine what best meets the needs of their population. Our recommended approach advances the implementation of employee choice on FF-SHOPs by allowing states to either implement employee or employer choice. Unlike the process in 2014 where the FF-SHOP was required to only offer employer choice, states would have the flexibility to determine if employee choice would be in the interest of employers, employees and other stakeholders in their small group market.

Providing the proposed flexibility to states will ensure any state that later seeks to transition to a state-based SHOP with employee choice has the opportunity to begin building the necessary operational and regulatory experience to eventually support its own employee-choice approach.

As the FF-SHOP, CMS would continue to act in its capacity to ensure QHP criteria and other SHOP eligibility criteria are met. CMS would, however, provide deference to states to determine what is in the best interest of their populations. CMS has previously deferred to state findings or recommendations in implementing the ACA. Consider the following examples:

- **Premium Rate Review.** Under the premium rate review regulations, CMS will adopt a state's determination of whether a rate increase is an unreasonable rate increase, as long as the state: 1) has an effective rate review program; and 2) within five days of its determination, provides its final determination of whether a rate increase is unreasonable, including a brief explanation of how its analysis of the regulation's relevant factors caused it to arrive at its determination. CMS Reg. § 154.210.

- **Annual Limit Waiver Process.** For the annual limit waiver process, OCIIO provided (through sub-regulatory guidance) that states could submit requests for waiver of the otherwise applicable restricted annual limits for state-mandated policies. The state was generally required to explain the policy's benefit design, and to provide an "estimate or analysis" of how compliance with the restricted annual limit would result in: 1) a significant decrease in access to benefits; or 2) a significant increase in premiums. The state could satisfy this latter requirement by either providing an attestation from the issuer's CEO, or submitting a statement from the state's insurance commissioner or another state official that 1) or 2) would occur. OCIIO 2010 – 1A (Nov. 5, 2010).

If the Rule were implemented as proposed, we are concerned that employers and employees would experience significant technical glitches in the FF-SHOP due to a lack of tested and verified functionality.

Automated processes are necessary in employee choice to ensure billing, payment and enrollment systems are coordinated. Issuers have been flexible in implementing numerous work-arounds to make enrollment work through the individual marketplaces. However,

these manual approaches are not transferable to employee choice.  IT automation is necessary to ensure employers receive an accurate bill (consolidated from employees enrolling in multiple QHPs) and issuers receive an accurate and timely payment (consolidated from multiple employers choosing their plans).

As explained in the previous recommendation, extending the CMS 2014 transitional policy into 2015 makes sense because almost all the same exigencies that existed in advance of 2014 continue for 2015.  In particular, the systems and processes required for employee choice are very complicated, and the processes are no further along in their implementation on the FF-SHOP than they were at this time last year.  Key progress reports, system specifications, and testing timeframes for the FF-SHOP have yet to be released to issuers.

One of the key factors CMS provided for last year's transitional policy was that it would provide issuers time to "design and implement the modifications to their systems necessary for employee choice and premium aggregation."  However, this would be impossible for an issuer in an FF-SHOP state to do given the lack of available specifications to date.

Unless transitional policies are provided again for 2015 or criteria for employee choice are relaxed, we are very concerned that employer and employees could encounter the same types of issues in SHOPs this November that individuals encountered last October.

## 17. Enrollment Periods Under SHOP (§ 155.725)

### Issue:

The NPRM maintains rolling enrollment in SHOPs.  However, it proposes to set the start of annual employer election periods in all SHOPs for plan years beginning in 2015 to be no earlier than November 15, the same date as the start of open enrollment in the corresponding individual market marketplace for the 2015 benefit year.

While the NPRM provides changes to the enrollment period, it does not specify criteria for Members of Congress enrolling through SHOP.

### Recommendation:

The Final Rule should provide flexibility for Members of Congress and their staff to work with the Office of Personnel Management and SHOP to align enrollment timeframes with those in the Federal Employees Health Benefits Program.

### Rationale:

As Members of Congress and their staff consider their coverage options, it would provide a more consumer-friendly experience if their enrollment periods are aligned with the timeframes they are accustomed to for making their coverage decisions.

## *Subpart O – Quality Reporting Standards for Exchanges*

## 18. Quality Rating System (§ 155.1400)

### Issue:

This proposed provision would require that Marketplaces publically report quality rating information.  In the Preamble, CMS indicates that starting in 2016 Marketplaces will display a quality rating calculated by CMS using a five star scoring criteria in a similar style and format to that of Medicare Advantage (MA).  As we noted in our comments on the November 2013 QRS Notice, drawing on the MA experience makes sense because of the depth of knowledge and expertise that CMS has accrued in the process.  However, several aspects of the MA Star program's methodology should not be replicated in the QRS.

**Recommendation #1**: Use the formal notice and comment rulemaking process to announce and implement changes to plan ratings.

Any revisions to the QRS should be done through the formal notice and comment rulemaking process.

**Rationale:**

The formal rulemaking process, which allows all industry stakeholders the opportunity to comment on the proposed changes for at least 60 days after publication of the proposed changes in the *Federal Register*, provides CMS with the most complete information and meaningful analysis of the proposals on which to base revisions to the QRS.  Using the formal notice and comment rulemaking process would be consistent, for example, with CMS' procedures for making changes to the Physician Quality Reporting System (PQRS): when CMS announced changes to the 2013 PQRS in the 2013 Medicare Physician Fee Schedule NPRM published in the *Federal Register* on July 30, 2012, it received and considered public comment, and announced the final changes in the 2013 Medicare Physician Fee Schedule Final Rule, which was published in the *Federal Register* on November 16, 2012.  The changes became effective on January 1, 2013.  As such, all stakeholders were notified of the final changes before they took effect and before data for the measures was collected.

**Recommendation #2:**  Maintain consistency in performance thresholds (including performance classification values and peer groups) year over year, and publicize in advance of the data collection period.

When CMS feels that a benchmark-related factor must be changed, we recommend that such an edit be announced in advance of the change, and prior to the collection of data relating to the modified factor.

**Rationale;**

Announcing changes in advance will help QHPs in their quality improvement activities – one of the QRS' guiding principles – by giving QHPs knowledge as to the evaluation standards, and it will promote transparency within the QRS.

**Recommendation #3:**  Provide sufficient time between the finalization of a change to the QRS and its implementation.

Because the effectiveness of the QRS will depend on providing meaningful information to beneficiaries, we recommend that CMS finalize each measure no fewer than twelve months before the data collection period begins.

**Rationale:**

Sufficient lead-time will ensure that the QRS is not based on stale data that was collected before the measure was finalized.  If QHP issuers are not provided advance notice of a measure or change before the data collection period begins, the measure effectively would become a report on QHP performance before the issuer knew it was to be evaluated.  This would undermine the fairness and transparency of the QRS.

## 19. State Flexibility (§ 155.1400)

**Issue:**

In addition to prominently displaying quality rating information for each QHP, as calculated by CMS in accordance with the QRS, in the Preamble CMS indicates that state marketplaces may display additional QHP quality-related information.  CMS believes this proposed approach would ensure that standardized information on the quality of health care would be collected and displayed across marketplaces but also provide flexibility for state marketplaces to incorporate additional information on their web sites to support the plan comparison and selection process by consumers.  We agree that some flexibility is important to enable states to tailor quality-related information to reflect local characteristics and priorities.  However, it is not clear whether state marketplaces may use the additional QHP quality-related information to adjust the QRS global quality rating, or go as far as calculating their own QRS ratings independent of CMS.  Moreover, the NPRM is silent on whether any parameters will apply to the state flexibility.

**Recommendation:**

CMS should clarify that state marketplaces will not be able to adjust the global quality rating calculated by CMS or create a separate QRS rating.  Moreover, CMS should establish as governing principles for state flexibility that if states display additional information, states must: 1) only use measures that have been endorsed by the NQF or required of health plans as part of QHP accreditation; 2) emulate CMS in aiming to align the measures with measures health plans currently report in the commercial markets and public programs; 3) only display additional quality information to complement the CMS global rating; and 4) take into account the administrative burden and cost of requiring additional information, as well as the other measure selection criteria that CMS intends to follow (such as those identified in the QRS notice of importance, performance gap, reliability and validity, feasibility).

**Rationale:**

An overarching goal of quality reporting for public and private programs should be consistency in measurement to limit administrative and cost burdens on payers and providers, to avoid consumer confusion, and to permit standardized comparisons across the country.  Consistency requires aligning with the general QRS principles that CMS used to guide the design of the QRS, and with CMS's measure selection criteria, as indicated in the November 2013 QRS Notice.  Consistency would be undermined by allowing states to adjust the HHS-calculated QRS ratings, which would cause needless consumer confusion, especially in multi-state metropolitan areas (such as Philadelphia) if an insurance issuer's QHP in one state (e.g., DE) had a different rating from its QHP in another state (e.g., PA).

## 20. Review Period (§ 155.1400)

**Issue**:

In the Preamble, CMS indicates it intends to offer QHP issuers that participate in the Federally-facilitated marketplace the opportunity to review their QHPs' quality rating information before the data become public to identify any discrepancies or errors with the data submitted.  However, CMS will only "encourage" state marketplaces to have a similar plan review period.  Moreover, the NPRM does not describe the review process, nor indicate whether QHP issuers will have an opportunity to appeal.

**Recommendation**:

CMS should require that all marketplaces give QHP issuers a plan review period, to cover data submitted for the QRS and any additional quality-related information the state marketplace requires.  In addition, CMS should model the review process on the administrative review process for Star ratings in Medicare Advantage, under which QHP issuers may request an administrative review of their global quality rating as well as of the underlying data.

**Rationale**:

As all marketplaces, Federally-facilitated and state, will be displaying CMS-calculated QRS ratings, it stands to reason that all QHP issuers regardless of marketplace type should be treated fairly and equally with an identical plan review period, and that CMS has the authority to require (not simply encourage) an identical review period.  Whether data are submitted for the QRS or as part of additional quality-related information required by the state marketplace, a review period will ensure that public data are not skewed by discrepancies or errors.

Explicitly adding an administrative review process would align the QRS with the Medicare Advantage Star system (which is the basis for the QRS), giving QHP issuers an opportunity to check and raise questions not only about the underlying data, but also about the calculation of the synthesized global quality rating.

## 21. Display of Enrollee Satisfaction Survey (§ 155.1405)

**Issue**:

The NPRM requires that marketplaces display results from the enrollee satisfaction survey (ESS).  In the Preamble, CMS calls for this to start in 2016.  CMS believes that marketplaces will meet the requirement to display the ESS by virtue of displaying QRS information because CMS intends to incorporate ESS data into the QRS, and will require that the QRS allow for drill-down to the underlying data.  However, CMS anticipates providing results to the full ESS survey to a marketplace on an annual basis and allowing marketplaces to choose to display all ESS results, including those scores not used as part of the QRS.

**Recommendation**:

CMS should establish a uniform policy for displaying ESS results, either requiring that all marketplaces display only QRS information with a drill-down to underlying ESS data, or that

all marketplaces display all ESS results.  In addition, CMS should consider deleting
questions from the ESS that are not incorporated into the QRS, and clarifying that even
though the QRS rating is by product type and not by metal level – meaning that the ESS
data that feed into the QRS will be aggregated by metal level – enrollees will still be able to
drill down to survey data by their metal level (assuming that sample sizes are sufficient).

Further, while we support in general the capability to drill down (to ESS and QRS individual
measures), we urge CMS to offer guidance as soon as possible concerning: 1) simple ways
of displaying the measures (e.g., instead of all measures appearing at once, allowing
consumers to see only those measures associated with a composite chosen from a drop-
down box); and 2) how to take into account the implications of the half-scale rule where
different measures may be displayed for QHPs for the same composites.

**Rationale:**

Consistency across marketplaces is important to avoid consumer confusion and minimize
administrative burden on QHP issuers.  If CMS decides that marketplaces need only display
QRS information, then including ESS questions that are not incorporated into the QRS
seems needless.  And even if CMS requires that all marketplaces display all ESS results, if
certain ESS questions are not considered important enough to be part of a QHP's
synthesized global quality rating, then it stands to reason that CMS should reconsider
whether the added costs of including those questions is worth the benefit.

When enrollees drill down to ESS data, it will only be meaningful if broken down by metal
level because satisfaction is likely to vary with different levels of benefits.

Finally, to mitigate confusion and make it as easy as possible for consumers to use the QRS
and ESS information to make good choices, simplicity and clarity in explaining what is being
displayed is essential.

## 22. State Flexibility (§ 155.1405)

**Issue:**

In the Preamble, CMS seeks comment on whether state marketplaces should have flexibility
to display the ESS 2015 beta test results prior to the scheduled public display of the federal
ESS in 2016, to encourage state flexibility and innovation with respect to enrollee
satisfaction information.

**Recommendation:**

Do not allow state marketplaces to display the ESS 2015 beta results: all marketplaces
should be on a level playing field.

**Rationale:**

There are two primary arguments against allowing state marketplaces to display ESS 2015
beta results: one is philosophical, the other operational.  First, the purpose of beta testing is
to see if problems appear in any step of the process, including the final global rating
calculation, which will require correction before final implementation.  It is highly likely that
CMS will need to make at least a couple of modifications to the QRS based on the beta

testing, which makes it risky to give testing results to consumers.  Allowing state marketplaces to display beta testing results goes against the very nature of what beta testing stands for—an opportunity to work out the kinks before going "live."  The 2015 beta results may well result in unfair assessments of issuers, in part because of the high likelihood that they will be affected by continuing operational challenges with marketplaces that are only partially if at all under the control of issuers.

Second, it is highly unlikely that final data displays will be ready by the November 2015 open season.  As explained below, we do not believe the time period for beta data submission is sufficient, and QHP issuers should have until August 15, 2014, not June 15, 2014, to submit validated data.  In addition, CMS needs to factor in a period for administrative review of the underlying data if QHP issuers need to check and raise questions about those data, a not unlikely occurrence for data from 2014.  It is critical that CMS finalize its plans and issuer requirements with respect to beta testing as soon as possible so that all issuers are prepared to conduct such testing.

## PART 156: HEALTH INSURANCE ISSUER STANDARDS

### Subpart B - Essential Health Benefits Package

### 23. Prescription Drug Benefits (§ 156.122 – language in Preamble only)

**Issue:**

In the Preamble to the NPRM, CMS indicates that the agency is considering amending the formulary exceptions standards under § 156.122(c) to require expediting the exceptions processes when necessary based on exigent circumstances, such as when an enrollee is suffering from a serious health condition or an enrollee is in a current course of treatment using a non-formulary drug.  For example, CMS could mandate that an issuer render a decision regarding exception requests within 24 hours of receipt of request.

**Recommendation:**

CMS should not amend the formulary exceptions standards to require expedited exceptions processes.  Further, BCBSA strongly believes that any changes to the prescription drug requirements must be done through notice-and-comment rulemaking.

**Rationale:**

As noted in our comments to the Annual Issuer Letter, most commercial plans already have exceptions processes in place that have been used for years and have been developed and vetted by P&T committees that includes providers, pharmacists, and other clinical experts.  Because issuers in the commercial market are responsible for both prescription drug and medical claims, they have a significant incentive to prevent the negative outcomes (and increased costs) that could arise if enrollees do not obtain medications that are appropriate for their health conditions.  As a result, issuers have historically had in place effective exceptions and appeals processes to ensure that patients receive appropriate medications.  For example, issuers have processes in place that allow those requests identified by the physician as urgent to be reviewed within 72 hours, but have average turnaround times for urgent requests within 6 hours.  Therefore, it is not clear to us what issue or problem CMS is

seeking to address, as issuers do in fact already have expedited exceptions processes in place.

In the Preamble, CMS expresses concern "that some enrollees, particularly those with certain complex medical conditions, are having trouble accessing in a timely fashion clinically appropriate prescription drugs…"  During the CCIIO April Pharmacy Stakeholders call, CCIIO staff said that they were receiving complaints that some people were not able to access needed medications in a timely fashion.  As noted in the Preamble, "Section 156.122(c) requires issuers that provide EHB to have procedures in place that allow an enrollee to request and gain access to clinically appropriate drugs not covered by the plan."  Rather than promulgating new regulations in an area where CMS already has requirements in place, and where currently the problem appears to be anecdotal, CMS should use its oversight authority to determine the extent of the problem and whether this can be corrected by working with issuers to ensure the current requirements are implemented in an appropriate manner, or if additional regulations are needed.

Further, the process for the exceptions process that CMS is considering appears to be imported from Medicare Part D.  By statute, the Part D process preempts all state laws, whereas with respect to the marketplace-based coverage, the implementation of the suggested process would necessitate a review to see whether it is inconsistent with state law, and if so, there would be major uncertainty as to which standard would apply.

Additionally, formulary information is available so that potential enrollees can compare coverage among plans for the drugs they are currently prescribed, or may be prescribed, and use such information to make an informed choice of which plan best suits their drug coverage needs prior to enrollment.

Finally, as we noted in previous comments, any changes to the prescription drug requirements must be done through notice-and-comment rulemaking.  CMS exercised its authority to define the essential health benefits, in part, by specifically defining the prescription drug essential health benefit to require certain minimum prescription drug coverage (see 45 C.F.R. § 156.122).  If CMS wants to also require that non-formulary drugs be covered during the first 90 days of a new enrollee's coverage, it must amend the requirements in § 156.122.  Appalachian Power Co. v. E.P.A., 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("It is well-established that an agency may not escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation").  CMS cannot require non-formulary drug coverage through informal guidance.

## 24. Small Group Maximum Deductible Limitations (§ 156.130(b))

**Issue**:

On April 1, 2014, President Obama signed the Protecting Access to Medicare Act of 2014, which included a repeal of the small group maximum deductible limits, effective immediately.

**Recommendation**:

In light of this new legislation, BCBSA recommends that 45 CFR § 156.130(b) be eliminated from the regulation.

**Rationale:**

According to 45 C.F.R. § 156.130(b)(3): "A health plan's annual deductible may exceed the annual deductible limit if that plan may not reasonably reach the actuarial value of a given level of coverage. . . without exceeding the annual deductible limit." As a result of the change in the law, this accommodation is no longer necessary.

*Subpart C - General Functions of an Exchange*

## 25. Enrollment Process for Qualified Individuals – Premium Payment (§ 156.265(d))

**Issue:**

The Rule proposes to require issuers in FFM to collect initial premiums no later than the day before the coverage effective date, codifying the requirement noted in the draft FFM Enrollment Guide for 2014 issued on October 3, 2013.

**Recommendation:**

BCBSA strongly recommends that issuers be provided the flexibility to establish their own business rules regarding first month's premium for enrollment provided the rules are implemented in a non-discriminatory manner.

**Rationale:**

Decisions regarding payment of the first month's premium for enrollment have traditionally been a business decision made by issuers.  Although for the 2014 open enrollment period issuers were originally required to have received and processed initial payment no later than the day before coverage was effectuated, CMS later reversed this requirement and instead allowed issuers the flexibility to establish later initial premium payment cut-off dates in order to encourage enrollment and support consumers who had difficulty enrolling in marketplace coverage.  Issuers need flexibility to establish business rule on premium payment in light of the SEPs and retroactive effective dates.  Such allowance will enable issuers to meet the universal goal of increasing consumer enrollment in marketplaces.

*Subpart G - Minimal Essential Coverage*

## 26. Other Coverage that Qualifies as MEC [Expatriate Coverage] (§ 156.602)

**Issue:**

The Rule proposes to:

- Codify the treatment of certain types of foreign group health coverage for expatriates as minimum essential coverage (MEC).  Specifically, the Rule would treat as MEC group health coverage for citizens or nationals of the U.S. working abroad, provided by either of the following: a foreign, self-insured group health plan; health insurance regulated by a foreign government; or health coverage provided by a foreign national health plan.

- Permit expatriates who are physically present in the U.S. for an entire month to have their foreign group coverage treated as MEC if the coverage provides benefits in the U.S. and meets the requirements above.

- Define "expatriates" as individuals for whom there is a good-faith expectation that they will reside outside of their home country for at least 6 months of a 12-month period, including any covered dependents.

**Recommendation #1**:  **BCBSA supports the proposed definition of "expatriate."**

**Rationale:**

A requirement that a person spend at least 6 months of a 12- month period outside of their home country ensures persons using expatriate coverage as MEC really spend a significant amount of time out of the U.S.

**Recommendation #2**:  **Clarify that expatriate coverage should not count as MEC for any longer than six months in any given year.**

**Rationale:**

The time limit for foreign coverage as MEC for U.S. expatriates should correspond to the amount of time a person is not required to be abroad in a 12-month period in order for their expatriate coverage to be considered MEC.

Because an expatriate is defined as an individual who is reasonably expected to reside outside of their home country for at least 6 months in a 12-month period, it makes sense to say that if the U.S. expatriate stays in the U.S. more than six months, the foreign coverage would no longer be considered MEC.

***Subpart I - Enforcement Remedies in FFEs***

**27. Notice of Non-compliance (§ 156.806)**

**Issue:**

The Rule proposes to add a provision requiring CMS to provide a written notice to issuers describing the potential violation and providing a 30-day period for the issuer to respond and to provide additional information to refute an alleged violation.  Thirty days is a short time period for refuting allegations given the broad range of potential issues that are subject to CMPs under § 156.805 and the potential scope of the issues.

**Recommendation:**

BCBSA recommends that CMS provide issuers with 60 days to respond and provide additional information to refute an alleged violation.  We also recommend that CMS adopt processes for QHP issuers to request an extension to respond to a notice of non-compliance consistent with other related programs, as follows:

Extension Language:

"In circumstances in which a QHP issuer cannot prepare a response to CMS within the 60 days provided in the notice, the QHP issuer may make a written request for an extension from CMS detailing the reason for the extension request and showing good cause.  If CMS grants the extension, the QHP issuer must respond to the notice within the time frame specified in CMS' letter granting the extension of time."

**Rationale:**

This extension language is based on the MLR notice of non-compliance regulation at § 158.603 and the PHSA notice of non-compliance regulation at § 150.307.  The MLR regulations and PHSA enforcement regulations both contain provisions describing a process for requesting an extension to respond to the agency.  CMS did not propose a similar provision for these marketplace regulations despite the potential scope of the basis for CMP, e.g., substantial failure to meet the minimum QHP certification standards.

## 28. Bases and Process for Decertification of a QHP Offered by an Issuer through a FFE (§ 156.810)

**Issue:**

CMS proposes to extend expedited decertification to any situation where a QHP issuer no longer meets the QHP certification standards.  The Preamble states that expedited decertifications are for violations that will put "QHP enrollees' ability to access necessary medical items or services "at risk" or substantially compromise the FFE."  (79 Fed. Reg. at 15848).  However, the text of the proposed regulation does not include this limitation.

**Recommendation:**

The Final Rule should clarify that expedited decertification is reserved for violations that put QHP enrollees' ability to access necessary medical items or services at risk or substantially compromise the operation of the marketplace.

**Rationale:**

This change would reflect the intention CMS described in the Preamble.

### *Subpart L – Quality Standards*

## 29. ESS Vendor Monitoring (§ 156.1105)

**Issue:**

In the Preamble, CMS indicates that starting in 2015 it will monitor CMS-approved enrollee satisfaction survey vendors to ensure ongoing compliance with the application and approval standards – if CMS determines that an approved vendor is non-compliant with the standards, CMS will take remedial actions that may include making the submitted survey results ineligible to be included for ESS results.  If this were to happen, CMS may not be able to calculate a global rating score for the QHP issuer who contracted with that vendor (under the current proposed hierarchy), or the global rating score will not be comparable to the score for QHP issuers for whom CMS includes ESS results.

**Recommendation:**

CMS should clarify how, if it determines that survey results are ineligible to be included for ESS results, it will calculate or require marketplaces to display the affected QHP issuer's global quality rating.  Furthermore, if CMS takes disciplinary action against a vendor and thereby invalidates the survey results, QHPs should not be penalized or put at a disadvantage when calculating the global rating score.

**Rationale:**

Consistency in rules for reporting quality information, across QHP issuers and across marketplaces, is critical to avoiding consumer confusion and minimizing administrative burden and unnecessary costs.  Addressing this issue in the Final Rule will preclude such confusion and cost

## 30. Child-Only QRS (§ 156.1120)

**Issue:**

CMS has previously proposed developing a separate child-only QRS measure set applying to QHPs that provide child-only coverage, and a child-only ESS.  The Preamble indicates that CMS continues to monitor the number of child-only QHP offerings on marketplaces, and that a limited number of child-only QHPs and enrollees may prohibit reliable child-only QHP rating calculations.

**Recommendation:**

CMS should clarify that a child-only QRS/ESS will be a future consideration, to be assessed in the same way that CMS intends to consider developing a QRS/ESS applicable to other marketplace offerings, such as stand-alone dental plans, catastrophic plans, and health care savings accounts.

**Rationale:**

A limited number of child-only QHPs raises questions not only about the reliability of rating calculations, but also about the value of spending resources on a process with limited application.  It is not as if the limited number of child-only QHPs will lack any quality information if CMS pushes off a child-only QRS/ESS to future consideration because the QRS and ESS include measures, composites, and domains that are relevant to all QHPs, child-only or not.  As currently worded, the NPRM would create unnecessary ambiguity (i.e., what constitutes a "limited number," and when will CMS determine that the number is too limited to proceed further?) that is not beneficial for QHP issuers' business planning.

## 31. QRS Measures (§ 156.1120)

**Issue:**

In the November 2013 QRS notice, CMS proposed a set of measures for the QRS.  In the Preamble, CMS indicates it intends to finalize these measures, and provide measure specifications, in future guidance, to give QHPs time to collect/submit data for the 2015 beta test.  (The recently released draft guidance, "QRS Scoring Specifications," still refers to the

proposed QRS measure set as it appears in the QRS notice.)  In addition, CMS seeks comment to inform future rulemaking on how best to align QRS measures reporting requirements with the accreditation standards for QHP issuers.

**Recommendation:**

Since the NPRM calls for current QHP issuers to prepare to submit the required validated data elements for QRS beta testing in 2014, we urge CMS to finalize the QRS measure set as soon as possible.  We are reattaching our response to the QRS notice, which includes numerous recommendations for measures selection, individual measures, and the organization and hierarchical structure of the QRS measure.  In addition, to align the QRS and accreditation, CMS should amend the process for recognizing accrediting entities to require use of a common, core set of clinical quality measures based on the QRS, and a common set of auditing procedures.

**Rationale:**

It will be difficult to align QRS measures reporting requirements with the accreditation standards for QHP issuers if CMS continues to allow recognized accrediting entities "to use a diverse measurement set" (in the final rule on "Recognition of Entities for the Accreditation of Qualified Health Plans, CMS rejected BCBSA's recommendation to require that recognized accrediting entities use a common, core set of clinical quality measures).  If more and more accrediting entities become recognized, the diversity of measurement sets may increase, thus compounding the difficulty of ever achieving alignment.

A core set of uniform measures for the QRS and for accreditation would minimize the burden and expense of data collection, data validation (i.e., the NPRM requires a QHP accredited by URAC to pay to validate the URAC accreditation measures and to pay again to validate QRS measures that belong to NCQA or another measure steward), and enable more expeditious implementation of these provisions.  Further, a common set of auditing procedures will ensure data integrity and allow an inherently streamlined, efficient process for reporting data.

## 32. Data Validation (§ 156.1120)

**Issue:**

The NPRM would require that QHP issuers submit data that has been validated.  In the Preamble, CMS indicates that in the "initial years" (period not specified) it intends to direct QHP issuers to follow the process specified by the quality measure steward for validation of its quality measures that are incorporated into the QRS, or provide technical guidance on a validation process for any measures for which the measure steward has not defined a validation process – which could lead to multiple validation and audit processes.  In "the future," CMS is considering establishing an application and approval process for independent third-party data validators.

**Recommendation:**

CMS should move swiftly to establish an application and approval process for independent third-party data validators – to be implemented no later than for data that QHP issuers must

submit in 2016 – and not wait for an unspecified future date.  Ideally, this same process
would apply to accrediting entities as well for their data validation processes so that there
would not be multiple independent audit requirements (one for QRS, one for accrediting
entities).

**Rationale:**

An independent third-party validator would simplify administration and, as noted above,
better ensure data integrity and allow an inherently streamlined, efficient process for
reporting data.

### 33. Product Level (§ 156.1120)

**Issue:**

In the Preamble, CMS calls for QHP issuers to collect and submit data for enrollees in each
product type offered by a QHP issuer in each state for which the QHP operates (for
example, HMO, POS, PPO).  However, as we noted in our comments on the QRS notice,
neither CMS nor CMS has defined product level.  The lack of clarity in simply offering as
examples "at the Health Maintenance Organization or Preferred Provider level" is
problematic because of the possibility that the QRS will compare apples with oranges,
depriving consumers of meaningful comparative information about products that may differ
in their degree of network composition and management and geographic coverage–and
possibly also creating opportunities for health plans to be selective in product offerings in an
attempt to maximize their ability to score high on the global rating.

**Recommendation:**

We urge CMS to clarify as soon as possible how it intends to define "product level"
reporting.  Moreover, CMS should clarify it intends to account for differences in QHP
products subject to the QRS to ensure a level playing field.  Since the marketplace
population is likely to vary across QHPs, we recommend that CMS examine differences in
health plan quality that may be driven by socioeconomic status, race/ethnicity, or other
population characteristics, and develop clear language for how this will be addressed prior
to implementing the QRS.

Initially, we recommend aligning reporting with the process used by accreditors; that is, the
QRS would group each QHP issuers' QHPs into pre-defined product types and require
aggregated reporting for each product type.  However, CMS would also have to include–as
part of its future technical guidance identifying further details regarding the rating
methodology component, elements, and measure specification–details on how CMS intends
to avoid inadvertently designing a QRS that creates an un-level playing field that skews
incentives regarding network composition or geographic coverage.

**Rationale:**

Knowing the direction CMS plans to take will help QHP issuers prepare, and will also
elucidate the types of additional data that CMS will have to collect and analyze to ensure an
apples-to-apples methodology (e.g., to what extent and how will the rating system take into
account differences between products with tightly managed networks versus products with

broad access networks, or products offered in selected counties/geographic areas versus products offered in broader areas/statewide). For example, one unintended consequence of the Medicare Star system is that it incentivizes cherry-picking and participation in metropolitan counties. By addressing these concerns, CMS will enable a system to reward QHP issuers for more meaningful QHP choices across a state, and thereby better serve QHP consumers. Aligning reporting with the accreditation process is consistent with CMS' interest in aligning align QRS measures reporting requirements with the accreditation standards for QHP issuers.

## 34. QRS for QHPs Outside Exchanges (§ 156.1120)

### Issue:

In the Preamble, CMS indicates it intends to allow a QHP issuer to collect data for the QRS based on enrollees of QHPs offered through and outside of the marketplace if the QHPs are identical as outlined in the Program Integrity Final Rule.

### Recommendation:

CMS should eliminate the ambiguity created by the word "allow," and require either that: 1) all QHP issuers collect/submit data for enrollees of identical QHPs offered through and outside the marketplace; or 2) all QHP issuers collect/submit data only for QHPs offered through the marketplace. If the former, CMS should allow for data to be tagged by QHP status and engage as soon as possible in studying whether variations in socioeconomic status, race/ethnicity, or other population characteristics affect the quality measures.

### Rationale:

If QHP issuers have discretion over whether to include enrollees of QHPs offered outside the marketplace, consistency will be lost. Results from one QHP to another may be skewed by significant population differences. In addition, allowing discretion opens the system to gaming.

## 35. QRS Timeline (§ 156.1120(b))

### Issue:

In the Preamble, CMS indicates it will phase in implementation of the QRS over time to give issuers time to collect, validate, and report quality measure data. In general, the data reporting period begins the first month of a calendar year through the middle of the sixth month of the calendar year. Current QHP issuers will need to prepare the required validated data elements for QRS beta testing in 2014, and submit the validated data for eligible QHP enrollees covered during 2014 for beta testing on or around June 15, 2015.

### Recommendation:

In general we support the timeline laid out in the Preamble. However, we recommend that CMS lengthen the time period of data submission for QRS beta testing to allow for final data submission by August 15, 2015.

**Rationale:**

As it is already April, and: 1) QHP issuers are still finalizing true, effectuated enrollments; 2) CMS has not finalized the QRS measure set; 3) CMS has not specified in technical guidance a validation process for any measures for which the measure steward has not defined a validation process; and 4) CMS has not yet clarified how it will define "product level" reporting, the time frame for beta testing seems dangerously short.  The extra two months will create an added margin of safety for plans to collect and validate required data.

## 36. Marketing Materials (§ 156.1120(b))

**Issue:**

The Preamble would allow QHP issuers to use quality ratings and ESS results in its marketing materials.  CMS intends to provide details regarding display of QRS/ESS results in technical guidance that it anticipates releasing in 2015.

**Recommendation:**

We support allowing QHP issuers to use QRS/ESS results in marketing materials, and suggest that CMS generally follow the marketing guidelines for Medicare Advantage.

**Rationale:**

Standards for marketing in Medicare Advantage have struck a good balance between meeting plans' marketing needs while not presenting information in a misleading manner to consumers.

## 37. Data Submission by ESS Vendors (§ 156.1125)

**Issue:**

The NPRM would require QHP issuers to contract with a CMS-approved ESS vendor to administer the ESS.  In the Preamble, CMS indicates that, starting in January 2015, QHP issuers would submit validated data to the vendor to administer the ESS, and then QHPs must ensure that their contracted ESS vendors submit the data collected from the ESS survey to CMS.  Though the Rule calls for CMS to monitor ESS vendors to ensure ongoing compliance, it leaves open to question the responsibility of the QHP issuer when the vendor is responsible for missing a deadline.

**Recommendation:**

BCBSA supports adding a "hold harmless" clause to § 156.1125(a): If a QHP issuer relies reasonably and in good faith on a representation by the ESS vendor that it will be able to submit the data collected from the ESS survey to CMS in the form, manner, and time specified by CMS, and this representation is later determined to be incorrect, the QHP issuer is considered to comply with any requirement under § 156.1125(b) to submit ESS data.

**Rationale:**

Including a "hold harmless" provision in the Final Rule would significantly alleviate any legal ambiguity concerning the extent to which a QHP issuer may rely on a vendor who is later determined to be non-compliant.

## 38. ESS for QHPs Outside Exchange (§ 156.1125)

**Issue**:

The Preamble indicates that CMS is considering an approach similar to the QRS, allowing a QHP issuer to include enrollees of QHPs offered through and outside of the marketplace, to ensure a reliable ESS sample size, as long as they are considered the same plan as established in § 153.500.

**Recommendation**:

We recommend the same changes as to the QRS: CMS should either:

1) Require all QHP issuers to include enrollees of identical QHPs offered outside of the marketplace; or

2) Prohibit including enrollees outside the Marketplace.

If the former, CMS should allow for data to be tagged by QHP status, and start analyzing as soon as possible whether variations in socioeconomic status, race/ethnicity, or other population characteristics affect any ESS results.  In addition, CMS should modify this provision so that inclusion of enrollees in identical QHPS offered outside the marketplace would apply only if the non-marketplace plan had at least 500 enrollees.

**Rationale**:

Just as for the QRS (under #33 above), if QHP issuers have discretion over whether to include enrollees of QHPs offered outside the Exchange, consistency will be lost; results from one QHP to another may be skewed; and the system will become susceptible to gaming.

## PART 158 – ISSUER USE OF PREMIUM REVENUE: REPORTING AND REBATE REQUIREMENTS

### *Subpart A - Disclosure and Reporting*

## 39. ICD-10 Conversion Expenses (§ 158.150)

**Issue**:

This provision would extend the timeframe for which issuers can include their ICD-10 conversion costs in their MLR calculation as quality improvement activity expenses.  It would permit issuers to report their 2014 ICD-10 conversion costs as QIA expenses in the 2014 reporting year, up to 0.3 percent of an issuer's earned premium in the relevant state and

market.  This treatment will extend through the first reporting year in which the Secretary requires ICD-10 as the standard medical data code set.

**Recommendation:**

BCBSA supports this proposed provision and recommends the Final Rule retain the proposed policy.

**Rationale:**

This is not a new policy; rather, it is an extension of a previous policy as a result of the delay in ICD-10, meaning issuers will incur costs related to the conversion in 2014.  In addition, this provision will have a minimal impact on consumers.

### Subpart B - Calculating and Providing the Rebate

### 40. Accounting for Special Circumstances (§ 158.221)

**Issue:**

The Rule proposes to modify the MLR regulations to account for the special circumstances of issuers in the individual and small group markets that offered transitional coverage or participated in the state and federal marketplaces (e.g., unanticipated costs due to high call center volume in January 2014).  The proposed changes would allow issuers that:

- Offered transitional coverage to multiply the incurred claims and expenses for quality improving activities incurred in 2014 in the MLR numerator by 1.0001.  The multiplier would be applied to the issuer's entire experience in 2014, which may include plans other than transitional coverage.

- Participate in marketplaces to multiply the incurred claims and expenses for quality improving activities incurred in 2014 in the MLR numerator by 1.0004.  The multiplier would be applied to the issuer's entire experience in 2014, which may include off-marketplace plans.

**Recommendation:**

BCBSA appreciates CMS' efforts to compensate issuers for the extensive time, expenses, and resources spent on improving the consumer experience for the marketplace rollout. However, we believe the adjustment is too small to offset the additional costs issuers have and will incur.

**Rationale:**

The amount of MLR relief issuers will obtain as a result of the proposed adjustment would account for a very small fraction of the unanticipated costs issuers have and will face.  If an issuer were to qualify for both the adjustment for transitional policy and for marketplace readiness this would only provide .04% of MLR relief, which is far below the amount issuers will incur.

Relief is deserved for issuers, who provided significant assistance to CMS and states at their own expense when unanticipated issues arose.  For example:

- Issuers invested a significant amount of resources, time and manpower to protect consumers from the disruptions caused by HealthCare.gov.

- Issuers upgraded their IT systems, staffed call centers and adjusted operations to mitigate issues with the rollout.

- Issuers spent significant money renewing and extending policies for 2014, working with state regulators to obtain approval for the extension of these policies by January 1, 2014.  Further, they priced their ACA-compliant plans assuming that lower-risk persons currently enrolled in the plans which were extended would move to the ACA compliant plans during 2014, which will have a significant negative impact on claims cost and thus their financials.

## 41. Distribution of De Minimis Rebates (§ 158.243)

### Issue:

The Rule proposes to clarify how issuers must distribute rebates where: 1) all of an issuer's rebates are de minimis; or 2) distribution of de minimis rebates to enrollee(s) whose rebates are not de minimis would result in an enrollee's receiving a rebate that exceeds the enrollee's annual premium.  In these two situations, the issuer must distribute de minimis rebates to enrollees in the policies that generated the de minimis rebates.

Note:  current rules allow issuers not to distribute de minimis rebates to enrollees in the policies that generated those rebates, but instead to aggregate such rebates and distribute them to other enrollees whose rebates are not de minimis.

### Recommendation:

BCBSA opposes the proposed changes to the de minimis rules and recommends the Final Rule not include them.  However, if the proposed changes are included in the Final Rule, issuers should be allowed to provide the de minimis rebates to the state to use for health education.

### Rationale:

The administrative expense associated with sending very small rebates exceeds the amount of rebate itself.  Given that the intent of the MLR is to contain the costs of health coverage, it would be counterproductive to require these administratively costly practices.  As CMS notes in the December 10, 2010 Interim Final Rule on medical loss ratios http://www.gpo.gov/fdsys/pkg/FR-2010-12-01/pdf/2010-29596.pdf:

"Without a minimum threshold, each enrollee would receive the rebate owed to him or her, but the cost of processing and distributing the rebate might be greater than the amount of the rebate."

"We agree that it does not make sense for issuers to provide rebates when the administrative cost of providing them exceeds their value to enrollees."

The changes proposed to this provision are inconsistent with the policy position articulated above.

In addition, the MLR provisions were developed in consultation with the NAIC.  The NAIC's Issue Resolution Document (IRD) 56 indicated that "an issuer need not pay rebates below a particular amount, to avoid the payment of minimal sums, as well as avoiding the administrative expense of processing those payments…If there are payments that are not made because they are de minimis…"

There was careful deliberation about all provisions of the MLR through this process, including the de minimis provision.  This unilateral modification by CMS ignores that deliberative process.

Since the vast majority of rebates paid are only in a single market segment (of issuers owing rebates in 2012, 89% owed rebates in a single market segment), the requirement to send a rebate for a market segment that is de minimis in effect means that de minimis rebates will be distributed to all enrollees in the market segment, which in the vast majority of instances would negate the reason to have a de minimis rebate provision.

We urge CMS to leave the de minimis provisions unchanged to ensure that MLR policies embrace the goals of the ACA and lead insurers to pay claims appropriately while reducing the administrative burden issuers.  Requiring the distribution of de minimis rebates would add an unjustified and costly administrative burden on insurers, with costs in excess of the benefit it provides.  However, if CMS does make changes to the requirements, issuers should be allowed to provide the de minimis rebates to the state where the rebates originated to be used for health education, as opposed to issuing checks to members for small amounts and incurring administrative cost that exceed the amount of the check.

# EXHIBIT 3

# United States Court of Appeals
## for the Federal Circuit

---

17-1994

## MODA HEALTH PLAN, Inc.,

*Plaintiff-Appellee,*

v.

## UNITED STATES,

*Defendant-Appellant.*

Appeal from the United States Court of Federal Claims in No. 16-649

---

## BRIEF OF AMERICA'S HEALTH INSURANCE PLANS, INC. AS *AMICUS CURIAE* IN SUPPORT OF REHEARING EN BANC

---

Ralph C. Nash
Professor Emeritus
GEORGE WASHINGTON UNIVERSITY
  LAW SCHOOL
2000 H St NW
Washington, DC 20052
Phone: (202) 338-2944

Leslie B. Kiernan
Pratik A. Shah
Robert K. Huffman
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave., NW
Washington, DC 20036
Phone: (202) 887-4000
Fax: (202) 887-4288

Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Ste 900
Washington, DC 20001
Phone: (202) 868-6915

*Counsel for* Amicus Curiae *America's Health Insurance Plans, Inc.*

# CERTIFICATE OF INTEREST

As called for by Federal Circuit Rule 47.4, Counsel for *Amicus Curiae* America's Health Insurance Plans, Inc. certifies the following:

1. The full name of every party or amicus represented by me is:

   America's Health Insurance Plans, Inc.

2. The name of the real party-in-interest (if the party named in the caption is not the real party in interest) represented by me is: Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None. America's Health Insurance Plans, Inc. has no parent corporation and is a trade association whose members have no ownership interests.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

   AKIN GUMP STRAUSS HAUER & FELD LLP: Leslie B. Kiernan, Pratik A. Shah, and Robert K. Huffman.

   DEUTSCH HUNT PLLC: Hyland Hunt and Ruthanne M. Deutsch.

   Ralph C. Nash, Professor Emeritus, George Washington University Law School.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

   Federal Circuit

   *Land of Lincoln Mutual Health Insurance Co. v. United States*, No. 17-1224

   *Blue Cross and Blue Shield of North Carolina v. United States*, No. 17-2154

   *Maine Cmty. Health Options v. United States*, No. 17-2395

Court of Federal Claims

*Alliant Health Plans, Inc. v. United States*, No. 16-1491C (Braden, J.)

*BCBSM, Inc. v. United States*, No. 16-1253C (Coster Williams, J.)

*Blue Cross and Blue Shield of Alabama v. United States*, No. 17-347C (Campbell-Smith, J.)

*Blue Cross and Blue Shield of Kanas City v. United States*, No. 17-95C (Braden, J.)

*BlueCross BlueShield of Tennessee v. United States*, No. 17-348C (Horn, J.)

*Blue Cross of Idaho Health Service, Inc. v. United States*, No. 16-1384C (Lettow, J.)

*Common Ground Healthcare Cooperative v. United States*, No. 17-877C (Sweeney, J.)

*EmblemHealth, Inc. v. United States*, No. 17-703C (Wheeler, J.)

*Farmer v. United States*, No. 17-363C (Campbell-Smith, J.)

*First Priority Life Ins. Co. v. United States*, No. 16-587C (Wolski, J.)

*Health Alliance Medical Plans, Inc. v. United States*, No. 17-653C (Campbell-Smith, J.)

*Health Net, Inc. v. United States*, No. 16-1722C (Wolski, J.)

*Health Republic Ins. Co. v. United States*, No. 16-259C (Sweeney, J.)

*HPHC Ins. Co., Inc. v. United States*, No. 17-87C (Griggsby, J.)

*Medica Health Plans v. United States*, No. 17-94C (Horn, J.)

*Minuteman Health Inc. v. United States*, No. 16-1418C (Griggsby, J.)

*Molina Healthcare v. United States*, No. 17-97C (Wheeler, J.)

*Montana Health CO-OP v. United States*, No. 16-1427C (Wolski, J.)

*Neighborhood Health Plan, Inc. v. United States*, No. 16-1659C (Smith, J.)

*New Mexico Health Connections v. United States*, No. 16-1199C (Bruggink, J.)

*Ommen v. United States*, No. 17-712C (Lettow, J.)

*Sanford Health Plan v. United States*, No. 17-357C (Bruggink, J.)


Dated: August 10, 2018                    By:    /s/Leslie B. Kiernan
                                                  Leslie B. Kiernan

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

STATEMENT OF INTEREST OF *AMICUS CURIAE*............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT ......................................................................................4

EN BANC REVIEW IS NECESSARY BECAUSE THE PANEL OPINION
JEOPARDIZES HEALTH INSURANCE PROVIDERS' ONGOING
BUSINESS RELATIONSHIPS WITH THE GOVERNMENT ..............................4

    A.    The Panel Majority's Decision Undercuts the Government's
Reliability as a Business Partner, Which Is of Critical
Importance in the Health Care Industry ................................................4

    B.    Rehearing Is Vitally Important Now Because the Risk
Corridors Program Is Only One of Many in Which the
Government Has Not Acted as a Reliable Business Partner................8

CONCLUSION .....................................................................................11

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Common Ground Healthcare Coop. v. United States*,
    137 Fed. Cl. 630 (2018) ........................................................................9

*Greenlee Cty. v. United States*,
    487 F.3d 871 (Fed. Cir. 2007) ...........................................................5

*King v. Burwell*,
    135 S. Ct. 2480 (2015) ......................................................................10

*Land of Lincoln Mut. Health Ins. Co. v. United States*,
    No. 17-1224, Docket No. 167 (Fed. Cir. filed July 30, 2018) .............2

*Salazar v. Ramah Navajo Chapter*,
    567 U.S. 182 (2012) ............................................................................5

*Texas v. United States*,
    No. 4:18-cv-167, Docket No. 92 (N.D. Tex. filed June 7, 2018) ......10

*Trump v. California*,
    267 F. Supp. 3d 1119 (N.D. Cal. 2017) .........................................8, 9

*United States v. Langston*,
    118 U.S. 389 (1886) ...........................................................................5

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) ...........................................................................5

**Statutes**

42 U.S.C. § 18071 ......................................................................................8

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124
    Stat. 119, as amended by the Health Care and Education
    Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029
    (2010) ......................................................................................*passim*

**Other Authorities**

Ctrs. for Medicare & Medicaid Servs., Nat'l Health Expenditure Data,
    Table 05-3 & n.2, https://www.cms.gov/Research-Statistics-Data-
    and-Systems/Statistics-Trends-and-
    Reports/NationalHealthExpendData/NationalHealthAccountsHisto
    rical.html ...........................................................................................7

Ctrs. for Medicare & Medicaid Servs., Early 2018 Effectuated
    Enrollment Snapshot (July 2, 2018) ..................................................7

Ctrs. for Medicare & Medicaid Servs., Medicare Advantage, Cost,
    PACE, Demo and Prescription Drug Plan Contract Report,
    Monthly Summary Report (July 2018) ...............................................7

Kaiser Family Found., *Total Medicaid Managed Care Enrollment*
    (2016) ................................................................................................7

Katie Keith, Insurers Can Continue Silver Loading for 2019,
    Health Affairs (Jun. 13, 2018),
    https://www.healthaffairs.org/do/10.1377/hblog20180613.293356/f
    ull ......................................................................................................9

Margot Sanger-Katz, *Republicans Couldn't Knock Down Obamacare.*
    *So They're Finding Ways Around It*, N.Y. TIMES, The Upshot
    (Apr. 11, 2018)..................................................................................9

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

America's Health Insurance Plans, Inc. ("AHIP") is the national trade association representing the health insurance community. AHIP advocates for public policies that expand access to affordable healthcare coverage to all Americans through a competitive marketplace that fosters choice, quality, and innovation. AHIP's members provide health and supplemental benefits through employer-sponsored coverage, the individual insurance market, and public programs such as Medicare and Medicaid. As a result, AHIP's members have broad experience working with other healthcare stakeholders, including medical providers as well as state and federal government agencies, to ensure that patients have access to needed treatments and medical services.

That experience gives AHIP extensive first-hand knowledge about the Nation's healthcare and health insurance systems and a unique understanding of how those systems work. Given the pervasive role of the federal government in those systems, including as a result of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 ("ACA"), AHIP's

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than the *amicus*, its members, or its counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief, which is accompanied by a motion for leave to file. *See* Fed. R. App. P. 29(b); Fed. Cir. R. 35(g).

experience is that those systems can function as intended only when the government meets its obligations as a reliable business partner. AHIP supports en banc review because the panel opinion, by upending decades of Federal Circuit and Supreme Court precedent, jeopardizes the reliability of health insurance providers' ongoing business relationships with the federal government.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Insurers across the country made the decision to enter into, and continue participating in, the new, risky insurance exchanges because of a clear statutory promise that—as all members of the panel agreed—unambiguously "created an obligation of the government to pay … the full amount indicated by the statutory formula … under the risk corridors program." Slip Op. at 19, Docket No. 87. A divided panel nonetheless concluded that an appropriations rider precluding the use of only certain funding sources impliedly suspended this statutory obligation. *Id.* at 20. AHIP agrees with Judge Newman and the petitioning health plans that this holding conflicts with Federal Circuit and Supreme Court precedent. *See* Dissent at 8, 14-17, Docket No. 87; Moda Health's Pet. for Reh'g En Banc at 6-11, Docket No. 89; Land of Lincoln's Pet. for Reh'g En Banc at 6-14, *Land of Lincoln Mut. Health Ins. Co. v. United States*, No. 17-1224, Docket No. 167 (Fed. Cir. filed July 30,

2018).[2]  AHIP writes to emphasize the critical need for en banc review because the panel majority's holding calls into question years of precedent holding the government to its obligations, thereby casting doubt on whether private health care providers can rely upon the federal government as a fair business partner—a question of urgent and increasing importance given the government's recent conduct in connection with other ACA programs.

This Court has long recognized that no entity would partner with the government if it did not expect the government to adhere to its commitments. Whether the commitments stem from statute or contract, the ability to rely upon the government's word is of paramount importance to health care programs, which depend upon partnerships with private providers to serve the consumers, patients, and beneficiaries who receive needed medical care.  Federal Circuit precedent has—until now—guaranteed those commitments in the absence of explicit and clear congressional intent to repudiate them.  The panel majority's opinion, however, now makes it a risky business to rely upon the government's assurances.  That deals a crippling blow to health insurance providers' business relationships with the government, which depend upon the providers' ability to trust that the government will act as a fair partner.

---

[2] AHIP also supports the rehearing petitions filed in *Maine Community Health Options v. United States*, No. 17-2395, and *Blue Cross & Blue Shield of North Carolina v. United States*, No. 17-2154.

The risk corridors default is just one example among many where the government has not acted as a reliable and fair partner committed to promoting a stable and sustainable market. For example, in 2017 the government ceased making cost sharing reduction payments mandated by ACA—well into the plan year and long after plans had set premiums based on clear statutory terms mandating payment. And in June 2018, the government took the unusual step of declining to defend key provisions of ACA in litigation—again, long after health insurance providers had designed plans in reliance on clear statutory provisions the government has now abandoned. En banc rehearing is needed to forestall even greater harm.

## ARGUMENT

## EN BANC REVIEW IS NECESSARY BECAUSE THE PANEL OPINION JEOPARDIZES HEALTH INSURANCE PROVIDERS' ONGOING BUSINESS RELATIONSHIPS WITH THE GOVERNMENT

### A. The Panel Majority's Decision Undercuts the Government's Reliability as a Business Partner, Which Is of Critical Importance in the Health Care Industry

The panel opinion has damaging effects that reach beyond the specific harm to the insurance market, the ACA exchanges, and consumers from the government's failure to meet its risk corridor obligations. As Judge Newman recognized, the panel majority's holding also "undermines the reliability of dealings with the government." Dissent at 19. That causes harm not only to those who partner with the government, but also to the government itself, whose "ability to benefit from participation of private enterprise depends on [its] reputation as a fair partner." *Id.*

4

The harm caused by the government's failure to meet its obligations has long been recognized by the Supreme Court and this Court. If "the Government could be trusted to fulfill its promise to pay only when more pressing fiscal needs did not arise, would-be contractors would bargain warily—if at all—and only at a premium large enough to account for the risk of nonpayment." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 192 (2012). Accordingly, the law safeguards the "Government's own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies." *United States v. Winstar Corp.,* 518 U.S. 839, 883 (1996) (plurality op.). Were it otherwise, "willing partners [would become] more scarce." *Salazar*, 567 U.S. at 192. For that reason, the law has long secured payment of governmental obligations even in the absence of appropriated funds, because "the Government's valid obligations will remain enforceable in the courts." *Id.* at 191 (internal citation and quotation omitted).

This is true for obligations created by statute as well as contract. The "mere failure of Congress to appropriate funds … does not in and of itself defeat a Government obligation created by statute." *Greenlee Cty. v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007). Nor does a congressional appropriations restriction, unless it "modified or repealed the previous law" "expressly or by clear implication." *United States v. Langston*, 118 U.S. 389, 394 (1886); *see* Dissent at 7-8. There was no such manifest intent here, only temporary restrictions on particular sources of

appropriated funds enacted in the context of unsuccessful efforts to repeal.  *See* Dissent at 6.  The upshot of treating such mere funding-source restrictions as an implied suspension of the obligation goes beyond contravening Federal Circuit precedent.  Allowing the government to default on its obligations means that—after receiving the direct financial benefit from the risk corridors program—the government has walked away from billions owed to health insurance providers, who had set premiums and participated in the exchanges in reasonable reliance on the clear statutory mandate and the government's repeated assurances.  *See* Dissent at 4-5.

Retroactively relieving the government of its clear statutory obligations based on funding-source restrictions directly harms health insurance providers that participated in the first years of the ACA exchanges, as well as the consumers they serve.  Beyond that, it also puts at risk the government's long-term interest in being trusted to act as a reliable business partner.  There are few industries in which that interest matters more than health care, where the government relies heavily upon partnerships with private providers for the delivery of services.  Of $944.1 billion dollars spent by the federal government on health care in 2016, across all programs, more than $738.2 billion (78%) involved services delivered through partnerships with doctors, hospitals, insurance providers, and other entities through programs

such as Medicare, Medicaid, and the ACA health insurance exchanges.[3]  Tens of millions of Americans receive health care through such programs, including over 9 million Americans who obtained subsidized health plans on ACA's exchanges,[4] over 20 million Americans who receive Medicare benefits through private health plans,[5] and over 65 million Americans who receive health care through Medicaid managed care programs.[6]

The panel decision imperils these sorts of partnerships in health care.  As Judge Newman emphasized, the panel majority permitted the government to repudiate its obligations even *after* health insurance providers had performed their part of the bargain.  Dissent at 17.  If it is perceived that the federal government can walk away from statutory obligations made to encourage private sector participation in new programs—and the courts will not secure those relied-upon obligations through the Judgment Fund—partnering with the federal government becomes a venture fraught with risk.

---

[3] *See* Ctrs. for Medicare & Medicaid Servs. ("CMS"), Nat'l Health Expenditure Data, Table 05-3 & n.2, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsHistorical.html.

[4] Ctrs. for Medicare & Medicaid Servs., Early 2018 Effectuated Enrollment Snapshot (July 2, 2018).

[5] Ctrs. for Medicare & Medicaid Servs., Medicare Advantage, Cost, PACE, Demo and Prescription Drug Plan Contract Report, Monthly Summary Report (July 2018).

[6] Kaiser Family Found., *Total Medicaid Managed Care Enrollment* (2016).

**B.    Rehearing Is Vitally Important Now Because the Risk Corridors Program Is Only One of Many in Which the Government Has Not Acted as a Reliable Business Partner**

Public-private partnerships in health care generally, and in the ACA individual and small-group markets specifically, depend upon clear, consistent, and consistently enforced rules governing the mutual obligations between private health insurance providers and the government.   The need to safeguard the reliable performance of the government's part of the bargain is ever more pressing.   The failure to pay risk corridors obligations was just one of several recent actions taken by the government that have undercut the strength of ACA's many public-private partnerships.

In 2017, for example, the government announced that it would no longer reimburse health insurance providers for the reductions in cost-sharing (e.g., co-pays and deductibles) that insurance providers are required to provide to certain low-income exchange beneficiaries, notwithstanding a clear statutory mandate to make these cost sharing reduction ("CSR") payments.   *See* 42 U.S.C. § 18071(c)(3)(A); *Trump v. California*, 267 F. Supp. 3d 1119 (N.D. Cal. 2017).   Once again, the abandonment of payment obligations occurred in the middle of a plan year and long after health plans had set premiums.   The decision to terminate CSR payments caused immediate harm to health insurance providers, as evidenced by the cases pending in the Court of Federal Claims seeking to recover monies owed from 2017,

the year of the government's mid-year about-face. *See, e.g.*, *Common Ground Healthcare Coop. v. United States*, 137 Fed. Cl. 630 (2018) (certifying class).

Thus far, the harm to many (though not all) consumers—particularly for 2018—has been much less than it could have been. This is because states and insurance providers worked hard to implement a strategy centered around so-called "silver loading," which sought to lessen the costly effects for consumers associated with the government's termination of CSR payments. *See Trump*, 267 F. Supp. 3d at 1133-35. But the government—doubling down on its nonpayment of amounts owed under an unambiguous statutory mandate—has signaled an interest in eliminating or prohibiting such efforts. *See, e.g.*, Margot Sanger-Katz, *Republicans Couldn't Knock Down Obamacare. So They're Finding Ways Around It*, N.Y. TIMES, The Upshot (Apr. 11, 2018) (reporting that the Centers for Medicare & Medicaid Services is considering barring states from using silver loading); Katie Keith, *Insurers Can Continue Silver Loading for 2019*, Health Affairs (Jun. 13, 2018), https://www.healthaffairs.org/do/10.1377/hblog20180613.293356/full (reporting that at a June 2018 hearing before the House Education and Workforce Committee Department of Health and Human Services, Secretary Azar did not rule out banning silver loading in the future). These statements continue to inject significant uncertainty into the market and call into question the government's commitment to stable and reliable rules.

9

The continued uncertainty surrounding CSR payments is not the only recent development that raises questions regarding the long-term reliability of the government as a business partner in health care. In response to litigation by Texas and other states seeking to enjoin ACA in its entirety, the government in June 2018 took the highly unusual step of declining to defend a congressional enactment. Although opposing an injunction, the government agreed with the plaintiffs that zeroing out the penalty for noncompliance with the individual mandate rendered that provision unconstitutional and required the invalidation of two key ACA market reforms, guaranteed issue and community rating, as of 2019 (the effective date of zeroing out the penalty).[7] *See* Fed. Defs. Br., *Texas v. United States*, No. 4:18-cv-167, Docket No. 92, (N.D. Tex. filed June 7, 2018). Once again, this development came only *after* plans had already developed products and submitted rates for 2019 that were based on the policies and rules that the government now jettisons.

The uncertainty and instability wrought by the government's repeated repudiation of prior positions and commitments, particularly in the health care context, shows the pressing need for en banc review here. This Court should restore Federal Circuit precedent recognizing that the government must act as a reliable

---

[7] Guaranteed issue "bar[s] insurers from denying coverage to any person because of his health," and community rating "bar[s] insurers from charging a person higher premiums for the same reason." *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015).

business partner and keep its promises, which in this particular case means the government must meet its risk corridor payment obligations.

## CONCLUSION

The Court should grant rehearing en banc.

Dated: August 10, 2018  Respectfully submitted,

By: */s/ Leslie B. Kiernan*

| | |
|---|---|
| Ralph C. Nash | Leslie B. Kiernan |
| Professor Emeritus | Pratik A. Shah |
| GEORGE WASHINGTON UNIVERSITY LAW SCHOOL | Robert K. Huffman |
| | AKIN GUMP STRAUSS HAUER & FELD LLP |
| 2000 H St NW | 1333 New Hampshire Ave., NW |
| Washington, DC 20052 | Washington, DC 20036 |
| Phone: (202) 338-2944 | Phone: (202) 887-4000 |
| | Fax: (202) 887-4288 |

Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW
Suite 900
Washington, DC 20001
Phone: (202) 868-6915

Counsel for *Amicus Curiae* America's Health Insurance Plans, Inc.

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Federal Circuit Rule 32(b), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b)(4) and Federal Circuit Rule 35(g).

1.　　Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b), the brief contains 2,359 words.

2.　　This brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(g), the undersigned has relied on the word count feature of this Microsoft Word in preparing this certificate.

Dated: August 10, 2018　　　　　　　/s/ Leslie B. Kiernan
　　　　　　　　　　　　　　　　　Leslie B. Kiernan

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing proposed brief with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system this 10th day of August, 2018, and served a copy on counsel of record by the CM/ECF system.

Dated:   August 10, 2018                    /s/ Leslie B. Kiernan
                                            Leslie B. Kiernan

**EXHIBIT 4**

Nos. 18-1023, 18-1028, 18-1038

In The
# Supreme Court of the United States

MAINE COMMUNITY HEALTH OPTIONS, *Petitioner*,
v.
UNITED STATES, *Respondent.*

MODA HEALTH PLAN, INC., ET AL., *Petitioners*,
v.
UNITED STATES, *Respondent.*

LAND OF LINCOLN MUTUAL HEALTH INSURANCE CO.,
*Petitioner*,
v.
UNITED STATES, *Respondent.*

*On Writ of Certiorari to the
United States Court of Appeals for the Federal Circuit*

## BRIEF OF AMERICA'S HEALTH INSURANCE PLANS AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS

| | |
|---|---|
| Leslie B. Kiernan | Pratik A. Shah |
| KIERNAN PLLC | *Counsel of Record* |
| Washington, DC | AKIN GUMP STRAUSS HAUER & FELD LLP |
| Hyland Hunt | 1333 New Hampshire Ave. NW |
| Ruthanne M. Deutsch | Washington, DC 20036 |
| DEUTSCH HUNT PLLC | (202) 887-4210 |
| Washington, DC | pshah@akingump.com |

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE*............................1

INTRODUCTION AND SUMMARY OF ARGUMENT.................................................................2

ARGUMENT..................................................................5

THE FEDERAL CIRCUIT'S DECISION THREATENS THE DEEP PARTNERSHIP BETWEEN HEALTH INSURANCE PROVIDERS AND THE GOVERNMENT. ................5

    A. The Decision Below Undercuts The Government's Reliability As A Business Partner.............................................................5

    B. Both the Government And Health Insurance Providers Expected That Risk Under The Program Would Be Shared Between Them, Not Just Among Insurance Providers. ......................................9

    C. The Government Reaped Substantial Benefits At The Expense Of Health Plans From Its Broken Promise On Risk Corridors. ......................................................14

    D. Permitting The Government To Renege On Its Clear Statutory Obligations Would Harm Public-Private Health Care Partnerships. ................................................19

CONCLUSION .......................................................23

ii

# TABLE OF AUTHORITIES

**C**ASES**:**

*Belknap v. United States,*
    150 U.S. 588 (1893) ............................................... 6

*Salazar v. Ramah Navajo Chapter,*
    567 U.S. 182 (2012) .......................................... 5, 6

*United States v. Langston,*
    118 U.S. 389 (1886) ............................................... 6

*United States v. Winstar Corp.,*
    518 U.S. 839 (1996) ............................................... 5

**S**TATUTES**:**

26 U.S.C.
    § 36B ..................................................................... 19

42 U.S.C.
    § 18062(b)(1) ............................................... 10, 15
    § 18062(b)(1)(A) .......................................... 11, 15
    § 18062(b)(1)(B) ........................................... 11, 15

Health Care and Education Reconciliation
    Act of 2010, Pub. L. No. 111-152, 124
    Stat. 1029 ............................................................. 1

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148, 124 Stat. 119 (2010).............. 1

**O**THER **A**UTHORITIES**:**

78 Fed. Reg. 15,410 (Mar. 11, 2013) ............. 10, 11, 17

iii

79 Fed. Reg. 13,744 (Mar. 11, 2014) ......................... 12

79 Fed. Reg. 30,240 (May 27, 2014) ......................... 13

80 Fed. Reg. 10,750 (Feb. 27, 2015) ......................... 13

1 GAO, *Principles of Federal Appropriations Law* (4th ed. 2016) ................................. 14

2 GAO, Principles of Federal Appropriations Law (3d ed. 2006) ................................. 14

2017 OFFICE OF THE SPECIAL DEPUTY RECEIVER ANN. REP. ............................... 8

AHIP, *2017 QHP Rate Filing—Key Dates* (Apr. 18, 2016) ..................................... 7

AHIP, Comment Letter, Exchange and Insurance Market Standards for 2015 and Beyond (Apr. 21, 2014) ............................... 12

Am. Acad. Actuaries, Comment Letter, Exchange and Insurance Market Standards for 2015 and Beyond (Apr. 21, 2014) .................................... 12

Am. Acad. of Actuaries, *Fact Sheet: ACA Risk-Sharing Mechanisms* (2013) ...................... 16

Am. Acad. of Actuaries, Issue Br., *Drivers of 2015 Health Insurance Premium Changes* (June 2014) ........................................ 9, 10

iv

CMS, *Medicaid Managed Care Enrollment and Program Characteristics, 2016* (2018) .................................................... 21

CMS, *Medicare Advantage, Cost, PACE, Demo and Prescription Drug Plan Contract Report*, Monthly Summary Report (Aug. 2019) ......................................... 20, 21

CMS, *National Health Expenditure Data* ................ 20

CMS, *Quarterly Marketplace Effectuated Enrollment Snapshots by State* ........................... 19

Ctrs. for Medicare & Medicaid Servs., Risk Corridors Payments for the 2014 Benefit Year (Nov. 19, 2015) ........................................... 14

Letter from Kevin J. Counihan, Ctrs. For Medicare & Medicaid Servs., to Insurance Commissioners (July 21, 2015) .......... 17

Jacobson, Gretchen et al., Kaiser Family Found., *A Dozen Facts about Medicare Advantage*, Nov. 13, 2018 ................................... 21

Kaiser Family Found., *Marketplace Effectuated Enrollment and Financial Assistance* (2018) .................................................. 22

MACPAC, MACStats: Medicaid & CHIP Data Book (2018).................................................. 22

Nat'l Org. of Life & Health Ins. Guar. Ass'ns, *The Safety Net at Work* .............................. 8

v

Norris, Doug et al., *Risk Corridors under the Affordable Care Act*, Society of Actuaries, Health Watch (Oct. 2013) ........................ 11, 12, 13

S. Ct. R. 37.3(a) .......................................................... 1

Sacks, Daniel W. et al*., The Effect of the Risk Corridors Program on Marketplace Premiums and Participation* (Nat'l Bureau of Econ. Research, Working Paper No. 24129, 2017, Revised 2019) ............... 18

Skopec, Laura et al, Dep't of Health & Human Servs., *Market Competition Works: Silver Premiums in the 2014 Individual Market Are Substantially Lower than Expected* (Aug. 9, 2013) .................... 18

Wright, Aaron S., et al., Milliman, *Ten potential drivers of ACA premium rates in 2017* (Dec. 2015) ................................................ 18

## INTEREST OF *AMICUS CURIAE*[1]

America's Health Insurance Plans, Inc. ("AHIP") is the national trade association representing health insurance providers.   AHIP advocates for public policies that expand access to affordable health care coverage to all Americans through a competitive marketplace that fosters choice, quality, and innovation.   AHIP's members provide health and supplemental benefits through employer-sponsored coverage, the individual insurance market, and public programs such as Medicare and Medicaid.  As a result, AHIP's members have broad experience working with other health care stakeholders, including medical providers as well as state and federal government agencies, to ensure that patients have access to needed treatments and medical services.

That experience gives AHIP extensive first-hand knowledge about the Nation's health care and health insurance systems and a unique understanding of how those systems work.  Given the pervasive role of the federal government in those systems, including as a result of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 ("ACA"), AHIP's experience is that those systems can function as intended only when the government meets its obligations as a reliable

---

[1] Counsel of record for all parties consent to the filing of this brief.  S. Ct. R. 37.3(a).  No counsel for any party authored this brief in whole or in part, and no person or entity other than *amicus curiae* or its counsel made a monetary contribution intended to fund the brief's preparation or submission.

2

business partner.

AHIP writes to emphasize that all relevant stakeholders, including the responsible government agency, agreed that the risk corridors program represented an unambiguous commitment by the government to share in a portion of the losses incurred by health insurance providers in the first years of the health insurance exchanges. The Federal Circuit's decision permitting the government to walk away from that clear commitment based on ambiguous appropriations riders years later jeopardizes ongoing and future public-private partnerships that are critically important to the Nation's health care system.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

Health insurance providers across the country decided to enter into the new and risky insurance exchanges because of a clear obligation Congress created in the ACA: "an obligation of the government to pay … the full amount indicated by the statutory formula … under the risk corridors program." Pet. App. 20.[2] Both the majority and dissenting judges on the Federal Circuit recognized that statutory obligation as unambiguous. The Federal Circuit nonetheless concluded that an appropriations rider precluding the use of only certain funding sources impliedly "suspended" that obligation, thereby depriving health insurance providers of billions of dollars in promised reimbursements.

---

[2] All citations to the Petition Appendix are to the appendix in No. 18-1028.

3

AHIP agrees with Petitioners that the Federal Circuit's decision finds no support in this Court's precedents. AHIP writes separately to emphasize that the Federal Circuit's holding also casts serious doubt on the ability of private entities to rely on the federal government as a fair business partner. Given the extensive participation of health insurance providers in the Nation's health care programs, that concern is one of grave importance.

This Court has long recognized that no entity would partner with the government if it did not expect the government to adhere to its commitments. Whether the government's monetary commitments stem from statute or contract, courts have—until now—guaranteed them in the absence of explicit and clear congressional intent to repudiate them. But the Federal Circuit's decision, which lets the government "suspend" (*i.e.*, repudiate) its clear substantive obligations on the basis of an at-best ambiguous appropriations rider, makes it a risky business to rely upon the government's assurances.

This case is particularly egregious because the Federal Circuit approved the government repudiating its obligation *after* it had reaped the benefit of its bargain. When they started, the ACA exchanges represented a new and uncertain market. Congress supported that market—inducing health insurance providers to participate and set lower premiums—with an express statutory command for the government to share in any substantial losses those providers might suffer. All relevant stakeholders, including actuaries, health insurance providers, and the Department of Health and Human Services

4

("HHS"), understood that the risk corridors program would distribute risk between the federal government and health insurance providers—not just among providers. Health insurance providers reasonably relied on that understanding, and the agency repeatedly confirmed it.

As a result, in the early years of the exchanges, health insurance providers set lower premiums than market conditions would otherwise warrant, and many suffered significant losses. Indeed, even if the government had made full risk corridors reimbursements as the statute requires, those health insurance providers still would have borne substantial losses. As it stands, although health insurance providers did their part—saving the government billions in reduced premium tax credit expenditures— they have been left covering the additional $12 billion of losses that the government had promised to reimburse.

Affirming the Federal Circuit's rule, which offers a roadmap for the government to dodge its commitments through snippets of legislative history buried in an after-the-fact appropriations rider, will necessarily damage business relationships between health insurance providers and the government. Such partnerships extend well beyond the ACA exchanges and are vitally important. Those partnerships deliver health care to tens of millions of Americans, and they depend upon the ability of insurance providers to trust that the government will act as a fair partner. This Court should reverse the judgment below to avoid significant and lasting damage to those partnerships and the benefits they bestow.

5

## ARGUMENT

**THE FEDERAL CIRCUIT'S DECISION THREATENS THE DEEP PARTNERSHIP BETWEEN HEALTH INSURANCE PROVIDERS AND THE GOVERNMENT.**

### A.    The Decision Below Undercuts The Government's Reliability As A Business Partner.

The Federal Circuit failed to hold the government to its "unambiguously mandatory" obligation to reimburse health insurance providers for over $12 billion in losses.  Pet. App. 16.  That failure evokes this Court's recognition of the serious damage that results from allowing the government to renege on its obligations.  If "the Government could be trusted to fulfill its promise to pay only when more pressing fiscal needs did not arise, would-be contractors would bargain warily—if at all—and only at a premium large enough to account for the risk of nonpayment." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 191-192 (2012).

The law thus safeguards the "Government's own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies," *United States v. Winstar Corp.*, 518 U.S. 839, 883 (1996) (plurality op.)—an interest that is all the more critical for major new programs that depend upon inducing private participation for their success.  Were it otherwise, "willing partners [would become] more scarce." *Salazar*, 567 U.S. at 192.  That is why, even in the absence of appropriated funds, it has been settled law—at least until now—that "the

6

Government's valid obligations will remain enforceable in the courts." *Id.* at 191 (citation and internal quotation marks omitted).

As recognized by the judges dissenting from denial of rehearing en banc, the Federal Circuit's decision creates just this sort of harm. By holding that "the Government can abrogate its obligation to pay through appropriations riders, after it has induced reliance on its promise to pay," the ruling "severely undermines the Government's credibility as a reliable business partner." Pet. App. 83 (Wallach, J., dissenting). That, in turn, impairs "[o]ur system of public-private partnership," which "depends on trust in the government as a fair partner." Pet. App. 67 (Newman, J., dissenting). The resulting harm is widespread. It hurts not only those who partner with the government, but the government itself and, most critically, the consumers who depend upon vital services provided through public-private partnerships.

Whether the repudiated obligation is viewed as a contractual promise or a statutory command makes no difference. Statutory obligations, like contractual ones, bind the government despite Congress's failure to appropriate sufficient funds to satisfy them. *Belknap v. United States*, 150 U.S. 588, 594 (1893) ("mere failure to appropriate" is "not, in and of itself alone, sufficient to repeal the prior act"). And a congressional appropriations restriction does not alter the nature of the government's obligation unless it "modified or repealed the previous law" "expressly, or by clear implication." *United States v. Langston*, 118 U.S. 389, 394 (1886).

7

There was no such repeal here, only restrictions on particular sources of appropriated funds that were enacted in the context of unsuccessful efforts to repeal. *See* 18-1028 Pet. Br. 30-33, 37-38.  Making matters worse, the Federal Circuit relied on inconclusive snippets of legislative history in construing the appropriations rider.  *Id.* at 33-35; *see* Pet. App. 26. What's more, the appropriations restriction was first enacted in December 2014, *after* health insurance providers had already provided coverage for nearly all of 2014 and had set premiums and committed to participate in the ACA exchanges for 2015.[3]  No matter the doctrinal lens, the upshot is that the Federal Circuit's rule allows the government to default on its obligations based on an at-best ambiguous appropriations rider, after receiving the direct financial and other benefits from the risk corridors program.  *See* Part C, *infra*.

That default has real consequences:  Some health insurance providers suffered the dire threat of insolvency from the government's retroactive repudiation.  Petitioner Moda Health Plan is owed more than $210 million; it escaped receivership and was able to continue providing coverage in Oregon only by raising a major influx of private capital.  18-

---

[3] Although the precise deadline varies by state, insurers generally must file premiums for approval in the spring or summer preceding the year in which they intend to offer the coverage.  *See, e.g.*, AHIP, *2017 QHP Rate Filing—Key Dates* (Apr. 18, 2016) ("Key Dates"), *available at* https://ahip.org/2017-qhp-rate-filing-key-dates. Final decisions regarding participation in the federal exchange must generally be made the September before the plan year starts.  *Id.*

8

1028 Pet. Br. 18.  Petitioner Blue Cross Blue Shield of North Carolina, too, suffered financial losses of over $300 million for just 2014 and 2015.  *Id.* at 18-19.

Nor is the harm limited to the Petitioners before the Court.  Insurance providers in Illinois, for example, have been required to pay assessments levied by the state guaranty fund because of the insolvency of Petitioner Land of Lincoln Mutual Health Insurance Company.[4]  *See, e.g.*, 2017 OFFICE OF THE SPECIAL DEPUTY RECEIVER ANN. REP. 12-13 (noting the Illinois guaranty association has paid out $45 million to cover medical care provided to Land of Lincoln's enrollees, and that the association can be reimbursed only if Land of Lincoln recovers the risk corridors reimbursements owed).[5]

It follows that if the Federal Circuit's holding is not reversed, health insurance providers and other private enterprises will doubt their ability to rely on the government's unambiguous promises.  And that

---

[4] In many instances, an insurance provider licensed in a state is required to join the state's guaranty association.  When an insolvent company is liquidated, the state's guaranty association may be called upon to provide continuing coverage and benefits to the insolvent company's policyholders.  In the event an insolvent company's assets are insufficient to cover the cost of providing those benefits (which is often the case), assessments may be imposed on insurance providers participating in the state's guaranty association.  In this way, all insurance providers share the risk and costs of another provider's insolvency.  *See* Nat'l Org. of Life & Health Ins. Guar. Ass'ns, *The Safety Net at Work*, *available at* https://www.nolhga.com/policyholderinfo/main.cfm/location/systemworks.

[5] *Available at* https://www.osdchi.com/PDF%20Files/Scanned%20Orders/osd/2017OSDAnnualReport.PDF.

9

doubt will deter future public-private partnerships—to the detriment of all, including consumers who depend on the vital services those partnerships make possible.

**B.    Both the Government And Health Insurance Providers Expected That Risk Under The Program Would Be Shared Between Them, Not Just Among Insurance Providers.**

When they made decisions about participating in the ACA's new exchanges, there was no reason for health insurance providers to doubt the unambiguous risk-sharing commitment Congress made on behalf of the government in enacting the risk corridors program. Indeed, the government expected health insurance providers to rely on that commitment—despite the absence of an advance appropriation—because that is the only way the risk corridors program could achieve its objective. To that end, HHS repeatedly represented that it interpreted the statute in the same way that the industry did: mandating government reimbursement to insurance providers for partial losses per the statutory formula, regardless of amounts collected under the program.

Health insurance providers faced enormous uncertainty in deciding whether to participate in the exchanges and in setting premiums for 2014 "because insurers had only limited experience data on individuals who would be newly insured in the post-reform market." Am. Acad. of Actuaries, Issue Br., *Drivers of 2015 Health Insurance Premium Changes*,

10

at 2 (June 2014).[6] That uncertainty would ordinarily demand a higher premium due to a "risk margin"; under actuarial principles, "[g]reater levels of uncertainty typically result in higher risk margins and higher premiums." *Id.* at 5.

But insurance providers were induced to participate in the exchanges—and to set lower premiums than otherwise would have been warranted—by a promise that even the Federal Circuit recognized was unambiguous, Pet. App. 16-17: the government would reimburse health insurance providers (in part) for any losses resulting from higher-than-expected costs to cover patient care during the first three years of the exchanges. From the outset, all stakeholders understood that the risk corridors program would thereby share risk between health insurance providers and the government, not simply spread risk among health insurance providers.

As Petitioners explain (18-1028 Pet. Br. 5-6), the statute's plain text requires that the Secretary "shall pay" an amount dictated by a formula that is neither qualified nor capped by the amount collected from insurance providers under the program. 42 U.S.C. § 18062(b)(1). Because the payment amounts are not linked to amounts collected, the statute "permits the Federal government and [qualified health plans] to share in … losses resulting from inaccurate rate setting." 78 Fed. Reg. 15,410, 15,412 (Mar. 11, 2013). That is very different from the two other premium stabilization programs, which were expressly designed

---

[6]   *Available at* http://www.actuary.org/files/2015_ Premium_Drivers_Updated_060414.pdf.

11

to be limited to amounts of collections from health insurance providers or third-party administrators on behalf of group plans. *See id.* at 15,411 (describing risk adjustment as a program in which "funds are transferred from issuers with lower-risk enrollees to issuers with higher-risk enrollees"); 42 U.S.C. § 18061(b)(1)(A)-(B) (establishing reinsurance program whereby entity "collects payments under subparagraph (A)," *i.e.*, from "health insurance issuers, and … on behalf of group health plans," and "uses amounts so collected to make reinsurance payments to health insurance issuers").

If it were not clear enough from the statute's text, the agency made clear in 2013 that the program required payments from the Treasury if collections were insufficient to cover amounts owed: The "risk corridors program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, HHS will remit payment as required under section 1342 of the Affordable Care Act." 78 Fed. Reg. at 15,473.   Health insurance providers shared this understanding of the program as "protect[ing] health insurance issuers against … pricing uncertainty of their plans, [by] temporarily dampening gains and losses in a risk-sharing arrangement between issuers and the federal government."   Doug Norris, et al., *Risk Corridors under the Affordable Care Act*, Society of Actuaries, Health Watch at 5 (Oct. 2013).[7] Because the program shared risk between the government and health

---

[7]   *Available at* http://us.milliman.com/uploadedFiles/insight/2013/Risk-corridors-under-the-ACA.pdf.

12

insurance providers, it was not "symmetric," and the industry recognized from the early days that having "losses … balance the gains … would be more a coincidence than a certainty." *Id.* at 6.

This shared understanding was so strong that after announcing for the first time—without opportunity for prior comment—that it intended to "implement this program in a budget neutral manner," 79 Fed. Reg. 13,744, 13,787 (Mar. 11, 2014), the agency reversed course just two months later. As the American Academy of Actuaries explained, the budget neutrality proposal "changes the nature of the risk corridor program from one that shares risk between issuers and CMS to one that shares risk between competing issuers." Am. Acad. Actuaries, Comment Letter, Exchange and Insurance Market Standards for 2015 and Beyond, at 3 (Apr. 21, 2014). Without risk-sharing by the government, however, the program would "not fully achieve its goal of mitigating risk due to mispricing," and health insurance providers would need to "build in additional risk margin"—*i.e.*, raise premiums. *Id.* at 3-4; *see also* AHIP, Comment Letter, Exchange and Insurance Market Standards for 2015 and Beyond, at 5 (Apr. 21, 2014) (expressing "significant concerns with the impact that such a [budget neutrality] policy would have on the risk corridors program's statutory goal of stabilizing premiums").

Responding to these comments, the agency explained that budget neutrality meant that the agency would offset collections against payments over the three-year life of the program, but it returned to its considered prior view that in the "event of a

13

shortfall … the Affordable Care Act requires the Secretary to make full payments to issuers." 79 Fed. Reg. 30,240, 30,260 (May 27, 2014).[8] And the next year—even after the first appropriations rider was adopted—the agency again reiterated "that the Affordable Care Act requires the Secretary to make full payments to issuers," stating that it "will use other sources of funding for the risk corridors payments" in the event of a shortfall in collections. 80 Fed. Reg. 10,750, 10,779 (Feb. 27, 2015).

As these statements reflect, no one in the industry or the government thought that the absence of an upfront appropriation for risk corridors within the ACA converted "shall pay" into "may or may not pay." In fact, the very uncertainty that led Congress to enact the risk corridors program made it impractical (if not impossible) to determine the amount of funds to appropriate in advance. All of "the values used in the risk corridor calculation are actual experienced values," meaning they could not be known for 2014 until well into 2015. Norris, *supra*, at 6 (noting plans were required to submit data by July 31 of the year following the benefit year). Accordingly, the total amounts owed under the program for just its first year of operation—and thus the amount of any appropriation needed for one year—could not be determined until late 2015.

---

[8] The agency stated that its ability to make full payments would depend upon identifying "other sources of funding … subject to the availability of appropriations," but not that the statutory "obligation" was so constrained. 79 Fed. Reg. at 30,260.

14

The need for *post hoc* calculations—and later corresponding appropriations—is not unique to the risk corridors program, which was enacted in 2010 but under which the amounts due could not be calculated until 2015. *See* 1 GAO, *Principles of Federal Appropriations Law*, at 2-54 (4th ed. 2016) ("Nor does organic legislation typically provide any form of an appropriation."). That practical timing reality does not render such statutory payment obligations illusory or contingent on later appropriations. All stakeholders so agreed here: the statute created a risk-sharing program health insurance providers could count on regardless of a later congressional appropriation.[9]

### C.   The Government Reaped Substantial Benefits At The Expense Of Health Plans From Its Broken Promise On Risk Corridors.

The bargain that health insurance providers had accepted—participating in the exchanges with the understanding that if they set premiums too low, there

---

[9] Tellingly, when HHS announced the prorated payment amounts for 2014, it stated that it was "recording those amounts that remain unpaid … as … obligation[s] of the United States Government for which full payment is required." Ctrs. for Medicare & Medicaid Servs., *Risk Corridors Payments for the 2014 Benefit Year* (Nov. 19, 2015). The agency could record such obligations without violating the Antideficiency Act only by determining that the statute mandates payment regardless of available appropriations. *See* 2 GAO, *Principles of Federal Appropriations Law*, 6-91 (3d ed. 2006) (Congress "may implicitly authorize an agency" to "obligate in excess of the amounts appropriated … by virtue of a law that necessarily requires such obligations.").

15

would be a federal backstop for part of their losses—still left much risk on their shoulders.  For its part, the government received a substantial benefit in the form of lower premiums—and therefore reduced payments for premium subsidies—in exchange for agreeing to cover just part of the losses for some providers.  The Court should not endorse a rule that allows the government to keep the sweet while dodging the bitter.

The statute sets forth a formula for determining when the government "shall pay" money to a health insurance provider, and how much.  42 U.S.C. § 18062(b)(1).  The calculation is based on the ratio of the "target amount"—generally, premiums net of administrative costs—to "allowable costs"—generally, the cost of providing benefits.  *Id.*

Any health plan that suffered losses of 3% or less—*i.e.*, in statutory terminology, its "allowable costs" were 103% or less of its "target amount"—bore the entirety of its loss, without any reimbursement by the government.   Likewise, all plans—even those entitled to receive a risk corridors reimbursement—were required to cover that 3% loss in full.  42 U.S.C. § 18062(b)(1).

Any plan that suffered more than a 3% loss was entitled to government reimbursement for a portion of the loss exceeding 3%.  Specifically, the government was required to reimburse plans 50% of any loss falling between 3% and 8%. 42 U.S.C. § 18062(b)(1)(A). And the government was required to reimburse plans 80% of any losses exceeding 8%.  *Id.* § 18062(b)(1)(B).

16

The figure below graphically depicts the statutory
formula:



**Illustration of ACA Risk Corridors**

Am. Acad. of Actuaries, *Fact Sheet: ACA Risk-Sharing
Mechanisms* at 2 (2013).[10]

   To illustrate, imagine a health plan that collects
$100 million in premium revenue, net of
administrative costs, and pays out $110 million to
cover health care for its enrollees. Under the statute,
the government promised to reimburse the plan for
$4.1 million of its $10 million loss, reducing its 10%
loss to a 5.9% loss.[11] As this example shows, a plan
incurring  a  loss  that  triggers  the  highest

---

   [10]  *Available  at*  https://www.actuary.org/files/ACA_
Risk_Share_Fact_Sheet_FINAL120413.pdf.

   [11] The $4.1 million payment equals 50% of the amount
representing the loss between 3% and 8% (50% of $5 million, or
$2.5 million), plus 80% of the loss exceeding 8% (80% of $2
million, or $1.6 million).

17

reimbursement rate would still often bear the majority of the loss—even if the government had satisfied its risk corridors obligations in full. And, by definition, any plan with an 8% loss or less would bear well more than half of the loss on its own.

Conversely, by requiring health plans to pay the government an equivalent share of the amount of premium revenues exceeding allowable costs, the statute limited their upside return in situations where premiums exceeded costs. Needless to say, while failing to meet its own obligations, the government has held health plans to theirs, requiring payment of the mandated amounts in full. *See* Pet. App. 13-14.

As discussed above, the stated purpose of this (limited) sharing of risk between health plans and the government was to induce insurance providers to set lower premiums. 78 Fed. Reg. at 15,413 (stating that the risk corridors program permits "issuers to lower rates by not adding a risk premium to account for perceived uncertainties in the 2014 through 2016 markets"). Throughout the life of the program, the government stressed the link between its commitment to make payments and lower premiums. In the summer of 2015, for example, the government recited that the ACA "requires the Secretary to make full payments to issuers" when it urged state regulators to hold the line against premium increases and to take risk corridor "payments ... into account before decisions are made on final rates" for 2016. Letter from Kevin J. Counihan, Ctrs. for Medicare & Medicaid Servs., to Insurance Commissioners (July 21, 2015).

18

Taking the government at its word (backed by the statute and precedent), health insurance providers delivered lower premiums that benefitted consumers and the government alike.  At the outset of the new exchanges, health insurance providers set premiums at competitive levels that were ultimately lower than expected.  Laura Skopec et al., Dep't of Health & Human Servs., *Market Competition Works: Silver Premiums in the 2014 Individual Market Are Substantially Lower than Expected*, at 1-2 (Aug. 9, 2013).[12]  Premiums in the exchange marketplace later increased significantly—by 37% from 2015 to 2017, the first year after the end of the program—with the sunset of the program often cited as a major factor (particularly for 2017).  *See* Daniel W. Sacks et al.*, The Effect of the Risk Corridors Program on Marketplace Premiums and Participation,* at 36 (Nat'l Bureau of Econ. Research, Working Paper No. 24129, 2017, revised 2019);[13] Aaron S. Wright et al., Milliman, *Ten potential drivers of ACA premium rates in 2017,* at 4 (Dec. 2015).[14]  An NBER paper found that premiums would likely have increased by only 10% over that period if the risk corridor program had been in place and allowed to operate as intended under the statute.  Sacks, *supra*, at 36.

These lower premiums directly reduced the amounts the government was required to pay in

---

[12] *Available at* https://aspe.hhs.gov/system/files/pdf/76701/ib_premiums_update.pdf.

[13] *Available at* https://www.nber.org/papers/w24129.

[14] *Available at* http://www.milliman.com/uploadedFiles/insight/2015/2140HDP_20160107.pdf.

19

premium tax credits, which are tied to the amount of premiums. *See* 26 U.S.C. § 36B. More than 85% of people who obtained health insurance on the exchanges received a premium tax credit in 2014, with similar percentages in subsequent years. *See* CMS, *Quarterly Marketplace Effectuated Enrollment Snapshots by State*, December 2014 Effectuated Tables; *id*. December 2015 Effectuated Tables (84%).[15] The lower premiums saved the government billions in reduced tax credits from 2014 to 2016.  Lower premiums also encouraged more individuals who did not qualify for premium tax credits to sign up for coverage on the exchanges; that, in turn, increased the pool of participants and allowed them to obtain greater coverage at lower cost.

The Court should not adopt a rule that allows the government to reap the benefits of its bargain while repudiating billions of dollars of unambiguous obligations based on unclear language in an appropriations bill—or, worse yet, in legislative history accompanying that bill.  That is untenable both as a matter of law and basic fairness.

### D. Permitting The Government To Renege On Its Clear Statutory Obligations Would Harm Public-Private Health Care Partnerships.

Allowing the sort of maneuver the government undertook here will inject uncertainty into other vital health care programs.  There are few industries in

---

[15] *Available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/Effectuated_Quarterly_Snapshots.html.

20

which the government acting as a reliable business partner matters more than health care. Aside from a few specialized examples (such as military treatment facilities), the federal government rarely delivers health care services itself. Instead, the government relies heavily on public-private partnerships to do so. Of the $982 billion spent by the federal government on health care in 2017, more than $764 billion (78%) involved services delivered through partnerships with doctors, hospitals, insurance providers, and other non-federal entities through programs such as Medicare, Medicaid, and the ACA health insurance exchanges.[16]

Health insurance providers are essential and reliable partners in public programs offering coverage to nearly 100 million Americans. For instance, the Medicare Advantage program serves more than 22 million Medicare beneficiaries—one in three—through private health plans that partner with the federal government. *See* CMS, *Medicare Advantage, Cost, PACE, Demo and Prescription Drug Plan Contract Report*, Monthly Summary Report (Aug.

---

[16] *See* CMS, *National Health Expenditure Data*, Table 05-3 & n.2, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpend Data/NationalHealthAccountsHistorical.html. The table reports $217.7 billion of spending on "Other Federal Health Insurance and Programs" that covers some additional private partnerships (like the Children's Health Insurance Program), but also some health care services delivered directly by the government (such as some Department of Defense and Department of Veterans Affairs expenditures). *Id.*

21

2019); [17]   Gretchen Jacobson et al., Kaiser Family Found., *A Dozen Facts about Medicare Advantage*, Nov. 13, 2018.[18]

Similarly, nearly 46 million people are enrolled in Medicare Part D coverage, a voluntary prescription drug benefit for Medicare beneficiaries that is provided through private health insurance plans approved by the federal government.  CMS, Monthly Summary Report, *supra*.  That number includes over 25 million individuals enrolled in stand-alone prescription drug plans and more than 19 million individuals enrolled in drug benefit coverage through a Medicare Advantage plan.  *Id.*

In addition, states and private Medicaid health plans depend on the federal government's Medicaid funding commitments to provide coverage to almost 55 million Medicaid beneficiaries.  CMS, *Medicaid Managed Care Enrollment and Program Characteristics, 2016*, at 5 (2018).[19]  For example, in 2016, 38 states utilized Medicaid managed care arrangements for at least some portion of their Medicaid programs, and 21 of those states saw at least

---

[17] *Available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/Monthly-Contract-and-Enrollment-Summary-Report-Items/Contract-Summary-2019-08.html.

[18] *Available at* https://www.kff.org/medicare/issue-brief/a-dozen-facts-about-medicare-advantage/.

[19] *Available at* https://www.medicaid.gov/medicaid/managed-care/downloads/enrollment/2016-medicaid-managed-care-enrollment-report.pdf.

22

75% of their Medicaid populations enrolled in managed care organizations. MACPAC, MACStats: Medicaid & CHIP Data Book, Ex. 29 (2018).[20]

Finally, over 10 million Americans enrolled in health plans offered on ACA exchanges in 2019, of which over 9 million received subsidies. *See* Kaiser Family Found., *Marketplace Effectuated Enrollment and Financial Assistance* (2019).[21]

Permitting the government to repudiate its obligations even after health insurance providers did what was asked of them imperils these sorts of health care partnerships. If the federal government can walk away from statutory obligations made to encourage private sector participation in new programs, at least without repealing those obligations openly and clearly, partnering with the federal government becomes a venture fraught with intolerable risk. And then everyone—the government, private partners, and citizens alike—loses.

---

[20] *Available at* https://www.macpac.gov/wp-content/uploads/2018/05/EXHIBIT-29.-Percentage-of-Medicaid-Enrollees-in-Managed-Care-by-State-July-1-2016.pdf.

[21] *Available at* https://www.kff.org/other/state-indicator/effectuated-marketplace-enrollment-and-financial-assistance/.

23

## CONCLUSION

This Court should reverse the judgment of the
Federal Circuit.

Respectfully submitted.

Leslie B. Kiernan                    Pratik A. Shah
KIERNAN PLLC                           *Counsel of Record*
                                     AKIN GUMP STRAUSS
                                       HAUER & FELD LLP
Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC

September 6, 2019

# EXHIBIT 5

No. 2017-1224

# In the
# United States Court of Appeals
## for the Federal Circuit

LAND OF LINCOLN MUTUAL HEALTH INSURANCE COMPANY, an Illinois Non-Profit Mutual Insurance Corporation,

*Plaintiff-Appellant,*

v.

UNITED STATES,

*Defendant-Appellee.*

_____

Appeal from the United States
Court of Federal Claims, Case No. 1:16-cv-00744-CFL.
The Honorable **Charles F. Lettow**, Judge Presiding.

## CORRECTED BRIEF OF *AMICUS CURIAE* KATE BUNDORF, SCOTT HARRINGTON, MARK PAULY, MICHAEL CHERNEW, THOMAS MCGUIRE, LEEMORE DAFNY, AND KOSALI SIMON IN SUPPORT OF PLAINTIFF-APPELLANT'S PETITION FOR REHEARING EN BANC

STEPHEN A. SWEDLOW
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 705-7400

*Counsel for Amicus Curiae
Kate Bundorf, Scott Harrington, Mark
Pauly, Michael Chernew, Thomas
McGuire, Leemore Dafny, and Kosali
Simon*

 COUNSEL PRESS · (866) 703-9373          PRINTED ON RECYCLED PAPER 

Form 9
Rev. 10/17

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Land of Lincoln Mutual Health Insurance Company **v.** **United States of America**

Case No. 17-1224

## CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ☐ (appellant) ☐ (respondent) ☐ (appellee) ☒ (amicus) ☐ (name of party)

Kate Bundorf, Scott Harrington, Mark Pauly, Michael Chernew, Thomas McGuire, Leemore Dafny, Kosali Simon

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Kate Bundorf | N/A | None |
| Scott Harrington | N/A | None |
| Mark Pauly | N/A | None |
| Michael Chernew | N/A | None |
| Thomas McGuire | N/A | None |
| Leemore S. Dafny | N/A | None |
| Kosali Simon | N/A | None |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

None

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b).  (The parties should attach continuation pages as necessary).

See Attachment A.

| 8/13/2018 | /s Stephen A. Swedlow |
|---|---|
| Date | Signature of counsel |
| Please Note: All questions must be answered | Stephen A. Swedlow |
| | Printed name of counsel |

cc: _____

**Reset Fields**

## **Attachment A**

### Federal Circuit

*Blue Cross and Blue Shield of North Carolina v. United States*, No. 17-2154

*Maine Cmty. Health Options v. United States*, No. 17-2395

*Moda Health Plan, Inc. v. United States,* No. 17-1994

### Court of Federal Claims

*Alliant Health Plans, Inc. v. United States*, No. 16-1491C (Braden, J.)

*BCBSM, Inc. v. United States*, No. 16-1253C (Coster Williams, J.)

*Blue Cross and Blue Shield of Alabama v. United States*, No. 17-347C (Campbell-Smith, J.)

*Blue Cross and Blue Shield of Kanas City v. United States*, No. 17-95C (Braden, J.)

*Blue Cross Blue Shield of Tennessee v. United States*, No. 17-348C (Horn, J.)

*Blue Cross of Idaho Health Service, Inc. v. United States*, No. 16-1384C (Lettow, J.)

*Common Ground Healthcare Cooperative v. United States*, No. 17-877C (Sweeney, J.)

*EmblemHealth, Inc. v. United States*, No. 17-703C (Wheeler, J.)

*Farmer v. United States*, No. 17-363C (Campbell-Smith, J.)

*First Priority Life Ins. Co. v. United States*, No. 16-587C (Wolski, J.)

*Health Alliance Medical Plans, Inc. v. United States*, No. 17-653C (Campbell-Smith, J.)

*Health Net, Inc. v. United States*, No. 16-1722C (Wolski, J.)

*Health Republic Ins. Co. v. United States*, No. 16-259C (Sweeney, J.)

*HPHC Ins. Co., Inc. v. United States*, No. 17-87C (Griggsby, J.)

*Medica Health Plans v. United States*, No. 17-94C (Horn, J.)

*Minuteman Health Inc. v. United States*, No. 16-1418C (Griggsby, J.)

*Molina Healthcare v. United States*, No. 17-97C (Wheeler, J.)

*Montana Health CO-OP v. United States*, No. 16-1427C (Wolski, J.)

*Neighborhood Health Plan, Inc. v. United States*, No. 16-1659C (Smith, J.)

*New Mexico Health Connections v. United States*, No. 16-1199C (Bruggink, J.)

*Ommen v. United States*, No. 17-712C (Lettow, J.)

*Sanford Health Plan v. United States*, No. 17-357C (Bruggink, J.)

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

CERTIFICATE OF INTEREST ....................................................................i

TABLE OF CONTENTS....................................................................v

TABLE OF AUTHORITIES ...............................................................vi

INTEREST OF *AMICI*.....................................................................1

SUMMARY OF THE ARGUMENT ....................................................1

ARGUMENT ....................................................................................3

I.    Private Firms Make Decisions by Assessing the Costs and Benefits of
      Their Actions .........................................................................3

II.   One of the Government's Primary Tools for Achieving Policy
      Objectives is to Influence Firm Behavior Through the Use of
      Financial Incentives............................................................3

III.  The Government Damages its Ability to Use Financial Incentives to
      Achieve Policy Objectives by, After the Fact, Not Paying the
      Amounts it Promised ...........................................................7

CONCLUSION ...............................................................................8

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page(s)**</u>

**Rules and Regulations**

Fed. Cir. R. 29(c) ..................................................................................................1
Fed. Cir. R. 35(g)……………………………………………………………..1
Fed. R. App. P. 29 .................................................................................................1

**Additional Authorities**

*https://www.energy.gov/eere/electricvehicles/electric-vehicles-tax-credits-*
   *and-other-incentives*.............................................................................4
*https://www.epa.gov/environmental-economics/economic-incentives#permit*.........4
*https://www.healthaffairs.org/do/10.1377/hblog20140514.038975/full/*.................5
*https://www.justice.gov/sites/default/files/civil/legacy/*.............................................4
*https://www.ttb.gov/main_pages/schip-summary.shtml*.............................................4

# INTEREST OF *AMICI*[1]

*Amici* are distinguished economists and professors of health policy, economics, and management.[2] They occupy prominent positions at preeminent universities and institutions, and are widely recognized as academic experts in health policy and, in particular, the study of regulated health insurance markets. They have no personal stake in the outcome of this case, but have an interest in assisting this Court in understanding the problems that finding for the Government in this case will create for the Government's future ability to incentivize private actors to achieve policy objectives.

## SUMMARY OF THE ARGUMENT

Regardless of one's views of the Affordable Care Act ("ACA") and the many reforms it brought to the healthcare industry, the Government clearly sought to create new health insurance markets and to incentivize private firms to provide coverage to consumers within those markets.  The use of incentives to influence the behavior of private firms and individuals is one of the Government's most powerful tools for achieving policy objectives.  The Government influences

---

[1]  Pursuant to Fed. R. App. P. 29, counsel for *amici* represents that counsel and *amici* authored this brief in its entirety and that none of the parties or their counsel, nor any other person or entity other than *amici* or its counsel, made a monetary contribution intended to fund the preparation or submission of this brief.  Pursuant to Fed. R. App. P. 29 and Fed. Cir. R. 29(c), all parties have consented to the filing of this brief. Pursuant to Fed. Cir. R. 35(g), *amici* have filed a motion for leave to file this brief.

[2]   A list of *amici curiae* is attached as Appendix A.

behavior through the use of incentives in a wide variety of markets and for a wide variety of purposes, such as encouraging farmers to plant certain types of crops, convincing young men and women to join the military, and, as here, encouraging businesses to participate in markets. The ways in which the Government creates the incentives for such private action vary, but they include (among others) risk mitigation programs and financial subsidies.

The key, however, to the Government's ability to incentivize private actors to achieve the goals of policymakers is the ability of those actors to rely on the Government's promises. If, as happened here, the Government induces private parties to enter and/or more fully participate in a market using financial incentives, but then chooses not to make the payments it promised, then the Government will weaken its ability to influence the behavior of private actors in the same or different markets in the future. To ensure its ability to promote and preserve well-functioning markets, it is thus critical that the Government make good on payments promised in situations like the ACA's risk corridor program, or else it will significantly compromise its ability to influence the behavior of firms. We believe this is a non-partisan issue, as ensuring the credibility of governmental promises vis a vis financial incentives bolsters the ability of any party to impact markets and related behavior of various stakeholders.

# ARGUMENT

## I. Private Firms Make Decisions by Assessing the Costs and Benefits of Their Actions

Private firms and individuals make decisions by assessing the benefits and costs of potential alternatives, generally choosing the course of action which maximizes their individual welfare. Private firms usually seek to maximize their economic value, which depends on the expected magnitude and risk of future cash flows. Risk that cannot be transferred to other entities or diversified away within the firm represents a significant cost to many firms of engaging in productive activity. This is especially true for insurance firms, which receive an upfront payment, usually referred to as a premium, in exchange for covering a consumer's future health care expenditures for a given period of time. Firms facing greater uncertainty in claim costs require greater amounts of capital to back their promises to pay future claims, raising capital costs and increasing premiums.

## II. One of the Government's Primary Tools for Achieving Policy Objectives is to Influence Firm Behavior Through the Use of Financial Incentives

From an economic perspective, two of the key functions of government are to set the rules that allow markets to work and to intervene when markets do not function well. While policy makers and economists may disagree over the merits of particular policies or whether government intervention is desirable in particular situations, there is broad consensus that an essential economic role of government

is to influence the behavior of private parties when market outcomes are likely to be inefficient. For decades, the Government has used private citizens' rational self-interest to help spur action to achieve its policy objectives. For example, there is a long history of the Government using subsidies, price supports, and crop insurance to support various types of agricultural production. These programs shape private action by both reducing the risks and increasing the benefits associated with such production. Other examples of the numerous ways that the Government has created incentives for private actors, include, among many others, the use of emission reduction credits and cap-and-trade programs to promote more environmentally-friendly technologies; federal excise taxes on tobacco products to reduce smoking; federal tax credits to promote the adoption of electric vehicles; and financial awards to relators (*i.e.*, "whistleblowers") in successful False Claims Act cases.[3] In each of these cases, the Government uses financial incentives to influence the behavior of individuals or firms by altering the benefits and costs of alternative courses of actions.

---

[3] *See https://www.epa.gov/environmental-economics/economic-incentives#permit* (EPA cap and trade/credits); *https://www.ttb.gov/main_pages/schip-summary.shtml* (federal excise tax); *https://www.energy.gov/eere/electricvehicles/electric-vehicles-tax-credits-and-other-incentives* (electric vehicle tax credits); *https://www.justice.gov/sites/default/files/civil/legacy/* 2011/04/22/C-FRAUDS_FCA_Primer.pdf (False Claims Act relator financial awards)

While the Government intervenes throughout the economy in many different ways, the ability of the Government to use these types of incentives is particularly important in the context of health insurance markets. Health insurance markets are highly regulated with regulations spanning a wide range of areas, including financial (e.g., reserve requirements; medical loss ratio regulation) to customer service (e.g., requirements for raising and resolving customer complaints) to access (e.g., "network adequacy" rules). The ability of the Government to design and implement regulation may help ensure that health insurance markets operate effectively and that high risk and low-income consumers have access to coverage.

The Government's use of financial incentives in health insurance markets has long predated the ACA. Focusing on the issue for this appeal, however, the ACA's risk corridors program helped shift the risk-benefit analysis for prospective qualified health plan ("QHP") issuers by reducing the risk of participation in the ACA's newly created health insurance exchanges.[4] The program did so by reducing the chance that QHP issuers would suffer outsized losses from participating in the exchanges during their early years, when the health characteristics and utilization of enrollees (and, thus, the issuers' risk profile) were still largely unknown. The lack of information on previously uninsured enrollees' likely use of health care made it exceptionally difficult for insurers to determine

---

[4] See *https://www.healthaffairs.org/do/10.1377/hblog20140514.038975/full/*

the level of premiums necessary to cover the costs of health care used by potential enrollees. Significantly, the program also constrained profits in those early years, so that insurers which happened to enroll people who were more healthy than predicted would not receive windfalls. In other words, the program reduced the risk to insurers of entering the new market by reducing the likelihood of both excessive losses and profits due to unanticipated levels of medical costs. This program had precedent in the context of the Medicare Part D prescription drug program, in which the Government created similar incentives over a decade ago to encourage private firms to participate in a newly created market for subsidized insurance for prescription drugs for aged and disabled beneficiaries.

By reducing the risk of participating in a newly created market, the Government encouraged firms to enter a new market characterized by considerable uncertainty in the risk profile of potential enrollees (and, thus, profitability). It is also important to note that the risk corridors program was only one of a variety of financial incentives created by the ACA intended to influence the behavior of both firms and individuals. Other incentives included reinsurance, risk adjustment, premium and cost-sharing subsidies, and the individual mandate. Taken together, these policies created a complex set of financial incentives for insurers to navigate as they evaluated the desirability of participating in the new market. While it was unclear at the time that insurers chose whether to participate in the exchanges and

set their premiums whether any given policy would have either its intended effects or even create unintended negative consequences, it is clear that insurers had strong incentives to consider how each of these policies would likely affect demand for their products and their risk pool when making these decisions.

III. **The Government Damages its Ability to Use Financial Incentives to Achieve Policy Objectives by, After the Fact, Not Paying the Amounts it Promised**

A key requirement underlying the Government's ability to create incentives for private economic action is that the Government stand behind any financial promises it makes to the actors whose behavior it wishes to affect. This is particularly important when financial incentives are paid out only *after* the private actor has committed to behaving in the way the Government prefers. In that situation, the private actor takes actions and commits resources based on how the incentives promised by the Government affect the benefits and costs of those actions. If the Government does not honor those commitments, it has induced the private actor to commit to a course of action based on inaccurate information regarding the likely consequences.

If the Government proves itself to be an unreliable counterparty, it creates a clear disincentive in the future for private actors to participate in the Government's efforts to influence their behavior. Put differently, if the Government's promises to pay are unreliable and subject to "bait and switch" behavior—and private actors

7

have limited ability to compel compliance with those promises, such as through litigation like this—then the Government's ability to achieve policy objectives through incentivizing private action will be substantially undermined.

This issue is not specific to the Affordable Care Act; it affects the more general ability of the Government to incentivize private actors. If, as the Government argues in this case, it can legally avoid its payment obligations to private actors after it has already incentivized their market participation through promises to make payments contingent upon particular outcomes, then it will severely compromise its ability to use these types of incentives to achieve policy objectives in the future. Such a result would remove one of the most powerful tools the Government has to affect the nature and direction of the economy.

## CONCLUSION

For the reasons discussed above, in order to preserve a sound system for governments to use financial incentives to influence the actions of private parties – particularly as it involves economic decisions, the Court should carefully consider the adverse consequences of allowing the Government to fail to honor promises on which private parties relied.

Dated: August 13, 2018

Respectfully submitted,

/s/ Stephen A. Swedlow

Stephen A. Swedlow
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 North Wacker Drive
Suite 2700
Chicago, IL 60606
(312) 705-7400

*Counsel for Amici Curiae*

# Appendix A

M. Kate Bundorf, Associate Professor of Health Research and Policy, Stanford University School of Medicine

Scott Harrington, Alan B. Miller Professor of Health Care Management, The Wharton School, University of Pennsylvania

Michael Chernew, Leonard D. Schaeffer Professor of Health Care Policy, Harvard Medical School

Leemore S. Dafny, Bruce V. Rauner Professor of Business Administration, Harvard Business School and Harvard Kennedy School of Government

Thomas G. McGuire, Professor of Health Economics, Department of Health Care Policy, Harvard Medical School

Mark V. Pauly, Bendheim Professor of Health Care Management and of Business Economics and Public Policy, The Wharton School, University of Pennsylvania

Kosali Simon, Herman Wells Professor, School of Public and Environmental Affairs, Indiana University

# CERTIFICATE OF COMPLIANCE

This brief complies with the word count limitation of Fed. Cir. R. 29(b)(4), and contains 1,941 words, exclusive of the portions exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type.

/s/ Stephen A. Swedlow
Stephen A. Swedlow
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 705-7400

*Counsel for Amicus Curiae*
*Kate Bundorf, Scott Harrington, Mark*
*Pauly, Michael Chernew, Thomas McGuire,*
*Leemore Dafny, and Kosali Simon*

## CERTIFICATE OF SERVICE

I, Rose E. Olejniczak, being duly sworn according to law and being over the age of 18, upon my oath deposes and states that:

Counsel Press was retained by Stephen A. Swedlow, Quinn Emanuel Urquhart & Sullivan, LLP, Counsel for *Amicus Curiae* Kate Bundorf, Scott Harrington, Mark Pauly, Michael Chernew, Thomas McGuire, Leemore Dafny, and Kosali Simon, to print this document. I am an employee of Counsel Press.

On August 14, 2018, Mr. Swedlow authorized me to electronically file the foregoing Corrected Brief of *Amicus Curiae* Kate Bundorf, Scott Harrington, Mark Pauly, Michael Chernew, Thomas McGuire, Leemore Dafny, and Kosali Simon In Support of Plaintiff-Appellant's Petition for Rehearing En Banc with the Clerk of the Federal Circuit using the CM/ECF System, which will serve e-mail notice of such filing on the following:

Daniel P. Albers
BARNES & THORNBURG LLP
One N. Wacker Drive, Suite 4400
Chicago, IL 60606
312-214-8311
dalbers@btlaw.com

*Counsel for Plaintiff-Appellant*
*Land of Lincoln Mutual Health Insurance*
*Company*

Jonathan Massey
MASSEY & GAIL LLP
1325 G Street NW, Suite 500
Washington, DC 20005
202-652-4511
jmassey@masseygail.com

*Counsel for Plaintiff-Appellant*
*Land of Lincoln Mutual Health*
*Insurance Company*

Scott E. Pickens
BARNES & THORNBURG LLP
1717 Pennsylvania Ave. NW, Suite 500
Washington, DC 20006
202-371-6349
scott.pickens@btlaw.com

*Counsel for Plaintiff-Appellant*
*Land of Lincoln Mutual Health Insurance*
*Company*

Alisa B. Klein
Mark B. Stern
Carleen M. Zubrzycki
UNITED STATES DEPARTMENT
OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530
202-514-2000
alisa.klein@usdoj.gov
mark.stern@usdoj.gov
carleen.m.zubrzycki@usdoj.gov

*Counsel for Defendant-Appellee*
*United States*

Eighteen paper copies will be filed with the Court within the time provided in

the Court's rules.

/s/  Rose E. Olejniczak
Rose E. Olejniczak

August 14, 2018

# EXHIBIT 6

Nos. 18-1023, 18-1028, 18-1038

In the

# Supreme Court of the United States

MAINE COMMUNITY HEALTH OPTIONS, *Petitioner*,

*v.*

UNITED STATES, *Respondent*.

MODA HEALTH PLAN, INC., *et al.*, *Petitioners*,

*v.*

UNITED STATES, *Respondent*.

LAND OF LINCOLN MUTUAL HEALTH INSURANCE
COMPANY, AN ILLINOIS NONPROFIT MUTUAL
INSURANCE CORPORATION, *Petitioner*,

*v.*

UNITED STATES, *Respondent*.

On Writs of Certiorari to the United States
Court of Appeals for the Federal Circuit

# BRIEF OF *AMICI CURIAE* ECONOMISTS
# IN SUPPORT OF PETITIONERS

Stephen A. Swedlow
   *Counsel of Record*
Andrew H. Schapiro
Quinn Emanuel Urquhart
   & Sullivan, LLP
191 North Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
stephenswedlow@quinnemanuel.com

*Counsel for Amici Curiae*

September 6, 2019

291069

i

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

TABLE OF AUTHORITIES...........................................ii

INTEREST OF *AMICI CURIAE* ...............................1

SUMMARY OF ARGUMENT....................................1

ARGUMENT ............................................................3

I.   Private Firms Make Decisions by
     Assessing the Costs and Benefits of
     Their Actions.....................................................3

II.  One of the Government's Primary Tools
     for Achieving Policy Objectives is to
     Influence Firm Behavior Through the
     Use of Financial Incentives............................4

III. The Government Undermines its Ability
     to Use Financial Incentives to Achieve
     Policy Objectives by, After the Fact, Not
     Paying the Amounts it Promised....................7

CONCLUSION...........................................................9

ii

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Moda Health Plan, Inc. v. United States,*
  892 F.3d 1311 (Fed. Cir. 2018).......................2

*Moda Health Plan, Inc. v. United States,*
  908 F.3d 738 (Fed. Cir. 2018)........................8

### Rules and Regulations

Sup. Ct. R. 37...............................................................1

### Additional Authorities

Jeffrey Clemens, *Regulatory Redistribution*
  *in the Market for Health Insurance,*
  7(2) AMERICAN ECONOMIC JOURNAL:
  APPLIED ECONOMICS. 109-134 (2015) .............2

John F. Cogan, *et al., The effect of Medicare*
  *coverage for the disabled on the market*
  *for private insurance,* 29(3) J. HEALTH
  ECON. 418-25 (2010) .......................................2

Scott Harrington, *Risk Corridors and Budget*
  *Neutrality,* HEALTH AFFAIRS, (May 14,
  2014) https://www.healthaffairs.org/do/
  10.1377/hblog20140514.038975/full/. .............6

Timothy J. Layton, *et al., Risk Corridors*
  *and Reinsurance in Health Insurance*
  *Marketplaces,* 2(1) AM. J. HEALTH
  ECON. 66-95 (2016) .........................................6

iii

Daniel W. Sacks, *et al.*, *How Do Insurance Firms Respond to Financial Risk Sharing Regulations?  Evidence from the Affordable Care Act,* NBER Working Paper w24129 (July 2019)................7

U.S. DEP'T OF ENERGY, *Electric Vehicles: Tax Credits and Other Incentives,* https://www.energy.gov/eere/ electricvehicles/electric-vehicles- tax-credits-and-other-incentives ....................5

U.S. DEP'T OF JUSTICE, *The False Claims Act: A Primer,* https://www.justice.gov/ sites/default/files/civil/legacy/2011/ 04/22/C-FRAUDS_FCA_Primer.pdf................5

U.S. DEP'T OF THE TREASURY, *Federal Excise Tax Increase and Related Provisions,* https://www.ttb.gov/ main_pages/schip-summary.shtml ................5

U.S. ENVTL. PROT. AGENCY, *Economic Incentives,* https://www.epa.gov/ environmental-economics/economic- incentives#permit ...........................................5

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are distinguished economists and professors of health policy, economics, and management.[2] They occupy prominent positions at preeminent universities and institutions, and are widely recognized as academic experts in health policy and, in particular, the study of regulated health insurance markets. They have no personal stake in the outcome of this case, but have an interest in assisting this Court in understanding the problems that allowing the decision below to stand would create for the government's future ability to incentivize private actors to achieve policy objectives.

## SUMMARY OF ARGUMENT

Regardless of one's views of the Affordable Care Act ("ACA") and the many reforms it brought to the healthcare industry, the government clearly sought through the statute to create new health insurance markets and to incentivize private firms to provide coverage to consumers within those markets. The use of incentives to influence the behavior of private firms and individuals is one of the government's most powerful tools for achieving policy objectives. The government influences behavior through the use of incentives in a wide variety of markets and for a wide variety of purposes, such as encouraging farmers to

---

[1]  Pursuant to Supreme Court Rule 37.6, *amici* state that no counsel for a party authored this brief in whole or in part, and no one other than *amici* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.  All parties have consented in writing to the filing of this brief.

[2]  A list of *amici curiae* is attached as Appendix A.

2

plant certain types of crops, convincing young men and women to join the military, and, as here, encouraging businesses to participate in markets. The ways in which the government creates the incentives for such private action vary, but they include (among others) risk mitigation programs and financial subsidies.[3]

The key to the government's ability to incentivize private actors to achieve the goals of policymakers, however, is the ability of those actors to rely on the government's promises. If, as the decision below permits, the government can use financial incentives to induce private parties to enter and/or more fully participate in a market, but then turn around and not make the payments it promised, the government's ability to influence the behavior of private actors in the same and even different markets in the future will be diminished. As Judge Newman explained succinctly in dissent below, "the government's ability to benefit from participation of private enterprise depends on the government's reputation as a fair partner" but the majority's decision "undermines the reliability of dealings with the government." *Moda Health Plan, Inc. v. United States*, 892 F.3d 1311, 1340 (Fed. Cir. 2018) (Newman, J., dissenting).

---

[3] For example, expansions of publicly financed insurance for low-income, high-cost adults can alleviate problems of adverse selection in private insurance markets by removing high risk consumers from the insurance pool. Jeffrey Clemens, *Regulatory Redistribution in the Market for Health Insurance*, 7(2) American Economic Journal: Applied Economics. 109-134 (2015) and John F. Cogan, R. Glenn Hubbard and Daniel P. Kessler, *The effect of Medicare coverage for the disabled on the market for private insurance*, 29(3) J. Health Econ. 418-25 (2010).

3

To ensure the government's ability to promote and preserve well-functioning markets, it is thus critical that it make good on payments promised in situations like the ACA's risk corridor program, lest it significantly compromise its ability to influence the behavior of firms. This is not only a highly important issue, but also a non-partisan one, as ensuring the credibility of governmental promises bolsters the ability of policymakers across the board to impact markets and related behavior of various stakeholders.

## ARGUMENT

### I. Private Firms Make Decisions by Assessing the Costs and Benefits of Their Actions

Private firms make decisions by assessing the benefits and costs of potential alternatives, generally choosing the course of action which maximizes their economic value. That value depends on anticipated amounts and timing of future cash flows (revenues and expenditures). Very importantly, economic value also depends on the degree of risk (uncertainty) associated with future cash flows and the costs incurred in managing risk. This is especially relevant for insurance firms, which receive an upfront payment, usually referred to as a premium, in exchange for covering a consumer's future health care expenditures for a given period of time. Insurance firms facing greater uncertainty in claim costs require greater amounts of capital to back their promises to pay future claims, raising capital costs and increasing premiums needed to provide coverage.

4

## II. One of the Government's Primary Tools for Achieving Policy Objectives is to Influence Firm Behavior Through the Use of Financial Incentives

From an economic perspective, two of the key functions of government are to set the rules that allow markets to work and to intervene when markets do not function well.   While policy makers and economists may disagree over the merits of particular policies or whether government intervention is desirable in particular situations, there is broad consensus that an essential economic role of government is to influence the behavior of private parties when market outcomes are likely to be inefficient.   For decades, the government has used private citizens' rational self-interest to help spur action to achieve its policy objectives.   For example, there is a long history of the government using subsidies, price supports, and crop insurance to support various types of agricultural production. These programs shape private action by both reducing the risks and increasing the benefits associated with such production.   Other examples of the numerous ways that the government has created incentives for private actors, include, among many others, the deductibility of mortgage interest to encourage people to purchase homes; the use of emission reduction credits and cap-and-trade programs to promote more environmentally-friendly technologies; federal excise taxes on tobacco products to reduce smoking; federal tax credits to promote the adoption of electric vehicles; and financial awards to relators (*i.e.*, "whistleblowers") in successful False Claims Act

5

cases.[4]  In each of these cases, the government uses financial incentives to influence the behavior of individuals or firms by altering the benefits and costs of alternatives.

The government's use of these types of mechanisms is particularly well established and important in the context of health insurance markets. The incentive at issue in this case – the risk corridors program – was designed to accomplish a straightforward and significant goal:  to encourage insurers to participate in the new health insurance marketplaces by offering insurance products to a new population with highly uncertain prospects.  The program did so by reducing the chance that prospective qualified health plan ("QHP") issuers would suffer outsized losses from participating in the ACA's newly expanded individual health insurance markets when the health characteristics and utilization of enrollees (and, thus, the issuers' risk

---

[4]  *See* U.S. ENVTL. PROT. AGENCY, *Economic Incentives,* https://www.epa.gov/environmental-economics/economic-incentives#permit (EPA cap and trade/credits); U.S. DEP'T OF THE TREASURY, *Federal Excise Tax Increase and Related Provisions,* https://www.ttb.gov/main_pages/schip-summary.shtml (federal excise tax);  U.S. DEP'T OF ENERGY, *Electric Vehicles: Tax Credits and Other Incentives,* https://www.energy.gov/eere/electricvehicles/electric-vehicles-tax-credits-and-other-incentives (electric vehicle tax credits); U.S. DEP'T OF JUSTICE, *The False Claims Act: A Primer,* https://www.justice.gov/sites/default/files/civil/legacy/2011/04/22/C-FRAUDS_FCA_Primer.pdf (False Claims Act relator financial awards).

6

profile) were still largely unknown.[5]   The lack of information on previously uninsured enrollees' likely use of health care made it exceptionally difficult for insurers to determine the level of premiums necessary to cover the costs of health care used by potential enrollees.  Significantly, the program also constrained profits in those early years, so that insurers which happened to enroll people who were healthier than predicted would not receive windfalls.  In other words, the program reduced the risk to insurers of entering the new market by reducing the likelihood of both excessive losses and profits due to unanticipated levels of medical costs.[6] This program had precedent in the context of the Medicare Part D prescription drug program, in which the government created similar incentives over a decade ago to encourage private firms to participate in a newly created market for subsidized insurance for prescription drugs for aged and disabled beneficiaries.

By reducing the risk of participating in a newly created market, the government encouraged firms to enter a new market characterized by considerable uncertainty in the risk profile of potential enrollees (and, thus, profitability).  The risk corridors program was only one of a variety of financial incentives created by the ACA intended to influence the behavior

---

[5]   *See* Scott Harrington, *Risk Corridors and Budget Neutrality*, HEALTH AFFAIRS (May 14, 2014), https://www.healthaffairs.org/do/10.1377/hblog20140514.03897 5/full/.

[6]   Using simulation analysis, Layton et al. (2016) demonstrate how risk corridors reduce the risk facing an insurer. Timothy J. Layton, *et al.*, *Risk Corridors and Reinsurance in Health Insurance Marketplaces*, 2(1) Am. J. Health Econ. 66-95 (2016).

7

of both firms and individuals.  Other incentives
included reinsurance, risk adjustment, premium and
cost-sharing subsidies, and the individual mandate.
Taken together, these policies created a complex set of
financial incentives for insurers to navigate as they
evaluated the desirability of participating in the new
market.  While at the time insurers chose whether to
participate in the exchanges and set their premiums
it was unclear whether any given policy would have
either its intended effects or even create unintended
negative consequences, it is indisputable that, when
making these decisions, insurers had every reason to
take into account how each of these policies would
likely affect demand for their products and their risk
pool.  Research demonstrates that insurers did
respond to the incentives created by the risk corridor
program in particular when setting premiums.[7]

### III.   The Government Undermines its Ability to Use Financial Incentives to Achieve Policy Objectives by, After the Fact, Not Paying the Amounts it Promised

The government's ability to create incentives for
private economic action hinges on expectations that
the government will stand behind any financial
promises it makes to the actors whose behavior it
wishes to affect.  This is particularly important when
financial incentives are paid out only *after* the private
actor has committed to behaving in the way the

---

[7]    Daniel W. Sacks, Khoa Vu, Tsan-Yao Huang and Pinar
Karaca-Mandic, *How Do Insurance Firms Respond to Financial
Risk Sharing Regulations?  Evidence from the Affordable Care
Act,* NBER Working Paper w24129 (July 2019),
https://www.nber.org/papers/w24129.pdf (last visited Aug. 28,
2019).

8

government prefers.  In that situation, the private actor takes actions and commits resources based on how the incentives promised by the government affect the benefits and costs of those actions.  If the government fails to honor those commitments, it has induced the private actor to commit to a course of action based on inaccurate information.

If the government proves itself to be an unreliable counterparty, it creates a clear disincentive in the future for private actors to modify their behavior based on government assurances.  Put differently, if the government's promises to pay are unreliable and subject to "bait and switch" behavior—and private actors have limited ability to compel compliance with those promises, such as through litigation like this—then the government's ability to achieve policy objectives through incentivizing private action will be substantially undermined.

This issue is not specific to the Affordable Care Act; it affects the more general ability of the government to incentivize private actors.  As Judge Wallach recognized in his dissent to the denial of the petition for rehearing *en banc*, "[t]he majority's holding casts doubt on the Government's continued reliability as a business partner in *all* sectors."  *Moda Health Plan, Inc. v. United States*, 908 F.3d 738, 747 (Fed. Cir. 2018) (Wallach, J., dissenting) (emphasis added).  If, as the decision below held, the government can legally avoid its payment obligations to private actors after it has already incentivized their market participation through promises to make payments contingent upon particular outcomes, then it will severely compromise its ability to use these types of incentives to achieve policy objectives in the future.  Such a result would remove one of the most powerful

9

tools the government has to affect the nature and direction of the economy.

## CONCLUSION

For the reasons discussed above, in order to preserve a sound system for governments to use financial incentives to influence the actions of private parties – particularly as it involves economic decisions, the Court should reverse the judgment of the court of appeals, to make clear that the government should not be permitted to disavow promises on which private parties relied.

Respectfully submitted,

STEPHEN A. SWEDLOW
*Counsel of Record*
ANDREW H. SCHAPIRO
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 North Wacker Drive
Suite 2700
Chicago, IL 60606
(312) 705-7400
stephenswedlow@
quinnemanuel.com

*Counsel for Amici Curiae*

September 6, 2019

**APPENDIX**

1a

## Appendix A

M. Kate Bundorf, Associate Professor of Health Research and Policy, Stanford University School of Medicine

Scott Harrington, Alan B. Miller Professor of Health Care Management, The Wharton School, University of Pennsylvania

Michael Chernew, Leonard D. Schaeffer Professor of Health Care Policy, Harvard Medical School

Jeffrey Clemens, Associate Professor of Economics, University of California San Diego

Leemore S. Dafny, Bruce V. Rauner Professor of Business Administration, Harvard Business School and Harvard Kennedy School of Government

Darius Lakdawalla, Qunitiles Professor of Pharmaceutical Development and Regulatory Innovation, University of Southern California

2a

Thomas G. McGuire, Professor of Health Economics, Department of Health Care Policy, Harvard Medical School

Mark V. Pauly, Bendheim Professor of Health Care Management and of Business Economics and Public Policy, The Wharton School, University of Pennsylvania

Kosali Simon, Herman Wells Professor, School of Public and Environmental Affairs, Indiana University