**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

HEALTH REPUBLIC INSURANCE
COMPANY,

        Plaintiff,
on behalf of itself and all others
similarly situated,

   vs.

THE UNITED STATES OF AMERICA,

        Defendant.

No.  1:16-cv-00259-MMS
(Judge Sweeney)

**<u>CLASS COUNSEL'S REPLY TO OPPOSITION AND OBJECTION</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      Percentage of the Fund is the Appropriate Approach ........................................................2

II.     Class Counsel's Fee Request is Reasonable ....................................................................5

        A.      Objectors do not address any of the seven reasonableness factors ........................5

        B.      The lodestar cross-check should not reduce the requested fee ...............................7

                1.      Detailed billing records are unnecessary for a cross-check .......................9

                2.      Class Counsel's submissions identify their lodestar ................................10

                3.      The Laffey matrix is no substitute for class counsel's actual hourly
                        rates ...........................................................................................................11

                4.      The implied cross-check multiplier is reasonable here ............................13

                5.      Better results warrant higher multipliers; the best results warrant
                        the highest multipliers..............................................................................14

                6.      The results class counsel achieved are unprecedented in megafund
                        cases, warranting a multiplier on the high end of the spectrum................15

                7.      Objectors' arguments for a lower multiplier ignore the law and
                        facts, and urge perverse incentives for the future ......................................16

                        (a)     Objectors' heavy reliance on *Clean Diesel* demonstrates an
                                unfortunate lack of engagement with the facts of this case ...........19

                        (b)     Class counsel provides evidence of market rates to show
                                what is reasonable, not to argue class members explicitly
                                agreed to 5% ................................................................................19

III.    Conclusion ....................................................................................................................20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbott v. Lockheed Martin Corp.*,
   2015 WL 4398475 (S.D. Ill. July 17, 2015) ............................................................ 10

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*,
   2015 WL 12732433 (C.D. Cal. Dec. 14, 2015) ........................................................ 10

*Bentley v. United of Omaha Life Ins. Co.*,
   No. 2020 WL 3978090 (C.D. Cal. Mar. 13, 2020) ................................................... 11

*Blum v. Stenson*,
   465 U.S. 886 (1984) ................................................................................................... 11

*Conley v. Sears, Roebuck & Co.*,
   222 B.R. 181 .............................................................................................................. 14

*Davis v. J.P. Morgan Chase & Co.*,
   827 F. Supp. 2d 172 (W.D.N.Y. 2011) ...................................................................... 9

*Eley v. D.C.*,
   793 F.3d 97 (D.C. Cir. 2015) .................................................................................... 12

*Entm't Software Ass'n v. Granholm*,
   2006 WL 6306504 (E.D. Mich. Nov. 30, 2006) ....................................................... 12

*Farrell v. Bank of America Corp., N.A.*,
   2020 WL 5230456 (9th Cir. Sept. 2, 2020) .............................................................. 14

*Geneva Rock Prods, Inc. v. United States*,
   119 Fed. Cl. 581 (2015) ......................................................................................... 8, 20

*Gokare v. Fed. Express Corp.*,
   2013 WL 12094887 (W.D. Tenn. Nov. 22, 2013) ................................................... 3, 9

*Gonzalez v. City of Maywood*,
   729 F.3d 1196 (9th Cir. 2013) ................................................................................... 11

*Health Republic Insurance Co. v. United States*,
   129 Fed. Cl. 757 (2017) ................................................................................. 2, 6, 10, 18

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) ......................................................................................... 9, 10, 11

*Hous. Rights Ctr. v. Sterling*,
    2005 WL 3320738 (C.D. Cal. Nov. 1, 2005)........................................................................ 12

*Il Fornaio (Am.) Corp. v. Lazzari Fuel Co.*,
    No. C 13-05197 WHA, 2015 WL 2406966 (N.D. Cal. May 20, 2015)................................... 11

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ............................................................................................... 11

*In re Citigroup Inc. Bond Litig.*,
    988 F. Supp. 2d 371 (S.D.N.Y. 2013)................................................................................... 15

*In re Citigroup Inc. Secs. Litig.*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013)................................................................................... 15

*In re Credit Default Swaps Antitrust Litig.*,
    2016 WL 2731524 (S.D.N.Y. April 16, 2016) ...................................................................... 15

*In re Crocs, Inc. Sec. Litig.*,
    2014 WL 4670886 (D. Colo. Sept. 18, 2014)......................................................................... 9

*In re Doral Financial Corp. Secs. Litig.*,
    No. MDL 1706, ECF No. 107 (S.D.N.Y. July 17, 2007) ...................................................... 14

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    2008 WL 4178151 (S.D. Tex. Sept. 8, 2008) ...................................................................... 15

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    586 F. Supp. 2d 732 ............................................................................................................ 15

*In re Immune Response Sec. Litig.*,
    497 F. Supp. 2d 1166 (S.D. Cal. 2007)................................................................................ 10

*In re Lucent Techs., Inc., Sec. Litig.*,
    327 F. Supp. 2d 426 (D.N.J. 2004) ..................................................................................... 10

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005)................................................................................... 2, 9, 14, 15

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
    2017 WL 1352859 (N.D. Cal. Apr. 12, 2017) ..................................................................... 19

*In re Wells Fargo & Co. Shareholder Deriv. Litig.*,
    445 F. Supp. 3d 508 (N.D. Cal. 2020) ................................................................................. 15

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005).......................................................................... 2, 4, 17

*Kane Cty., Utah v. United States,*
   145 Fed. Cl. 15 (2019) ................................................................................................ 5, 14

*Lahiri v. Universal Music & Video Distribution Corp.,*
   606 F.3d 1216 (9th Cir. 2010) ........................................................................................ 11

*Liqwd, Inc. v. L'Oréal USA, Inc.,*
   CIVIL ACTION NO. 17-14-JFB-SRF (D. Del. Dec. 16, 2019) ............................................ 12

*Longnecker Prop. v. United States,*
   2016 WL 9445914 (Fed. Cir. Nov. 14, 2016) .................................................................. 9

*Moda Health Plan, Inc. v. United States,*
   908 F.3d 738 (Fed. Cir. 2018) ........................................................................................ 18

*Molina Healthcare of California, Inc. v. United States*
   133 Fed. Cl. 14 (2017) .................................................................................................. 18

*New England Carpenters Health Benefits Fund v. First Databank, Inc.,*
   2009 WL 2408560 (D. Mass. Aug. 3, 2009) .................................................................... 14

*Park v. Thomson Corp.,*
   633 F. Supp. 2d 8 (S.D.N.Y. 2009) ................................................................................ 11

*Quimby v. United States,*
   107 Fed. Cl. 126 (2012) ................................................................................................ 2

*Retta v. Millennium Prods., Inc.,*
   2017 WL 5479637 (C.D. Cal. Aug. 22, 2017) .................................................................. 15

*Riverside Cnty. Dept. of Mental Health v. A.S.,*
   Case No. 08-cv-00503-ABC (C.D. Cal. Feb. 22, 2010) .................................................... 13

*Rosenfeld v. U.S. Dep't of Justice,*
   904 F. Supp. 2d 988 (N.D. Cal. 2012) ............................................................................ 12

*Sabo v. United States,*
   127 Fed. Cl. 606 (2016) ................................................................................................ 10

*Smothers v. NorthStar Alarm Servs., LLC,*
   2020 WL 1532058 (E.D. Cal. Mar. 31, 2020) .................................................................. 10

*Stanley v. U.S. Steel Co.,*
   2009 WL 4646647 (E.D. Mich. Dec. 8, 2009) .................................................................. 9

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,*
   2005 WL 1213926 (E.D. Pa. May 19, 2005) .................................................................... 14

*Transweb, LLC v. 3M Innovative Props. Co.*,
    No. 10-cv-04413-FSH (D.N.J. Sept. 24, 2013) ...................................................................... 12

*UM Corp. v. Tsuburaya Productions Co., Ltd.*,
    CV 15-03764-AB (AJWx), (C.D. Calif., Aug. 1, 2018)........................................................... 12

*Welch v. Metro. Life Ins. Co.*,
    480 F.3d 942 (9th Cir. 2007) ................................................................................................. 11

*Yeressian v. Dep't of the Army*,
    534 F. App'x 968 (Fed. Cir. 2013) ......................................................................................... 12

Class Counsel hereby responds to the one substantive objection submitted by counsel for Kaiser and United.  The objection stakes out a surprisingly hostile position based on the erroneous premise that lodestar is the only appropriate measure here, and that the Court should somehow view (and treat) Class Counsel's fee request as antagonistic to a class that chose it as counsel and trusted it to pursue their interests doggedly at every turn, which it undoubtedly did. We respectfully submit that the request for a 5% fee award, to which the vast majority of the class has not objected,[1] is fully warranted.  As discussed below and in the Petition, there is no reasonable dispute that Class Counsel: originally pioneered and developed the case theory, filed the class complaint months before any other plaintiffs filed their complaints copying Class Counsel's theory of recovery, willingly assisted other counsel to help individual plaintiffs file their own complaints (which largely repeated Class Counsel's complaint), diligently pursued this claim for over four years while helping to manage all the individual cases that adopted the class complaint theory, put all class members on notice prior to opting in that class members may pay 5% in attorney's fees to Class Counsel, and ultimately obtained a judgment for 100% of the amount sought under the claim, totaling $3.7 billion in total judgments.  There also is no dispute that Class Counsel created the game plan and path for an additional $8 billion in value for other plaintiffs who filed their own claims often with the willing assistance of Class Counsel.

The substance of the objection boils down to one simple complaint – the objectors do not want to pay 5% of their full recovery (netting them 95% of the claim) and would rather pay one fifth of one percent, which is less than the actual hourly amount incurred by Class Counsel.  For the reasons stated below, this objection should be disregarded by the Court because the requested fee of 5% is, in fact, reasonable under all the factors this Court uses to assess the reasonableness

---

[1]   Nearly 90% of the approximately 70 organizations with plans in the class, representing $2.1 billion in damages, do not object.

of such an award, including the lodestar cross-check.  The objectors' attempt to turn this into a lodestar-only, fee-shifting analysis does not change that conclusion, particularly due to their failure to actually address the reasonableness factors in any way.

## I.      Percentage of the Fund is the Appropriate Approach

The objection's central premise is that the lodestar cross-check is not just a reasonableness check, or one factor among many to be considered, but instead the *only* factor that matters.  Objectors ignore that the class notice expressly informed potential class members that counsel would seek compensation as a percentage of the recovery, with lodestar used as a cross-check—not as the *only* relevant consideration.  *Health Republic* Dkt. 50-1; *Common Ground* Dkt. 32-1.  Knowing that class counsel would seek a percentage of the fund up to 5%, objectors chose to opt in.  It is objectors, and not class counsel, who seek to evade the import of the class notice by insisting that the Court adopt a lodestar-only approach.  *See Quimby v. United States*, 107 Fed. Cl. 126, 134 (2012) (binding opt-in class members to disclosed fee arrangement).

Even if objectors had not assented to the percentage-of-the-fund approach, courts overwhelmingly recognize that approach as the preferred method in common fund cases.  Only 12% of courts still employ the lodestar approach.  Fitzpatrick Dec. ¶ 14 (Dkt. 84-2).  Although objectors cite a single case for the proposition that the lodestar method is appropriate in megafund cases (Obj. at 18-19), the overwhelming majority of megafund cases use the percentage-of-the-fund approach.  Fitzpatrick Supp. Dec. ¶ 4 (Ex. 3).  And they do so for good reason.  The percentage approach is "favored in common fund cases because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005).  The percentage method also "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *In re WorldCom, Inc.*

*Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005).  By contrast, the lodestar method "creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits.'"  *Id.* (internal quotation marks omitted); *see also Gokare v. Fed. Express Corp.*, 2013 WL 12094887, at *3 (W.D. Tenn. Nov. 22, 2013) ("[T]he lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation and creates inherent incentive to prolong the litigation.") (quotation marks omitted).

The objection illustrates the failures of the lodestar approach and the benefits of the percentage method.  Objectors' position is that the Court should employ a lodestar method to award class counsel less than the cost of the actual time it spent on these matters.  That would create the exact sort of *dis*incentives the percentage-of-the fund approach avoids.  In objectors' world, class counsel who innovate and doggedly pursue claims to maximize returns for class members should, at best, expect to receive a fraction of their typical hourly rate, and only if they pull off an improbable victory.  If they do not, they should expect to receive nothing.  Faced with such an *ex ante* opportunity, no competent counsel would bring a case like this as a class action. Instead, they would simply choose to pursue work paid by the hour, where there is little if any risk of non-payment, or would pursue only individual contingency actions with a fixed fee percentage.  *See* Fitzpatrick Supp. Dec. ¶ 3.

As an example, Quinn Emanuel's engagement agreements with Health Republic and Common Ground provide for a 25% attorney's fee.  Swedlow Dec. ¶ 8 (Dkt. 84-1).  If the terms of the fee agreements were applied to Health Republic and Common Ground's recoveries in these matters, Quinn Emanuel would receive $28.6 million for representing just two entities. Objectors' position is that the Court should employ the lodestar method to slash counsel's fee by

75% *because* it represented 180 entities instead of two, and because it obtained a judgment orders of magnitude larger than those two entities' individual claims.  That certainly is no way to structure incentives.  *See, e.g.*, *WorldCom*, 388 F. Supp. 2d at 359 ("[T]o attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.").

Indeed, employing objectors' approach would directly disadvantage them and all those like them in the future.  When United and Kaiser opted in, they did so because, *inter alia*, that allowed them to pursue their risk corridor claims without bringing a lawsuit against the federal government, one of their biggest sources of revenue as administrators of Medicare and Medicaid plans.  Their objection, while denigrating and mischaracterizing Class Counsel's role and responsibility in developing and pursuing the theory *it* originally pioneered, cannot credibly criticize the Quinn Emanuel's quality as class counsel.  Kaiser, for its part, has hired Quinn Emanuel several times over many years for other complex litigation.  And United specifically solicited Class Counsel to pitch for other unrelated contingency cases after choosing to opt into this case, based upon the quality of representation in this case.  Swedlow Supp. Dec. ¶ 7 (Ex. 2).

Both objectors sought and received regular advice from Class Counsel on sensitive issues specific to their unique circumstances and goals.  Both objectors were given the opportunity through Class Counsel to participate in the parallel litigations and appeals.  Both were directly aware of the significant substantive role Class Counsel played in advising, mooting, substantively editing briefs in other cases, and influencing strategy in all the individual cases and appeals.  Both objectors are sophisticated large entities with over $80 billion and $240 billion in annual revenues who chose to opt in after being informed of the fee expectations and after specifically exploring alternative counsel options.  United specifically stated it considered hiring

counsel to file an individual claim both on an hourly basis and on contingency, but chose instead to opt into this class. Swedlow Supp. Dec. ¶ 9. United sought to actively participate in settlement discussions with the government without being a named plaintiff in a filed case against the government, because the government is and was United's biggest client. Same for Kaiser. *Id.* Both got what they bargained for, but now object to the fee petition in an obvious (and economically rational, albeit legally unsupportable) attempt to further increase revenue.[2]

If objectors get their way, it is hard to imagine why future class counsel will be incentivized to provide the arrangement that allows entities like United and Kaiser to satisfy all of their aims. The Court should reject objectors' effort to impose—contrary to the class notice— a widely-rejected lodestar approach that would signal to competent counsel that they should avoid representing classes in the Court of Federal Claims.

## II.   Class Counsel's Fee Request is Reasonable

### A.   Objectors do not address any of the seven reasonableness factors

Objectors' lodestar-only approach wholly fails to account for the seven factors almost universally used in this court when determining the reasonableness of a fee request: (1) the quality of counsel; (2) the complexity and duration of litigation; (3) the risk of non-recovery; (4) the fee that likely would have been negotiated between private parties in similar cases; (5) any class member's objections to the settlement terms or fees requested by class counsel; (6) the percentage applied in other class actions; and (7) the size of the award. *See, e.g., Kane Cty., Utah v. United States*, 145 Fed. Cl. 15, 18 (2019). There is a reason that objectors almost

---

[2]   Indeed, during the objection period, Class Counsel was contacted by counsel for joining objector CareFirst, who attempted to negotiate a lower attorney's fee either for the class or for CareFirst individually. Swedlow Supp. Dec. ¶ 13. Class Counsel informed CareFirst that the Court must decide a reasonable attorney's fee for the class, and not for individual class members. *Id.*

entirely ignore the applicable legal standard: every factor supports the reasonableness of class counsel's fee request. *See generally* Petition at 9-28.

A brief summary of the factual background surrounding the supplemental notice may assist in demonstrating that 5% is fair and reasonable for all class members. In the days before it filed the supplemental notice motion with this Court, Class Counsel learned from other outside counsel and potential class members that other firms were signing up clients to pursue this exact claim in individual actions at contingencies of 15% and more, based in part upon the supposition that Class Counsel would seek and receive 33% of any recovery. In fact, the day before it filed the supplemental notice motion, Class Counsel met in person with several lawyers, including Frank O'Loughlin and Cindy Oliver of Lewis Roca, who represented QHP issuers that were deciding whether to opt into *Health Republic*. One of those entities, Colorado Health Insurance Cooperative, Inc. ("Colorado") was considering hiring Crowell & Moring, a respected law firm that ultimately did represent many QHP issuers in individual Risk Corridors cases all filed months and years after *Health Republic*. Mr. O'Loughlin requested the meeting with Class Counsel to assess their skill and to advise his clients whether to opt into the class. Later that same day, Class Counsel confirmed with other potential class members, including Common Ground, that contingency firms including Crowell were proposing terms for individual representations far in excess of 5%. As a consequence and based upon the settlement posture of the case at that time, Class Counsel supplemented the notice to self-limit the attorney's fees to 5%, which was objectively below the "market" contingency rate. Even after the supplement, Crowell was unwilling to reduce its contingency to 5%. Joe Holloway, Receivership Supervisor for Colorado, sent Crowell's "best and final" offer to Class Counsel revealing that even after the supplemental notice, the "market" rate for Risk Corridors contingency cases was above 5%. As

a consequence and based upon the recommendation of separate counsel, Colorado opted into this class. *See* Swedlow Supp. Dec. ¶¶ 10-11. This was not a unique or isolated circumstance.

In light of these facts and others set forth in the Petition, Objectors' failure to meaningfully address the factors used by the Court of Federal Claims to assess fee petitions demonstrates that a 5% fee is reasonable. Nearly two-thirds of the class member entities—and nearly 90% of the organizations whose entities opted in—do not object to Class Counsel's fee request.[3] These are sophisticated entities the same as the objectors, and they opted in based on the same notice. Class Counsel communicated with every class member during the objection period, and objecting required only a one sentence email to counsel (like those five organizations and two Kaiser entities submitted). In this context, the substantial number of entities not objecting, and their total recoveries, are significant. Indeed, application of the 5% fee to the non-objecting class members' recoveries alone would result in an award of over $100 million in fees.

### B.     The lodestar cross-check should not reduce the requested fee

The question is not whether the applicable factors favor counsel's fee request—objectors all but concede that they do. Instead, the only question remaining is whether the lodestar cross-check has an effect on the Court's reasonableness analysis. As an initial matter, objectors notably ignore that class counsel was not obligated to subject the fee award in this case to a lodestar cross-check—indeed, a majority of modern common fund cases, including several from this Court, do not use lodestar even as a check. Fitzpatrick Dec. ¶ 29. That class counsel

---

[3]     This case differs from a typical class action suit, wherein a handful objectors seek to protect the interests of the whole class. Each class member in this case is sophisticated and most will receive substantial recoveries from these suits—indeed, some non-objecting organizations are set to receive hundreds of millions of dollars, and scores will receive tens of millions of dollars. These entities can be expected to protect their interests—yet they chose not to join the objection, even though doing so required nearly no resources or effort, and even though Kaiser and United apparently engaged in an organized effort to recruit objectors. *See* Swedlow Supp. Dec. ¶ 13.

nevertheless volunteered to undergo that cross-check does not change what it is—a final check on requested fees, made in light of—not instead of—the actual reasonableness factors.

Objectors mischaracterize the fee request as somehow inconsistent with the supplemental notice relating to attorney's fees. Objectors omit certain facts known to them that render this argument disingenuous. First, at the time of the supplemental notice, Class Counsel was in active settlement negotiations with the government to resolve the entire Risk Corridors liability. Those settlement discussions contemplated substantially full payment of the Risk Corridors claims and would have required substantially complete class participation to be acceptable to the government. The government contemplated the class action as the mechanism to resolve and pay the entire Risk Corridors liability. Swedlow Supp. Dec. ¶ 3. In that context, the supplemental notice identified both the extent of class participation and a lodestar cross check as factors that could have led to a percentage fee substantially lower than 5%, because, if substantially all class members received substantially full recovery, that would have meant $10 billion in settlement proceeds at a time Class Counsel had spent $2 million in lodestar. In that circumstance, a 250 times lodestar multiplier may have resulted in a fee request substantially lower than 5% ($500,000,000). However, another three years passed, two-thirds of eligible class members chose to pursue individual claims or wait to file, and Class Counsel continued to pursue and maintain this claim in the face of decreasing odds of ultimate success. In the end, Class Counsel prevailed. In light of this, the final lodestar cross-check is in no way inconsistent with either the letter or the spirit of the supplemental notice, nor of the fee Class Counsel requests. As the Court of Federal Claims noted in a case cited in the class notice here, "the lodestar cross-check provides information for the court's consideration, not a mandate," and it *does not trump the primary reliance on the percentage of common fund method*." *Geneva Rock Prods, Inc. v.*

*United States,* 119 Fed. Cl. 581, 595-96 (2015) (*rev'd in part on other grounds by Longnecker Prop. v. United States*, 2016 WL 9445914, at *1 (Fed. Cir. Nov. 14, 2016) (emphasis added).

In contrast, objectors' characterization of the cross-check severely misapprehends the nature of that exercise. Those arguments miss the mark in several respects.

### 1.     Detailed billing records are unnecessary for a cross-check

Objectors cite a fee-shifting case, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983), for the proposition that Class Counsel is required to submit detailed billing records in support of a fee request. But this is not a fee-shifting case. Where fee-shifting is at issue, like in *Hensley*, the lodestar method is the sole, *mandatory* method to determine attorney's fees, and detailed records are necessary. But in a common fund case, where the fee request is based on the value class counsel created for the class members paying its fees, courts overwhelmingly prefer the percentage method for the very reason that it "spares the court and the parties the cumbersome, enervating, and often surrealistic process of lodestar computation." *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 184 (W.D.N.Y. 2011).[4] Thus, in conducting the lodestar *cross-check*—as distinct from the lodestar *method*—courts do not require detailed billing records, and instead routinely rely on declarations regarding the applicable lodestar. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306–07 (3d Cir. 2005) ("The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records.").[5]

---

[4] *See also Stanley v. U.S. Steel Co.*, 2009 WL 4646647, at *1 (E.D. Mich. Dec. 8, 2009) ("Use of the percentage method also decreases the burden imposed on the Court by eliminating a full-blown, detailed and time consuming lodestar analysis."); *Gokare*, 2013 WL 12094887, at *3 ("The inefficiency concerns that exist with the lodestar method would be significant here as combing through billing records for more than 9,346 hours of law firm work would require a large and unnecessary expenditure of judicial resources.").

[5] *See also In re Crocs, Inc. Sec. Litig.*, 2014 WL 4670886, at *4 n. 4 (D. Colo. Sept. 18, 2014) ("Because the Court has adopted the percentage method, the lodestar calculation is used

### 2.   Class Counsel's submissions identify their lodestar

Class Counsel provided the number of hours spent on the *Health Republic* and *Common Ground* matters, the hourly rates for associates, partners, and staff, a blended rate for attorneys and staff, and detailed descriptions of the type of work class counsel performed.  *See* Swedlow Dec. ¶¶ 9-11, 18-24.  This work included, but is not limited to, developing the legal theory that ultimately resulted in a $12 billion industry-wide recovery; briefing on multiple dispositive motions; tending to the needs of hundreds of class members, including often-daily inquiries; participating as amicus in multiple appeals; and routinely advising counsel for individual litigants, including the Supreme Court parties.  *See id.*; *see also* Swedlow Supplemental Dec. ¶¶ 5, 12.  Courts routinely rely on declarations of precisely this sort in conducting a lodestar cross-check.  *See, e.g., Smothers v. NorthStar Alarm Servs., LLC*, 2020 WL 1532058, at *8 (E.D. Cal. Mar. 31, 2020); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1176 (S.D. Cal. 2007); *In re Lucent Techs., Inc., Sec. Litig.*, 327 F. Supp. 2d 426, 448 (D.N.J. 2004).[6]  Objectors' demand for granular detail is not consistent with the less-exhaustive lodestar cross-check.

The cases objectors cite are inapposite *fee-shifting* cases, not common fund cases.[7]  Objectors also suggest that "countless common fund cases have reduced hours in a lodestar cross-check based on insufficient billing records," but two of the four cases they cite utilize the

---

only for comparison purpose. . . . Thus, the Court will not undertake an exhaustive lodestar analysis."); *Abbott v. Lockheed Martin Corp.*, 2015 WL 4398475, at *3 n.1 (S.D. Ill. July 17, 2015) ("The Court may rely on summaries submitted by attorneys and need not review actual billing records.")

[6]   If the Court believes further detail is necessary, Class Counsel is of course willing to supplement its submissions as directed by the Court.

[7]   *See* Objection at 8-9 (citing *Hensley v. Eckerhart*, 461 U.S. 424 (1983); *Sabo v. United States*, 127 Fed. Cl. 606, 636 (2016); and *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 2015 WL 12732433, at *40 (C.D. Cal. Dec. 14, 2015).

lodestar *method*, not a lodestar *cross-check*,[8] and the other two cases, in turn, relied exclusively on authority from fee-shifting and lodestar *method* cases.[9]   In other words, these two outlier courts made the same mistake as objectors, failing to differentiate between instances where lodestar is the sole relevant factor and those where it is used only as a check.   The unfortunate reality is that objectors, through lawyers who have never sought to vindicate the objectors' risk corridors rights, are treating Class Counsel as if they are opposing counsel.   Objectors get this case backward—the law rewards, not punishes, class counsel who obtain extraordinary results.

### 3.  The Laffey matrix is no substitute for class counsel's actual hourly rates

Extending their fee-shifting theme, objectors argue the Court must assess whether class counsel's "requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Objection at 11 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)).   The irony of the argument is that class counsel *did* provide exactly such evidence:   many different attorneys offered risk corridor claim representation on contingency, but all were higher than the 5% class counsel requests.

Where objectors next err is by asking the Court to reduce class counsel's fee because its rates are higher than those found on the Laffey matrix.   The Laffey matrix is a chart the Department of Justice created to help courts make determinations in fee-shifting cases against the government that purportedly reflects rates for counsel in the Washington, D.C. market.

---

8   *See* Objection at 9 (citing *Park v. Thomson Corp.*, 633 F. Supp. 2d 8 (S.D.N.Y. 2009), and *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1222 (9th Cir. 2010)).

9   *See* Objection at 9 (citing *Bentley v. United of Omaha Life Ins. Co.*, No. 2020 WL 3978090 (C.D. Cal. Mar. 13, 2020); and *Il Fornaio (Am.) Corp. v. Lazzari Fuel Co.*, No. C 13-05197 WHA, 2015 WL 2406966, at *4 (N.D. Cal. May 20, 2015)).   The relevant portions of *Bentley* relied on *Hensley*, *Gonzalez v. City of Maywood*, 729 F.3d 1196 (9th Cir. 2013), and *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945 (9th Cir. 2007), all fee shifting cases.   *Il Fornaio* relied exclusively on *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 944 (9th Cir. 2011), a case which considered the district court's use of the lodestar *method*.

Courts, however, have repeatedly found that the Laffey matrix—which is based on rates from decades ago, adjusted for inflation, but not actual current analyses—is out of step with the actual market for sophisticated legal counsel.[10]

The Federal Circuit has furthermore noted that "the Laffey Matrix is imprecise and is merely a guide." *Yeressian v. Dep't of the Army*, 534 F. App'x 968, 971 (Fed. Cir. 2013).  And even the D.C. Circuit has noted that the matrix is "crude," and that litigants should supplement it with "other evidence such as" surveys and affidavits reflecting market rates.  *Eley v. D.C.*, 793 F.3d 97, 101 (D.C. Cir. 2015).  Class counsel did just that, with public data and surveys identifying the rates class counsel's peer firms charge—including Kirkland & Ellis, whose participation in risk corridor litigation objectors tout.  Silver Dec. ¶ 83-91.[11]  Class Counsel's rates are aligned with the market for top-tier counsel who practice in major metropolitan areas, *id.*, an assessment that comports with the findings of innumerable courts regarding Quinn Emanuel's rates.[12]  Objectors present no contrary evidence, notwithstanding that they are repeat

---

[10] *See, e.g.*, *Rosenfeld v. U.S. Dep't of Justice*, 904 F. Supp. 2d 988, 1003 (N.D. Cal. 2012) (rejecting Laffey matrix where plaintiff "submitted competent evidence showing market . . . substantially exceed the Laffey index"); *Entm't Software Ass'n v. Granholm*, 2006 WL 6306504, at *3 (E.D. Mich. Nov. 30, 2006) (rejecting application of the Laffey Matrix where it proved inconsistent with surveys of attorneys' rates); *Hous. Rights Ctr. v. Sterling*, 2005 WL 3320738, at *2 (C.D. Cal. Nov. 1, 2005) (finding that "rates of up to $1,000 per hour. . . . [are] much more in line with this Court's experience than is the Laffey Matrix").

[11] Objectors ask the court to ignore the opinions of Prof. Silver and Prof. Fitzpatrick, citing to one case each where a court disagreed with them.  Objectors ignore the scores of courts that have relied on their insights, empirical data, and opinions.  *See* Fitzpatrick Dec. ¶ 3; Silver Dec. ¶ 5 (Dkt. 84-3).  Moreover, both experts provide detailed empirical data related to attorney's fees and assess class counsel's request in light of that data.

[12] *See, e.g.*, *See Liqwd, Inc. v. L'Oréal USA, Inc.*, CIVIL ACTION NO. 17-14-JFB-SRF, 25-28 (D. Del. Dec. 16, 2019) (finding that Quinn Emanuel's "hourly rates and [] hours spent [are] reasonable"); Order Granting In Part Defendant Tsuburaya Productions Co. Ltd.'s Motion for Attorney's Fees and Full Costs, *UM Corp. v. Tsuburaya Productions Co., Ltd.*, CV 15-03764-AB (AJWx), (C.D. Calif., Aug. 1, 2018) (ECF No. 350); Report and Recommendation of Special Master, *Transweb, LLC v. 3M Innovative Props. Co.*, No. 10-cv-04413-FSH (D.N.J. Sept. 24, 2013) (ECF No. 567) (Special Master's ruling finding that Quinn Emanuel was a "premier

players in complex litigation who have retained Quinn Emanuel in other contexts and are unquestionably aware of the prevailing rates for sophisticated counsel, including risk corridor counsel.

The Department of Justice also recognizes that the Laffey matrix does not reflect the market for sophisticated counsel, and it has recently hired one of class counsel's experts, Prof. Fitzpatrick, to update the Laffey matrix to reflect current market rates for sophisticated counsel. Fitzpatrick Supp. Dec. ¶ 9.  In fact, the new Laffey matrix will not only include exactly the sort of submissions class counsel made here; it will incorporate *Quinn Emanuel's hourly rates*.  *Id.*

### 4.  <u>The implied cross-check multiplier is reasonable here</u>

Objectors' proposal must be placed in perspective.  Objectors maintain that the Court should apply a .88 lodestar multiplier, resulting in a 0.22% fee award.  A 0.22% percentage of the fund award is lower than any of which class counsel is aware, let alone for counsel that pioneered and doggedly pursued a novel legal theory that resulted in billions of dollars of recovery, representing 100% of damages.  Moreover, objectors ask the court to award an attorney's fee that is far, far less than they would have paid to pursue an individual case on an hourly basis, even though class counsel bore the risk of non-recovery.  For instance, objector SHA LLC asks to pay approximately $35,000 on a $15 million recovery.  Objector Presbyterian, across two entities, asks to pay about $30,000 on a nearly $12.9 million recovery.  It is objectors, and not class counsel, who seek a windfall.

---

litigation firm" and that total fees of $26,146,493.45 were reasonable); Civil Minutes re: Order Granting Motion for Attorneys' Fees, *Riverside Cnty. Dept. of Mental Health v. A.S.*, Case No. 08-cv-00503-ABC (C.D. Cal. Feb. 22, 2010) (ECF No. 123) (awarding full amount of attorneys' fees sought for work performed by Quinn Emanuel).

**5.**      **Better results warrant higher multipliers; the best results warrant the
highest multipliers**

The thrust of the objection is that class counsel's 5% fee request is unreasonable because courts typically apply lodestar multipliers lower than the one implied by the request.   Class counsel does not deny that the multiplier implied by its request is at the high end of the range courts approve.   The circumstances and results of this case, and the reasonableness factors to which the objectors do not respond, all show why that multiplier is reasonable.

As an initial matter, courts—including the Court of Federal Claims—have repeatedly approved large lodestar multipliers. *See* Pet. at 30-31 (identifying cases with awards involving lodestar multipliers as high as 66).[13]   Moreover, because courts are not required to conduct a lodestar cross-check when awarding fees in a common fund case, many class counsel simply do not submit summaries of their lodestar unless they believe it helps them.   Fitzpatrick Supp. Dec. ¶ 6.   Thus, all else being equal, class counsel whose lodestar implies a relatively low multiplier are more likely than their high multiplier peers to highlight their lodestar in a fee application.  *Id.* This selection bias, however, means that the data provided to courts skews *low* in terms of implied multipliers.  *Id.* That is yet another reason a cross-check cannot and should not trump a full reasonableness analysis, and why objectors err in suggesting otherwise.

---

[13]    *See also Kane Cty., Utah v. United States*, 145 Fed. Cl. 15, 20 (2019) (6.13 multiplier, and collecting cases approving or referencing approved multipliers between 5.39 to 19.6); *Farrell v. Bank of America Corp., N.A.*, 2020 WL 5230456 (9th Cir. Sept. 2, 2020) (10.15 multiplier); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (8.3 multiplier); *In re Doral Financial Corp. Secs. Litig.*, No. MDL 1706, ECF No. 107 (S.D.N.Y. July 17, 2007) ("A 15.25% fee represents a reasonable multiplier of 10.26."); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (15.6 multiplier); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736 n.44 (E.D. Pa. 2001) (lodestar multiplier of 4.5-8.5 was "unquestionably reasonable"); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 182 (8.9 multiplier).

**6.      The results class counsel achieved are unprecedented in megafund cases, warranting a multiplier on the high end of the spectrum**

Class Counsel's performance and forthrightness warrants its requested fee.   Class Counsel pioneered and pursued a legal theory that resulted in a $12 billion industry-wide recovery—including $3.7 billion in these cases—representing a 100% recovery.   A complete recovery renders this case unique among megafund cases, which often award high lodestar multipliers for recoveries that represent only a small fraction of the class's actual damages. Objectors' notion that the lodestar multiplier should be the same in a case with a settlement with a 20% recovery as it is in a case with a 100% recovery is misguided, unfair, and would create perverse incentives for future class actions.   *See, e.g.*, *Rite Aid*, 146 F. Supp. 2d at 736 n.44 (if lodestar multiplier does not increase where counsel obtains abnormally good results, "the lodestar approach begins to dominate and supersede the percentage of the recovery formula").

Indeed, while objectors cite numerous cases involving lower multipliers, they never account for the recovery relative to the class's damages in those cases.   Many of the cases objectors cite clearly address cents-on-the-dollar recoveries.[14]   Likewise, megafund cases almost never approach even a 50% recovery, let alone the 100% recovery class counsel achieved here.[15] In each of those cases, had counsel achieved the same sort of total recovery achieved here, and

---

[14]   *See, e.g., Retta v. Millennium Prods., Inc.*, 2017 WL 5479637, at *12 (C.D. Cal. Aug. 22, 2017) (approving a 3.5 lodestar multiplier on a 22% recovery); *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 379 (S.D.N.Y. 2013) (applying a 1.34 multiplier to a 24%  recovery); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2008 WL 4178151, at *6 (S.D. Tex. Sept. 8, 2008) (noting the class obtained a roughly 16% recovery of $7.2 billion out of $44 billion in potential damages); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 787-80 (approving a 5.2 multiplier).

[15]   *See, e.g., In re Wells Fargo & Co. Shareholder Deriv. Litig.*, 445 F. Supp. 3d 508 (N.D. Cal. 2020) (approving a 2.7 multiplier on a 6.9 to 9.6 percent recovery); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *8, *16 (S.D.N.Y. April 16, 2016) (awarding multiplier of 6 on a 15 to 23% recovery of Plaintiffs' estimate of $8–$12 billion in damages); *In re Citigroup Inc. Secs. Litig.*, 965 F. Supp. 2d 369, 401 (S.D.N.Y. 2013) (2.8 multiplier on a 9% recovery).

had the lodestar multiplier increased commensurately, the multiplier would have neared or substantially exceeded the multiplier implied by class counsel's request in these cases. Class counsel's unprecedented 100% recovery thus justifies a lodestar multiplier well in excess of the run-of-the-mill megafund case, where the class recovers just a sliver of its losses.[16]

### 7.   Objectors' arguments for a lower multiplier ignore the law and facts, and urge perverse incentives for the future

Objectors assert three reasons they believe a high multiplier is inappropriate. None actually support such a notion.

*First*, objectors argue (at 14) that a low multiplier is warranted because this case did not involve extensive discovery. But that gets the cross-check and multiplier analysis wrong. It also ignores the proposition for which the cases objectors cite stand. The second reasonableness factor, the complexity and duration of the litigation, acts as a basis to support higher multipliers, because the harder class counsel works for the class, the more they should be rewarded, in order to align incentives in that and future cases. *See* Pet. at 16-17 (collecting cases). Discovery is often, but not always, one of the hallmarks of such work. *See* Objection at 14 (collecting cases). However, the lack of discovery in a case, like this one, where much of the record was already public and liability hinged on poring over that detailed public record and making nuanced legal arguments should not have a negative effect on class counsel's fees; otherwise, class counsel would be disincentivized from bringing important legal interpretative cases in the future just because they do not likely involve "discovery" that will push up lodestar unnecessarily. Further,

---

[16] Objectors devote a section of their brief to cherry-picking cases cited in class counsel's motion for the uncontroversial proposition that fee awards of 30-40% are commonplace, and pointing out that some of these cases featured low lodestar multipliers. Obj. at 19-20. But objectors miss the point: a lodestar cross-check, if it's applied, should be more rigorous where counsel ask for 40% of the recovery because class members' collection would be dramatically lower as a result. Not so where counsel asks for just 5% of the recovery.

calculating lodestar multipliers as Objectors appear to propose—applying a *higher multiplier* where discovery and motion practice already result in a *higher lodestar*—would doubly reward counsel based on the hours billed, rather than the results obtained. This is precisely the backward approach that the percentage-of-the-fund approach was meant to avoid. *See, e.g., WorldCom*, 388 F. Supp. 2d 319, 355 (lodestar method "tempts lawyers to run up their hours").

*Second*, objectors argue (at 20) that the court should lower class counsel's fee award because it obtained substantial class participation, and the class notice suggested high levels of participation could lead to an attorney's fee below 5%. But as explained above, when the notice was drafted, class counsel contemplated the possibility an early settlement with the government, for nearly full amounts, and with nearly full participation from all potential class members—a scenario that would have resulted in a lodestar multiplier of approximately 250. *See* Swedlow Supp. Dec. ¶ 3. Had that settlement occurred, the lodestar cross-check may have thus provided a substantially different picture when assessing the reasonableness of a 5% award (on a $10 billion recovery). But that is not what happened. The class represents one-third participation, the risk corridors cases were litigated to judgment, and class counsel's lodestar increased substantially over the years to account for its continued pursuit of the claims, even when this case was partially stayed. In *this* scenario under *these* facts, the 5% counsel requests is justified and reasonable under the factors actually required by the law, which objectors do not address.

*Third*, objectors suggest (at 5-6, 19-20) that Class Counsel did not meaningfully contribute to the class's recovery. Objectors' suggestion is specious. Class Counsel was, by several months, the first to file a risk corridors case, and developed the Tucker Act legal theory that prevailed at the Supreme Court. Months after Class Counsel filed suit, other law firms filed copycat suits, including the cases that reached the Supreme Court. Many of those copycats—

including Moda, a Supreme Court party—were averse to filing suit, and only chose to do so after Class Counsel paved a viable path to victory.  It is no exaggeration to say that the risk corridor litigation and recovery may never had happened if Class Counsel not filed *Health Republic*.  And Class Counsel was never territorial: it regularly advised counsel for individual litigants, recognizing that a rising tide lifted all boats.  Swedlow Dec. ¶¶ 9, 18, 22.

In addition to pioneering the risk corridors claim, Class Counsel likewise filed the first brief on the merits of the theory, when it responded to the government's motion to dismiss in *Health Republic*.  This Court subsequently made the first favorable substantive ruling for any risk corridors plaintiff when it largely denied the motion to dismiss.  *See Health Republic Insurance Co. v. United States*, 129 Fed. Cl. 757 (2017).  Judge Wheeler's subsequent opinion granting plaintiffs summary judgment in *Molina Healthcare of California, Inc. v. United States*—which objectors tout as a milestone in risk corridors litigation—cites this Court's *Health Republic* opinion repeatedly, noting that it "remain[ed] the most thorough and instructive discussion of the Government's ripeness arguments."  133 Fed. Cl. 14, 30 (2017).  When, by happenstance, other later filed cases proceeded to Federal Circuit faster than *Health Republic*, Class Counsel provided input with respect to the appeals, attended and participated in moot arguments, and submitted amicus briefs.  Class Counsel's amicus briefs were extensively cited by Judge Wallach in his dissent from denial of *en banc* rehearing, which increased the likelihood that the Supreme Court would grant certiorari.  *See Moda Health Plan, Inc. v. United States*, 908 F.3d 738, 747-48 (Fed. Cir. 2018) (Wallach, J., dissenting from denial of *en banc* rehearing).

Class Counsel likewise participated as other law firms presented its legal theory and arguments to the Supreme Court, again providing input and submitting amicus briefs.  Objector United affirmatively recognized that Quinn was guiding the individual cases, as it sent an email

to Class Counsel indicating that "Quinn has worked closely with [counsel for Moda] throughout the life of these respective cases."  Swedlow Supp. Dec. ¶ 5.  It thus is no surprise that after entry of judgment in *Health Republic*, counsel for one of the largest contingents of QHPs contacted Class Counsel to say that its "class action was a bold and unprecedented move."  *Id*. ¶ 5.

(a)  Objectors' heavy reliance on *Clean Diesel* demonstrates an unfortunate lack of engagement with the facts of this case

Objectors' reliance on the auto dealer *Clean Diesel* case is particularly jarring.  In that case, the court applied a lodestar approach to a megafund settlement directly resulting from a different settlement in an earlier related case brought by different counsel for a different category of plaintiffs (consumers).  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 1352859, at *2 (N.D. Cal. Apr. 12, 2017).  *This* case presents the exact opposite scenario:  other firms and individual risk corridor litigants benefitted from Class Counsel's legwork and legal theory, not vice versa.   The core of objectors' position is thus that class counsel's requested fees should be slashed by 95% because copycat cases proceeded to appeal first, mainly because of the opt-in period in which objectors chose to join the class.  It is difficult to imagine a stronger disincentive to bringing novel, but valuable, class claims.

(b)  Class counsel provides evidence of market rates to show what is reasonable, not to argue class members explicitly agreed to 5%

Finally, objectors misrepresent (at 20-21) class counsel's position with respect to the class notice.  Objectors say that they did not agree to a 5% fee by opting in, but class counsel has never contended that class members had a binding contract to pay a 5% fee.[17]  What class counsel pointed out—and what is true—is that all class members had fair warning that they may

---

[17]   As noted above, objectors (and all other class members) did assent to use of the percentage-of-the-fund approach when they opted in, as the class notice expressly represented that Quinn Emanuel would seek fees as a percentage of the recovery, subject to a lodestar *cross-check* (not the lodestar *method*).  *See supra* § I.

pay a 5% attorney's fee and they chose to opt in anyway, and that numerous class members were told to anticipate that Quinn Emanuel would seek a 5% attorney's fee.[18]  Pet. at 23-24.  Class members could have investigated other options, and many did, but they chose to opt in because Quinn Emanuel's offer represented the best deal available to them on the market.  As discussed above, United in particular is an example of this.  Swedlow Supp. Dec. ¶ 9.

Just like United, all of the objectors are sophisticated entities with in-house legal departments who were not in any sense misled by the notice.  If objectors truly believe that the market presented superior alternatives, any them could have submitted a declaration to that effect.  Instead, objectors remain silent about what their expectations were, and what alternatives they had available.  The evidence is thus unrebutted that they had no obligation to opt in, knew they had other options for counsel, knew Class Counsel might seek up to 5%, and, in light of these facts, were not only comfortable with the possibility, but chose it as their perceived best option.

In short, the record amply supports a 5% attorney's fee and the associated lodestar multiplier.  Under these circumstances, employing the lodestar cross-check to diminish class counsel's requested fee award would allow the tail to wag the dog, improperly subordinating every other relevant factor to the lodestar.  *Geneva Rock Prods.*, 119 Fed. Cl. at 594.

### III.  <u>Conclusion</u>

For all the foregoing reasons, Class Counsel respectfully believes a 5% attorney's fee—on the lowest end of percentage fees typically approved in class litigation—is fully warranted.

---

[18]     Objectors oddly suggest that class counsel's representations to class members are "pure inadmissible hearsay," but even if the hearsay rule applied to these fee petition proceedings,  counsel's representations are offered to show notice to class members, not the truth of the matter asserted.

Dated: September 3, 2020                    Respectfully submitted,

                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP

                                            */s/ Stephen Swedlow*
                                            Stephen Swedlow
                                            stephenswedlow@quinnemanuel.com
                                            191 North Wacker Drive
                                            Suite 2700
                                            Chicago, Illinois 60606
                                            Telephone:  (312) 705-7400
                                            Facsimile:  (312) 705-7401

                                            J.D. Horton
                                            jdhorton@quinnemanuel.com
                                            Adam B. Wolfson
                                            adamwolfson@quinnemanuel.com
                                            865 S. Figueroa Street
                                            Los Angeles, California 90017
                                            Telephone:  (213) 443-3000
                                            Facsimile:  (213) 443-3100

                                            *Attorneys for Plaintiff Health Republic*
                                            *Insurance Company and the Class*