# Exhibit 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

*Health Republic Insurance Co, v. United States*

No. 16-259C

*Common Ground Healthcare Cooperative v. United States*

No. 17-877C

**SUPPLEMENTAL DECLARATION OF BRIAN T. FITZPATRICK**

1.  I submitted a declaration in support of class counsel's fee requests in these matters on July 30, 2020. I now submit this supplemental declaration to respond to the objection filed by Kaiser Foundation Health Plan et al. Nothing in the objection has caused me to change my opinion that class counsel's fee requests are reasonable.

2.  The objectors asserted that courts have "rejected" my opinions as a fee expert. *See* p.3 n.6. But, as I noted in footnote 1 of my initial declaration, dozens of courts have relied on my opinions and my scholarly work to award fees in class actions. Although, of course, not every court has agreed with me every single time, the vast majority of courts have—even in the face of contrary expert opinions, *see, e.g.*, *Tennille v. W. Union Co.*, 2014 WL 5394624, at *2 (D. Colo. Oct. 15, 2014) ("I am persuaded by Mr. Fitzpatrick's concise and well reasoned analysis and expertise that Class Counsel's fee request is both reasonable and appropriate."). Furthermore, no court has ever said that I was unqualified to opine as an expert on this subject. As I noted in my initial declaration, I am the author of the most comprehensive empirical study that has ever been published of fee awards in class actions, and the topic continues to be a large focus of my academic work.

3.      In a book I published last year with the University of Chicago Press, I described an unfortunate and counterproductive approach to fee awards that I see reflected in the objectors' arguments:

> Now, if you were a class member who had been swindled . . . and you had to decide how to pay the class's lawyer, how would you do it? Maybe if you were doing it at the end of the case, you would think to yourself, Well, the lawyer has already recovered all this money for me, so perhaps I should give him as little as possible so I can keep as much as possible for myself! That would be perfectly rational until you were swindled the next time and couldn't find a lawyer to represent you because the lawyer knew what you would do at the end of the case.

Brian T. Fitzpatrick, THE CONSERVATIVE CASE FOR CLASS ACTIONS 91 (2019). In particular, the objectors—who opted into the class with the understanding from the notice that class counsel intended to request a percentage of any common fund—want the court to use the lodestar method instead, but to do so after reducing class counsel's hours by 35%, after reducing class counsel's hourly rate by 35%, and then applying a multiplier of only 2.0. *See* pp.8-11, 17-22. This would end up paying class counsel a fee equal to 84.5% of their lodestar (0.65 * 0.65 * 2 = 0.845). This means that class counsel would have taken this case and worked on it *for years* with no guarantee they would get anything, win it spectacularly by *recovering 100% of damages*, only to be rewarded with a fee equal to *less* than they would have earned if they had *not* taken the case and instead simply billed their clients by the hour every month on other matters during all this time. Needless to say, no rational lawyer would have taken that deal if it had been offered to them at the outset of this case. As I note in the above quotation from my book, it is perfectly rational, if shortsighted, for the objectors to try to push that deal on class counsel now. But the great majority of courts shaping the law on class counsel fee awards over the years have made clear they should not engage in that sort of short-term, biased-by-hindsight thinking. We will not have much of a class action system if lawyers work for years at great financial risk and with no guarantee of success only to

receive less than their hourly rates at the end in the cases in which they are successful. In order to induce lawyers to take class action cases and to invest in them to the fullest, we have to think about fees **_ex ante_**—i.e, what would the class and class counsel have agreed upon had they had the opportunity to bargain over fees at the outset? It is obvious that "nothing if you lose and 84.5% of the value of your time if you win" does not satisfy that test.

4.   So what *would* satisfy that test? From everything I have reviewed in connection with these cases, it remains my opinion that the 5% class counsel requests is a more than reasonable estimate. As I noted in my initial declaration, sophisticated clients who hire lawyers on contingency use the percentage method and not the lodestar method. *See* ¶ 15. In this case, in fact, Health Republic and Common Ground each hired Quinn Emanuel to represent them on a straight contingency (of 25%) if the action did not proceed as a class action. Moreover, even in the biggest cases, sophisticated clients pay their lawyers much larger percentages than class counsel have requested here. *See id*. at ¶ 22. Further, what is true of sophisticated clients is true of judges. In my initial declaration, I set forth a table with every billion-dollar class action case of which I am aware. In Table 1, below, I recreate that list but expand it to include the fee method used by the court. As the Table shows, even in billion-dollar cases, judges almost never use the lodestar method; the objectors' focus on the *Volkswagen Diesel Engine* case to the contrary is an *extreme* outlier.[1] Finally, as the Table below also shows, when judges use the percentage method

---

[1] The objectors also ignore that this settlement on behalf of Volkswagen dealers followed a settlement earlier the same year in a virtually identical consumer case (see the second row in the Table). The consumer case used the percentage method when awarding class counsel fees, but the judge was concerned the lawyers in the follow-on dealer case would reap a windfall if he did the same for them. Needless to say, this is not follow-on litigation.

even in billion-dollar cases, the vast majority of awards are greater than the 5% requested by class counsel here.

**Table 1: All federal class action settlements greater than or equal to $1 billion**

| Case | Settlement Amount | Fee Method | Fee Percentage |
|---|---|---|---|
| BP Gulf Oil Spill (2012) | $13 billion | Percent | 4.3% |
| Volkswagen Diesel Engine (Consumer) (2017) | $10 billion | Percent | 1.7% |
| Enron Securities Fraud (2008) | $7.2 billion | Percent | 9.52% |
| Diet Drugs Products Liability (2008) | $6.4 billion | Percent | 6.75% |
| WorldCom Securities (2005) | $6.1 billion | Percent | 5.5% |
| Payment Card Interchange Fees Antitrust (2014) | $5.7 billion | Percent | 9.56% |
| Visa Antitrust (2003) | $3.4 billion | Percent | 6.5% |
| Indian Trust (2011) | $3.4 billion | Not specified | 2.9% |
| Tyco Securities (2007) | $3.3 billion | Percent | 14.5% |
| Cendant Securities (2003) | $3.2 billion | Percent | 1.73% |
| Petrobras Securities (2018) | $3 billion | Lodestar | 6.2% |
| AOL Securities (2006) | $2.65 billion | Percent | 5.9% |
| Bank of America Securities (2013) | $2.4 billion | Not specified | 6.5% |
| Foreign Exchange Antitrust (2018) | $2.31 billion | Percent | 13% |
| Toshiba Diskette (2000) | $2.1 billion (total) $1 billion (cash) | Both | 7.1% (total) 15% (cash) |
| Toyota Unintended Acceleration (2013) | $1.6 billion (est. total) $757 million (cash) | Percent | 12.3% (total) 26.4% (cash) |
| Credit Default Swaps Antitrust (2016) | $1.87 billion | Percent | 13.6% |
| Prudential Insurance (2000) | $1.8 billion | Percent | 4.8% |
| Household Securities (2016) | $1.58 billion | Percent | 24.7% |
| Syngenta Corn (2018) | $1.51 billion | Percent | 33.33% |
| Volkswagen Diesel Engine (Dealer) (2017) | $1.2 billion | Lodestar | 0.25% |
| Black Farmers Discrimination (2013) | $1.2 billion | Percent | 7.4% |
| Tobacco Antitrust (2003) | $1.2 billion | Lodestar | 5.9% |
| Chinese Drywall (2018) | $1.12 billion | Both | 9.18% |
| TFT-LCD Antitrust (2013) | $1.1 billion | Percent | 28.6% |
| Nortel Securities I (2006) | $1.1 billion | Percent | 3% |
| Nortel Securities II (2006) | $1.1 billion | Percent | 8% |
| Royal Ahold Securities (2006) | $1.1 billion | Percent | 12% |
| Allapattah Contract (2006) | $1.1 billion | Percent | 31.33% |
| Sulzer Hip (2003) | >$1 billion | Both | 4.8% |
| Nasdaq Antitrust (1998) | $1 billion | Percent | 14% |
| NFL Concussion (2018) | ≈ $1 billion | Both | 10.8% |
| N = 32 | | | Low = 0.25% High = 33.33% Avg = 10.18% (total) 10.86% (cash) |

4

| Case | Settlement Amount | Fee Method | Fee Percentage |
|---|---|---|---|
| | | | Med =   7.25% (total) 7.70% (cash) |

5. This brings me to the modified version of the lodestar method that some courts use: the percentage method "crosschecked" by the lodestar. As I noted in my initial declaration, clients who hire lawyers on contingency do not use a lodestar crosscheck because it would give their lawyers terrible incentives—incentives to try to drag cases out or not to care about how big the recovery gets. *See* ¶ 32. Even sophisticated clients who can monitor their lawyers do not want them working on contingency with such incentives. *See id*. Most courts, too, do not use the lodestar crosscheck—and those that do use it only as one of many factors. *See id.* at ¶ 29.

6. But even when the lodestar crosscheck is used, courts must ensure that it does not create the sort of detrimental incentives the percentage of fund method was designed to avoid in the first place. If the lodestar crosscheck is to be done here, does it make class counsel's 5% fee request unreasonable? In my opinion, it does not. As I said in my initial declaration, there is no doubt the multiplier here would be very high. But it would not be unprecedented—and that is true even though the observable data on lodestar multipliers probably skews lower than reality due to what we call "selection effects." More specifically, when lodestar multipliers are low, class action lawyers are happy to volunteer them to the court because it creates the impression that their fee requests are more reasonable. However, when multipliers are high, whether due to class counsel's efficiency or due to them obtaining an extraordinary result for the class, class action lawyers are much less willing to volunteer the data needed to make that determination with the court. Thus, in the observable data, we end up seeing all the low multipliers but not all the high multipliers. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7

5

J. Empirical J. Stud. 811, 834 n.80 (2010) ("It should be emphasized . . . that [the settlements where courts used the lodestar cross check] may not be representative of the settlements where the percentage-of-the-settlement method was used without the lodestar cross-check."). For this reason, it is my opinion that class counsel's multiplier here is probably even more common than the data suggests.

7. But if a high multiplier still leads the court to believe that class counsel's fee request needs further justification, in my opinion, the court does not have to look far to find it: the class has recovered 100% of its damages. As I noted in my initial declaration, this is particularly unusual in the class action context; almost no class actions settle or resolve at such a high amount. *See* ¶ 27. Unusually good results are ample justification for unusually high lodestar multipliers, not the least of which because they align incentives in both this case and in future cases. That is, the reason class counsel's multiplier is high is because they recovered so much for the class. If fee awards are cut for that reason, then why would class counsel try hard to recover so much in future cases?

8. The objectors' arguments otherwise confuse statutory fee shifting cases with the common fund fee award at issue here—which is governed not by statute but by the common law of unjust enrichment. For example, the objectors suggest there is a strong presumption that multipliers should not exceed 1.0 when courts use the lodestar method. *See* p. 7 (quoting *Perdue v. Kenny A.,* 559 U.S. 542 (2010)). But *Kenny A*. was a statutory fee-shifting award, not a common fund fee award. *See, e.g., Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) ("[T]he district court misapplied the principles that govern fee shifting cases to the common fund case before it.").

9. Likewise, the objectors urge the Court to reject class counsel's hourly rates—which are the real hourly rates class counsel charges their corporate clients for non-contingent work—in

6

favor of the rates called for by the Laffey Matrix. *See* pp. 11-12. But, again, the Laffey Matrix was created for a federal fee-shifting statute; it was neither designed for nor is required in common fund class actions like this one. Moreover, it is well-known that the data in the Laffey Matrix—gathered as it was decades ago—is extremely out of date. Although the Matrix has been revised over the years with inflation adjustments, it is not known how accurately these adjustments reflect the rates actually charged by firms practicing complex litigation in Washington DC. For this reason, the Department of Justice hired me to gather current data in order to create a new matrix. *See* Contract No. 15JA1620P00000231. The method I am using includes looking through court dockets to find cases where lawyers have revealed the hourly rates that real clients actually pay. In other words, the new matrix will be based on precisely the kind of rates that class counsel used in calculating their lodestar in this very case.

10. I have been compensated for this declaration at a rate of $950 per hour.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 3, 2020.

_____

Brian T. Fitzpatrick

Nashville, TN