**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY, | |
| Plaintiff, on behalf of itself and all others similarly situated, | No.  1:16-cv-00259-MMS (Judge Sweeney) |
| vs. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

**<u>DISPUTE SUBCLASS'S MOTION TO DISMISS THE GOVERNMENT'S COUNTERCLAIM</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     BACKGROUND ...............................................................................................2

    A.    Risk Corridors Litigation .................................................................2

    B.    The *Conway* Litigation ...................................................................4

    C.    Meritus Insolvency Proceedings .......................................................4

II.    ARGUMENT ....................................................................................................7

    A.    Under Reverse Preemption, the Court Lacks Subject Matter Jurisdiction to Adjudicate the Government's Counterclaim ..........................................7

    B.    The Government's Claim for Interest Against Both Meritus and Colorado HealthOp Should Be Dismissed.......................................................11

         1.    The Government May Not Claim Interest When the Government Is the Net Debtor..........................................................................12

         2.    The Government May Not Claim Interest Accruing After the Dispute Subclasses' Insolvencies ............................................13

    C.    Colorado Law Prohibits the Government's Counterclaim Against Colorado HealthOp ......................................................................14

         1.    Colorado Law Provides the Federal Rule of Decision..............................15

         2.    Colorado Law Prohibits the Government From Offsetting Colorado HealthOp's Debts Against Its Risk Corridor Judgment.............18

         3.    Federal Common Law Does Not Permit the Offset Sought By The Government.......................................................................21

    D.    Meritus Paid the Debts Identified in the Counterclaim in Full in 2017.................23

III.    CONCLUSION................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

**United States Supreme Court Cases**

*Am. Elec. Power Co., Inc. v. Conn.*,
  564 U.S. 410 (2011) ................................................................................................ 15

*Clearfield Tr. Co. v. United States*,
  318 U.S. 363 (1943) ................................................................................................ 15

*Erie Ry. Co. v. Tompkins*,
  304 U.S. 64 (1938) .................................................................................................. 22

*Gratiot v. United States*,
  40 U.S. 336 (1841) .................................................................................................. 22

*Maine Community Health Options*,
  140 S. Ct. 1308 (2020) .............................................................................................. 3

*Sexton, as Trustee in Bankruptcy of Kessler & Co. v. Dreyfus*,
  219 U.S. 339 (1911) ................................................................................................ 13

*Swift v. Tyson*,
  41 U.S. 1 (1842) ...................................................................................................... 22

*United States Department of Treasury v. Fabe*,
  508 U.S. 491 (1993) ................................................................................... 8, 9, 13, 14

*United States v. Kimbell Foods, Inc.*,
  440 U.S. 715 (1979) ..................................................................................... 15, 16, 17

*United States v. Munsey Trust Co. of Washington, D.C.*,
  332 U.S. 234 (1947) ................................................................................................ 22

*United States v. Texas*,
  507 U.S. 529 (1993) ................................................................................................ 22

*United States v. Yazell*,
  382 U.S. 341 (1966) ................................................................................................ 16

*Vanston Bondholders Protective Committee v. Green*,
  329 U.S. 156 (1946) ................................................................................................ 13

ii

**Federal Circuit Court Cases**

*Davister Corp. v. United Republic Life Ins. Co.*,
 152 F.3d 1277 (10th Cir. 1998) ........................................................................ 9, 10

*Johnson v. All-State Constr. Co.*,
 329 F.3d 848 (Fed. Cir. 2003) ...................................................................... 22, 23, 24

*Massie v. United States*,
 226 F.3d 1318 (Fed. Cir. 2000) ............................................................................... 7

*Montana v. United States*,
 124 F.3d 1269 (Fed. Cir. 1997) .............................................................................. 16

*Munich Am. Reinsurance Co. v. Crawford*,
 141 F.3d 585 (5th Cir. 1998) ......................................................................... 9, 10

*Ralston Purina Co. v. Parsons Feed & Farm Supply, Inc.*,
 416 F.2d 207 (8th Cir. 1969) ................................................................................. 12

*Stephens v. American Int'l Ins. Co.*,
 66 F.3d 41 (2d Cir. 1995) ...................................................................................... 10

**Other Federal Court Cases**

*Conway v. United States*,
 No. 18-1623, 145 Fed. Cl. 514 (2019)................................. 4, 14, 15, 16, 17, 18, 19, 20, 21, 22

*Ideal Innovations, Inc. v. United States*,
 138 Fed. Cl. 244 (2018) ........................................................................................ 5

*In re Amwest Sur. Ins. Co.*,
 245 F. Supp. 2d 1038 (D. Neb. 2002) .................................................................... 11

*In re PRS Ins. Grp., Inc.*,
 294 B.R. 609 (Bankr. D. Del. 2003) ..................................................................... 11

*Local Oklahoma Bank v. United States*,
 59 Fed. Cl. 713 (2004) .......................................................................................... 12

*Pikulin v. United States*,
 97 Fed. Cl. 71 (2011) ............................................................................................. 5

**State Court Cases**

*Bluewater Ins. Ltd. v. Balzano*,
 823 P.2d 1365 (Colo. 1992) .............................................................................. 20, 21

*In re Liquidation of Pine Top Ins. Co.*,
  322 Ill. App. 3d 693 (2001) .................................................. 13

*Martinez v. People*,
  69 P.3d 1029 (Colo. 2003) ..................................................... 20

*McCoy v. People*,
  442 P.3d 379 (Colo. 2019) ..................................................... 19

## **Statutory Authorities**

15 U.S.C. § 1012 .......................................................................... 7

15 U.S.C. § 1012(b) ............................................................... 8, 10

28 U.S.C. § 1503 ..................................................... 7, 8, 9, 10, 11

28 U.S.C. § 2508 ..................................................... 7, 8, 9, 10, 11

37 U.S.C. § 3713 ......................................................................... 8

31 U.S.C.§ 3717 ........................................................................ 14

42 U.S.C. § 18041(d) ................................................................ 17

Ariz. Rev. Stat. § 20-635 ......................................................... 13

Ariz. Rev. Stat. § 20-612(a) ....................................................... 8

Ariz. Rev. Stat. § 20-612(c) ....................................................... 9

Colo. Rev. Stat. § 10-3-504(2) ................................................... 9

Colo. Rev. Stat. § 10-3-517(2) ................................................. 13

Colo. Rev. Stat. § 10-3-529(1) ............................................ 19, 20

Colo. Rev. Stat. § 10-3-529(5) ................................................. 20

Colo. Rev. Stat. § 10-3-529(6) ................................................. 20

Colo. Rev. Stat. § 10-3-541(1)(b) ............................................ 18

Colo. Rev. Stat. § 10-3-541(1)(c) ............................................ 18

## **Federal Rules and Regulations**

45 CFR § 30.18 ......................................................................... 14

RCFC 12(b)(1) ......................................................................................................................... 5

RCFC 12(b)(6) ......................................................................................................................... 5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY, | |
|        Plaintiff,<br>       on behalf of itself and all others<br>       similarly situated, | No.  1:16-cv-00259-MMS<br>(Judge Sweeney) |
|    vs. | |
| THE UNITED STATES OF AMERICA, | |
|        Defendant. | |

## <u>DISPUTE SUBCLASS' MOTION TO DISMISS THE GOVERNMENT'S COUNTERCLAIM</u>

For over half a decade, the federal government unlawfully failed to make risk corridor payments it promised to qualified health plan ("QHP") issuers to induce them to join Affordable Care Act marketplaces.  For some QHP issuers, the government's dereliction of duty was harmful.  For others, including the members of the Dispute Subclass, it was fatal.  The government's failure to meet its obligations—to the tune of tens or hundreds of millions of dollars—rendered Dispute Subclass members insolvent and forced them into liquidation proceedings.  The government now asserts counterclaims against the very entities its misconduct bankrupted.  To add insult to injury, the government seeks interest on the Dispute Subclass's purported debts at an effective annual rate exceeding 15%.  The government thus seeks to profit from the fact that its unlawful conduct rendered Dispute Subclass members unable to meet their financial obligations.

The government's counterclaims have no merit.  Not only does this Court lack subject matter jurisdiction over the government's claims, but the government's claim for interest against

Meritus and Colorado HealthOp is foreclosed by both state and federal law; its claim against Colorado HealthOp has already been adjudicated and rejected by the Court of Federal Claims; and, finally, its claim against Meritus was paid by Meritus, in full, three years ago.  The Court should therefore dismiss the government's counterclaims.

## I.      BACKGROUND

### A.      Risk Corridors Litigation

Section 1342 of the Affordable Care Act created the "risk corridor" program designed to mitigate the risks of QHP issuers that chose to participate in the ACA marketplaces.  Under Section 1342, for the years 2014, 2015, and 2016, the government was required to make statutorily defined payments to QHP issuers whose costs exceeded certain thresholds.  The program was designed to induce issuers to participate in the then-nascent marketplaces, notwithstanding the substantial uncertainties surrounding them.  Based on the government's promises, the three members of the Dispute Subclass—Meritus Health Partners, Meritus Mutual Health Partners (collectively, "Meritus"), and Colorado Health Insurance Cooperative, Inc. ("Colorado HealthOp")[1]—sold policies on the Arizona (Meritus) and Colorado (Colorado HealthOp) ACA state exchanges in the 2014 and 2015 benefit years.

In late 2014, after the government induced Meritus and Colorado HealthOp to participate in ACA exchanges, the government attempted to reverse course with respect to risk corridor payments, passing an appropriations bill that purportedly prevented the Department of Health and Human Services from making payments beyond the amount the risk corridors program took in from QHP issuers.  As a result, the government failed to meet its risk corridor obligations to Meritus and Colorado HealthOp. For Meritus Health Partners, this amounted to a loss of over

---

[1]   While Freelancers Co-Op of New Jersey is currently a member of the Dispute Subclass, Freelancers and the government have agreed in principle to resolve their dispute, and the  parties intend to file a motion to place Freelancers in a separate subclass.

$58 million.  For Meritus Mutual, it was over $14 million.  For Colorado HealthOp, it was over $111 million.

The government's failure to make nearly $200 million in payments it promised to Meritus and Colorado HealthOp had a predictable effect:  all three entities became insolvent. Colorado HealthOp entered into liquidation in January 2016, while Meritus entered into liquidation in August 2016.  The government filed proofs of claims in both the Meritus and Colorado HealthOp liquidation proceedings.

On April 27, 2020, the Supreme Court confirmed in an 8-1 decision that the government's failure to make risk corridor payments to QHP issuers was unlawful.  *Maine Community Health Options*, 140 S. Ct. 1308 (2020).  In a May 12, 2020 status report, the government for the first time in this four-plus-year litigation indicated that it may seek to assert an offset defense or counterclaim against unidentified class members.  Dkt. 72.

On October 30, 2020, the government filed its amended answer in this matter.  The amended answer conceded the Dispute Subclass's entitlement to full risk corridor payments for the years 2014 and 2015.  Dkt. 101 at 1.  The amended answer contained a single counterclaim against Colorado HealthOp and Meritus for breach of statutory and regulatory obligations to make payments under various provisions of the Affordable Care Act.  *Id*. at 9-10.  The counterclaims alleged that both Colorado HealthOp and Meritus owe the government under the ACA's risk adjustment and cost-sharing reduction reconciliation programs and for risk adjustment program user fees, and that Colorado HealthOp owes the government under the ACA's reinsurance program.  The government further seeks over $7 million in interest from

Colorado HealthOp and over $18 million in interest from Meritus.  The government's claimed interest reflects an effective annual rate exceeding 15%.[2]

### B.      The *Conway* Litigation

On October 19, 2018, Colorado HealthOp, through its liquidator, Michael Conway, filed suit in the Court of Federal Claims seeking to recover reinsurance program payments that the government unlawfully withheld.  *See Conway v. United States*, No. 18-1623, Dkt. 1 (Fed. Cl. 2018).  The *Conway* complaint alleged that instead of making required reinsurance payments to Colorado HealthOp, the government set off debts Colorado HeathOp purportedly owed to the government against the reinsurance payments.  The government's setoff, according to the complaint, violated Colorado law, which prevents parties that owe money to an insolvent insurer from offsetting non-contractual debts against the funds owed to the insurer.  The Court of Federal Claims agreed, and on October 3, 2019 ruled that Colorado HealthOp was entitled to its full reinsurance payment, as the government's offset violated Colorado law governing insurer insolvencies.  *Conway v. United States*, 145 Fed. Cl. 514 (2019).  The government's appeal of *Conway* is pending before the Federal Circuit.  *See Conway v. United States*, No. 20-1292 (Fed. Cir.).

### C.      Meritus Insolvency Proceedings

On August 10, 2016, the Superior Court of Arizona, Maricopa County ("Liquidation Court") appointed a receiver for Meritus Health and Meritus Mutual, declaring both entities to be insolvent and placing each company under an order of liquidation.  Meritus Liquidation Order

---

[2]   *See* Department of Health and Human Services, Interest Rates on Overdue and Delinquent Debts, available at https://www.hhs.gov/about/agencies/asfr/finance/financial-policy-library/interest-rates/index.html (identifying applicable interest rates from 2010 to present as between 9.375% and 11.25%); 45 CFR § 30.18 (requiring the Department of Health and Human Services to charge a six percent penalty on debts delinquent over 90 days).

(Ex. 1).[3]   The Liquidation Court subsequently established a proof of claim procedure for Meritus' alleged creditors.   *See* Order Approving Liquidation Plan (Ex. 2).   The government subsequently submitted three proofs of claim for:

- Claims by the Centers for Medicare and Medicaid Services ("CMS") against Meritus Health related to ACA programs in the total amount of $50,650,123.02, including each of the debts identified in the government's counterclaim.   *See* Meritus Health CMS Proof of Claim (Ex. 3) at 2-6.

- Claims by CMS against Meritus Mutual related to ACA programs in the total amount of $94,581,998.78, which included each of the debts identified in the government's counterclaim, as well as debts arising from ACA Start-up and Solvency Loans.   *See* Meritus Mutual CMS Proof of Claim (Ex. 4) at 1, 11.

- Claims by the Department of Justice in an undetermined amount which asserted that it included the same claims asserted by CMS.   *See* DOJ Meritus Proof of Claim (Ex. 5).

Each of the three proof of claims asserted that the Government's claims were subject to set-off, and included a signed affirmation by a Government official that, among other things the claims were due and owing and the statements and documents submitted were true and correct to the signer's knowledge.   *See* Ex. 3 at 2; Ex. 4 at 2-3; Ex. 5 at 3-4.

In two letters dated November 16, 2017, Meritus's receiver informed the government that it accepted certain offsets identified in the government's proofs of claim.[4]   Specifically, Meritus Health notified the government that it offset $46,195,827.78 in risk adjustment payments, $3,899,178.47 in cost-sharing reduction reconciliation payments, and $44,141.47 in user fees

---

[3]   Although motions to dismiss are generally based on the complaint's allegations, the Court may take judicial notice of any relevant public records.   *See Ideal Innovations, Inc. v. United States*, 138 Fed. Cl. 244, 248 (2018) ("Although the materials the Court may consider is more limited under RCFC 12(b)(6) than under RCFC 12(b)(1), the Court may still go beyond the complaint's allegations. The Court, for example, may take judicial notice of any relevant public records."). Each of the exhibits to this motion is from the docket of the court overseeing Meritus's liquidation, and so the Court may take judicial notice of them.   *See Pikulin v. United States*, 97 Fed. Cl. 71, 73 n. 3 (2011) (court may take judicial notice of court records in closely related litigation).

[4]   In contrast to Colorado insurance law, Arizona insurance law contemplated an offset under these circumstances, which offset was applied by Meritus at the request of the government.

owed to the government against reinsurance and risk corridors payments owed to Meritus Health. *See* Meritus Health Offset Letter (Ex. 6) at 1-2. The letter further informed the government that the amount that the government owed to Meritus Health under the risk corridors and reinsurance programs had been reduced from $62,684,619.00 to $12,034,495.98, reflecting the payment of the aforementioned (and other) debts by offset. *Id*.

Meritus Mutual likewise informed the government that it offset $594,168.87 in risk adjustment payments, $115,649.36 in cost-sharing reduction reconciliation payments, and $7.76 in user fees owed to the government against risk corridor and reinsurance payments owed to Meritus Mutual. *See* Meritus Mutual Offset Letter (Ex. 7) at 1-3. The letter further informed the government that the amount that the government owed to Meritus Mutual under the risk corridors and reinsurance programs had been reduced from $16,221,332.00 to $15,465,414.47, reflecting the payment of the aforementioned (and other) debts by offset. *Id*.

The two offset letters told the government that no further claim to interest would be considered, as Meritus's debts to the government had been paid by offset. Ex. 6 at 2; Ex. 7 at 3. The letters also afforded the government an opportunity to respond to the offset. Ex. 6 at 3; Ex. 7 at 4. Having received no response from the Government, on December 11, 2018, Meritus's receiver filed a request with the Liquidation Court for approval of the offset, and a hearing was subsequently set on March 8, 2019. *See* Meritus Offset Petition (Ex. 8). The Government received a copy of the receiver's request and the notice of the hearing. As reported to the Liquidation Court, these documents were sent via hard copy and via email. *See* Ex. 8 at 20-24; Report on Notice to Claimants (Ex. 9). The Government did not file a response to the petition and did not appear at the hearing. *See* Order on Meritus Setoff Petition (Ex. 10) at 6.

After the hearing, the Liquidation Court approved the offset.  The Liquidation Court indicated that, after the offset was effectuated, the net risk corridors amount owed to Meritus Health is $4,863,176.00, and the net risk corridors payment owed to Meritus Mutual is $12,182,140.00.[5]  Ex. 10 at 7.  The Liquidation Court's order confirmed that the net effect of the setoff of claims is that the government owed Meritus (diminished) risk corridor payments, while all the ACA debts owed to the government (aside from those arising from start-up and solvency loans) were satisfied.  *Id* at 6.  Meritus's balance sheets reflect this offset.  *See* Dec. 31, 2018 Meritus Balance Sheet (Ex. 11) at 14.  Notwithstanding the payment of Meritus's ACA debts by offset, the government now seeks a second payment of those exact debts, adding millions in interest that purportedly accrued in the years *after* the debts were paid.

## II.    ARGUMENT

### A.    Under Reverse Preemption, the Court Lacks Subject Matter Jurisdiction to Adjudicate the Government's Counterclaim

"[T]he Court of Federal Claims, like all inferior federal courts, is a court of jurisdiction limited by what Congress allows."  *Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000).  The government relies on two federal statutes that it maintains give this Court jurisdiction to entertain its counterclaim:  28 U.S.C. §§ 1503 and 2508.  *See* Am. Answer ¶ 4. The government is correct that it is typically the case that the Court of Federal Claims has jurisdiction to adjudicate the government's asserted offsets.  In this instance, however, the federal statutes conflict with state statutes and the McCarran-Ferguson Act, 15 U.S.C. § 1012, limits the Court's ability to adjudicate the government's counterclaim.  Specifically, the Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a

---

[5] From the pleadings, there does not appear to be a material dispute regarding calculations of the amounts that the government owes Meritus under the ACA.

fee or tax upon such business, unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b).  Under the Act, where a generally applicable federal law conflicts with a state insurance law, the federal law is "reverse pre-empted" and the state insurance law controls.

In *United States Department of Treasury v. Fabe*, the Supreme Court explained the McCarran-Ferguson Act's import with respect to the government's efforts to recover debts from insolvent insurers.  508 U.S. 491 (1993).   In *Fabe*, the government asserted that, pursuant to 37 U.S.C. § 3713, it was entitled to a "superpriority" for the debts it was owed in an insurer insolvency proceeding.  The federal superpriority statute conflicted with state insurance law, prioritizing the government's claims behind, among other claims, administrative expenses and policyholder claims.  *Id*. at 495.  The Court ruled that to the extent the state priority law serves to protect policyholders, it is a law enacted "for the purpose of regulating the business of insurance," and it reverse pre-empts conflicting federal laws that do not "specifically relate[] to the business of insurance."  *Fabe*, 508 U.S. at 505-06.  The Court subsequently ruled that 37 U.S.C. § 3713, the general federal superpriority statute, was reverse pre-empted by the state priority law to extent the state law prioritized the claims of policyholders (and administrative costs of the insolvency proceeding) above the government's claims.  *Id*. at 508-09.

In this case, the McCarran-Ferguson Act and Arizona and Colorado law operate to preempt 28 U.S.C. §§ 1503 and 2508, the statutes the government relies on to establish subject matter jurisdiction.  Both Arizona and Colorado law reserve the power to adjudicate an insolvent insurer's debts for the court overseeing the insurer's liquidation, and provide the liquidation court with exclusive jurisdiction over matters related to the insurer's liquidation.  A.R.S. 20-612(a) ("The superior court is vested with exclusive original jurisdiction of delinquency proceedings under this article, and is authorized to make all necessary and proper orders to carry

out the purposes of this article."); A.R.S. 20-612(c) ("Delinquency proceedings pursuant to this article shall constitute the sole and exclusive method of liquidating . . . an insurer."); Colo. Rev. Stat. § 10-3-504(2) ("The district court in and for the city and county of Denver shall have jurisdiction to entertain, hear, or determine any complaint praying for the . . . liquidation . . . of any insurer, or praying for an injunction or restraining order or other relief preliminary to, incidental to, or relating to such proceedings other than in accordance with this part 5.").

The McCarran-Ferguson Act and *Fabe* require that 28 U.S.C. § 1503 and § 2508—the federal statutes allowing the government to pursue offsets in the Court of Federal Claims—yield to state laws vesting exclusive jurisdiction over offsets (and other matters related to liquidation) in state liquidation courts.  Not only is this the law, but it makes sense.  A "policy of placing ultimate control over all issues relating to the insolvency proceedings in a single court is aimed at protecting the relationship between the insurance company and its policyholder," and requires those proceedings be "shielded from federal interference by the McCarran-Ferguson Act" under *Fabe*.  *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 593 (5th Cir. 1998); *see also Davister Corp. v. United Republic Life Ins. Co.,* 152 F.3d 1277, 1281 (10th Cir. 1998) ("The Utah statute consolidating all claims against a liquidating insurer, by its nature and express terms, was enacted to protect policyholders.").  Indeed, consolidation of all claims against a liquidated insurer in a single forum "prevents the unnecessary and wasteful dissipation of the insolvent company's funds that would occur if the receiver had to defend unconnected suits in different forums across the country."  *Munich,* 141 F.3d at 593.  "Consolidation also eliminates the risk of conflicting rulings, piecemeal litigation of claims, and unequal treatment of claimants, all of which are of particular interest to insurance companies and policyholders[.]"  *Id.*  Perhaps most importantly, "[a]llowing a putative creditor to pluck from the entire liquidation proceeding one

discrete issue," would "directly impact the policyholders because it deals with a purported asset of the insurance company that could be apportioned to them." *Davister*, 152 F.3d at 1281. Consequently, federal appellate courts have repeatedly ruled that even where federal law otherwise requires that a claim be heard in a particular forum, that entitlement is trumped by the McCarran-Ferguson Act and state laws vesting exclusive jurisdiction over insurer liquidations in specific state courts. *Davister*, 152 F.3d at 1282 (holding that under McCarran-Ferguson Act and state insurer liquidation regimes, creditor was not entitled to pursue claim in arbitration against insolvent insurer even though the Federal Arbitration Act otherwise authorized arbitration); *Munich*, 141 F.3d at 595-96 ("We therefore hold that the FAA is reverse pre-empted under the McCarran–Ferguson Act, thereby leaving the district court without the power to compel arbitration in this case."); *Stephens v. American Int'l Ins. Co.*, 66 F.3d 41, 45 (2d Cir. 1995) (holding that Kentucky Liquidation Act superseded creditor's right to arbitrate under the FAA). So too here. Under the McCarran-Ferguson Act, the government's claims against insolvent insurers must be adjudicated in the state courts overseeing the Dispute Subclass's liquidations. As courts have repeatedly noted, any other outcome would substantially interfere with the carefully crafted insurer insolvency regimes established by the states.

In short, neither 28 U.S.C. § 1503 nor 28 U.S.C. § 2508 "specifically relates to the business of insurance," and so the McCarran-Ferguson Act provides that they are inoperative to the extent they conflict with state insurance laws. 15 U.S.C. § 1012(b). Because the two statutes that would typically give this Court jurisdiction to hear the government's counterclaim conflict with Arizona and Colorado laws vesting *exclusive* jurisdiction to determine claims against insolvent insurers in state liquidation courts, they cannot form the basis for this Court's jurisdiction. Absent any operative statutory basis for subject matter jurisdiction, the Court must

dismiss the government's counterclaims.[6]  *See, e.g., In re PRS Ins. Grp., Inc.*, 294 B.R. 609, 613 (Bankr. D. Del. 2003)  (holding bankruptcy court's subject matter jurisdiction was preempted under McCarran-Ferguson Act); *In re Amwest Sur. Ins. Co.*, 245 F. Supp. 2d 1038, 1045 (D. Neb. 2002) ("Nebraska's statute designating the state forum for adjudication of these claims regulates the business of insurance and, under the McCarran–Ferguson Act, cannot lawfully be 'invalidate[d], impair[ed], or supercede[d]' by permitting additional litigation in the federal court on the basis of diversity.").

### B.     The Government's Claim for Interest Against Both Meritus and Colorado HealthOp Should Be Dismissed

Even if the Court had subject matter jurisdiction to hear the government's counterclaims, the government's counterclaim fails on the merits.  As an initial matter, the government's claim for interest against Meritus and Colorado HealthOp contravenes both state and federal law and should be dismissed.

---

[6]     The Dispute Subclass does not dispute that the ACA is responsible for the existence of their purported debts.  But the existence of a debt pursuant to the ACA is not inconsistent with Arizona or Colorado law; indeed, state insurer insolvency laws presuppose that the insurers have debts that have become too much to bear.  The inconsistency between state and federal law in this case arises from the government's attempt to pursue its counterclaims in this court under 28 U.S.C. § 1503 and § 2508, which conflicts with state reservations of exclusive jurisdiction over liquidation matters for the state liquidation courts.  It is 28 U.S.C. § 1503 and § 2508—which the government must concede are not specifically directed to the business of insurance—and not the Affordable Care Act that are reverse pre-empted by the McCarran-Ferguson Act under *Fabe*.  It is likewise immaterial the government's asserted ability to offset arises from common law and not a statute.  The question, for purposes of assessing subject matter jurisdiction, is not whether the government's right to offset conflicts with state law; it is whether the federal laws giving the Court the authority to hear the government's counterclaims are reverse pre-empted by state insurance laws under the McCarran-Ferguson Act.  And those laws—28 U.S.C. § 1503 and § 2508—are undisputedly "Act[s]  of Congress" subject to McCarran-Ferguson Act reverse pre-emption.

### 1.    The Government May Not Claim Interest When the Government Is the Net Debtor

Applying federal law, the government is not entitled to pre-judgment interest under the well-established "interest on the balance" rule.  Where two parties have claims that "arise out of related transactions,"[7] prejudgment interest "is available only on the net difference between the two claims at any point in time."  *Local Oklahoma Bank v. United States*, 59 Fed. Cl. 713, 722-23 (2004) (*citing Ralston Purina Co. v. Parsons Feed & Farm Supply, Inc.*, 416 F.2d 207, 212 (8th Cir. 1969)).  "The objective of the rule is to compensate for the loss of the use of money only to the extent of the difference between the two claims."  *Id.* (internal quotation marks omitted).  With respect to both Meritus and Colorado HealthOp, the government is the *net debtor*— excluding the government's claimed prejudgment interest, it owes *more* to Meritus[8] and Colorado HealthOp in risk corridor payments than the government asserts Meritus and Colorado HealthOp owe to it for other ACA obligations.[9]  Consequently, the government has no entitlement to the interest it seeks.

---

[7]    The government's position across the risk corridor cases has been that the ACA "created several interrelated programs under which the Parties' respective claims arise."  *See* Dkt. 80 at 1.

[8]    As noted in Section II.D, Meritus's position is that the government's debt was paid in full in November 2017.  But even if the Court finds otherwise, both Meritus Health and Meritus Mutual were owed millions more in risk corridor payments than the non-interest debts asserted in the government's counterclaim.

[9]    The government seeks $19,588,835.69 in non-interest debts from Colorado HealthOp and 50,551,556.84 in non-interest debts from Meritus, Dkt. 101, but Colorado HealthOp is owed over $111 million in risk corridor payments and Meritus was owed over $68 million in risk corridor payments before it effectuated an offset of its debts to the government.  *See* CMS, Risk Corridor Payments and Charge Amounts for Benefit Year 2014 (Nov. 19, 2015), available at https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RC-Issuer-level-Report.pdf; CMS, Risk Corridor Payments and Charge Amounts for Benefit Year 2015 (Nov. 18, 2016), available at https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2015-RC-Issuer-level-Report-11-18-16-FINAL-v2.pdf.

## 2. The Government May Not Claim Interest Accruing After the Dispute Subclasses' Insolvencies

As noted above, under black letter federal law, the government is not entitled to interest. Even if the interest-on-the-balance rule did not doom the government's claim for interest, however, the McCarran-Ferguson Act and Arizona and Colorado law would separately defeat the government's interest claim. For hundreds of years, the rule has been that interest on a debt ceases to accrue once an entity enters insolvency proceedings. *See In Re Liquidation of Pine Top Ins. Co.,* 322 Ill. App. 3d 693, 701-02 (2001) (holding that claims against insolvent insurers cannot include any post-allowance interest); *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 164 (1946) ("[t]he general rule in bankruptcy and in equity receivership has been that interest on the debtors' obligations ceases to accrue at the beginning of the proceedings"); *Sexton, as Trustee in Bankruptcy of Kessler & Co. v. Dreyfus*, 219 U.S. 339, 344 (1911) ("For more than a century and a half the theory of the English bankrupt system has been that everything stops at a certain date."). This prohibition is reflected in both the Arizona and Colorado insurer insolvency laws, which fix the rights and liabilities of an insolvent insurer upon issuance of an order of liquidation. *See* Ariz. Rev. Stat. § 20-635 ("The rights and liabilities of the insurer and of its creditors, policyholders, stockholders, members, subscribers and all other persons interested in its estate shall, unless otherwise directed by the court, be fixed as of the date on which the order directing the liquidation of the insurer is filed[.]"); Colo. Rev. Stat. § 10-3-517(2) ("Upon issuance of the order, the rights and liabilities of any such insurer and of its creditors, policyholders, shareholders, members, and all other persons interested in its estate shall become fixed as of the date of entry of the order of liquidation[.]") This fixing of rights is a key component of the priority system for insolvent insurers that is already expressly protected under *Fabe.*

13

The government's position is that it is entitled to interest that continues to accrue to this day at an effective rate exceeding 15% annually, pursuant to 31 U.S.C.§ 3717 and 45 CFR § 30.18.  Needless to say, the government's position is inconsistent with the Arizona and Colorado laws fixing debts on the date a liquidation order is entered.  And, under the McCarran-Ferguson Act and *Fabe*, Arizona and Colorado law reverse pre-empt the statutory bases for any assertion of post-liquidation order interest by the government.  Taken to its logical conclusion, the government's position is that it (and no other creditor, including policyholders) can continue to accrue post-liquidation order interest at above-market rates until the government's claims consume the insurer's entire estate—or, at the very least, until it consumes the entirety of the government's obligation to the insurer, which is precisely what the government has done to Meritus Health.  It is difficult to conceive of a federal law that would more powerfully interfere with the rights of policyholders than one which allows the government to usurp via delay the entirety of a multi-million-dollar asset that could be used to pay policyholder claims.  *See Fabe*, 508 U.S. at 505-06 ("The primary purpose of a statute that distributes the insolvent insurer's assets to policyholders in preference to other creditors is identical to the primary purpose of the insurance company itself: the payment of claims made against policies.").  Arizona and Colorado law thus reverse pre-empt the statutory bases for the government's interest claim.

## C.    Colorado Law Prohibits the Government's Counterclaim Against Colorado HealthOp

In *Conway*, Judge Hertling—evaluating the government's attempt to recoup from Colorado HealthOp by offset the same ACA debts at issue in the government's counterclaims here—ruled that the government's offset violated Colorado law, which in turn supplied the relevant federal rule of decision.  *Conway*, 145 Fed. Cl. at 529.  The same legal principles that

required judgment for Colorado HealthOp in *Conway* defeat the government's counterclaim as to Colorado HealthOp in this case.

### 1.      Colorado Law Provides the Federal Rule of Decision

The government's asserted right to setoff sums purportedly owed it by the Dispute Subclass against their recovery in this case "arises under common law, not statute."   Order Granting Government's Motion for Leave to Amend, Dkt. 96 at 9.   Because the federal government "exercis[es] a constitutional function or power" when it "disburses funds or pays its debts," federal courts may need to supply "the governing rule of law" relating to these functions where federal statutes do not provide one.  *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 367 (1943).   But while significant federal property interests may require "federal law governance," that "does not necessarily mean that federal courts should *create* the controlling law."  *Am. Elec. Power Co., Inc. v. Conn.*, 564 U.S. 410, 422 (2011) (emphasis added).   Rather, "[a]bsent a *demonstrated need* for a federal rule of decision, [federal courts have] taken 'the prudent course' of 'adopt[ing] the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation.'"  *Id.* (quoting *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 740 (1979)).

In *Kimbell*, faced with a similar situation to that presented here, the Supreme Court was called upon "to determine the rights of the United States as against private creditors" with respect to the relative priority of liens arising from federal lending programs.  440 U.S. at 740. The Court first decided that, even though "the statutes authorizing these federal lending programs do not specify the appropriate rule of decision," the "priority of liens stemming from federal lending programs must [nonetheless] be determined with reference to federal law," because the agencies in question were performing federal, constitutional functions.  *Id.* at 726–27.

But just because federal law applied "d[id] not inevitably require resort to uniform

federal rules." *Id.* at 727–28. Instead, in order to determine whether to fashion such a rule or else "adopt[] the otherwise applicable state-law rule of decision[,] [t]he *Kimbell* court considered three factors . . . : '(1) the need for national uniformity, (2) whether state law would 'frustrate specific objectives' of the federal program; and (3) the extent to which federal rules might 'disrupt commercial relationships predicated upon state law.'" *Conway*, 145 Fed. Cl. at 527 (quoting *Montana v. United States*, 124 F.3d 1269, 1274 (Fed. Cir. 1997)). In *Kimbell*, each of these factors supported "'the prudent course' of 'adopt[ing] the readymade body of state law as the federal rule of decision." 440 U.S. at 740. The same result obtains here.

*First*, the government cannot credibly claim that any "need for national uniformity" requires that a uniform rule regarding the government's offset rights in insurance liquidation proceedings. In *Kimbell*, the Court rejected the government's "generalized pleas for uniformity," noting that the government operations in question were already "specifically and in great detail adapted to state law." 440 U.S. at 729–30. Because "[t]he programs already conform to each State's commercial standards," the Court concluded that "the agencies [already] function effectively without uniform procedures and legal rules," undermining any claim that uniformity was needed for effective administration. *Id.*

The absence of any need for uniformity is even clearer here, where state-by-state administration is baked into the ACA by design. As this Court noted in *Conway*, "[e]ven more than the [Small Business Administration program in *United States v. Yazell*, 382 U.S. 341 (1966)], the ACA's provision for separate exchanges, reinsurance, and risk-adjustment programs in all 50 states demonstrates that the ACA creates no requirement that could not be met by each state operating its own programs, presumably applying its own insurance liquidation priority scheme." 145 Fed. Cl. at 528. And "[l]ike the FHA loan-processing procedures in *Kimbell* . . .

the ACA does not require that HHS's obligations to reinsurance and risk-adjustment program participants issue forth as 'nationwide act[s] of the Federal Government, emanating in a single form from a single source.'" *Id.* (quoting *Kimbell*, 440 U.S. at 733). "The adaptability of the reinsurance and risk-adjustment programs, evident on the face of the statute creating them and from the fact that states like Connecticut and Massachusetts may operate both or one of them, suggest that Colorado's insurance liquidation priority scheme[s] [are] the appropriate federal rule[s] of decision here." *Id.*

*Second*, applying Colorado's insurance liquidation priority schemes would not "frustrate specific objectives" of the ACA. 440 U.S. at 729. Applying state law would merely place the government "in substantially the same position as private lenders,"[10] undermining any suggestion that a "special status it seeks is []necessary to safeguard the public fisc." *Kimbell*, 440 U.S. at 737. Further, the ACA specifically provides that "[n]othing in this title shall be construed to preempt any State law that does not prevent the application of the provisions of this title." 42 U.S.C. § 18041(d). Given the ACA's stated policy of *non-preemption*, it makes scant sense to instead determine that the ACA's specific objectives would be frustrated unless this court displaces state regulation of insurance liquidation. *See Conway*, 145 Fed. Cl. at 528 ("The ACA non-preemption clause's title alone—'No Interference with State Regulatory Authority'— suggests that the reinsurance and risk-adjustment programs can be properly implemented in the face of potentially less favorable, but not outright incompatible state insurance liquidation law, like Colorado's priority scheme.").

*Third*, the "application of a federal rule would disrupt commercial relationships predicated on state law." *Kimbell*, 440 U.S. at 729. As the Supreme Court noted in *Kimbell*,

---

[10] In fact, in a *better* position than nearly all creditors except policyholders. *See* C.R.S.A. § 10-3-541.

announcing a new federal rule that would give the federal government greater priority over other creditors under preexisting state law would cause "[c]reditors who justifiably rely on state law . . . [to] have their expectations thwarted whenever a federal contractual security interest suddenly appeared and took precedence." *Id.* at 739. "Because the ultimate consequences of altering settled commercial practices are so difficult to foresee . . . the prudent course is to adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation." *Id.* at 739–40. This concern is even more pronounced here, where a uniform federal rule would not only threaten to disrupt the expectations of sophisticated business parties (who, after all, may at least have the benefit of legal advice), but also of ordinary policyholders. *See Conway*, 145 Fed. Cl. at 529 (noting that Colorado state law assures policyholders of a higher priority of payment than the Federal Government).

Consequently, Colorado law supplies the relevant federal rule of decision governing the government's right to pursue an offset against Colorado HealthOp.

### 2. Colorado Law Prohibits the Government From Offsetting Colorado HealthOp's Debts Against Its Risk Corridor Judgment

To provide maximal protection to policyholders, Colorado requires that their claims receive higher priority in the event of an insurer's liquidation insurer than all other creditor claims except those incurred through the liquidation process. *See* Colo. Rev. Stat. § 10-3-541(1)(b). The federal government receives the next-best treatment.[11] *Id.* § 10-3-541(1)(c). As Judge Hertling noted in *Conway* with respect to the exact debts the government presently asserts against Colorado HealthOp, allowing the government to claim this offset would "violate[] Colorado's insurance liquidation priority scheme by [allowing it to] leap-frog[] claimants with

---

[11] Of course, the federal government receives equal priority to other policyholders for any claims it asserts as a policyholder. *Id.* § 10-3-541(b).

higher priority." *Conway*, 145 Fed. Cl. at 524.  Neither Colorado statutes nor Colorado common law permits this disruption.

Notwithstanding this order of priority, Colorado statutorily permits parties to set off "mutual debts or mutual credits" arising out of contracts between the insurer and creditor. Specifically, Colorado law provides:

> Notwithstanding any other provision of this title, mutual debts or mutual credits, whether arising out of one or more contracts between the insurer and another person in connection with any action or proceeding under this part 5, shall be set off, and the balance only shall be allowed or paid . . .

Colo. Rev. Stat. § 10-3-529(1).  This statute does not authorize the government's efforts to offset Colorado HealthOp's debts because the debts at issue do not arise out of a contract.

As Judge Hertling held in *Conway*, Colorado's offset statute permits only those offsets that arise out of a contract between the insurer and creditor.  This is plain from the statutory language, which permits offset of "mutual debts or mutual credits, whether arising out of *one or more contracts* between the insurer and another person."  Colo. Rev. Stat. § 10-3-529(1) (emphasis added).  This language does not permit offsets that do not arise out of a contract or contracts, because such offsets would not "aris[e] out of one or more contracts between the insure and another person." *Id.*[12];  *McCoy v. People*, 442 P.3d 379, 389 (Colo. 2019) (instructing courts to "read statutory words and phrases in context, and . . . construe them according to the rules of grammar and common usage."). Here, none of the debts identified in the counterclaim are contractual—the government identifies only risk adjustment payments, reinsurance payments, CSR reconciliation payments, user fees, and interest on those totals as the debts at issue.  Dkt.

---

[12] To take an example: if one were to praise "the advocate's prodigious skill at oral advocacy, whether arising from one or several arguments before the Court of Federal Claims," the listener would have no basis to conclude the advocate acquired her skill by arguing before the Southern District of New York, much less that she was an accomplished college debater.

101 ¶¶ 52-56.  To the extent the government argues that Colo. Rev. Stat. § 10-3-529(1) permits

offsets of *non-contractual* debts, the government stretches the statute's meaning well past its

breaking point.  *Conway*, 145 Fed. Cl. at 525.

This view is reinforced when § 10-3-529(1) is read, as it must be, in its full statutory

context.  *See Martinez v. People*, 69 P.3d 1029, 1033 (Colo. 2003) (noting that "[t]he legislature

is presumed to intend that the various parts of a comprehensive scheme are consistent with and

apply to each other, without having to incorporate each by express reference in the other

statutory provisions.")  As Judge Hertling noted in *Conway*, "Subsection 5 of the offset statute

permits certain offsets that are otherwise barred when 'the contracts' meet certain requirements."

145 Fed. Cl. at 525 (quoting Colo. Rev. Stat. § 10-3-529(5)).  Further, Subsection 6 (the

statute's effective date provision) provides:

> This section shall be effective January 1, 1993, and shall apply to all *contracts* entered into, renewed, extended, or amended on or after said date and to debts or credits arising from any business written or transactions occurring after January 1, 1993, pursuant to any *contract* including those in existence prior to January 1, 1993 . . . For purposes of this section, any change in the terms of, or consideration for, any *such contract* shall be deemed an amendment.

Colo. Rev. Stat. § 10-3-529(6).

As Judge Hertling explained, "[t]hese neighboring provisions" would make little sense if

"in the context of the entire statute the Colorado legislature" intended to permit offsets of debts

other than those arising through insurance contracts.  145 Fed. Cl. at 525.  Read on its own terms

and in the context of the statute to which it belongs, § 10-3-529(1) does not permit the

government's asserted offsets because they do not arise out of a contract.

Nor does Colorado common law provide offset rights beyond those specifically codified

at Colo. Rev. Stat. § 10-3-529(1).  The Colorado Supreme Court held as much in *Bluewater Ins.*

*Ltd. v. Balzano*, where it rejected various reinsurers' attempts to claim offsets against sums owed

to an insurer in liquidation.  823 P.2d 1365, 1374 (Colo. 1992).  Whatever offset rights might

exist as a matter of Colorado common law did not apply in the insurer liquidation context, where

"any exercise of the right to offset here in effect would create a preference for the reinsurers over

the policyholders in the distribution of Aspen's assets, contrary to public policy."  *Id.* at 1376.

The Court specifically "reject[ed] the reinsurers' argument that the insurance liquidation act was

intended to preserve an equitable right to offset," concluding instead that the Act's order of

priority in liquidation required abrogation of any such right.  *Id.* at 1369; *Conway*, 145 Fed. Cl. at

526 ("The [Colorado Supreme] Court assumed without deciding that 'an equitable right to offset

does obtain in the reinsurance context,' and concluded that the legislature had abrogated any

such right.  Then . . . the Court addressed whether a common law right of offset was implicit in

the insurance liquidation priority statute. It answered that question in the negative." (quotations

omitted).  Accordingly, the government's proposed offsets violate Colorado law.  The Court

should dismiss the government's counterclaim as to Colorado HealthOp.

> **3.**     **Federal Common Law Does Not Permit the Offset Sought By The Government**

Though this court should look to state law to supply the federal rule of decision, the result

would be no different even if this court chose instead to fashion a uniform federal rule governing

the priority of the government's offset within a state's existing insurance liquidation scheme

without reference to the content of any state's law.  This is so because to the extent that any

uniform rule of federal common law defines the scope of federal government's offset rights, that

rule furnishes the government with *the same offset rights* as could be exercised by other

creditors.

"As recognized by the Supreme Court since at least 1841, the United States has the same

common law right to setoff as a private party."  Order Granting Motion for Leave to Amend,

Dkt. 96 at 9 (citations omitted); *see also United States v. Munsey Trust Co. of Washington, D.C.*, 332 U.S. 234, 239 (1947) ("The government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.'").[13]  But here, as explained above, Colorado specifically restricts the offset right of "private part[ie]s" and other creditors under precisely these circumstances, so as to prevent them from "leap-frogging claimants with higher priority" and undermining the state's generally applicable insurance liquidation scheme.  *Conway*, 145 Fed. Cl. at 524.  Allowing the government to offset under these circumstances would grant it *greater* rights than private parties or other creditors, an outcome completely at odds with the holding of *Munsey* and the cases that preceded it that the federal government is entitled to *equal* treatment.

Certain Federal Circuit cases have noted that "the government retains its setoff right unless there is some explicit statutory or contractual provision that bars its exercise." *Johnson v. All-State Constr. Co.*, 329 F.3d 848, 854 (Fed. Cir. 2003) (citing cases).  These cases reflect the axiom that "[i]n order to abrogate a common-law principle," a contract or statute "must 'speak directly' to the question addressed by the common law."  *United States v. Texas*, 507 U.S. 529, 534 (1993).  They have little relevance here, where Colorado has clearly acted to abrogate the common law of offset with respect to insurers in liquidation.  None of these cases depart from *Munsey*'s holding that the federal government has neither lesser *nor greater* offset rights than either parties.

To the extent any uniform federal rule sets out the scope of the government's offset

---

[13] When the Supreme Court first recognized the federal government's "common right [of offset,] which belongs to every creditor," *Gratiot v. United States*, 40 U.S. 336, 370 (1841), it likely conceived of it as an element of the general "common law."  *Swift v. Tyson*, 41 U.S. 1, 18 (1842), *overruled by Erie Ry. Co. v. Tompkins*, 304 U.S. 64 (1938).  Because the "general common law" was subject to displacement by state statutes, *id.*, federal offset rights likely were as well.

rights, the rule is simply one of parity: the federal government shall be no better or worse treated than other creditors when it comes to offset rights.  That rule does not allow the federal government to sweep away even-handed state regulation and instead demand for itself greater offset rights than those enjoyed by private parties.  Accordingly, the federal common law right to offset, which provides the government with only the same rights available to other creditors, independently defeats the government's counterclaim against Colorado HealthOp.

### D.    Meritus Paid the Debts Identified in the Counterclaim in Full in 2017

Finally, Meritus already paid the amounts sought by the government in its counterclaims through offset implemented in accordance with Arizona insurance law at the request of the government.  The government's insistence that Meritus pay borderline-usurious interest on amounts paid years ago, with the interest continuing to churn with no end in sight, reveals the hypocrisy of its position:  while the government maintains that it is entitled to pursue the same right to offset that belongs to any party with mutual debts, it refuses to acknowledge that Meritus—*in 2017*—paid by offset the very debts the government now pursues.  "This court recognizes the right of private entities to exercise the common law right of set-off against the United States."  *Local Okla. Bank*, 59 Fed. Cl. at 721.  A valid setoff requires "(i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff." *Johnson v. All-State Const., Inc.*, 329 F.3d 848, 854 (Fed. Cir. 2003).  In *Johnson*, for instance, the Federal Circuit ruled that a single notice satisfied each of these requirements where the notice states that the government "would not make [a payment] because 'the amount to be retained for liquidated damages exceeds the amount of the invoice."  *Id*. at 854-55.  The notice, according to the Federal Circuit, "reflected a decision to effectuate a setoff; [] reflected an act to accomplish the set-off; and [] recorded the set-off."  *Id*. (internal quotation marks omitted).

Here, on November 16, 2017, Meritus—***at the government's request***—effectuated an offset of the very debts the government now seeks to collect (for a second time). The government filed proofs of claim with Meritus's receiver that expressly requested the government's Claim be treated "as a secured claim to the extent it is subject to set-off by a claim of the Debtor against the United States," and noted that "[t]he United States is a unitary creditor for purposes of set-off and recoupment." *See* Ex. 3 at ¶ 16; Ex. 4 at 3 ("The United States hereby expressly reserves its right to set-off or recoup any claim against debts owed to the Estate by the United States."). In the November 16, 2017 letters to the government, Meritus's receiver accepted the government's offset requests as part of the claims adjudication process. Specifically, the receiver sent the government a "Notice of Setoff and Claim Determination" for both Meritus Health and Meritus Mutual which identified (1) Meritus's debts to the government that were subject to offset and (2) the government's debts to Meritus, from which Meritus's debts would be offset, which included risk corridor and reinsurance payments. *See* Exs. 6, 7. The letters identified the amount of money the government owed to Meritus Health and Meritus Mutual "after application of the Setoff", and indicated that "[d]ue to the offset, no further entitlement to interest asserted by Claimant would be considered under the Claim." Ex. 6 at 2; Ex. 7 at 3. Meritus subsequently recorded the offset in its balance sheets, and the Liquidation Court ratified the offset. *See* Ex. 10 at 7; Ex. 11 at 14.

These steps more than met the three requirements to effectuate an offset: Meritus made the decision to take an offset; sent the November 16, 2017 letters to the government to accomplish the offset; and recorded the offset both in its November 16, 2017 letters and in its balance sheets. *See Local Okla. Bank,* 59 Fed. Cl. at 721 (2004) (correspondence reflected a proper offset directed at a government agency); *see also Johnson*, 329 F.3d at 854-55 (a single

notice successfully effectuated a setoff).   The debts that were extinguished via offset in November 2017 are the exact same debts that the government now seeks to double-recover via its counterclaim.   *Compare* Ex. 6 at 2 and Ex. 7 at 2-3 (identifying cost sharing reduction reconciliation payments, risk adjustment payments, and user fees owed to the government among the debts being setoff against risk corridor and reinsurance payments owed to Meritus), *with* Am. Ans. ¶¶ 57-59 (identifying those same debts as those the government now seeks to recover).[14] Accordingly, the government's counterclaim seeks to recover debts that have already been paid, plus interest that would continue to churn at the government's discretion.   Because the debts at issue were paid in November 2017, the government does not have a plausible claim for interest—the government may not claim years of interest on non-existent debts.[15]   The government's counterclaim should be dismissed in full as to Meritus.[16]

## III.   CONCLUSION

For the foregoing reasons, the Court should dismiss the government's counterclaim.   The Court lacks subject matter jurisdiction to entertain the government's counterclaim, and even if it were properly before this Court, it fails on the merits in full, as to both Meritus and Colorado

---

[14]   With the exception of the user fees, the amounts paid to the government by offset exceed the principal amounts identified in the Amended Answer.   The Amended Answer requests $46,583,774.29 in risk adjustment payments, $3,920,461.72 in CSR reconciliation payments, and $47,320 in user fees.   Dkt. 101 at 10.   The amounts offset in November 2017, between Meritus Health and Meritus Mutual, include $46,789,996.65 in risk adjustment payments, $4,014,827.83 in CSR reconciliation payments, and $44,149.23 in user fees.   Ex. 6 at 2; Ex. 7 at 2-3.

[15]   As explained in Section II.B., *supra*, even if Meritus's debts to the government had not been extinguished in 2017, the government's claim for interest is prohibited by both the "interest on the balance" rule and the McCarran-Ferguson Act.

[16]   As noted above, the Court may take judicial notice of the documents reflecting the offset, which are part of the public record in the Liquidation Court proceeding.   If the Court, however, is disinclined to do so, it also may treat this portion of the motion as a motion for summary judgment under RCFC 12(d).

HealthOp.  In the alternative, the Court should dismiss the government's counterclaim to the extent it seeks interest.

DATED:  November 20, 2020

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/ Stephen Swedlow*
Stephen Swedlow
stephenswedlow@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401

J.D. Horton
jdhorton@quinnemanuel.com
Adam B. Wolfson
adamwolfson@quinnemanuel.com
865 S. Figueroa Street
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

*Attorneys for Plaintiff Health Republic
Insurance Company and the Classes*