# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| Health Republic Insurance Company,<br><br>    Plaintiff, on behalf of itself and all others similarly situated,<br><br>vs.<br><br>United States of America.<br><br>    Defendant. | Case No. 16-259C<br><br>Judge Kathryn C. Davis |

## PLAINTIFF COLORADO HEALTH INSURANCE COOPERATIVE, INC.'S ANSWER TO DEFENDANT'S COUNTERCLAIM

### NATURE OF THE ACTION

**Counterclaim 1.**  On January 3, 2017, the Court certified this matter as a class action. Docket No. 30.

**Answer 1.**  Admit.

**Counterclaim 2.**  On July 17, 2020, the parties filed the "Joint Motion to Divide Class into Subclasses and Stipulation for Entry of Partial Judgement as to One Subclass." Docket No. 80. The Motion proposed that the class be divided into three subclasses: (1) Non-Dispute Subclass, (2) the Dispute Subclass, and (3) the Arches Subclass. The Dispute Subclass consisted of Colorado Health Insurance Cooperative, Inc. (HIOS ID 20472) ("Colorado Health"), Freelancers CO-OP of New Jersey, Inc. (HIOS ID 10191) ("Freelancers"), Meritus Health Partners (HIOS ID 60761) ("Meritus Health"), and Meritus Mutual Health Partners (HIOS ID 92045) ("Meritus Mutual"). *Id.*[1]

**Answer 2.**  Admit.

---

[1] Meritus Health and Meritus Mutual are collectively referred to as "Meritus."

**Counterclaim 3.**     On July 23, 2020, the Court entered an Order dividing the class into the three proposed subclasses. Docket No. 82.

**Answer 3.**     Admit.

## JURISDICTION

**Counterclaim 4.**     This Court possesses jurisdiction to entertain defendant's counterclaim pursuant to 28 U.S.C. §§ 1503 and 2508.

**Answer 4.**     The allegation in Paragraph 4 is an allegation of jurisdiction and so does not require a response. To the extent a response is required, Deny.

## STATUTORY BACKGROUND

**Counterclaim 5.**     The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, and the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (the "ACA"), were enacted in March 2010.

**Answer 5.**     Admit.

**Counterclaim 6.**     The ACA created Health Benefit Exchanges ("Exchanges"), virtual marketplaces in each state where individuals and small groups can purchase pre-certified health insurance coverage and obtain federal subsidies, if eligible. 42 U.S.C. §§ 18031-18041, 18071; 26 U.S.C. § 36B.

**Answer 6.**     This paragraph contains conclusions of law and characterizations of the ACA, to which no response is required. Further, the government has previously stated (Dkt. 101) that no answer to these allegations is required, given the Supreme Court's decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020).

**Counterclaim 7.**     The ACA also created a number of inter-related programs.

**Answer 7.** This paragraph contains conclusions of law and characterizations of the ACA, to which no response is required. Further, the government has previously stated (Dkt. 101) that no answer to these allegations is required, given the Supreme Court's decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020).

**Counterclaim 8.** The ACA established the Consumer Operated and Oriented Plan program to foster the creation of new consumer-governed, nonprofit health insurance issuers known as "CO-OPs." 42 U.S.C. § 18042(a)(1)-(2). This program provided loans for start-up costs ("start-up loans") and loans to enable CO-OPs to meet the solvency and capital reserve requirements of the states in which they are licensed to sell health insurance ("solvency loans"). *Id.* § 18042(b)(1). As a condition of program participation, the ACA requires CO-OPs to comply with all applicable federal and state law and to enter into a loan agreement providing comprehensive governance and funding provisions. *Id.* § 18042(b)(2)(C)(i)-(ii), (c)(5).

**Answer 8.** Paragraph 8 contains references to multiple federal statutes, which speak for themselves and do not require a response. Further, the government has previously stated (Dkt. 101) that no answer to these allegations is required, given the Supreme Court's decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020).

**Counterclaim 9.** Loan recipients that fail to make loan payments when due are "subject to any and all remedies available to the Department of Health and Human Services ("HHS"), Centers for Medicare & Medicaid Services ("CMS") under law to collect the debt." 45 C.F.R. § 156.520(d). With respect to the start-up loan, the underlying loan agreement expressly preserves HHS's right to collect the debt through offset. *See* Loan Agreement § 19.12 ("Lender shall have at its disposal the full range of available rights, remedies and techniques to collect delinquent debts . . . including . . . administrative offset").

**Answer 9.** This paragraph contains conclusions of law and characterizations of the ACA, to which no response is required. To the extent a response is required, admit that the cited statute was enacted as part of the ACA and that Colorado Health entered the Loan Agreement with Defendant, but otherwise deny.

**Counterclaim 10.** In an effort to mitigate the pricing risk and incentives for adverse selection, the ACA established three inter-related premium-stabilization programs modeled on existing programs established under the Medicare program.[2] Informally known as the "3Rs," the ACA reinsurance, risk adjustment, and risk corridors programs began with the 2014 benefit year, which started January 1, 2014. *See* 42 U.S.C. §§ 18061-18063.

**Answer 10.** This paragraph contains conclusions of law and characterizations of the ACA, to which no response is required. Further, the government has previously stated (Dkt. 101) that no answer to these allegations is required, given the Supreme Court's decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020).

**Counterclaim 11.** The 3Rs programs distribute risks among insurers. Each of the 3Rs programs is funded by amounts that insurers or plans pay into the program. *See* 76 Fed. Reg. 41,930, 41,948 (July 15, 2011) ("The payments and receipts in risk adjustment, reinsurance, and risk corridors are financial transfers between insurers.").

**Answer 11.** This paragraph contains conclusions of law and characterizations of the ACA and its implementing regulations, to which no response is required. Further, the government has previously stated (Dkt. 101) that no answer to these allegations is required, given the Supreme Court's decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020).

---

[2] *Compare* 42 U.S.C. §§ 18061-18063 *with id.* §§ 1395w-115(a)(2), (b), (c), (e); *see also id.* §§ 18062(a); 18063(b); 42 C.F.R. § 423.329(b)-(c).

**Counterclaim 12.**   The risk corridors program was created by section 1342 of the ACA. It was a temporary program for the 2014, 2015, and 2016 benefit years. 42 U.S.C. § 18062.

**Answer 12.**   This paragraph contains conclusions of law and characterizations of the ACA, to which no response is required. Further, the government has previously stated (Dkt. 101) that no answer to these allegations is required, given the Supreme Court's decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020).

**Counterclaim 13.**   The reinsurance program was created by section 1341 of the ACA. It was a temporary program for the 2014, 2015, and 2016 benefit years under which amounts collected from insurers and self-insured group health plans were used to fund payments to insurers of eligible plans that covered high-cost individuals. 42 U.S.C. § 18061.

**Answer 13.**   This paragraph contains conclusions of law and characterizations of the ACA, to which no response is required. Further, the government has previously stated (Dkt. 101) that no answer to these allegations is required, given the Supreme Court's decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020).

**Counterclaim 14.**   The risk adjustment program was created by section 1343 of the ACA. It is a permanent program under which amounts collected from insurers whose plans have healthier-than-average enrollees in a state market risk pool are used to fund payments to insurers whose plans have sicker-than-average enrollees in the same state market risk pool. 42 U.S.C. § 18063.

**Answer 14.**   This paragraph contains conclusions of law and characterizations of the ACA, to which no response is required. Further, the government has previously stated (Dkt. 101)

that no answer to these allegations is required, given the Supreme Court's decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020).

**Counterclaim 15.** The ACA contemplated states administering their own reinsurance and risk adjustment programs, with HHS responsible for operating those programs in states that fail to do so. 42 U.S.C. §§ 18061(b), 18063, 18041(a)-(c). In practice during the time relevant here, all states but one deferred to HHS to administer their reinsurance and risk adjustment programs as set forth in the ACA's state flexibility provision, *id.* § 18041. *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10,750, 10,759 (Feb. 27, 2015).

**Answer 15.** This paragraph contains conclusions of law and characterizations of the ACA and its implementing regulations, to which no response is required. Further, the government has previously stated (Dkt. 101) that no answer to these allegations is required, given the Supreme Court's decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020).

**Counterclaim 16.** A significant source of financial transfers between issuers and HHS under the ACA were for payment of premium tax credits ("PTC") and cost-sharing reductions ("CSR") and for CSR reconciliation payments. In order to make insurance more affordable, the ACA makes many individuals eligible for federal subsidies to help reduce their monthly health insurance premiums and their episodic cost sharing requirements (*i.e.*, deductibles, copays, and coinsurance). These APTCs and CSRs are only available to eligible consumers who purchase an individual market qualified health plan (excluding catastrophic plan coverage) through an Exchange. 42 U.S.C. § 18071(f)(2). Rather than provide this assistance directly to eligible individuals to pay to their health insurers, the Department of Treasury (as

directed by HHS) paid the subsidies in advance to eligible individuals' insurers based on estimates derived from issuer-provided data. 42 U.S.C. § 18082. And, if the advance monthly CSR payments wound up being too high (or too low), collections (or further payments) were required to reconcile the difference. *E.g.*, 26 C.F.R. § 1.36B-4; 45 C.F.R. § 156.430.

**Answer 16.** This paragraph contains conclusions of law and characterizations of the ACA and its implementing regulations, to which no response is required.

**Counterclaim 17.** The ACA and its implementing regulations mandated the payment of user fees in connection with the administration of the risk adjustment program. *See* 42 U.S.C. §§ 18031(d)(5), 18041(c)(1), 18063; 45 C.F.R. §§ 153.610(f).

**Answer 17.** This paragraph contains conclusions of law and characterizations of the ACA and its implementing regulations, to which no response is required.

**Counterclaim 18.** As part of its payment and collections process, as relevant here, HHS may net payments owed to issuers and their affiliates against amounts due from those issuers and their affiliates that arise under the risk adjustment, reinsurance, and risk corridors programs, or that result from reconciliation of advance CSR payments ("CSR Reconciliation amounts"), 45 C.F.R. § 156.1215.

**Answer 18.** Deny.

## FACTUAL ALLEGATIONS

### Colorado Health

**Counterclaim 19.** Colorado Health was formed pursuant to the ACA CO-OP program.

**Answer 19.** Admit.

### Colorado Health's Loan Agreement with CMS

7

**Counterclaim 20.**   On July 23, 2012, Colorado Health and CMS entered into a loan agreement ("Loan Agreement") under which Colorado Health received a start-up loan ("Start-up Loan") in the principal amount of $12,266,400 and a solvency loan ("Solvency Loan") in the principal amount of $57,129,600. *See* 42 U.S.C. § 18042(b)(1).

**Answer 20.**   Admit.

**Counterclaim 21.**   The Start-up Loan is evidenced by a promissory note. *See* 42 U.S.C. § 18042(b)(3). CMS disbursed, in separate disbursements, the funding available under the Start-up Loan to Colorado Health in its entirety ($12,266,400).

**Answer 21.**   Admit.

**Counterclaim 22.**   The Solvency Loan is evidenced by a promissory note. 42 U.S.C. § 18042(b)(3). CMS disbursed to Colorado Health, in separate disbursements, all of the funding available under the Solvency Loan ($57,129,600).

**Answer 22.**   Admit.

### Colorado Health's Liquidation

**Counterclaim 23.**   Colorado Health participated in the Colorado markets in the 2014 and 2015 benefit years.

**Answer 23.**   Admit.

**Counterclaim 24.**   On November 10, 2015, the Denver County District Court issued a rehabilitation order for Colorado Health. The subsequent efforts to rehabilitate Colorado Health proved futile, and a petition was filed seeking an order of liquidation.

**Answer 24.**   Admit.

**Counterclaim 25.**   On January 4, 2016, the Denver County District Court issued a liquidation order for Colorado Health.

**Answer 25.**   Admit.

### Colorado Health's Failure to Pay Charges Owed under the Risk Adjustment Program

**Counterclaim 26.**   Colorado Health failed to pay charges due to CMS under the risk adjustment program.

**Answer 26.**   Deny.

**Counterclaim 27.**   As of July 15, 2020, Colorado Health owes CMS $16,561,782.17 in risk adjustment charges.

**Answer 27.**   Deny.

### Colorado Health's Failure to Pay Charges Owed under the Reinsurance Program

**Counterclaim 28.**   Colorado Health failed to pay charges due to CMS under the reinsurance program.

**Answer 28.**   Deny.

**Counterclaim 29.**   As of July 15, 2020, Colorado Health owes CMS $771,298 in reinsurance contributions.

**Answer 29.**   Deny.

### Colorado Health's Failure to Pay CSR Reconciliation Charges

**Counterclaim 30.**   Colorado Health also failed to pay charges due to CMS resulting from CSR Reconciliation under the CSR program.

**Answer 30.**   Deny.

**Counterclaim 31.**   As of July 15, 2020, Colorado Health owes CMS $2,180,837.60 in CSR reconciliation charges.

**Answer 31.**   Deny.

### Colorado Health's Failure to Pay Risk Adjustment User Fees

**Counterclaim 32.** Colorado Health also failed to pay risk adjustment user fees.

**Answer 32.** Deny.

**Counterclaim 33.** As of July 15, 2020, Colorado Health owes CMS $74,917.92 in risk adjustment user fees.

**Answer 33.** Deny.

### Colorado Health's Failure to Pay Interest on Debts

**Counterclaim 34.** Colorado Health is required to pay, and has failed to pay, interest on debts due to CMS. 45 C.F.R. § 30.18.

**Answer 34.** Deny.

### Meritus

**Counterclaim 35.** Compass Cooperative Mutual Health Network, doing business as Meritus Mutual, was formed pursuant to the ACA CO-OP program. Compass Cooperative Health Plan, Inc., doing business as Meritus Health, was a wholly-owned subsidiary of Meritus Mutual.

**Answer 35.** Colorado Health lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

**Counterclaim 36.** Meritus Mutual and Meritus Health operated under common control. They had the same officers and directors, shared the same home office, and shared services for the adjudication and payment of claims.

### Meritus' Loan Agreements with CMS

**Counterclaim 37.** On June 7, 2012, Meritus Mutual and CMS entered into a loan agreement ("Loan Agreement") under which Meritus Mutual received a start-up loan ("Start-up

10

Loan") in the principal amount of $20,890,333 and a solvency loan ("Solvency Loan") in the principal amount of $72,422,900. 42 U.S.C. § 18042(b)(1).

**Counterclaim 38.**   The Start-up Loan is evidenced by a promissory note. See 42 U.S.C. § 18042(b)(3). CMS disbursed, in separate disbursements, the funding available under the Start-up Loan to Meritus Mutual in its entirety ($20,890,333).

**Counterclaim 39.**   The Solvency Loan is evidenced by a promissory note. 42 U.S.C. § 18042(b)(3). CMS disbursed to Meritus Mutual, in separate disbursements, all of the funding available under the Solvency Loan ($20,890,333).

### Meritus' Liquidation

**Counterclaim 40.**   Meritus participated in the Arizona markets in the 2014 and 2015 benefit years.

**Counterclaim 41.**   On August 10, 2016, the Superior Court of Arizona, County of Maricopa, issued a liquidation order for Meritus.

### Meritus' Failure to Pay Charges Owed under the Risk Adjustment Program

**Counterclaim 42.**   Meritus failed to pay charges due to CMS under the risk adjustment program.

**Counterclaim 43.**   As of July 15, 2020, Meritus owes CMS $46,583,774.29 in risk adjustment charges.

### Meritus' Failure to Pay CSR Reconciliation Charges

**Counterclaim 44.**   Meritus failed to pay CSR reconciliation charges due to CMS under the CSR program.

**Counterclaim 45.**   As of July 15, 2020, Meritus owes CMS $3,920,461.72 in CSR reconciliation payments.

**Meritus' Failure to Pay Risk Adjustment User Fees**

**Counterclaim 46.**  Meritus failed to pay risk adjustment user fees.

**Counterclaim 47.**  As of July 15, 2020, Meritus owes CMS $47,320.83 in risk adjustment user fees.

**Meritus' Failure to Pay Interest on Debts**

**Counterclaim 48.**  Meritus is required to pay, and has failed to pay, interest on debts due to CMS. 45 C.F.R. § 30.18.

**Answer 35– 48.** Paragraphs 35 – 48 of the Complaint do not require a response because those paragraphs concern Meritus Health Partners and Meritus Mutual Health Partners, parties respecting which the Court has already entered judgment. Dkt. 156.

## COUNT I
### BREACH OF STATUTORY AND REGULATORY DUTIES

**Counterclaim 49.**  Defendant repeats and incorporates by reference the preceding allegations as if set forth in full.

**Answer 49.** Plaintiff repeats and incorporates by reference its responses to Paragraphs 1-48 as if fully set forth herein.

**Counterclaim 50.**  The Dispute Subclass participated in the 3Rs and CSR programs. For each benefit year in which the Dispute Subclass participated in those programs, the members of that subclass received payment and/or were required to pay charges under those ACA programs.

**Answer 50.** Paragraph 50 contains conclusions of law, to which no response is required. To the extent a response is required, deny.

**Counterclaim 51.** By failing to pay charges and other amounts required under the ACA, the Dispute Subclass breached their statutory and regulatory duties.

**Answer 51.** Paragraph 51 contains conclusions of law, to which no response is required. To the extent a response is required, deny.

### Colorado Health

**Counterclaim 52.** Colorado Health owes and has failed to pay charges due to CMS under the risk adjustment program in the amount of $16,561,782.17.

**Answer 52.** Paragraph 52 contains conclusions of law, to which no response is required. To the extent a response is required, deny.

**Counterclaim 53.** Colorado Health owes and has failed to pay contributions due to CMS under the reinsurance program in the amount of $771,298.

**Answer 53.** Paragraph 53 contains conclusions of law, to which no response is required. To the extent a response is required, deny.

**Counterclaim 54.** Colorado Health owes and has failed to pay CSR reconciliation charges due to CMS under the CSR program in the amount of $2,180,837.60.

**Answer 54.** Paragraph 54 contains conclusions of law, to which no response is required. To the extent a response is required, deny.

**Counterclaim 55.** Colorado Health owes and has failed to pay risk adjustment user fees due to CMS in the amount of $74,917.92.

**Answer 55.** Paragraph 55 contains conclusions of law, to which no response is required. To the extent a response is required, deny.

**Counterclaim 56.** The United States is entitled to interest on all of these debts due, and as of July 15, 2020, the accrued interest due was $7,347,418.49.

**Answer 56.** Paragraph 56 contains conclusions of law, to which no response is required. To the extent a response is required, deny.

## Meritus

**Counterclaim 57.** Meritus owes and has failed to pay charges due to CMS under the risk adjustment program in the amount of $46,583,774.29.

**Counterclaim 58.** Meritus owes and has failed to pay CSR reconciliation charges due to CMS under the CSR program in the amount of $3,920,461.72.

**Counterclaim 59.** Meritus owes and has failed to pay risk adjustment user fees due to CMS in the amount of $47,320.83.

**Counterclaim 60.** The United States is entitled to interest on all of these debts due, and as of July 15, 2020, the accrued interest due was $18,070,304.58.

**Answer 57 – 60.** Paragraphs 57-60 of the Complaint do not require a response because those paragraphs concern Meritus Health Partners and Meritus Mutual Health Partners, parties respecting which the Court has already entered judgment (Dkt. 156).

The remainder of Defendant/Counterclaim Plaintiff's Complaint is a prayer for relief sought from the Court, to which no response is required.

## DEFENSES

1. The Complaint fails to state a claim upon which relief can be granted.

2. Defendant/Counterclaim Plaintiff has unclean hands.

Plaintiff/Counterclaim Defendant denies that Defendant/Counterclaim Plaintiff is entitled to the relief requested in the Counterclaim or to any relief whatsoever.

Dated: March 20, 2023

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ Adam B. Wolfson*
Adam B. Wolfson
adamwolfson@quinnemanuel.com
865 S. Figueroa Street
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Andrew Schapiro
andrewschapiro@quinnemanuel.com
191 North Wacker Drive
Suite 2700
Chicago, Illinois 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

*Attorneys for Colorado HealthOp and the Class*