## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY,<br><br>     Plaintiff,<br>     on behalf of itself and all others<br>     similarly situated,<br><br>   vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>     Defendant. | No. 1:16-cv-259C-KCD<br>(Judge Davis) |
| COMMON GROUND HEALTHCARE COOPERATIVE,<br><br>     Plaintiff,<br>     on behalf of itself and all others<br>     similarly situated,<br><br>   vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>     Defendant. | No. 1:17-cv-00877-KCD<br>(Judge Davis) |

## CLASS COUNSEL'S MOTION FOR APPROVAL OF ATTORNEY'S FEE REQUEST

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

I.     INTRODUCTION ..................................................................................................1

II.    ARGUMENT ......................................................................................................4

     A.     Class Counsel's Lodestar Is Reasonable................................................5

         1.     Legal standard ..............................................................................5

             (a)     Type of proof ...................................................................5

             (b)     Calculating the lodestar amount.......................................5

             (c)     A lodestar cross-check utilizes class counsel's current rates at the time of the fee application...............................6

         2.     Class Counsel's implied lodestar multiplier ...............................7

     B.     Class Counsel's Implied Multiplier Is "Within The Realm of Reason".................8

     C.     The Court's Findings On The *Moore* Factors Collectively Demonstrate Why A Fee Implying Even A Very High Multiplier Is Appropriate Here ...........11

         1.     The extraordinary benefits Class Counsel generated for the class strongly support a high multiplier (*Hensley*; seventh *Moore* factor).........12

         2.     Because the lodestar method is meant to approximate a competitive fee, a 5% award remains a bargain (fourth *Moore* factor)........................................................................................17

         3.     Riskier cases warrant higher multipliers (third *Moore* factor)..................18

         4.     The complexity and duration of this litigation support a higher multiplier (second *Moore* factor)...............................................20

         5.     A 5% fee is at the extreme low end of all class actions, including "megafund" cases (sixth *Moore* factor)....................................20

         6.     Providing excellent representation increases what constitutes a reasonable fee (first *Moore* factor) ...........................................23

         7.     The low number and nature of the objections indicates Class Counsel's fee request is reasonable (fifth *Moore* factor).........................24

III.    CONCLUSION.................................................................................................25

**TABLE OF AUTHORITIES**

**Page**

INSERT

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) ........................................................ 23

*Americas Mining Corp. v. Theriault*,
51 A.3d 1213 t(Del. 2012) ............................................................................... 10, 11

*Avera v. Sec'y of Health & Hum. Servs.*,
515 F.3d 1343 (Fed. Cir. 2008) ................................................................................ 6

*Biery v. United States*,
818 F.3d 704 (Fed. Cir. 2016) .................................................................................. 7

*Bywaters v. United States*,
670 F.3d 1221 (Fed. Cir. 2012) ................................................................................ 6

*Chalmers v. City of Los Angeles*,
796 F.2d 1205 (9th Cir. 1986), *amended*, 808 F.2d 1373 (9th Cir. 1987) ................ 5

*Chiu v. United States*,
948 F.2d 711 (Fed. Cir. 1991) .................................................................................. 7

*Farrell v. Bank of America Corp., N.A.*,
2020 WL 5230456 (9th Cir. Sept. 2, 2020) .............................................................. 9

*Florin v. Nationsbank of Georgia, N.A.*,
60 F.3d 1245 (7th Cir. 1995) .............................................................................. 18, 19

*Geneva Rock Prods, Inc. v. United States*,
119 Fed. Cl. 581 (2015) ....................................................................................... 4, 17

*Gisbrecht v. Barnhart*,
535 U.S. 789 (2002) ..................................................................................... 11, 15, 16

*Goldberger v. Integrated Resources, Inc.*,
209 F.3d 43 (2d Cir. 2000) .................................................................................... 16

*Health Republic Ins. Co. v. United States*,
58 F.4th 1365 (2023) ................................ 1, 4, 5, 7, 8, 10, 11, 12, 15, 17, 18, 21, 25

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ...................................................................... 5, 10, 12, 13

*In re Bluetooth Headset Prod. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ............................................................................. 4, 15, 16

*In re Cendant Corp. PRIDES Litig.*,
    243 F.3d 722 (3d Cir. 2001) .................................................................. 12, 16

*In re Crocs, Inc. Sec. Litig.*,
    2014 WL 4670886 (D. Colo. Sept. 18, 2014) ............................................. 5

*In re Doral Financial Corp. Secs. Litig.*,
    No. MDL 1706, ECF No. 107 (S.D.N.Y. July 17, 2007) ........................... 9

*In re Enron Corp. Secs., Derivative, & Erisa Litig.*,
    586 F. Supp. 2d 732 (S.D. Tex. 2008) ............................................... 13, 21

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    343 F. Supp. 3d 394 (S.D.N.Y. 2018) ...................................................... 20

*In re Mercedes-Benz Emissions Litigation*,
    2021 WL 7833193 (D.N.J. Aug. 2, 2021) .................................................. 9

*In re Merry-Go-Round Enterprises, Inc.*,
    244 B.R. 327 (Bankr. D. Md. 2000) ......................................................... 11

*In re NASDAQ Market-Makers Antitrust Litigation*,
    187 F.R.D. 465 (S.D.N.Y. 1998) .............................................................. 21

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
    991 F. Supp. 2d 437 (E.D.N.Y. 2014) ..................................................... 21

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998) .................................................................... 16

*In re Rite Aid Corp. Sec. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa. 2001) ....................................................... 13

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005) .................................................................. 4, 5

*In re Southern Peru Copper Corp.*,
    2011 WL 6382006 (Del. Ch. Dec. 20, 2011) ........................................... 21

*In re Stock Exchanges Options Trading Antitrust Litig.*,
    2006 WL 3498590 (S.D.N.Y. Dec. 4, 2006) .............................................. 6

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ................................................................... 17

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
    535 F. Supp. 2d 249 (D.N.H. 2007) ........................................................ 21

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ................................................................... 6

*In re Washington Public Power Supply Systems Securities Litigation*,
    19 F.3d 1291 (9th Cir. 1994) ............................................................................................ 3, 6

*Kastrati v. M.E.G. Restaurant Enterprises Ltd.*,
    2023 WL 180043 (S.D.N.Y. Jan. 13, 2023) ...................................................................... 6

*LeBlanc-Sternberg v. Fletcher*,
    143 F.3d 748 (2d Cir. 1998) ............................................................................................... 6

*Longnecker Prop. v. United States*,
    2016 WL 9445914 (Fed. Cir. Nov. 14, 2016) .................................................................. 4

*Maine Cmty. Health Options v. United States*,
    140 S. Ct. 1308 (2020) ..................................................................................................... 16

*McCown v. City of Fontana*,
    565 F.3d 1097 (9th Cir. 2009) ........................................................................................ 12

*McDaniel v. Cnty. Of Schenectady*,
    595 F.3d 411 (2d Cir. 2010) .............................................................................................. 4

*McKnight v. Hinojosa*,
    54 F.4th 1069 (9th Cir. 2022) ......................................................................................... 13

*McKnight v. Uber Techs., Inc.*,
    2021 WL 4205055 (N.D. Cal. Sept. 2, 2021) ................................................................ 13

*Mercier v. United States*,
    156 Fed. Cl. 580 (2021) ..................................................................................... 9, 20, 22, 23

*Minuteman Health, Inc. v. United States Dep't of Health & Human Servs.*,
    291 F. Supp. 3d 174 (D. Mass. 2018) ............................................................................ 20

*Missouri v. Jenkins*,
    491 U.S. 274 (1989) ........................................................................................................... 6

*Moda Health Plan, Inc. v. United States*,
    892 F.3d 1311 (Fed. Cir. 2018) ................................................................................ 16, 19

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
    2009 WL 2408560 (D. Mass. Aug. 3, 2009) ................................................................. 10

*Perdue v. Kenny A. ex rel. Winn*,
    559 U.S. 542 (2010) ........................................................................................................... 7

*Perez v. Rash Curtis & Assoc.*,
   2020 WL 1904533 (N.D. Cal. Apr. 17, 2020) .......................................................... 8, 9, 12, 23

*Science Applications Int'l Corp. v. United States*,
   2021 WL 3557427 (Fed. Cl. Aug. 11, 2021) .................................................................... 6

*Smith v. Village of Maywood*,
   17 F.3d 219 (7th Cir. 1994) ............................................................................................ 6

*Stetson v. West Publ'g Corp.*,
   714 Fed. Appx. 681 (9th Cir. Oct. 30, 2017) ................................................................ 6

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
   2005 WL 1213926 (E.D. Pa. May 19, 2005) ................................................................ 11

*Walmart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ....................................................................................... 15, 16

## Statutory Authorities

11 U.S.C. § 328(a) ......................................................................................................... 11

42 U.S.C. § 406(b)(1)(A) .............................................................................................. 11

## Rules and Regulations

Fed. R. Civ. P. 23 ............................................................................................................ 7

## Treatises

5 *Newberg and Rubenstein on Class Actions* § 15:50 (6th ed.) .................................... 7

5 *Newberg and Rubenstein on Class Actions*, § 15:67 (Rubenstein ed., 5th ed. 2020) ............... 21

## Other Authorities

*SCOTUS case reversal rates (2007-Present)*, Ballotpedia,
   https://ballotpedia.org/SCOTUS_case_reversal_rates_(2007_-_Present) .............................. 19

*The Supreme Court at Work,* The Supreme Court of the United States
   https://www.supremecourt.gov/about/courtatwork.aspx ........................................ 19

## I.     **<u>INTRODUCTION</u>**

In vacating this Court's previous fee award, the Federal Circuit did not find fault with the vast majority of the Court's detailed and thoughtful analysis. *See generally Health Republic Ins. Co. v. United States*, 58 F.4th 1365 (2023). Nor did the court identify any particular defects in the Court's reasoning. The Federal Circuit held only that, given the notice's language, "the law required a lodestar cross-check," and directed this Court to "reconsider any parts of its analysis affected by the conclusions we have reached." *id.* at 1374, 1378. As guideposts, the Federal Circuit noted that, "[f]or a lodestar cross-check, the resulting multiplier need not fall within any pre-defined range," but explained that a court should "take care to explain how the application of a multiplier is justified by the facts of a particular case." 58 F.4th at 1375 (citations and quotation marks omitted). In short, despite the objectors' broadside attack against this Court's application of the seven *Moore* factors, the Federal Circuit took issue with only one aspect of this Court's decision—the lodestar cross-check—and directed the Court to "provide more explanation than so far presented concerning the adequacy of Quinn Emanuel's hours and rates in light of the Objectors' criticisms." *Id.* at 1378.

For these reasons, Class Counsel focuses this motion on a lodestar cross-check and how it interplays with the seven reasonableness factors, all of which this Court correctly found support the fee percentage Class Counsel seeks. *See* Dkt. 138.[1] Those factors and the Court's conclusions about them are relevant to the cross-check because, as the Federal Circuit's opinion and precedent from across the country make clear, each factor weighing in favor of a requested fee serves to increase the maximum permissible implied lodestar multiplier. The caselaw also teaches that

---

[1]   Unless otherwise specified, all generic references to "Dkt." in this motion are to docket entries in the *Health Republic* class action.

where counsel obtain the best results for the riskiest claims, the most substantial awards are merited. And if class counsel preemptively caps its fee at the very low end of both the market for identical claims *and* awards in similar types of action, those fees should be deemed reasonable, even with a high implied multiplier.

Below and in its supporting papers, Class Counsel provides a complete lodestar cross-check analysis demonstrating why a 5% fee remains reasonable and correct. In brief, the benefit the class received from Class Counsel's work was uniquely favorable, and Class Counsel undertook extraordinary risks and costs to obtain this result on claims it pioneered, all while capping its fee at a percentage below any other offered for the exact same claims. No court, to Class Counsel's knowledge, has ever found that such facts warrant a low lodestar multiplier— quite the opposite. And the cases the Federal Circuit cited that applied a lower multiplier make this point, because they were either substantially simpler, settled sooner, involved follow-on claims the class counsel did not originate, or obtained demonstrably worse results for the class.

Among the documents supporting Class Counsel's brief is the Declaration of Professor William Rubenstein, the current author of *Newberg and Rubenstein on Class Actions*, the leading treatise on class actions. Professor Rubenstein provides a detailed analysis of Class Counsel's lodestar and concludes, *inter alia*, that it not only is clearly reasonable for a case like this, but it exhibits the sort of efficiency and efficacy that the law seeks to reward. As part of this analysis (which relies in part on an extensive database Professor Rubenstein keeps in the ordinary course of his research and scholarship), he explains how Class Counsel's work yielded more for the class on a per hour basis than any other class action of which he is aware. He also provides, based on his unquestioned expertise, important context and analysis of the fee request, explaining why many

of the objectors' previous arguments either misunderstand or misapply the concept of a lodestar cross-check.

Class Counsel does not rely on Professor Rubenstein's analysis and declaration alone. In the original fee application, Class Counsel used its historical rates to calculate its lodestar, which resulted in the 19x multiplier the Court analyzed. This was conservative of Class Counsel, because courts are in accord—including in opinions the United/Kaiser Objectors themselves recently cited, *see* Dkt. 188, at 6 (citing *In re Washington Public Power Supply Systems Securities Litigation*, 19 F.3d 1291, 1302 (9th Cir. 1994)), that class counsel should submit lodestar cross-checks based on their *current* rates at the time of the fee application. Had Class Counsel done so in July 2020 with its original fee application, the implied multiplier would have been substantially lower. Using its now-current rates only for work performed through July 2020, that multiplier reduces further to **11.5**.[2] There is copious authority indicating that such an implied multiplier is reasonable for a case like this, where every reasonableness factor weighs heavily in class counsel's favor.

As the case law on which the Federal Circuit relied makes clear, class actions that exhibit the unique combination of high risk and huge benefits to the class warrant the very highest multipliers of all (when they use multipliers). And, comparing other large class action results—as the Federal Circuit urged this Court to do—indicates that courts routinely award fee percentages far higher than 5% for results that do not even approach the net amount of damages the class here has already received. The lodestar cross-check therefore serves to confirm, not undercut, Class

---

[2]   Class Counsel utilizes its lodestar through July 2020 so the Court may compare apples to apples between its two fee petitions (*i.e.*, the same work on the same hours billed for the same results). Since July 2020, however, Class Counsel has continued to work for the risk corridor subclasses, as well as build on its risk corridors work for the cost-sharing reduction class members (almost all of which are also risk corridor class members). Class Counsel will address that additional lodestar at the appropriate time.

Counsel's request, and it is for these reasons that Class Counsel respectfully renews its application for a 5% fee from the Non-Dispute Subclass's common fund.

## II.   <u>ARGUMENT</u>

As *Geneva Rock Prods, Inc. v. United States*, the case the class notice cited, explains:

> [T]he lodestar cross-check provides information for the court's consideration, not a mandate[.] The lodestar multiplier does not need to fall within a specific range, but a comparison to the lodestar multipliers in similar cases may provide additional guidance to the court. Nevertheless, 'the lodestar cross-check does not trump the primary reliance on the percentage of common fund method.'

119 Fed. Cl. 581, 595-96 (2015) (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307 (3d Cir. 2005) ("*Rite Aid II*")) (*rev'd in part on other grounds by Longnecker Prop. v. United States*, 2016 WL 9445914, at *1 (Fed. Cir. Nov. 14, 2016).[3] The Federal Circuit reaffirmed this concept in its decision in this case, noting that application of a lodestar cross-check "does not exclude taking full account of the relevant attorney-fees considerations as they apply to a particular case." *Health Republic*, 58 F.4th at 1375.

Since "the implicit goal of the lodestar approach" is "to approximate the reasonable fee that a competitive market would bear," *McDaniel v. Cnty. Of Schenectady*, 595 F.3d 411, 420 (2d Cir. 2010), the reasonableness factors a Court applies in the first instance help it determine whether an implied lodestar multiplier is too high or too low. *Health Republic*, 58 F.4th at 1375; *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). This multi-faceted interplay between the lodestar number and the reasonableness factors is why, in appropriate cases, multipliers sometimes skew outside of the typical range. *See*, *e.g.*, *infra* at 8-11 (collecting cases). For the reasons discussed below, this is exactly such a case, because the implied lodestar from

---

[3]   Class Counsel notes that, like the Court in *Geneva Rock*, the Federal Circuit also approvingly cited *Rite Aid* multiple times. *See Health Republic*, 58 F.4th at 1372, 1375, 1378.

Class Counsel's work not only is within a range previously accepted by other courts, but is also eminently reasonable in light of this Court's detailed analysis of the seven *Moore* factors.

A.   **Class Counsel's Lodestar Is Reasonable**

1.   **Legal standard**

The first step in a lodestar cross-check is to identify the lodestar that the Court will analyze.

(a)   Type of proof

When determining class counsel's lodestar for a cross-check, "[m]ore relaxed specificity and documentation standards apply" than would if "the lodestar method is directly used to set the fee." *Health Republic*, 58 F.4th at 1378. Thus, "[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting." *Id.* (quoting *Rite Aid II*, 396 F.3d at 306). In performing that calculation, "[t]he district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *Rite Aid II*, 396 F.3d at 306-307. This is because doing otherwise would defeat the entire purpose of utilizing a percentage-of-the-fund approach. *See id.*; *see also In re Crocs, Inc. Sec. Litig.*, 2014 WL 4670886, at *4 n. 4 (D. Colo. Sept. 18, 2014) ("Because the Court has adopted the percentage method, the lodestar calculation is used only for comparison purpose. … Thus, the Court will not undertake an exhaustive lodestar analysis.").

(b)   Calculating the lodestar amount

To determine the lodestar amount, a court takes "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The reasonable hourly rate is based on the "experience, skill, and reputation of the attorney requesting fees." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), *amended*, 808 F.2d 1373 (9th Cir. 1987). To determine a reasonable hourly rate, the Court looks to "the rate prevailing in the community for similar work performed by attorneys of comparable skill,

experience, and reputation." *Id.* at 1210-11. When, unlike most class action firms, class counsel primarily bills by the hour and can provide evidence of the rates it charges paying clients, the "firm's normal and customary rates are the best evidence that the rate is comparable to the market rate." *Science Applications Int'l Corp. v. United States*, 2021 WL 3557427, at *2 (Fed. Cl. Aug. 11, 2021) (internal quotations omitted); *Kastrati v. M.E.G. Restaurant Enterprises Ltd.*, 2023 WL 180043, at *2 (S.D.N.Y. Jan. 13, 2023) ("Courts in this district also have recognized that an 'attorney's customary billing rate for fee-paying clients is ordinarily the best evidence of' a reasonable hourly rate.") (citing and quoting *In re Stock Exchanges Options Trading Antitrust Litig.*, 2006 WL 3498590, at *9 (S.D.N.Y. Dec. 4, 2006)); *see also* Rubenstein Decl. ¶¶ 15-17. The relevant community for hourly rates is typically the forum in which the district court sits. *Bywaters v. United States*, 670 F.3d 1221, 1233 (Fed. Cir. 2012) (quoting *Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1349 (Fed. Cir. 2008)).

        (c)    <u>A lodestar cross-check utilizes class counsel's current rates at the time of the fee application</u>

A final point not previously briefed, but which the United/Kaiser Objectors' own cited caselaw makes clear, is that class counsel seeking fees from a common fund are entitled to present their lodestar in terms of their current hourly rates at the time of their fee application. *See*, *e.g.*, *Washington Public Power Supply Systems*, 19 F.3d at 1305 (cited by United/Kaiser Objectors, Dkt. 188, at 6); *Stetson v. West Publ'g Corp.*, 714 Fed. Appx. 681, 683 (9th Cir. Oct. 30, 2017) (noting adjustments to current rates should be "as of the date of the fee request"); *Smith v. Village of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994) (similar); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *9 (S.D.N.Y. Nov. 7, 2007) ("The use of current rates to calculate the lodestar figure has been repeatedly endorsed by courts") (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998)).

To be sure, the Federal Circuit has held in the context of fee-shifting from the government that counsel must utilize historical, not current, rates—the so-called "no-interest rule." *See Biery v. United States,* 818 F.3d 704, 714 (Fed. Cir. 2016). That is because "no award in the nature of interest ***against the United States*** is permitted unless expressly and unambiguously authorized by statute." *Chiu v. United States*, 948 F.2d 711, 719 (Fed. Cir. 1991) (emphasis added); *see also Biery*, 818 F.3d at 714 (citing *id.* at 719). This Court made similar rulings here regarding Plaintiffs' request for pre- and post-judgment interest against the government. *See* Dkt. 31, at 26-27.

This motion, however, does not seek any fees or payment from the government and, thus, *Biery*'s no-interest rule has no application here. Class Counsel is unaware of any decision from either the Court of Federal Claims or Federal Circuit applying *Biery* in the context of a common fund fee request. Accordingly, as the Federal Circuit urged this Court to do with Fed. R. Civ. P. 23 case law, *see*, *e.g.*, *Health Republic*, 58 F.4th at 1371 ("Appropriately borrowing from case law under  Fed. R. Civ. P. 23 … the parties before us recognize…"), this Court should apply the consensus view that current rates are appropriate for a lodestar cross-check. *See supra*; *see also* 5 Newberg and Rubenstein on Class Actions § 15:50 (6th ed.) ("[F]ees are usually not paid until the end of a fee-shifting case and that delay is generally accounted for 'either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value.'" (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 556 (2010)))

### 2.     Class Counsel's implied lodestar multiplier

In Wolfson Decl., Ex. A, Class Counsel provides a detailed breakdown of the attorneys and legal staff members who provided services for this case, and identifies their respective hourly rates and hours billed on an annual basis. That exhibit then totals their respective lodestar for each year and adds up all lodestar for Class Counsel's work through July 30, 2020. *Id.* As that analysis demonstrates, if the Court applies Class Counsel's 2020 rates, Class Counsel's total lodestar is

$11,372,851.50, implying a 16.25 multiplier. If the Court utilizes Class Counsel's current rates, Class Counsel's lodestar is $16,083,217.00, implying an 11.5 multiplier.

In support of its lodestar amount, Class Counsel provides a description of the work its attorneys performed, which was necessary, proper, and reasonable to achieve these results it did for the class. Wolfson Decl. ¶¶ 2-6. Professor Rubenstein performed an independent analysis of Class Counsel's work based on his deep expertise in class actions and by comparing class actions of similar size and complexity. He concludes the amount and type of work that Class Counsel performed is not only clearly reasonable, but exhibits the exact type of restraint and efficiency that courts should encourage, because class-action attorneys sometimes seek to pad their hours in order to inflate their lodestar. Rubenstein Decl. ¶¶ 18-27. Finally, one of Class Counsel's Global Co-Managing Partners—who previously headed its Washington, D.C. office—provides confirmation that the rates Class Counsel cites in its supporting papers are the normal and customary rates it charges paying clients, and provides further confirmation that these are rates clients pay for the services of D.C.-based attorneys. Burck Decl. ¶¶ 3-5; *see also* Wolfson Decl. ¶ 4.[4]

Based on this multi-layered proof, Class Counsel submits its lodestar reflects the true and accurate amounts it would have billed by the hour for these cases, had it not taken on the risk of representing the class on full contingency.

### B.   Class Counsel's Implied Multiplier Is "Within The Realm of Reason"

Although every fee request must be specific to its facts, *Health Republic*, 58 F.4th at 1374-1377, it bears noting that Class Counsel's implied lodestar multiplier is well-supported in the case law. *Perez v. Rash Curtis & Assoc.*, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020), is instructive.

---

[4]   If the Court would like to see, as additional proof, redacted examples of actual invoices utilizing these hourly rates for Washington, D.C.-based attorneys and matters, Class Counsel would be happy to provide them *in camera*.

There, like here, the court certified a class, which class counsel then took to final judgment. *Id.* at *1, *15. There, like here, the class award resulted in a "megafund" (*i.e.*, a fund over $100 million). *Id.* At *15 ($267 million class award); *see also Mercier v. United States*, 156 Fed. Cl. 580, 592 (2021) (Kaplan, C.J.) (defining megafund as anything over $100 million). And there, like here, class counsel's expected lodestar on the case (reduced in various amounts based on different assumptions) implied different multipliers well above the norm; in that case, 13.42, 15.42, and 18.15. 2020 WL 1904533, at *20-*21. However, **un**like here, class counsel in *Perez* requested 33.33% of the class award. *Id.* at *15.

In conducting a lodestar cross-check, the *Perez* court observed that "all three multipliers are still within the surveyed acceptable range" and awarded class counsel the requested 33.33% fee. It did so because it found that the following facts "weigh in favor of a higher lodestar multiplier": "[t]he benefit obtained for the class [was] an extraordinary result," there was (and remained, in that particular case) the substantial risk of nonpayment, and "the general quality of the representation and the complexity and novelty of the issues presented" were high. *Id.* at *21. This Court reached essentially the same conclusions about Class Counsel (among others) in its original fee award. *See* Dkt. 138 at 13-17.

*Perez* is not the only case that confirms reasonable fees can nevertheless imply high multipliers; numerous cases the Federal Circuit did not mention or distinguish make the same essential point. *See*, *e.g.*, *In re Mercedes-Benz Emissions Litigation*, 2021 WL 7833193, at *16 (D.N.J. Aug. 2, 2021) ("Courts in this Circuit and elsewhere have approved large multipliers, when appropriate, in a range exceeding 10."); *see also Farrell v. Bank of America Corp., N.A.*, 2020 WL 5230456 (9th Cir. Sept. 2, 2020) (10.15 multiplier, as demonstrated by the dissent's discussion of the lodestar relative to the fee award); *In re Doral Financial Corp. Secs. Litig.*, No. MDL 1706,

ECF No. 107 (S.D.N.Y. July 17, 2007) ("A 15.25% fee represents a reasonable multiplier of 10.26."); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 182 (8.9 multiplier); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (8.3 multiplier).

As Professor Rubenstein further explains, his own research confirms the same. Rubenstein Decl. ¶¶ 35-37. He cautions, however, that looking *just* at multipliers cited in lodestar cross-check cases can provide a misleading view of what constitutes a reasonable contingent fee. First, the vast majority of contingency arrangements in the United States are private, but most exceed 30% and all indications are that many embody very high multipliers. *Id.* ¶¶ 38-39. Second, only about half of class action fee awards utilize a lodestar cross-check, so looking only at multipliers without reference to the greater body of fee percentage awards ignores critical information for the reasonableness analysis. *Id.* Third, because attorneys are more likely to invite or justify their fee requests with a lodestar cross-check when their lodestar-to-fee ratio is relatively low, relying only on lodestar cross-check cases ignores selection bias. *Id.* It is for these reasons that he discusses how an implied multiplier interacts with the reasonableness factors, rather than supplant them. *Id.* ¶¶ 29-34, 40-44.

To this point, although the Federal Circuit noted the three cases this Court previously cited regarding high multipliers provided "weak support" for a high multiplier here, those cases still exhibit the correct *process* for analyzing a lodestar cross-check (or cross-check-style arguments).

For example, while it is true that *Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012), was not a decision under federal law, *see Health Republic*, 58 F.4th at 1375, the Delaware Supreme Court analyzed a class action fee request by looking primarily at the benefits class counsel generated for the class (in accord with *Hensley*), as well as at a number of reasonableness

factors in light of arguments akin to a lodestar cross-check (*i.e.*, that class counsel's fee would equal "66 times the value of their time and expenses"). *Americas Mining*, 51 A.3d at 1252.

Similarly, in *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926 (E.D. Pa. May 19, 2005), the lack of objectors was one factor applied in a broader analysis to approve a fee equaling 15.6 class counsel's lodestar.

Finally, it is true that in *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000), the court assessed whether a contingent-fee agreement was reasonable under 11 U.S.C. § 328(a), and that it was not a common fund case. However, the reasonableness analysis *Merry-Go-Round* utilized is effectively identical to the approach the Supreme Court required in *Gisbrecht v. Barnhart*, 535 U.S. 789, 808 (2002), for contingent-fee agreements under 42 U.S.C. § 406(b)(1)(A). The Federal Circuit approvingly quoted and cited *Gisbrecht* just one page earlier in its decision. *Compare Health Republic*, 58 F.4th at 1374 (quoting and citing *Gisbrecht*); *with* 1375 (discussing *Merry-Go-Round*). These two opinions confirm that courts routinely assess the reasonableness of contingent fees through a variety of means, and have concluded in proper cases that reasonable fees can imply multipliers as high as 19.6 (or higher).

What constitutes a "proper case" varies, but the consistent through line is that courts analyze the reasonableness of a fee request in light of the overall circumstances, and, if those reasonableness factors cut heavily in class counsel's favor, conclude a high multiple is permissible. Professor Rubenstein, the Federal Circuit, and multiple opinions the Federal Circuit cited approvingly (discussed further below) confirm the same.

## C.    The Court's Findings On The *Moore* Factors Collectively Demonstrate Why A Fee Implying Even A Very High Multiplier Is Appropriate Here

As the Federal Circuit noted, there is no *per se* rule against fees that imply high lodestar multipliers; it is just that multipliers "far outside the evident relevant norm … require exceptional

justification." *Health Republic*, 58 F.4th at 1376. Class Counsel has always conceded the amount of work it performed in these cases implies a high lodestar multiplier, *see*, *e.g.*, Dkt. 84 at 30, Dkt. 93 at 14-15; its contention remains that the seven *Moore* factors provide exactly the "exceptional justification" for that type of award. Given the focus here on a lodestar cross-check, the below discussion explains—by looking to the logic of other cases, as the Federal Circuit urged, *see Health Republic*, 58 F.4th at 1375 ("More particularly still, a court should 'examine[ ] the reasoning behind ... awards in cases of similar size.'" (quoting *In re Cendant*, 243 F.3d at 737))—how and why the Court's findings on the *Moore* factors refute the idea that Class Counsel seeks a windfall, and how each finding pushes up the ceiling for what constitutes an unreasonable implied multiplier.[5]

### 1. The extraordinary benefits Class Counsel generated for the class strongly support a high multiplier (*Hensley*; seventh *Moore* factor)

Ultimately, *the* most important question for determining whether a lodestar multiplier indicates a fee is too high or too low is the benefit obtained for the class. *See Hensley*, 461 U.S. at 434-36; *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009) (ultimate reasonableness of the fee "is determined primarily by reference to the level of success achieved by the plaintiff").[6] Courts employing a lodestar cross-check thus view the benefit to the class as the "foremost" consideration in assessing multipliers, and find that exceptional results warrant higher multipliers. *See. e.g.*, *Perez*, 2020 WL 1904533, at *21 (holding multipliers between 13.42-18.15 were

---

[5] Class Counsel's discussion addresses the *Moore* factors out of order, because the caselaw explains why some factors hold more importance than others when conducting a lodestar cross-check.

[6] Although *Hensley* and *McCown* are fee-shifting cases and therefore of limited utility with respect to the detail of proof necessary for a lodestar cross-check, the Federal Circuit noted that *Hensley* is instructive in how to assess lodestar for cross-check purposes. *See Health Republic*, 58 F.4th at 1378.

reasonable, given, *inter alia*, class counsel obtained an "extraordinary result" for the class); 5 Newberg on Class Actions § 15:87 (citing "the risks counsel took" and "the results they achieved for the class" as the most important factors in assessing "the reasonableness of a lodestar multiplier").[7] In contrast, where class counsel achieves "only limited success" for the plaintiffs, a court should "award only that amount of fees that is reasonable in relation to the results obtained." *Hensley*, 461 U.S. at 436, 440; *see also*, *e.g.*, *McKnight v. Uber Techs., Inc.*, 2021 WL 4205055, at *7 (N.D. Cal. Sept. 2, 2021), *aff'd sub nom. McKnight v. Hinojosa*, 54 F.4th 1069 (9th Cir. 2022) (applying *Hensley* in percentage-of-the-fund case to slightly reduce fee request because the results class counsel achieved were not "exceptional").

As this Court already found, Class Counsel created huge benefits for the class. Dkt. 138 at 13-17. The first and most obvious is that Class Counsel not only identified the facts and legal theories underlying the class's (and broader industry's) risk corridor claims, but also had the conviction of belief to locate a class representative, Health Republic, who was willing to bring suit even in the face of intense skepticism. *Id.*; *see also* Dkt. 84-1 (Swedlow Decl.) ¶¶ 8-9; Dkt. 84-4 (Bonder Decl.) ¶¶ 9-10.

But, of course, the benefits did not stop there. As the Court previously held, the legal theory Class Counsel identified and was the first to pursue is the only theory that ultimately won at the Supreme Court, and Class Counsel helped promote and support that theory at every step. Dkt. 138

---

[7]    *See also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736 n.44 (E.D. Pa. 2001) ("*Rite Aid I*") (if lodestar multiplier does not increase where counsel obtains abnormally good results, "the lodestar approach begins to dominate and supersede the percentage of the recovery formula"); *In re Enron Corp. Secs., Derivative, & Erisa Litig.*, 586 F. Supp. 2d 732, 752 (S.D. Tex. 2008) ("The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement [and] the skill of the attorneys[.]"); *In re WorldCom, Inc. Secs. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) (noting that "public policy" supports a high multiplier where "[t]he size of the recovery achieved for the class . . . could not have been achieved without the unwavering commitment of Lead Counsel to this litigation.")

at 15-16. In the end, Class Counsel's pioneering and dogged efforts resulted in a 100% damages recovery for the class (and for all other risk corridors plaintiffs), *id.* at 13-17, resulting in billions of dollars in recoveries nearly every class member had effectively written off. As Professor Rubenstein notes, this generated $384,000 of recovery per hour worked; a unique result among class actions, stemming from uniquely efficient work. Rubenstein Decl. ¶¶ 1, 23.

With one notable exception, Class Counsel remains unaware of a single megafund case where counsel obtained 100% damages for the class. That one exception, however—*In re Urethane Antitrust Litigation*—resulted in a one-third fee award on an $835 million common fund ($278 million). 2016 WL 4060156 (D. Kan. July 29, 2016). Thus, to the best of Class Counsel's knowledge, *this* case is entirely unique in terms of the benefits obtained versus the fee requested—*i.e.*, even if Class Counsel receives its requested 5% fee, the class will receive more of its damages than any other megafund case while paying less.

For example, the court in *In re Blue Cross Blue Shield Antitrust Litig.*, recently awarded class counsel $626.5 million out of a $2.67 billion common fund settlement; a 23.47% fee. 2022 WL 4587617, at *1 (N.D. Ala. Aug. 9, 2022). In arguing for that fee, class counsel noted the settlement represented approximately "7.3% to 14.3% of estimated maximum potential recoveries" of past damages. *See In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-cv-20000-RDP, Dkt. 2733-1, at 48 (N.D. Ala. May 28, 2021). Class counsel in that case therefore received a fee almost 3.5x higher than what Class Counsel requests here, but for a result that (as a percentage of damages) is a small fraction of what Class Counsel achieved and (in hard numbers) is approximately 70% of what Class Counsel obtained for the class here. This highlights the extraordinary nature of this lawsuit and the class's uniquely extraordinary benefits.

14

Furthermore, the benefits Class Counsel provided also included the class structure itself. As unrebutted evidence makes clear, several class members—including *both* United and Kaiser— opted into the class because they felt they could not bring suit directly against the government, else potentially face its wrath. Dkt. 93-2 (Swedlow Supp. Decl.) ¶¶ 7, 9. The benefit from "hiding" as an absent class member thus meant the difference between a 100% recovery of the amounts the government previously refused to pay, versus no risk corridor recovery at all

It is true the Federal Circuit observed that "[i]f the benefits are large in comparison to the amount of time counsel spent on the case, a downward adjustment is ... in order." *Health Republic*, 58 F.4th at 1374 (quoting *Gisbrecht v. Barnhart*, 535 U.S. 789, 808 (2002). However, the pertinent question is "a downward adjustment from what?" In the Supreme Court opinion the Federal Circuit cited for this proposition, the benchmark was a 25% contingent fee. *See Gisbrecht*, 535 U.S. at 807. The same 25% benchmark was at issue in the very next case the Federal Circuit cited, *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("Thus, for example, where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage ...."). And, in the very next opinion the Federal Circuit cited, *Walmart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (2d Cir. 2005), the Court assessed whether class counsel's request for an 18% fee on a $3.3 billion settlement was reasonable—in that case, the District Court awarded 6.5%, which the Second Circuit upheld. *Id.* at 122-124.

Here, Class Counsel recognized that any substantial amount of opt-ins would render typical fee award benchmarks inappropriate. It therefore adjusted its fee downward to the bottom of the megafund fee spectrum, thereby preemptively addressing the concern the Federal Circuit notes. Had the case settled before Class Counsel spent significant time or effort vindicating the class's

rights, then the notice gave additional comfort any fee percentage could be reduced even further under those circumstances. *See* Dkt. 138 at 20 n.6.[8] Thus, the notice's cross-check language protected against windfalls stemming from early settlement, ultra-high opt-in rates, or both.

But, of course, an early and/or partial settlement is not what happened. Nor did every single QHP opt into the class. Instead, class members representing approximately a third of all unpaid risk corridor amounts opted in, Class Counsel continued to litigate the case for years, and, through Class Counsel's efforts (both within the class action and without), the class obtained a 100% damages award, 95% of which Class Counsel obtained permission to distribute as soon as it could. The windfall situation the notice contemplated did not occur and, after the Federal Circuit originally held the risk corridors claims Class Counsel originated were invalid as a matter of law, *see Moda Health Plan, Inc. v. United States*, 892 F.3d 1311 (Fed. Cir. 2018), *rev'd and remanded sub nom. Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308 (2020), Class Counsel faced the highly likely risk of never being paid—yet, it continued on for years after that.

Placing a ceiling on the fee was itself a benefit to the class. That sort of voluntary downward departure from typical benchmarks should be rewarded—not punished—especially when it means the class now enjoys unique benefits no other megafund class has ever received.

---

[8]   This comfort addressed the concerns raised by courts in the Federal Circuit's two other case citations in the portion of its opinion citing *Gisbrecht*, *Bluetooth*, and *Walmart*. *See In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 736 (3d Cir. 2001) (involving a settlement class counsel obtained after just four months of work); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 339 (3d Cir. 1998) (remanding for further consideration of fee award, because class counsel largely followed on an independent task force's work and the lower court did not explain fee award in light of such facts). The Federal Circuit's final citation, *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), reiterated the typical warning against providing fees that are windfalls, but otherwise held only that courts within the Second Circuit can employ either the lodestar or percentage methods, and encouraged courts utilizing the percentage method to still conduct a cross-check. *Id.* at 49.

2. <u>**Because the lodestar method is meant to approximate a competitive fee, a 5% award remains a bargain (fourth *Moore* factor)**</u>

In *In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001)—which the Federal Circuit cited approvingly, *see Health Republic*, 58 F.4th at 1375—the Seventh Circuit observed that applying an automatic "megafund cap" to fees would disincentivize any "sane lawyer" from even attempting to achieve an amazing result for a class. *Synthroid*, 274 F.3d at 718. It therefore discussed the reasoning behind that Circuit's "market-based approach" to class counsel fees, the gist of which is that "any method other than looking to prevailing market rates assures random and potentially perverse results." *Id.* at 719. Accordingly, under *Synthroid*, courts benchmark reasonable fees by looking first at "actual agreements" (*e.g.*, between counsel and class representatives), and next at data from similar suits "where large [plaintiffs] have chosen to hire counsel up front." *Id.* at 720.

Class Counsel recognizes only one *Moore* factor explicitly utilizes a market-based approach. And the *ex ante* "deal" Class Counsel offered class members was a 5% fee cap subject to a lodestar cross-check. However, *Geneva Rock* (the case the opt-in notice cited) explicitly considers a lodestar cross-check in light of the *Moore* factors. 119 Fed. Cl. at 592. Thus, class members agreed that market agreements are relevant to determining Class Counsel's fees.

As to the first benchmark (actual agreements between Class Counsel and class members), each of Health Republic and Common Ground agreed to pay Class Counsel 25% of their damages, had the case not been certified and proceeded to individual judgments. Dkt. 84-1 (Swedlow Decl.) ¶ 8. Had Class Counsel just pursued the two class representative's claims, it would have made over $28 million in fees from them alone.

Moreover, not a single other contingency lawyer handling risk corridor claims was willing to go as low as 5% for its fees. Dkt. 93-2 (Swedlow Supp. Decl.) ¶¶ 10-12. This is powerful market

17

evidence under the fourth *Moore* factor because, even paying a 5% fee, every single class member has already received more in net risk corridor damages than any other risk corridor plaintiff paying a contingency fee. Rubenstein Decl. ¶ 43. Thus, the unrebutted market evidence shows Class Counsel provided a bargain, which contributes to the overall picture that even a high multiplier here is not unreasonable. *Id.*

### 3.     Riskier cases warrant higher multipliers (third *Moore* factor)

In another case the Federal Circuit cited approvingly, *Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245 (7th Cir. 1995)—*see Health Republic*, 58 F.4th at 1375—the Seventh Circuit noted that a risk multiplier goes up with the risk of a case. *See Florin*, 60 F.3d at 1247. The Federal Circuit held the same. *See Health Republic*, 58 F.4th at 1375 (applying a lodestar cross-check "does not exclude taking full account of the relevant attorney-fees considerations as they apply to a particular case," such as "the risk of nonpayment in a contingency-fee commonfund arrangement"). In *Florin*, the Seventh Circuit noted one could quantify this interplay between risk and reasonable reward by dividing 1 (*i.e.*, the lodestar amount) by the chance of success (*i.e.*, the risk). 60 F.3d at 1247 n.3. That is just one formulation of the concept, but useful here.

As the Court noted, the objective facts here show this was a very risky case. Dkt. 138 at 17. The majority of lower courts to review the claims rejected them. The initial Federal Circuit panel rejected them. The Federal Circuit refused to review that decision *en banc*. In the end, "[i]t would take a favorable decision by the Supreme Court to change the course." *Id.* As Professor Rubenstein puts it:

> Specifically, after the Federal Circuit had ruled against the plaintiffs on the key legal issue in related cases, the only chance of success relied on a constellation of factors that are more infrequent than Halley's Comet: (1) the Supreme Court had

to grant the petition for *certiorari*, a step the Court takes in about 1.3% of cases;[9] and (2) it then had to reverse the Federal Circuit, a step the Court takes in about 71% of the cases arising from this Circuit that it actively reviews.[10]  Together, these odds (.013 x .71) means the case had a .0092 chance – roughly 1 in 100 chance – of succeeding at that moment.

Rubenstein Decl. ¶ 44.

With all of these risks ahead, Class Counsel nevertheless pioneered the class's claims and continued to invest heavily in them even after the Court stayed this case pending the appeals and even after the initial Federal Circuit loss. Dkt. 138 at 17. In fact, Class Counsel billed *one third* of its lodestar on the class's behalf *after* the Federal Circuit handed down its *Moda* opinion; *i.e.*, the absolute riskiest point to invest its time and efforts. Wolfson Decl. ¶ 7. Applying *Florin*'s logic and risk multiplier formula, Class Counsel's odds of winning at the beginning of this case were not high. Looking at all the facts now, it appears that, *at best*, it had a 10% chance of success from the start, which immediately implies a risk-based multiplier of 10. And, if one takes into account *ex ante* the chances that the Supreme Court would not only take up the case, but then also find in the class's favor, the risk-based multiplier goes up dramatically from there—easily to 100. Rubenstein Decl. ¶ 44.

The *Moore* factors, of course, look at risk as just one factor among many, so any lodestar cross-check cannot simply assess an implied multiplier in terms of risk. However, here, the extraordinarily risky nature of the claims pushes up the risk-based portion of any multiplier to what would otherwise be termed the very high end. That is fully consistent with a 5% fee.

---

[9] Supreme Court of the United States, *The Supreme Court at Work* ("Each Term, approximately 5,000-7,000 new cases are filed in the Supreme Court. . . . Plenary review, with oral arguments by attorneys, is currently granted in about 80 of those cases each Term . . ."), available at https://www.supremecourt.gov/about/courtatwork.aspx.

[10] Ballotpedia, *SCOTUS case reversal rates (2007-Present)*, available at https://ballotpedia.org/SCOTUS_case_reversal_rates_(2007_-_Present).

4.     __The complexity and duration of this litigation support a higher multiplier (second *Moore* factor)__

As does the riskiness of a case, its complexity and duration also push up what is considered a reasonable fee. *See, e.g.*, *Mercier*, 156 Fed. Cl. at 591; *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 416–17 (S.D.N.Y. 2018) (holding that the complexity factor favored approval of counsel's fee request because the case presented "unique and difficult issues not only for the parties, but also for the broader investor public"); *cf. Minuteman Health, Inc. v. United States Dep't of Health & Human Servs.*, 291 F. Supp. 3d 174, 179 (D. Mass. 2018) (the Affordable Care Act "is a notoriously complex statute, health insurance is notoriously difficult to administer effectively, and the federal health-care bureaucracy is notoriously cumbersome."). As the Court already noted, the legal questions presented in these cases were far from straightforward. *See* Dkt. 138 at 14-15. Furthermore, Class Counsel lent its aid "in either a direct or supporting role at every level before the class members in these cases were awarded judgment in their favor," a process that "spanned the course of over four [now, seven] years." *Id.* at 15. Class Counsel also organized and managed two large classes representing over one third of the overall risk corridor claims value. *Id.* at 16. This *Moore* factor is thus yet another basis to conclude that Class Counsel earned fees at the high end of implied multipliers.

5.     __A 5% fee is at the extreme low end of all class actions, including "megafund" cases (sixth *Moore* factor)__

As this Court recognized in its original decision, *see* Dkt. 138 at 21-22, and as every single expert who has provided analysis for this case explains—including Professor Rubenstein, who literally wrote the book on class actions—a 5% fee is at the extreme low end of class action fee awards, regardless of the size of the common fund. *See* Rubenstein Decl. ¶¶ 2, 30 n.29; Dkt. 84-2 (Fitzpatrick Decl.) ¶¶ 23, 26; Dkt. 84-3 (Silver Decl.) ¶¶ 20, 69, 75-77. Moreover, although courts utilize the percentage-of-the-fund method over 90% of the time to award fees, they utilize a

lodestar cross-check only about 40-50% of the time. 5 Newberg and Rubenstein on Class Actions § 15:67 (Rubenstein ed., 5th ed. 2020) (approximately 50% of common fund cases do not consider lodestar at all); Rubenstein Decl. ¶ 38; Fitzpatrick Decl. ¶ 29 (citing studies showing that over half of courts do not employ the lodestar method primarily or as a cross-check). This means that only about 40% of percentage-based fee awards involve a lodestar cross-check, indicating that any reasonableness analysis involving a lodestar cross-check should also look at fees awarded in class actions *without* a cross-check. Rubenstein Decl. ¶¶ 38-39. This is why the sixth *Moore* reasonableness factor is "the ***percentage*** applied in other class actions," rather than the "lodestar multiplier." *See Health Republic*, 58 F.4th at 1372 (quoting *Moore*, 63 Fed. Cl. at 787).

That a 5% fee is at the very low end of class action fee awards is even more notable when one also considers (as discussed in detail above) that most class actions settle, meaning that class members typically receive far less than the 95% of damages class members already received here. This includes megafund case after megafund case,[11] examples of which Class Counsel cited in its previous papers and respectfully notes the Federal Circuit neither mentioned nor distinguished. *See generally Health Republic*, 58 F.4th 1365. And the vast majority of even those cases routinely award class counsel far more than the 5% Class Counsel requests here.

---

[11]    *See, e.g.*, *In re Southern Peru Copper Corp.*, 2011 WL 6382006, at *1 (Del. Ch. Dec. 20, 2011) (awarding approximately $304 million in fees and expenses, totaling 15% of the $2 billion judgment); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) (awarding $464 million in fees, representing 14.5% of $3.3 billion recovery); *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 488 (S.D.N.Y. 1998) (in case involving recovery in excess of $1 billion, fee of $143,780,000, or 14% of the total fund was reasonable and appropriate); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437, 445 (E.D.N.Y. 2014) (holding that that requested attorney fee award representing 9.56% of total recovery, or approximately $544.8 million, was fair and reasonable); *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) (holding that that requested attorney fee award representing 9.52% of total recovery, or approximately $688 million, was fair and reasonable).

Chief Judge Kaplan's October 29, 2021 opinion in *Mercier v. United States*, 156 Fed. Cl. 580 (2021)—a decision that post-dates Class Counsel's original fee petition—is instructive here. In that case, class counsel obtained a $160 million settlement from the government, which equaled 65% of the class members' claimed overtime and back pay damages. *Id.* at 584. In assessing class counsel's 30% fee request, Chief Judge Kaplan first analyzed the request in light of the same seven *Moore* factors this Court applied in its original fee award decision. *Id.* at 591. Then, recognizing that high of a settlement made *Mercier* a "megafund" case, *id.* at 592, Chief Judge Kaplan applied extra scrutiny to class counsel's 30% fee request (including a lodestar cross-check) to balance (a) properly incentivizing attorneys to take on similar cases in the future, (b) recognizing the excellent work the particular class counsel in that case provided, and (c) avoiding a windfall. *Id.* at 591-593. In the end, on $10.8 million in lodestar, and based on her comprehensive analysis, Chief Judge Kaplan awarded class counsel a 20% fee ($32 million), thus reducing the net amount class members obtained from the case to approximately 48% of their claimed damages. *Id.*

*Mercier* provides useful and important context for Class Counsel's renewed fee request. In a megafund class action from the Court of Federal Claims involving lodestar lower than this case and a common fund just 4% of what Class Counsel obtained for the class, the Court awarded a fee percentage four times *higher* than what Class Counsel requests, netting class members (as a percentage of their damages) approximately half of what class members here would receive: 48% v. 95%. None of this is a criticism of *Mercier* or its reasoning; rather, the point is that, by every single metric, class members here will be better off than similarly-situated megafund class members from the Court of Federal Claims, but pay less as a percentage of their damages for that result. If one takes seriously that the ultimate benefit to the class is what most matters for assessing reasonableness in light of a lodestar cross-check, *see supra* at 12-16, and that the sixth *Moore*

factor specifically requires looking at fee percentages from similar cases, the stark difference in net result between *Mercier* and this case (even after applying Class Counsel's 5% fee) dramatically underscores why Class Counsel's fee request remains reasonable.

These comparable cases explain why a fee implying even a multiplier in the high teens is reasonable in this case. As discussed above, such a multiplier has been accepted in the past, *see supra* at 8-11, and in nearly every other megafund case and in virtually all other class actions, class counsel obtaining far less beneficial results for the class have received higher fees, whether expressed as a percentage or in hard dollars. The class members here are better off with a lower fee percentage than any megafund class members of which Class Counsel is aware, including the megafund class members in *Mercier*. These comparisons weigh strongly in favor of finding 5% reasonable, even with a high implied multiplier. *Moore*, 63 Fed. Cl. at 787.

### 6. Providing excellent representation increases what constitutes a reasonable fee (first *Moore* factor)

Because "[t]he quality of Class Counsel is essentially undisputed here," Dkt. 138 at 13, Class Counsel does not focus overmuch on this factor except to note that, just like each of the other *Moore* factors, higher quality representation pushes up the number that constitutes a reasonable fee. *See*, *e.g.*, *Perez*, 2020 WL 1904533, at *21; *see also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 WL 6250657, at *1 (S.D.N.Y. Nov. 29, 2018) (noting that quality of counsel is "best measured by results"). As the Court observed, "Class Counsel demonstrated a degree of foresight in bringing these suits and focusing their attention on the Section 1342 claim several months before other parties began filing individual complaints based in part on the same legal theory," and that the claims Class Counsel pioneered "resulted in a huge award to the classes here." Dkt. 138 at 13-14. This sort of creative, forward-thinking, and relentless representation demonstrates independent value worth rewarding.

7. **The low number and nature of the objections indicates Class Counsel's fee request is reasonable (fifth *Moore* factor)**

In the briefing on Class Counsel's original fee application, "90 percent of the organizations whose entities opted into these suits, representing approximately $2.1 billion in damages, do not object to the fee." Dkt. 138 at 25. As the Court observed, "the number of objections is relatively low when viewed in the context of the classes here," and it therefore found that "the final factor supports the determination that Class Counsel's fee request is reasonable." *Id.*

On this renewed motion, it bears noting that applying a 5% fee to *just* the $2.1 billion in damages represented by the non-objectors yields Class Counsel over $100 million in fees. Cross-checking Class Counsel's lodestar to just that portion of the damages in this case implies a multiplier well outside the "norm," confirming that a high multiplier does not itself indicate Class Counsel would receive a windfall here—which is further bolstered by the fact that Class Counsel resolved three different risk corridor subclass's claims *after* its initial fee petition, and not a single subclass member objected to a 5% fee.

Finally, looking to the *nature* of the objections, the only objector argument with which the Federal Circuit agreed is that the Court needed to conduct a full lodestar cross-check. The Federal Circuit, however, did *not* endorse any of the other objections (despite that the objectors raised them during the appeal), nor did it accept the objectors' argument that Class Counsel should receive fees implying a 0.88 lodestar multiplier. Given that this *Moore* factor does not just look at the number of objections, but also their character, even the nature of the objections raises little concern about the reasonableness of Class Counsel's fee—particularly when the factors the Supreme Court and multiple Courts of Appeal on which the Federal Circuit relied indicate that Class Counsel earned the 5% fee it requests.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Class Counsel respectfully renews its request that the Court approve its application for an attorney's fee of 5% of the net recovery for the Non-Dispute Subclasses in *Health Republic* and *Common Ground*. In *Health Republic*, this amounts to an attorney's fee of $95,183,102.35 on a net recovery of $1,903,662,047.19; in *Common Ground*, this amounts to an attorney's fee of $89,665,569.32 on a net recovery of $1,793,311,386.47.

Dated: May 2, 2023                          Respectfully submitted,


                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP

                                            */s/ Adam B. Wolfson*
                                            Adam B. Wolfson
                                            adamwolfson@quinnemanuel.com
                                            865 S. Figueroa Street
                                            Los Angeles, California 90017
                                            Telephone: (213) 443-3000
                                            Facsimile: (213) 443-3100

                                            Andrew Schapiro
                                            andrewschapiro@quinnemanuel.com
                                            191 North Wacker Drive
                                            Suite 2700
                                            Chicago, Illinois 60606
                                            Telephone:  (312) 705-7400
                                            Facsimile:  (312) 705-7401

                                            *Attorneys for Plaintiff Health Republic*
                                            *Insurance Company, Common Ground Health*
                                            *Cooperative, and the Class*