**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY,<br><br>    Plaintiff,<br>    on behalf of itself and all others<br>    similarly situated,<br><br>        vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>    Defendant. | No. 1:16-cv-259C-KCD<br>(Judge Davis) |
| COMMON GROUND HEALTHCARE COOPERATIVE,<br><br>    Plaintiff,<br>    on behalf of itself and all others<br>    similarly situated,<br><br>        vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>    Defendant. | No. 1:17-cv-00877-KCD<br>(Judge Davis) |

## <u>OBJECTORS' MOTION FOR AN ORDER DIRECTING AN ACCOUNTING AND SAFEKEEPING OF THE DISPUTED FUNDS AND LIMITED DISCOVERY</u>

The undersigned members of the *Health Republic* and *Common Ground* Non-Dispute Subclasses (the Objecting Class Members)[1] submit this motion seeking an accounting of the disputed portion of the common fund, an order directing the return of the funds to an interest-bearing client trust account for safekeeping pending final resolution of Quinn Emanuel Urquhart & Sullivan, LLP's fee award, and limited discovery related to the forthcoming fee petition.

---

[1] The class members submitting this motion are identified on the signature block.

# TABLE OF CONTENTS

**Page**

I.      Introduction....................................................................................................................1

II.     Background....................................................................................................................4

     A.      The risk corridors litigation .................................................................................4

     E.      Quinn Emanuel is awarded 5% and the Objecting Class Members appeal ............7

     F.      The Federal Circuit vacates the $185 million fee award ........................................8

     G.      Objecting Class Members request an accounting, safekeeping of the disputed funds, and limited discovery related to the judgment preservation insurance ............................................................................................................9

     H.      The March 21, 2023 Status Conference..............................................................10

     I.       Quinn Emanuel again refuses to provide an accounting.......................................11

III.    Argument .....................................................................................................................12

     A.      The Court has authority to grant the relief requested here....................................12

     B.      Quinn Emanuel must provide a full accounting of the disputed funds.................16

     C.      The disputed funds should be returned to an interest-bearing client trust account ..............................................................................................................19

     D.      The Court should permit discovery into the terms, limitations, and circumstances of any insurance concerning the fee award ...................................21

IV.     Conclusion ...................................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*In re "Agent Orange" Prod. Liab. Litig.*
818 F.2d 216 (2d Cir. 1987)......................................................................................4, 15, 25

*AEG Invs., LP v. United States*
147 Fed. Cl. 537 (2020) .....................................................................................................14

*Ark. Teacher Ret. Sys. v. State St. Bank & Tr. Co.*
512 F. Supp. 3d 196 (D. Mass. 2020) ...............................................................................15

*Blue Cross & Blue Shield of N.C. v. United States*
No. 16-cv-651 .......................................................................................................................5

*Brooks v. Berryhill*
No. 1:15-cv-00436, 2017 WL 10716887 (D.D.C. Oct. 26, 2017) .................................15, 16

*Common Ground Healthcare Coop. v. United States*
No. 1:17-cv-877 .............................................................................................................5, 6, 7

*Estakhrian v. Obenstine*
No. CV 11-3480 FMO, 2019 WL 3035119 (C.D. Cal. Mar. 26, 2019) ..............................15

*First Priority Life Ins. Co. v. United States*
No. 1:16-cv-587 ...........................................................................................3, 5, 8, 12, 21

*Fresh Kist Produce, L.L.C. v. Choi Corp.*
362 F. Supp. 2d 118 (D.D.C. 2005) ...................................................................................13

*General Motors Corp. v. City of New York*
501 F.2d 639 (2d Cir.1974)................................................................................................13

*Goldberger v. Integrated Res., Inc.*
209 F.3d 43 (2d Cir. 2000)................................................................................................12

*Haggart v. Woodley*
809 F.3d 1336 (Fed. Cir. 2016).........................................................................................13

*Health Republic Insurance Company v. United States*
No. 1:16-cv-259 ...............................................................................4, 5, 6, 7, 8, 12, 14

*Hurstell v. Clement*
No. 99-3701, 2000 WL 1100387 (E.D. La. Aug. 4, 2000) ....................................................15

*Idalski v. Crouse Cartage Co.*
229 F. Supp. 2d 730 (E.D. Mich. 2002)..............................................................................15

*Land of Lincoln Mut. Health Ins. Co. v. United States*
  No. 16-cv-744 ...................................................................................................5

*Maine Community Health Options v. United States*
  140 S. Ct. 1308 (2020)................................................................................4, 7

*Me. Cmty. Health Options v. United States*
  No. 16-cv-967 ...................................................................................................5

*Moda Health Plan, Inc. v. United States*
  No. 1:16-cv-649 ................................................................................................5

*Most v. State Bar*
  67 Cal. 2d 589 (1967) .....................................................................................19

*Neuberg v. Michael Reese Hosp. Found.*
  123 F.3d 951 (7th Cir. 1997) .........................................................................15

*Quantico Tactical Inc. v. United States*
  148 Fed. Cl. 440 (2020) ............................................................................13, 14

*Qwest Corp. v. City of Portland*
  204 F.R.D. 468 (D. Or. 2001) ........................................................................20

*Rodriguez v. City of N.Y.*
  721 F. Supp. 2d 148 (E.D.N.Y. 2010) ...........................................................15

*Rodriguez v. Disner*
  688 F.3d 645 (9th Cir. 2012) .........................................................................15

*Rothe Dev. Corp. v. DOD*
  545 F.3d 1023 (Fed. Cir. 2008).......................................................................20

*Skelton v. General Motors Corp.*
  860 F.2d 250 (7th Cir. 1988) .........................................................................12

*Talley v. Alton Box Bd. Co.*
  37 Ill. App. 2d 137 (1962) ..............................................................................15

*In re Villa Marina Yacht Harbor, Inc.*
  984 F.2d 546 (1st Cir. 1993)...........................................................................20

*In re Washington Public Power Supply Systems Securities Litigation*
  19 F.3d 1291 (9th Cir. 1994) .........................................................................12

<u>Statutes</u>

28 U.S.C. § 1491(a)(1)............................................................................................4

42 U.S.C. § 18062(b) ...................................................................................................................4

77 Fed. Reg. 17220, 17220 (Mar. 23, 2012) ................................................................................4

## I.     Introduction

As a result of the Federal Circuit's ruling, this Court will issue a new attorney's fee award that may require Quinn Emanuel to return to the Class a substantial portion of the initial $185 million fee award.  But the Objecting Class Members believe—and Quinn Emanuel does not deny—that it has already distributed that $185 million to its partners, despite knowing that its entitlement to that sum was disputed by some of its Class member clients.  Quinn Emanuel's premature distribution of the disputed funds was not only an ethical violation, but it creates a concrete, practical problem as well:  how can the Court discharge its fiduciary duty to protect the Class and ensure that Quinn Emanuel can promptly return whatever funds the Court may order returned?

To address that problem, the Objecting Class Members request three things: (1) a full accounting; (2) an order to deposit the funds into an interest-bearing trust account; and (3) discovery into judgment preservation insurance Quinn Emanuel purchased before distributing the funds to its partnership.

***A Full Accounting****:  This motion is necessary because, rather than voluntarily disclose what it has done with the funds and confirm that they are protected in an interest-bearing trust account, Quinn Emanuel has refused to answer any questions and has repeatedly told the Objecting Class Members' counsel to "go file a motion."  The Court should order a full accounting of the $185 million from the time Quinn Emanuel took possession of it from the claims administrator to the time it improperly distributed the money to its partners.  The Court is unquestionably empowered to order that accounting as part of its inherent equitable authority as well as its fiduciary duty to protect the Class.  Further, Quinn Emanuel is ethically obligated to provide the accounting.

Quinn Emanuel's position—that is has no obligation to account for the funds because the Objecting Class Members aren't its clients—is legally false, contrary to Quinn Emanuel's prior statements to the Class and to this Court, and irrelevant in any event because the ethical duty to

account extends not just to clients but to third parties.  *See* ABA Model Rules of Prof'l Conduct R. 1.15(d) (2023) (requiring counsel to, upon request, "promptly render a full accounting" of "funds . . . in which a client *or third person* has an interest") (italics added); D.C. Rules of Prof'l Conduct R. 1.15(c) (2018) (same); Cal. Rules of Prof'l Conduct R. 1.15(d)(4) (2018) (same); Ill. Rules of Prof'l Conduct R. 1.15(d) (2015) (same).  Finally, a full accounting will reveal facts that the Court can and should consider in deciding the proper fee award on remand.

> ***An Order to Deposit the Funds Into an Interest-Bearing Trust Account****:*  When the accounting confirms that Quinn Emanuel has in fact already distributed the funds to its partners, the Court should order Quinn Emanuel to immediately deposit $185 million plus any interest that would have accrued in an interest-bearing client trust account, which should not be moved until further order of the Court.  That is the best way to ensure that the Class is protected against possible non-payment or delay in payment.  And it is what the ethical rules required in the first instance.  *See* ABA Model Rules of Prof'l Conduct R. 1.15(e) (2023) ("When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved."); D.C. Rules of Prof'l Conduct R. 1.15(d) (2018) (same); Cal. Rules of Prof'l Conduct R. 1.15(c)(2) (2018) (same); Ill. Rules of Prof'l Conduct R. 1.15(e) (2015) (same).

Quinn Emanuel's consistent position has in effect been "trust us, we're good for the money."  But this bald promise does not come close to meeting the Court's fiduciary obligation to ensure the Class will ultimately receive its portion of the common fund to which the Court deems it entitled.  Nor does it satisfy Rule 1.15's strict safekeeping requirements. [2]  The *only*

---

[2] All references to the "Rule" or "Rules" are to the above-mentioned Rules of Professional Conduct unless otherwise noted.  Any citation to the "Rule" or "Rules" are to the Rules of Professional Conduct in effect at the time of the relevant conduct at issue.  Note, though, the current versions of Rule or Rules in effect are not substantively different from the version of the Rule or Rules cited in this brief.  The Rules, related comments, and related ethics opinions are attached to the Appendix at Exhibits 4-25.  The Declarations of ethics experts Andrew I. Dilworth and George R. Clark discussing the applicable Rules are attached to the Appendix at

sure way to guarantee the Class will be paid back in full is an order directing Quinn Emanuel to maintain the money safely in an interest-bearing client trust account.

Quinn Emanuel has not denied that it purchased "judgment preservation" insurance against the possible reduction of its $185 million fee award to enable the distribution of the disputed fees to its partners. But this does not excuse Quinn Emanuel's conduct because Rule 1.15's safekeeping requirement is a non-delegable duty. Nor would such insurance adequately protect the Class: the Class's right to prompt repayment should not depend on the conduct of a stranger to this litigation; there is no assurance that the insurance is adequate in amount; and there is no assurance that the insurance company will not raise defenses based on representations Quinn Emanuel may have made to procure the insurance. In short, the existence of any insurance would neither safeguard the Class against the financial risk Quinn Emanuel created by distributing the funds to itself, nor would it absolve Quinn Emanuel of its ethical violation.

***Discovery into Judgment Preservation Insurance****:* The Court should also permit discovery into the terms and circumstances of any such insurance for a variety of reasons. *First*, courts routinely order disclosure of "the terms of any agreement about fees for the services for which the claim is made" including "side agreements" between "class counsel and others about the fees claimed by the motion." RCFC 54(d)(2)(B)(iv) and Fed. R. Civ. P. 23(h), 2003 Advisory Committee Note.[3] *Second*, the Court is entitled to consider any ethical violations by Quinn Emanuel in deciding the amount of attorney's fees to award. *Third*, Quinn Emanuel will likely argue that the insurance obviates or reduces the need for it to deposit the disputed funds into a client trust account. This argument should be rejected out-of-hand because insurance is no substitute (even in the best of circumstances) for cash in a trust account. But if the Court is inclined to consider the insurance as any kind of substitute for cash, it must do so on a fully informed basis—including understanding the monetary limits of such insurance, what terms and conditions of coverage may excuse the insurance company from paying or delay payment, and

Exhibits 2-3.

[3] All references to "RCFC" are to the Rules of the United States Court of Federal Claims (2021).

whether the insurance company has already raised (or could raise) any coverage defenses.

These three actions will allow the Court to fully discharge its fiduciary duty to protect the Class and ensure that Quinn Emanuel can promptly return any amounts from the common fund to which it is not ultimately entitled.  It also ensures Quinn Emanuel fulfills its "duty to be sure that the court, in passing on the fee application, has all the facts, as well as [Quinn Emanuel's] fiduciary duty to the class not to overreach."  *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 223 (2d Cir. 1987) (cleaned up).

## II.    Background

## A.    The risk corridors litigation

To induce health plans to participate in "Health Benefit Exchanges" to make health coverage more accessible, the Affordable Care Act established the risk corridors program, which provided for reimbursements to health plans that suffered losses in the exchanges.  *See* 42 U.S.C. § 18062(b); 77 Fed. Reg. 17220, 17220 (Mar. 23, 2012); *see also Maine Community Health Options v. United States*, 140 S. Ct. 1308, 1315-16, 1331 (2020).  But after the program began, Congress included an appropriations rider forbidding the Department of Health and Human Services from adequately funding the program.  *See* Maine Community, 140 S. Ct. at 1317 (citing Pub. L. 115–31, §223, 131 Stat. 543).

When the government failed to make the payments required by the statute, many health plans sued the United States in the Court of Federal Claims seeking damages under the Tucker Act, the statute that waives sovereign immunity for claims against the United States based on a federal statute, like the Affordable Care Act provisions here.  *See id*. at 1328; 28 U.S.C. § 1491(a)(1).

In February 2016, Quinn Emanuel filed *Health Republic Insurance Company v. United States*, No. 1:16-cv-259 ("HR"), a putative class action challenging the government's failure to make risk corridors payments.  Other law firms and health plans brought individual (non-class

action) lawsuits in early to mid-2016 challenging the government's nonpayment.[4] A year later, in June 2017, Quinn Emanuel filed a parallel class action complaint in *Common Ground Healthcare Coop. v. United States*, No. 1:17-cv-877 ("CG").

**B.      The class notice assurances**

All class actions brought in the Claims Court are "opt-in." RCFC 23 2002 Rules Committee Notes. Unlike conventional opt-out class actions, an eligible class member must affirmatively choose to participate in these actions.

On January 3, 2017, the Claims Court certified the proposed opt-in class in *Health Republic* (which the government did not oppose) and appointed Quinn Emanuel as lead class counsel and Health Republic as class representative. (Order, HR Dkt. 30.) On February 24, 2017, the Claims Court approved Quinn Emanuel's proposal for notice to the potential class members. (Order, HR Dkt. 42.) On March 15, 2017, Quinn Emanuel sent a notice stating that if the lawsuit resulted in recovery to the Class, it would seek an attorney's fee award that would be deducted from any recovery by the Class. Importantly, that initial notice did not identify how much it would seek, whether by indicating a percentage of recovery or otherwise. (*Id.*; Amended Notice, HR Dkt. 41-1.)

Quinn Emanuel's Stephen A. Swedlow, prior lead Class Counsel, used this notice to actively solicit class members, including the Objecting Class Members who were considering filing "an individual claim both on an hourly basis and on contingency." (Suppl. Swedlow Decl. ¶¶ 6, 9, HR Dkt. 93-2.) Quinn Emanuel's original fee petition discusses these recruitment efforts as a "long and arduous process of providing notice to all of the putative class members and, because this is an opt-in class action, meeting with and discussing the case with potential class members and answering their questions about the claims (including, *inter alia*, the reasons to join

---

[4] *See, e.g.*, *First Priority Life Ins. Co. v. United States*, No. 1:16-cv-587; *Moda Health Plan, Inc. v. United States*, No. 1:16-cv-649; *Blue Cross & Blue Shield of N.C. v. United States*, No. 16-cv-651; *Land of Lincoln Mut. Health Ins. Co. v. United States*, No. 16-cv-744; *Me. Cmty. Health Options v. United States*, No. 16-cv-967.

the class)." (Mot. for Fees at 4, HR Dkt. 84.)

In March 2017, based on concerns that some potential Class members misunderstood the possible amount of requested fees, Quinn Emanuel obtained the Court's permission to distribute a supplemental Class notice which added the following limitation on fees that Class members would owe if they agreed to let Quinn Emanuel represent them:

**9. Will joining the Class cost me any money?**

Class Counsel represents that it will request no more than **5%** of any judgment or settlement obtained for the Class. The fee may be substantially less than 5% depending upon the level of class participation represented by the final membership of the Class. In any event, the exact percentage of Class Counsel's fees will be determined by the Court subject to, among other things, the amount at issue in the case and what is called a "lodestar cross-check" (i.e., a limitation on class counsel fees based on the number of hours actually worked on the case). *See, e.g.*, *Geneva Rock Products, Inc. v. United States*, 119 Fed. Cl. 581, 595-96 (2015); *Loving v. Sec'y of Health and Human Servs.*, 2016 WL 4098722, at *4 (Fed. Cl. Spec. Mstr. July 7, 2016).

(Mot. to Suppl. Class Notice at 2, HR Dkt. 50-1 (emphasis in original).)

"This supplemental notice was sent to every putative class member before the deadline to opt in, so all eventual class members joined the class with this information in hand." (Mot. for Fees at 5, HR Dkt. 84.) Mr. Swedlow details several communications he had with the Objecting Class Members wherein he, among other things, "personally informed each of them of the fee expectations" should they decide to opt in. (Suppl. Swedlow Decl. ¶¶ 6-9, HR Dkt. 93-2.)

The opt-in deadline was May 12, 2017. In total, 153 health plans opted into the *Health Republic* Class. Quinn Emanuel then sent a nearly identical notice to potential members in the *Common Ground* Class. (Mot. to App. Notice, CG Dkt. 32; Order, CG Dkt. 33.) 130 health plans opted into the *Common Ground* Class. All health plan issuers "who chose to opt in affirmatively selected Quinn Emanuel *as their counsel*." (Swedlow Decl ¶ 17, HR Dkt. 84-1, (emphasis added).)

**C.    The merits are decided while *Health Republic* and *Common Ground* are stayed**

On July 22, 2017, the Court stayed the *Health Republic* and *Common Ground* cases pending resolution of appeals in other cases involving materially identical claims. During the

stay, on April 27, 2020, the Supreme Court ruled against the government on the central issue in the risk corridor cases, holding that health plan issuers were entitled to collect the ACA-promised payments under the Tucker Act.  *See Maine Community*, 140 S. Ct. at 1331.

On July 13, 2020, the parties jointly moved to divide each *Health Republic* and *Common Ground* Class into several subclasses:  one large subclass (in each action) that did not dispute the amounts of the proposed risk corridor payments (Non-Dispute Subclasses), and several smaller subclasses that disputed the amount of offsets to, or the total amount due for, the risk corridor payments.  (Joint. Mot., HR Dkt. 80; CG Dkt. 103.)

In light of *Maine Community*, the Court entered megafund money judgments in favor of the *Health Republic* and *Common Ground* Non-Dispute Subclasses on July 23, 2020, in amounts totaling approximately $3.7 billion.  (HR Dkt. 83; CG Dkt. 72.)

**D.    Quinn Emanuel moves for a 5% award**

Quinn Emanuel moved for attorney's fees in both cases, requesting 5% of the $3.7 billion common fund recovery—or about $185 million.  (HR Dkt. 84; CG Dkt. 107.)  The Objecting Class Members filed an opposition and objection to Quinn Emanuel's fee motion.  (Obj. to Fee Mot., HR Dkt. 89.)  Several other Class Member filed joinders in the Objecting Class Members' opposition.  (HR Dkt. 93-1.)  The Objecting Class Members argued that Quinn Emanuel's requested 5% fee was based on a questionable lodestar, not supported by a lodestar cross-check, and resulted in an unjustified 18-19x lodestar multiplier (i.e., more than 18 times Quinn Emanuel's typical hourly rate).  (Obj. to Fee Mot., HR Dkt. 89, CG Dkt. 114.)

**E.    Quinn Emanuel is awarded 5% and the Objecting Class Members appeal**

On September 16, 2021, the Court granted Quinn Emanuel's motion for a $185 million fee.  (Order, HR Dkt. 138, CG Dkt. 153.)  The next day, the Clerk entered RCFC 54(b) judgments awarding Quinn Emanuel its requested $185 million fee.  (Judgment, HR Dkt. 143; CG Dkt. 155.)  RCFC 62(a) automatically stayed execution of the attorney's fee judgments for 30 days.

On October 1, 2021—two weeks after the RCFC 54(b) judgments were entered and while

the fee judgment was stayed—the Objecting Class Members filed their notice of appeal.  (Notice, HR Dkt. 144, CG Dkt. 159.)  Sixteen days later, on October 17, 2021, the automatic stay expired and the judgment went into effect.

At some point on or after October 17, 2021, Quinn Emanuel directed the claims administrator to disburse the $185 million to itself.[5]  The exact date of this disbursement is unknown because Quinn Emanuel: (1) did not provide notice when it received the funds from the claims administrator and (2) has since refused to provide an accounting to the Objecting Class Members.[6]  What is certain, however, is that Quinn Emanuel could not obtain the funds until after it knew both that the Objecting Class Members (i) had objected to the award, and (ii) filed a timely notice of appeal.  In other words, Quinn Emanuel knew that its right to the $185 million was, and continued to be, "disputed" as contemplated by the Rules.

## F.     The Federal Circuit vacates the $185 million fee award

On January 31, 2023, the Federal Circuit vacated the fee awards and remanded for further proceedings.  *Health Republic*, 58 F.4th at 1378.  The Federal Circuit's findings emphasized that general attorney's fee case law and principles, as well as a fiduciary's scrutiny, apply to the determination of a proper fee in this case:

*First,* the Federal Circuit found that it was mandatory to perform a lodestar cross-check when the "court-approved notices sent to potential class members, for use by potential members in deciding to whether to opt into the classes, expressly guaranteed use of a lodestar cross-check."  *Id.* at 1372-73.  Contrary to Quinn Emanuel's contention, "the court-approved guarantee of a judicial lodestar cross-check was part of the 'deal' offered to potential class members and accepted by what we may assume to be all issuers that chose to join the classes."  *Id.* at 1373.  "And because each class-action notice referred simply to a 'lodestar crosscheck,' what was promised and therefore required was application of the scrutiny and accompanying standards generally bearing that name in attorney's-fee case law."  *Id.* at 1374.

---

[5] (Keshavarzi Decl., ¶4, Ex. 27.)
[6] (Keshavarzi Decl., ¶¶2-7, Exs. 26-27.)

*Second*, the Federal Circuit found it was also mandatory to give "consideration or weight to [two] pertinent principles" articulated by the Supreme Court in the non-class-action context when fees are to be paid from a recovery—*even when there is an ex ante fixed contingency fee agreement for a set percentage* (and here, there is not):  "If the benefits are large in comparison to the amount of time counsel spent on the case, a downward adjustment is . . . in order"; and "[a] court should disallow windfalls for lawyers."  *Id.* at 1374.  Providing sufficient analysis and "consideration of multipliers used in comparable cases" to justify the award made is "consistent with the principles endorsed by the Supreme Court [a]nd it does not exclude *taking full account of the relevant attorney-fees considerations as they apply to a particular case*."  *Id.* at 1375 (emphasis added).

*Third*, the Federal Circuit found that "[t]his is not a case in which a class notice stated that a fixed percentage of recovery would be awarded unless the court determines it to be unreasonable . . . The class notice in each case before us stated a maximum possible request and that *the court itself would determine the proper fee*. . . . At least in such a case, although a range of reasonableness undisputedly exists, . . . the court's task *is to make its own determination of what fee to award*, within the range of reasonable possibilities, considering the relevant principles and precedents addressing comparable facts."  *Id.* at 1376-77 (emphasis added).

*Finally*, the Federal Circuit opined that all aspects of the fee analysis should be viewed through the lens of the Court's role as a fiduciary to the Class:

> We have concluded that the court must honor the class-notice commitments if, as here, they remain material to the court's task and that the court in this case may not treat the request as presumptively the proper award but must play a more neutral role, characterized as a fiduciary one, in deciding what fee is warranted.  The Objectors argue that those conclusions may have a bearing on aspects of the fee analysis beyond the lodestar cross-check.  Opening Br. at 48–53.  On remand, the Claims Court should reconsider any parts of its analysis affected by the conclusions we have reached above.

*Id.* at 1378.

**G.    Objecting Class Members request an accounting, safekeeping of the disputed funds, and limited discovery related to the judgment preservation insurance**

On March 14, 2023, counsel for the Objecting Class Members called Quinn Emanuel partner and current lead Class Counsel, Adam Wolfson, to discuss this matter. (Keshavarzi Decl., ¶2.)  During that call, Objectors' Counsel: (i) inquired as to the status of the $185 million fee award; (ii) inquired as to the interest that had accrued to date on those disputed funds and whether any interest would be returned to the Class; and (iii) requested that Quinn Emanuel return the disputed funds. (*Id.*)  Mr. Wolfson responded that the funds had already been "distributed"—but it was not clear in context whether he meant "distributed" by the claims administrator to Quinn Emanuel, or "distributed" by Quinn Emanuel to its partners. (*Id.*)  When Objectors' Counsel pressed Mr. Wolfson to disclose where the disputed funds were, he responded that the fund are "safe" and that if the Objecting Class Members wanted the funds returned or any interest on them, they were going to "have to file a motion." (*Id.*)  During that call Mr. Wolfson also stated that "the 5% is still at issue" as Quinn Emanuel would again seek 5% of the recovery on remand. (*Id.*)

On March 17, 2023, Objectors' Counsel sent a letter requesting a full accounting of the disputed funds—"including confirmation and evidence that the funds were being held in an interest-bearing trust account for the benefit of the clients"—as required by Rule 1.15 of the Rules of Professional Conduct. (*Id.*, ¶3, Ex. 26)

On March 20, 2023, Mr. Wolfson responded to that letter and refused to provide the requested accounting or return the disputed funds, claiming the Rules of Professional Conduct were inapplicable for two reasons:  (1) the Objecting Class Members, as unnamed class members, were not Quinn Emanuel's clients, and (2) no party sought to stay or modify execution of the judgments. (*Id.*, ¶4, Ex. 27 at p. 2.)

## H.    The March 21, 2023 Status Conference

On March 21, 2023, the Court held the first status conference following the Federal Circuit's remand. (Order, HR Dkt. 185, CG Dkt. 177.)  At the status conference, counsel for the Objecting Class Members raised concerns about Quinn Emanuel's distribution of the disputed funds to its partners and that Quinn Emanuel procured judgment preservation insurance (JPI) to

enable that distribution.  (Transcript, CG Dkt. 180 at 24:6-13.)  Quinn Emanuel did not deny either assertion.  (*Id.* at 26:7-15.)

 The Court directed the parties to meet and confer and file a joint status report by April 4, 2023.  (Order, HR Dkt. 187, CG Dkt. 178.)

## I. Quinn Emanuel again refuses to provide an accounting

 On March 28, 2023, Quinn Emanuel and Objectors' Counsel met and conferred as directed by the Court.  (Keshavarzi Decl., ¶5.)  During that conference, Objectors' Counsel renewed its request for an accounting and confirmation that the disputed funds were being held in an interest-bearing trust account.  (*Id.*)  Quinn Emanuel did not respond to the request on the grounds that the Objecting Class Members were not Quinn Emanuel's clients.  (*Id.*)  Objectors' Counsel then asked for information concerning any JPI Quinn Emanuel procured before distributing the fee award to its partners.  (*Id.*)  Objectors' Counsel told Mr. Wolfson the Objecting Class Members wanted to know what rights, if any, they have under the policies and what defenses the insures could or might assert.  (*Id.*)  Objectors' Counsel also explained that the Objecting Class Members do not want to be in a position where they would have to go to an insurance company that was not a party to the dispute to collect any disputed funds eventually ordered returned to the Class.  (*Id.*)  Objectors' Counsel also explained that the Objecting Class Members have a right to know whether the JPI affected Quinn Emanuel's position on remand with respect to the fee petition, meaning that Quinn Emanuel may be required to ask for 5% because the JPI requires it to do so.  (*Id.*)  Objectors' Counsel further explained that Objecting Class Members believe that the communications with the insurer(s) could be relevant to their evaluation of coverage under the JPI.  (*Id.*)  Mr. Wolfson did not deny Quinn Emanuel had procured JPI, but instead contended it was not relevant and that the parties need only discuss a briefing schedule.  (*Id.*)

 On April 3, 2023, the parties met and conferred again. (*Id.*, ¶6.)  During that call, Objectors' Counsel told Mr. Wolfson that the Objecting Class Members believe that Quinn Emanuel distributed the $185 million to its partners and obtained JPI in order to do so.  (*Id.*)

-11-

Objectors' Counsel told Mr. Wolfson that, if Quinn Emanuel's position is that this did not happen, he should say so. (*Id.*) Mr. Wolfson responded that he "was not going to get into Quinn Emanuel's inner workings" and that the Objecting Class Members would have to go "file a motion." (*Id.*) Objectors' Counsel pressed the issue explaining that under Rule of Professional Conduct 1.15 of any applicable jurisdiction, the Objecting Class Members were either clients or third parties with an interest in the disputed funds and thus were entitled to an accounting. (*Id.*) In short, the Objecting Class Members had a right to the accounting regardless of Quinn Emanuel's characterization of them as clients or otherwise. (*Id.*) Objectors' Counsel did not receive a response to those questions. (*Id.*)

As of the filing of this motion, Quinn Emanuel has failed to provide an accounting of the disputed funds, failed to confirm that the funds are in an interest-bearing client trust account, and failed to provide any information about the JPI. (Keshavarzi Decl., ¶7.)

## III.   Argument

### A.   The Court has authority to grant the relief requested here

The Court has the authority to grant the relief requested here—an accounting, safekeeping of the disputed funds in an interest-bearing client trust account, and discovery into the JPI—for four independent reasons.

*First*, the Court acts as a fiduciary to the Class. *See Health Republic*, 58 F.4th at 1377; *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 52 (2d Cir. 2000) ("[T]he court is to act 'as a fiduciary who must serve as a guardian of the rights of absent class members.'"); *Skelton v. General Motors Corp*., 860 F.2d 250, 253 (7th Cir. 1988) ("The court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications."); *In re Washington Public Power Supply Systems Securities Litigation*, 19 F.3d 1291, 1302 (9th Cir. 1994) ("[A]t the fee-setting stage, plaintiffs' counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class. It is obligatory, therefore, for the trial court judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.") (cleaned up).

Here, all the relief requested is important to protect the Class's interests in promptly receiving whatever share of the $185 million (plus interest) that the Court may determine must be returned to the Class, once the fee award is reconsidered.

*Second*, because Quinn Emanuel's fee application for a share of the common fund is grounded in equity, the Court possesses the full range of its inherent equitable authority to ensure that the result of the proceedings is fair. *See Fresh Kist Produce, L.L.C. v. Choi Corp*., 362 F. Supp. 2d 118, 128 (D.D.C. 2005) ("[T]he court must be sensitive to underlying equities when determining attorneys' fee awards in common fund cases."); *Haggart v. Woodley*, 809 F.3d 1336, 1352, 1359 (Fed. Cir. 2016) ("The common fund doctrine is rooted in the traditional practice of courts of equity and derives from the equitable power of the courts" and, "[a]t its heart, equity is about fairness.").

*Third*, courts have an "inherent power and duty" to enforce attorneys' moral and ethical responsibilities. *See, e.g.*, *Quantico Tactical Inc. v. United States*, 148 Fed. Cl. 440, 444-45 (2020) ("Courts have the inherent power and duty to 'supervise the conduct of the members of [their] bar[s]' to ensure that attorneys' moral and ethical responsibilities are not breached.") (alterations in original); 6 Newberg and Rubenstein on Class Actions ("Newberg") § 19:10 (6th ed. 2022) ("[T]here is no doubt that a court possesses the 'inherent authority' to enforce ethical codes of conduct for the lawyers appearing before them." (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)); *Kenosha Auto Transp. Corp*., 206 Ct. Cl. 888, 891 (U.S. 1975) ("We believe that the court, in an appropriate case, has a responsibility to examine an allegation of violation of professional ethics and to uphold the integrity of the legal process."); *General Motors Corp. v. City of New York*, 501 F.2d 639, 643 n. 11 (2d Cir.1974) ("[T]he court's inherent power to assure compliance with these prophylactic rules of ethical conduct has not been questioned at any stage of these proceedings.").

Here, there is reason to believe that Quinn Emanuel has prejudiced the Class through several ethical violations. These may include:

- Improperly commingling the disputed funds in Quinn Emanuel's operating account

-13-

after receiving the funds from the claims administrator, rather than sequestering the funds in an interest-bearing trust account;

- Misappropriating and dissipating the disputed funds by distributing them to the partnership, despite the ongoing dispute as to the appropriate amount of fees;

- Entering into an agreement(s) via the JPI that raise(s) conflict of interest concerns;

- Disclosing confidential client information to the JPI insurer(s) in the course of satisfying the insurer(s) underwriting inquiries; and

- Refusing to provide a full accounting upon request.

The Court can and should exercise its inherent power to protect the Class from the effects of this conduct.[7]

*Finally*, the Court can and should permit investigation of ethical violations not only for the protection of the Class, but also because such violations are one factor the Court is entitled to consider in "mak[ing] its own determination of what fee to award." *Health Republic*, 58 F.4th at 1377. As the Federal Circuit explained, the Court must determine the appropriate fee "considering the relevant principles and precedents addressing comparable facts," "taking full account of the relevant attorney-fees considerations as they apply to a particular case," and viewed through the lens of a "fiduciary." *Id*. at 1375-77.

Courts have routinely found that ethical violations are part of the "relevant principles and precedents" and "relevant attorney-fees considerations" that a court may consider in setting an

---

[7] This Court has already recognized that the ABA Model Rules, along with the D.C., California, and Illinois Rules of Professional Conduct "likely govern Class Counsel's representation in the instant cases." (CG Dkt. 153 at p.26.) *See also Quantico Tactical*, 148 Fed. Cl. at 445 ("In assessing a disqualification motion, this Court of Federal Claims is guided by the Model Rules of Professional Conduct of the American Bar Association, the Rules of Professional Conduct of the Bar to which the attorney at issue is admitted to practice, and relevant caselaw.") (citation omitted); *AEG Invs., LP v. United States*, 147 Fed. Cl. 537, 538 (2020) ("The Rules of the United States Court of Federal Claims do not explicitly incorporate the ABA Model Rules of Professional conduct. Nonetheless, the Court 'use[s] the ABA model rules to provide guidance regarding counsel's obligations to the [C]ourt.'") (alterations in original); Newberg, *supra*, § 19:10 ("Courts require lawyers to comply with the applicable rules of professional responsibility; for this purpose, federal courts typically utilize the professional responsibility rules of the state in which they are situated.").

attorney's fee award.  *See, e.g.*, *Rodriguez v. City of N.Y.*, 721 F. Supp. 2d 148, 151-52 (E.D.N.Y. 2010) ("The Court is authorized to fulfill [its] obligation [to determine a reasonable attorney's fee in a class action] by governing and supervising the ethical conduct of attorneys as provided in the Code of Professional Responsibility." (citation omitted)); *Neuberg v. Michael Reese Hosp. Found.*, 123 F.3d 951, 956 (7th Cir. 1997) ("Under Illinois law, unprofessional conduct can affect an attorney's right to recover fees and in some cases may be a complete bar to recovery."); *Hurstell v. Clement*, No. 99-3701, 2000 WL 1100387, at *3-4 (E.D. La. Aug. 4, 2000) (forfeiture of attorney's fees when counsel "intentionally commingled funds in direct contravention of his ethical duties" by "withdrawing $100,000 from the trust and paying his law firm after being informed that [his clients] contested his fee" and failed "to account for the whereabouts of the money"); *Idalski v. Crouse Cartage Co.*, 229 F. Supp. 2d 730, 742 (E.D. Mich. 2002) (finding counsel forfeited fee under referral fee agreement for misappropriating client funds); *Ark. Teacher Ret. Sys. v. State St. Bank & Tr. Co.*, 512 F. Supp. 3d 196, 258-66 (D. Mass. 2020) (reducing class counsel's fee award after finding that counsel:  (i) secretly paid a finder's fee, (ii) misrepresented hourly rates in calculating the reported lodestar amount, and (iii) repeatedly violated duties of disclosure and candor contrary to FRCP 11 and the Mass. Rules of Professional Conduct).[8]

---

[8] *See also Rodriguez v. Disner*, 688 F.3d 645, 653 (9th Cir. 2012) ("In determining what fees are reasonable, a district court may consider a lawyer's misconduct, which affects the value of the lawyer's services."); *Talley v. Alton Box Bd. Co.*, 37 Ill. App. 2d 137, 146 (1962) ("[T]he courts freely refer to the Code of Ethics as a reliable guide to what constitutes unprofessional conduct; also, that such conduct does have some effect on attorney fees, and in some cases, may be a complete bar to any recovery."); *Estakhrian v. Obenstine*, No. CV 11-3480 FMO (CWx), 2019 WL 3035119, at *17 (C.D. Cal. Mar. 26, 2019) ("Fraud or unfairness on the part of the attorney will prevent [the attorney] from recovering for services rendered; as will . . . acts of impropriety inconsistent with the character of the profession, and incompatible with the faithful discharge of its duties." (alterations in original) (citation and internal quotation marks omitted)); *In re "Agent Orange"*, 818 F.2d at 222 (opining that in fulfilling their role as protector of class members, "courts should look to various codes of ethics as guidelines for judging the conduct of counsel"); *Brooks v. Berryhill*, No. 1:15-cv-00436 (CKK/GMH), 2017 WL 10716887, at *7 (D.D.C. Oct. 26, 2017) ("[U]nder long-standing equitable principles, a district court has broad discretion to deny fees to an attorney who commits an ethical violation.") (citation and internal quotation marks omitted); Restatement (Third) of the Law Governing Lawyers ("Law Governing

**B.     Quinn Emanuel must provide a full accounting of the disputed funds**

Quinn Emanuel has refused to confirm or deny that it distributed the disputed $185 million to its partners.  It is essential for the Court to ascertain whether Quinn Emanuel has in fact done so in order to protect the Class.  If the funds have been maintained in an interest-bearing client trust account (which Quinn Emanuel also refuses to confirm or deny), then the Court will know that the Class is protected.  But if the funds have been misappropriated, the Court needs to understand that so it can take appropriate steps—in particular, ordering the funds to be sequestered in an interest-bearing trust account—to ensure that Quinn Emanuel can and will promptly return any portion of the $185 million that exceeds the Court's fee award.

A full accounting will also reveal what Quinn Emanuel did with the money after receiving it from the claims administrator but before distributing the funds to its partners.  If Quinn Emanuel commingled the funds in its general operating account, that in and of itself is an ethical violation.  In contrast, if Quinn Emanuel deposited the funds into an interest-bearing trust account (as it should have done) before distributing the funds, that fact would be relevant for two reasons: (i) it demonstrates that Quinn Emanuel understood that the funds were "disputed" for purposes of the Rules, and (ii) because the Class is entitled to interest on any funds returned, a full accounting will establish what interest *would have accrued* in this particular interest-bearing account, which could impact how much additional interest the Class is ultimately due.

Further, an accounting is appropriate for a reason beyond the imperative of protecting the Class:  Quinn Emanuel is also ethically obligated to provide the requested accounting.  *See* ABA Model Rules of Prof'l Conduct R. 1.15(d) (2023) (requiring counsel to, upon request, "promptly render a full accounting" of "funds . . . in which a client or third person has an interest"); D.C.

---

Lawyers"), § 37, com. d (2000) ("Forfeiture should be proportionate to the seriousness of the offense.  For example, a lawyer's failure to keep a client's funds segregated in a separate account (*see* § 44) should not result in forfeiture if the funds are preserved undiminished for the client.  But forfeiture is justified for a flagrant violation even though no harm can be proved."); *id.*, Reporter's Note, com. c (collecting cases where attorney's breach of ethical obligation justified fee forfeiture).

Rules of Prof'l Conduct R. 1.15(c) (2018) (substantially same); Cal. Rules of Prof'l Conduct R. 1.15(d)(4) (2018) (substantially same); Ill. Rules of Prof'l Conduct R. 1.15(e) (2015) (substantially same); *see also* Law Governing Lawyers, *supra*, § 44, com. h (providing counsel must account for disputed funds "when requested").

During the meet and confer process, Quinn Emanuel has dismissed this ethical obligation, contending the Rule does not apply because the Objecting Class Members are not its clients.[9] This argument is meritless. Rule 1.15 applies to clients *and* third parties. So, even if Quinn Emanuel were right that the Objecting Class Members are not its clients (they *are* clients), that would not make a difference under any applicable version of the ethical Rules.

Quinn Emanuel is also wrong when it tries to deny an attorney-client relationship with the Objecting Class Members. Even in the context of an opt-out class, courts recognize an attorney-client relationship between class counsel and absent class members.[10] This relationship is even more clear in the context of an opt-in class, where Quinn Emanuel recruited the Class members to select its firm as counsel rather than retain other non-class counsel.

Indeed, Quinn Emanuel *told this Court* that the Class members are its clients. For example, in its Motion for Fees, Quinn Emanuel wrote:

> Unlike typical class actions—which bind thousands or potentially millions of individuals (who likely have never heard of the suit) unless they opt out—each of the class members here affirmatively chose to opt in to the Health Republic and Common Ground classes, which meant they *affirmatively selected Quinn Emanuel as their counsel* amid a competitive marketplace offering numerous other options of highly-qualified counsel, on both contingency and hourly bases.

(HR Dkt. 84 at p. 23) (emphasis added) (emphasis in original omitted); *see also id.* at p. 29

---

[9] (Keshavarzi Decl., ¶4, Ex. 27.)

[10] *See, e.g.*, Newberg, *supra*, § 19:2 ("[O]nce a class has been certified, the default presumption is that there is an attorney-client relationship between class counsel and the absent class members."); Newberg, *supra*, § 19:2 n.3 (collecting cases finding a "complete" attorney-client relationship between class counsel and unnamed class members after certification); *see also* ABA Formal Op. 07-448 (October 20, 2007) ("Additionally, unnamed class members in a class action lawsuit will be deemed after certification of the class to be represented by class counsel, absent their affirmative election to 'opt out' of the certified class.").

("[T]he percentage method is the clear preference '*when potential clients and lawyers bargain freely for representation*,' particularly, as here, for '*sophisticated individual clients* [with] high-stakes, complex claims worth hundreds of millions of dollars.") (emphasis added) (alteration in original).

Quinn Emanuel also admitted that Class members are its clients when it sent the Court-approved notice to putative class members.  In it, Quinn Emanuel wrote:  "If you become a Class Member, your interests will be represented by the Class Representative *and Class Counsel*."  (Amended Notice, HR Dkt. 41-1 at pp. 5-6) (emphasis added).

In short, Quinn Emanuel has conceded that the class members are "clients" who selected Quinn Emanuel as their "counsel."

In meeting and conferring, Quinn Emanuel has also argued that, even if Rule 1.15 applied, it does not owe an accounting because the fee awards became "final and executable" when no party sought to stay or modify them.[11]  This argument is irrelevant.  All that is required to trigger the Rule 1.15 obligation to sequester disputed funds is that the attorney is aware of the dispute.  Here, there is no doubt that Quinn Emanuel was aware of the dispute well before October 17, 2021—the earliest date that the claims administrator could have distributed the funds to Quinn Emanuel.  (*See* RCFC 62(a); Judgment, HR Dkt. 143, CG Dkt. 155.)  That is because the Objecting Class Members had filed a notice of appeal on October 1, 2021.  (Notice, HR Dkt. 144, CG Dkt. 159.)

Consistent with the Court's fiduciary duty to the Class, its inherent equitable authority, and its authority to ensure ethical practice, the Court should direct Quinn Emanuel to provide a full accounting of the disputed funds as provided by the ABA Model Rules on Client Trust Account Records, Rule 1 (2023).  *See also* D.C. Rules of Prof'l Conduct R. 1.15, com. 2 (2018); Cal. Rules of Prof'l Conduct R. 1.15, Standard 1 (2018); Ill. Rules of Prof'l Conduct R. 1.15(e) (2015).

---

[11] (Keshavarzi Decl., ¶4, Ex. 27.)

SMRH:4882-1086-7037

**C.      The disputed funds should be returned to an interest-bearing client trust account**

Absent unexpected proof that Quinn Emanuel has already done so, the Court should also order Quinn Emanuel to deposit the disputed funds (or an equivalent sum, including appropriate interest) in an interest-bearing client trust account.  The Court should do so, first, because that is the best way to ensure that the Class is promptly and fully paid all sums it is owed once the fee proceedings are concluded.  Anything less—such as relying on Quinn Emanuel's assurances that it will be willing and able to promptly pay the money—puts the Class at risk.

Further, it was Quinn Emanuel's obligation in the first instance to sequester the funds, precisely to avoid the sort of misappropriation that threatens the Class here.  *See* ABA Model Rules of Prof'l Conduct R. 1.15(e) (2023) ("When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved."); D.C. Rules of Prof'l Conduct R. 1.15(d) (2018) (substantially same); Cal. Rules of Prof'l Conduct R. 1.15(c)(2) (2018) (substantially same); Ill. Rules of Prof'l Conduct R. 1.15(f) (2015) (substantially same).  As further explained in a District of Columbia ethics opinion:

> Because of the lawyer's duty of loyalty to the client, the client's mere assertion of a claim is enough to prevent the lawyer from withdrawing any disputed property: "There is no requirement that the dispute be genuine, serious, or bona fide, . . . The lawyer may not take possession of property the ownership of which is disputed by the client until it is absolutely clear that the dispute with the client has been finally resolved." *In re Haar*, 667 A.2d 1350, 1353 (D.C. 1995).
>
> The lawyer's obligation is to safeguard the funds in a segregated account until the dispute is resolved.

D.C. Ethics Opinion 293 (Disposition of Property of Clients and Others Where Ownership Is in Dispute) (footnote omitted).[12]

The distribution of disputed client funds to its partners not only threatens the security of

---

[12] *See also* Law Governing Lawyers, *supra*, § 44, Reporter's Note, coms. d, f (collecting cases finding disputed funds should be held in a separate, interest-bearing account); *Most v. State Bar*, 67 Cal. 2d 589, 597 (1967) ("An attorney may not unilaterally determine his own fee and withdraw funds held in trust for his client in order to satisfy it, without the knowledge or consent of the client.").

the fund principal, but of interest as well.  Especially where sums in dispute are large, the attorney's obligation is to sequester the funds in an interest-bearing account.  That is because "[w]hen trust accounts may bear interest for the benefit of . . . client[s] and the amount and probable duration of the deposit justify the effort and expense involved, the lawyer should arrange for an interest-bearing account, with the interest to be transmitted to the clients."  Law Governing Lawyers, *supra*, § 44, com. d; *see also* ABA Commission on Interest Lawyers' Trust Accounts Overview ("Lawyers often handle money that belongs to clients . . . . Sometimes the amount of money that an attorney handles for a single client is quite large.  In such cases, lawyers deposit the funds into trust accounts, where the funds can earn interest for the client."); D.C. Rules of Prof'l Conduct R. 1.15(b) (2018) (substantially same); State Bar of Cal. Handbook on Client Trust Accounting, Section III, Key Concept 1 at p. 8[13] (2023) (substantially same); Ill. Rules of Prof'l Conduct R. 1.15(f) (2015) (substantially same).

In short, there is no doubt that sequestering the disputed funds in an interest-bearing trust account is the best way to protect the Class, and that it was Quinn Emanuel's ethical duty to do so in the first instance.  Further, "there is no doubt that a court possesses the 'inherent authority' to enforce ethical codes of conduct for the lawyers appearing before them."  Newberg, *supra*, § 19:10 (citing *Chambers*, 501 U.S. at 43).  Additionally, "[a] court may order a lawyer to deposit property in court or in an interest-bearing account pending further court orders."  Law Governing Lawyers, *supra*, § 45, com. e; *see also id.*, Reporter's Note, com. e (collecting cases).[14]

---

[13] *Available at*:
https://www.calbar.ca.gov/Portals/0/documents/ethics/Publications/Portals0documentsethicsPublicationsCTA-Handbook.pdf

[14] *See also In re Villa Marina Yacht Harbor, Inc.*, 984 F.2d 546, 548 (1st Cir. 1993) (The court's inherent power "to manage the litigation before it" is "not governed by rule or statute" and the court may "do what is necessary and proper to conduct judicial business in a satisfactory manner.") (citation omitted); *Rothe Dev. Corp. v. DOD*, 545 F.3d 1023, 1034 (Fed. Cir. 2008) (taking no issue with "the district court order[ing] DOD to deposit $10,000 with the court registry as a formal act of tender" in Little Tucker Act action); *Qwest Corp. v. City of Portland*, 204 F.R.D. 468, 470 (D. Or. 2001) (recognizing district court has inherent power to require party to deposit funds with the court); RCFC 1 ("These rules govern the procedure in the United States Court of Federal Claims in all suits.  They should be construed, administered, and employed by

Finally, when balancing the equities, the harm to the Class by not protecting the disputed funds in an interest-bearing trust account is outweighed by any harm to Quinn Emanuel by forcing it to return those funds as required by the Rules. Any harm suffered by Quinn Emanuel would not have arisen but for its failure to honor its fiduciary and ethical obligations to the Class.

The Objecting Class Members respectfully request that the Court use its inherent authority to order Quinn Emanuel to return the disputed funds (or their monetary equivalent) and accrued interest to an interest-bearing trust account for the safekeeping and benefit of all Class members pending final resolution of the award.

**D.      The Court should permit discovery into the terms, limitations, and circumstances of any insurance concerning the fee award**

Quinn Emanuel has not denied that it purchased "judgment preservation" insurance (JPI) against the possible reduction of its $185 million fee award before distributing the fee award to its partners. Insurance is no substitute for the cash that Quinn Emanuel should have kept in an interest-bearing trust account for the class. No amount or type of JPI could remedy Quinn Emanuel's ethical violation of distributing disputed client funds to its partners—Rule 1.15's safekeeping requirement imposes a non-delegable duty on lawyers. But the terms of each layer of the JPI are relevant and discoverable nonetheless for at least the following reasons [15]:

*First*, the Court may order disclosure of "the terms of any agreement about fees for the services for which the claim is made." RCFC 54(d)(2)(B)(iv). [16] Any JPI is discoverable under this rule because the insurance would constitute an agreement to repay a portion of the fees previously distributed to Quinn Emanuel. Courts give weight to agreements not only among the

---

the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.")

[15] The JPI is presumed to be layered or in a tower, i.e., a program involving a series of insurers writing coverage, each one in excess of lower limits written by other insurers.

[16] Courts have wide discretion under FRCP 54(d)(2)—which is the functional equivalent of RCFC 54(d)(2)—to determine the appropriate procedure when evaluating a fee award, including ordering an evidentiary hearing, disclosure of additional information, and even discovery. Wright & Miller, 10 Federal Practice and Procedure § 2680 (4th ed. 2022).

parties regarding the fee motion, but also to agreements *between class counsel and others* about the fees claimed by the motion.  Fed. R. Civ. P. 23(h), 2003 Advisory Committee Note.  "'Side agreements' regarding fees provide at least perspective pertinent to an appropriate fee award." *Id.*

      For example, as one Bloomberg Law Practical Guidance article on JPI explains:  "There may be times when the insurer requires …[the] insured to vigorously prosecute all arguments that could result in an appellate win."[17]  If any of the policies require Quinn Emanuel to seek the same 5% award on remand—especially when that agreement was made prior to the Federal Circuit's opinion vacating that award—then the JPI provides "at least some perspective" as to *why* Quinn Emanuel is seeking 5% on remand.  An agreement between class counsel and a third party about the fees claimed by the motion "is worthy of consideration" as a side agreement to seek a sum certain regardless of any new law of the case.  Fed. R. Civ. P. 23(h), 2003 Advisory Committee Note.

      *Second*, Quinn Emanuel may argue that the insurance obviates or reduces the need to deposit the disputed funds into a client trust account.  This argument should be rejected out-of-hand because insurance is no substitute for cash in a trust account, and it would not undo the ethical violation inherent in distributing the disputed funds to the partners—misappropriation.  But if Quinn Emanuel points to the JPI as the means of paying a debt owed to the Class, then the JPI necessarily becomes a "mode of payment" of attorney fees that a court "must ensure . . . [is] fair and proper."  Fed. R. Civ. P. 23(h), 2003 Advisory Committee Note.

      *Third*, and relatedly, if the Court is willing to consider any contention that the JPI absolves the misappropriation, the Court's fiduciary obligation to protect the Class mandates that it do so on a fully informed basis—including understanding the monetary limits of such

---

[17] Ross Weiner, *Judgment Preservation Insurance: Protecting Plaintiffs' Award*, Bloomberg Law (Apr. 2022), https://www.bloomberglaw.com/external/document/XM3LAH4000000/litigation-professional-perspective-judgment-preservation-insura.

insurance, what terms and conditions of coverage may excuse the insurance company from paying or delay payment, and whether the insurer(s) have or may raise coverage defenses that could delay or prevent the distribution of any insurance proceeds.  Whether any JPI claim will be covered at all depends on the terms and conditions of each policy.  The insurance may be limited in amount, or there may be conditions and exclusions that cast doubt on any payment.[18]

One such coverage limitation is particularly pertinent:  insurance policies commonly contain provisions that void coverage if the applicant concealed or misrepresented a material fact in applying for the insurance.  Indeed, JPI "coverage will typically be excluded for losses resulting from material misrepresentations or omissions made during the underwriting process."[19]  Because JPI "insurers are picking the 'safest, easiest-to-price' situations," it stands to reason that the insurers of the $185 million award believed there was little risk the award would be overturned on appeal.[20]  That calls into question whether Quinn Emanuel fully and fairly disclosed to the JPI insurer(s) the risk of the vacatur that in fact ensued.  To the extent the insurers came to this conclusion based on any misrepresentation or concealment of a material fact by Quinn Emanuel, that could jeopardize coverage to the detriment of the Class.  Quinn Emanuel's communications with the insurers should therefore be disclosed along with the JPI policies so that the Court and the Class can determine the chance that a concealment or misrepresentation coverage defense might exist.  For the same reason, any communications such as a notice of an actual or potential claim, and any responses or reservation of rights by insurers, would similarly be relevant to whether coverage might apply.

And even assuming coverage is ultimately found, the Court would also need to evaluate the financial stability of each insurer to confirm any claim could be timely paid.  Permitting JPI

---

[18] "Each Judgment Preservation Insurance Policy is Bespoke."  Ross Weiner, *supra*.

[19] Matthew Grosack et al., *Emerging Trends in Litigation Risk Insurance*, Insurance Journal (Mar. 7, 2022), https://www.insurancejournal.com/magazines/mag-features/2022/03/07/656822.htm.

[20] Roy Strom, *Quinn Emanuel's Juicy Obamacare Fee Tests Litigation Insurers*, Bloomberg Law (Apr. 13, 2023), https://news.bloomberglaw.com/business-and-practice/quinn-emanuels-juicy-obamacare-fee-tests-litigation-insurers.

in the context of a disputed attorney's fee award arising out of a large common fund recovery not only harms the Class, it also tasks the Court with being the additional *financial* fiduciary of the Class.

*Fourth*, it is possible (indeed, likely) that any payment by a JPI insurer would not be due until all appeals are exhausted: "JPI is concerned only with final judgments . . . . [t]here can be no loss unless and until the judgment is final and there is no longer any chance of further appeal."[21]  Therefore, if the Court orders Quinn Emanuel to repay some portion of the $185 million award, it will initially have to do so from its operating accounts.  If Quinn Emanuel were unable to do so, the Class may not benefit from the JPI (if at all) until Quinn Emanuel exhausts all appeals.  If this delay is inherent in the JPI, the Court and the Class are entitled to understand that fact.

*Fifth*, Quinn Emanuel has an ethical obligation to provide conflict-free representation and the ethical rules specifically prohibit lawyers from:  (1) "acquir[ing] a[] . . . pecuniary interest adverse to a client" and (2) accepting "compensation for representing a client from one other than the client" unless certain criteria are met.  ABA Model Rules of Prof'l Conduct R. 1.8(a), (f) (2023) (requiring, among other things, "informed consent" of the client); *id.* R. 1.7; *see also* D.C. Rules of Prof'l Conduct R. 1.7, 1.8(a), (e) (2018) (substantially same); Cal. Rules of Prof'l Conduct R. 1.7, 1.8.1, 1.8.6 (substantially same) (2018); Ill. Rules of Prof'l Conduct R. 1.7, 1.8(a), (f) (2015) (substantially same).  The Objecting Class Members should be able to evaluate the terms of each JPI policy to determine whether they violate the Rules by interfering with counsel's independent judgment, as any such violation would again be relevant to Quinn Emanuel's fee award determination on remand.  Fed. R. Civ. P. 23(h)(2), 2003 Advisory

---

[21] Weiner, *supra*; *see also* Grosack et al., *supra*  ("[C]overage under litigation risk insurance is almost uniformly triggered on the ultimate and non-appealable final judgment or disposition of a litigation.  Thus, while flexible in the sense that each coverage plan is customized and can provide other more immediate benefits, the insurance payout comes only if there is a judgment and after any applicable appeals are exhausted, such that the triggering adverse judgment or order is truly final and can no longer be challenged.")

Committee Note ("The court may allow an objector discovery relevant to the objections.").[22]

*Finally,* as detailed above, the Court is entitled to consider any ethical violations by Quinn Emanuel in deciding the amount of attorney's fees to award.  In addition to the most obvious of Quinn Emanuel's ethical violations—misappropriating disputed client funds and failing to provide an accounting of those funds when requested—it is plausible that Quinn Emanuel may have violated others in the context of securing the JPI.  In particular, it is likely that the JPI insurer(s) demanded a rigorous underwriting process before taking on such a large risk.[23]  In that context, Quinn Emanuel may have disclosed client confidences to the JPI insurer(s) to satisfy the insurance underwriters' due diligence.  If that occurred, the Court is entitled to consider that fact in deciding the appropriate fee award.  Further, Quinn Emanuel would be obligated to account to the Class for any profits the firm made by using client confidential information to secure the insurance.[24]

## IV.   Conclusion

The Objecting Class Members respectfully request that the Court order Quinn Emanuel

---

[22] *See also In re "Agent Orange"*, 818 F.2d at 221-22, 226 (considering "an issue of first impression:  whether an undisclosed, consensual fee sharing agreement, which adjusts the distribution of court awarded fees in amounts which represent a multiple of the sums advanced by attorneys to a class for litigation expenses, satisfies the principles governing fee awards and is consistent with the interests of the class," and finding that "the fee sharing agreement violates the principles for awarding fees in an equitable fund action and places class counsel in a position potentially in conflict with the interests of the class which they represent"); *id.* at 225 ("Additionally, potential conflicts of interest in class contexts are not examined solely for the actual abuse they may cause, but also for potential public misunderstandings they may cultivate in regard to the interests of class counsel.").

[23] *See* Grosack et al., *supra* ("[D]ue diligence and underwriting of these [litigation risk] policies are fact-intensive and detailed.  A prospective insured should be ready to provide feedback on the opposing party's litigation tactics and tone . . ."—and here, the "opposing party" would be Quinn Emanuel's clients, the Objecting Class Members.)

[24] *See* Law Governing Lawyers, *supra*, § 60(2) ("[A] lawyer who uses confidential information of a client for the lawyer's pecuniary gain other than in the practice of law must account to the client for any profits made."); Cal. Civ. Prac. Business Litigation § 36:19 ("All benefits and advantages acquired by the agent as an outgrowth of the agency, exclusive of the agent's agreed compensation, are deemed to have been acquired for the benefit of the principal, and the principal is entitled to recover those benefits in an appropriate action.")

to:  (1) provide a full accounting of the disputed portion of the common fund, (2) return the

disputed funds to an interest-bearing client trust account for safekeeping pending final resolution

of the fee petition, and (3) provide limited discovery related to the judgment preservation

insurance for the fee award, including all such policies and communications with the insurer(s).

Dated:  May 2, 2023                      Respectfully submitted,

SHEPPARD MULLIN RICHTER & HAMPTON LLP
Moe Keshavarzi
mkeshavarzi@sheppardmullin.com
Katherine Rice
krice@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071
Telephone: 213.620.1780

Jenna A. Fasone
jfasone@sheppardmullin.com
501 West Broadway, 19th Floor
San Diego, CA 92101
Telephone: 619.338.6500

*Counsel for Kaiser Foundation Health Plan, Inc., Kaiser Foundation Health Plan of Georgia, Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc., Kaiser Foundation Health Plan Inc. of Colo., Harken Health Insurance Company, Health Plan of Nevada, Inc., Oxford Health Plans (NJ), Inc., Rocky Mountain Health Maintenance Organization, Incorporated, UnitedHealthcare Benefits Plan of California, UnitedHealthcare Community Plan, Inc., UnitedHealthcare Insurance Company, UnitedHealthcare Life Insurance Company UnitedHealthcare of Alabama, Inc., UnitedHealthcare of Colorado, Inc., UnitedHealthcare of Florida, Inc., UnitedHealthcare of Georgia, Inc., UnitedHealthcare of Kentucky, Ltd., UnitedHealthcare of Louisiana, Inc., UnitedHealthcare of Mississippi, Inc., UnitedHealthcare of New England, Inc., UnitedHealthcare of New York, Inc., UnitedHealthcare of North Carolina, Inc., UnitedHealthcare of Oklahoma, Inc.,*

*UnitedHealthcare of Pennsylvania, Inc., UnitedHealthcare of the Mid-Atlantic, Inc., UnitedHealthcare of the Midlands, Inc., UnitedHealthcare of the Midwest, Inc., UnitedHealthcare of Utah, Inc., UnitedHealthcare of Washington, Inc., UnitedHealthcare of Ohio, Inc., Rocky Mountain HealthCare Options, Inc., All Savers Insurance Company, and CareConnect Insurance Company, Inc. fka North Shore-LIJ Insurance Company Inc.*