## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY, | |
| Plaintiff, on behalf of itself and all others similarly situated, | No. 1:16-cv-259-KCD (Judge Davis) |
| vs. | |
| THE UNITED STATES OF AMERICA, | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |
| COMMON GROUND HEALTHCARE COOPERATIVE, | |
| Plaintiff, on behalf of itself and all others similarly situated, | No. 1:17-cv-877-KCD (Judge Davis) |
| vs. | |
| THE UNITED STATES OF AMERICA, | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

## DECLARATION OF MOE KESHAVARZI IN SUPPORT OF OBJECTING CLASS MEMBERS' OPPOSITION TO CLASS COUNSEL'S SECOND MOTION FOR APPROVAL OF ATTORNEY'S FEE REQUEST FOR RISK CORRIDORS NON-DISPUTE SUBCLASS

I, Moe Keshavarzi, declare as follows:

1.      I am an attorney with Sheppard, Mullin, Richter & Hampton LLP.  I have

personal firsthand knowledge of the facts set forth herein, except where the context indicates

otherwise.  I am counsel to the Objecting Class Members, which are identified in **Exhibit A**,

attached hereto, and in the accompanying Opposition to Class Counsel's Second Motion for Approval of Attorney's Fee Request for Risk Corridors Non-Dispute Subclass (the "Objectors").

2.     Class Counsel attempts to minimize the weight of the Objectors by claiming that "90 percent of the organizations whose entities opted into these suits, representing approximately $2.1 billion in damages, do not object to the fee."  HR Dkt. 138 at 25, 192 at 24.  This is misleading.  54 class members are objecting and signing this brief, 40 of which are members of Health Republic and 44 of which are members of Common Ground.  The Objectors therefore represent more than 27% of the Health Republic Non-Dispute subclass, more than 33% of the Common Ground Non-Dispute subclass, and more than 30% of the issuers that joined one or both of those subclasses.  *Compare* HR Dkt. 98; CG Dkt. 125 (147 health plans opted into the Health Republic Non-Dispute subclass; 132 into the Common Ground Non-Dispute subclass; 179 health plans opted into one or both of the Non-Dispute subclasses).

3.     Class Counsel's other arguments show that it knows this is misleading.  Indeed, when it suits Class Counsel, it counts each issuer as a separate entity—*see, e.g.,* HR Dkt. 84-1, ¶ 17; CG Dkt. 107-1, ¶ 17 ("Ultimately, 153 QHP *issuers* joined the Health Republic class and 130 QHP *issuers* joined the Common Ground class, representing approximately one-third of the total value of all risk corridor claims.  This represents by orders of magnitude the largest contingent of QHP *issuers* represented by any law firm in risk corridors litigation.") (emphasis added).  Class Counsel thus considers each of its issuer clients separately when it comes to how many "affirmatively selected Quinn Emanuel as their counsel," just not when considering how many object to its fee.  *See id.*

4.     Despite the Federal Circuit's reversal on appeal, Class Counsel has not returned any portion of the now-vacated $185 million award to the class.

5.      On remand, Class Counsel's insurance requires it to "vigorously" "prosecute its interests in" the $185 million "Trial Judgment" issued September 16, 2021 or risk jeopardizing the insurance coverage.  Attached as **Exhibit B** is a true and correct copy of Quinn Emanuel's primary judgment preservation coverage insurance policy (to which all excess policies follow form).

6.      Class Counsel's second fee petition raises the same arguments Class Counsel made to the Federal Circuit.  **Exhibit C**, attached hereto, is a true and correct copy of Class Counsel's brief at the Federal Circuit.

7.      Because the Common Ground retainer agreement apparently states that Common Ground agreed to an attorney's fee of ***up to*** 25%, my office asked Class Counsel to produce Common Ground's retainer agreement.  That request was flatly denied.   Class Counsel also refused to provide any additional information or answer the central question of what would have resulted in a less than 25% fee under the Common Ground agreement.  Class Counsel provided two excuses for its refusal to disclose this information; neither has merit.  First, it claimed that the terms were already disclosed "in the sworn declarations of Mr. Swedlow (Dkt. 84-1), Ms. Bonder (Dkt. 84-4), and Ms. Mahaffey (Dkt. 84-5)."   But those declarations merely state that Health Republic agreed to a 25% contingency fee and Common Ground an "up to 25%" contingency fee.  No further details have been disclosed, which is what prompted my request. Second, Class Counsel argued that the Objectors somehow waived the right to raise these arguments substantively and procedurally by not raising them earlier—*i.e.,* in opposition to the first fee petition, on appeal, or in briefing since the appeal.   But Class Counsel has filed an entirely new and separate fee petition—including new arguments that it could have (but failed to) raise in its first fee petition (e.g., that current hourly rates should be used in calculating the

lodestar).  No case or legal principle has been cited requiring the Objectors to have made every conceivable argument that could have been raised in response to the first fee petition (or in other briefing) in order to raise it now.  Nor does it offer any explanation for why Class Counsel should be able to raise new arguments on remand while the Objectors may not.  Attached as **Exhibit D** is a true and correct copy of that email correspondence.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 5, 2024, at Los Angeles, California.

_____
MOE KESHAVARZI

# EXHIBIT A
## Table of Objecting Class Members

## TABLE OF OBJECTING CLASS MEMBERS

| Health Republic | |
|---|---|
| **HIOS** | **Issuer Name** |
| 16049 | All Savers Insurance Company |
| 36373 | All Savers Insurance Company |
| 36677 | All Savers Insurance Company |
| 39924 | All Savers Insurance Company |
| 85947 | All Savers Insurance Company |
| 92137 | All Savers Insurance Company |
| 98971 | All Savers Insurance Company |
| 80473 | Group Health Cooperative |
| 95865 | Health Plan of Nevada, Inc. |
| 21032 | Kaiser Foundation Health Plan of Colo. |
| 89942 | Kaiser Foundation Health Plan of Georgia |
| 90296 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 94506 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 95185 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 40513 | Kaiser Foundation Health Plan, Inc. |
| 60612 | Kaiser Foundation Health Plan, Inc. |
| 71287 | Kaiser Foundation Healthplan of the NW |
| 48834 | Oxford Health Plans (NJ), Inc. |
| 80208 | Rocky Mountain Health Care Options |
| 97879 | Rocky Mountain HMO |
| 71667 | UnitedHealthcare Community Plan, Inc. |
| 31779 | UnitedHealthcare Insurance Company |
| 49650 | UnitedHealthcare Insurance Company |
| 45002 | UnitedHealthcare Life Insurance Company |
| 59809 | UnitedHealthcare Life Insurance Company |
| 68259 | UnitedHealthcare of Alabama, Inc. |
| 68398 | UnitedHealthcare of Florida, Inc. |
| 43802 | UnitedHealthcare of Georgia, Inc. |
| 23671 | UnitedHealthcare of Kentucky, Ltd. |
| 38499 | UnitedHealthcare of Louisiana, Inc. |
| 97560 | UnitedHealthcare of Mississippi, Inc. |
| 79881 | UnitedHealthcare of New England, Inc. |
| 54235 | UnitedHealthcare of New York, Inc. |
| 54332 | UnitedHealthcare of North Carolina, Inc |
| 33931 | UnitedHealthcare of Ohio, Inc. |
| 24872 | UnitedHealthcare of Pennsylvania, Inc. |
| 21066 | UnitedHealthcare of the Mid-Atlantic Inc |
| 31112 | UnitedHealthcare of the Mid-Atlantic Inc |
| 16724 | UnitedHealthcare of the Midwest, Inc. |
| 66413 | UnitedHealthcare of Utah, Inc. |

| Common Ground | |
|---|---|
| **HIOS** | **Issuer Name** |
| 36373 | All Savers Insurance Company |
| 39924 | All Savers Insurance Company |
| 85947 | All Savers Insurance Company |
| 98971 | All Savers Insurance Company |
| 78726 | All Savers Insurance Company |
| 80473 | Group Health Cooperative |
| 78463 | Harken Health Insurance Company |
| 95852 | Harken Health Insurance Company |
| 95865 | Health Plan of Nevada, Inc. |
| 21032 | Kaiser Foundation Health Plan of Colo. |
| 89942 | Kaiser Foundation Health Plan of Georgia |
| 90296 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 94506 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 95185 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 40513 | Kaiser Foundation Health Plan, Inc. |
| 60612 | Kaiser Foundation Health Plan, Inc. |
| 23371 | Kaiser Foundation Healthplan of the NW |
| 71287 | Kaiser Foundation Healthplan of the NW |
| 48834 | Oxford Health Plans (NJ), Inc. |
| 80208 | Rocky Mountain Health Care Options |
| 97879 | Rocky Mountain HMO |
| 37873 | UnitedHealthcare Benefits Plan of California |
| 49650 | UnitedHealthcare Insurance Company |
| 31779 | UnitedHealthcare Insurance Company |
| 23489 | UnitedHealthcare Insurance Company |
| 57860 | UnitedHealthcare Insurance Company |
| 69443 | UnitedHealthcare Insurance Company |
| 68259 | UnitedHealthcare of Alabama, Inc. |
| 59036 | UnitedHealthcare of Colorado, Inc. |
| 68398 | UnitedHealthcare of Florida, Inc. |
| 43802 | UnitedHealthcare of Georgia, Inc. |
| 38499 | UnitedHealthcare of Louisiana, Inc. |
| 97560 | UnitedHealthcare of Mississippi, Inc. |
| 54235 | UnitedHealthcare of New York, Inc. |
| 33931 | UnitedHealthcare of Ohio, Inc. |
| 45480 | UnitedHealthcare of Oklahoma, Inc. |
| 24872 | UnitedHealthcare of Pennsylvania, Inc. |
| 21066 | UnitedHealthcare of the Mid-Atlantic Inc |
| 38599 | UnitedHealthcare of the Mid-Atlantic Inc |
| 44751 | UnitedHealthcare of the Midlands, Inc. |
| 51902 | UnitedHealthcare of the Midlands, Inc. |
| 16724 | UnitedHealthcare of the Midwest, Inc. |
| 66413 | UnitedHealthcare of Utah, Inc. |
| 43861 | UnitedHealthcare of Washington, Inc. |

# EXHIBIT B
**Quinn Emanuel's Primary Judgment Preservation Coverage Insurance Policy**

## SPECIFIC LITIGATION INSURANCE POLICY
### (Judgment Preservation Coverage)

**This declares and certifies that pursuant to the authority granted to the undersigned by the insurance carriers identified below (the "Insurers", and each an "Insurer"), in consideration of the payment of premium specified herein, and in accordance with the terms and conditions of this Policy, the Insurers are bound, severally and not jointly, to provide the insurance as set forth in this Policy.**

**Reference No.:** ███████

## POLICY DECLARATIONS

| | |
|---|---|
| Named Insured | Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), its successors and assigns |
| Mailing Address: | 865 S. Figueroa St., 10th Floor<br>Los Angeles, California 90017<br>Attn: Richard Schirtzer<br>Email: richardschirtzer@quinnemanuel.com |
| Broker of Record:<br>Mailing Address: | ███████ |
| Limit of Liability: | $25,000,000, in the aggregate, as primary policy |
| Judgment Deficiency: | $175,750,000, inclusive of prejudgment interest, post-judgment interest, and costs |
| Trial Judgment: | $185,000,000. |
| Premium: | ███████, plus surplus lines tax |

The coverage offered by this **Policy** is subject to the Terrorism Risk Insurance Act. Your election to accept or reject Terrorism Risk Insurance is reflected in Endorsement No. 1 attached to this **Policy**. **There is no premium attributable to Terrorism Risk Insurance with respect to this Policy.**

███████ is a Delaware Series limited liability company and a subsidiary of ███████, specializing in providing underwriting management and other services to insurance companies, whose insurance products are distributed through agents and brokers. In California: ███████

Rev. 12-30-2021



| Policy Period: | One year, beginning December 30, 2021 (the "**Inception Date**") to December 30, 2022, each as of 12:01AM ("**Expiration of the Policy**"), each as of 12:01AM, provided that expiration of the **Policy Period** shall not affect (1) the coverage provided hereunder with respect to the **Attorney's Fee Dispute** or (2) the status of the **Claim**.          . |
|---|---|
| Endorsements: | (1) Terrorism<br>(2) OFAC Disclosure |
| Schedule: | Statement of the Material Events |

## INSURER DECLARATIONS

The insurance provided by this **Policy** is a quota-share insurance program comprised of the following insurers and their respective policies, each participating severally and not jointly:

| Insurer | Insurer's Policy No. | Quota Share Percentage |
|---|---|---|
| **The following Quota Share: Participants, severally and not jointly:** | ▇▇▇▇▇ | 30% |
| ▇▇▇▇▇▇▇▇ | | |
| ▇▇▇▇▇▇▇▇ | ▇▇▇▇▇▇ | 30% |
| ▇▇▇▇▇▇▇▇ | ▇▇▇▇▇▇ | 20% |
| ▇▇▇▇▇▇▇▇ | ▇▇▇▇▇▇ | 20% |

Unless otherwise specified, the terms "**Insurer**" or "**Insurers**", as used in this **Policy**, shall refer to all insurers collectively, with the understanding that each **Insurer** is liable only for its respective quota share percentage of loss as reflected in the above chart.

2

QE000186

**Claim Representative Provision:**

████████████ ("████" or the "**Claim Representative**") shall serve as the claim representative on behalf of all the **Insurers**.  All **Insurers** shall be bound by the decisions communicated by ████ as the **Claim Representative**.  The **Insured** shall reasonably cooperate with the **Claim Representative** and may rely upon communications made to or received from ████ as the **Claim Representative** for all **Insurers** for the **Claim**.

These Declarations Pages, together with the **Policy** attached hereto, the endorsements, and the schedules, shall constitute the **Policy** declared to hereby.



By: _____

Authorized Representative

**THIS POLICY PROVIDES COVERAGE IN ACCORDANCE WITH ITS TERMS AND CONDITIONS SOLELY WITH RESPECT TO THE ATTORNEY'S FEE DISPUTE.  IT DOES NOT PROVIDE FOR A DUTY TO DEFEND OR FOR DEFENSE COSTS. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

**IMPORTANT NOTICE:**

**1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**

**2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

**3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY**

**CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

**4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN)  INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE**

Exhibit B
Page 10

QE000187

CALIFORNIA DEPARTMENT OF INSURANCE AT THE TOLL-FREE NUMBER 1-800-927-4357 OR INTERNET WEBSITE WWW.INSURANCE.CA.GOV. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NONUNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO VISIT THE NAIC'S INTERNET WEBSITE AT WWW.NAIC.ORG. THE NAIC—THE NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS—IS THE REGULATORY SUPPORT ORGANIZATION CREATED AND GOVERNED BY THE CHIEF INSURANCE REGULATORS IN THE UNITED STATES.

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY  CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER. YOU CAN FIND A LINK TO EACH STATE FROM THIS NAIC INTERNET WEBSITE: HTTPS://NAIC.ORG/STATE_WEB_MAP.HTM.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS   DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NONUNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A "LIST OF APPROVED SURPLUS LINE INSURERS (LASLI)." ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEBSITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: HTTP://WWW.INSURANCE.CA.GOV/01-CONSUMERS/120-COMPANY/07-LASLI/LASLI.CFM

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE EFFECTIVE IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU."

Date: _____

Insured: _____

Exhibit B
Page 11

QE000188

## SPECIFIC LITIGATION INSURANCE POLICY
### (Judgment Preservation Coverage)

In consideration of, and subject to, the payment of the premium and subject to all the terms and conditions of this **Policy**, the **Insurer** and the **Insured** agree as follows:

## I.   INSURING AGREEMENT

Subject the terms and conditions of this **Policy**, the **Insurer** shall indemnify, reimburse or pay to the **Insured** any **Loss** up to the **Limit of Liability** resulting from a **Final Judgment**.

## II.   DEFINITIONS

As used herein, the following terms are defined as follows:

   (A)  "**Claim**" means the **Attorney's Fee Dispute**, which **Claim** is deemed to have been made and reported as of the **Inception Date**.

   (B)  "**Claim Representative**" shall have the meaning given in the declarations of this **Policy**.

   (C)  "**Designated Loss Payee**" means the person(s) or entity(ies) as may be designated by the **Insured** upon notice to the **Insurer** pursuant to Section V (C) below.

   (D)  "**Final Judgment**" means a final, non-appealable order or judgment rendered in the **Attorney's Fee Dispute** where the order or judgment has not been rendered as a result of settlement, stipulation, default or failure to appeal, prosecute, and/or defend the **Attorney's Fee Dispute**.  For the avoidance of doubt, it is expressly acknowledged that this **Policy** does not cover settlements, stipulations, default or failure to appeal, and/or prosecute the **Attorney's Fee Dispute**; provided, however, a stipulation made in good faith regarding non-dispositive issues pertaining to the appeal such as, for example and without limitation, the record on appeal, page limits and briefing extensions, shall not render a final, non-appealable order or judgment something other than a **Final Judgment**.

   (E)  "**Inception Date**" shall have the meaning given in the declarations of this **Policy**.

   (F)  "**Insured**" means Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), its successors and assigns.

   (G)  "**Insurer**" or "**Insurers**" means all insurers to this **Policy**, as identified in the declarations of this **Policy**, with the understanding that each participates hereunder severally and not jointly.

Exhibit B
Page 12

QE000189

**(H)** "**Judgment Deficiency**" means the monetary amount by which a **Final Judgment** results in the **Insured** being awarded less than $175,750,000 (one hundred seventy-five million, seven hundred fifty thousand U.S. dollars), including any pre- or post-judgment interest or other costs (to the extent applicable).

**(I)** "**Attorney's Fee Dispute**" means the dispute in which certain opt-in class members in the lawsuits captioned *Health Republic Insurance Company v. United States* (No. 16-cv-259C) and *Common Ground Healthcare Cooperative v. United States* (No. 17-cv-877C) have challenged the attorney's fees awarded to the **Insured** by the District Court for the United States Court of Federal Claims issued September 16, 2021 (Doc. 138) (the "**Trial Judgment**"), including without limitation any appeal of the **Trial Judgment**, as that dispute may be amended, bifurcated, transferred, consolidated, removed to or made in another forum, appealed and/or remanded.

**(J)** "**Limit of Liability**" means the maximum amount payable under this **Policy**, which is $25,000,000 (twenty-five million U.S. dollars).

**(K)** "**Loss**" means the amount of a **Judgment Deficiency**.

**(L)** "**Policy Period**" shall have the meaning given in the declarations of this **Policy**.

## III.    ADMINISTRATION OF THE ATTORNEY'S FEE DISPUTE

**(A)** All notices, documents, information and other materials required to be furnished by the **Insured** shall be given in writing to ▮▮▮▮▮▮▮▮▮▮ and shall be sent via email to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or to such other email address or business address as the **Claim Representative** shall designate by notice to the **Insured**. All notices by the **Claim Representative** to the **Insured** shall be given in writing and sent to the **Insured** via the following email and business addresses, respectively, or to such other email and business address as the **Insured** shall designate by notice to the **Claim Representative**:

**Insured's** email address:           Richardschirtzer@quinnemanuel.com

**Insured's** business address:        865 S. Figueroa St., 10th Floor
                                      Los Angeles, California 90017
                                      Attn: Richard Schirtzer

**(B)** Absent the **Insurer's** consent otherwise, the **Insured** shall defend any appeal of the **Trial Judgment** and any post-trial motions vigorously, in good faith, and with the same zeal as if no insurance were in place. In the case of a remand, the **Insured**

QE000190

shall prosecute its interests in the **Attorney's Fee Dispute,** vigorously, in good faith, and with the same zeal as if no insurance were in place.  It is understood that the **Insured** will need to make strategic decisions in any proceeding and shall do so with the same zeal as if no insurance were in place.  It is expressly acknowledged that the **Insurer** can withhold its consent to any request that the **Insured** no longer defend such appeal or prosecute such interests unless the **Insured** has reasonably and clearly established that the pursuit of the **Insured's** claims made in the **Attorney's Fee Dispute** are rendered fruitless Further, it is expressly acknowledged that this Section III (B) shall not result in any exclusion or limitation of **Loss** unless the **Insurer** can establish by a preponderance of the evidence that the **Insured's** failure to defend the appeal and/or prosecute its interests in the **Attorney's Fee Dispute,** in each case, vigorously in good faith, and with the same zeal as if no insurance were in place, materially prejudiced the **Insurer** (the **Insurer** shall bear the burden of establishing by a preponderance of such evidence, with the burden being the burden which would be required before the applicable arbitral panel pursuant to Section V.(E) under this **Policy**).

**(C)**   To the extent reasonably practicable under applicable protective orders or other restrictions on disclosure, the **Insured** shall furnish to the **Claims Representative**, in form and substance reasonably satisfactory to the **Claim Representative**, (i) such reports as to the status of the **Attorney's Fee Dispute** as the **Claim Representative** may request from time to time, but not more frequently than every sixty (60) days, (ii) the appellant's opening brief, informally called the "Blue Brief," (iii) no later than five (5) days prior to its due date, a draft of the **Insured's** (appellee's) response brief, informally called the "Red Brief," (iv) the appellant's reply to the arguments raised by appellee, informally called the "Grey Brief," (v) any substantive motions filed in the appeal, with sufficient time to allow the **Claim Representative** to meaningfully participate, (vi) any scheduling order entered on the appellate docket, (vii) the proposed outline of oral argument points at least five (5) days prior to the scheduled date of oral argument, and (vii) all substantive written orders, decisions, and judgments entered in the **Attorney's Fee Dispute**.  If the **Attorney's Fee Dispute** is remanded, the **Insured** shall give to the **Claim Representative** all information and cooperation as the **Claim Representative** may reasonably request (such request to be in writing and addressed to the **Insured** and to counsel representing the **Insured** in the **Attorney's Fee Dispute**).

It is expressly acknowledged that although the **Claim Representative** shall have the right to reasonably and meaningfully participate in discussions with the **Insured** and its counsel regarding the **Attorney's Fee Dispute** and receive regular updates and important documents as set forth in this **Policy**, the **Insured** shall have the unconditional discretion and right to control the **Attorney's Fee Dispute** and to make all strategic decisions in connection therewith.  For the sake of clarity, nothing herein shall be deemed to require the **Insured** to violate any order of any court,

including without limitation any protective or confidentiality order limiting the disclosure of information.

**(D)** Further, this Section III shall not result in any exclusion or limitation of **Loss** payable under this **Policy** unless the **Insurer** can establish both that:  (i) the **Insured's** noncompliance under this Section materially prejudiced the **Insurer** (the **Insurer** shall bear the burden of proving any such material prejudice to a clear and convincing standard); and (ii) the **Claim Representative** provided the **Insured** and the **Designated Loss Payee(s)**, if any, with timely notice and opportunity to cure any alleged non-compliance by the **Insured** in performance of its obligations under this **Policy**. Any exclusion or limitation of **Loss** payable under this **Policy** shall be excluded or limited only to the extent commensurate with the proven material prejudice.

## IV.    EXCLUSION

The **Insurer** shall not be liable to make any payment of the portion of **Loss** proximately caused by the substantive content of a material inaccuracy (or materially misleading statement) made in the Statement of Material Events attached to this **Policy** but only to the extent that the **Insurer** can establish by clear and convincing evidence both that: (a) the **Insured** was aware that such statement was materially inaccurate or materially misleading as of the **Inception Date**; and (b) the **Insurer** was actually prejudiced by the alleged inaccuracy in such statement.

## V.    OTHER GENERAL CONDITIONS

### (A)    CLAIM MADE AND REPORTED

This **Policy**, in accordance with its terms and conditions, applies only to the **Claim**.  It is expressly acknowledged that the **Insured** has made and reported the **Claim** under this **Policy** as of the **Inception Date**.  Expiration of this **Policy** shall not affect coverage of the **Claim.**

### (B)    CANCELLATION OF POLICY

The **Insurer** may cancel this **Policy** for non-payment of premium by sending not less than twenty (20) days' written notice to the **Insured**, and the **Designated Loss Payee(s)**, if any, at their last known email and business addresses.  This **Policy** cannot otherwise be cancelled, voided, or rescinded.

### (C)    PORTABILITY (SUCCESSOR COVERAGE) & LOSS PAYEE COVERAGE

8

Upon the express written consent of the **Designated Loss Payee(s)**, if any, this **Policy** may be freely assigned by the **Insured** to (1) an affiliate of the **Insured**, (2) to a subsequent purchaser (whether through a merger or acquisition) of either (a) the **Insured** or (b) substantially all of the assets of the **Insured**.

Upon the express written consent of the **Designated Loss Payee(s)**, if any, this **Policy** may be assigned as collateral to a lender to the **Insured,** in which event such lender shall be named as a **Designated Loss Payee**, to the extent its interests may appear, on this **Policy**.

Any (absolute or collateral) assignment of interests under this **Policy**, as described above, shall become effective upon written notice of such assignment from the **Insured** to the **Claim Representative**; provided, however, that no assignment of this **Policy** or any interest under this **Policy** shall be effective if the result would be to otherwise materially alter the terms of coverage under this **Policy** or to increase the **Insurers'** liability hereunder.

The **Claim Representative** may acknowledge receipt of the assignment and/or may issue an endorsement to this **Policy** acknowledging the assignment and related terms including priority of payment in the event of multiple loss payees without cost to the **Insured**.

All payment of any **Loss** under this **Policy** shall be made to the **Insured** or the **Designated Loss Payee(s)**, if any, or to a bank account(s) to be designated by the **Insured** or **Designated Loss Payee(s)**, if any, in writing to the **Claim Representative**. The **Insurers** shall have no liability for having followed written instructions received from (or purportedly received from) the **Insured** or the **Designated Loss Payee(s),** as the case may be.

**(D)     MODIFICATION**

No change in or modification of this **Policy** shall be effective except when made by written endorsement signed by an authorized representative of the **Insurer**, the **Loss Payee(s)**, if any, and the **Insured**.

**(E)     ARBITRATION**

All disputes between the **Insured** and the **Insurer** (or **Claim Representative**) which may arise under or in connection with this **Policy**, whether arising before or after the termination of this **Policy**, and whether arising in connection with the interpretation of this provision of this **Policy**, shall be submitted to binding JAMS arbitration before a single arbitrator under the then prevailing Comprehensive Arbitration Rules. New York shall be the forum of any arbitration proceeding, and New York shall be the choice of law for any arbitration proceeding or any dispute relating to this **Policy**. Judgment may be entered upon the award in any court of competent jurisdiction. The construction of

Exhibit B
Page 16

**QE000193**

this **Policy** shall be made in accordance with the general principles of construction with respect to insurance agreements and without any presumption in favor of any party.

**(F)     ENTIRE AGREEMENT**

This **Policy**, including the declarations, the schedules and/or endorsements attached hereto, constitute the entire agreement between the **Insured** and the **Insurer** relating to this judgement preservation insurance coverage.

10



**SCHEDULE**

**STATEMENT OF MATERIAL EVENTS**

This Statement of the Material Events (the "**Statement**") is made a part of the **Policy** to which this **Statement** is attached. Capitalized terms not defined in this **Statement** are defined in the **Policy**.

As of the **Inception Date,** the **Insured** declares the following to be true:

<u>Trial Court Review</u>
1) In February 2016, **Insured** became the first law firm to file suit on behalf of a Qualified Health Plan (QHP) issuer to recover unlawfully withheld risk corridor payments under Section 1342 of the Affordable Care Act.

2) The **Attorney's Fees Dispute** was brought certain QHP insurer class members (the "**Objectors**") represented by **Insured**.

3) The **Insured** pioneered the legal theories in the class action and, as noted by the United States Court of Federal Claims (the "**Court**"), often focused their efforts on the most successful legal theories and claims before other counsel pursuing similar suits on behalf of other opt-in class members.

4) The **Objectors** each opted-in pursuant to class notices and agreed to be represented by the **Insured.**

5) One of the notices sent to the **Objectors** indicated that the **Insured** would seek up to 5% of any judgment or settlement but that the exact amount of the **Insured**'s compensation would ultimately be determined by the **Court.**

6) As described by the **Court**, the **Objectors** are sophisticated corporate entities that could have elected to pursue their claims individually.

7) The **Objectors** obtained approximately $3.7 billion (a 100% recovery) in the litigation.

8) **Objectors** now seek to challenge the amount of the attorney's fees awarded by the **Court**, which awarded approximately $185 million dollars to the Insured – $95,183,102.35 to Insured from the *Health Republic* Non-Dispute Subclass Fund and $89,665,569.32 from the *Common Ground* Non-Dispute Subclass Fund. *Health Republic v. United States* (Case No. 1:16-cv-00259-KCD).

<u>Status of Appeal</u>
9) **Objectors** filed a Notice of Appeal on or about October 1, 2021 (Doc. 144), appealing the case to the United States Court of Appeals for the Federal Circuit.

11



10) **Objectors** have not yet filed their opening brief in the appeal.

Settlement Discussions

11) With respect to the **Attorney's Fee Dispute**, there has not been any meaningful settlement discussions to date, and there are no present settlement offers.

By: _____

Name: Richard A. Schirtzer

Title    Partner

Exhibit B
Page 19

**QE000196**

**ENDORSEMENT NO. 1**

**POLICYHOLDER DISCLOSURE
NOTICE OF TERRORISM INSURANCE COVERAGE**

**NO PREMIUM CHARGE FOR TERRORISM COVERAGE**

**TERRORISM RISK INSURANCE ACT**

You are hereby notified that the Terrorism Risk Insurance Act of 2002, as amended pursuant to the Terrorism Risk Insurance Program Reauthorization Act of 2019, effective January 1, 2021 (collectively referred to as "TRIA" or the "Act"), established a program within the Department of the Treasury under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. Under the Act, you have a right to an offer of insurance coverage for losses arising out of acts of terrorism. As defined in Section 102(1) of the Act: The term "certified acts of terrorism" means any act that is certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

**DISCLOSURE OF FEDERAL SHARE OF COMPENSATION**

You should know that where coverage is provided by this policy for losses resulting from "certified acts of terrorism," such losses may be partially reimbursed by the United States government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States government agrees to reimburse eighty percent (80%) of covered terrorism losses that exceed the statutorily established deductible paid by the insurance company providing the coverage. There is no premium charged for terrorism coverage, as indicated below.

**CAP ON LOSSES FROM "CERTIFIED ACTS OF TERRORISM"**

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits United States government reimbursement as well as insurers' liability for losses resulting from "certified acts of terrorism" when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

13

**CONDITIONAL TERRORISM COVERAGE**

The Terrorism Risk Insurance Program Reauthorization Act of 2019 is scheduled to terminate at the end of December 31, 2027 unless renewed, extended or otherwise continued by the federal government. Should the Act terminate on December 31, 2027, or be repealed, any terrorism coverage as defined by the Act provided in the policy will also terminate.

**$0 PREMIUM DISCLOSURE**

In accordance with the Act, we are required to offer you coverage for losses resulting from an act of terrorism that is certified under TRIA as an act of terrorism. The policy's other provisions will still apply to such an act. We are further required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

The portion of your annual premium that is attributable to coverage for "certified acts of terrorism" pursuant to TRIA is **$0 (zero),** and does not include any charges for the portion of losses covered by the United States government under the Act.

**If you choose to accept this offer, this form does not have to be returned.**

**You may choose to reject this offer by signing the statement below and returning to us.** Your policy will be changed to exclude the described coverage.

**REJECTION OF COVERAGE FOR "CERTIFIED ACTS OF TERRORISM"**

| | |
|---|---|
| | I hereby reject the inclusion of certified terrorism coverage that is offered under the policy for **$0 (zero)** additional premium. I understand that the policy will provide no coverage for losses resulting from "certified acts of terrorism," and an exclusion of certain terrorism losses will be made part of this policy. |

_____

Policyholder/Applicant's Signature                Named Insured

_____

Print Name

_____

Date

14



### ENDORSEMENT NO: 2

### COMPLIANCE WITH EXECUTIVE ORDERS, REGULATIONS, RULES & DIRECTIVES OF U.S. TREASURY, EUROPEAN UNION, UNITED KINGDOM, UNITED NATIONS, & GERMANY CONCERNING SANCTIONS, PROHIBITIONS & RESTRICTIONS OF PAYMENT (Collectively, "Sanctions")

### A. AS TO INSURERS SUBJECT TO THE OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

OFAC administers and enforces sanctions policy, based on Presidential declarations of "national emergency". On an ongoing basis OFAC identifies and lists numerous individuals, entities and sanctions with respect to a particular country as "Specially Designated Nationals and Blocked Persons." Such individuals and entities include but are not limited to:

• Foreign agents;

• Front organizations;

• Terrorists;

• Terrorist organizations; and

• Narcotics traffickers.

This list of Specially Designated Nationals and Blocked Persons can be located on the United States Treasury's web site - http://www.treasury.gov/offices/enforcement/ofac/

In accordance with OFAC regulations, if it is determined that an Insured or any person or entity claiming the benefits of this insurance has violated U.S. sanctions laws or regulations or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to the laws and regulations administered and enforced by OFAC. When an insurance policy is considered to be a blocked or frozen contract, no payment or premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments may also apply (to the extent required by applicable law).

### B. AS TO INSURERS SUBJECT TO NON-US SANCTIONS

None of the **Insurers** shall be liable for any payment under the policy to which this endorsement is attached to the extent that such payment would expose the **Insurers**, their respective parent company or their respective ultimate controlling entity to any sanction, prohibition, reporting obligation or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America; provided, however:

1. The above clause shall not apply to ▮▮▮▮▮▮▮▮▮▮ concerning the sanction regimes of UK and USA; and

15

2. ▮▮▮ shall not be liable for any payment under the policy to which this endorsement is attached to the extent that such payment would expose ▮▮▮ to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, or Germany.

Exhibit B
Page 23

QE000200

# EXHIBIT C
**Class Counsel's Federal Circuit Brief**

Exhibit C
Page 24

Appeal Nos. 2022-1018, 2022-1019

# United States Court of Appeals

*for the*

# Federal Circuit

HEALTH REPUBLIC INSURANCE COMPANY,
*Plaintiff-Appellee*

KAISER FOUNDATION HEALTH PLAN INC.,
and additional parties stated on continuation page,
*Plaintiffs-Appellants*

v.

UNITED STATES,
*Defendant-Appellee*

Appeal from the United States Court of Federal Claims, No. 1:16-cv-00259-KCD, Judge Kathryn C. Davis

COMMON GROUND HEALTHCARE COOPERATIVE,
on behalf of itself and all others similarly situated,
*Plaintiff-Appellee*

KAISER FOUNDATION HEALTH PLAN INC.,
and additional parties stated on continuation page,
*Plaintiffs-Appellants*

v.

UNITED STATES,
*Defendant-Appellee*

Appeal from the United States Court of Federal Claims, No. 1:17-cv-00877-KCD, Judge Kathryn C. Davis

## BRIEF OF PLAINTIFFS-APPELLEES

Dated: March 31, 2022

Exhibit C
Page 25

David M. Cooper
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
davidcooper@quinnemanuel.com

Stephen A. Swedlow
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401
stephenswedlow@quinnemanuel.com

J. D. Horton
Adam B. Wolfson
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
jdhorton@quinnemanuel.com
adamwolfson@quinnemanuel.com

*Attorneys for Plaintiffs-Appellees*

Exhibit C
Page 26

## COVER SHEET CONTINUATION PAGES

Because it is impossible to list all Appellants on the cover sheet, Appellees

provide these continuation pages.  The full list of Appellants in Case No. 2022-1018

is as follows:

KAISER FOUNDATION HEALTH PLAN INC., KAISER FOUNDATION
HEALTH PLAN OF GEORGIA, KAISER FOUNDATION HEALTH PLAN OF
THE MID-ATLANTIC STATES, INC., KAISER FOUNDATION HEALTH
PLAN INC. OF COLO., KAISER FOUNDATION HEALTHPLAN OF THE NW,
GROUP HEALTH COOPERATIVE, HARKEN HEALTH INSURANCE
COMPANY, HEALTH PLAN OF NEVADA, INC., OXFORD HEALTH PLANS
(NJ), INC., ROCKY MOUNTAIN HEALTH MAINTENANCE
ORGANIZATION, INCORPORATED, UNITEDHEALTHCARE BENEFITS
PLAN OF CALIFORNIA, UNITEDHEALTHCARE COMMUNITY PLAN,
INC., UNITEDHEALTHCARE INSURANCE COMPANY,
UNITEDHEALTHCARE LIFE INSURANCE COMPANY,
UNITEDHEALTHCARE OF ALABAMA, INC., UNITEDHEALTHCARE OF
COLORADO, INC., UNITEDHEALTHCARE OF FLORIDA, INC.,
UNITEDHEALTHCARE OF GEORGIA, INC., UNITEDHEALTHCARE OF
KENTUCKY, LTD., UNITEDHEALTHCARE OF LOUISIANA, INC.,
UNITEDHEALTHCARE OF MISSISSIPPI, INC., UNITEDHEALTHCARE OF
NEW ENGLAND, INC., UNITEDHEALTHCARE OF NEW YORK, INC.,
UNITEDHEALTHCARE OF NORTH CAROLINA, INC.,
UNITEDHEALTHCARE OF OKLAHOMA, INC., UNITEDHEALTHCARE OF
PENNSYLVANIA, INC., UNITEDHEALTHCARE OF THE MID-ATLANTIC,
INC., UNITEDHEALTHCARE OF THE MIDLANDS, INC.,
UNITEDHEALTHCARE OF THE MIDWEST, INC., UNITEDHEALTHCARE
OF UTAH, INC., UNITEDHEALTHCARE OF WASHINGTON, INC.,
UNITEDHEALTHCARE OF OHIO, INC., ROCKY MOUNTAIN
HEALTHCARE OPTIONS, INC., ALL SAVERS INSURANCE COMPANY,
UNITEDHEALTHCARE INSURANCE COMPANY INC.

Exhibit C
Page 27

The full list of Appellants in Case No. 2022-1019 is as follows:

KAISER FOUNDATION HEALTH PLAN INC., KAISER FOUNDATION HEALTH PLAN OF GEORGIA, KAISER FOUNDATION HEALTH PLAN OF THE MID-ATLANTIC STATES, INC., KAISER FOUNDATION HEALTH PLAN INC. OF COLO., KAISER FOUNDATION HEALTHPLAN OF THE NW, GROUP HEALTH COOPERATIVE, HARKEN HEALTH INSURANCE COMPANY, HEALTH PLAN OF NEVADA, INC., OXFORD HEALTH PLANS (NJ), INC., ROCKY MOUNTAIN HEALTH MAINTENANCE ORGANIZATION, INCORPORATED, UNITEDHEALTHCARE BENEFITS PLAN OF CALIFORNIA, UNITEDHEALTHCARE COMMUNITY PLAN, INC., UNITEDHEALTHCARE INSURANCE COMPANY, UNITEDHEALTHCARE LIFE INSURANCE COMPANY, UNITEDHEALTHCARE OF ALABAMA, INC., UNITEDHEALTHCARE OF COLORADO, INC., UNITEDHEALTHCARE OF FLORIDA, INC., UNITEDHEALTHCARE OF GEORGIA, INC., UNITEDHEALTHCARE OF KENTUCKY, LTD., UNITEDHEALTHCARE OF LOUISIANA, INC., UNITEDHEALTHCARE OF MISSISSIPPI, INC., UNITEDHEALTHCARE OF NEW ENGLAND, INC., UNITEDHEALTHCARE OF NEW YORK, INC., UNITEDHEALTHCARE OF NORTH CAROLINA, INC., UNITEDHEALTHCARE OF OKLAHOMA, INC., UNITEDHEALTHCARE OF PENNSYLVANIA, INC., UNITEDHEALTHCARE OF THE MID-ATLANTIC, INC., UNITEDHEALTHCARE OF THE MIDLANDS, INC., UNITEDHEALTHCARE OF THE MIDWEST, INC., UNITEDHEALTHCARE OF UTAH, INC., UNITEDHEALTHCARE OF WASHINGTON, INC., UNITEDHEALTHCARE OF OHIO, INC., ROCKY MOUNTAIN HEALTHCARE OPTIONS, INC., ALL SAVERS INSURANCE COMPANY, UNITEDHEALTHCARE INSURANCE COMPANY INC.

Exhibit C
Page 28

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 22-1018, 22-1019 |
| **Short Case Caption** | Health Republic Insurance Company v. US |
| **Filing Party/Entity** | Health Republic Insurance Company and Common Ground Healthcare Cooperative |

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box.**  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 3/31/2022

Signature:   /s/ Stephen A. Swedlow

Name:   Stephen A. Swedlow

Exhibit C
Page 29

i

FORM 9. Certificate of Interest

Form 9 (p. 2)
July 2020

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Common Ground Healthcare Cooperative | | |
| Health Republic Insurance Company | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

Exhibit C
Page 30

ii

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☑ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

Exhibit C
Page 31

In response to question 5 of Federal Circuit Form 9, there are no related cases that must be identified pursuant to Federal Circuit Rule 47.5(b). The following appeal is identified pursuant to Federal Circuit Rule 47.5(a):

(1) The title and number of the earlier appeal: Common Ground Healthcare Cooperative v. United States, No. 20-1286

(2) The date of decision: September 30, 2020

(3) The composition of the panel: Judges Reyna, Wallach, and Chen

(4) The citation of the opinion in the Federal Reporter: The order disposing of the appeal was not published in the Federal Reporter.

Exhibit C
Page 32

iv

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................i

STATEMENT OF RELATED CASES ................................................ xiii

PRELIMINARY STATEMENT .................................................................1

COUNTERSTATEMENT OF THE ISSUES.............................................3

COUNTERSTATEMENT OF THE CASE...................................................3

    A.    The First Risk Corridors Litigation ......................................3

    B.    Summary Judgment And Appellate Proceedings In The Risk Corridor Cases ...................................................................8

    C.    The Fee Award Of 5% Of The Common Fund...................11

SUMMARY OF ARGUMENT ................................................................14

ARGUMENT ...........................................................................................19

I.    THE COURT OF CLAIMS ACTED WELL WITHIN ITS DISCRETION IN USING THE PERCENTAGE-OF-THE-FUND APPROACH WHILE ALSO IN THE ALTERNATIVE PERFORMING A LODESTAR CROSS-CHECK .......................................20

    A.    The Court Of Claims Had Discretion To Use A Percentage-Of-The-Fund Approach ........................................................21

    B.    The Court Of Claims Had Discretion Not To Treat The Lodestar As Dispositive ...................................................25

        1.    A Lodestar Cross-Check Does Not Prohibit A High Multiplier Of The Lodestar, Especially Where The Fees Constitute A Low Percentage Of The Fund............................25

        2.    A Lodestar Cross-Check Is Not Required ................................34

Exhibit C
Page 33

II.   THE COURT OF CLAIMS ACTED WELL WITHIN ITS
      DISCRETION IN APPLYING THE SEVEN-FACTOR TEST TO
      DETERMINE THAT, WITH OR WITHOUT A LODESTAR
      CROSS-CHECK, 5% OF THE FUND WAS A REASONABLE FEE
      AWARD ............................................................................................37

      A.    The Court Of Claims Correctly Found The Quality Of Counsel
            Supports The 5% Award ......................................................38

      B.    The Court Of Claims Correctly Found The Complexity Of The
            Litigation Supports The 5% Award ....................................40

      C.    The Court Of Claims Correctly Found The Risk of Non-
            Recovery Supports The 5% Award......................................41

      D.    The Court Of Claims Correctly Found The Fee That Likely
            Would Have Been Negotiated Between Private Parties In
            Similar Cases Supports The 5% Award ...............................44

      E.    The Court Of Claims Correctly Found The Percentage Applied
            In Other Class Actions Supports The 5% Award ...............49

      F.    The Court Of Claims Correctly Found The Size Of The Award,
            In Comparison To The Size Of The Fund, Supports The 5%
            Award ..................................................................................49

      G.    The Court Of Claims Correctly Found The Paucity Of
            Objections Supports The 5% Award....................................50

      H.    The Court Of Claims Correctly Found A 5% Award Is
            Reasonable Given A Lodestar Cross-Check .......................51

CONCLUSION ..................................................................................54

CERTIFICATE OF COMPLIANCE ...............................................56

Exhibit C
Page 34

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbott v. Lockheed Martin Corp.*,
    2015 WL 4398475 (S.D. Ill. July 17, 2015)......................................................33

*Altnor v. Preferred Freezer Servs., Inc.*,
    197 F. Supp. 3d 746 (E.D. Pa. 2016)...........................................................26

*Americas Mining Corp. v. Theriault*,
    51 A.3d 1213 (Del. 2012)...........................................................................53

*In re Black Farmers Discrimination Litig.*,
    953 F. Supp. 2d 82 (D.D.C. 2013)...............................................................36

*Blue Cross & Blue Shield of N. Carolina v. United States*,
    131 Fed. Cl. 457 (2017)........................................................................5, 42

*Blum v. Stenson*,
    465 U.S. 886 (1984).................................................................................22

*Brown v. Phillips Petroleum Co.*,
    838 F.2d 451 (10th Cir. 1988)...................................................................36

*Bywaters v. United States*,
    670 F.3d 1221 (Fed. Cir. 2012)..................................................................19

*Camden I Condominium Ass'n, Inc. v. Dunkle*,
    946 F.2d 768 (11th Cir. 1991)...................................................................22

*In re Cardinal Health Inc. Sec. Litigations*,
    528 F. Supp. 2d 752 (S.D. Ohio 2007).........................................................26

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)................................................................25, 26

*In re Cendant Corp. PRIDES Litig.*,
    243 F.3d 722 (3d Cir. 2001)......................................................................30

*Central R.R. & Banking Co. v. Pettus*,
    113 U.S. 116 (1885).................................................................................22

Exhibit C
Page 35

*Conley v. Sears, Roebuck & Co.*,
   222 B.R. 181 (D. Mass. 1998) ..................................................................53

*In re Crocs, Inc. Sec. Litig.*,
   2014 WL 4670886 (D. Colo. Sept. 18, 2014) .............................................33

*Davis v. J.P. Morgan Chase & Co.*,
   827 F. Supp. 2d 172 (W.D.N.Y. 2011) .......................................................29

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab.
   Litig.*,
   553 F. Supp. 2d 442 (E.D. Pa. 2008) *aff'd sub nom.*
   *In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009) .........................................34

*In re Doral Fin. Corp. Secs. Litig.*,
   No. MDL 1706, ECF No. 107 (S.D.N.Y. July 17, 2007) ............................53

*Farrell v. Bank of Am. Corp., N.A.*,
   827 F. App'x 628 (9th Cir. 2020) ......................................................... 35, 53

*Fischel v. Equitable Life Assurance Soc'y of the U.S.*,
   307 F.3d 997 (9th Cir. 2002) ....................................................................21

*Flores v. Zorbalas*,
   2019 WL 7142886 (Minn. Ct. App. Dec. 23, 2019) ...................................36

*Garcia v. Schlumberger Lift Sols.*,
   2020 WL 6886383 (E.D. Cal. Nov. 24, 2020), *report and
   recommendation adopted*, 2020 WL 7364769 (E.D. Cal. Dec. 15,
   2020) .......................................................................................................34

*Geneva Rock Prods, Inc. v. United States*,
   119 Fed. Cl. 581 (2015) ....................................................... 26, 27, 29, 32

*Gisbrecht v. Barnhart*,
   535 U.S. 789 (2002) ........................................................................ 22, 23

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000) ................................................................ 32, 36

*Haggart v. Woodley*,
   809 F.3d 1336 (Fed. Cir. 2016) ................................................ 12, 19, 21, 35

*Health Republic Ins. Co. v. United States*,
   129 Fed. Cl. 757 (2017) ..............................................................................5

Exhibit C
Page 36

*In re Home Depot Inc.*,
   931 F.3d 1065 (11th Cir. 2019) ....................................................36

*In re Immune Response Sec. Litig.*,
   497 F. Supp. 2d 1166 (S.D. Cal. 2007) .......................................34

*In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg.,*
   *Sales Pracs. & Prod. Liab. Litig.*,
   952 F.3d 471 (4th Cir. 2020) .......................................................32

*Jones v. Dominion Res. Servs., Inc.*,
   601 F. Supp. 2d 756 (S.D.W. Va. 2009) .....................................34

*Kane Cty., Utah v. United States*,
   145 Fed. Cl. 15 (2019) ................................................... 42, 49, 53

*Keil v. Lopez*,
   862 F.3d 685 (8th Cir. 2017) .......................................................36

*Laffitte v. Robert Half Int'l Inc.*,
   1 Cal. 5th 480 (Cal. 2016) ...........................................................26

*Lambert v. United States*,
   124 Fed. Cl. 675 (2015) ...............................................................35

*Land of Lincoln Mutual Health Insurance Co. v. United States*,
   129 Fed. Cl. 81 (2016) ...........................................................9, 42

*Longnecker Prop. v. United States*,
   2016 WL 9445914 (Fed. Cir. Nov. 14, 2016) .............................27

*Loving v. Sec'y of Health and Human Servs.*,
   2016 WL 4098722 (Fed. Cl. July 7, 2016) ............................ 26, 27

*In re Lucent Techs., Inc., Sec. Litig.*,
   327 F. Supp. 2d 426 (D.N.J. 2004) ..............................................34

*Maine Cmty. Health Options v. United States*,
   133 Fed. Cl. 1 (2017) ...............................................................5, 42

*Maine Cmty. Health Options v. United States*,
   140 S. Ct. 1308 (2020) ................................... 3, 10, 39, 40, 41, 42

*McAdams v. Robinson*,
   26 F.4th 149 (4th Cir. 2022) .......................................................21

Exhibit C
Page 37

*Mercier v. United States,*
  156 Fed. Cl. 580 (2021) ..................................................................................20

*In re Merry-Go-Round Enters., Inc.,*
  244 B.R. 327 (Bankr. D. Md. 2000) ..............................................................52

*Moda Health Plan, Inc. v. United States,*
  130 Fed. Cl. 436 (2017) ............................................................................ 5, 8, 9

*Moda Health Plan, Inc. v. United States,*
  908 F.3d 738 (Fed. Cir. 2018) ............................................................ 9, 10, 39, 42

*Monserrate v. Tequipment, Inc.,*
  2012 WL 5830557 (E.D.N.Y. Nov. 16, 2012) ...............................................26

*Moore v. GMAC Mortg.,*
  2014 WL 12538188 (E.D. Pa. Sept. 19, 2014) ...................................... 35, 36

*Moore v. United States,*
  63 Fed. Cl. 781 (2005) ............................................................................ 20, 42, 49

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust
    Litig.,*
  768 F. App'x 651 (9th Cir. 2019) ......................................................... 31, 33

*New England Carpenters Health Benefits Fund v. First Databank, Inc.,*
  2009 WL 2408560 (D. Mass. Aug. 3, 2009) ..................................................53

*Perdue v. Kenny A. ex rel. Winn,*
  559 U.S. 542 (2010) ......................................................................................23

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions,*
  148 F.3d 283 (3d Cir. 1998) .................................................................. 30, 31, 45

*In re Puerto Rican Cabotage Antitrust Litig.,*
  815 F. Supp. 2d 448 (D.P.R. 2011) ................................................................34

*Quimby v. United States,*
  107 Fed. Cl. 126 (2012) .......................................................................... 35, 42

*Raulerson v. United States,*
  108 Fed. Cl. 675 (2013) .......................................................................... 35, 49

*Rawa v. Monsanto Co.,*
  934 F.3d 862 (8th Cir. 2019) ......................................................................21

Exhibit C
Page 38

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005) .......................................................... 25, 32, 33

*Sprague v. Ticonic Nat'l Bank*,
    307 U.S. 161 (1939).............................................................................22

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
    2005 WL 1213926 (E.D. Pa. May 19, 2005)......................................52

*Swedish Hosp. Corp. v. Shalala*,
    1 F.3d 1261 (D.C. Cir. 1993)..........................................................22, 45

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) .............................................................45

*In re Synthroid Mktg. Litig.*,
    325 F.3d 974 (7th Cir. 2003) .............................................................45

*Threatt v. Farrell*,
    142 S. Ct. 71 (2021)..........................................................................35

*Trustees v. Greenough*,
    105 U.S. 527 (1881)..........................................................................22

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002)...........................................................31

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ...........................................................24, 31

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) .............................................................24

*Williams v. Rohm & Haas Pension Plan*,
    658 F.3d 629 (7th Cir. 2011) .........................................................36, 45

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
    364 F. Supp. 2d 980 (D. Minn. 2005) ................................................26

## STATUTORY AUTHORITIES

42 U.S.C. § 406 ..................................................................................... 22, 23

42 U.S.C. § 18062.......................................................................................3

Pub. L. No. 113-235, 2491, 128 Stat. 2130 (2014)....................................3

Exhibit C
Page 39

## ADDITIONAL AUTHORITIES

Manual for Complex Litigation § 14.121 (4th ed. 2004) ........................................20

Restatement (Third) of the Law Governing Lawyers § 34.......................................46

Exhibit C
Page 40

## <u>STATEMENT OF RELATED CASES</u>

There are no related cases that must be identified pursuant to Federal Circuit Rule 47.5(b).  The following appeal is identified pursuant to Federal Circuit Rule 47.5(a):

1.  The title and number of the earlier appeal:  Common Ground Healthcare Cooperative v. United States, No. 20-1286.

2.  The date of decision:  September 30, 2020.

3.  The composition of the panel:  Judges Reyna, Wallach, and Chen.

4.  The citation of the opinion in the Federal Reporter:  The order disposing of the appeal was not published in the Federal Reporter.

Exhibit C
Page 41

## PRELIMINARY STATEMENT

In a thorough and well-reasoned order, the Court of Claims acted well within its discretion to determine the reasonable amount of attorney's fees by awarding Class Counsel 5% of the common fund.  The key facts upon which the Court of Claims relied to reach its reasonableness determination are undisputed:  Class Counsel pioneered the novel claim that achieved a 100% recovery for the class, filing the first complaint by several months and drafting the first substantive brief on the issue.  Class Counsel prevailed despite a very substantial risk of receiving nothing, as most Court of Claims judges and this Court rejected the claim, and success ultimately depended on the Supreme Court granting certiorari and holding the provision at issue to be one of the very rare money-mandating statutes.  In addition, sophisticated health insurance companies paid far more than 5% in contingency-fee agreements in a competitive market for counsel pursuing these very same claims on an individual basis.  Appellants, consisting of health plans in the Kaiser and United Healthcare families ("Objectors"), largely ignore these facts and the Court of Claims' reasoning, which are more than sufficient to support the 5% award.

Objectors ask this Court to hold that the Court of Claims was required to award Class Counsel less than 1% of the fund in attorney's fees—a virtually unheard-of number in any case, let alone one with the extraordinary facts here.  In so doing, Objectors focus myopically on the lodestar multiplier.  But this Court and

1

Exhibit C
Page 42

every other circuit to address the issue have held that the trial court has discretion to choose the percentage-of-the-fund method over the lodestar method. Indeed, it would be nonsensical to treat hourly rates as the only legitimate means of determining reasonable compensation, especially when the competitive legal market for bringing these very claims proves otherwise.

Objectors' request for a cap on the lodestar multiplier also flies in the face of well-established precedent. Courts uniformly hold that there is no requirement to consider the lodestar multiplier at all and that, if used as a cross-check, the lodestar is merely one factor among many. Objectors incorrectly suggest that the Court of Claims failed to perform a lodestar cross-check, when the court did exactly that— looking at the lodestar multiplier and finding it reasonable given the particular circumstances here. Objectors' suggestion that the Court of Claims had to not only consider the lodestar, but treat it as a dispositive cap, is a legally baseless attempt to require the lodestar method—which the Court of Claims was undisputedly entitled to reject. It also would create warped incentives, whereby attorneys are not rewarded for achieving outstanding results, and instead are rewarded for litigating *in*efficiently.

In sum, this Court should reject Objectors' request for this Court to usurp the Court of Claims' discretion to determine a reasonable fee award and to invent an unprecedented and arbitrary cap on the lodestar multiplier, regardless of the

Exhibit C
Page 43

percentage of the fund awarded or the results and circumstances of the case. This Court should affirm.

## COUNTERSTATEMENT OF THE ISSUES

1.    Did the Court of Claims act within its discretion in using the percentage-of-the-fund method to determine reasonable attorney's fees, while in the alternative performing a lodestar cross-check?

2.    Did the Court of Claims act within its discretion in finding that the multi-factor test for assessment of fee awards supported an award of 5% of the common fund?

## COUNTERSTATEMENT OF THE CASE

### A.    The First Risk Corridors Litigation

The Affordable Care Act established the risk corridors program to provide reimbursements for Qualified Health Plan ("QHP") issuers suffering losses in the new insurance markets that the act created. *See* Appx2; 42 U.S.C. § 18062. This program was a critical component of the expansion of healthcare coverage, encouraging insurers to provide plans for the previously uninsured in the new insurance markets. Appx2; *see also Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1315 (2020). Congress, however, subsequently adopted an appropriations rider forbidding the Department of Health and Human Services from sufficiently funding the program to make the requisite reimbursement payments. *See* Pub. L. No. 113-235, § 227, 128 Stat. 2130, 2491 (2014).

Exhibit C
Page 44

In January 2016, Class Counsel met with Health Republic Insurance Company ("Health Republic"), an Oregon-based CO-OP that had suffered significant losses as a result of the Government's refusal to make full risk corridor payments in 2014. Appx1952. These losses caused Health Republic to wind down its operations after 2015, forcing thousands of people in Oregon to find new insurers, or go without coverage. Appx1951-1952. Health Republic agreed to a contingency fee arrangement pursuant to which Class Counsel would receive 25% of any recovery. Appx1952-1953. At this time, other QHP issuers expressed skepticism about the prospects of such an action. Appx1952.

On February 24, 2016, Class Counsel filed a complaint on behalf of Health Republic and a putative class of Qualified Health Plan ("QHP") issuers, seeking recovery for the full amounts owed as risk corridor payments. Appx62. Class Counsel brought this claim based on one legal theory: the Government violated its statutory obligation to make payments under Section 1342 of the Affordable Care Act, which is a money-mandating statute, and the class could recover the unpaid amounts pursuant to the Tucker Act. Appx83-84. This was both the first action to challenge the Government's failure to make risk corridor payments and the first action to raise a money-mandating theory for recovery of these payments under the Tucker Act. Appx2. While Objectors misleadingly suggest (Br. 21) that "[o]ther prominent law firms and health plans were also involved with the issue during the

Exhibit C
Page 45

same period," the Health Republic complaint proceeded as the sole complaint in the nation seeking this relief for several months, until other issuers filed copycat suits starting in May 2016.   Appx1953, Appx1802.   Accordingly, Class Counsel's complaint laid the foundation for all of the follow-on cases, defining the only successful legal theory and strategy for recovery that those cases pursued. Appx1953, Appx3.

The Government moved to dismiss Health Republic's Complaint on June 24, 2016, arguing that Section 1342 did not constitute a money-mandating statute providing a substantive right to payment.  Appx88, Appx108-113.  Class Counsel filed the first brief on the merits of the claim, *see* Appx440-470, and the Court of Claims made the first favorable substantive ruling for any risk corridors plaintiff when it largely denied the motion to dismiss.  *See Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757 (2017); Appx607-634.  This decision closely tracked Class Counsel's briefing and would be relied upon heavily by subsequent courts.  Appx5 (citing *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436 (2017)).  In contrast, several other Court of Claims decisions, in actions brought by other firms, rejected the claims.  *See, e.g.*, *Maine Cmty. Health Options v. United States*, 133 Fed. Cl. 1 (2017); *Blue Cross & Blue Shield of N. Carolina v. United States*, 131 Fed. Cl. 457 (2017).

Exhibit C
Page 46

## B.   Class Certification And Class Notice

While the Court of Claims was considering the Government's motion to dismiss, Health Republic successfully obtained class certification on January 3, 2017. Appx3, Appx604-606.   On February 24, 2017, the court granted Class Counsel's proposed class notice plan.   *See* Appx684-685.   The action was to be an opt-in class action, requiring potential class members to affirmatively submit a Class Action Opt-In Notice Form to join the class.   Appx3, Appx691-701 (the Amended Class Notice).

The Amended Class Notice informed potential class members that, "[i]f the Class is successful in this litigation … Class Counsel will ask the Court's permission to be compensated for litigating the case and representing the successful Class.   Any sums received by Class Counsel in compensation will be deducted from any recovery, which will proportionately reduce the amount of any award each Class Member receives."   Appx696.   That opt-in notice did not identify as compensation any particular percentage or amount of a proposed fee award.   Appx696, Appx4.

When it became known to Class Counsel that potential class members were under the erroneous assumption that Class Counsel would seek a fee percentage of approximately 30% of any judgment, Class Counsel obtained the court's permission to distribute a supplement to the class notice.   Appx4; Appx1384-1387.   That supplemental notice stated:   "Class Counsel represents that it will request no more than 5% of any judgment or settlement obtained for the QHP Issuer Class.   The fee

Exhibit C
Page 47

may be substantially less than 5% depending upon the level of class participation represented by the final membership of the QHP Issuer Class.  In any event, the exact percentage of Class Counsel's fees will be determined by the Court subject to, among other things, the amount at issue in the case and what is called a 'lodestar cross-check.'"  Appx1389 (underline in original).  Ultimately, 153 members opted into the class, and many of those opt-in members joined after discussing contingency-fee arrangements with other law firms, none of which was willing to agree to a contingency rate at 5% or lower.  Appx1803-1804.

Class Counsel also filed a separate class action complaint for the benefit year of 2016 on behalf of Common Ground Healthcare Cooperative ("Common Ground") and a putative class.  Appx2260.  The court certified that class, Appx2644-2646, and approved Class Counsel's proposed class notice plan for the opt-in class action, Appx2697, which was identical in relevant part to the class notice used for the Health Republic class.  Appx5; *compare* Appx2680 *with* Appx1389.  130 QHP issuers opted into the Common Ground class.  Appx1804.

Together, the 153 opt-in issuers in the Health Republic class and the 130 opt-in issuers in the Common Ground class represented approximately one-third of the total value of all risk corridor claims.  Appx1804.  The opt-in class members are highly sophisticated entities, many with their own in-house counsel, who selected Class Counsel as their counsel in a competitive marketplace with numerous other

7

Exhibit C
Page 48

options for qualified counsel.  Appx1804.  In particular, Objectors in this appeal—health plans in the Kaiser and United Healthcare families—are large, sophisticated entities with over $80 billion and $240 billion in annual revenues who chose to opt in after being informed of the fee expectations and after exploring alternative counsel options.  Appx2216.  United Healthcare specifically stated it considered hiring counsel to file an individual claim both on an hourly basis and on contingency, but chose instead to opt into this class. Appx2217.

### C.  Summary Judgment And Appellate Proceedings In The Risk Corridor Cases

During the opt-in process, Class Counsel moved for summary judgment, advancing the very legal theories that ultimately were adopted by the Supreme Court. Appx703.  The motion for summary judgment was accompanied by numerous declarations and hundreds of pages of exhibits.  *See* Appx744-746.

Because the follow-on cases were not class actions (and therefore did not need to seek class certification nor provide an opt-in period) and could benefit from Class Counsel's success against the Government's motion to dismiss, the follow-on cases proceeded through the litigation process more quickly than the Health Republic opt-in class action, even though they were filed later.  *See, e.g.*, *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436 (2017).  *Moda* was the first such case in which a decision on summary judgment issued, and the decision in that case "relied extensively on the court's decision denying the Government's request to dismiss

Exhibit C
Page 49

Health Republic's Section 1342 claim." Appx5. The Government appealed the summary judgment decision in *Moda*, and the Court of Claims therefore stayed the Health Republic opt-in class action before the cross-motions for summary judgment were resolved. Appx1699-1700. The court also stayed the Common Ground opt-in class action before the Government's response to the complaint was to be filed. Appx2285.

Class Counsel nonetheless continued to work towards the successful prosecution of the risk corridor actions, including by filing amicus briefs on behalf of Health Republic, Common Ground, and additional parties in those cases that were pending before this Court. *See Land of Lincoln Mutual Health Ins. Co. v. United States*, No. 17-1224, Doc. 46, Brief Of *Amicus Curiae* Health Republic In Support Of Plaintiff-Appellant (Fed. Cir. Feb. 7, 2017); *id.*, Doc. 184, Brief Of *Amicus Curiae* Health Republic And Common Ground In Support Of Petition For Rehearing *En Banc* (Fed. Cir. Aug. 14, 2018); *Moda Health Plan, Inc. v. United States*, No. 17-1994, Doc. 44 Brief Of *Amicus Curiae* Health Republic In Support Of Plaintiff-Appellee (Fed. Cir. Aug. 27, 2017).

This Court ruled in favor of the Government in each risk corridors appeal, Appx5, and denied the motion for rehearing *en banc*, *see Moda Health Plan, Inc. v. United States*, 908 F.3d 738 (Fed. Cir. 2018). But Class Counsel's *amicus* submissions were cited throughout the dissent from denial of rehearing *en banc*,

Exhibit C
Page 50

laying the groundwork for the Supreme Court's grant of certiorari and, ultimately, reversal. *See id*. at 747-48 (Wallach, J., dissenting); Appx6. Indeed, Objector United Healthcare affirmatively recognized that Class Counsel was guiding the individual cases, as it sent an email to them stating that "Quinn has worked closely with [counsel for Moda] throughout the life of these respective cases." Appx2216.

In the subsequent Supreme Court proceedings, Class Counsel submitted amicus briefs at both the certiorari and merits stages. *See Maine Cmty. Health Options v. United States*, Nos. 18-1023, 18-1028, 18-1038, Brief of *Amici Curiae* Economists In Support Of Petitioners (Mar. 8, 2019); Brief of *Amici Curiae* Economists In Support Of Petitioners (Sep. 6, 2019). Class Counsel also devoted "substantial time and effort" to "extensively consult[] with counsel for the appellants with respect to both briefing and oral argument" at the Supreme Court. Appx1806, Appx6.

The Supreme Court's decision "essentially vindicated the argument Class Counsel incepted in *Health Republic*." Appx6. In particular, the Supreme Court held "that §1342 of the Affordable Care Act established a money-mandating obligation, that Congress did not repeal this obligation, and that petitioners may sue the Government for damages in the Court of Federal Claims." *Maine Cmty.*, 140 S. Ct. at 1315. As a result of the Supreme Court's decision, "the industry-wide recovery for QHP issuers amounts to roughly $12 billion." Appx6. And the class

Exhibit C
Page 51

members in these actions received "a large chunk of that amount: $1.9 billion in *Health Republic* and $1.8 billion in *Common Ground*." Appx6. In short, due to the legal theory Class Counsel pioneered, the class members recovered 100 percent of their unpaid risk corridor payments. Appx7.

### D. The Fee Award Of 5% Of The Common Fund

Having prevailed in obtaining complete recovery for the classes, Class Counsel sought approval for attorney's fees of 5% of the common fund. *See* Appx1757. Across the two opt-in class actions, 90% of the organizations whose entities opted into the suits did not object to the proposed 5% fee. Appx25. Objectors argued that Class Counsel should not recover more than 0.22% of the common fund, insisting that the Court of Claims apply the lodestar method, reduce Class Counsel's hours worked by at least 35%, further reduce the billable rate, and impose a lodestar multiplier of no more than two. Appx7-8; Appx1959-1987. If applied, this would have meant that Class Counsel earned a fraction of what they would have made if they had represented Health Republic and Common Ground on an individual basis, and less even than what they would have made if they had taken on the representations on an hourly basis. Appx2192.

The Court of Claims rejected these objections, and awarded Class Counsel a 5% fee. Appx27-28. The court first rejected Objectors' assertion that the lodestar method was the only appropriate metric for awarding attorney's fees. Appx8-13.

Exhibit C
Page 52

The court recognized that this Court had granted trial courts discretion to choose between the percentage-of-the-fund or lodestar method in a common fund case. Appx10 (citing *Haggart v. Woodley*, 809 F.3d 1336, 1352 (Fed. Cir. 2016)). The court then declined to rely exclusively on the lodestar method, which it noted can be "difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation." Appx11. Accordingly, the Court of Claims applied a percentage-of-the-fund approach, guided by the seven-factor balancing test commonly applied in the Court of Claims. Appx13.

*First*, the court determined the quality of Class Counsel supported the fee request. Appx13-14. The court concluded the quality was "essentially undisputed here," while emphasizing the critical role Class Counsel played in developing the "legal theory" that "resulted in a huge award to the classes here," and in defeating dismissal. Appx13-14.

*Second*, the court found the litigation was particularly complex because, at the time Class Counsel filed the first action, "there was little in the way of relevant binding precedent." Appx14. The court also noted the "diverging opinions in the Court of Federal Claims, the Federal Circuit, and Supreme Court" as evidence of the complexity of the dispute. Appx15. In concluding that this factor supported the fee request, the court emphasized Class Counsel's prominent role at every stage in the collective risk corridors litigations, from formulating the legal theories in the first

12

Exhibit C
Page 53

instance, defeating motions to dismiss, and drafting persuasive amicus submissions before this Court and the Supreme Court. Appx15-16.

*Third*, the court concluded the risk of nonrecovery was high, supporting the fee request. Appx17. As the court explained, money-mandating obligations are "rare," the Government "vigorously opposed the claim," and multiple courts sided with the Government along the way. Appx17.

*Fourth*, the court found that a significantly higher fee likely would have been negotiated between private parties in similar cases, which strongly supports the fee request. Appx18-21. The court concluded the fee of 5% was "considerably lower" than if the class members had pursued their claims individually, pointing to the much higher rates obtained by other firms representing issuers in risk corridor litigation. Appx18-21.

*Fifth*, the court assessed the percentage applied in other class actions, and concluded that the 5% fee was "low" in comparison. Appx21-22. The court emphasized that, even in megafund cases, counsel frequently obtains much higher percentages. Appx21-22.

*Sixth*, the court assessed the overall size of the award, and while acknowledging it was large, found it reasonable given the size of the class members' 100% recovery. Appx22-23. The court also concluded that the "infinitesimal" fee Objectors advocated, as a percentage of the total recovery, was not justified.

13

Exhibit C
Page 54

Appx22-23.  In addition, while the court held that a lodestar cross-check was not necessary, it nonetheless performed one.  Appx24-25.  The court noted that detailed billing records are not required where the lodestar is merely used as a cross-check.  Appx23.  The court then applied a lodestar cross-check and concluded that the 18-19x multiple was "not … outside the realm of reasonableness" in light of other cases that "approved similar or larger multipliers."  Appx24-25.

*Seventh*, the court found support for the fee request from the fact that only a small minority of class members objected.  Appx25.  Emphasizing that "90 percent of the organizations whose entities opted into these suits … do not object to the fee," the court considered the number of objections to be "relatively low."  Appx25.

In sum, the Court of Claims concluded that each factor supported a fee award of 5% of the common fund.

### SUMMARY OF ARGUMENT

**I.**  The Court of Claims acted well within its discretion in deciding attorney's fees based on an appropriate percentage of the fund, while also finding the lodestar multiplier to be reasonable.  This Court has held that, where a fee award comes from a common fund rather than through fee-shifting, a trial court has the choice to use the percentage-of-the-fund method or the lodestar method.  A mountain of precedent, including from the Supreme Court, supports the trial court's discretion to choose the

Exhibit C
Page 55

percentage-of-the-fund method.  And the Court of Claims based that choice here on undisputed facts regarding the particular circumstances of this case.

Objectors do not argue that the Court of Claims erred in determining a reasonable percentage of the fund based on a well-established, seven-factor test.  Nor do they argue that the Court of Claims erred in how it balanced those factors.  Instead, they argue that *regardless* of whether and how much those factors support a 5% award, the Court of Claims is categorically barred from awarding more than a small multiple of the lodestar.

There is no support for that position.  Courts uniformly hold that there is no such bar.  When trial courts perform a lodestar cross-check, the lodestar multiplier is merely one factor among many and is not treated as dispositive.  The Court of Claims explained why the lodestar here was of minimal relevance, yet still went on to consider the lodestar multiplier and explain that it is reasonable in light of all of the facts supporting a 5% award.  Objectors wrongly assert that there was no cross-check merely because they do not like the outcome of that cross-check.  Indeed, while Objectors profess to request only a lodestar *cross-check*, Objectors' demand that the Court of Claims put dispositive weight on the lodestar multiplier is just an ill-disguised demand to apply the lodestar *method*.  And Objectors' attempt to turn the cross-check into a multiplier cap comes with all the problems of the lodestar method that countless courts have identified:  it incentivizes inefficiency and

Exhibit C
Page 56

overbilling, fails to align the interests of counsel and the class, and conflicts with the realities of the market preference for contingency-fee arrangements in high-risk cases like this one.

In any event, the Court of Claims had no obligation to consider the lodestar at all, let alone as a cap with a small multiplier.  While Objectors cite some circuit courts encouraging district courts to look at the lodestar as a cross-check, none requires it.  Similarly, Objectors' assertion that the class notice demands a cross-check misreads the notice and wrongly interferes with the Court of Claims' ultimate discretion to determine the reasonableness of the fee.

**II.**  The Court of Claims also acted well within its discretion in balancing all of the factors, including the lodestar multiplier, to conclude that a 5% fee award was reasonable here.

*First*, the Court of Claims correctly found that the extraordinary performance of Class Counsel supports the 5% award.  As the court explained, Class Counsel was the first to propose the novel legal theory that ultimately succeeded in achieving a 100% recovery for all class members.  Objectors do not mention the "quality of counsel" factor or the weight the court afforded it.

*Second*, the Court of Claims correctly found that the complexity of the litigation supports the 5% award.  The court noted the significant legal complexities of a novel claim that required Supreme Court review, and the challenges of attending

16

Exhibit C
Page 57

to the needs of a large opt-in class. Objectors also do not mention this factor or the court's reliance on it.

*Third*, the Court of Claims correctly found that the substantial risk of nonrecovery supports the 5% award. The risk of nonrecovery is apparent here based on the novelty of the claim and the fact that this Court (along with the majority of Court of Claims judges) rejected it. Thus, the class and Class Counsel would have recovered nothing absent Supreme Court review and reversal, which is always a doubtful proposition, especially in cases against the Government. Once again, Objectors ignore this factor and the Court of Claims' finding that Class Counsel should be rewarded for taking on a substantial risk and prevailing for the class.

*Fourth*, the Court of Claims correctly found that the fees negotiated on the very same claims support the 5% award. The market among sophisticated insurers hiring law firms to pursue these claims establishes that the going rate was several times greater than the 5% award here. Objectors produced no evidence to the contrary, and no response to the point that the competitive market's *ex ante* determination of reasonable fees should be granted substantial weight.

*Fifth*, the Court of Claims correctly found that the percentage of the fund awarded in other class actions supports the 5% award. The standard contingency fee is upwards of 25%, and even in so-called megafund cases, the average is well above 5%. Objectors provide no explanation for why the percentage award this case—

17

Exhibit C
Page 58

where the Court of Claims found that every factor supports a high award—should be uniquely low among all common fund cases.

*Sixth*, the Court of Claims correctly found that the size of the award, in comparison to the size of the common fund, supports the 5% award.  The court explained that while the award is substantial, it is reasonable given the $3.7 billion obtained for the class.  Indeed, Objectors fail even to mention the percentage that they seek: a fraction of 1%.  That is indefensible—and certainly not required in an abuse-of-discretion analysis.

*Seventh*, the Court of Claims correctly found that the minimal number of objectors supports the 5% award.  Objectors note that 34 class members objected, but they fail to mention that nearly all of those belonged only to the two organizations appealing here and that 90% of organizations did not join the objections despite Objectors lobbying them to do so.  As the Court of Claims explained, that the vast majority of these opt-in class members—all sophisticated entities—chose not to object further shows the reasonableness of the award.

*Finally*, the Court of Claims correctly found that a 5% award is reasonable even when considering that it implies a high lodestar multiplier.  While the 18-19x multiplier here is high, it is hardly unprecedented, and more than justified given the unique facts here:  a 100% recovery for the class, rather than the typical settlement for a fraction of the claimed damages; a claim so novel and risky that it would have

18

Exhibit C
Page 59

provided zero recovery absent Supreme Court review; and a competitive market confirming that sophisticated entities consistently agreed to fee percentages several times what was awarded here. Moreover, while the lodestar multiplier is at the high end of the range courts typically approve, it is equally true that 5% of the fund is at the low end of the range. The question is simply which is the proper lens through which to view the award, a question that undeniably rests within the Court of Claims' discretion based on the seven factors it applied when assessing fees. There is no legal basis to disregard that well-supported, discretionary judgment here.

## **ARGUMENT**

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." RCFC 23(h). In common fund cases, counsel for the class "is entitled to reasonable attorney fees from the fund as a whole." *Haggart*, 809 F.3d at 1352 (alterations and quotations omitted).

This Court reviews "the determination of reasonable attorney fees for abuse of discretion." *Id.* at 1354. This discretion is "considerable" because of "the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Bywaters v. United States*, 670 F.3d 1221, 1228 (Fed. Cir. 2012). While Objectors pay lip service to the abuse-of-discretion standard, they refuse to apply it in any of their reasoning,

19

Exhibit C
Page 60

instead repeatedly insisting that this Court make its own determination of what fee award is reasonable. However, the Court of Claims correctly determined—and certainly acted within its discretion in determining—that 5% of the common fund constituted reasonable attorney's fees in this case.

## I. THE COURT OF CLAIMS ACTED WELL WITHIN ITS DISCRETION IN USING THE PERCENTAGE-OF-THE-FUND METHOD WHILE ALSO IN THE ALTERNATIVE PERFORMING A LODESTAR CROSS-CHECK

The Court of Claims properly applied a seven-factor test in determining the reasonableness of the fee award here. In particular, the court looked at "(1) the quality of counsel; (2) the complexity and duration of the litigation; (3) the risk of nonrecovery; (4) the fee that likely would have been negotiated between private parties in similar cases; (5) any class members' objections to the settlement terms or fees requested by class counsel; (6) the percentage applied in other class actions; and (7) the size of the award." Appx9 (quoting *Moore v. United States*, 63 Fed. Cl. 781, 787 (2005) (in turn citing Manual for Complex Litigation § 14.121 (4th ed. 2004)). This Court of Claims routinely applies this well-established test for deciding a common-fund award. *See Mercier v. United States*, 156 Fed. Cl. 580, 591 (2021) (citing cases).

Objectors do not dispute that this test is proper in determining the percentage of the fund to award. Nor do they dispute the Court of Claims' reasoning that "[n]o single factor is necessarily dispositive; they can be weighed in the Court's discretion."

Exhibit C
Page 61

Appx9.   Indeed, they barely mention the seven-factor test the Court of Claims applied or its analysis of several of the factors.  Instead, Objectors' brief rests on the idea that regardless of the analysis of these seven factors, the court is categorically prohibited from awarding fees that are a substantial multiplier of the lodestar.  This theory is wrong as a matter of law.

### A.   The Court Of Claims Had Discretion To Use A Percentage-Of-The-Fund Method

This Court and other circuits uniformly recognize that, in common fund cases, district courts have discretion regarding whether to use the percentage-of-the-fund method or the lodestar method in determining reasonable attorney's fees.  As this Court has explained:  "In common fund cases, district courts have applied the lodestar method to determine the amount of attorney fees. … *Alternatively*, as in this case, courts may determine the amount of attorney fees to be awarded from the fund by employing a percentage method."  *Haggart*, 809 F.3d at 1354-55 (emphasis added).  Other circuit courts hold the same.[1]

---

[1]   *See, e.g.*, *McAdams v. Robinson*, 26 F.4th 149, 162 (4th Cir. 2022) ("The percentage-of-recovery method considers the portion of the total settlement fund that will go to attorneys' fees.  A district court may choose the method it deems appropriate based on its judgment and the facts of the case.") (citation omitted); *Rawa v. Monsanto Co.*, 934 F.3d 862, 870 (8th Cir. 2019) ("The district court has discretion to use either a lodestar or percentage-of-the-fund method in determining an appropriate recovery …."); *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002) ("In a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method

Exhibit C
Page 62

Supreme Court precedent also strongly supports application of the percentage approach—and, at a minimum, discretion to use that approach—in common fund cases.  In particular, the Supreme Court has explained that "under the 'common fund doctrine,' … a reasonable fee is based on a percentage of the fund bestowed on the class," as opposed to "a reasonable fee under § 1988[, which] reflects the amount of attorney time reasonably expended on the litigation." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984).  Indeed, "every Supreme Court case addressing the computation of a common fund fee award has determined such fees on a percentage of the fund basis." *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 773 (11th Cir. 1991) (citing *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 128 (1885); *Trustees v. Greenough*, 105 U.S. 527, 532 (1881)).

Moreover, when faced with a statute that sets a reasonableness limitation on fees for attorneys who represent Social Security beneficiaries, *see* 42 U.S.C. § 406(b), the Supreme Court held that the percentage approach is proper and lodestar is not. *See Gisbrecht v. Barnhart*, 535 U.S. 789 (2002).  The Court explained that "the lodestar method was designed to govern imposition of fees on the losing party," but

---

in calculating a fee award."); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993) ("[A] percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases.").

Exhibit C
Page 63

"Section 406(b) is of another genre: It authorizes fees payable from the successful party's recovery." *Id.* at 802, 806.[2] Thus, the district court erred in giving "primacy" to the lodestar calculation. *Id.* at 793, 808-09. Instead, courts should decide "reasonableness … based on the character of the representation and the results the representative achieved." *Id.* at 808. The Court concluded by noting: "Judges of our district courts are accustomed to making reasonableness determinations in a wide variety of contexts, and their assessments in such matters, in the event of an appeal, ordinarily qualify for highly respectful review." *Id.* Here, just like in *Gisbrecht*, reasonableness should be measured not by the lodestar, but rather by "the character of the representation and the results achieved," with "highly respectful" deference afforded to the lower court.

The Court of Claims explained precisely why the percentage approach was preferable both generally and specifically given the circumstances of this case. "While the lodestar method is the preferred means of calculating attorney's fees in fee-shifting cases, it has fallen out of favor in cases where fees are paid from a common fund." Appx10. The reasons are clear: the lodestar method "'is difficult to apply, time-consuming to administer, inconsistent in result, and capable of

---

[2] Appellant cites (Br. 30, 33) *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010), for the supposed benefits of the lodestar approach, but that is a fee-shifting case, which is therefore inapposite here.

Exhibit C
Page 64

manipulation.'"  Appx11 (quoting MCL § 14.121 and citing cases).  It also "creates incentives for inefficiency," Appx11, by providing "an unanticipated disincentive to early settlements [and] tempt[ing] lawyers to run up their hours," *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005).  In contrast, "the percentage method … directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Id.* (cleaned up).

Moreover, "[c]onsidering the circumstances of these cases," the Court of Claims found that "a nuanced, factor-based analysis will more appropriately gauge the reasonableness of Class Counsel's requested fee."  Appx11.  The lodestar approach "fails to appreciate … the class members' affirmative choice to join these suits (knowing the potential of a five percent fee) rather than to pursue individual claims subject to a higher market rate for attorney's fees and the tremendous 100 percent recovery they obtained."  Appx11.  Thus, it was more than reasonable for the Court of Claims to apply the percentage-of-the-fund method, and this fact-specific decision was well within the Court of Claims' discretion.  *See, e.g.*, *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994) ("[I]n common fund cases, no presumption in favor of either the percentage or the lodestar method encumbers the district court's discretion to choose one or the other.").

Exhibit C
Page 65

## B. The Court Of Claims Had Discretion Not To Treat The Lodestar As Dispositive

In the face of the unequivocal precedent allowing use of the percentage-of-the-fund method in common fund cases and the Court of Claims' unchallenged reasoning establishing why it should be applied here, Objectors argue that they are asking only for a lodestar "cross-check." But their attempt to require application of the lodestar method in the guise of a lodestar "cross-check" fails as a matter of law.

### 1. A Lodestar Cross-Check Does Not Prohibit A High Multiplier Of The Lodestar, Especially Where The Fees Constitute A Low Percentage Of The Fund

A lodestar cross-check has a clear and well-understood meaning that Objectors fail to address, and it does *not* prohibit an award simply because it would represent a high multiplier of the lodestar. Even in the circuit (that Objectors repeatedly cite) with the most lodestar-friendly precedents, "the resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307 (3d Cir. 2005). The lodestar multiplier is simply one factor that is "relevant" to the analysis, "[b]ut the lodestar cross-check does not trump the primary reliance on the percentage of common fund method." *Id.* "[I]f the District Court does consider the lodestar, it might think of it as a floor and the fee under the retainer agreement as a ceiling. In such event, it should explain on the record its reasons for selecting a fee award at or between these two figures." *In re Cendant Corp. Litig.*, 264 F.3d 201, 285-86 (3d

Exhibit C
Page 66

Cir. 2001).  In short, the lodestar cross-check is just that—a check, not an inflexible command.  Countless cases are in accord.[3]  Objectors cite none to the contrary.

Furthermore, Objectors (along with all of the opt-in class members) agreed to an award that would be based primarily on a percentage of the fund.  After noting that "Class Counsel represents that it will request no more than **5%** of any judgment or settlement," the notice states:  "In any event, the exact percentage of Class Counsel's fees will be determined by the Court subject to, among other things, the amount at issue in the case and what is called a 'lodestar cross-check' (*i.e.*, a limitation on class counsel fees based on the number of hours actually worked on the case).  *See, e.g.*, *Geneva Rock Prods., Inc. v. United States*, 119 Fed. Cl. 581, 595-96 (2015); *Loving v. Sec'y of Health and Human Servs.*, 2016 WL 4098722, at

---

[3]  *See, e.g.*, *Altnor v. Preferred Freezer Servs., Inc.*, 197 F. Supp. 3d 746, 767 (E.D. Pa. 2016) ("[T]he lodestar cross-check remains non-dispositive, and its relevance is increasingly challenged by the realities of today's legal practice."); *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 505 (Cal. 2016) ("[W]e emphasize the lodestar calculation, when used in this manner, does not override the trial court's primary determination of the fee as a percentage of the common fund and thus does not impose an absolute maximum or minimum on the potential fee award."); *Monserrate v. Tequipment, Inc.*, 2012 WL 5830557, at *3 n.1 (E.D.N.Y. Nov. 16, 2012) ("[T]his [lodestar] calculation is meant to serve as a rough indicator of the propriety of a fee request, not as a litmus test."); *In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752, 764 (S.D. Ohio 2007) ("The lodestar cross-check does not supplant the court's detailed inquiry into the attorneys' skill and efficiency in recovering the settlement, but instead acts as simply another factor ...."); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 997 (D. Minn. 2005) ("To the extent that the Fund Objectors imply that the courts ... set a multiplier cap, the court reads the precedent otherwise.") (citation omitted).

Exhibit C
Page 67

*4 (Fed. Cl. July 7, 2016)."  Appx1389.  Thus, Objectors had notice of and agreed to a fee that would be determined based on a "percentage" of the judgment or settlement, with that percentage determined by the court.  Appx1389.

While Objectors focus (Br. 50) on the language concerning a lodestar cross-check, they ignore that the notice cites a case defining what any cross-check would entail:  "[T]he lodestar cross-check provides information for the court's consideration, not a mandate[.]  The lodestar multiplier does not need to fall within a specific range, but a comparison to the lodestar multipliers in similar cases may provide additional guidance to the court.  Nevertheless, *the lodestar cross-check does not trump the primary reliance on the percentage of common fund method*." *Geneva Rock Prods, Inc. v. United States*, 119 Fed. Cl. 581, 595-96 (2015), *rev'd in part on other grounds by Longnecker Prop. v. United States*, 2016 WL 9445914, at *1 (Fed. Cir. Nov. 14, 2016) (emphasis added) (citations and quotations omitted).  Thus, the very provision that Objectors rely upon as supposedly requiring a lodestar cross-check—which it does not, *see infra* at 34-37—made it unequivocally clear to Objectors that any cross-check would not trump the primary reliance on an approach based on a percentage of the fund.

Under this standard, the Court of Claims plainly performed a lodestar cross-check.  It looked at the $10 million lodestar amount and the 18-19x multiplier. Appx24-25.  It compared the multiplier to other cases.  Appx24-25.  And it found

Exhibit C
Page 68

that "even if the Court applied the lodestar cross-check, a multiplier of 18-19 would, at least, not be outside the realm of reasonableness." Appx25. This finding that the fee award was reasonable even looking at it from a lodestar perspective is, by definition, a lodestar cross-check. Objectors' bald assertion (Br. 27) that there was no cross-check wrongly ignores this analysis in the order.

Given that the Court of Claims performed a cross-check, Objectors must retreat to the idea (Br. 38-44) that a lodestar cross-check categorically prohibits the award of a high multiplier of the lodestar. *See* Br. 25-26 ("There is no basis to conclude that the multiplier in excess of 18 effectively awarded in this case could ever be reasonable."); Br. 39 ("[A] lodestar multiplier should be in the low single digits."). Indeed, while at times Objectors request (Br. 26, 53) only a remand for the Court of Claims to conduct a lodestar cross-check, such a remand would be pointless given that the cross-check already happened. Seemingly recognizing this problem, at other times Objectors request (Br. 45-46) a remand whereby "this Court should instruct that … the multiplier should be within the range generally recognized as acceptable, i.e., generally 1 to 2, and certainly no higher than 4."

Objectors' request for an inflexible cap on the multiplier is legally baseless. As discussed above, courts uniformly hold a cross-check does not and cannot impose such a cap. Objectors' proposed cap is therefore not a request for a cross-check, but a request for a back-door application of the lodestar method. Simply put, if the

Exhibit C
Page 69

lodestar (with some multiplier) sets the ceiling for attorney's fees, then the lodestar—rather than the percentage of the fund—becomes the primary lens through which to determine reasonableness. As discussed *supra* at 21-24, that is exactly the approach that courts repeatedly reject and the Court of Claims found especially improper under the circumstances here. *See, e.g.*, *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 185 (W.D.N.Y. 2011) ("[T]he Court must be cautious of placing too much weight on these numbers lest it re-introduce the problems of the lodestar method.") (alterations and quotations omitted). Thus, Objectors cannot obtain indirectly through application of a supposed cross-check the lodestar methodology that they unquestionably cannot receive in the first place—and do not even argue for in this appeal.

Furthermore, there is no precedent or logic supporting the imposition of a multiplier cap. In contrast with Objectors' request (Br. 45-46) that the Court of Claims' discretion be bound to a multiplier of "1 to 2, and certainly no higher than 4," courts frequently allow a multiplier of greater than 4—in fact, the case cited in the class notice allowed a 5.39 multiplier. *See Geneva Rock*, 119 Fed. Cl. at 595; *see also infra* at 52-53 (citing many cases with higher multipliers). While Objectors attempt (Br. 42-44) to distinguish some of those cases on the facts (for reasons that are meritless, *see infra* at 52-53), the point is that whether a high multiple is warranted in a given case is a fact-specific, multi-factor, discretionary determination.

Exhibit C
Page 70

Objectors rely heavily (Br. 34-36) on *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir. 2001), but *Cendant* only highlights Objectors' error in focusing on the lodestar to the exclusion of all else. *Cendant* held that the district court erred as a matter of law in providing an analysis "too cursory for us to have a sufficient basis to review for abuse of discretion," which did "not even specify whether it was using the percentage-of-recovery method or the lodestar method," and "did not explicitly consider any of [the seven] factors" for the percentage-of-recovery method. *Id.* at 733-34 (quotations omitted). That is obviously a far cry from the Court of Claims' extensive, careful analysis of each factor here. Given the lack of reasoning to review in *Cendant*, the Third Circuit performed its own analysis of the factors and found that an award of 5.7-7.3% of the common fund (depending on how it was calculated) was unjustified given the work performed and the lack of complexity of the case. *Id.* at 735-41 & n.25. Only *after* performing this analysis did the Third Circuit look to the lodestar and hold that the "abuse of discretion in this case is magnified when one looks at the lodestar multiplier." *Id.* at 742. And even that lodestar analysis was carefully limited: the Third Circuit did not hold, but only "strongly suggest[ed,] that a lodestar multiplier of 3 … is the appropriate ceiling," and this suggestion was for that specific case given all of the factors the court analyzed, not a mandate for all other cases. *Id.*; *cf. In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*,

Exhibit C
Page 71

148 F.3d 283, 340 (3d Cir. 1998) (noting prior case that affirmed "a fee that resulted in a multiplier of 9.3").

The other cases Objectors cite (Br. 38-39) are even farther afield. In one, the Second Circuit held that the district court did not abuse its discretion in awarding 6.5% of the fund (for attorney's fees of more than $220 million), and that the 3.5 lodestar multiple was reasonable without any suggestion that a higher lodestar would be impermissible. *See Wal-Mart*, 396 F.3d at 122-23. In another, the Ninth Circuit found no abuse of discretion in awarding 28% of the fund, which represented a lodestar multiplier of 3.65, emphasizing deference to the district court and the limited usefulness of the lodestar analysis. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-51 (9th Cir. 2002); *see also id.* at 1050 n.5 ("The lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee, since the lodestar method does not reward early settlement."). The only other circuit court case Objectors cite found no abuse of discretion in affirming an award of 20% of the fund, which represented a 3.66 lodestar multiplier, again with no suggestion of a multiplier cap. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 F. App'x 651, 653-54 (9th Cir. 2019); *see also id.* at 654 ("The district court did not abuse its discretion in finding that the large size of the

31

Exhibit C
Page 72

settlement fund did not warrant a reduction of the 20 percent fee award.").  In short, Objectors cite only one case finding an abuse of discretion—where the district court provided essentially no analysis—and the rest properly defer to the district court in approving percentages that greatly exceed the percentage awarded here.

Finally, Objectors' assertion (Br. 46-47) that the cross-check required in-depth scrutiny of billing records is likewise baseless.  The Court of Claims correctly held that "detailed billing records are not required where the percentage-of-the-fund, or even the lodestar cross-check, is employed."  Appx23.  As the Third Circuit has explained, "[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting."  *In re Rite Aid*, 396 F.3d at 306.  Thus, "[t]he district courts may rely on summaries submitted by the attorneys and need not review actual billing records."  *Id.* at 306-07.  Numerous decisions are in accord, including the very case cited in the class notice.[4]  Objectors ignore virtually all of this well-

---

[4]  *See Geneva Rock*, 119 Fed. Cl. at 595 (holding that "the hours documented by counsel need not be exhaustively scrutinized," there need be no "mathematical precision nor bean-counting," and ultimately not looking at hours at all, but rather using "the statutory fee amount of $696,753.80 under the Uniform Relocation Act [to] approximate[] the lodestar amount," and adding "$50,000 to reflect the additional time that has been and will be spent by class counsel") (citations omitted); *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 482 n.7 (4th Cir. 2020) ("A so-called 'lodestar cross-check' is the comparison of (1) a calculation of attorney's fees using the percentage-of-recovery method to (2) a rough or imprecise lodestar calculation."); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("Of course, where used as a mere cross-check, the hours documented by counsel

Exhibit C
Page 73

established case law and the incongruity of requiring detailed scrutiny for what is supposed to be merely a cross-check on the percentage method.  They cite only *Rite Aid*, which as discussed above expressly disclaimed a requirement of actual billing records, and a Ninth Circuit case which did the same.  *In re Nat'l Collegiate Athletic Ass'n*, 768 F. App'x at 654 ("[T]he district court may rely on attorney fee summaries rather than actual billing records.").  Indeed, Objectors concede (Br. 34)—when explaining why a cross-check is not too onerous—that the court "need not scrutinize each individual billed hour, but may instead focus on the general question of whether the fee award appropriately reflects the degree of time and effort expended by the attorneys."

Objectors also mischaracterize the evidence presented here.  Class Counsel provided the number of hours spent on the *Health Republic* and *Common Ground* matters; the hourly rates for associates, partners, and staff; a blended rate for attorneys and staff; and detailed descriptions of the type of work Class Counsel performed.  *See* Appx1805-1807.  This work included, but is not limited to,

---

need not be exhaustively scrutinized by the district court.  Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case.") (citation omitted); *In re Crocs, Inc. Sec. Litig.*, 2014 WL 4670886, at *4 n.4 (D. Colo. Sept. 18, 2014) ("[T]he Court will not undertake an exhaustive lodestar analysis."); *Abbott v. Lockheed Martin Corp.*, 2015 WL 4398475, at *3 n.1 (S.D. Ill. July 17, 2015) ("The Court may rely on summaries submitted by attorneys and need not review actual billing records.").

Exhibit C
Page 74

developing the legal theory that ultimately resulted in a $12 billion industry-wide recovery; briefing on multiple dispositive motions; tending to the needs of hundreds of class members, including often-daily inquiries; participating as amicus in multiple appeals; and routinely advising counsel for individual litigants, including the Supreme Court parties. *See* Appx1805-1807; *see also* Appx2216; Appx2218-2219. Courts often rely on declarations of precisely this sort in conducting a lodestar cross-check.[5]  There was no error, let alone abuse of discretion, in the Court of Claims doing so here.

## 2. A Lodestar Cross-Check Is Not Required

Objectors' request for a cross-check that prohibits high lodestar multipliers is especially improper because it was well within the Court of Claims' discretion not to perform a lodestar cross-check at all.  While Objectors cite several cases that apply a cross-check, approximately half of all courts in common fund cases do not use the lodestar, even as a cross-check.  *See* 5 Newberg on Class Actions § 15:67; *see also* Appx1828 (citing studies showing that over half of courts do not employ the lodestar

---

[5]  *See, e.g.*, *Garcia v. Schlumberger Lift Sols.*, 2020 WL 6886383, at *19 (E.D. Cal. Nov. 24, 2020), *report and recommendation adopted*, 2020 WL 7364769 (E.D. Cal. Dec. 15, 2020); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 465 n.18 (D.P.R. 2011); *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 766 (S.D.W. Va. 2009); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 553 F. Supp. 2d 442, 485-86 (E.D. Pa. 2008), *aff'd sub nom. In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1176 (S.D. Cal. 2007); *In re Lucent Techs., Inc., Sec. Litig.*, 327 F. Supp. 2d 426, 448 (D.N.J. 2004).

Exhibit C
Page 75

method primarily or as a cross-check).  The same is true in the Court of Claims.  *See, e.g.*, *Lambert v. United States*, 124 Fed. Cl. 675, 683 n.10 (2015); *Raulerson v. United States*, 108 Fed. Cl. 675, 680-81 (2013); *Quimby v. United States*, 107 Fed. Cl. 126, 132 (2012).  While Objectors assert (Br. 29) that this Court's decision in *Haggart* leaves open the question whether a cross-check is required, this Court inserted no caveat in its holding:  district courts may use lodestar (with a risk multiplier) or "may determine the amount of attorney fees … by employing a percentage method."  809 F.3d at 1355.  And that is exactly what the Court of Claims did here.

While Objectors cite some circuits *recommending* a cross-check, they cite none *requiring* it, instead leaving it to the district court's discretion.  For instance, the Ninth Circuit recently held that the district court did not "abuse its discretion in using the percentage-of-recovery method to calculate fees and refusing to conduct a lodestar crosscheck.  This Court has consistently refused to adopt a crosscheck requirement, and we do so once more."  *Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 630 (9th Cir. 2020), *cert. denied sub nom. Threatt v. Farrell*, 142 S. Ct. 71 (2021).  In the Third Circuit, likewise, "[t]he lodestar cross-check is 'suggested,' but not mandatory."  *Moore v. GMAC Mortg.*, 2014 WL 12538188, at *2 (E.D. Pa.

Exhibit C
Page 76

Sept. 19, 2014).[6]  Objectors' proposed mandatory lodestar cross-check thus has no

legal support.

Even assuming a lodestar cross-check could be required in some instances,

the Court of Claims explained precisely why the lodestar approach was of little, if

any, relevance here.  *See supra* at 23-24.  Objectors' only case-specific basis for a

lodestar cross-check here is the mention of such a cross-check in the class notice.

However, as the Court of Claims held, "a reduction was not guaranteed" because

"the ultimate decision to reduce a requested fee percentage, if at all, rests within the

Court's discretion."  Appx20.  Objectors present no argument as to how a class

---

[6]    Other circuit courts likewise hold that the decision whether to perform a cross-check is at the discretion of the district court.  *See, e.g.*, *In re Home Depot Inc.*, 931 F.3d 1065, 1091 n.25 (11th Cir. 2019) ("We do not mean to suggest that a cross-check is required.  A lodestar cross-check is a time-consuming exercise."); *Keil v. Lopez*, 862 F.3d 685, 701 (8th Cir. 2017) ("Although not required to do so, the court verified the reasonableness of its award by cross-checking it against the lodestar method"); *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("[C]onsideration of a lodestar check is not an issue of required methodology."); *Goldberger*, 209 F.3d at 50 ("[W]e encourage the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage."); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988) (holding no abuse of discretion in refusal to apply lodestar cross-check); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 101 (D.D.C. 2013) ("In this circuit, such a lodestar cross-check is not required, although district courts are free to employ such a cross-check at their discretion to confirm the reasonableness of an award.") (citation omitted); *see also Flores v. Zorbalas*, 2019 WL 7142886, at *2 (Minn. Ct. App. Dec. 23, 2019) ("Appellant concedes there is no legal authority requiring the district court to perform a lodestar cross-check to confirm the reasonableness of the fee award.").

Exhibit C
Page 77

notice could legitimately infringe upon the Court of Claims' authority and discretion to determine reasonableness. Indeed, this is exactly what the class notice said—"the exact percentage of Class Counsel's fees will be determined by the Court," Appx1389—and the brief reference to a lodestar cross-check cannot and did not change that well-established principle. In any event, and at a minimum, the class notice does not require that the Court of Claims apply any particular weight to the lodestar cross-check, let alone the dispositive weight that Objectors rely upon as the basis for reversal.

## II. THE COURT OF CLAIMS ACTED WELL WITHIN ITS DISCRETION IN APPLYING THE SEVEN-FACTOR TEST TO DETERMINE THAT 5% OF THE FUND WAS A REASONABLE FEE AWARD

The Court of Claims examined all elements of the seven-factor test, finding that each factor supported a 5% award, and that the lodestar multiplier was of minimal relevance here, but regardless did not undermine the reasonableness of the 5% award. Appx13-25. Appellants assert (Br. 49) that "the Claims Court seemed to treat the fee award process as a baseball arbitration, and having rejected the Objecting Class Members' proposal, it defaulted to Class Counsel's request." But this assertion blinks the reality of the order, which does not default to anything, but rather explains why 5% is reasonable after considering and balancing every relevant consideration. Indeed, as discussed *infra* at 38-43, 50-51, Objectors do not dispute the Court of Claims' findings on four of the seven factors, and say little about the

37

Exhibit C
Page 78

other three.  Objectors therefore have no plausible argument that the Court of Claims abused its discretion in its fact-specific, discretionary judgment about how it weighed these factors to determine that a 5% award is reasonable in this case.

### A.    The Court Of Claims Correctly Found The Quality Of Counsel Supports The 5% Award

Just as "[t]he quality of Class Counsel [was] essentially undisputed" in the Court of Claims, Appx13, the same is true here.  Objectors do not contest the Court of Claims' findings that "Class Counsel and the members of Class Counsel's team have a history of providing quality results for their clients, including in large class actions," that "Class Counsel demonstrated a degree of foresight in bringing these suits and focusing their attention on the Section 1342 claim several months before other parties began filing individual complaints based in part on the same legal theory," and that "the same argument they first pressed eventually persuaded the Supreme Court to rule in favor of QHP issuers."  Appx13-14.  In short, Class Counsel identified and developed legal claims that an entire industry imitated, which nearly one-third of that industry chose to support by selecting Class Counsel as their counsel, and which resulted in an extraordinary 100% recovery for each and every class member.

To the extent Objectors attempt (Br. 23-24) to minimize Class Counsel's role because another firm ultimately argued the winning Supreme Court case, the Court of Claims correctly found otherwise.  "That the favorable Supreme Court decision

Exhibit C
Page 79

came down in separate, parallel cases handled by other counsel does not undermine the quality of Class Counsel's representation or the value added by class counsel to the broader risk corridors litigation." Appx14. Indeed, the reason other cases "beat Class Counsel to the high court was because Class Counsel, unlike in some of those cases, successfully defeated dismissal at the pleading stage," and "what is more important is that Class Counsel's legal theory resulted in a huge award to the classes here." *Id.* Regardless, Class Counsel did not stand idly by at the appellate stage: among other things, Class Counsel hired Professor M. Kate Bundorf, a healthcare economist, as an expert, and submitted four amicus briefs to the Federal Circuit and two to the Supreme Court. *See* Appx1775-1776. Judge Wallach's dissent from denial of *en banc* rehearing extensively cited these amicus briefs. *See Moda Health Plan*, 908 F.3d at 747-48 (Wallach, J., dissenting from denial of *en banc* rehearing). And the argument stressed in Class Counsel's amicus briefs—warning of the dangers of the government's failure to act as an honest broker and honor its commitments to insurers—was also a focus of the Supreme Court's opinion. *See Maine Cmty.*, 140 S. Ct. at 1331; *see also* Appx15-16 (Court of Claims finding "objective impact" from Class Counsel's participation in lower court and appellate proceedings).

Moreover, to the extent Objectors question the novelty of Class Counsel's legal theory with the benefit of hindsight, the reality is that no other law firm even

Exhibit C
Page 80

mentioned this theory until several months after Class Counsel did so. *See supra* at 4-5. It was Class Counsel that first recognized that the "Risk Corridors statute is one of the rare laws permitting a damages suit in the Court of Federal Claims." *Maine Cmty.*, 140 S. Ct. at 1329. This legal theory is the exact one eight Justices of the United States Supreme Court eventually vindicated after more than four years of contentious litigation. *Id.* Class Counsel's undisputed role in pioneering this novel legal theory that resulted in a 100% recovery for all class members strongly supports a 5% fee award.

### B. The Court Of Claims Correctly Found The Complexity Of The Litigation Supports The 5% Award

The Court of Claims also correctly found—and Objectors do not dispute—that the complexity of the litigation supported the fee award. Appx14-16. As the court explained, the legal issue was "complex enough to split multiple courts as to its proper resolution," and "Class Counsel engaged in litigation in either a direct or supporting role at every level before the class members in these cases were awarded judgment in their favor," in "efforts [that] spanned the course of over four years." Appx15. Indeed, at the time Health Republic filed its Complaint, not a single case had interpreted or even cited to Section 1342 of the Affordable Care Act. Even the more general question about whether a statute is money-mandating had little precedent, as "[r]arely has the Court determined whether a statute can fairly be

40

Exhibit C
Page 81

interpreted as mandating compensation by the Federal Government." *Maine Cmty.*, 140 S. Ct. at 1329 (quotations omitted).

The Court of Claims also found substantial complexities from Class Counsel representing 283 class members representing approximately one-third of the overall value of risk corridors claims. "The logistics of administering such large class participation—for example, flying to meet with QHP issuers, fielding and resolving questions of class members and other issuers, assisting class members who faced insolvency—magnifies the complexity of these cases." Appx16. Indeed, during the four-plus years of this litigation, Class Counsel fielded often-daily inquiries from class members (and other QHP issuers) about a variety of litigation and ACA-related topics, including the susceptibility of risk corridor claims to government offset, the interaction between this litigation and state insolvency laws, possible settlement of claims, and the timing of any recovery. Appx1805. Class Counsel also took steps to enable class members to leverage their risk corridor claims to obtain financing necessary to stay in business, and regularly consulted with and advised liquidators and state insurance officials. Appx1805-1806; Appx1957-1958. In sum, the undisputed complexities support the 5% fee award.

## C. The Court Of Claims Correctly Found The Risk of Non-Recovery Supports The 5% Award

In yet another undisputed finding, the Court of Claims correctly found that a substantial risk of non-recovery is powerful justification for the fee award here.

Appx17.  "Success was dependent on a showing that Section 1342 created one of those 'rare money-mandating obligation[s]' requiring the Government to make risk corridors payments to QHP issuers."  Appx17 (quoting *Maine Cmty.*, 140 S. Ct. at 1331).  The majority of Court of Claims judges to decide the issue rejected the claim;[7] this Court also rejected the claim and *en banc* review.  *See Moda Health Plan*, 892 F.3d 1311.  Simply put, the legal theory was untested and "the consistent losses other firms faced in litigating the same claim increased the riskiness of any additional time Class Counsel spent on *Health Republic* and *Common Ground*."  Appx17.  In other cases, the Court of Claims has held that the risk of nonrecovery supports a substantial attorney's fee where there was an absence of controlling precedent, *see Moore*, 63 Fed. Cl. at 789; where other, similar suits have been unsuccessful, *see Kane Cty., Utah v. United States*, 145 Fed. Cl. 15, 19 (2019); and where the government disputed the plaintiff's key positions, *see Quimby*, 107 Fed. Cl. at 133— all of which are true here.

While it is easy in retrospect to see the claims as meritorious, that was very questionable *ex ante*.  Success ultimately depended on the Supreme Court taking the case and reversing, which is itself an extraordinarily doubtful proposition given the

---

[7]  *See Maine Cmty.*, 133 Fed. Cl. 1 (Bruggink, J.); *Blue Cross* , 131 Fed. Cl. 457 (Griggsby, J.); *Land of Lincoln Mutual Health Insurance Co. v. United States*, 129 Fed. Cl. 81 (2016) (Lettow, J.).

Exhibit C
Page 83

limited number of cases in which the Court grants certiorari review.  The idea that the Supreme Court would take this case, rule against the government, and force the government to pay $12 billion to health insurers was, to say the least, a very uncertain proposition.  Class Counsel risked approximately 10,000 hours of its attorneys' time on that proposition.  If it was wrong, if the Supreme Court had simply denied certiorari as it does in the vast majority of cases, Class Counsel would have received nothing.  And there was little optimism about risk corridor claims among industry insiders—for instance, Dawn Bonder, CEO of Health Republic, was told by the CEO of Moda (which would eventually become the second QHP issuer to file suit) that she was "bold" to even consider filing an action because there was such a low likelihood of success.  Appx1952-1953.

The Court of Claims acted well within its discretion in concluding that a 5% fee award was a proper reward for taking on that risk.  Class Counsel's work on the risk corridors matters is the epitome of a campaign in which class counsel undertook a significant, ever-increasing commitment to a matter despite low odds of success. If leading law firms are to pursue these kinds of important-but-novel legal theories, then there must be a reward when they achieve a full recovery on behalf of their clients.

43

Exhibit C
Page 84

**D.   The Court Of Claims Correctly Found The Fee That Likely Would Have Been Negotiated Between Private Parties In Similar Cases Supports The 5% Award**

The Court of Claims correctly found that the market rates in similar cases "weighs heavily in favor of reasonableness" here because "Class Counsel's five percent fee is … well below the market rate for attorney's fees in the risk corridors litigation."  Appx18.  For instance, Class Counsel concluded a 25% fee arrangement with both Health Republic and Common Ground before the certification of their respective classes.  *Id.*; *see also* Appx1800-01.  Other firms' contingency-fee percentages for their individual plaintiffs were also "in multiples" of the 5% fee awarded here.  Appx18; *see also* Appx1803 (same); Appx2217 (noting "other firms were signing up individual clients to pursue this exact claim in individual actions at contingencies of 15% and more"); Appx2218 ("contingency firms including Crowell were in fact proposing terms for individual representations far in excess of 5%").  Indeed, even *after* Class Counsel agreed to a 5% cap, Crowell refused to lower its fee to 5%.  Appx2218.  Objectors produced nothing in opposition to any of this evidence, and indeed no suggestion that even a single plaintiff negotiated a fee at 5% or lower.

The market rate of "multiples" of 5% is extraordinarily strong evidence that the 5% award here is reasonable.  Attorney's fees should reflect the "market rate for legal services . . . rather than the compensation a judge thinks appropriate as a matter

Exhibit C
Page 85

of first principles." *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 975 (7th Cir. 2003). Thus, "[t]he district court must try to assign fees that mimic a hypothetical ex ante bargain between the class and its attorneys." *Williams*, 658 F.3d at 635. This approach avoids the risk that "hindsight alters the perception of the suit's riskiness." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718-19 (7th Cir. 2001). "Only *ex ante* can bargaining occur in the shadow of the litigation's uncertainty." *Id*. at 719; *see also, e.g.*, *Swedish Hosp.*, 1 F.3d at 1269.

This reasoning is especially relevant here, where (as discussed *supra* at 41-43) the *ex ante* risk of nonrecovery (and no fee) was very substantial. Objectors argue (Br. 50) that "[t]he Third Circuit has called into question the utility of this factor in megafund cases," but the Third Circuit did so only "in cases involving the aggregation of over 8 million plaintiffs." *In re Prudential Ins. Co*, 148 F.3d at 340. This concern does not apply to a class of 283 sophisticated plaintiffs who could have pursued individual claims and chose instead to opt into the class. *See Synthroid*, 264 F.3d at 719 ("Insurers are sophisticated purchasers of legal services," and their behavior can thus "*define* the market.") (emphasis in original); *see also* Appx20 (recognizing the sophistication of the insurers as purchasers of legal services, often with their own in-house counsel).

At a minimum, it is not an abuse of discretion for the Court of Claims to determine that a percentage is reasonable where it is even lower than the market fees

Exhibit C
Page 86

produced through extensive negotiations in a competitive marketplace among sophisticated entities. The Court of Claims made this point plainly: "there is little reason for the Court to step in to protect the interests of sophisticated entities who made a considered decision to join these cases and, as a result, will enjoy—even at the max rate of five percent—considerably lower costs than if they pursued their claims individually." Appx21; *see also* Restatement (Third) of the Law Governing Lawyers § 34 cmt. c (2000) ("Fees agreed to by clients sophisticated in entering into such arrangements (such as a fee contract made by inside legal counsel in behalf of a corporation) should almost invariably be found reasonable."). Objectors claim (Br. 52) that they would have been better off hiring Class Counsel at hourly rates, but the *ex post* alternative they would choose now, knowing that the case was successful, is not relevant to the bargain that insurers would have struck—and *did strike*—when they did not yet know the outcome.

Furthermore, Objectors affirmatively joined the class with the knowledge that the fee award would be based on the percentage of the fund of up to 5%. As the Court of Claims found, "the class members in these cases consist of sophisticated entities with access to in-house legal counsel," and they chose to opt in to the class "notwithstanding that there was a market for private counsel representing individual QHP issuers with risk corridors claims." Appx19-20. Thus, their "affirmative

46

Exhibit C
Page 87

choice to join these cases and pay, at most, the five percent fee identified in the class notices points strongly in favor of approving Class Counsel's fee." Appx20.

Objectors suggest (Br. 51-52) that the notice promised a reduction of the fee under the circumstances here, but as the Court of Claims found, that is false. The notice stated that "the fee *may* be substantially less than 5% depending upon the level of class participation." Appx1389 (emphasis added). Thus, "[a]s the language of the notices makes clear, … a reduction was not guaranteed." Appx20. Indeed, the very next sentence of the notice states: "In any event, the exact percentage of Class Counsel's fees will be determined by the Court …." Appx1389. And Class Counsel made clear to numerous class members that it planned to seek a 5% fee. Appx1803-1804. The class members chose to accept that arrangement rather than pursue their claims individually, and it is reasonable to hold them to that choice. Moreover, the Court of Claims noted that the potential reduction mentioned in the notice was inserted because, at the time of the notice, there was the possibility of an early settlement for nearly full amounts, and with nearly full participation from all potential class members. Appx20-21. A reduction in the fee award may have been appropriate in that situation, but the settlement did not occur and the class represents one-third (not full) participation. Appx16. In *this* scenario under *these* facts, the 5% Class Counsel requests is reasonable under the factors required by the law, which Objectors barely address.

47

Exhibit C
Page 88

Finally, the absurdity of Objectors' position is apparent because it would mean that Class Counsel earns less for representing the class of 283 insurers than it would have earned had it represented only a few insurers individually. For instance, Common Ground and Health Republic agreed to a 25% fee, which would equal $28.6 million just for representing two entities. Appx2182. Other law firms received similar fees based on their agreements with individual insurers. Appx18. Thus, Objectors' attempt to require a lodestar-based award—in defiance of the market recognition of the reasonableness *ex ante* of percentages of much greater than 5%—has the perverse effect of reducing Class Counsel's fees because it brought its claims on behalf of a class rather than bringing claims on behalf of only a few insurers individually. It also would incentivize attorneys to bombard the Court of Claims with dozens of individual claims (and thereby obtain the benefit of market-based, contingency-fee agreements), rather than as an opt-in class (where the court would, under Objectors' approach, be required to apply a lodestar cap). There is no reason to incentivize such enormous inefficiencies for the court and the parties, which would ultimately result in plaintiffs paying *more* for attorney's fees, just as Objectors here would have paid more had they proceeded individually.

Exhibit C
Page 89

### E. The Court Of Claims Correctly Found The Percentage Applied In Other Class Actions Supports The 5% Award

The percentage applied in other class actions further supports the award here. Appx21-22. Percentage of fund awards are most frequently between 30% and 40% in common fund cases. *See Kane Cty.*, 145 Fed. Cl. at 19 (collecting cases); *Raulerson*, 108 Fed. Cl. at 680; *Moore*, 63 Fed. Cl. at 787. Even in so-called megafund cases, with billions of dollars in damages, "a five percent fee is well within the reasonable range of fees sought and, in fact, is on the low end of what is traditionally awarded." Appx21; *see also* Appx1824-26 (table of 32 billion-dollar class action awards and accompanying fee percentages, showing average of more than 10% and median of more than 7%). Objectors' proposed award of less than 1% of the fund would be an extreme outlier in any case, let alone one where (as here) the Court of Claims found every factor to support a greater award.

### F. The Court Of Claims Correctly Found The Size Of The Award, In Comparison To The Size Of The Fund, Supports The 5% Award

While the Court of Claims acknowledged that the award is "seemingly massive" when viewed "[i]n a vacuum," "comparing that amount to the almost $3.7 billion awarded to the class members demonstrates the reasonableness of the request and weighs heavily in the Court's analysis." Appx22. Notably, even while Objectors purport to accept the lodestar only as a cross-check to the percentage-of-the-fund method, they do not even mention the percentage that they believe is

Exhibit C
Page 90

required here. That is because their requested award in the Court of Claims of $8.8 million would constitute 0.22% of the fund, *see* Appx22, and even their suggestion now of at most two times the lodestar ($20 million) would constitute a miniscule and virtually unheard-of 0.5% of the fund. For instance, as the Court of Claims noted, "Rocky Mountain Health Maintenance Organization, Inc. … seeks to pay fees of approximately $109,000 from its combined $49.5 million dollar judgment." Appx22. While Objectors complain (Br. 25) about a windfall to attorneys, it is Objectors who seek a windfall, whereby they would pay almost nothing in fees despite the substantial risk of non-recovery, despite receiving 100% of their claimed damages, and despite the market rate on fees for these claims being well in excess of 5%.

### G. The Court Of Claims Correctly Found The Paucity Of Objections Supports The 5% Award

The lack of any objection from the vast majority of class members further supports the award. Appx25. Of the 283 class members, 34 joined the single motion objecting to fees, and nearly all of those belonged only to the two organizations appealing here: United Healthcare and Kaiser. *Id.* In particular, "90 percent of the organizations whose entities opted into these suits, representing approximately $2.1 billion in damages, do not object to the fee." *Id.* This is especially significant because the class members are sophisticated parties—many with claims for tens of millions of dollars—who chose not to join the objection even though doing so would have cost nothing and even though United Healthcare and Kaiser apparently engaged

Exhibit C
Page 91

in an organized effort to recruit objectors.  Appx2219.  Accordingly, "the number of objections is relatively low when viewed in the context of the classes here," and this factor "likewise supports the determination that Class Counsel's fee request is reasonable."  Appx25.  Once again, Objectors do not dispute these facts or the import of this factor in supporting the reasonableness of the 5% fee award.

### H.    The Court Of Claims Correctly Found A 5% Award Is Reasonable Given A Lodestar Cross-Check

Finally, the fee award is reasonable when considering the lodestar multiple it implies.  Appx24-25.  As the Court of Claims explained, while the multiple here is on the high end, there are several cases where courts have approved similar or greater multiples and it is reasonable here given all of the factors discussed above.  Appx24-25.  Indeed, the justification for a high multiple here is much stronger than in virtually any other case, including the cases awarding similar or greater multiples. It is extraordinarily rare that counsel has pioneered a legal theory that no other firm put forward until months later, that the legal theory was so risky and untested that it required Supreme Court review to be successful, that the class recovered 100% of its damages on a final judgment (not, as is typical, a settlement for a fraction), that there was a competitive market among sophisticated parties establishing fees of 15% or more for these very claims, and that the high lodestar multiple still constitutes only 5% of the common fund.  It is difficult to find a case with even *one* of these

51

Exhibit C
Page 92

factors, let alone all of them.[8]  And there is certainly no case ever suggesting that the weighing of these factors to approve a 5% fee award and a high lodestar multiple is an abuse of discretion.  Indeed, Objectors concede (Br. 42) that "[c]ourts reserve multipliers above this [1-4x] range for the most trend-setting cases, pursued by class counsel efficiently and at significant risk," and that is exactly what happened here, as the Court of Claims found.

Objectors also err in their attempt to distinguish the other cases approving high multipliers.  In *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005), the court approved a 15.6 multiplier, and Objectors' only argument (Br. 44) is that no one there objected.  But here, the vast majority of class members (all sophisticated) also did not object, and the other factors discussed above are much *stronger* than in *Stop & Shop*, where the class recovery in a settlement was for much less than 100% of the claimed damages, and the fee award was for 20% (not 5%) of the fund.  2005 WL 1213926, at *17-18. In *In re Merry-Go-Round Enters., Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000),

---

8   Objectors cite (Br. 39-43) a number of district court and Court of Claims cases that applied low lodestar multipliers, but the question here is not whether courts *must* approve awards with high multipliers, but whether they *can* do so.  In any event, none of the cases Objectors cite concerns the two biggest factors supporting the fee award here:  that the plaintiffs received 100% of their damages in a final judgment (rather than a settlement for a fraction, as in virtually every other common fund case), and that the market rate for sophisticated plaintiffs with these claims reflected an even higher percentage of the fund.

Exhibit C
Page 93

Objectors argue (Br. 44-45) that the court only looked at whether the 19.6 multiplier was unethical, but in fact the court also determined that it was reasonable—even when the fee award was for 40% of the fund. 244 B.R. at 337-38. And in *Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012), Appellants assert (Br. 44) that no lodestar cross-check was conducted for the award of 15% of the fund and a 66 multiplier, but the Delaware Supreme Court did not ignore the lodestar: it held that "the hours that counsel worked is of secondary importance to the benefit achieved," noting the lower court "was aware of the hourly rate that its Fee Award implied," but nonetheless held the lower court acted within its discretion in giving greater weight to the percentage of the fund. *Id.* at 1257-59.[9]

---

[9] Objectors simply ignore the many cases approving multipliers far greater than the 4x they deem to be a cap, even if they are not quite as large as the 18-19x here. *See, e.g.*, *Kane Cty.*, 145 Fed. Cl. at 20 (6.13 multiplier, and collecting cases approving or referencing approved multipliers between 5.39 and 19.6); *Farrell*, 827 F. App'x 628 (10.15 multiplier); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (8.3 multiplier); *In re Doral Fin. Corp. Secs. Litig.*, No. MDL 1706, ECF No. 107 (S.D.N.Y. July 17, 2007) ("A 15.25% fee represents a reasonable multiplier of 10.26."); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 182 (D. Mass. 1998) (8.9 multiplier).

In addition, because courts are not required to conduct a lodestar cross-check when awarding fees in a common fund case, many class counsel simply do not submit summaries of their lodestar unless they believe it helps them. Appx2226-2227. Thus, class counsel whose lodestar implies a relatively low multiplier are more likely than their high-multiplier peers to highlight their lodestar in a fee application. Appx2226-2227. This selection bias means that the data provided to courts skews *low* in terms of implied multipliers. Appx2226-2227.

Exhibit C
Page 94

Objectors' argument also fails to confront the simple point that the balancing of the factors matters more than the lodestar multiplier.  When viewed through the lens of the percentage of the fund, the 5% award is lower than in most cases, and when viewed through the lens of the lodestar multiplier, the award is higher than in most cases.  As discussed *supra* Part I, the Court of Claims acted well within its discretion to prioritize the percentage-of-the-fund method, even if the lodestar is used as a cross-check.  The result achieved in this case—a 100% class recovery comprised of a nearly $3.7 billion judgment fund, obtained after Class Counsel took on significant risk and continued to doggedly pursue the classes' interests after several potentially case-ending setbacks—supports a high lodestar multiple. And unless the lodestar is a hard cap—which it is not, *supra* at 25-34—it cannot overcome the many factors supporting a 5% fee award here.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court of Claims' judgment awarding attorney's fees of 5% of the fund should be affirmed.

Exhibit C
Page 95

Dated: March 31, 2022                              Respectfully submitted,

                                                   /s/ *Stephen A. Swedlow*

David M. Cooper                                    Stephen A. Swedlow
QUINN EMANUEL URQUHART &                           QUINN EMANUEL URQUHART &
SULLIVAN, LLP                                      SULLIVAN, LLP
51 Madison Avenue, 22nd Floor                      191 N. Wacker Drive, Suite 2700
New York, New York 10010                           Chicago, Illinois 60606
Telephone: (212) 849-7000                          Telephone: (312) 705-7400
Facsimile: (212) 849-7100                          Facsimile: (312) 705-7401
davidcooper@quinnemanuel.com                       stephenswedlow@quinnemanuel.com

                                                   J. D. Horton
                                                   Adam B. Wolfson
                                                   QUINN EMANUEL URQUHART &
                                                   SULLIVAN, LLP
                                                   865 S. Figueroa Street
                                                   Los Angeles, California 90017
                                                   Telephone: (213) 443-3000
                                                   Facsimile: (213) 443-3100
                                                   jdhorton@quinnemanuel.com
                                                   adamwolfson@quinnemanuel.com

             *Attorneys for Plaintiffs-Appellees*

Exhibit C
Page 96

## **CERTIFICATE OF COMPLIANCE**

Counsel for Plaintiffs-Appellees hereby certifies that:

1. The brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because exclusive of the exempted portions it contains 13,689 words as counted by the word processing program used to prepare the brief; and

2. The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2013 in a proportionately spaced typeface: Times New Roman, font size 14.


Dated: March 31, 2022          */s/ Stephen A. Swedlow*
         Stephen A. Swedlow
         QUINN EMANUEL URQUHART &
         SULLIVAN, LLP
         191 N. Wacker Drive, Suite 2700
         Chicago, Illinois 60606
         Telephone: (312) 705-7400
         Facsimile: (312) 705-7401
         stephenswedlow@quinnemanuel.com

         *Attorney for Plaintiffs-Appellees*

# EXHIBIT D

**May 18, 2023 to May 30, 2023 Email Correspondence**

| From: | Adam Wolfson |
| To: | Jenna Fasone |
| Cc: | Andrew Schapiro; David Cooper; Daniel Schwartz; Moe Keshavarzi; Katherine Rice |
| Subject: | RE: Health Republic and Common Ground v USA |
| Date: | Tuesday, May 30, 2023 10:25:12 AM |

Hi Jenna,

Given the disclosure of these terms in the sworn declarations of Mr. Swedlow (Dkt. 84-1), Ms. Bonder (Dkt. 84-4), and Ms. Mahaffey (Dkt. 84-5), as well as that we made virtually identical arguments on them in the initial fee petition in 2020, *see* Dkt. 84 at 21; Dkt. 93 at 13-14, we do not believe anything further is required at this time. Also supporting our position are a few other points. First is that United and Kaiser did not contest any of these sworn statements or the arguments based on them in the original opposition, *see generally* Dkt. 89; nor did it contest or even discuss them on appeal. Second is that United and Kaiser did not make these requests in the parties' meet and confers, at the status conference, or in their opening or reply briefs. As such, we not only continue to believe the request is unnecessary in light of triple sworn testimony, but also procedurally improper.

If you would like to utilize the "up to 25%" language to argue against our points in the renewed fee petition, despite that Common Ground clearly does not object to either the summary in our briefs or our request for a 5% fee as class counsel, that is of course United and Kaiser's prerogative. However, to the extent you intend to argue to the Court that we refused to provide copies of the engagement letters, we ask that you attach this full email chain rather than selectively quote via declaration, so that Judge Davis has the full context of the conversation.

Thank you,
Adam

**From:** Jenna Fasone <JFasone@sheppardmullin.com>
**Sent:** Friday, May 26, 2023 1:48 PM
**To:** Adam Wolfson <adamwolfson@quinnemanuel.com>
**Cc:** Andrew Schapiro <andrewschapiro@quinnemanuel.com>; David Cooper <davidcooper@quinnemanuel.com>; Daniel Schwartz <danielschwartz@quinnemanuel.com>; Moe Keshavarzi <MKeshavarzi@sheppardmullin.com>; Katherine Rice <KRice@sheppardmullin.com>
**Subject:** RE: Health Republic and Common Ground v USA

**[EXTERNAL EMAIL from jfasone@sheppardmullin.com]**

Adam,

Quinn Emanuel's second fee motion (HR Dkt. 192) argues that the second most important *Moore* factor is factor 4 (i.e., the fee that likely would have been negotiated between private parties in similar cases).  The motion then argues that "courts benchmark reasonable fees by looking first at 'actual agreements' (e.g., between counsel and class representatives)" and in that context argues "each of Health Republic and Common Ground agreed to pay Class Counsel 25% of their damages." The fact that "Health Republic and Common Ground will only pay as fees whatever percentage the

Court awards" is thus irrelevant if Quinn Emanuel is arguing 25% is the "first benchmark" under factor 4.

You note below that "the fee terms are as summarized in Mr. Swedlow's sworn declaration and discussed in our public briefs from the original fee petition" which glosses over the "up to" 25% distinction.  You have represented to the Court that "the details of [Quinn Emanuel's] retainer agreements with Health Republic and Common Ground" have been disclosed.   A summary is not details.  And you have not answered the central question as to what would have resulted in a less than 25% fee under the Common Ground agreement.

We ask one final time for Quinn Emanuel to provide the class representative agreements upon which Quinn Emanuel argues for a 25% benchmark in the pending fee petition.

Jenna

**Jenna A. Fasone**
+1 619-338-6642 | direct
JFasone@sheppardmullin.com | Bio

**Sheppard**Mullin
501 West Broadway, 19th Floor
San Diego,  CA 92101-3598
+1 619-338-6500 | main
www.sheppardmullin.com | LinkedIn | Twitter

**From:** Adam Wolfson <adamwolfson@quinnemanuel.com>
**Sent:** Monday, May 22, 2023 7:39 AM
**To:** Jenna Fasone <JFasone@sheppardmullin.com>
**Cc:** Andrew Schapiro <andrewschapiro@quinnemanuel.com>; David Cooper <davidcooper@quinnemanuel.com>; Daniel Schwartz <danielschwartz@quinnemanuel.com>; Moe Keshavarzi <MKeshavarzi@sheppardmullin.com>; Katherine Rice <KRice@sheppardmullin.com>
**Subject:** RE: Health Republic and Common Ground v USA

Hi Jenna,

The agreements were longer than that, addressing the typical requirements for an engagement letter. However, the fee terms are as summarized in Mr. Swedlow's sworn declaration and discussed in our public briefs from the original fee petition. And, as also discussed in the briefs from the original fee petition (and reaffirmed in the renewed fee petition), Health Republic and Common Ground will only pay as fees whatever percentage the Court awards, which is less than the 25% to which they originally agreed—and which is consistent with common practice for fee relationships with class representatives.

Adam

**From:** Jenna Fasone <JFasone@sheppardmullin.com>
**Sent:** Friday, May 19, 2023 11:30 AM
**To:** Adam Wolfson <adamwolfson@quinnemanuel.com>
**Cc:** Andrew Schapiro <andrewschapiro@quinnemanuel.com>; David Cooper
<davidcooper@quinnemanuel.com>; Daniel Schwartz <danielschwartz@quinnemanuel.com>; Moe
Keshavarzi <MKeshavarzi@sheppardmullin.com>; Katherine Rice <KRice@sheppardmullin.com>
**Subject:** RE: Health Republic and Common Ground v USA

**[EXTERNAL EMAIL from jfasone@sheppardmullin.com]**

Adam,

The initial motion states "Health Republic and Common Ground both agreed to attorneys' fees of
25% of any gross recovery, whether through a judgment for the class or a class settlement."  Mr.
Swedlow's declaration then states "Common Ground agreed to an attorney's fee of up to 25% of the
gross recovery in the event of a class action settlement or judgment."  The reply repeats what is in
the motion that "Quinn Emanuel's engagement agreements with Health Republic and Common
Ground provide for a 25% attorney's fee."

There are no further disclosures of the terms of these agreements.  I note that Quinn Emanuel's
position in the April 4, 2023 status report was that "Class Counsel already disclosed the details of its
retainer agreements with Health Republic and Common Ground."  HR Dkt. 188.

Is your representation that the engagement/retainer agreements had only one term each: (1) Health
Republic pays attorneys' fees of 25% and (2) Common Ground pays attorneys' fees up to 25% (with
no further provisions)?

Jenna


**Jenna A. Fasone**
+1 619-338-6642 | direct
JFasone@sheppardmullin.com | Bio

**Sheppard**Mullin
501 West Broadway, 19th Floor
San Diego,  CA 92101-3598
+1 619-338-6500 | main
www.sheppardmullin.com | LinkedIn | Twitter

**From:** Adam Wolfson <adamwolfson@quinnemanuel.com>
**Sent:** Friday, May 19, 2023 11:05 AM
**To:** Jenna Fasone <JFasone@sheppardmullin.com>
**Cc:** Andrew Schapiro <andrewschapiro@quinnemanuel.com>; David Cooper
<davidcooper@quinnemanuel.com>; Daniel Schwartz <danielschwartz@quinnemanuel.com>; Moe
Keshavarzi <MKeshavarzi@sheppardmullin.com>; Katherine Rice <KRice@sheppardmullin.com>

**Subject:** RE: Health Republic and Common Ground v USA

Hi Jenna,

Please see Health Republic Dkt. 84 at 21; 84-1 ¶ 8; 93 at 3-4, where we disclosed and discussed these terms as part of the original fee petition, as well as in reply to United and Kaiser's objections.

Best,
Adam

---

**From:** Jenna Fasone <JFasone@sheppardmullin.com>
**Sent:** Thursday, May 18, 2023 2:31 PM
**To:** Adam Wolfson <adamwolfson@quinnemanuel.com>
**Cc:** Andrew Schapiro <andrewschapiro@quinnemanuel.com>; David Cooper <davidcooper@quinnemanuel.com>; Daniel Schwartz <danielschwartz@quinnemanuel.com>; Moe Keshavarzi <MKeshavarzi@sheppardmullin.com>; Katherine Rice <KRice@sheppardmullin.com>
**Subject:** Health Republic and Common Ground v USA

**[EXTERNAL EMAIL from jfasone@sheppardmullin.com]**

---

Adam,

Your opposition indicates Quinn Emanuel has disclosed the terms of its fee agreements with the class representatives.  However, we have never seen those agreements.  Would you please provide them to us?

Jenna

**Jenna A. Fasone**
+1 619-338-6642 | direct
JFasone@sheppardmullin.com | Bio

**Sheppard**Mullin
501 West Broadway, 19th Floor
San Diego,  CA 92101-3598
+1 619-338-6500 | main
www.sheppardmullin.com | LinkedIn | Twitter

<u>Attention:</u> This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.