## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY,<br><br>       Plaintiff,<br>       on behalf of itself and all others<br>       similarly situated,<br><br>   vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>       Defendant. | No. 1:16-cv-259-KCD<br><br>(Judge Davis)<br><br><br>**ORAL ARGUMENT REQUESTED** |
| COMMON GROUND HEALTHCARE COOPERATIVE,<br><br>       Plaintiff,<br>       on behalf of itself and all others<br>       similarly situated,<br><br>   vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>       Defendant. | No. 1:17-cv-877-KCD<br><br>(Judge Davis)<br><br><br>**ORAL ARGUMENT REQUESTED** |

## OBJECTORS' MOTION TO AMEND THE JUDGMENT TO INCLUDE PREJUDGMENT INTEREST

## TABLE OF OBJECTING CLASS MEMBERS

| Health Republic | |
|---|---|
| HIOS | Issuer Name |
| 16049 | All Savers Insurance Company |
| 36373 | All Savers Insurance Company |
| 36677 | All Savers Insurance Company |
| 39924 | All Savers Insurance Company |
| 85947 | All Savers Insurance Company |
| 92137 | All Savers Insurance Company |
| 98971 | All Savers Insurance Company |
| 80473 | Group Health Cooperative |
| 95865 | Health Plan of Nevada, Inc. |
| 21032 | Kaiser Foundation Health Plan of Colo. |
| 89942 | Kaiser Foundation Health Plan of Georgia |
| 90296 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 94506 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 95185 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 40513 | Kaiser Foundation Health Plan, Inc. |
| 60612 | Kaiser Foundation Health Plan, Inc. |
| 71287 | Kaiser Foundation Healthplan of the NW |
| 48834 | Oxford Health Plans (NJ), Inc. |
| 80208 | Rocky Mountain Health Care Options |
| 97879 | Rocky Mountain HMO |
| 71667 | UnitedHealthcare Community Plan, Inc. |
| 31779 | UnitedHealthcare Insurance Company |
| 49650 | UnitedHealthcare Insurance Company |
| 45002 | UnitedHealthcare Life Insurance Company |
| 59809 | UnitedHealthcare Life Insurance Company |
| 68259 | UnitedHealthcare of Alabama, Inc. |
| 68398 | UnitedHealthcare of Florida, Inc. |
| 43802 | UnitedHealthcare of Georgia, Inc. |
| 23671 | UnitedHealthcare of Kentucky, Ltd. |
| 38499 | UnitedHealthcare of Louisiana, Inc. |
| 97560 | UnitedHealthcare of Mississippi, Inc. |
| 79881 | UnitedHealthcare of New England, Inc. |
| 54235 | UnitedHealthcare of New York, Inc. |
| 54332 | UnitedHealthcare of North Carolina, Inc |
| 33931 | UnitedHealthcare of Ohio, Inc. |
| 24872 | UnitedHealthcare of Pennsylvania, Inc. |
| 21066 | UnitedHealthcare of the Mid-Atlantic Inc |
| 31112 | UnitedHealthcare of the Mid-Atlantic Inc |
| 16724 | UnitedHealthcare of the Midwest, Inc. |
| 66413 | UnitedHealthcare of Utah, Inc. |

| Common Ground | |
|---|---|
| HIOS | Issuer Name |
| 36373 | All Savers Insurance Company |
| 39924 | All Savers Insurance Company |
| 85947 | All Savers Insurance Company |
| 98971 | All Savers Insurance Company |
| 78726 | All Savers Insurance Company |
| 80473 | Group Health Cooperative |
| 78463 | Harken Health Insurance Company |
| 95852 | Harken Health Insurance Company |
| 95865 | Health Plan of Nevada, Inc. |
| 21032 | Kaiser Foundation Health Plan of Colo. |
| 89942 | Kaiser Foundation Health Plan of Georgia |
| 90296 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 94506 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 95185 | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. |
| 40513 | Kaiser Foundation Health Plan, Inc. |
| 60612 | Kaiser Foundation Health Plan, Inc. |
| 23371 | Kaiser Foundation Healthplan of the NW |
| 71287 | Kaiser Foundation Healthplan of the NW |
| 48834 | Oxford Health Plans (NJ), Inc. |
| 80208 | Rocky Mountain Health Care Options |
| 97879 | Rocky Mountain HMO |
| 37873 | UnitedHealthcare Benefits Plan of California |
| 49650 | UnitedHealthcare Insurance Company |
| 31779 | UnitedHealthcare Insurance Company |
| 23489 | UnitedHealthcare Insurance Company |
| 57860 | UnitedHealthcare Insurance Company |
| 69443 | UnitedHealthcare Insurance Company |
| 68259 | UnitedHealthcare of Alabama, Inc. |
| 59036 | UnitedHealthcare of Colorado, Inc. |
| 68398 | UnitedHealthcare of Florida, Inc. |
| 43802 | UnitedHealthcare of Georgia, Inc. |
| 38499 | UnitedHealthcare of Louisiana, Inc. |
| 97560 | UnitedHealthcare of Mississippi, Inc. |
| 54235 | UnitedHealthcare of New York, Inc. |
| 33931 | UnitedHealthcare of Ohio, Inc. |
| 45480 | UnitedHealthcare of Oklahoma, Inc. |
| 24872 | UnitedHealthcare of Pennsylvania, Inc. |
| 21066 | UnitedHealthcare of the Mid-Atlantic Inc |
| 38599 | UnitedHealthcare of the Mid-Atlantic Inc |
| 44751 | UnitedHealthcare of the Midlands, Inc. |
| 51902 | UnitedHealthcare of the Midlands, Inc. |
| 16724 | UnitedHealthcare of the Midwest, Inc. |
| 66413 | UnitedHealthcare of Utah, Inc. |
| 43861 | UnitedHealthcare of Washington, Inc. |

**TABLE OF CONTENTS**

Page

I. Introduction ...............................................................................................................1

II. Factual Background....................................................................................................3

    A.      The September 2021 Fee Award................................................................3

    B.      Quinn Emanuel Obtains Judgment Preservation Insurance So That It Can Keep Almost All of the Award Regardless of What Happens on Appeal, and Then Distributes It to Its Partners ................................................3

    C.      The Federal Circuit Vacates the September 2021 Fee Award Instructing the Court to Hold Quinn Emanuel to Its Promise of a Lodestar Cross-Check .............4

    D.      Quinn Emanuel Seeks the Same 5% on Remand while the Objectors Move for an Accounting and Safekeeping of the Disputed Award ..................................4

    E.      Quinn Emanuel and the Court Both Acknowledge that the Class Is Entitled to Restitution and Interest ..................................................5

    F.      The October 2024 Judgment Cuts the Award in Half............................6

    G.      Quinn Emanuel Contends the Class Would Have Received Zero Interest on the Common Fund But Offers a Paltry 1.775% "Compromise"............................6

III. Argument ..................................................................................................................7

    A.      Legal Standard Under RCFC 59(e)...........................................................7

    B.      The Class Is Entitled to Prejudgment Interest Under Principles of Restitution and Unjust Enrichment ....................................................8

    C.      The Appropriate Rate of Interest Here Is the Prime Rate .....................................10

    D.      Whether the Common Fund Account Was Interest-Bearing or Not is Irrelevant ..............................................................................15

    E.      The Court Can Also Order an Accounting to Determine the Actual Amount by Which Quinn Emanuel Was Unjustly Enriched ...............................17

IV. Conclusion ................................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Alberti v. Klevenhagen*
    896 F.2d 927, *vacated in part on other grounds*, 903 F.2d 352 (5th Cir. 1990) ....................10

*Baker v. Socialist People's Libyan Arab Jamahirya*
    775 F. Supp. 2d 48 (D.D.C. 2011) ..........................................................................8

*Brunswick Corp. v. United States*
    36 Fed. Cl. 204 (1996), *aff'd*, 152 F.3d 946 (Fed. Cir. 1998)................................................12

*Cheyenne Res., Inc. v. Elk Horn Coal Corp.*
    265 S.W.3d 184 (Ky. 2008) ...................................................................................9

*City of Milwaukee v. Cement Div., Nat. Gypsum Co.*
    515 U.S. 189 (1995)...........................................................................................10

*Crowe v. Bolduc*
    365 F.3d 86 (1st Cir. 2004)....................................................................................7

*Dynamics Corp. of Am. v. United States*
    766 F.2d 518 (Fed. Cir. 1985)...............................................................................12

*Forman v. Korean Air Lines Co.*
    84 F.3d 446 (D.C. Cir. 1996) ............................................................................7, 10

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*
    No. 03-cv-1431, 2008 WL 928535 (N.D. Cal. Apr. 4, 2008).................................................12

*Fresh Kist Produce, L.L.C. v. Choi Corp.*
    362 F. Supp. 2d 118 (D.D.C. 2005) ..........................................................................8

*Gidada v. Islamic Republic of Iran*
    No. 1:21-cv-2338, 2024 WL 3738822 (D.D.C. July 1, 2024) ............................................7, 13

*Haggart v. Woodley*
    809 F.3d 1336 (Fed. Cir. 2016)................................................................................8

*Health Republic Ins. Co. v. United States*
    58 F.4th 1365 (Fed. Cir. 2023) ........................................................................3, 4, 5

*Jakubowicz v. Islamic Republic of Iran*
    No. 18-cv-1450, 2024 WL 1826610 (D.D.C. Apr. 25, 2024).....................................10, 11, 13

*Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*
    954 F.2d 1279 (7th Cir. 1992) .......................................................................2, 11, 15

*Oldham v. Korean Air Lines Co*.
  127 F.3d 43 (D.C. Cir. 1997) ........................................................................................8

*Osterneck v. Ernst & Whinney*
  489 U.S. 169 (1989) .......................................................................................................7

*PSM Holding Corp. v. Nat'l Farm Fin. Corp*.
  743 F. Supp. 2d 1136 (C.D. Cal. 2010), *aff'd in part*, 884 F.3d 812 (9th Cir. 2018)...............9

*Stockman Bank of Montana v. AGSCO, Inc.*
  747 N.W.2d 516 (N.D. 2008) .........................................................................................9

*Texaco P.R., Inc. v. Dep't of Consumer Affairs*
  60 F.3d 867 ...................................................................................................................17

*The Boeing Co. v. United States*
  86 Fed. Cl. 303 (2009) .............................................................................................11, 12

*Uniroyal, Inc. v. Rudkin-Wiley Corp*.
  939 F.2d 1540 (Fed. Cir. 1991)....................................................................................10

*W. Virginia v. United States*
  479 U.S. 305 (1987)................................................................................................10, 15

Statutes

Penn Carey Law Article............................................................................................................14

Other Authorities

Federal Rule Civil Procedure, Rule 59(e).................................................................................7

Restatement (First) of Restitution § 74 (1937) .....................................................................9, 10

Restatement (Third) of Restitution and Unjust Enrichment § 18 ...........................................2, 10

Restatement (Third) of Restitution and Unjust Enrichment § 53 (2011)........................................9

## I.    Introduction

Last year the Federal Circuit vacated the $185 million fee award to class counsel Quinn Emanuel Urquhart & Sullivan ("Quinn Emanuel") and remanded the matter for further consideration.  Even though Quinn Emanuel had already distributed the challenged fee award to its partners, it repeatedly represented that there was no need for an accounting or to place the disputed funds in an interest-bearing account while this Court reconsidered the fee award. Rather, Quinn Emanuel assured the class and the Court that, if the Court were to reduce the award, it would promptly return the difference to the class *plus interest*.  In fact, Quinn Emanuel chastised the objecting class members ("Objectors") for trying to protect their interest in the funds and emphasized that the calculation of interest it would owe to the class in the event the award were reduced would be "simple."

Despite claiming the calculation of interest would be "simple"—and despite telling the Court that if it had "never ruled on the original fee petition" the "money [would be] in a common fund…accruing interest"—Quinn Emanuel now claims that "the common fund accounts are *not interest-bearing*" and thus erroneously contends that prejudgment interest would have been ***nothing***.[1]  Apparently what Quinn Emanuel meant when it told the Court and the class that the calculation would be "simple" is that the math is easy because interest is 0%.  Quinn Emanuel's position is factually incorrect and disingenuous at best.  The class now has a claim in restitution as necessary to avoid Quinn Emanuel's unjust enrichment as a result of its taking an extra $92.4 million that has now been determined to belong to the class as of September 2021.[2]  (*See*

---

[1] Declaration of Jenna A. Fasone, Ex. A (November 13, 2024 email from Adam Wolfson) (emphasis added).

[2] Because Quinn Emanuel purchased insurance to cover the award it obtained by disregarding its promises to the class, the result is that Quinn Emanuel will be unjustly enriched no matter how much prejudgment interest is awarded because it will keep nearly twice the award to which it is

Restatement (Third) of Restitution and Unjust Enrichment, § 18.)  As such, contrary to Quinn

Emanuel's assertion that prejudgment interest should be calculated based on the interest rate

applicable to the common fund (i.e., 0%), the question is *not* what would have happened "had

Class Counsel not distributed the funds from the common fund account in 2021."[3]  Instead, the

question is what would have happened *if the class received the $92.4 million* back in 2021 at the

time of the original judgment, *instead of Quinn Emanuel*.  In any event, under no circumstances

would $92.4 million (or $185 million) have sat in a zero-interest account for several years with a

claims administrator that charges a fee for its services.

   As discussed in more detail below, the prime rate—i.e., the rate charged by banks on

short-term, unsecured loans to their most creditworthy customers, like Quinn Emanuel, is the

most appropriate measure of prejudgment interest.  "Prejudgment interest at the market [i.e.,

prime] rate puts *both* parties in the position they would have occupied had compensation been

paid promptly."  *Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954

F.2d 1279, 1331-32 (7th Cir. 1992) (emphasis in original).

   In order to protect the class, the Objectors are now moving under RCFC 59(e) to amend

the October 18, 2024 judgment to include prejudgment interest out of an abundance of caution in

the event the Court believes prejudgment interest must be awarded as part of that judgment.  As

discussed in the Objectors' filings from yesterday, however, the Objectors respectfully request

that the Court order Quinn Emanuel to repay the undisputed excess award it has retained for the

past several years so that the dispute over how much interest is due does not further delay any

distribution to the class, consistent with Quinn Emanuel's promise to "repay any difference (if

---

equitably entitled.

[3] *See* Fasone Decl., Ex. A.

any) between the two awards" "if the Court orders a lower fee award"—which it has now done.
(H.R. Dkt. 202 at 17.)  And, consistent with the Objectors' calculations below, $21,292,259.13 is
the proper amount of interest equitably owed to the class.  The Objectors (and the class) are in
the current position of being owed $92.4 million because Quinn Emanuel ignored its promises to
the class when it first moved for fees; Quinn Emanuel should not be permitted to disregard yet
another promise it has made to the Court and the class, this time about interest, by being
permitted to claim that the amount should be zero.

## II.    Factual Background

### A.    The September 2021 Fee Award

On September 16, 2021, the Court granted Quinn Emanuel's initial motion for a $185
million fee, or 5% of the combined judgments for the risk corridors non-dispute subclasses in
*Health Republic* and *Common Ground*.  (Order, H.R. Dkt. 138, C.G. Dkt. 153.)  The next day,
the Clerk entered RCFC 54(b) judgments consistent with that order.  (Judgment, H.R. Dkt. 143;
C.G. Dkt. 155.)  On October 1, 2021, the Objectors filed their notice of appeal.  (H.R. Dkt. 144,
C.G. Dkt. 159.)  The RCFC 62(a) automatic stay expired on October 17, 2021.

### B.    Quinn Emanuel Obtains Judgment Preservation Insurance So That It Can Keep Almost All of the Award Regardless of What Happens on Appeal, and Then Distributes It to Its Partners

Quinn Emanuel does not deny, and therefore concedes, that it directed the claims
administrator to distribute the full amount of fees originally awarded by the Court to the firm.
(H.R. Dkt. 202-1, ¶ 4; H.R. Dkt. 210.)  It has refused to provide details such as the timing of the
distribution, but presumably it followed the expiration of the automatic stay.  *Id.*  Nor has it
disclosed how it handled the funds once received from the claims administrator, but it likewise
does not deny that it distributed the funds to its partners.  *Id.*  Quinn Emanuel did eventually,
however, upon Court order, provide evidence of the judgment preservation insurance ("JPI") it

-3-

purchased to cover the majority of the original $185 million award should the award be reduced following the Objectors' appeal. (H.R. Dkt. 211; H.R. Dkt. 212.)

## C.    The Federal Circuit Vacates the September 2021 Fee Award Instructing the Court to Hold Quinn Emanuel to Its Promise of a Lodestar Cross-Check

On January 31, 2023, the Federal Circuit vacated the $185 million award and remanded to the Court, instructing it to hold Quinn Emanuel to its promise of "a lodestar cross-check in accordance with [the Federal Circuit's] opinion, including an assessment of whether there is sufficient justification for an award with an implicit multiplier outside the mainstream of relevant multipliers." *Health Republic Ins. Co. v. United States*, 58 F.4th 1365, 1377-78 (Fed. Cir. 2023) (also directing the Court to reconsider any parts of its analysis beyond the lodestar cross-check affected by the Federal Circuit's conclusions). The Federal Circuit explained that it did not see sufficient justification "for an award with an implicit multiplier outside" "the [normal] range of 1 to 4," much less 18-19. *Id.* The mandate issued on March 9, 2023. *See* H.R. Dkt. 183.

## D.    Quinn Emanuel Seeks the Same 5% on Remand while the Objectors Move for an Accounting and Safekeeping of the Disputed Award

Following a status conference on March 21, 2023, the Court entered a scheduling order governing the remand proceedings. (H.R.. Dkt. 187.) Pursuant to that order, on May 2, 2023, Quinn Emanuel filed its renewed Motions for Approval of Attorney's Fee Request seeking—despite the Federal Circuit's opinion—the same 5% (or $185 million) award on remand. (H.R. Dkt. 192.)

The Objectors contemporaneously filed a motion requesting three things: (1) a full accounting of the disputed award; (2) an order to deposit the disputed funds into an interest-bearing trust account; and (3) discovery concerning the JPI that Quinn Emanuel had purchased before distributing the funds to its partners. (H.R. Dkt. 194.) The Objectors argued that a full accounting of what happened to the funds would, among other things, establish what interest

-4-

would have accrued and thus how much interest the class might ultimately be owed. *Id.* The Objectors also argued that, to protect the class (and its ability to earn interest on what could be a large sum of money) the Court should order Quinn Emanuel to deposit the funds into an interest-bearing account for safekeeping. *Id.* And finally, the Objectors argued that the JPI would not adequately protect the class because it would place the class's right to prompt repayment in the hands of strangers to this litigation. *Id.*

**E.    Quinn Emanuel and the Court Both Acknowledge that the Class Is Entitled to Restitution and Interest**

In response to the Objectors' motion, "Quinn Emanuel correctly argue[d], to the extent the fee award is modified, Objectors will have a right to restitution from Quinn Emanuel. *See Health Republic* ECF No. 202 at 14 (citing Restatement (First) of Restitution § 74 (1937); Restatement (Third) of Restitution and Unjust Enrichment § 18 & cmt. e (2011))." (Order on Objectors' Motion for Discovery, H.R. Dkt. 210.) Quinn Emanuel also "unequivocally commit[ed] to repay any difference (if any) between the two awards," and represented that any interest owed on the difference would be a "simple" calculation. (H.R. Dkt. 202.)

The Court found that it was not necessary "to determine the question of interest when the Court ha[d] not yet considered the merits of the renewed fee request." *Id.* The Court denied the Objectors' request for an accounting and safekeeping, but did "not foreclose Objectors' ability to reassert its request for an accounting to the extent it is necessary or appropriate to determine any interest owed if the Court ultimately reduces the fee award." *Id.*

The Court ordered Quinn Emanuel to produce the JPI policy documents. Those documents show that Quinn Emanuel purchased $166.85 million in coverage, with the primary policy triggered once the fee award is reduced by $9.1 million—that is, Quinn Emanuel pays the first $9.1 million, and then the JPI insurers pay up to $166.85 million. (H.R. Dkt. 211-1

(Keshavarzi Decl., ¶ 5 and Ex. B); H.R. Dkt. 212 (Keshavarzi Suppl. Decl., ¶ 2 and Ex. E).)

**F.    The October 2024 Judgment Cuts the Award in Half**

On October 10, 2024, the Court granted Quinn Emanuel's renewed Motions for Approval of Attorney's Fee Request (H.R. Dkt. 192; C.G. Dkt. 185) subject to a reduction of the requested fee to 2.5% of the common fund for a total award of $92,424,335.84—half of the vacated September 2021 award.  (H.R. Dkt. 224.)  At the July 25, 2024 hearing on the renewed motion, Quinn Emanuel reiterated its promise to repay any difference plus interest:

> At this point, if -- this was encapsulated in one of your earlier orders in this case -- if you order anything less than 5 percent, we, as class counsel, will owe them the difference plus interest.  So at this point, the class, if Your Honor awards less than 5 percent, gets the benefit of -- the time benefit of money.  They get interest.

Transcript (July 25, 2024) 25:7-13.  *See also* Transcript (July 25, 2024) at 24:2-6 ("Say that – say Your Honor had never ruled on the original fee petition and the money was just in a common fund, you know, accruing interest.  What would happen in that instance is the class would be entitled to the common fund plus interest…") and 25:17-21 ("So what's reflected in what they would get from any difference that Your Honor orders is that accounting for time.  It's just like what I was saying, if the common fund had never left an escrow account and had been accruing interest this entire time.").

On October 18, 2024, the Clerk entered two RCFC 54(b) judgments consistent with the October 10 Opinion and Order (collectively referred to as the "Judgment").  (H.R. Dkt. 226; C.G. Dkt. 230 (emphasis added).)

**G.    Quinn Emanuel Contends the Class Would Have Received Zero Interest on the Common Fund But Offers a Paltry 1.775% "Compromise"**

After the Court issued its second fee award, the Objectors asked Quinn Emanuel for its position on interest.  (*See* Fasone Decl., Ex. A.)  Quinn Emanuel refused to answer the question,

claiming the Objectors should go first. *Id.* The Objectors responded by stating their position is "the prime rate compounded annually. *See, e.g., Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450–51 (D.C. Cir. 1996); *Gidada v. Islamic Republic of Iran*, No. 1:21-cv-2338, 2024 WL 3738822, at *12 (D.D.C. July 1, 2024) (setting forth the prime rates during the relevant period)." *Id.* Quinn Emanuel responded that the applicable rate of interest is zero because "the common fund accounts are not interest-bearing" and "the purpose of an interest rate in this situation is to put the class members in the same position they would have been, had Class Counsel not distributed the funds from the common fund account in 2021." *Id.* But it did not offer any explanation as to why it failed to inform the Court and the Objectors of this fact when it opposed the Objectors' motion to return the funds after the Federal Circuit vacated the award. *See id.* Apparently realizing the flaw in its position, Quinn Emanuel then offered that, while in its view the applicable rate of interest is *zero* and it owes *no* interest, it would be willing (apparently for no reason other than pure benevolence) to pay 1.775%, which it claims is half the average of the short-term Treasury rates over the last three years. *See id.*

## III.    Argument

### A.    Legal Standard Under RCFC 59(e)

RCFC 59(e) permits a party to file "[a] motion to alter or amend a judgment." RCFC 59(e). Discretionary prejudgment interest is a proper subject for a Rule 59(e) motion. *See e.g., Osterneck v. Ernst & Whinney*, 489 U.S. 169, 177 (1989); *see also Crowe v. Bolduc*, 365 F.3d 86, 92–93 (1st Cir. 2004) ("Following *Osterneck's* lead, we conclude that Rule 59(e) is the proper procedural vehicle for motions seeking to revise a judgment to include an initial award of prejudgment interest (whether mandatory or discretionary).")

"The decision to award prejudgment interest, as well as how to compute that interest,

rests within the discretion of the court, subject to equitable considerations." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). The purpose of prejudgment interest "is to compensate the plaintiff for any delay in payment resulting from the litigation." *Oldham v. Korean Air Lines Co*., 127 F.3d 43, 54 (D.C. Cir. 1997). Because Quinn Emanuel's fee application for a share of the common fund is grounded in equity, the Court possesses the full range of its inherent equitable authority to ensure that the result of the proceedings is fair. *See Fresh Kist Produce, L.L.C. v. Choi Corp.*, 362 F. Supp. 2d 118, 128 (D.D.C. 2005) ("[T]he court must be sensitive to underlying equities when determining attorneys' fee awards in common fund cases."); *Haggart v. Woodley*, 809 F.3d 1336, 1352, 1359 (Fed. Cir. 2016) ("The common fund doctrine is rooted in the traditional practice of courts of equity and derives from the equitable power of the courts" and, "[a]t its heart, equity is about fairness.")[4]

B.    **The Class Is Entitled to Prejudgment Interest Under Principles of Restitution and Unjust Enrichment**

Quinn Emanuel has repeatedly assured the class and the Court that a reduction of the fee award would require it to repay the difference between the awards "plus interest" under principles of restitution. *See* H.R. Dkt. 202 at 8, 11–12 (opposing an accounting or an order requiring Quinn Emanuel to place the disputed and then vacated fee award in an interest bearing account and explaining that "[e]very court to have considered the issue has held that Class Counsel's offer—repayment of the difference plus interest if the Court orders a lower fee award—is more than sufficient"); Transcript (July 25, 2024) ("[I]f you order anything less than 5

---

[4] *See also* RCFC 1 ("These rules govern the procedure in the United States Court of Federal Claims in all suits. They should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.")

percent, we, as class counsel, will owe them the difference plus interest.  So at this point, the

class, if Your Honor awards less than 5 percent, gets the benefit of – the time benefit of money.

They get interest.").  The Court recognized the same.  (H.R. Dkt. 210 at 13 & n.4.)  The Court

stated that "to the extent the fee award is modified, Objectors will have a right to restitution from

Quinn Emanuel" and explained that Objectors could potentially seek an accounting to the extent

it is necessary to determine any interest owed.  *Id*.

Consistent with Quinn Emanuel's assurances and the Court's holdings, "[t]he

Restatement *mandates* an award of interest where a monetary payment had been made on the

original judgment."  *PSM Holding Corp. v. Nat'l Farm Fin. Corp*., 743 F. Supp. 2d 1136, 1155

(C.D. Cal. 2010), *aff'd in part*, 884 F.3d 812 (9th Cir. 2018) (emphasis added); Restatement

(First) of Restitution § 74 cmt. d ("If payment has been made to the judgment creditor or to his

agent, or to an officer who has paid the judgment creditor, upon reversal of the judgment the

payor is entitled to receive from the creditor the amount thus paid *with interest*." (emphasis

added)).  Indeed, cases have repeatedly confirmed that prejudgment interest is owed on funds

paid under a judgment that is subsequently reversed.  *See, e.g., Stockman Bank of Montana v.

AGSCO, Inc.*, 747 N.W.2d 516, 518 (N.D. 2008) (holding that the state's prejudgment interest

statute supplies the applicable interest rate when a judgment is paid but later reversed); *Cheyenne

Res., Inc. v. Elk Horn Coal Corp*., 265 S.W.3d 184, 186 (Ky. 2008) (same).  The Restatement of

Restitution—relied on by both Quinn Emanuel and the Court—confirms the same.  Restatement

(Third) of Restitution and Unjust Enrichment § 53 (2011) (explaining that liability in restitution

based on the receipt of money normally includes prejudgment interest).

Thus, the Court's reduction of the September 2021 fee award requires Quinn Emanuel to

pay prejudgment interest to the class.  Moreover, it is appropriate for the Court to grant this

restitutionary remedy—"either sua sponte or on motion"—in this case and without requiring the class to pursue a new suit. Restatement (Third) of Restitution and Unjust Enrichment § 18 cmt. b (2011). Rather, consistent with the authorities in Section III(A) above, the Court can and should amend the Judgment to include an award of prejudgment interest.

## C.    The Appropriate Rate of Interest Here Is the Prime Rate

There is no federally mandated prejudgment interest rate. *City of Milwaukee v. Cement Div., Nat. Gypsum Co*., 515 U.S. 189, 194 (1995). Instead, federal courts have long recognized that prejudgment interest "is an element of complete compensation," which "serves to compensate for the loss of use of money." *W. Virginia v. United States*, 479 U.S. 305, 310 & n.2 (1987). This is consistent with the purpose of interest under principles of restitution: to put the parties to a reversed judgment "back as nearly as may be in the position [they] would have occupied had no judgment been rendered." Restatement (First) of Restitution § 74, Reporters' Notes (1937).

While the Court has discretion to determine the rate of prejudgment interest (*Uniroyal, Inc. v. Rudkin-Wiley Corp*., 939 F.2d 1540, 1545 (Fed. Cir. 1991)), several courts have described the prime rate[5] as "***the most appropriate measure of prejudgment interest***." *See, e.g., Jakubowicz v. Islamic Republic of Iran*, No. 18-cv-1450, 2024 WL 1826610, at *3 (D.D.C. Apr. 25, 2024) (emphasis added); *see also Forman v. Korean Air Lines Co*., 84 F.3d 446, 450–51 (D.C. Cir. 1996) (collecting cases and concluding that "the prime rate is not merely as appropriate as the Treasury Bill rate, but more appropriate."); *Alberti v. Klevenhagen*, 896 F.2d 927, 938, *vacated in part on other grounds*, 903 F.2d 352 (5th Cir. 1990) (holding a district

---

[5] The prime rate is the rate charged by banks on short-term, unsecured loans to their most creditworthy customers, which presumably includes Quinn Emanuel.

court's failure to use the prime rate to be error).[6]

The prime rate is the most common measure of interest and it is conservative.  The prime rate conservatively reflects what highly creditworthy parties that were deprived of funds as the result of an ultimately reversed judgment would have actually paid for a loan during the relevant period:

> Money today is not a full substitute for the same sum that should have been paid years ago.  Prejudgment interest therefore is an ordinary part of any award under federal law.  By committing a tort, the wrongdoer creates an involuntary creditor.  It may take time for the victim to obtain an enforceable judgment, but once there is a judgment the obligation is dated as of the time of the injury.  In voluntary credit transactions, the borrower must pay the market rate for money.  <u>(The market rate is the minimum appropriate rate for prejudgment interest, because the involuntary creditor might have charged more to make a loan.)  Prejudgment interest at the market rate puts *both* parties in the position they would have occupied had compensation been paid promptly.</u>

*Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1331-32 (7th Cir. 1992) (identifying the prime rate as "the market rate") (underlined emphasis added; italics in original).  The prime rate also reflects how the parties would have invested the funds awarded in a subsequent judgment had they received them at the time of the original judgment. *The Boeing Co. v. United States*, 86 Fed. Cl. 303, 323 (2009) (citing this reason as a basis for awarding prejudgment interest at the prime rate).

Moreover, "it is not necessary . . . [for a party to] demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate." *Id.*  A prime interest rate is in line with the rate at which class members borrow money. *Compare Jakubowicz v. Islamic*

---

[6] *See also* Knoll, Michael S. and Colon, Jeffrey M., "The Calculation of Prejudgment Interest" (2005). All Faculty Scholarship. 114 (Fasone Decl., Ex. B) (asserting prejudgment interest should be awarded at the defendant's unsecured borrowing rate and addressing and rebutting various arguments against use of the prime rate, or in the alternative explaining that use of the defendant's unsecured borrowing or prime rate would under-compensate plaintiffs where the claim is large relative to that plaintiff's wealth—as is the case here with many of the defunct class members.)

*Republic of Iran*, No. 18-cv-1450, 2024 WL 1826610, at *3 (D.D.C. Apr. 25, 2024) (identifying

prime interest rate between 3.25% and 8.50% for 2021 through 2024) *with* UnitedHealth Group

Form 10-K (Feb. 28, 2024) (explaining that, for UnitedHealth Group's short term borrowings,

"[i]f amounts had been drawn on the bank credit facilities as of December 31, 2023, annual

interest rates would have ranged from 5.8% to 8.5%"); Form 10-K (Feb. 24, 2023) (5.1% to

7.5% as of December 31, 2022). Indeed, if anything, applying the prime rate likely

*undercompensates* the class, since the prime rate is only available to the most creditworthy

borrowers, and would therefore not be available to all class members. [7]

 With respect to compounding, quarterly compounding is common and appropriate.

*Boeing*, 86 Fed. Cl. at 323 ("[Q]uarterly compounding is the most common convention employed

in these cases."). At the very least, annual compounding is appropriate because "no prudent,

commercially reasonable investor would invest at simple interest." *Brunswick Corp. v. United

States*, 36 Fed. Cl. 204, 219 (1996), *aff'd*, 152 F.3d 946 (Fed. Cir. 1998); *see also Dynamics

Corp. of Am. v. United States*, 766 F.2d 518, 520 (Fed. Cir. 1985); *Fresenius Med. Care

Holdings, Inc. v. Baxter Int'l, Inc.*, No. 03-cv-1431, 2008 WL 928535, at *2 (N.D. Cal. Apr. 4,

2008) ("compounding is needed to account for the time value of money" (internal quotation

marks omitted)).

 The applicable prime rate for the years at issue are as follows:

-  2021: 3.25

---

[7] *See, e.g.,* Complaint, ¶ 11 (H.R. Dkt. 1) ("When CMS and HHS were unable to pay the QHPs their full risk corridor receivables for 2014, many insurance companies experienced cash flow problems and/or were unable to meet regulatory reserve requirements. This required insurance companies to satisfy their cash flow and reserve shortfalls, or risk going out of business. Some companies were unable to remedy the cash flow and/or reserve shortfalls, and, as a consequence, went out of business.")

- 2022: 4.86

- 2023: 8.20

- 2024: 8.50

*Jakubowicz v. Islamic Republic of Iran*, No. 18-cv-1450, 2024 WL 1826610, at *3 (D.D.C. Apr. 25, 2024); *see also Gidada v. Islamic Republic of Iran*, No. 1:21-cv-2338, 2024 WL 3738822, at *12 (D.D.C. July 1, 2024), *report and recommendation adopted*, No. 21-cv-2338, 2024 WL 3741438 (D.D.C. July 1, 2024).

Applying the September 16, 2021 date of the initial fee award as the starting date, and the date of this filing as the end date, the class would be entitled to roughly $21 million in interest (assuming annual compounding) calculated as follows:

| Year | Rate | Modified Rate (partial years) | Initial Amount | Amount with Interest Applied | Annual Interest |
|------|------|-------------------------------|----------------|------------------------------|-----------------|
| 2021 | 3.25 | 0.94 | $92,424,335.84 | $93,296,669.64 | $872,333.80 |
| 2022 | 4.86 | N/A | $93,296,669.64 | $97,830,887.78 | $4,534,218.14 |
| 2023 | 8.2 | N/A | $97,830,887.78 | $105,853,020.58 | $8,022,132.80 |
| 2024 | 8.5 | 7.43 | $105,853,020.58 | $113,716,594.97 | $7,863,574.39 |
| **SUM:** | | | | | **$21,292,259.13** |

This calculation is conservative, in that it reflects a low borrowing rate enjoyed by only the most creditworthy borrowers.  In that regard, it is consistent with the equitable underpinnings of the common fund doctrine which requires the class to be compensated with a fair rate of interest for the more than three years it has been waiting to be made whole; meanwhile Quinn Emanuel has enjoyed not only the funds it was due, but twice that amount (which it will be permitted to keep on account of the JPI), for the same period of time.  In addition, applying the prime rate will impose the least administrative burden for the Court and the parties because it is a matter of public information, not subject to dispute, and the application of the prime rate to

judgments for the purpose of calculating prejudgment interest is laid out in court opinions.

Finally, use of a rate that is consistent with Quinn Emanuel's likely borrowing rate (i.e., the prime rate) is appropriate because it improves efficiency for courts and the parties by properly aligning economic incentives. As one Penn Carey Law article concludes:

> There are many benefits to using the defendant's unsecured, floating borrowing rate. Once litigation has begun, judicial resources are economized because neither party has an incentive to unnecessarily delay litigation. Prior to litigation, because defendants who are found liable must pay and successful plaintiffs will receive complete economic compensation for damages, both parties will have the proper economic incentives to take the correct amount of care, thereby improving efficiency.[8]

As is evident here, providing anything lower than the market (i.e., prime) rate for even the most creditworthy entities like Quinn Emanuel is inconsistent with the alignment of "proper economic incentives" because it would further incentivize the behavior that gave rise to the injury here—Quinn Emanuel's failure to honor its promises to the class and the Court in the class notice. In addition, even though Quinn Emanuel has repeatedly acknowledged it would owe the class interest if the fee award was lowered on remand, and even though Quinn Emanuel is a fiduciary to its client class members, it was willing to represent to the Court that if the money had sat in the common fund it would have been earning interest, but now claims that it "understand[s] from the claims administrator that it would not have accrued any interest, because the common fund accounts *are not interest-bearing*."[9] The Objectors contend that if this was Quinn Emanuel's money, it would have taken care to ensure the account its $92.4 million (or in this case, $185 million) was sitting in was earning more than 0% interest. As the Seventh Circuit noted:

> Tortfeasors who choose to reinvest their money in their business (as [Quinn

---

[8] Knoll and Colon, "The Calculation of Prejudgment Interest" (Fasone Decl., Ex. B)

[9] Fasone Decl., Ex. A (November 13, 2024 email from Adam Wolfson).

Emanuel] has done) rather than create a trust fund must believe that the returns in their enterprise exceed the market rate. Having earned this higher rate of return for the duration of the litigation, they are in no position to complain when called on to pay prejudgment interest. An injurer allowed to keep the return on this money has profited by the wrong.

*Matter of Oil Spill by Amoco Cadiz,* 954 F.2d at 1332.

In sum, the prime rate is the most equitable and administratively feasible way to calculate prejudgment interest and if anything, undercompensates many of the class members here.

## D.    Whether the Common Fund Account Was Interest-Bearing or Not Is Irrelevant

Quinn Emanuel concedes that "the purpose of an interest rate in this situation is to put the class members in the same position" but then improperly contends that the relevant "position" is the "position [the class] would have been, had Class Counsel not distributed the funds from the common fund account in 2021."[10] This is conceptually incorrect, factually erroneous, and disingenuous at best.

*First,* Quinn Emanuel's argument about what the "but for" world looks like is wrong. Had the Court not awarded the extra $92.4 million to Quinn Emanuel, the money would have been distributed to the class; it would not have sat with the claims administrator. The point of prejudgment interest is "to compensate for *the loss of use of money.*" *W. Virginia v. United States*, 479 U.S. 305, 310 & n.2 (1987) (emphasis added). Here, the correct question is what would have happened if the Court awarded Quinn Emmanual $92.4 million in its September 2021 judgment, instead of the $185 million it actually awarded? The answer is simple: the class would have received an additional $92.4 million at the end of 2021. The money would not have sat in any common fund account, interest-bearing or otherwise. It would have been distributed like the rest of the common fund (H.R. Dkt. 98), and the class would have had an extra $92.4

---

[10] Fasone Decl., Ex. A (November 13, 2024 email from Adam Wolfson).

million to invest in their businesses, pay off creditors, use for payroll instead of taking out a loan, or whatever else their managers decided made economic sense.

*Second,* even if it did matter what kind of interest the common fund was earning when sitting with the claims administrator—it doesn't—it is simply not credible for Quinn Emanuel to argue that $185 million (or $92.4 million) would have sat with the claims administrator, *which charges a fee for the administration of funds*, and apparently holds settlement funds in non-interest-bearing accounts. *See* Declaration of Stephen A. Swedlow, ¶ 24 (H.R. Dkt. 84-1.); Fasone Decl., Ex. A. At a minimum, Quinn Emanuel could have put the funds in a high-yield savings account which would have cost nothing and earned substantial interest over the past several years. The notion that Quinn Emanuel—who capitalized on the fee award pending appeal by procuring JPI to guarantee maximum recovery regardless of outcome—would have let the money sit in an account that incurred fees and earned no interest is simply not credible.

*Third,* when the Objectors asked the Court to transfer the funds to an interest-bearing trust account to ensure that the money was earning interest at a fair rate, the Court denied the request because Quinn Emanuel promised the Court it would repay any difference "*with interest.*" As a fiduciary to the class, the Court should enforce that promise.

*Finally,* equity and simple fairness demand that Quinn Emanuel not be unjustly enriched at the expense of the class. Quinn Emanuel breached one promise to the class in the class notice to convince this Court to initially award it $185 million. Then it procured JPI to guarantee it could maintain almost all of it. And when the award was vacated, it made another promise to convince the Court to allow it to keep the funds and not put it into an account that earned interest for the benefit of the class. Now it wants to breach yet another promise too, to gain yet another windfall. That is the epitome of unjust enrichment.

**E.    The Court Can Also Order an Accounting to Determine the Actual Amount by Which Quinn Emanuel Was Unjustly Enriched**

Nonetheless, if the Court has any doubts regarding an equitable rate of interest for the loss of use suffered by the class, it should order an accounting and require Quinn Emanuel to account for its use of the funds awarded under the since-vacated September 2021 fee award until the present.  *See* H.R. Dkt. 210 at 13 n.4 ("This ruling does not foreclose Objectors' ability to reassert its request for an accounting to the extent it is necessary or appropriate to determine any interest owed if the Court ultimately reduces the fee award.").  *See Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 875 ("Because restitution is founded on the concept of unjust enrichment, a court considering a request for restitution must investigate *the extent to which* the target 'received a benefit.'") (emphasis added.)

However, because the Objectors believe Quinn Emanuel has distributed the money to its partners, this approach is likely much less administratively feasible than using Quinn Emanuel's likely borrowing rate—i.e., the prime rate.  That said, a true accounting to determine the full benefit enjoyed by Quinn Emanuel since September or October 2021 would be an appropriate measure of its unjust enrichment.

**IV.    Conclusion**

Based on the foregoing, the Court should amend the Judgment to order Quinn Emanuel to pay $21,292,259.13 in interest to the claims administrator for pro-rata distribution to the pertinent subclasses.

Dated:  November 15, 2024                    Respectfully submitted,

-17-

SHEPPARD MULLIN RICHTER & HAMPTON LLP
Moe Keshavarzi
mkeshavarzi@sheppardmullin.com
Katherine B. Rice
krice@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071
Telephone: 213.620.1780

Jack F. Burns
jburns@sheppardmullin.com
Jenna A. Fasone
jfasone@sheppardmullin.com
501 West Broadway, 19th Floor
San Diego, CA 92101
Telephone: 619.338.6500