## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| _____ | ) | |
| HEALTH REPUBLIC INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | No. 16-259 |
| v. | ) ) | Filed: June 3, 2025 |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) ) | |
| COMMON GROUND HEALTHCARE COOPERATIVE, | ) ) ) | |
| Plaintiff, | ) ) | No. 17-877 |
| v. | ) ) | Filed: June 3, 2025 |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## <u>OPINION AND ORDER</u>

This matter was remanded from the United States Court of Appeals for the Federal Circuit for further proceedings on Quinn Emanuel Urquhart & Sullivan, LLP's ("Class Counsel") request to approve a five-percent attorney's fee. On October 10, 2024, the Court granted Class Counsel's renewed motion, subject to a reduction of the requested fee to 2.5 percent of the common fund. The Clerk entered judgment on October 18, 2024. Before the Court is the Motion to Amend Judgment to Include Prejudgment Interest, pursuant to Rule 59(e) of the Rules of the United States Court of Federal Claims ("RCFC"), filed by objecting members of the Non-Dispute Subclasses ("Objectors"). Although the parties do not dispute that the Court should award interest to the Non-Dispute Subclasses, the parties disagree as to the interest rate that should apply to the difference

in the fee awards for the approximately three-year period between the date of the Court's initial judgments and the date of the judgments on remand. Objectors ask the Court to apply the prime rate to calculate prejudgment interest, while Class Counsel advocates for either the postjudgment interest rate provided for in 28 U.S.C. § 1961(a) or the rate the Non-Dispute Subclasses would have received from an interest-bearing common fund escrow account.

For the reasons that follow, the Court **GRANTS** Objectors' Motion and awards prejudgment interest to the Non-Dispute Subclasses, but not at the prime rate. Rather, equitable principles of restitution support an interest award based on the rate that would have been earned if the Claims Administrator had maintained in an interest-bearing escrow account the portion of the fee award that Class Counsel has since returned to the Non-Dispute Subclasses.

## I.  BACKGROUND

The present issue concerns the amount of interest due to the Non-Dispute Subclasses as a result of the reduction of Class Counsel's attorney's fee award on remand. Given the parties' divergent views on the issue, framing the context of the dispute is important here. This is not a case where the prevailing party was awarded attorney's fees as an element of damages against the liable party. *See Alberti v. Klevenhagen*, 896 F.2d 927, 938, *vacated in part on other grounds*, 903 F.2d 352 (5th Cir. 1990). Nor is this a case where interest is necessary to compensate the Non-Dispute Subclasses for the delay between an injury caused by Class Counsel and the Subclasses' receiving damages for that injury. *See, e.g.*, *Jakubowicz v. Islamic Republic of Iran*, No. 18-cv-1450, 2024 WL 1826610, at *3 (D.D.C. Apr. 25, 2024). These cases concern a fee dispute between Objectors (as members of the Non-Dispute Subclasses) and their counsel in a class action that was structured to award attorney's fees from a common fund in which each class member "has an undisputed and mathematically ascertainable claim to part of [the] lump-sum judgment recovered

on [its] behalf." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479 (1980). Consistent with its fiduciary duty to the Non-Dispute Subclasses, the Court's role in resolving the fee request was to approve a reasonable attorney's fee award to be paid to Class Counsel from the Non-Dispute Subclasses' judgments against the United States.

On September 16, 2021, the Court granted Class Counsel's original motion for a $184,848,671.67 fee, or five percent of the combined judgments for the Risk Corridors Non-Dispute Subclasses in *Health Republic* and *Common Ground*. *See* Op. & Order at 27–28, ECF No. 138.[1] Class Counsel subsequently executed on the fee award judgments and collected the full five-percent fee from the Claims Administrator. As the Court previously held, in the absence of any request by Objectors to stay the fee award judgments pending appeal, Class Counsel's conduct was consistent with the Court's rules and the case law concerning final judgments, and counsel did not violate its ethical duties to the Non-Dispute Subclasses. *See generally* Op. & Order, ECF No. 210.

Ultimately, however, Objectors succeeded on appeal, and the Federal Circuit vacated the Court's initial award. *See Health Republic Ins. Co. v. United States*, 58 F.4th 1365, 1369–71 (Fed. Cir. 2023). On remand, the Court reduced the original fee request by half, awarding Class Counsel $92,424,335.84, or 2.5 percent of the common fund. *See* Op. & Order at 29, ECF No. 224. This reduction in award meant that Class Counsel was obligated to return approximately $92.4 million to the Claims Administrator for distribution to the Non-Dispute Subclasses. Class Counsel conceded as much in earlier proceedings, arguing that Objectors would have a right to restitution from Class Counsel to the extent the Court modified the initial fee award on remand. *See* Class

---

[1] Because all the briefing, including the Rule 59(e) Motion, and orders pertaining to the fee request in both cases is substantively the same, for ease of reference this opinion will cite only to the docket in *Health Republic* unless otherwise noted.

Counsel's Opp'n to Objectors' Mot. for Acct., Safekeeping of Disputed Funds, & Disc. at 12, ECF No. 202.  Class Counsel has since made good on its representation and on December 2, 2024, returned the difference in the fee awards to the Claims Administrator.  *See* Notice of Compliance, ECF No. 243.

The Court's reduction of the fee award on remand also raised the question of what amount of interest, if any, should be paid to the Non-Dispute Subclasses on the difference in the fee awards.  On November 15, 2024, shortly after the Court entered judgment on remand, Objectors moved to amend the judgments to add an award of prejudgment interest.  *See* Objectors' Mot. to Am. J. to Include Prejudgment Interest, ECF No. 234; Objectors' Mot. to Am. J. to Include Prejudgment Interest, *Common Ground* ECF No. 234.  To be clear, the parties do not dispute that the Non-Dispute Subclasses are entitled to some amount of interest.  *See* ECF No. 234 at 7; *see also* Class Counsel's Opp'n at 7, ECF No. 244.  Indeed, Class Counsel previously represented that restitution for any reduced fee award on remand would include interest.  *See* ECF No. 202 at 12 (describing its offer of "repayment of the difference plus interest if the Court orders a lower fee award").  The matter of interest is before the Court now only because the parties could not agree on the appropriate interest rate to apply.

## II.   LEGAL STANDARDS

RCFC 59(e) permits a party to file "[a] motion to alter or amend a judgment."  RCFC 59(e). A Rule 59(e) motion is the proper procedural vehicle for a request for discretionary prejudgment interest.  *See, e.g.*, *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 177 (1989); *see also Crowe v. Bolduc*, 365 F.3d 86, 92–93 (1st Cir. 2004).[2]   The purpose of prejudgment interest "is to

---

[2] Although both *Osterneck* and *Crowe* considered Federal Rule of Civil Procedure ("FRCP") 59(e), FRCP 59(e) is identical to RCFC 59(e), and thus case law interpreting the corollary rule is instructive.  *See Progressive Indus., Inc. v. United States*, 888 F.3d 1248, 1253

compensate the plaintiff for any delay in payment resulting from the litigation." *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997).

"The decision to award prejudgment interest, as well as how to compute that interest, rests within the discretion of the court, subject to equitable considerations." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  In the context of a common fund class action, the equitable considerations also include those inherent in awarding attorney's fees from a common fund.  *See Fresh Kist Produce, L.L.C. v. Choi Corp.*, 362 F. Supp. 2d 118, 128 (D.D.C. 2005) ("[T]he court must be sensitive to underlying equities when determining attorneys' fee awards in common fund cases."); *Haggart v. Woodley*, 809 F.3d 1336, 1352, 1359 (Fed. Cir. 2016) (noting that the "common fund doctrine is rooted in the traditional practice of courts of equity and derives from the equitable power of the courts" and that "[a]t its heart, equity is about fairness").

The Court has considerable latitude to determine the appropriate prejudgment interest rate. *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1579–80 (Fed. Cir. 1988) ("Simply put, the question of the rate at which such an award should be made is a matter left to the sound discretion of the trier of fact . . . .").  As such, reviewing courts "have permitted the use of statutory rates set by states, U.S. Treasury bill rates, and the prime rate," among other methods. *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1076 (Fed. Cir. 2020) (internal quotation omitted); *see also Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 556 (Fed. Cir. 1984) (citing cases); *see also Allen Archery, Inc. v. Browning Mfg. Co.*, 898 F.2d

n.4 (Fed. Cir. 2018) ("'precedent interpreting the Federal Rules of Civil Procedure applies with equal force to the comparable Rules of the Court of Federal Claims'") (quoting *Kraft, Inc. v. United States*, 85 F.3d 602, 605 n.6, *modified on other grounds on denial of reh'g*, 96 F.3d 1428 (Fed. Cir. 1996)); *see also Fla. Power & Light Co. v. United States*, 66 Fed. Cl. 93, 96 (2005) ("In applying RCFC 59, judges of this Court regularly cite to cases applying FRCP 59.").

787, 789 (Fed. Cir. 1990).  The Court also has discretion to determine the type and frequency of compounding.  *See Pettro v. United States*, 47 Fed. Cl. 136, 154 (2000); *see also Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995) (en banc).

### III.  DISCUSSION

Objectors argue that the award of interest to the Non-Dispute Subclasses should be calculated using the prime rate, which on average ranged from 3.25 percent to 8.5 percent during the period between the date of the Court's initial judgments, September 16, 2021, and the date Objectors filed their motion to amend the judgments, November 15, 2024.  *See* ECF No. 234 at 15–19.  Class Counsel, on the other hand, urges the Court to utilize the postjudgment interest rate provided for in 28 U.S.C. § 1961(a)—*i.e.*, "the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment"—which was 0.08 percent based on the date of the Court's initial judgments.  *See* ECF No. 244 at 8–11, 12 (chart). Alternatively, it argues that the interest rate applicable to the Claims Administrator's typical common fund escrow account—*i.e.*, the Fidelity Treasury Only Money Market Fund rate, which essentially tracks the 52-week U.S. Treasury Bill rate—should apply.  *See id*. at 12–14; *see* Ex. B to Class Counsel's Opp'n ¶¶ 3–4, ECF No. 244-3 (Decl. of Chris Rung).  That rate on average ranged from .51 percent to 4.5 percent during the period between the date of the Court's initial judgments and the date of the remand judgments, October 18, 2024 ("interim period").[3]  ECF No. 244 at 15 (reproducing chart in paragraph five of the Rung Declaration).  To determine the appropriate method of calculating interest, the Court must first consider the underlying rationale for awarding interest to the Non-Dispute Subclasses, which are based on the principles of

---

[3] The "interim period" closes on the date of the judgments on remand, not the date on which Objectors filed their Rule 59(e) Motion.  *Pre*judgment interest, as its name suggests, cannot be awarded for the period after the date of judgment.

restitution and the equitable considerations arising under the facts specific to these cases. While ordering an accounting would be the most accurate way to measure how much Class Counsel was unjustly enriched by maintaining the initial fee award during the interim period (and thus the amount of prejudgment interest to award), it is neither administratively feasible nor necessary at this juncture. Rather, having reviewed the options suggested by the parties, the Court finds that the common fund escrow account rate is the most appropriate way to calculate interest here. Each of the parties' preferred interest rates—the prime rate as favored by Objectors, and the statutory postjudgment rate as favored by Class Counsel—is inappropriate.

### A. The Non-Dispute Subclasses Are Entitled to Prejudgment Interest During the Interim Period Under a Theory of Restitution.

The parties disagree as to what interest rate should apply in these cases, but they agree that an award of interest is due under a theory of restitution. *See* ECF No. 234 at 6; ECF No. 244 at 7. The Court concurs.

When a judgment is reduced on remand, as it was here, "the disadvantaged party [has] a claim in restitution as necessary to avoid unjust enrichment." Restatement (Third) of Restitution & Unjust Enrichment ("Restatement") § 18 (Am. Law Inst. 2011); *see also Wesby v. District of Columbia*, 502 F. Supp. 3d 136, 140 (D.D.C. 2020) (" When a litigant makes a payment to satisfy a judgment that is later reversed, the general rule is that 'what has been lost to a litigant under the compulsion of a judgment shall be restored thereafter, in the event of a reversal, by the litigants opposed to him, the beneficiaries of the error.'" (quoting *Atl. Coast Line R.R. Co. v. Florida*, 295 U.S. 301, 309 (1935))); *see also* ECF No. 210 at 13 (noting that "to the extent the fee award is modified, Objectors will have a right to restitution from Quinn Emanuel"). The concept of unjust enrichment includes not only the property (or its value) for which the person is liable to make restitution but also any "supplemental enrichment in the form of interest, rent, or other measure of

use value, to the extent that such further enrichment is either realized in fact or appropriately presumed." Restatement § 53.

As the United States District Court for the District of Columbia has explained, "[t]he unjust enrichment proviso reflects the nature of restitution as an equitable remedy. Restitution is not a matter of right, but is 'ex gratia.'" *Wesby*, 502 F. Supp. 3d at 140–41 (internal quotation omitted). Although a court may take into account the equitable factors raised by the parties' conduct, finding unjust enrichment does not require bad faith on the part of the defendant. *See Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583, 594–95 (2d Cir. 1961) ("Here the delay is not the fault of the plaintiffs and while it may equally not be the fault of the defendant, the plaintiffs have lost and the defendant has benefited.").

Here, it is without doubt that Class Counsel benefited from the Court's initial judgments, which the Federal Circuit subsequently found to be in error and vacated. *Wesby*, 502 F. Supp. 2d at 140. But contrary to Objectors' characterizations, Class Counsel are not fairly considered "tortfeasors" who have harmed the Subclasses by holding onto the difference in the fee awards during the interim period. ECF No. 234 at 14–15. The entire initial fee award of approximately $185 million became available to Class Counsel after the date of the initial final judgments, and counsel lawfully executed on those judgments to obtain the funds. Nonetheless, the Court reduced the award on remand. Since Class Counsel had for approximately three years the beneficial use of a portion of the fee award to which it ultimately was not entitled, the return of that portion plus prejudgment interest is due to the Non-Dispute Subclasses to avoid Class Counsel's unjust enrichment and to compensate the Subclasses. Indeed, in opposing the Non-Dispute Subclasses' request for sequestration of the fee award funds during the remand, Class Counsel itself represented that it would repay "the difference plus interest" if the Court reduced the award. ECF

No. 202 at 12.  To be clear, however, awarding prejudgment interest is not (and should not be) intended to punish Class Counsel.  While "[p]rejudgment interest is an element of complete compensation," *West Virginia v. United States*, 479 U.S. 305, 310 (1987), the Court emphasizes its source as an equitable remedy.

**B.      While an Accounting Would Be the Most Accurate Method to Calculate Prejudgment Interest, It Is Neither Administratively Feasible nor Necessary.**

Once the Court makes the threshold decision to award prejudgment interest, it has "discretion to determine the amount, which encompasses setting the rate, the accrual date and the methodology for computing such interest."  *Cayuga Indian Nation of N.Y. v. Pataki*, 165 F. Supp. 2d 266, 297 (N.D.N.Y. 2001), *rev'd on other grounds*, 413 F.3d 266 (2d Cir. 2005).

Given the circumstances of the instant cases, the most equitable method of computing interest would require determining how much Class Counsel benefited from the use of the initial fee award during the interim period.  Ideally, that determination could be made by identifying the rate of interest Class Counsel actually earned on the fee award funds.  Payment of the same rate to the Non-Dispute Subclasses would ensure that Class Counsel is not unjustly enriched by the profits it earned on the portion of the award that it returned to the Non-Dispute Subclasses following remand.  *See* Restatement § 18 cmt. e ("The claim of the judgment debtor is valid only to the extent of any unjust enrichment . . . ."); *see also* Recent Development, *Prejudgment Interest as Damages: New Application of an Old Theory*, 15 STAN. L. REV. 107, 112 (1962) ("Under the unjust enrichment theory, . . . the court's focus should not be on plaintiff's probable earnings, but on defendant's *actual* earnings." (emphasis added)); *see also Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 132 (3d Cir. 2000) ("[I]f the only objective were to prevent unjust enrichment, disgorgement of the defendant's actual profits would be the appropriate measure of interest to be awarded.").

Both parties agree (or at least recognize), however, that identifying that rate, which would require an accounting from Class Counsel, would be administratively infeasible. *See* ECF No. 244 at 20 (arguing that "Objectors' request for an accounting essentially asks the Court to order discovery of every Quinn Emanuel partner since 2021"); ECF No. 234 at 22 (explaining that "because the Objectors believe Quinn Emanuel has distributed the money to its partners, this approach is likely much less administratively feasible than using . . . the prime rate"). Although Class Counsel has never specifically explained what it did with the fee award funds, its opposition brief essentially confirms Objectors' instinct that the money was distributed to the firm's partners, most likely along with other profits that the firm brought in during the year of the initial judgments. Attempting to collect information from potentially hundreds of partners that sufficiently tracks his or her individual use and benefit of the fee award funds over an approximately three-year period would be onerous to say the least. Especially given the length of time that this fee dispute has persisted, the Court does not believe that any benefits gained from accuracy would be worth the further delay and likely additional litigation attendant to ordering an accounting. Perfection should not be the enemy of the good. Accordingly, the Court agrees that an accounting would be administratively impracticable.

Moreover, the Court is not strictly required to order an accounting. Objectors' assertion that they are "entitled to an accounting" if the Court chooses an interest rate lower than the prime rate, Objectors' Reply at 24, ECF No. 247, is not supported by any citation to law. Prejudgment interest is discretionary, and the Court has wide latitude in determining the amount due to the Non-Dispute Subclasses. *Baker*, 775 F. Supp. 2d at 86; *Rite–Hite*, 56 F.3d at 1555. The Court need not review an accounting to make that determination, and instead will examine the appropriateness of each measure of interest suggested by the parties.

C.    **Awarding Prejudgment Interest at the Prime Rate, as Objectors Suggest, Is Not Appropriate.**

Objectors argue that the Non-Dispute Subclasses are entitled to prejudgment interest at the prime rate, which on average ranged from 3.25 percent to 8.5 percent over the interim period. *See* ECF No. 234 at 15, 18. The prime, or market, rate is the rate that banks charge creditworthy customers for short-term unsecured loans. *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996). Objectors "have the burden of proving the scope and extent of" the prejudgment interest award they seek. *Cayuga Indian Nation*, 165 F. Supp. 2d at 362. They have fallen short of proving the appropriateness of applying the prime rate under the circumstances of these cases.

The common theme across the cases on which Objectors rely to advocate for the prime rate is that the defendant in each case damaged the plaintiff by violating its rights. *See In re Oil Spill by the Amoco Cadiz off the Coast of France on March 16, 1978*, 954 F.2d 1279, 1332 (7th Cir. 1992) ("An injurer allowed to keep the return on this money has profited by the wrong."). Indeed, courts that have employed the prime rate for prejudgment interest across a variety of contexts tend to focus on the harm or damage to the plaintiff. *See id.* at 1331–32 (negligent oil spill); *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (trademark infringement); *Jakubowicz*, 2024 WL 1826610, at *3 (terrorist attacks in Israel); *Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 34–35 (D.D.C. 2014) (suicide bombings in Kenya and Tanzania); *Est. of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 & n.1 (D.D.C. 2013) (bombing of U.S. embassy in Lebanon); *Forman*, 84 F.3d at 450 (Korean Air Lines plane shot down by Soviet fighter plane); *EEOC v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 579 (6th Cir. 1984) (Title VII employment discrimination suit); *Frey v. Coleman*, 903 F.3d 671, 684 (7th Cir. 2018) (same); *Boeing Co. v. United States*, 86 Fed. Cl. 303, 322–24 (2009) (patent infringement).

11

While Objectors cite some favorable language from these cases to support their view that the prime rate is the best rate to apply, the actions of the defendants in those cases are a far cry from the actions of Class Counsel in the cases at hand.  While it is true that Class Counsel must now pay the Non-Dispute Subclasses for the benefit of its interim use of the fee award funds that it had to return, Class Counsel is not paying the Non-Dispute Subclasses damages for an injury in the traditional sense.  As an initial matter, attorney's fees are not part of the damages that relate to the underlying merits of a suit; rather, they are a cost of bringing such a suit.  As the United States Supreme Court has emphasized, attorney's fees "are not part of the compensation for the plaintiff's injury but traditionally have been regarded as an element of costs awarded to the prevailing party." *Osterneck*, 489 U.S. at 175.  And here, the attorney's fees at issue are a cost of litigation that the Non-Dispute Subclasses must bear in recovering their damages from the United States.  *Haggart*, 809 F.3d at 1352 (holding that in common fund cases "a litigant or a lawyer . . . is entitled to reasonable attorney fees from the fund as a whole" (internal quotations and modifications omitted) (citing *Boeing*, 444 U.S. at 478)).

This situation has little in common with one in which a court rationalizes ordering prejudgment interest at the prime rate to avoid rewarding a defendant for its unlawful actions and to compensate the plaintiff for the delayed recovery of damages.  Here, Class Counsel was entitled to reasonable attorney's fees because of its success in representing the Non-Dispute Subclasses in litigation, and Class Counsel did not commit any wrongdoing by obtaining the fee award funds after the initial judgments.  There was simply an adjustment to the overall fee award following an appeal.[4]  Thus, the Court declines Objectors' invitation to award interest at the prime rate.

---

[4] It is also worth noting that because the Federal Circuit only vacated the initial award and remanded to this Court with instructions to reassess Class Counsel's request, it was not a given that an adjustment would occur, nor could the amount of any modification be certain before the

**D.    Awarding Prejudgment Interest at the Statutory Postjudgment Interest Rate, as Class Counsel Suggests, Is Also Not Appropriate.**

Class Counsel urges the Court to employ the much lower postjudgment interest rate provided for in 28 U.S.C. § 1961(a).  *See* ECF No. 244 at 8.  Like Objectors' proposal of the prime rate, this approach is also unsuitable.  The statute defines the postjudgment interest rate as the "1-year constant maturity Treasury yield" from the week preceding the date of the judgment, compounded annually.  28 U.S.C. § 1961(a).  Here, that rate was a mere 0.08 percent, based on the initial judgment date of September 16, 2021.  *See* ECF No. 244 at 11.  Class Counsel argues that this rate is proper because it was used in a similar common fund case, and although the statute does not specifically cover this case, it should still guide the Court's analysis because it is "the most equitable approach."  *Id.*  This argument is easily dispatched.

First, as Objectors correctly observe, and as Class Counsel admits, the statute itself does not apply to or affect judgments of the Court of Federal Claims.  ECF No. 247 at 13; *see* 28 U.S.C. § 1961(c)(4) ("This section shall not be construed to affect the interest on any judgment of any court not specified in this section."); *see also* ECF No. 244 at 9 ("To be clear, this Court cannot grant postjudgment interest under 28 U.S.C. § 1961.").  Second, the common fund case to which Class Counsel analogizes these cases, *In re Optical Disk Drive Products Antitrust Litigation*, No. 21-16291, 2022 WL 1955672 (9th Cir. June 6, 2022), did not actually use the § 1961 postjudgment interest rate.  Finally, there is thin support, if any, for the claim that a fixed 0.08-percent interest rate is "the most equitable" given how low it is relative to other prevailing interest rates during the interim period.  The Court expands on this analysis below.

---

Court's judgments on remand.  It is therefore difficult to accept Objectors' view that Class Counsel held onto funds during the appeal and remand that clearly belonged to the Subclasses all along.

To address the first point, § 1961 largely applies to money judgments recovered in civil cases in district courts. 28 U.S.C. § 1961(a). Section 1961(c)(3) allows for the payment of interest "on judgments of the United States Court of Federal Claims only as provided in . . . any other provision of law." In a prior decision, the Court pointed out that "plaintiff has not, pursuant to 28 U.S.C. § 1961(c)(3), identified any statute allowing for the payment of interest on judgments of the Court of Federal Claims." *Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757, 779 (2017). Similarly, here, Class Counsel has not identified any provision of law which would trigger this Court's obligation to award interest under § 1961.

More fundamentally, the statute does not apply because it governs postjudgment interest rather than prejudgment interest. *Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 274 (7th Cir. 1993) (citing *Gorenstein*, 874 F.2d at 436–37). Indeed, the fact that Congress has statutorily set a postjudgment interest rate, but not a prejudgment interest rate, recognizes that the Court has discretion in awarding prejudgment interest, which the case law confirms. *See City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 194 (1995) (suggesting that the lack of a prejudgment interest statute "indicates that the question is governed by traditional judge-made principles"); *see also Gorenstein*, 874 F.2d at 436–37 ("[C]ourts are bound by that rate so far as postjudgment interest is concerned. But prejudgment interest is governed by federal common law, and the courts are free to adopt a more discriminating approach."). Since there is no statutory interest rate to apply in these cases, the Court must turn to its discretionary authority to determine the appropriate interest rate.

Second, Class Counsel's reliance on *Optical Disk Drive* to support its request that this Court apply the § 1961 statutory rate is misplaced. In *Optical Disk Drive*, like here, the court reduced an attorney's fee award on remand from the Ninth Circuit, and counsel repaid to the class

the difference between the initial award and the post-vacatur award.  *See* 2022 WL 1955672, at *1.

The court then considered how much prejudgment interest was due to the class.  *Id.* at 3.  Class

Counsel claims that because the Ninth Circuit cited 28 U.S.C. § 1961 when discussing which

interest rate to apply, that statute should govern here.  *See* ECF No. 244 at 8.  However, although

the Ninth Circuit did *cite* § 1961, it did not actually order the trial court to *apply* the statute's

postjudgment interest rate.  Instead, on remand, the trial court applied the interest rate agreed upon

in the parties' settlement agreement, which was the rate earned by the escrow account into which

class counsel refunded any fee award funds previously paid to them under the agreement's quick-

pay provision.  *See In Re: Optical Disk Drive Products Antitrust Litig.*, No. 10-md-02143, ECF

No. 3100 (N.D. Cal. Aug. 8, 2022).  The Ninth Circuit only cited § 1961 to refute the objectors'

contention that counsel owed interest on the entire fee award rather than on the modified post-

vacatur award.  *See Optical Disk Drive*, 2022 WL 1955672, at *3.  Thus, *Optical Disk Drive* does

little to persuade the Court to adopt the statutory postjudgment interest rate.

Third, the Court is unpersuaded by Class Counsel's alternative argument that the statutory

rate "represents the most equitable approach, as the postjudgment interest rate reflects Congress'

determination of the opportunity cost of money, and there is no reason to override that

determination here."  ECF No. 244 at 5.  The problem with this argument is that "Congress'

determination of the opportunity cost of money" is context specific, and that context is specifically

cabined by the statute's language.  Class Counsel's argument seems to suggest that "Congress's

determination of the opportunity cost of money" is a universal rule that applies to all cases,

including cases involving prejudgment interest.  But as the case law demonstrates, courts have

discretion to apply different prejudgment interest rates because the opportunity cost of money and

other relevant factors differ depending on the facts at hand and the period in question.  While the

§ 1961 statutory rate reflects a congressional determination for the cases that fall under that statute, nothing in the statute suggests it should apply to a case such as this one. In fact, as discussed above, the plain language suggests the opposite.

To artificially freeze in time the interest rate—which here, would be 0.08 percent—does not account for the changing economic conditions (and thus changing interest rates) over the interim period. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 838–39 (1990) (explaining that under 28 U.S.C. § 1961 "the interest rate for any particular judgment is to be determined as of the date of the judgment, and that is the single rate applicable for the duration of the interest accrual period"). Since the prejudgment interest rate applied in these cases should reflect what Class Counsel unjustly gained by having the benefit of the fee award funds for nearly three years, the fluctuating fiscal conditions over the period in question must be taken into account. *See* Anthony E. Rothschild, Comment, *Prejudgment Interest: Survey and Suggestion*, 77 Nw. U. L. Rev. 192, 222 (1982) ("The rate of prejudgment interest should be a flexible one which is responsive to changing economic conditions."). The statutory postjudgment interest rate does not account for those changes.

Indeed, it is difficult to characterize an interest rate of 0.08 percent as "equitable" when, during the interim period, most interest rates (including the U.S. Treasury Bill rate for most of 2022, 2023, and 2024) were many orders of magnitude higher. The Court may take judicial notice of the general investment climate in determining an appropriate prejudgment interest rate. *Andrew Corp. v. Gabriel Elecs., Inc.*, 785 F. Supp. 1041, 1055 n.14 (D. Me. 1992); *see also Boeing*, 86 Fed. Cl. at 323–24 (describing the court's consideration of "the extraordinarily positive investment climate that prevailed during the years in question—from 1994 to 2003"). While without an accounting the Court cannot ascertain with certainty how much Class Counsel benefited from the

use of the extra $92.4 million during the interim period, it would be very surprising if the return was even close to as low as 0.08 percent. Thus, adopting the statutory postjudgment interest rate would be inconsistent with the equitable principles this Court is charged with employing. *See In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 240 (D.D.C. 2005) (noting that the "fundamental criterion guiding the exercise of discretion to award prejudgment interest is whether [the] plaintiff will be fully compensated without it"). Given that the Court's focus here is on making an equitable adjustment to correct the unjust enrichment of Class Counsel, the Court finds the 0.08-percent statutory rate to be too low.

E.    **The Interest Rate That the Non-Dispute Subclasses Would Have Received from An Interest-Bearing Common Fund Escrow Account, as Applied to the Difference in Fee Awards, Is Reasonable and Justified.**

Class Counsel alternatively argues that the Court should apply the interest rate earned in the Claims Administrator's typical common fund escrow account during the interim period, which is the same approach adopted in *In re Lumber Liquidators Chinese-Manufactured Flooring Durability Marketing, Sales Products & Products Liability Litigation*, No. 15-md-2627, 2020 WL 5757504 (E.D. Va. Sept. 4, 2020), *aff'd*, 27 F.4th 291 (4th Cir. 2022).[5] *See* ECF No. 244 at 12. The Court finds Class Counsel's second proposed approach to be the most appropriate of the options presented.

First, Class Counsel's analogy to *Lumber Liquidators* is instructive. In *Lumber Liquidators*, similar to here, the trial court's fee award was vacated on appeal. *See* 2020 WL 5757504, at *1. To calculate prejudgment interest on the modified award, the court directed class counsel "to return to the Escrow Account the interest that would have accrued" in the account on the initial attorney's fee award. *Id.* at *13. This was equivalent to the amount that the class would

---

[5] As noted above, the same approach was also used in *Optical Disk Drive* to award interest to the class.

have obtained had the fee award funds remained in the common fund escrow account after the initial award. *See* ECF No. 244 at 12–13.

Importantly, in *Lumber Liquidators*, attorney's fees were agreed to as part of a settlement agreement that included a quick-pay provision and a procedure for repaying fee award funds and calculating interest. *See* ECF No. 247 at 11. As the Court previously acknowledged, the quick-pay settlement provision in *Lumber Liquidators* distinguishes it from the present case. *See* ECF No. 210 at 10 (discussing both *Lumber Liquidators* and *Optical Disk Drive* and recognizing "that no such quick-pay provision is applicable here, as these class actions concluded in judgments for the Class, not settlements"). Though the Court acknowledges that *Lumber Liquidators* is not directly on point here because of the quick-pay provision, it is the closest case to these cases that either party has provided. That the court in *Lumber Liquidators* approved the use of the common fund escrow account rate to calculate prejudgment interest supports the contention that such a rate is appropriate in this similar context, where there was likewise no wrongdoing or injury caused by Class Counsel.

Class Counsel represents that the common fund escrow account utilized in these cases was not interest-bearing, but the interest rate that would have applied to the Claims Administrator's typical common fund escrow account is the rate of the Fidelity Treasury Only Money Market Fund, which essentially tracks the U.S. Treasury Bill rate. *See* ECF No. 244 at 6 ("[H]ad the claims administrator put the money into its typical interest-bearing account, the interest rate would have been based on a U.S. Treasury money market fund pegged to short-term Treasuries."). During the interim period, that rate ranged on average from .51 percent to 4.5 percent as the market fluctuated. *Id.* at 15 (chart).

The common fund escrow account rate (*i.e.*, the U.S. Treasury Bill rate) best reflects the equitable principles underlying restitution and unjust enrichment, as well as the circumstances of these cases.  The rate most accurately represents the amount by which Class Counsel was unjustly enriched by the use of fee award funds because it reflects the rate that it could have earned on the funds during the time between the initial and remand judgments.  *See* Restatement § 53 cmt. e ("Unless a different rate of prejudgment interest is specified by statute, the rationale of preventing unjust enrichment suggests that the court should apply the rate that most closely reflects the value to the defendant of the interim use of the claimant's funds.").  Moreover, this rate reflects exactly what Objectors requested in their motion for sequestration of the fee award funds during the remand.  *See* Objectors' Mot. for Acct., Safekeeping of Disputed Funds, & Disc. at 1, ECF No. 194 (requesting "an order directing the return of the funds to an interest-bearing client trust account for safekeeping pending final resolution of [Class Counsel's] fee award").

The common fund escrow account rate is also equitable because it reflects the best approach to risk in this scenario.  The U.S. Treasury Bill rate (to which the common fund escrow account's rate is tied) reflects a more conservative approach to risk than the prime rate.  While the "prime rate . . . not only consists of the financial community's guess as to future inflation rates, a profit component and an allowance for the risk of default," "the 52-week Treasury Bill rate . . . is said to represent the financial community's guess as to the appropriate return on a risk-free loan." *Forman*, 84 F.3d at 450.  The key difference, then, between the more conservative Treasury Bill rate and the prime rate is that the Treasury Bill rate does not include a profit or risk component. *Est. of Doe*, 943 F. Supp. 2d at 184.  As the Court previously held, Objectors provided no reason to question Class Counsel's unequivocal commitment to repay any difference in the fee awards. *See* ECF No. 210 at 13.  And consistent with that commitment, it promptly returned the fee award

funds pursuant to the Court's order.  *See* ECF No. 243.  While it is possible that Class Counsel (or more specifically, the firm's partners) may have invested the fee award funds and made a return that was greater than the Treasury Bill rate, it is also possible that those investments were riskier, and thus Class Counsel could have lost money.  *See, e.g.*, *Holmes*, 213 F.3d at 132–33 (rejecting a challenge to the district court's use of the Treasury Bill rate (albeit applied as a single rate for the interest accrual period per § 1961) and explaining that "any return the Plan realized in excess of the risk-free yield on Treasury Bills . . . would be the result of the Plan's investment expertise and labor, as well as additional risk that the Plan, not Appellants, bore").  Thus, the Court finds that the Treasury Bill rate reflects the best basis upon which to determine the interest that could have been gained on the difference in fee awards during the interim period.  Applying this rate remedies Class Counsel's unjust enrichment and compensates—but does not overcompensate—the Non-Dispute Subclasses for Class Counsel's use of the fee award funds during the interim period.

Objectors argue, also relying on *Lumber Liquidators*, that if the Court does apply the common fund escrow account rate, the Non-Dispute Subclasses are entitled to interest on the *entire* initial award amount of approximately $185 million.  *See* ECF No. 247 at 6–7, 11.  Though Objectors do little to explain their reasoning, this contention seems to rest on an erroneous notion that once the Federal Circuit vacated the initial fee award, it was as if Class Counsel had never been entitled to possession of the funds, and that therefore interest should be owed on the entire initial award amount.  The basis for this argument is the same *Lumber Liquidators* decision on which Class Counsel relies, where the court awarded prejudgment interest at the U.S. Treasury Bill rate applied to the entire fee award.  *See id.* at 12; *see also Lumber Liquidators*, 2020 WL 5757504, at *1. But that aspect of the *Lumber Liquidators* decision was not based on any equitable or other general principle of restitution or prejudgment interest.  Rather, the court was required

under Virginia law to resolve an ambiguity in the settlement agreement about the payment of interest in favor of the class. *See Lumber Liquidators*, 2020 WL 5757504, at *12. In contrast, here, there was no settlement agreement or quick-pay provision that specified how interest would be calculated, either based on the whole or modified award amount. In fact, absent a contractual provision saying so, it makes little sense to conclude that Class Counsel was unjustly enriched by earning interest on the portion of the funds it was ultimately awarded on remand. That interest was its to earn.

Further, the idea that Class Counsel should pay back interest on the entire initial fee award was roundly rejected by *Optical Disk Drive*, where no question of ambiguous contractual language was raised. As the Ninth Circuit explained, and as logic confirms, "the class was entitled to interest only on the portion of the funds that ultimately belongs to the class." *Optical Disk Drive*, 2022 WL 1955672, at *3 (citing 28 U.S.C. § 1961 and *Perkins v. Standard Oil Co. of Cal.*, 487 F.2d 672 (9th Cir. 1973)). The corollary to that statement here is that Class Counsel is entitled to keep any gains on the portion of the initial fee award that ultimately belonged to Class Counsel. Awarding interest on the entire initial award—which would result in approximately the same amount of interest as the prime rate—would be contrary to equitable principles.

## F.    Annual Compounding Is Appropriate.

The final issue is compounding. The first step in this determination is whether to award simple or compound interest. If the Court awards compound interest, the second step is to determine the frequency at which it should be compounded.

"[I]t is well-settled that a trial court has discretion on whether to award simple or compound interest." *Pettro*, 47 Fed. Cl. at 154 (citing *Rite–Hite*, 56 F.3d at 1555). "Although the rate of prejudgment interest and whether it should be compounded or uncompounded are matters left

largely to the discretion of the court, the purpose of prejudgment interest should guide the court in exercising that discretion." *Boeing*, 86 Fed. Cl. at 322.

"[C]ompound prejudgment interest is the norm in federal litigation." *In re Amoco Cadiz*, 954 F.2d at 1331–32 (citing *West Virginia*, 479 U.S. at 310). Compound interest—which is essentially "interest on interest," *Gorenstein*, 874 F.2d at 437—is appropriate because "no prudent, commercially reasonable investor would invest at simple interest." *Brunswick Corp. v. United States*, 36 Fed. Cl. 204, 219 (1996), *aff'd*, 152 F.3d 946 (Fed. Cir. 1998) (unpublished table decision); *see also Dynamics Corp. of Am. v. United States*, 766 F.2d 518, 520 (Fed. Cir. 1985) (reversing and remanding award of simple interest where rationale was that simple interest was "traditional" even though there was no clear precedent that delay damages could not include compound interest); *Cayuga Indian Nation*, 165 F. Supp. 2d at 359 (explaining that economists typically agree that compound interest, as opposed to simple interest, is appropriate in calculating prejudgment interest); *Am. Nat'l Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 937–38 n.11 (7th Cir. 2003) (describing compound interest as the "norm," though not a hard and fast "rule," and explaining that compound interest should apply unless there are "countervailing considerations," such as "if the prevailing party has caused unreasonable delay in the proceedings and thus artificially delayed the rendition of judgment"). The Court thus finds it appropriate to compound the prejudgment interest in these cases.

The next question is the frequency of compounding. Class Counsel does not directly address the compounding issue but assumes annual compounding in its summary table. *See* ECF No. 244 at 15 (chart). Objectors request that the prejudgment interest on the returned fee award

be compounded at least quarterly, rather than on a simple annual basis.[6]  *See* ECF No. 234 at 17.

For this argument, Objectors rely primarily on a single patent case, in which the court indicated

that "quarterly compounding is the most common convention employed in these cases."  *Boeing*,

86 Fed. Cl. at 323.  By "these cases," the court presumably was referring to patent infringement

cases, several of which it cited in the preceding sentences.  *Id.*  In the patent context, "courts

consider how often the licensee would have made payments in accordance with the hypothetical

negotiation" to determine the frequency of compounding (*i.e.*, annually, semiannually, quarterly).

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, No. 10-cv-187, 2016 WL 6246590,

at *3 (D. Neb. May 11, 2016).  Here, unlike in a patent case, there is no hypothetical license

negotiation to consider because there is no patent at issue.  Thus, the cases that Objectors cite

suggesting quarterly or semi-annual compounding are inapplicable.

The Claims Administrator's typical common fund escrow account, which the Court has

used to determine the appropriate interest rate in these cases, compounds interest annually.  *See*

ECF No. 244-3 ¶ 4.  Accordingly, the Court finds that annual compounding is appropriate.

\*       \*       \*

After giving careful consideration to the evidence presented and the parties' arguments, the

Court, in its discretion, finds it just and equitable to award prejudgment interest in the total amount

of $10,002,502.20 based on the common fund escrow account rate over the interim period,

compounded annually.  The calculation of prejudgment interest is summarized in the table below.

---

[6] However, in Objectors' table calculating interest over the interim period, they too "assume annual compounding," suggesting that they accept that annual compounding could be appropriate.  *See* ECF No. 234 at 18 (chart).

| | Year | Rate | Modified Rate (partial years) | Initial Amount | Amount with Interest Applied | Annual Interest |
|---|---|---|---|---|---|---|
| **Treasury Bill Average Anniversary Compounding** | Year 1: 9/17/21–9/17/22 | 0.51% | | $92,424,335.84 | $92,895,699.95 | $471,364.11 |
| | Year 2: 9/17/22–9/17/23 | 4.24% | | $92,895,699.95 | $96,834,477.63 | $3,938,777.68 |
| | Year 3: 9/17/23–9/17/24 | 5.38% | | $96,834,477.63 | $102,044,172.53 | $5,209,694.90 |
| | Partial year: 9/17/24–10/18/24 | 4.50% | 0.375% | $102,044,172.53 | $102,426,838.00 | $328,665.47 |
| | **TOTAL** | | | | | **$10,002,502.20** |

## IV.    CONCLUSION

Based on the foregoing, the Court **GRANTS** Objectors' Motion to Amend Judgment to Include Prejudgment Interest (*Health Republic* ECF No. 234; *Common Ground* ECF No. 234), subject to the application of a different interest rate than requested. The total prejudgment interest awarded to the Non-Dispute Subclasses on the modified attorney's fee award is $10,002,502.20. Pursuant to RCFC 54(b), there being no just reason for delay, the Clerk is directed to enter judgment for the Non-Dispute Subclass in *Health Republic*, No. 16-259 C, in the amount of $5,150,288.38 and to enter judgment for the Non-Dispute Subclass in *Common Ground*, No. 17-877, in the amount of $4,852,213.82.

The Court **ORDERS** Class Counsel to transmit, by no later than June 17, 2025, $10,002,502.20 to the Claims Administrator for distribution to Non-Dispute Subclass members pro rata and utilizing the same procedures as it did with the original risk corridors-related damages distributions. Class Counsel will also instruct the Claims Administrator to so distribute the funds to the Subclass members by no later than July 1, 2025, and to inform Class Counsel by no later than June 27, 2025, if any issues have arisen that the Claims Administrator believes will prevent

24

distribution to any Subclass member(s) by July 1, 2025.  If any such issues arise, Class Counsel will provide a status report to the Court on or before July 1, 2025, so the Court may determine and address next steps, if any.  To the extent any issues arise with respect to distribution to any particular Subclass member(s), those issues will not prevent or delay distribution to the Subclass members to whom distribution may be accomplished without incident.  Once all distributions are complete, Class Counsel shall inform the Court.

       **SO ORDERED**.


Dated: June 3, 2025                           */s/ Kathryn C. Davis*
                                               KATHRYN C. DAVIS
                                               Judge